**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

GMP:BCR
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 22, 2018

By Hand and ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joaquin Archivaldo Guzman Loera
Criminal Docket No. 09-466 (S-4) (BMC)

Dear Judge Cogan:

The government respectfully submits this letter in response to the requests raised in the letters to the Court from Newsday (Dkt. No. 339) (the "Newsday Letter"), the New York Times (Dkt. Nos. 345, 371) (the "New York Times Letters") and Vice Media (Dkt. No. 368) (the "Vice Media Letter).

Among other things, the Newsday Letter requests an unredacted copy of the government's Second Motion In Limine (Dkt. No. 327) and objects to the government's request that the Court limit the dissemination of photographs and sketches of cooperating witnesses. See Dkt. No. 339 at 1-2. For the reasons detailed herein, the Court has more than sufficient basis to conclude that the government permissibly filed its second motion in limine on the public docket with redactions, and that it may limit the dissemination of photographs and sketches of cooperating witnesses in order to protect their safety.

Separately, the Newsday Letter, the New York Times Letters, and the Vice Media Letter concern press access to voir dire in this case. The government has attempted to reach agreement with the defendant as to a joint position on the issues of press access to voir dire raised in the letters before the Court. The defendant has not yet indicated whether he agrees with the position proposed by the government, which is set forth herein. Specifically, the government proposes that press presence at voir dire be limited to at most a single pool reporter permitted to observe voir dire through closed circuit television or other video feed. This proposal accords with governing law in the Second Circuit by appropriately balancing the right of access accorded to the press and the public under the First Amendment with the

defendant's right to a fair trial under the Sixth Amendment and the need to protect prospective jurors from harassment and intimidation in an effort to ensure their candor at jury selection.

I. The Government's Second Motion *in Limine* Was Properly Redacted and Partially Sealed

The Newsday Letter asks the Court to provide it with access to an unredacted copy of the government's second set of motions in limine. See Newsday Letter at 1. In effect, this is a request to unseal the unredacted version of the motion and a challenge to the propriety of the government's redactions and partial sealing. Newsday's request should be denied, and the government's request for partial sealing—in its second motion in limine, see Dkt. No. 326 at 95-96—should be granted.

As the government explained in the second motions in limine, partial sealing of the government's brief is warranted to protect the safety of potential witnesses and their families. See Dkt. No. 326 at 95-96. As the Second Circuit has explained, the need to protect sources, witnesses, and law enforcement personnel can justify sealing court documents and declining to permit public access to their contents. See United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995). Both in the motion in limine itself and in a number of ex parte filings before the Court, the government has extensively proffered the factual reasons why its cooperating witnesses face risks of harassment and violent retaliation should their identities be publicly revealed.[1]

In any event, most of the redactions in the government's second motion in limine were factual proffers of anticipated cooperating witness testimony. Once that testimony is presented at trial, of course, it will be publicly revealed to members of the press and any other persons present in the courtroom. The government's partial sealing request therefore amounts only to a temporary delay in making the proffered information available to the press and the public. This temporary delay is critical to ensure, before the cooperating witnesses' identities are publicly revealed, that the government: (1) has sufficient time in advance of trial to ensure that cooperating witnesses and their families are adequately protected; and (2) can protect its cooperating witnesses' safety as long as possible.

[1] In its previous ex parte submissions, the government has explained its concern for the security of witnesses and the risks of disclosure of sensitive information in this case. See, e.g., Dkt. No. 31 at 3-4; Dkt. No. 45 at 2-3; Dkt. No. 78 at 2-3. In part because of the concerns raised in the government's prior ex parte submissions, the Court has entered a protective order, see Dkt. No. 57; upheld restrictions on the defendant's ability to receive visitors and contact third parties, see Dkt. No. 71; and ordered the defense not to reveal the names of potential witnesses in public filings, see Dkt. Nos. 116, 129. The Court also granted the government's motions to defer disclosure of Rule 16 materials that would identify the government's witnesses. See Dkt. Nos. 168, 176, 203, 207.

