**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

GMP:AG/PEN
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 3, 2018

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joaquin Archivaldo Guzman Loera
Criminal Docket No. 09-466 (S-4) (BMC)

Dear Judge Cogan:

The government respectfully submits this letter in opposition to the defendant's Motion in Limine to "preclude use of ledgers" to be authenticated by Juan Carlos Ramirez Abadia (the "Ramirez Ledgers") at trial (see Dkt. #481).[1] Moreover, the defendant moves to admit government statements in a motion from another matter as Admissions of a Party Opponent under Fed. R. of Evid. 801(d)(2). For the reasons set forth below, Court should deny the defendant's motions.

---

[1] The defense submitted his motion while Ramirez is on direct examination. The government moved in limine generally to admit drug ledgers in a motion filed April 10, 2018 (Dkt. #213), based upon facts supporting authenticity similar to the facts of the instant matter, albeit while not specifically referencing Ramirez's identity. Moreover, Mr. Balarezo and Mr. Pupura were familiar with the issues related to the admission of the Ramirez Ledgers well in advance of trial, as the admission of these same ledgers was litigated three years ago in the United States v. Beltran-Leyva, 12-CR-184 (D.D.C., Leon. J.), a prosecution in which Mr. Balarezo and Mr. Purpura represented Alfredo Beltran Leyva and Ramirez was noticed as a witness. Mr. Balarezo and Mr. Purpura received actual copies of Mr. Ramirez's ledgers and related reports when they were served with Mr. Ramirez's 3500 for the Beltran-Leyva trial.

I. Ramirez has Personal Knowledge of the Ledgers

The defendant moves to preclude the admission of ledgers marked government exhibits ("GX") 302-A through 302-I, which Ramirez, the witness who is currently testifying at trial, will authenticate as soon as Monday (December 3, 2018). For the reasons set forth below, the Ramirez Ledgers are admissible.

A. Factual Background

Ramirez has testified that he was a leader of the Colombian Norte Valle Cartel ("NVC"). He is further expected to testify that, while head of the NVC, he sent ten cocaine shipments to the Sinaloa Cartel from approximately 2002 through 2005, which Ramirez referred to by the code name "Juanita" ("Juanita shipments"). Ramirez ordered his workers to keep detailed accounting ledgers of his cocaine shipments. Ramirez also ordered his employees to keep detailed accounting ledgers of all of the NVC's expenses. Ramirez personally reviewed the entries made in these ledgers, which are marked as GX 302-A through 302-I, at or near the time the entries were made. Ramirez, in fact, reviewed the ledgers line by line with his employees to check for accuracy, frequently making changes to the entries contained therein. While Ramirez did not personally provide these ledgers to the government, he will testify that GX 302-A through 302-I are the same as the aforementioned ledgers kept by his organization.

Ramirez is also expected to testify that in mid-2004, he fled to Venezuela from Colombia. While in Venezuela, Ramirez remained in charge of the NVC and controlled its day to day operations. His workers, including his top lieutenants, traveled to Venezuela to meet with him frequently, if not daily. Ramirez was also in telephone contact with his workers overseeing the day-to-day functioning of the NVC in Colombia. Ramirez's workers provided the aforementioned ledgers to him, including those for the Juanita shipments, and Ramirez continued to review the ledgers as he had done in the past while in Colombia.

The government further expects Mr. Ramirez to testify that at some point he felt unsafe in Venezuela and relocated to Brazil. [2] While in Brazil, defense counsel correctly quoted from the government's prior filing in the Beltran Leyva case, in which Ramirez was noticed as a witness, which described Ramirez's use of the ledgers in Brazil:

> [Ramirez] will further testify that that from mid-2004 on, he did not personally meet with [his top lieutenant] or other members of

---

[2] Juanita shipments 1 through 6 occurred while Ramirez was in Colombia. Juanita 7 occurred while Ramirez was in Venezuela. Juanita shipments 8, 9 and 10 occurred while Ramirez was in Brazil. Nonetheless, Ramirez's involvement in the preparation and planning of Juanita shipments 7 through 10 remained the same as it had been for Juanita shipments 1 through 6.

> the conspiracy to discuss the information that was entered in the ledgers, nor did he review the ledgers line by line with [his top lieutenant] (as he did before fleeing Colombia).

See Government Motion in Limine to Admit or Allow Evidence, United States v. Alfredo Beltran Leyva, 12-CR-184 (D.D.C., Leon. J.), Dkt. # 68 at 8-9.

However, defense failed to include the following portion of the government's motion:

> However, [Ramirez] will testify that [he] remained familiar with the business practices of his DTO, which he maintained control of through intermediaries, and that the DTO continued to maintain the ledgers in the manner in which they were maintained prior to his departure from Colombia. [Ramirez] will also testify that he would arrange to have certain ledgers sent to him via courier, including those of the Juanita shipments, which [ ] contain detail[ed] information regarding payments and investments pertaining to [Juanita] drug shipments.

See id.