II. The Government's Request to Prohibit Dissemination of Photographs and Sketches of Cooperating Witnesses is Proper

The Newsday Letter also challenges the government's request that the Court prohibit dissemination of photographs and sketches of cooperating witnesses. See Newsday Letter at 2. For the reasons set forth in the government's second set of motions in limine, there is a valid basis to impose the narrowly-tailored limits that the government requests in order to protect the identities of the government's cooperating witnesses. See Dkt. No. 326 at 73-79.

III. *Voir Dire* Should Be Limited to at Most a Single Pool Reporter With Additional Necessary Limitations

The New York Times Letters request that the New York Times be permitted to attend and observe voir dire during jury selection in the defendant's upcoming trial. See Dkt. No. 345 at 4, Dkt. No. 371 at 1. The Newsday Letter similarly seeks to have the Court "clarify" its procedures for permitting the press access to the jury selection process. See Dkt. No. 339 at 2. The Vice Media Letter joins in the requests of the New York Times and Newsday to provide for press presence at voir dire. See Dkt. No. 368 at 1. In the most specific proposal made by the New York Times, individual voir dire would be conducted in open court, at counsel table, with the press seated in the jury box. See Dkt. No. 371 at 1. A pool reporter would be permitted to attend discussions of private matters, with transcripts of private sidebars released the same day and jury questionnaires made public at the beginning of voir dire. See Dkt. No. 271 at 1-2. The particular security concerns and the risk of harassment stemming from substantial press interest in this case merit more restrictive measures, which are permissible under Second Circuit precedent without infringing on the First Amendment rights of the press and public or the Sixth Amendment right of the defendant to a fair trial.

A. Legal Standards

The Second Circuit has held that there is a qualified "'right to attend criminal trials . . . implicit in the guarantees of the First Amendment.'" ABC, Inc. v. Stewart, 360 F. 3d 90, 98 (2d Cir. 2004) (quoting Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980)). That right of access can extend to the examination of prospective jurors as part of the voir dire process. Id. (citing Press Enterprise Co. v. Superior Court, 464 U.S. 501, 504-10 (1984) ("Press Enterprise I")).

But the right of access to the proceedings in criminal trials is not absolute, and "must, in certain circumstances, give way . . . to other rights or interests, such as the defendant's Sixth Amendment right to a fair trial or the privacy interests of prospective jurors." See id. (citing Press Enterprise I at 510-11) (internal citation and quotation marks omitted). In the particular context of voir dire, the Supreme Court in Press Enterprise Co. v. Superior Court, 478 U.S. 1 (1986) ("Press Enterprise II") created a two-part balancing test to determine whether closure, such as precluding the press from voir dire, is appropriate: "[T]he [proceeding] shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by

publicity that closure would prevent, and second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." Id. at 14.

In applying these standards, the Second Circuit has emphasized that "different circumstances call for different cures," and that there are "no prescriptions to be applied formulaically" when a district court decides whether to close voir dire to the press. Stewart, 360 F.3d at 104. In one case, United States v. King, 140 F.3d 76, 80 (2d Cir. 1998), the Second Circuit affirmed a limited closure of voir dire proceedings by conducting individual follow-up questions during voir dire outside of the presence of the public and the press, and denying access to the transcripts of in camera individual voir dire until the jury was empaneled. See id. at 80. In implementing those limitations, the district court had found that they were necessary in order to ensure that the prospective jurors would be fully candid concerning the defendant, boxing promoter Don King, in light of the considerable press attention that the case had received, as well as the strong likelihood that voir dire would explore the "delicate area of possible racial bias." United States v. King, 911 F. Supp. 113, 117 (S.D.N.Y. 1995). See also United States v. King, No. 94-CR-455, 1998 WL 50221 at *2 (S.D.N.Y. Feb. 5, 1998) ("[C]andor on the part of prospective jurors is of particularly great importance in this case and [], absent a degree of juror privacy, such candor is likely to be restricted. Prospective jurors, if made aware that their views will be publicly disseminated in the next day's newspapers or radio or television broadcasts, will be under pressure not to express unpopular opinions relevant to their choice as trial jurors."). Thus, the Second Circuit concluded, "[i]n light of the widespread and largely negative publicity concerning King and the racial tensions heightened by some aspects of that publicity, [the district court was] entitled to conduct individual juror questioning in the absence of the press." 140 F.3d at 82.