Ramirez is expected to testify in the instant trial that, while he was in Brazil, he was still in charge of his DTO and that he frequently communicated with his top lieutenants about the Juanitas and that he continued to review ledgers related to the Juanita shipments that his workers sent to him. Additionally, Ramirez is expected to testify that he spoke with his top lieutenant about Juanita 8 and 9 after they were seized by the United States Coast Guard in September of 2004. It was after this seizure that Ramirez decided to send his first submarine of cocaine to the Sinaloa Cartel, which he referred to as Juanita 10. Ramirez was intimately aware of the details of this shipment through conversations with his top lieutenants and co-conspirators, as he was with all other drug shipments sent by the NVC, including reviewing the accounting ledgers related to Juanita 10.

B. The Legal Standard

Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." A trial court has "broad discretion to determine whether [evidence] has been properly authenticated." United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999). "Rule 901(a) . . . is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991) (internal quotation marks and citation omitted); see also United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004). "[T]he burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." Pluta, 176 F.3d at 49 (internal quotation marks and citation omitted). Rule 901 "does not erect a particularly high hurdle." United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001) (internal quotation marks and citation omitted). In general, the Second Circuit has "stated that the standard for authentication is one of reasonable likelihood, and is minimal." United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007) (internal quotation marks and parenthetical omitted).

Drug ledgers such as those in the present case are admissible pursuant to Rule 801(d)(2)(E), as coconspirator statements and may be admitted against a defendant where the government shows "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990). In determining whether a party has established a proper foundation, a court may consider hearsay and other evidence not admissible at trial, including the content of the drug ledgers themselves. See Fed. R. Evid. 104(a), 1101(d)(1); Bourjaily, 483 U.S. at 178-79.

In United States v. Coughman, 116 F.3d 1472 (2d Cir. 1997), the Second Circuit outlined the evidence required to authenticate a drug ledger as a coconspirator statement. In that case, the government presented "substantial evidence of the narcotics conspiracy itself, and of the defendants' involvement in it." Id. The government's expert testified that the records were drug ledgers, explained why such ledgers were necessary in a drug trafficking organization, and offered testimony as to the ledgers' coded references to the defendants' nicknames and the quantities of drugs sold. As the court explained, "[t]his evidence was more than sufficient to establish the admissibility and authentication of the drug ledgers." Id.

Similarly, in United States v. Vanwort, 887 F.2d. 375 (2d Cir. 1989), the Second Circuit upheld the admissibility of a computer printout that contained names and addresses of coconspirators, as well as accounting ledgers "depicting several drug transactions." Id. at 388. The defendant objected to the admission of the printout claiming it was of questionable relevance and probative value. Id. The court upheld the admission of the documents, stating that the print-out was "analogous to a conspirator's address book." Id.; see also United States v. Ashraf, 320 F. App'x 26, 28-29 (2d Cir 2009) (summary order)

(holding that Sixth Amendment's Confrontation Clause is not implicated when admitting drug ledger and testimony of coconspirator interpreting ledger because coconspirator statements are not hearsay under Rule 801(d)(2)(E)).

While admission of a drug ledger as a coconspirator statement is widely accepted, ledgers are also admissible into evidence as business records. To admit drug ledgers under the business records exception to the hearsay rule under Rule 803(6), the government must show: (1) the document was made or transmitted by a person with knowledge at or near the time of the incident recorded and (2) the document was kept in the course of a regularly conducted business activity. Fed. R. Evid. 803(6). In United States v. Foster, 711 F.2d 871 (9th Cir. 1983), the court admitted drug ledgers under the business record exception of Rule 803(6), which implicated the defendant in drug transactions. Id. at 882. There, a witness testified that she kept a record of drug transactions and that it was her regular practice to enter the amounts of drugs sold on a particular day and the amount of money she received for those drugs. Id. The testimony also showed that the information was recorded contemporaneously. Id. Despite the fact that the ledger was incomplete and that the entries were out of sequence, the court held that the ledger was admissible pursuant to Rule 803(6) as a business record. Id. See United States v. Cooper, 868 F.2d 1505, 1514 (6th Cir. 1989) (holding that log book of sham prescriptions kept contemporaneously with creation of the sham prescriptions was admissible pursuant to Rule 803(6)); United States v. Lizotte, 856 F.2d 341, 344 (1st Cir. 1988) (holding that drug ledger made contemporaneously with drug sales was admissible under Rule 803(6)); United States v. Cohen, 384 F.2d 699, 700-01 (2d. Cir. 1967) (holding that bookkeeper's list of union bribes was admissible as a business record).

Finally, drug ledgers are admissible when not offered to prove the truth of the notations contained therein, but as evidence of the commission of the crime or the existence of the conspiracy. See Alosa, 14 F.3d at 696 (holding that admission of drug ledgers presented no hearsay problem because they were admitted for non-hearsay purposes of showing "character and use of the place where the notebooks were found" and that there had been "more than one participant and thus a conspiracy") (internal quotation marks and citation omitted); see also United States v. Bohmont, 413 F. App'x 946, 955-56 (8th Cir. 2001) (summary order) (entries in drug ledger showed that "types of activities that were charged in the indictment were being carried out in the hotel room").