In Stewart, by contrast, the Second Circuit noted that there had been widespread media coverage of the case prior to trial, but that in contrast to the subject of racial bias in King, there was no "controversial issue to be probed in voir dire that might have impaired the candor of prospective jurors." 360 F.3d at 101. The Second Circuit also noted that concerns about juror candor could have been mitigated by making the members of the venire anonymous, concealing their identities from the press and public. See id. at 104. The court further opined that even if members of a press pool were permitted to attend some of the voir dire proceedings, the district court could ensure protection of juror privacy by "advis[ing] the array of prospective jurors that those individuals 'believing public questioning [would] prove damaging because of embarrassment' could request to answer those questions in camera." Id. at 105 (quoting Press-Enterprise I, 464 U.S. at 512).

Of particular relevance here because the case likewise related to large criminal organizations, the Second Circuit contrasted its position rejecting closed voir dire on the particular facts of the Stewart case to the Fourth Circuit's decision in In re Greensboro News Co., 727 F.2d 1320 (4th Cir. 1984). In that case, the Fourth Circuit justified its affirmance of closed voir dire by explaining:

> This case involves various organizations that occasionally evoke strong opinions in people. It may be that some people believe that these

> organizations are prone to violence. If some potential jurors believed these propositions they might be reluctant to express any strong opinions about these organizations, knowing that their responses would be reported by the media.

Id. at 1325.

Recently, a district court limited press access to the individual portions of voir dire—i.e. sidebar questioning, in the particular manner that jury selection was conducted for that case—to a single press pool reporter, with the court also retaining the ability to excuse the reporter if a juror requested or if the court otherwise determined that the presence of the reporter would inhibit the prospective juror's candor. See United States v. Shkreli, 260 F. Supp. 3d 257, 259 (E.D.N.Y. 2017) (KAM). As Judge Matsumoto explained, "voir dire can be a uniquely uncomfortable experience" for the venire, and that in high-profile cases, in particular, "prospective jurors may be subject to having their answers reported and disseminated that same day." 260 F. Supp. 3d at 260. The court also noted that the defendant in that case had "attracted a tremendous amount of negative publicity and notoriety," that "certain of the issues to be probed at voir dire relate to beliefs and actions . . . concerning polarizing topics, such as race, gender, politics, and class," and that "disclosure of juror names would increase the risk that jurors would not be candid." Id. at 261-62.

Thus, the Shkreli court concluded that a single pool reporter would be permitted at sidebar for individual questioning of the venire persons.[2] See id. at 263. The court noted, however, that it would ensure that jurors would be made aware that they could "request[] that the reporter be excused from sidebar" and that the court could also excuse the reporter on its own initiative if it determined that a juror did not "appear fully comfortable answering questions fully and honestly in the presence of a reporter." Id. The court also restricted the parties' use of the jurors' names in order to preserve the jury's anonymity and protect the jurors from harassment. See id. at 264.

B. Application

Recognizing the risk of fear of harassment or intimidation on the part of the jury, the Court has already ruled that the jury empaneled in this matter will be anonymous and partially sequestered. See Dkt. No. 187. As the Court explained in that order, the government has "presented strong and credible reasons to believe that the jury needs protection." Id. at 2. The Court also recognized that this "case has generated significant media coverage, which is likely to only increase once the trial begins." Id. at 3.

[2] The Shkreli court did not make use of jury questionnaires, so the court employed both general, open questioning as well as individualized sidebar questioning.