C. Analysis

Ramirez's expected testimony is sufficient to authenticate GX 301-A through 302I. Though Ramirez did not prepare the initial draft of the ledgers, he has personal knowledge of the existence and preparation of the ledgers. He also has personal knowledge of the facts that formed the basis of the ledgers, namely the intimate details relating to aspects of the Juanita shipments. Ramirez ordered the ledgers to be kept and maintained as part of the operation of the NVC, reviewed the entries in the ledger at or near the time the entries were made by his subordinates, insured their accuracy by making factual changes when necessary and overall adopted the ledgers as his own statements.

While it is true that Ramirez cannot now identify the individual who initially made the entry on the ledgers, that fact is irrelevant. Ramirez has sufficient personal knowledge of the statements of his co-conspirators and therefore has adopted them as his own. Therefore not only will the ledgers be properly authenticated, but they are admissible as co-conspirator statements under rule 801(d)(2)(e) or as business records under Fed. R. Evid. 803(6). See United States v. Ford, 435 F. 3d. 204, 214-215 (2nd Cir. 2006) (custodian of a business record "need not have personal knowledge of the actual creation of the document," even when creator of the document "claimed not to remember when or why" a notation was made.).

II. The Government's Prior Beltran Leyva Statements Are Not Inconsistent

Defense counsel asserts that the government made inconsistent statements about the evidence related to the Juanita shipments during litigation in the Beltran Leyva case. According to the defendant, the government argued during the Beltran Leyva case that Juanita 8 "was destined" for the Beltran Leyva organization and that Juanita 9 was "destined for Ignacio "Nacho" Coronel." Thus, the defendant concludes, the government represented that the defendant was not involved in the shipments, which is inconsistent with the government's current theory that the defendant has criminal liability for these shipments. See Def. Mot., Dkt. #481 at 6. For the reasons set forth below, the government never alleged that the defendant was not have involvement in the Juanita shipments nor did it make inconsistent prior statements about the matter.

As detailed in the defendant's motion, the government made reference to the Juanita 8 and 9 shipments in the Beltran Leyva case by stating that the shipments were "destined" for then-Sinaloa Cartel member Beltran Leyva and Sinaloa Cartel member Nacho Coronel, respectively. Id. This statement is correct, as these Juanita shipments were destined for - meaning sent to - Beltran Leyva and Coronel so that their workers could retrieve the shipments on the high seas. This fact is not mutually exclusive of the fact that Beltran Leyva and Coronel, as well as other leaders of the Sinaloa Cartel, were also investors in the shipments.

Ramirez is expected to testify that, when organizing the Juanita shipments, leaders of the Sinaloa Cartel, specifically the defendant, the Zambadas, the Beltran Leyvas, Nacho Coronel, and the Carrillo Fuentes', partnered with him as Mexican investors in the

shipments. The only aspect of the shipments that would change would be whose workers would handle the logistics of receiving the shipments on the high seas and then bringing the cocaine into Mexico. Ramirez is further expected to testify that the workers handling the logistics of the cocaine shipments did not necessarily correlate to the leaders who were investing. Indeed, a second cooperating witness ("CW2") will similarly testify that members of the Sinaloa Cartel, including the defendant, the Zambadas, the Beltran Leyvas and Nacho Coronel, were investors in the shipments. CW2 is also expected to testify that the shipments were sent to, or received by, worker of the various Cartel leaders on a rotating basis.

Thus, the defendant's characterization of the government's statements is incorrect. Moreover, the government's prior statements in the Beltran-Leyva case were not intended to address the defendant' role in the Juanita shipments. In fact, the defendant fails to inform the Court that in the Beltran Leyva case, the defendant Alfredo Beltran was solely charged with being a member of an international drug distribution conspiracy under Title 21, United States Code, Sections 959 and 963. He was not charged with a continuing criminal enterprise as is the defendant in this case. Thus, in the Beltran Leyva case, Judge Leon repeatedly admonished the government that the Beltran Leyva case was about the one defendant, and not about the Sinaloa Cartel, the Federation or Joaquin Guzman. As a result, all of the government's filings were narrowly tailored to abide by the Court's instructions, thereby referencing Alfredo Beltran's Leyva's drug trafficking organization as the Beltran Leyva Organization (as opposed to what it was until 2008 – a part of the Sinaloa Cartel).

Thus, the defendant's attempt to use the government's statements in the Beltran Leyva case does not meet the requirements set forth by the Second Circuit in Ford, as outlined in the defendant's motion. See Dkt # 481 at 6; Ford, 435 F. 3d at 215. First, the assertions that the defendant claims are admissions by a party opponent are not "similar assertions." Second, the inference that the defendant wishes to draw from the government's statements is not "fair" and an innocent explanation exists for the government's statements. Id.

## III. Conclusion

For the reasons set forth above, the Court should grant the government's request.

Respectfully submitted,

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
Southern District of Florida

.

cc: Clerk of the Court (BMC) (by ECF)