Indeed, there is little doubt that the defendant's case is continuing to generate significant media interest, from local, national, and international press.[3] As in Shkreli, a "tremendous amount" of publicity and notoriety can counsel in favor of limitations on press observation of voir dire. See Shkreli, 260 F. Supp. 3d at 261. Additionally, as in Shkreli and King, "certain of the issues to be probed at voir dire relate to . . . polarizing topics, such as race, gender, politics, and class." Id. at 262. Specifically, the venire in this case will be asked various controversial and polarizing questions such as the prospective jurors' views on drug policy, opinions about international drug cartels and the prosecution of foreign nationals, and personal views about persons of Mexican descent such as the defendant. The fact that these "controversial [and] private issues" are in play additionally risks that "even the most dutiful venireperson may find it difficult to be entirely forthright about controversial or private issues in the presence of a press reporter." Id. at 262. Conversely, the fact that such "socially polarizing issues" were not present in Stewart was a key factor leading that court to conclude that voir dire did not need to be limited to exclude the press. See Stewart, 360 F.3d at 102.

On the other hand, unlike in Shkreli, the names and specific identities of the potential jurors in this case will not be released because the Court has already ruled that the jury will be anonymous. See Dkt. No. 187 at 3; see also Shkreli, 260 F. Supp. 3d at 262 ("[D]isclosure of juror names would increase the risk that jurors would not be candid . . . ."); Stewart, 360 F.3d at 104 (holding that, in some circumstances, "concealing the identities of the prospective jurors" can "ensure juror candor"). Nonetheless, personal information revealed in venirepersons' questionnaire answers or during individual questioning still runs a risk of revealing the prospective jurors' identities. As the Shkreli court recognized, the reach of social media and internet searching poses particular risks of harassment to jurors. See Shkreli, 260 F. Supp. 3d at 263.[4]

---

[3] See, e.g., Alan Feuer, Who Will Testify Against El Chapo at Trial?, New York Times (Oct. 9, 2018), available at: https://www.nytimes.com/2018/10/09/nyregion/el-chapo-guzman-trial-witnesses.html (last accessed Oct. 19, 2018); Emily Saul, El Chapo's Wife a No-Show at His Pretrial Court Appearance, New York Post (Oct. 10, 2018), available at: https://nypost.com/2018/10/10/el-chapos-wife-a-no-show-at-his-pretrial-court-appearance/ (last accessed Oct. 19, 2018); Alan Feuer, 7 Tons of Cocaine in Jalapeno Cans: The Evidence Against El Chapo, New York Times (Apr. 10, 2018), available at: https://www.nytimes.com/2018/04/10/nyregion/prosecution-evidence-against-el-chapo.html (last accessed Oct. 19, 2018); Keegan Hamilton, El Chapo's Lawyers Say There's Evidence He Was Just a Cartel Middle Manager, Vice News (Jun. 26, 2018), available at: https://news.vice.com/en_us/article/bj3eaq/el-chapos-lawyers-say-theres-evidence-he-was-just-a-cartel-middle-manager (last accessed Oct. 19, 2018).

[4] Those risks can be present even if the jurors' names themselves are kept anonymous, as personal identifying information that seems innocuous in isolation—such as a juror's general neighborhood or occupation—may reveal a juror's identity or at least give rise to speculation as to the juror's identity when combined. Thus, the Court should exercise caution in eliciting personal information from the venire and should permit redactions of personal information in transcripts of jury selection. See Shkreli, 360 F. Supp. 3d at 264 (permitting redaction of information that

Although the anonymity of the venire in this case will help, to some degree, to protect the jurors' privacy and safety, the security concerns present here are substantially more serious than those posed in the jury trials of Martin Shkreli and Martha Stewart. As the Court has already explained in its order granting the government's request for an anonymous and partially sequestered jury, "many of the allegations involve murder, assault, kidnapping, or torture of potential witnesses or those suspected of assisting law enforcement," which made the government's security concerns "particularly salient." Dkt. No. 187 at 3.

Certainly, the government and the Court are taking steps to allay those risks, including jury anonymity and partial sequestration. But potential jurors are nonetheless likely to worry that they may be subject to harassment, intimidation, or other reprisals should they be fully candid at jury selection, either with personal identifying information or by revealing their views about this case and its subject matter beyond mere generalities. See, e.g., United States v. Vario, 943 F.2d 236, 240 (2d Cir. 1991) (holding that anonymous jury is warranted where media interest "enhance[s] the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public"). As the Second Circuit has explained, such lack of candor on the part of prospective jurors can risk prejudice to the defendant's Sixth Amendment right to a fair trial. See Stewart, 360 F.3d at 98 ("The constitutional right of access [to criminal proceedings], however, is not absolute, and must, in certain circumstances, give way . . . to other rights or interests, such as the defendant's Sixth Amendment right to a fair trial or the privacy interests of prospective jurors.") (internal citation and quotation marks omitted).

The Court should therefore be reluctant to entertain what the New York Times Letters, Newsday Letter, and Vice Media Letter seek—the attentive presence at voir dire of a large group of national and foreign press, suggesting to the venire that their answers and their identities are under scrutiny and likely to be promptly revealed to allies and associates of the defendant, or others who may be interested in identifying or harassing jurors for their own ends. See Shkreli, 260 F. Supp. 2d at 260 ("There are few circumstances other than jury selection in which a citizen is called into court, placed under oath, and required to candidly and truthfully answer questions about sensitive personal issues or controversial beliefs or biases. . . . In a high-profile case in which there has been ongoing pre-trial media coverage, [] prospective jurors may be subject to having their answers reported and disseminated that same day.").

In this case, the use of jury questionnaires obviates the need for general questions of the entire venire. All of the voir dire, in other words, will be individualized and of the nature of voir dire that is typically conducted at sidebar in the ordinary trial. Because of the extraordinary media interest in the case and the unique risks that might cause prospective jurors to be less than candid if they believe their responses are likely to be broadcast or if there

"appears in a context in which it would be possible to identify the venireperson" even if names are not used).

is a chance that their identities will be revealed, the Court should close voir dire to the public and permit only a single pool reporter to observe individual voir dire, as in Shkreli. See 260 F. Supp. 3d at 263.[5] Should the Court agree with the government that only a single pool reporter should observe voir dire, the government additionally suggests that the Court arrange for the reporter to observe voir dire via video conference or similar closed-circuit television feed to allow prospective jurors to be fully candid with the Court, without the intimidation of the presence of a reporter in the room itself. In addition, the government requests that the Court consult with the United States Marshals Service to ensure that the reporter chosen is a regular member of the Eastern District of New York press pool, or has otherwise been vetted and determined to be a legitimate member of the press corps.[6]

Moreover, as in Shkreli, the Court should exercise its discretion to mute or temporarily disable the video feed—effectively excusing the pool reporter for a short duration—when requested by a prospective juror, or when the Court otherwise determines that the presence of the reporter might be inhibiting the juror's candor. See Shkreli, 260 F. Supp. 3d at 263. Finally, transcripts of voir dire should only be made available following the empanelment of a jury, see King, 140 F.3d at 80 (affirming district court's decision to conduct individual follow-up questioning out of presence of the public and press, and to make transcripts of jury selection available only after jury was empaneled), and should jury selection take more than a day, the members of the entire jury pool should be instructed not to review any press reporting about the case, including the previous days' jury selection.

## IV. Conclusion

For the reasons set forth above, the Court should deny Newsday's request for an unredacted copy of the government's second motions in limine, grant the government's motion to prohibit dissemination of photographs and sketches of cooperating witnesses, and

[5] In Stewart, the Second Circuit noted that pool reporters at voir dire had been employed in other high-profile prosecutions such as those of Imelda Marcos and Sheir Omar Abdel Rahman. See Stewart, 360 F.3d at 94-95.

[6] Given the intense interest in this case from the foreign press, the government is concerned that individuals working on behalf of the defendant's associates may attempt to gain access to voir dire under the guise of being a member of the press. Indeed, at least two of the government's cooperating witnesses have provided information that the defendant's close associates had used fear and intimidation to manipulate members of the press in the defendant's home state of Sinaloa to work on the Cartel's behalf, and another cooperating witness has noted that it was not uncommon for leaders of the Sinaloa Cartel to exert control over members of the press in Mexico City.

permit no more than a single pool reporter to observe voir dire through the use of closed circuit video.

Respectfully submitted,

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
Southern District of Florida

.

cc: Clerk of the Court (BMC) (by ECF)