3013

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                          09-CR-00466(BMC)
 3    UNITED STATES OF AMERICA,
                                          United States Courthouse
 4                                        Brooklyn, New York

 5              -against-                 December 13, 2018
                                          9:30 a.m.
 6    JOAQUIN ARCHIVALDO GUZMAN
      LOERA,
 7
                   Defendant.
 8
      ------------------------------x
 9
                   TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10             BEFORE THE HONORABLE BRIAN M. COGAN
                   UNITED STATES DISTRICT JUDGE
11                      BEFORE A JURY

12    APPEARANCES

13    For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                 Eastern District of New York
14                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
15                               BY:  GINA M. PARLOVECCHIO, ESQ.
                                      ANDREA GOLDBARG, ESQ.
16                               Assistant United States Attorneys

17                               UNITED STATES ATTORNEY'S OFFICE
                                 Southern District of Florida
18                               99 NE 4th Street
                                 Miami, Florida 33132
19                               BY:  ADAM S. FELS, ESQ.
                                 Assistant United States Attorney
20
                                 DEPARTMENT OF JUSTICE
21                               Criminal Division
                                 Narcotic and Dangerous Drug Section
22                               145 N. Street N.E. Suite 300
                                 Washington, D.C. 20530
23                               BY:  ANTHONY NARDOZZI, ESQ.
                                      AMANDA LISKAMM, ESQ.
24

25    (CONTINUED FOLLOWING PAGE)
```

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

```
1    (APPEARANCES CONTINUED)

2

3

4    For the Defendant:        BALAREZO LAW
                               400 Seventh Street, NW
5                              Washington, D.C. 20004
                               BY:  A. EDUARDO BALAREZO, ESQ.
6
                               LAW OFFICES OF JEFFREY LICHTMAN
7                              11 East 44th Street, Suite 501
                               New York, New York 10017
8                              BY:  JEFFREY H. LICHTMAN, ESQ.
                                    PAUL R. TOWNSEND, ESQ.
9
                               LAW OFFICE OF PURPURA & PURPURA
10                             8 E. Mulberry Street
                               Baltimore, Maryland 21202
11                             BY:  WILLIAM B. PURPURA, ESQ.

12                             LAW OFFICES OF MICHAEL LAMBERT, ESQ.
                               369 Lexington Avenue, PMB #229
13                             New York, New York 10017
                               BY:  MICHAEL LEIGHT LAMBERT, ESQ.
14                                  MARIEL COLON MIRO, ESQ.

15

16
     Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
17                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
18
     Proceedings recorded by mechanical stenography.  Transcript
19   produced by computer-aided transcription.

20

21

22

23

24

25
```

CIFUENTES VILLA – DIRECT – MR. FELS

1                    (In open court.)

2              (Open court; no jury present.)

3              (Time noted: 9:38 a.m.)

4              THE COURT:  Good morning.  Let's have the jury in,

5    please.

6              (WHEREUPON, at 9:39 a.m., the jury entered the

7    courtroom.)

8              THE COURT:   Everyone can be seated.  Good morning,

9    ladies and gentlemen.

10             Let's continue with direct examination.

11             MR. FELS:  Thank you, Your Honor.

12             (Witness takes the witness stand.)

13   JORGE MILTON CIFUENTES VILLA, called as a witness, having been

14   previously first duly sworn/affirmed, was examined and

15   testified as follows:

16   DIRECT EXAMINATION

17   BY MR. FELS:

18   Q    Mr. Cifuentes, did you carry a gun when you would go to

19   meetings to discuss drug shipments?

20   A    In Colombia, yes, I did, sir.  But not in Mexico.

21   Q    Now let's talk about a person named Patricia Monsalve.

22   Who is she?

23   A    She was my brother Francisco Ivan Cifuentes' girlfriend.

24   Q    And do you know what happened to her, ultimately?

25   A    She was arrested, she was extradited to the United

CIFUENTES VILLA – DIRECT – MR. FELS

1   States, and she served a sentence here.

2   Q    For what?

3   A    For drug trafficking.

4   Q    Did you ever have any conversations with your brother

5   Alex Cifuentes about who Patricia was sending cocaine to?

6   A    Yes, sir, to Don Joaquin Guzman Loera.

7   Q    And after Patricia got arrested and expedited, what

8   concerns, if any, did you have about what she might do when

9   she got to the United States?

10  A    Well, I was worried that she would cooperate with the US

11  government and give them information about my illegal

12  activities as well as my family's.

13  Q    So what did you do?

14  A    Well, I had Patricia's son, my nephew Carlitos, nearby,

15  and I was trying to listen to what information he was getting,

16  what information he could get.

17  Q    Did you get any information out of your nephew?

18  A    No, sir.

19  Q    Did you interfere in any way with Patricia's cooperation?

20  A    No, sir.

21  Q    Let's go back to Telmo Castro, the Ecuadorian military

22  official.  What happened to him?

23  A    Well, he was arrested in Ecuador when they did the

24  seizure of the 8 tons.

25  Q    And did you ever have any discussions with Don Joaquin

CIFUENTES VILLA - DIRECT - MR. FELS

1   Guzman and Alex about Telmo Castro?

2   A     Yes, sir.  We bribed the Ecuadorian government to get him

3   released.

4   Q     For what purpose?

5   A     To recruit him so that he would continue working --

6   working in drug trafficking with us.

7   Q     Did you personally play a role in bribing the Ecuadorian

8   officials to get Telmo Castro out of jail?

9   A     Yes, sir, I was the one who got the attorneys, the

10  contacts, and we paid $700,000 from Don Joaquin's money.

11  Q     Now, we have gone over a couple of cell phone calls.  Did

12  you use another communication device to further your drug

13  trafficking activities?

14  A     Well, sir, yes, we had a cryptography system, and we also

15  used text messages.

16  Q     And where did you get those devices from?

17  A     The Blackberrys are the text devices, and they use a text

18  system that's Canadian and a cryptography system that's

19  Canadian.

20  Q     And who gave you those devices?

21  A     My brother Alex got them for me from Tony, a Canadian

22  guy.

23  Q     And did you receive anything from Christian?

24  A     Yes, sir, a communication device, also.

25  Q     Okay.  You mentioned this Canadian name, Tony.  Who is

3018

CIFUENTES VILLA - DIRECT - MR. FELS

1    he?

2    A    Tony was a Canadian drug trafficker who was interested in

3    doing a drug deal from Venezuela using a sailboat.

4    Q    And did you -- who introduced you to Tony?

5    A    My brother Alexander, he sent him to me to Venezuela when

6    I was in hiding.

7    Q    Did you come to an agreement with Tony about shipping

8    drugs to Canada?

9    A    Yes, sir.

10   Q    And who was in this partnership?

11   A    Stephen Tello, for Tony, Don Joaquin Guzman, my brother

12   Alexander Cifuentes, and me.

13   Q    Did Alex Cifuentes ever explain to you how he would get

14   the drugs into Canada?

15   A    Yes, sir.  After I got the cocaine and the sailboat to

16   Don Joaquin and Alex at a property that was on the border with

17   Canada and the United States that had access to the ocean.

18   Q    So what is the significance of having property on both

19   sides of the border?

20   A    Well, it is a lot easier when a Canadian sailboat comes

21   with a Canadian flag, and come in to bring the cocaine into

22   American territory, it is easy.

23   Q    But what's the significance of the properties being on

24   both sides of the border?

25   A    Like I said, the ease of introducing the drugs, the

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

CIFUENTES VILLA – DIRECT – MR. FELS

1  cocaine into the United States.

2  Q    Now, did Alex ever introduce any customers that you had

3  to Don Joaquin?

4  A    Yes, sir.

5  Q    Who?

6  A    For example, La Serie, Dominican baseball player.

7  Q    You said he was a customer of yours, initially?

8  A    Yes.  In the '90s, he was in charge of sales.  He sold my

9  product here in New York.  He had the capability of moving one

10  ton of cocaine here in New York in a week, but that –– I am

11  talking 1990s.  This –– we are talking different volumes, a

12  different time.

13  Q    So how do you know that Alex introduced La Serie to Don

14  Joaquin Guzman?

15  A    Alex asked for my authorization to introduce him to Don

16  Joaquin.

17  Q    When?

18  A    When?

19  Q    Yes.  What time frame.

20  A    I don't know.  2008, 2009, I don't know the exact date.

21  I don't know what you are referring to, what time.

22  Q    Let me ask it a different way.  For what purpose was Alex

23  asking you for permission to introduce La Serie to Don

24  Joaquin?

25  A    Well, to help with the sale of cocaine that we were

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

CIFUENTES VILLA - DIRECT - MR. FELS

1    sending from Ecuador.

2    Q    And what happened?

3    A    He introduced him.

4    Q    And did that create an issue with Alex after Alex

5    introduced La Serie to Don Joaquin Guzman?

6    A    Well, they worked together for a while, and then Alex

7    starts complaining to me that Don Joaquin is now working and

8    communicating directly with La Serie and -- well, he was

9    complaining that they pushed him aside.

10   Q    Now, sir, were you in the United States at some point in

11   the 1990s?

12   A    Yes, sir.

13   Q    Did you get arrested in Houston, Texas?

14   A    Yes, sir.

15   Q    What did you get arrested for?

16   A    Money laundering and drug trafficking.

17   Q    And how did you get out of those charges?

18   A    The charges were dismissed.

19   Q    And did you do something that helped get those charges

20   dismissed?

21   A    I think at that time the laws were different in Texas,

22   but this is -- the issue is that they didn't catch me with

23   anything red-handed so they seized $3 million at a house and

24   some handwritten accounting notes that I had made of -- for

25   two tons, and they -- so when they do a handwriting test on

3021

CIFUENTES VILLA – DIRECT – MR. FELS

1    me, well, I'm normally right-handed, but I took the test with

2    my left hand on this occasion so they just couldn't find any

3    familiarity with the form, so the charges were dismissed.

4    Q    Now, sir, when you came to the United States, you agreed

5    to cooperate, correct?

6    A    Yes, sir, that's true.

7    Q    Did you sign an agreement with the United States of

8    America?

9    A    Yes, sir.

10   Q    I'm showing you, just for identification purposes, marked

11   as Government Exhibit 3500-JMCV-4.  Sir, directing your

12   attention to page 6 --

13   A    Yes, sir.

14   Q    -- which is JMCV-000047, and page 7, which is

15   JMCV-000048.  Do you recognize your signature?

16   A    Yes, sir.

17   Q    And can you read the date?

18   A    Is the first number the month or the day?

19   Q    Well, let's take a look at the top.  Can you read that --

20   interpret it in Spanish?

21   A    Well, that's my handwriting, my own handwriting, with my

22   right hand, March 3, 2015.

23          MR. FELS:  Okay.  Your Honor, we would seek to move

24   this into evidence.

25          MR. LICHTMAN:  No objection.

CIFUENTES VILLA – DIRECT – MR. FELS

1        THE COURT:  Received.

2        (Government Exhibit 3500-JMCV-4, was received in

3   evidence.)

4        MR. FELS:  And publish to the jury.

5   BY MR. FELS:

6   Q    Sir, do you recognize what this document is, 3500-JMCV-4?

7   A    Yes, sir, that's my cooperation agreement with the

8   government and the charges against me.

9   Q    And those -- there's an Exhibit A.  Do you know what this

10  document is?

11  A    The charges.

12  Q    Take a look at -- sir, is this your consent preliminary

13  order of forfeiture money judgment?

14  A    Yes, that's correct.  It is in English, so.

15  Q    Okay.  Well, sir, let -- that's a good question.  My next

16  question was, were these documents translated for you in

17  Spanish before you signed them?

18  A    Yes, sir.

19  Q    Have you reviewed these documents recently?

20  A    Yes, sir.

21  Q    And did you review them at the time that you signed them?

22  A    Yes, sir.

23  Q    Now, based on your understanding of your agreement with

24  the government, what were you required to do with respect to

25  cooperating with the government?

3023

CIFUENTES VILLA - DIRECT - MR. FELS

1    A    Well, I have to provide all my criminal history, all my

2    activities, all the people with whom I committed these

3    criminal activities, I have to forfeit my assets, bank

4    accounts, and I have to help locate them, and that's it, and

5    be at the government's disposal so that they can use me for

6    whatever they need for me to talk about the case.

7    Q    And, sir, have you been sentenced yet?

8    A    No, sir.

9    Q    What sentence are you facing now?

10   A    Well, I arrived in the US with -- at level 38 in the

11   guidelines.  According to my attorney, that means that I face

12   ten years to life.  After I confessed to my violence and

13   weapons, I went up from level 38 to level 40 -- 48 --

14   interpreter correction -- 38 to 48.  And in the guidelines,

15   that means life to life.  But since I was extradited from

16   Colombia, the maximum sentence I can get from the United

17   States government is 40 years.

18   Q    What are you hoping to receive by cooperating?

19   A    Well, I am hoping to get a sentence reduction.  I am 52

20   years old, so a life sentence means life for me.

21   Q    And what's your understanding of what you need to do

22   today and yesterday and the day before, when you testified, in

23   order to be eligible for a sentencing reduction?

24   A    Tell the truth about all the facts.

25   Q    What's your understanding about whether you would receive

CIFUENTES VILLA - DIRECT - MR. FELS

1    a larger or smaller reduction based on the outcome of this

2    trial?

3    A    No.  My understanding is that I have nothing to do with

4    the result of this trial.  I am here to provide information

5    about some facts in support of my testimony from five years

6    ago -- statements from five years ago.

7    Q    And you mentioned that there is a limit of 40 years.  Do

8    you know why there is a limit of 40 years on your sentence?

9    A    I am not a law specialist, but I understand that in

10   Colombia the maximum sentence would be 40 years.  So there

11   should be some sort of a parity, I guess, between the law.

12              MR. LICHTMAN:  Objection.

13              THE COURT:  He's giving his understanding.  It

14   doesn't mean it's right.

15              Go ahead.

16   BY MR. FELS:

17   Q    Now, I want to talk about some benefits that your family

18   has received or might receive in the future.  What is your

19   understanding of what the government has agreed to do with

20   your family?

21   A    Oh, well, nothing.  I did ask them for the favor of

22   helping me bring my family to the United States, but they

23   haven't done absolutely anything.  And I really don't have a

24   lot of hope that they would do it.

25   Q    Well, has the government explained to you that they would

CIFUENTES VILLA - DIRECT - MR. FELS

1    attempt to help move your family -- some of your family

2    members to the United States?

3    A    Yes, sir.

4    Q    Have there been any promises made in that regard?

5    A    No, sir.

6    Q    I want to get back to the end of the Ecuador story.

7    Remember we played some calls yesterday about the situation

8    that your family was facing now that the 8 tons of cocaine had

9    been seized.  Do you remember those calls?

10   A    Yes, sir.

11   Q    The beginning of 2010, couple of months after the

12   seizure, where is your brother Alex living?

13   A    He was in Mexico, at the golden triangle with Don

14   Joaquin.

15   Q    And did you have -- did you and your family have concerns

16   over the fact that he was still up in Mexico?

17   A    Yes, sir.

18   Q    And how was the situation with Alex's safety resolved

19   with Don Joaquin Guzman?

20   A    Well, Don Joaquin was tense because of the loss of the

21   cocaine, and so he asked me to get him the money or actually

22   the cocaine for the next trip.

23   Q    And what was your response?

24   A    Well, I told him to just let me look into it, that I

25   would probably be able to get him three tons, and he said,

CIFUENTES VILLA - DIRECT - MR. FELS

1    okay, and I am going to send my nephew Tomas so he can take a

2    look at them, and then I told him no, things are not going to

3    go the way you want them to go.  And I said, don't send me --

4    don't send Tomas over to me, you know, I'm going to tell you

5    the moment that I am ready, I'm going to tell you so they can

6    send that to you.

7    Q    Okay.  Did you, in fact, send them the three tons?

8    A    No, sir.

9    Q    So how did you resolve the situation with Don Joaquin and

10   Alex?

11   A    Well, you know, Don Joaquin resolved it.  I mean, he gets

12   Tomas in touch.  He, Tomas, had been in touch with the

13   guerilla, and they managed for him to get a credit, and then

14   he asked me to place my properties as collateral for the

15   credit line that he had gotten for the cocaine.

16   Q    Who asked you to put your properties as collateral?

17   A    Don Joaquin Guzman Loera.

18   Q    So what did you do -- first of all, did you agree?

19   A    Well, of course.  My brother was living with him.

20   Q    And what do you mean by that?

21   A    Well, I feared for my brother's safety.

22   Q    So what did you do as a first step to put this plan in

23   motion to get your properties turned over as collateral?

24   A    Well, I said to my accountant, Marco Tulio Flores, for

25   him to show some of the properties in Cali so that these

CIFUENTES VILLA – DIRECT – MR. FELS

1    people could see which properties they wanted to use as

2    collateral for that credit.

3    Q    And did you have a conversation with your accountant?

4    A    Yes, sir.

5              MR. FELS:  Ladies and gentlemen, we have another

6    transcript.  You all should have your binders.  If you would

7    all please turn to Government Exhibit 606I-3FT.  We are just

8    going to play a short clip, a little over a minute, from the

9    start of the call.

10             (Audio played.)

11    BY MR. FELS:

12    Q    All right.  So going back to page 2, who are these two

13    individuals in the call?

14    A    My accountant, Marco Tulio Flores, and I.

15    Q    And what date is this call?

16    A    May 18, 2010.

17    Q    All right.  So just summarize, what's going on in this

18    call?

19    A    Well, Marco Tulio called me, and he told me that he had

20    already met with the people, we have to get the collateral

21    because, I mean, in exchange for the credit, and that he had

22    already showed them that plot of land of Pance, which is a

23    plot that could be built on, and it is in an area right

24    outside of Cali, Colombia.

25    Q    What was that lot –– oh, I'm sorry.  Go ahead.

3028

CIFUENTES VILLA – DIRECT – MR. FELS

1   A    No, please go ahead.

2   Q    What was that lot worth at the time?

3   A    Well, in my books, I would say it was around $5 million.

4   Q    And in the bottom of page 2, Marco Tulio said, it seems

5   strange to me, and I gave them that Pance, because they would

6   only talk of two and a half.

7   A    Well, yes, I had prepared Marco Tulio because -- for him

8   to give the collateral.  In fact, we had to give a collateral

9   of about $8 million.  And these people were actually very

10  satisfied with that plot of land in Pance because they said

11  that they only needed collateral worth 2.5 million.

12  Q    So who is it that Marco Tulio was showing the property

13  to?

14  A    Well, he was showing that to the cocaine suppliers that

15  Don Joaquin had found, and also to Tomas, his nephew.

16  Q    Whose nephew?

17  A    Don Joaquin Guzman's nephew.

18  Q    Now, Mr. Cifuentes, were you asked to review another

19  video and two photographs to see if you could recognize the

20  people in the video in the two photographs?

21  A    Yes, sir.

22  Q    Were you able to recognize some of the people in the

23  video in the two photographs?

24  A    Yes, sir.

25  Q    And, again, just for the witness.  Showing you what's

CIFUENTES VILLA – DIRECT – MR. FELS

1    been marked as Government Exhibit 703A for identification

2    purposes, do you recognize anything on this disc?

3    A    Yes, sir.  I recognize my initials, which I wrote in

4    there, as well as the date of December 10, 2018.

5    Q    And what's the significance of those initials and your

6    date?

7    A    Well, that this is the same disc that I actually reviewed

8    with the information of the video and the pictures.

9              MR. FELS:  Your Honor, we move to admit Government

10   Exhibit GX 703A.

11             MR. LICHTMAN:  No objection.

12             THE COURT:  Received.

13             (Government Exhibit 703-A, was received in

14   evidence.)

15             MR. FELS:  And if we can play the video on this

16   disc.

17             (Video played.)

18   BY MR. FELS:

19   Q    Sir, you see there's a man with glasses on the left.  Do

20   you recognize that person?

21   A    Yes, sir.

22   Q    Who is that?

23   A    That's Marco Tulio Flores Sepulveda.  That's my

24   accountant.

25   Q    And he's talking to a man here, appears to be a red

3030

CIFUENTES VILLA - DIRECT - MR. FELS

1   shirt, his back to us.  Do you see that individual's face?

2   A    No, sir.

3   Q    Showing you what's been -- let's just make it this way.

4        I show you for identification purposes the two

5   photographs that you talked about before, Government Exhibit

6   GX 703A-3.  Do you recognize this person on the left with the

7   glasses?

8   A    Yes, sir.  Marco Tulio Flores.

9        MR. FELS:  Your Honor, move to admit.

10       MR. LICHTMAN:  No objection.

11       THE COURT:  Received.

12       (Government Exhibit 703A-3, was received in

13   evidence.)

14   BY MR. FELS:

15   Q    Showing the jury what's GX 703A-3.  Again, could you draw

16   your finger and circle around Marco Tulio, the accountant.

17   A    (Witness complying).

18   Q    Thank you.

19       And then I am going to show you, just for the

20   witness, also.  Do you recognize the man in the red shirt in

21   Government Exhibit GX 703A-2?

22   A    Yes, sir.

23   Q    And who is that individual?

24   A    That's Tomas, Don Joaquin's nephew.

25       MR. FELS:  Your Honor, move to admit.

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

CIFUENTES VILLA – DIRECT – MR. FELS

1          MR. LICHTMAN:  No objection.

2          THE COURT:  Received.

3          (Government Exhibit 703A-2, was received in

4     evidence.)

5          MR. FELS:  And move to publish Government Exhibit GX

6     703A-2.

7     Q    Do you mind drawing a circle around the man in the red

8     shirt?

9     A    (Witness complying).

10    Q    Again, who is this?

11    A    Tomas, Don Joaquin's nephew.

12    Q    Now, after your call on the 18th of May with Marco Tulio

13    Flores, did you call one of your family members to let them

14    know about the resolution of this issue with Alex?

15    A    Yes, sir.

16    Q    And who is that?

17    A    My mother.

18    Q    And why did you want to call your mother?

19    A    Well, my mother was very worried for Alex's life, with

20    obvious reasons.

21         MR. FELS:  We have another call, ladies and

22    gentlemen, which is 606I-3G.  Just going to play a clip from

23    that, starting at 4 minutes, and ending in 5 minutes, 55

24    seconds.

25         (Audio played.)

3032

CIFUENTES VILLA - DIRECT - MR. FELS

1   Q    Let's pause it there and just go through this part, and

2   we will resume.

3              Page 2, line 3, you say:  Oh, I was able to get the

4   guarantee for Menor.  Are you happy with that?

5              Who is Menor?

6   A    My brother, Hildebrando Alexander Cifuentes Villa.

7   Q    And what do you mean by the guarantee?

8   A    I was talking about the properties that I was giving as

9   collateral for the cocaine that Don Joaquin required.

10  Q    And then line 5, you say:  I sent Marco Tulio, place the

11  Pance lot as guarantee for his project.

12             Who is "his" project?  Who is the "his" in that

13  sentence?

14  A    Don Joaquin.

15  Q    And line 8:  Because now, because now the man could take

16  off patiently.

17             What do you mean by that?

18  A    Well, I referred to the fact that Don Joaquin had been

19  putting a lot of pressure on us, and now he could relax.

20  Q    And let's turn to page 3, line 10.  You say:  What

21  happened was that I ended up without the thing that those guys

22  had installed, I went to call him, and it is no longer, it did

23  not, that the license was expired.

24             What are you talking about?  What license?

25  A    The security software for the encrypted communication

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

3033

CIFUENTES VILLA – DIRECT – MR. FELS

1  system.

2  Q    So what was the significance of the license being

3  expired?

4  A    Well, number one, the engineer is the responsible person.

5  And, secondly, the system is down now, so none of us can have

6  secure communication anywhere.

7  Q    Does that include Don Joaquin Guzman?

8  A    Of course.

9  Q    Let's just skip ahead to the next call.  Showing you

10  what's been introduced as Government Exhibit 606I-3H.  Sir,

11  were you able to listen to this call?

12  A    Which one?

13  Q    606I-3HT.

14  A    Yes, sir.

15  Q    Are you on this call?

16  A    No, sir.

17  Q    How are you able to understand it if you weren't on it?

18  A    Because I am part of this business of this deal.

19  Q    And what's the date of this call?

20  A    May 21.

21  Q    What were the dates of the last two calls we just

22  listened to?

23  A    May 18.

24  Q    So three days later?

25  A    That's correct, sir.

3034

CIFUENTES VILLA – DIRECT – MR. FELS

1    Q    Let's start playing the very first clip, and this should

2    be on the Sanction System.

3              Ladies and gentlemen, this should be up on your

4    screen.

5              (Audio played.)

6    Q    We can stop it right there.  Who are these two people

7    talking, calling each other uncle and nephew?

8    A    Don Joaquin Guzman Loera and Tomas, his nephew.

9    Q    All right.  Let's continue.

10             (Audio played.)

11   Q    Pause it there.

12             Tomas and Don Joaquin Guzman are talking about the

13   extensions working.  Do you understand what they are talking

14   about?

15   A    Of course.  They are talking about the encryption

16   communication system which is not working because the engineer

17   didn't pay for the licenses.

18   Q    All right.  Let's continue on.  Oh, I'm sorry.  I'm

19   sorry.

20             One more thing we passed over.  Don Joaquin Guzman

21   said call Panchito's extension, or have -- see if -- have him

22   call you.

23             Who is Don Joaquin talking about there?

24   A    Panchito is my brother, Alexander Cifuentes.  So when he

25   refers to the extension, is that each of us was assigned an

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

CIFUENTES VILLA - DIRECT - MR. FELS

1    extension on the system, be it like 101, 111.  It depended on

2    who the user was.

3    Q    Okay.  Let's continue on.

4              (Audio played.)

5    Q    Let's pause it there.

6              Now, who is that Don Joaquin Guzman is talking to?

7    A    He's speaking to the cocaine supplier, a member of the

8    guerillas of the FARC.

9    Q    And he is saying if you have six and if we pay you two

10   and a half, you can send six over there to Guaya?

11             THE INTERPRETER:  Counsel, would you indicate

12   where --

13             MR. FELS:  Sorry.  Page 3, line 19.

14   A    This means that when he says Guaya, he means Guayaquil,

15   Ecuador, and they are talking about six tons of cocaine, and

16   he's saying he's going to pay two and a half of those with

17   money and the rest on credit.

18   Q    And on the top of page 4, line 21:  Listen -- this is Don

19   Joaquin Guzman:  Listen.  I am going to buy two, and we will

20   leave you Simon's properties there as collateral for the rest.

21             What's going on there?

22   A    First of all, he's a really good businessman because now

23   he's saying he's going to pay 2, not two and a half.  And,

24   secondly, that he's going to put my properties as collateral

25   for the other four tons.

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

3036

CIFUENTES VILLA - DIRECT - MR. FELS

1   Q    And why do you say it is your properties?

2   A    Well, because they are talking about my properties.  They

3   say Simon, and I am Simon.  Simon.

4   Q    And then he says:  We are two partners.  Continuing in

5   line 21.  If you want to send an associate of yours so you can

6   see who you are talking to, Compadre and I are partners.

7        Who do you know Don Joaquin Guzman to call Compadre?

8   A    Mayo Zambada.

9   Q    Let's play the tape just for the next two seconds.

10       (Audio played.)

11  Q    Let's pause that there.  "The guy from the M."

12  A    Mayo Zambada.

13  Q    Why do you know that Mayo Zambada is "the guy from the

14  M"?

15  A    Because I know he's Don Joaquin's partner, I know he's

16  Don Joaquin's Compadre.

17  Q    What's the first initial of Mayo?

18  A    Mayo, "M."

19  Q    And just to be clear, what was one of your nicknames?

20  A    "Jota," the initial, "J."

21  Q    Let's continue on.

22       (Audio played.)

23  Q    Let's pause it there.  Joaquin Guzman says:  If you want,

24  my nephew can stay there with you until you get -- arrange or

25  whatever.

3037

CIFUENTES VILLA - DIRECT - MR. FELS

1          What's he talking about there?

2     A    He's telling the guerillas that he can leave there --

3     Tomas there as a guarantee that he is going to fulfill his

4     commitment.  Same thing I did with my brother Alex.  I left

5     him with him.

6     Q    All right.  Let's continue.

7               (Audio played.)

8     Q    Let's pause it there.

9               Joaquin Guzman is talking about:  I need you to do

10    me a favor and let a guy check the things.

11              It is on the top of page 5, line 29.  What is he

12    talking there, check the things?  Line 29, page 5.

13              THE INTERPRETER:  Yes.  Line 29, page 5 just says,

14    "well, is the purse."

15              MR. FELS:  Yes.  It is down about halfway down.  I

16    need you to do me a favor, give me a favor (in Spanish).

17              THE INTERPRETER:  Sorry, Counsel.  We have it as

18    line 31.

19              MR. FELS:  Oh, apologize.

20    A    He's referring to the fact that he wants him to check the

21    quality of the cocaine because Don Joaquin was not satisfied

22    with the quality of the cocaine that Gilberto Garcia a/k/a

23    Politico had sold us, and he was right.

24    Q    Let's keep going.

25              (Audio played.)

Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter

3038

CIFUENTES VILLA – DIRECT – MR. FELS

1          (Continued on the next page.)

2          (Call played.)

3     Q     Let's pause it there.  Generally describe what is going

4     on here?

5     A     Well, they are talking logistics.  The guerrilla, the

6     person who is negotiating with him is accepting that he will

7     have somebody sent to check out the quality of the cocaine.

8     But the man is saying, the cocaine supplier is saying, that

9     before he shows him, before he shows him the cocaine he wants

10    50 percent for the 2 tons.

11    Q     And right here on the screen you have Joaquin Guzman

12    saying, Do you agree that we pay you for two and leave the

13    property for the other four.  Again, what does that mean?

14    A     That he'll pay him the value of 2 tons in cash.  And

15    he'll leave properties as collateral for the other 4 tons.

16    Q     Let's continue on.

17          (Call played.)

18          Let's pause it there at 7:08.

19          What was that conversation going back and forth

20    about 2100 and 2,000?

21    A     About the value of the cocaine per kilo either $2,000 or

22    $2,100 per kilo of cocaine.

23    Q     Let's continue.

24          (Call played.)

25          Let's pause, 7:38.

CIFUENTES VILLA – DIRECT – MR. FELS

1          What does Joaquin Guzman and this other individual

2    just agree to?

3    A    Well, the agreement was that he was going to pay for

4    2 tons, and that 4 tons are going to be left on credit, they

5    accepted the issue with the properties.  And finally I do

6    understand that they left it at $2,000; that is, the cocaine.

7    Q    I was going to say 2 tons of what?

8    A    The cocaine.

9    Q    So 6 tons in total?

10   A    Yes, sir, 6 tons of cocaine.

11   Q    Let's resume, please.

12          (Call played.)

13          Let's pause right there, 8:14.

14          What is Tomas is talking about freight charges, what

15   is the significance of that?

16   A    They are discussing the place where they will place the

17   cocaine at, which is Guayaquil.  And Tomas says it's $2,100

18   plus freight, that means to take it from the border of

19   Colombia to Guayaquil.  And it's the same freight that I used

20   to pay Telmo Castro, the Captain, which was $100.

21   Q    Let's resume.

22          (Call played.)

23          Why don't we pause there, 9:32.

24          There is a reference there, Tomas is saying to

25   Panchito, Panchito is?

3040

CIFUENTES VILLA - DIRECT - MR. FELS

1    A    My brother, Alexander Cifuentes.

2    Q    Let's keep going.

3              (Call played.)

4              Pause it there, 9:51.

5              Tomas talks about Gabriel, going over to Gabriel's

6    residence, what is the significance of that?

7    A    Gabriel is one of the go-fast boats, he actually drives

8    one of those go-fast boats to deliver the cocaine.  He was

9    living in Guayaquil at the house that I had rented out for

10   them.  And then when he said over to Gabriel's, he meant

11   Guayaquil.

12   Q    Have we seen Gabriel's name somewhere in the evidence in

13   this case?

14   A    Yes, sir.

15   Q    Showing what you is marked Government's Exhibit, and

16   introduced, as Government's Exhibit 301A, page 58, line 2561,

17   para Gabriel y Martin c/u 500.

18   A    Well that's for Gabriel and Martin, and that's 500 each,

19   that's for their payroll for their expenses.  And those are

20   two of the guys with the go-fast boat guys.

21   Q    The lines around that entry, 2560, then 2562, 2565, who

22   are these references to payments?

23   A    For Tomas, and that's refers to Don Joaquin's nephew.

24   Q    Let's resume with the call, please.

25              (Call played.)

CIFUENTES VILLA - DIRECT - MR. FELS

1      Pause it there at 10:06.

2      Right there you can see the top of the screen, Yes

3  yes, yes.  The properties are ready here.  They are here,

4  already went and looked at them.  What is he talking about?

5  A    Well, he's saying that he already went to check out the

6  property with Marco Tulio Flores in Cali.  He's referring to

7  the Pance lot.

8  Q    Let's continue.

9      (Call played.)

10      Let's pause it there at 11:07.  He's saying he

11  doesn't have the money over there, Don Joaquin.  Where is he

12  talking about?

13  A    He says that he doesn't have any cash at the

14  Colombia/Ecuador border.

15  Q    You're interpreting that, when you say over there?

16  A    Yes, of course.

17  Q    Let's continue.

18      (Call played.)

19      Now one of those lines, page 13, should be line 115,

20  Don Joaquin Guzman says, No, no.  He will look at the

21  merchandise first.  I'll send the technician over tomorrow or

22  the next day.  What is the merchandise?

23  A    Cocaine.

24  Q    Sir, to the best of your knowledge did this deal ever go

25  through?

CIFUENTES VILLA - DIRECT - MR. FELS

1    A    No, sir.

2    Q    Why is that?

3    A    Because in the end the people didn't ask for the title of

4    the properties to be transferred.

5    Q    So you don't know if the 2 tons that Don Joaquin Guzman

6    negotiated to pay did get sent?

7    A    No, sir, I do not know.  I don't have any information

8    about that.

9              MR. FELS:  Your Honor, we have no further questions.

10             THE COURT:  Okay.  Cross-examination.

11             MR. FELS:  Your Honor, if we could have a short

12   sidebar, please?

13             THE COURT:  Okay.

14             (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1              (Sidebar conference.)

2              MR. FELS:  We have a witness who to needs to get

3     back by the end of the day.

4              THE COURT:  You want to take a witness out of turn?

5              MR. FELS:  Yes.

6              THE COURT:  Any objection?

7              MR. LICHTMAN:  We talked about this, he has to get

8     out before lunch.  I would start the cross, then when there is

9     a period of time they need to get him out before lunch, I'd

10    stop.

11             MR. FELS:  That's fine.

12             THE COURT:  If you want, it's up to you, I don't see

13    why not play it safe for your cross.  Then we have to take

14    this witness out with the Marshals.

15             MR. FELS:  I don't mind if you want to start the

16    cross.

17             MR. LICHTMAN:  I rather go straight without a break.

18             THE COURT:  I would imagine.  Let's excuse him and

19    take the other witness.  I think the Marshals want us to have

20    the jury stand in the hall while the witness is taken out,

21    then bring in the other witness, then do your cross after

22    that.

23             MS. GOLDBARG:  Just at sidebar, another witness we

24    believe who will testify after the cross is completed who also

25    has a time constraint, depending on -- we're fitting the

3044

SIDEBAR CONFERENCE

1  witnesses in -- depending on his cross, we believe it's after

2  the cross.  He also may be out of order.  We discussed it also

3  with defense counsel.

4          THE COURT:  We'll play it by ear talk.  To each

5  other how long you expect that second witness to take.

6          MS. GOLDBARG:  Yes.

7          MR. LICHTMAN:  I'd like to get my cross done, if I

8  can.

9          MS. GOLDBARG:  This person is at the end of the day.

10         THE COURT:  So two witnesses out of turn, then

11  cross.

12         MR. LICHTMAN:  One witness out of turn, then my

13  cross, then another witness.  We'll see how we're doing.

14         THE COURT:  How long is the next witness?

15         MR. FELS:  Next witness is 20 minutes.

16         MR. LICHTMAN:  Famous last words, 45 if we're lucky.

17         THE COURT:  Do you know who the witness is?  Is your

18  cross long?

19         MR. LICHTMAN:  No.

20         THE COURT:  Let's do this one witness.  Okay.

21         (End of sidebar conference.)

22         (Continued on the next page.)

23

24

25

```
1                    (In open court.)

2                    THE COURT:  Ladies and gentlemen, we're going to

3         defer cross-examination of this witness in order to

4         accommodate travel necessities with another witness.  In order

5         to do that, I have to reset the courtroom a little.  So I need

6         you to lineup in the hall and we'll bring you back in in three

7         minutes.

8                    (Jury exits.)

9                    THE COURT:  Everyone be seated.  Marshals can take

10        out the witness.

11                   (Jury enters.)

12                   THE COURT:  Be seated.  The Government may call its

13        next witness.

14                   MR. FELS:  The Government calls Todd Smith.

15                   COURTROOM DEPUTY:  Remain standing and raise your

16        right hand.

17                   (Witness takes the witness stand.)

18        TODD SMITH, called as a witness, having been first duly

19        sworn/affirmed, was examined and testified as follows:

20                   THE WITNESS:  I do.

21                   COURTROOM DEPUTY:  State and spell your name for the

22        record.

23                   THE WITNESS:  Todd Smith, S-M-I-T-H.

24                   THE COURT:  You may inquire.

25        DIRECT EXAMINATION
```

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

3046

TODD SMITH – DIRECT – MR. FELS

1  BY MR. FELS::

2  Q    Good morning, Special Agent Smith.  For whom do you work?

3  A    Drug Enforcement Administration.

4  Q    What is your current responsibility?

5  A    Currently a staff coordinator at headquarters working in

6  the Operations Division Office of Global Enforcement Section,

7  OGE, which is strategic programming planning.

8  Q    And how long have you been in your current position?

9  A    I've been in Headquarters since June 2018; my current

10  position since August 2018.

11  Q    Where were you prior to being in Headquarters?

12  A    Chicago Field Division, Division Office.

13  Q    What were your responsibilities then?

14  A    From June of 2012 to June of 2018 I was group supervisor

15  overseeing Group 38 in Chicago.

16  Q    Did you have a particular area of focus?

17  A    We were mainly on long-term conspiracies.

18  Q    Prior to being the group supervisor, what were you?

19  A    I was a Special Agent in the Chicago Field Division,

20  Division Office.

21  Q    How long have been with the DEA?

22  A    Since 2004.

23  Q    So prior to that, where were you working?

24  A    Prior to that I was an Inspector with Customs Border &

25  Protection.

TODD SMITH - DIRECT - MR. FELS

1    Q    I want to focus your attention to November of 2008.

2    Where were you working at that time?

3    A    I was a Special Agent with DEA in Chicago assigned to our

4    HIDTA, High Intensity Drug Trafficking, Group 43.

5    Q    Who were you working with at the time.

6    A    What agency?

7    Q    What other individuals, other agents, that you were

8    working with?

9    A    On the team I was working for group supervisor Warren,

10   Special Agent Eric Durante with the group at the time, Special

11   Agent Connie Kuriate, Special Agent Pat Bagley was in the

12   group at the time.  We had a number of Chicago police

13   department Detectives or Task Force officers in the group,

14   Barney Graf, Josh Weitzman.  We had other Task Force officers

15   from other departments.  We had County Sheriff Detective

16   Robert Vaughn.  We had a Palos Park, I believe.

17            MR. PURPURA:  We'll stipulate it was a large group

18   of people.

19            THE COURT:  Yes, that's good.

20   Q    Let me direct your attention on some work that you did

21   with Eric Durante.

22   A    Sure.

23   Q    Did there come a time that you observed Special Agent

24   Durante receive an e-mail?

25   A    Yes.

3048

TODD SMITH - DIRECT - MR. FELS

1    Q    Who was the e-mail from?

2    A    Intel analyst Adrian Ibanez.

3    Q    What is it that you observed Eric Durante do with that

4    e-mail?

5    A    He burned the e-mail on to a disk.

6    Q    You observed him doing that?

7    A    Yes.

8    Q    Was there any sort of manipulation or editing of the

9    contents of the e-mail?

10   A    Not that I saw.

11   Q    Did you witness Eric Durante putting that disk somewhere?

12   A    Yes.

13   Q    Where is that?

14   A    We put it into an evidence bag and it was submitted into

15   evidence.

16   Q    Showing you what is marked for identification purposes as

17   Government's Exhibit N194, which is Government's Exhibit --

18   sorry -- Government's Exhibit 609H, which is listed on the

19   exhibit label N194.  And showing you Government's Exhibit 609E

20   as in echo, which is listed here as N200.  What are these two

21   disks?

22   A    Recorded calls.

23   Q    Do you recognize your initials on these disks?

24   A    Yes, I do.

25   Q    What is the significance of that?

TODD SMITH – DIRECT – MR. FELS

1    A    In the witness by section it shows that I was present and

2    signed when it was put into its original envelope.

3    Q    You notice there is a date opened, which is today's date

4    and a signature, whose signature is that?

5    A    That's my signature; I opened the bag this morning.

6    Q    Let me show you one more disk.  I should add, did you do

7    this for both disks 609H and 609E?

8    A    Correct.

9    Q    Was there a time that Special Agent Durante received a

10   disk from Mr. Adrian Ibanez?

11   A    Yes, a FedEx package.

12   Q    Showing you what is marked for identification as

13   Government's Exhibit 609D, the contents of that package, did

14   you open that up today as well?

15   A    I did.

16   Q    Inside is an exhibit number N381, do you recognize your

17   initials?

18   A    I do.  The witness by section, similar to the other bag,

19   I witnessed that being sealed.

20   Q    So, sir, were you asked to review a disk that has been

21   marked in evidence as Government's Exhibit 609K?

22   A    I was.

23   Q    Do you recognize anything on that disk?

24   A    Those are my initials, TS; and today's date, December 13,

25   2018.

3050

TODD SMITH - DIRECT - MR. FELS

1  Q    Can you describe what is the significance of your

2  initials and that date?

3  A    This morning I reviewed the contents on this disk.  I

4  compared them to the original calls contained on those other

5  two disks.

6  Q    Did you compare the time stamps for each of the calls on

7  Government's Exhibit 609K?

8  A    I did.

9  Q    Did they match up with identical calls contained in

10 Government's Exhibit 609D, 609E, 609H?

11 A    That's correct.

12 Q    Do they appear to be altered in any way?

13 A    No, sir.

14        MR. FELS:  Your Honor, at this point we would move

15 to introduce Government's Exhibit 609K.

16        MR. PURPURA:  I have an objection.  Perhaps a

17 sidebar?

18        THE COURT:  Okay.

19        (Continued on the next page.)

20

21

22

23

24

25

SIDEBAR CONFERENCE-SEALED

1              (Sidebar conference sealed.)

2              (End of sidebar conference.)

3              (Continued on the next page.)

SMITH - DIRECT - MR. FELS

1          (In open court.)

2          THE COURT:  609K is received.  Anything else?

3          (Government Exhibit 609K, was received in evidence.)

4          MR. FELS:  Just one more thing, your Honor.

5   BY MR. FELS::

6   Q    Sir, I want to direct your attention to the date of

7   November 13, 2008.  Do you remember what you were assigned to

8   do that day?

9   A    Yes, we were going to be fronted, at the time we thought

10  18 kilograms of heroin, we were working in operation.

11  Q    And was there an undercover officer who was assigned to

12  that operation?

13  A    Yes, Task Force Officer Mario Elias.

14  Q    Where was this deal supposed to take place?

15  A    At a Home Depot in North Lake, Illinois.

16  Q    Have you been to that Home Depot?

17  A    I have.

18  Q    Were you there on the night of November 13, 2008?

19  A    I was.

20  Q    Showing you what is marked for identification purposes

21  for the witness only Government's Exhibit 21 --

22          MR. PURPURA:  No objection.

23          MR. FELS:  Move to admit 212-1.

24          THE COURT:  Received.

25          (Government Exhibit 212-1, was received in

3053

SMITH – DIRECT – MR. FELS

1    evidence.)

2    BY MR. FELS::

3    Q    Do you recognize what this exhibit is depicting?

4    A    Yes.

5    Q    What is that?

6    A    The Home Depot in North Lake, Illinois.

7    Q    Did Mario Elias receive something from a suspect at that

8    date?

9             MR. PURPURA:  Objection.

10            THE COURT:  Sustained.

11   Q    What happened at the end of this encounter?

12            MR. PURPURA:  Objection.

13            THE COURT:  Sustained.

14   Q    You were present for this surveillance?

15   A    I was.

16   Q    And did you meet up with Mario Elias at the end of the

17   encounter?

18   A    We did.

19   Q    Did you observe what Mario Elias had obtained?

20   A    Yes.

21   Q    The next day, what you were asked to do with what Mario

22   had obtained?

23   A    I was asked to process the seizure from the night before

24   into evidence.

25   Q    What was the seizure?

SMITH - DIRECT - MR. FELS

1   A    The seizure was 20 kilograms of heroin.

2   Q    Showing you, again just for the witness, what is marked

3   Government's Exhibit 212-3.

4                MR. PURPURA:  No objection.

5                MR. FELS:  Introduce into evidence and publish.

6                THE COURT:  Received.

7                (Government Exhibit 212-3, was received in

8   evidence.)

9   Q    Special Agent Smith, what are we looking at at 212-3?

10  A    That's a photograph of the seizure in its entirety taken

11  by the lab.  So it's the 20 kilograms laid out in front of the

12  two boxes that I packaged it in.

13  Q    And are you familiar with the term DEA 7A?

14  A    I am.

15  Q    Did you fill out a DEA 7A for this Exhibit 17, this

16  heroin?

17  A    I did not; I filled out a DEA-7.

18  Q    I apologize, DEA-7.  Showing you Government's Exhibit

19  212-9.

20                MR. PURPURA:  No objection.

21                MR. FELS:  Move to introduce.

22                THE COURT:  Received.

23                (Government Exhibit 212-9, was received in

24  evidence.)

25  Q    What is 212-9?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

SMITH - DIRECT - MR. FELS

1   A    DEA-7 for Exhibit 17, 20 kilograms of heroin.

2   Q    Did you prepare these remarks?

3   A    I did.  In Section 24 is my name, and in Section 24A is

4   my signature and the date of November 14, 2008.

5   Q    Where does it say that that Home Depot was located, if

6   can you read that?

7   A    37 West North Avenue, North Lake, Illinois.

8   Q    This describes what you did with the exhibit?

9   A    Correct, yes.  It shows that Task Force Officer Mario

10  Elias turned in an undercover vehicle over to a target at the

11  Home Depot.  The target took possession of the vehicle.  Short

12  time later, returned the undercover vehicle to undercover Task

13  Force Officer Elias at the above-referenced Home Depot.

14  Special Agent Durante recovered a black, plastic bag, which

15  contained 20 kilograms of heroin, Exhibit 17, as witnessed by

16  Special Agent Bagley.  Special Agent Bagley and Zoltay

17  submitted Exhibit 17 to the DEA overnight drug vault for

18  safe-keeping.

19          November 14, 2018, Special Agent Durante and Graf

20  recovered Exhibit 17 from the overnight vault.  And Special

21  Agent Todd Smith, myself, and Graf processed Exhibit 17 into

22  evidence and transported it the North Central Laboratory for

23  storage and safe-keeping.

24  Q    Thank you.  Are you aware that a lab report was prepared?

25  A    Yes.

SMITH - DIRECT - MR. FELS

1   Q    Showing what you is marked --

2              MR. PURPURA:  No objection.

3              MR. FELS:  Your Honor, move to introduce, and

4   without objection, 212-2.

5              THE COURT:  Received.

6              (Government Exhibit 212-2, was received in

7   evidence.)

8              MR. FELS:  And publish.

9   BY MR. FELS::

10  Q    What was the test results of Exhibit 17 that you

11  submitted for evidence?

12  A    The North Central Laboratory submitted their findings,

13  Exhibit 17 active drug ingredient heroin hydrochloride with

14  94.4 purity.

15  Q    Reserve weight?

16  A    19.74 kilograms.

17             MR. FELS:  Your Honor, if the witness could step

18  down, we have an exhibit to show.

19             THE COURT:  Okay.

20             (Witness steps off stand.)

21  Q    Showing you what is marked for identification purposes as

22  Government's Exhibit --

23             MR. PURPURA:  No objection.

24             MR. FELS:  We'd like to introduce as --

25             THE COURT:  I know you're trying to help, but you

3057

SMITH – DIRECT – MR. FELS

1   got to let him finish.

2            MR. FELS:  212-8A and 212-8B.

3   Q    Do you recognize your signature in any of these boxes?

4   A    I do.

5   Q    On one box or both?

6   A    Both boxes.

7   Q    What is this?

8   A    This is the Exhibit 17, the 20 kilograms of heroin.  I

9   sealed both boxes and placed the kilograms in the boxes.

10  Q    This is the same heroin that was obtained on November 13,

11  2008?

12  A    Yes.

13  Q    Let's open them up.

14           THE COURT:  Those are received.

15           (Government Exhibit 212-8A & 212-8B, was received in

16  evidence.)

17  Q    What are we looking at?

18  A    The 20-kilogram seizure from November 13, 2008 processed

19  by the lab.

20  Q    If you can take a look, there appears to be some writing?

21  A    Yes, the word B-O-T-E was written on every kilogram.

22  Q    Do you know what the significance of that is?

23  A    In Spanish it means boat.

24           MR. FELS:  No further questions.

25           THE COURT:  Any cross?

TODD SMITH - CROSS - MR. PURPURA

1      MR. PURPURA:  Your Honor, there will be.  I would

2   ask the Court to consider a break at this point.

3      THE COURT:  Okay.  Let's take our morning break,

4   ladies and gentlemen.  We'll reconvene 11:35 a.m.  Remember

5   not to talk about the case.  We'll see you shortly.

6      (Jury exits.)

7      (Brief recess.)

8      MR. PURPURA:  Your Honor, I have no problem with the

9   Government clearing off the evidence.

10      THE COURT:  You're asking them to do that.

11      MR. PURPURA:  Yes, please.

12      THE COURT:  Makes sense.

13      (Jury enters.)

14      THE COURT:  Be seated.  Cross-examination.

15      MR. PURPURA:  Thank you, your Honor.

16   CROSS-EXAMINATION

17   BY MR. PURPURA::

18   Q    Agent, I'll put on the overhead what is admitted into

19   evidence as Exhibit 212-3.  That is the picture of the cocaine

20   that the other agents are now taking away.

21      Agent, now again, directing your attention to

22   Government's Exhibit 212-3, and you already spoke about this,

23   B-O-T-E, bote, and that's the marking on all the kilos,

24   correct?

25   A    Good morning, sir, yes.

TODD SMITH - CROSS - MR. PURPURA

1    Q    Good morning, thank you.  And now this seizure occurred

2    on November 13, 2008, correct?

3    A    Correct, sir.

4    Q    We have 20 kilos there with B-O-T-E, bote, on it,

5    correct, sir?

6    A    Yes.

7    Q    The question I have for you, you've been in the HIDTA

8    Task Force, the High Intensity Drug Task Force in Chicago for

9    a period of time, are you familiar with that markings on those

10   kilos?

11   A    Prior to the seizure, I'd never seen those markings.

12   Q    How long have you been in Chicago as a High Intensity

13   Drug Task Force officer prior to the seizure in November 2008?

14   A    Since 2004.

15   Q    So the prior four years you never saw those markings,

16   B-O-T-E, which are fairly obvious on all four of those kilos?

17   A    On all 20 kilos, that's correct.

18   Q    We know already, but can you tell us quickly why anyone

19   would put any type of markings on kilos?

20   A    Generally kilograms are marked so the end recipient knows

21   it's the same kilos that they purchased.

22   Q    Purchased as in Colombia, Mexico wherever they purchased

23   them?

24   A    Correct.

25   Q    Are you familiar with Project Fountainhead?

TODD SMITH - CROSS - MR. PURPURA

1    A    I am.

2    Q    Did you submit -- strike that.

3          What is Project Fountainhead?

4    A    Project Fountainhead is run by the DEA lab, where they

5    take images of kilos, both exterior but then also stampings on

6    kilos.  All the tape and packaging materials are removed,

7    occasionally kilograms are stamped with an imprint, it could

8    be anything.  We have a database that tracks that.

9          MR. FELS:  Objection, your Honor to further

10   questioning on this.

11         THE COURT:  There hasn't been a further question

12   yet, let's see.

13   Q    Did you submit the B-O-T-E to Project Fountainhead?

14         MR. FELS:  Objection, your Honor.

15         THE COURT:  Sustained.

16         MR. PURPURA:  I have no further questions.

17         THE COURT:  Any redirect?

18         MR. FELS:  No, your Honor.

19         THE COURT:  You may step down.  Thank you.

20         (Whereupon, the witness was excused.)

21         THE COURT:  Are we resuming cross-examination of the

22   other witness?

23         MR. FELS:  Yes, your Honor.

24         THE COURT:  I need to have the jury stand in the

25   hall for a minute.  Don't go anywhere; we'll be right back.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1           (Jury exits.)

2           THE COURT:  Be seated.  Let's get Mr.  Cifuentes

3    back.

4           (Witness resumes stand.)

5           THE COURT:  Let's have the jury back.

6           (Jury enters.)

7           THE COURT:  We'll have cross-examination of

8    Mr.  Cifuentes.

9           MR. LICHTMAN:  Thank you, Judge.

10   CROSS-EXAMINATION

11   BY MR. LICHTMAN::

12   Q    Good morning, Mr.  Cifuentes.

13   A    Good morning.

14   Q    You've been committing crimes since you were a child,

15   correct?

16   A    Yes, sir.

17   Q    And you've been lying since you were a child; isn't that

18   true?

19   A    Yes, sir, that's right.

20   Q    You grew up in Medellin you said?

21   A    Yes, sir.

22   Q    One of nine children?

23   A    That's correct.

24   Q    And you said you were second to the youngest?

25   A    Yes, sir.

3062

CIFUENTES VILLA – CROSS – MR. LICHTMAN

1    Q    Alex was the youngest?

2    A    That's right.

3    Q    Alex was born in January of 1968?

4    A    That's right.

5    Q    So you were less than two years apart?

6    A    Yes, sir.

7    Q    You had told the Government that your father was a truck

8    driver?

9    A    That's right.

10   Q    And you had also testified the other day that your father

11   carried contraband, like whiskey and cigarettes from the

12   seaport to your home?

13   A    That's right, yes, sir.

14   Q    Then he would store that contraband for a few days until

15   smaller trucks would come and pick that contraband up?

16   A    Yes, sir.

17   Q    You've told the Government that you would help him, you

18   started helping him when you were just four years old?

19   A    Yes, sir, that's right.

20   Q    You helped him move the boxes of contraband from his

21   truck into storage?

22   A    Yes, sir.

23   Q    And then from storage into the smaller trucks?

24   A    Yes, we would store it at home.

25   Q    And you began talking to the Government, proffering with

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   them, in approximately February 2014; is that correct?

2   A    Yes, sir.

3   Q    You would never lie to the Government, correct?

4   A    No, sir.

5   Q    You would never lie to the Judge or this jury, correct?

6   A    No, sir.

7   Q    You respect our laws in America, correct?

8   A    Well, I have committed crimes in the United States.

9   Q    But you respect the law now?

10  A    Yes, sir.

11  Q    And you respect the Government, the prosecutors and the

12  agents?

13  A    Yes, sir.

14  Q    Now your father was actually a drug dealer, wasn't he, as

15  well?

16  A    Yes, sir.

17  Q    He grew cocaine on his farm?

18  A    No, sir, he didn't have a farm.  The cocaine was

19  processed at his farm.

20  Q    Who's farm?

21  A    My father's.

22  Q    So your father did have a farm.

23  A    Yes, but we did not sell cocaine.

24  Q    Didn't he dry cocaine in the ovens in your house?

25  A    No.  My older brother was the one in charge of processing

3064

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   the cocaine.

2   Q    So your brother, Alex, who was less than two years

3   younger than you, did not assist your father drying cocaine in

4   the family's property?

5   A    Well, like I said, my father did not know how to process

6   cocaine.  My older brother was the one in charge of processing

7   the cocaine.  And Alex did help us.

8   Q    Forget Pacho, I'm talking about your father.

9   A    That's right.

10  Q    Didn't Alex assist your father in drying cocaine in the

11  ovens on your property?

12  A    As far as I know, no, my Dad did not process cocaine.

13  Q    So what did your father actually do with cocaine?

14  A    Well, my Dad was a driver.  He drove his truck; he did

15  not own the truck.  And initially they would bring contraband

16  from the port, whiskey and cigarettes --

17  Q    Let me interrupt --

18  A    -- and sometimes --

19  Q    -- and focus the question if I can.

20       Did your father have anything to do with cocaine?

21  A    Yes, sir.

22  Q    What did he have to do with cocaine?

23  A    The trucks that he would drive as a driver he would

24  transport coca base from the Ecuadorian/Colombian border to

25  Medellin.

3065

CIFUENTES VILLA – CROSS – MR. LICHTMAN

1    Q    Your father was a drug dealer, correct?

2    A    That's right, yes, sir.

3    Q    Are you aware that in all of your debriefings with the

4    Government you never once mentioned that he was involved in

5    dealing drugs?

6    A    You're mistaken, sir.  I did do that.

7    Q    I'm going to show for the witness only, 3500-73.  I would

8    mark this for identification, I suppose, Defendant's exhibit

9    321, and ask you to read to yourself the X, paragraph three?

10   A    It's in English.

11   Q    I meant translate, I apologize?

12        MR. FELS:  Objection.  It's the method of

13   cross-examination on this.

14        THE COURT:  He's trying to refresh his recollection,

15   I think he can do that.

16        (Interpreter reading for the witness.)

17   Q    Are you ready, sir?

18   A    Yes, sir, I'm ready.

19   Q    Does that refresh your recollection that you never told

20   that your father was involved in any kind of cocaine dealings,

21   just that your older brother, Pacho, was?

22        MR. FELS:  Objection.  Misstates his testimony.

23        THE COURT:  Let's have a sidebar.

24        (Continued on the next page.)

25

3066

SIDEBAR CONFERENCE

1          (Sidebar conference.)

2          THE COURT:  It's hard enough to use a 302 to impeach

3   a witness's recollection, it's not the witness's statement.

4   When you're using an omission, something that's not there, you

5   didn't tell, I think the most you can do is ask, you didn't

6   tell.  If he says I don't remember if I told or not, then you

7   can show him this.  But he didn't say that.

8          MR. LICHTMAN:  You're saying there is no need to

9   refresh because he denied.

10         THE COURT:  If he says affirmatively, I told them.

11         MR. LICHTMAN:  Let me just clean it up by saying did

12  you tell the Government that your father --

13         THE COURT:  Same question again.

14         MR. LICHTMAN:  Same question.

15         THE COURT:  Okay, but he's going to say no.

16         MR. LICHTMAN:  Then that's it, what am I going to

17  do.  I can't do it until I call an agent.

18         (End of sidebar conference.)

19         (Continued on the next page.)

20

21

22

23

24

25

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

3067

CIFUENTES - CROSS - MR. LICHTMAN

1          (In open court.)

2     BY MR. LICHTMAN::

3     Q    What you were just given, does that refresh your

4     recollection that you never told the Government that your

5     father was a drug dealer?

6               MR. FELS:  Objection.

7               THE COURT:  I'll allow it.

8     A    It refreshes my memory the fact that I did mention it.

9     And I did not write down those notes, but I've always told the

10    truth.

11    Q    Now do you recall being debriefed by the Government about

12    your family structure?

13    A    Yes, sir.

14    Q    You were asked about all of your siblings, there are nine

15    of you?

16    A    Yes, sir.

17    Q    As you testified on direct, even when all of you were

18    young, the drug business to your family was a family business?

19    A    Yes, sir.

20    Q    And you were asked to name each of your siblings and

21    whether or not they were involved in drug dealing?

22    A    I do not remember if they asked me in that way, but I did

23    mention it.

24    Q    Let me see if I can avoid having you read something.  You

25    were asked about each of your family members, each of your

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CIFUENTES - CROSS - MR. LICHTMAN

1   brothers and sisters?

2   A    No, sir.

3   Q    You were not asked about each of your siblings?

4   A    No, they asked me about my crimes.

5   Q    They didn't ask you about whether or not your siblings

6   dealt drugs as well?

7   A    They would ask me who was present when we were at the lab

8   processing the cocaine and I did mention that.

9   Q    Okay.  So just to be clear, and then I'll move on, you

10  were not asked specifically about each of your siblings and

11  whether or not they dealt drugs?

12  A    As far as I remember, it wasn't in that way.

13  Q    Then I'm going to be putting up to refresh your

14  recollection 3500-JMC-92 and marked as Defendant's exhibit

15  320.

16          THE COURT:  Since it's not moved into evidence, you

17  don't need to remark it, you can just recite the number.

18          MR. LICHTMAN:  Fair enough.

19  Q    If you can review to yourself of that portion.

20          THE INTERPRETER:  Would you like the interpreter

21  read that, sir?

22          MR. LICHTMAN:  Unless he suddenly learns English,

23  yes.

24          (Interpreter reading for the witness.)

25  A    Yes, sir.

CIFUENTES - CROSS - MR. LICHTMAN

1  Q    Does that refresh your recollection that you were asked

2  by Government, prosecutors and agents to describe the

3  involvement of each of your siblings in the drug world?

4  A    Yes, sir, I guess you could say that.

5  Q    And you were asked that first Teresa is the oldest, was

6  the first in the family, your sister Teresa?

7  A    Yes.

8  Q    Your sister Teresa is the oldest in the family?

9  A    Yes, she's the oldest one.

10  Q    She was not involved in the narcotics field, was she?

11  A    No, no, sir.

12  Q    Pacho was next, that's Francisco?

13  A    That's correct, yes, sir.

14  Q    He was obviously a very major drug trafficker.

15  A    Yes, sir.

16  Q    Lucia was next your sister?

17  A    Correct.

18  Q    You told the Government that she was not involved in the

19  drug business?

20  A    She was not involved in the drug business.

21  Q    Okay.  So we listened to tapes just yesterday that you

22  interpreted for the Government -- for the jury, correct?

23  A    Yes, sir.

24  Q    And she was discussing drug dealings on those tapes,

25  wasn't she, just yesterday I believe?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

3070

CIFUENTES - CROSS - MR. LICHTMAN

1    A    Yes, sir.

2    Q    So you just said 30 seconds ago that she was not involved

3    in the drug business, and now you're saying that she's

4    discussing drug business, which is it?

5    A    I did not know that Jaime Alberto shared everything with

6    her.  She shouldn't have been involved in drug trafficking,

7    but she helped my nephew and --

8            THE INTERPRETER:  The interpreter wants to the

9    clarify something.

10   A    And my sister now is in jail.

11   Q    She's in jail for drug trafficking, correct?

12   A    Of course, that's correct.

13   Q    But you maintain that she's not involved in the drug

14   business?

15   A    What I maintain is that when I gave that statement I did

16   not know that she was involved and that she had been talking

17   to my nephew, that's when I spoke to them about this.

18   Q    You had no idea that your sister, Lucia, was involved in

19   drug trafficking until she got arrested?

20   A    No, sir, I did not know.

21   Q    So when you had a problem with her son, Jaime, remember

22   when he stole some cocaine that wasn't his?

23   A    That's correct, yes, sir.

24   Q    Didn't your other family members pressure Lucia to get

25   that cocaine back from Jaime?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CIFUENTES - CROSS - MR. LICHTMAN

1    A    Yes, for her to locate Jaime Alberto Roll.  But as far as

2    I understand, that does not mean that she was involved in drug

3    trafficking.

4    Q    So what you're saying is that that you enlisted Lucia to

5    find Jaime who had stolen the 225 kilograms of crack cocaine,

6    but at no point did anybody in the family tell her why you

7    desperately needed to find Jaime?

8    A    I am not saying that Lucia did not know of the other

9    siblings' activities, of course she did know about the drug

10   trafficking activities, but she did not traffic drugs.  She

11   was protecting her son.  And she did not say where he was.

12   And that was Don Joaquin's cocaine.

13   Q    The reason she didn't say where her son was is because

14   she knew that he had stolen cocaine, correct?

15   A    I guess so, yes, sir.

16   Q    You guess that she's in jail over drug trafficking.  She

17   received an 11-year sentence, are you aware of that?

18   A    That's correct.

19   Q    And we can agree now, and I'll move off of this now, that

20   your sister, Lucia, was involved in the drug business along

21   with her son, your parents and most of your siblings?

22   A    Yes, sir, you're completely right, sir.

23   Q    One last question, do you recall that when you spoke to

24   the Government about your siblings and their involvement in

25   the drug business this was on November 30, 2017?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CIFUENTES - CROSS - MR. LICHTMAN

1    A    Can you repeat that please?

2    Q    Do you recall that when you were asked by the Government

3    about the involvement of your siblings in the drug business,

4    that that debriefing occurred on November 30, 2017?

5    A    Well, from what I see with what you're marking, yes, sir.

6    Q    So your sister, though, was arrested for drug trafficking

7    in 2014, three years earlier, correct?

8    A    Yes, sir.

9    Q    So three years later, after you knew your sister was in

10   jail with an 11-year sentence for drug trafficking, you told

11   these prosecutors and agents that she was not involved in the

12   drug business?

13   A    No, sir, I said she was in jail.  It was in all the news.

14   Why would I try to hide that?

15   Q    Sir, all I asked -- please, there is not a question.

16   A    I didn't prepare these documents, I'm sorry.

17   Q    In 2014, I hate to belabor this, you knew your sister

18   went to jail for a long stretch for drug dealing?

19   A    For helping my nephew yes, sir.

20   Q    In 2017, three years later, you told these prosecutors

21   that she was not involved in the drug business?

22   A    That's not true, sir.

23   Q    We'll move on.

24        Jaime, as you said, was her son?

25   A    He still is her son, yes.

CIFUENTES - CROSS - MR. LICHTMAN

1    Q    Understood.  He's still a drug dealer, correct?

2    A    He's in this jail in La Picota doing his time for drug

3    trafficking, yes.  I'm assuming he's no longer a drug

4    trafficking.

5    Q    In jail you mean.

6    A    In jail.

7    Q    Fair enough.  Last question on this topic.  You're

8    telling the jury that you had discussion with Jaime and Lucia

9    was going to be kept in the dark about everything that he was

10   doing?

11   A    I don't remember.  Can you refresh my memory?  What are

12   you talking about?

13   Q    No, that's okay.  You treated Jaime Alberto Roll in a

14   trusting manner, would you agree?

15   A    Yes, sir.

16   Q    You trusted him so much that you actually asked him to

17   help you deceive Mr. Guzman, correct?

18   A    Yes, sir, that's true.

19   Q    That was with regard to the cocaine that was missing.

20   You wanted Jaime to show Mr. Guzman's nephew, Tomas, the same

21   cocaine twice to fool him into thinking that there was more

22   cocaine than there was -- sorry about that long question?

23            THE COURT:  Do you want to rephrase it?

24            THE INTERPRETER:  Thank you, your Honor.

25   Q    You had Jaime Alberto Roll -- you asked him to lie to

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

3074

CIFUENTES - CROSS - MR. LICHTMAN

1    Mr. Guzman's nephew?

2    A    Yes, sir, I asked him for that favor, yes.

3    Q    To show the same cocaine twice to Tomas, to give the

4    appearance that there was more cocaine than there was?

5    A    Yes, to show him part of the cocaine twice so it would

6    seem there were 8 tons.  Yes, sir, that's true.

7    Q    In your mind Jaime was a drunk; is that correct?

8    A    Jaime didn't drink.  Because my sister Lucia was an

9    alcoholic and his experience growing up was very difficult.

10   Q    You don't recall telling the Government that Jaime

11   Alberto Roll was a drunk?

12   A    No, sir.

13   Q    Could you use your recollection refreshed on this?

14   A    Well, if you could do that.  But Jaime Alberto doesn't

15   drink.  He doesn't drink.

16            THE COURT:  I don't think so, Mr. Lichtman.

17            MR. LICHTMAN:  I was waiting, Judge.  That was nice

18   of me.

19   Q    Did you tell the Government that Jaime Alberto Roll lived

20   off of women?

21   A    He lived off of women?  I don't understand that question.

22   Q    Did you tell the Government that Jaime Cifuentes lived

23   off of women, that he used women to support him?

24   A    No, sir.

25   Q    And you used Jaime Cifuentes as a strawman for some your

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CIFUENTES - CROSS - MR. LICHTMAN

1  companies, if you know what that means?

2  A    Yes, I know that word, strawman.  Yes, I did do that.

3  Q    Meaning you fraudulently listed him as at owner of the

4  company?

5  A    Yes, sir.

6  Q    To protect yourself?

7  A    To protect the companies, the properties.

8  Q    Because you were a criminal.

9  A    Guilty, yes, sir.

10  Q    You wanted to hide the fact that a criminal like you

11  owned those companies?

12  A    More than that, it was that in my tax filings there was

13  not enough room to put this in my name.

14  Q    Now Jaime was your older sister Lucia's son?

15  A    Yes, sir, correct.

16  Q    And your family was a very close family, correct?

17  A    Unfortunately, no.  We had conflicts like any other

18  family I assume.

19  Q    You had conflicts that any normal family could have.

20  A    Yes, gossip here, gossip there.

21  Q    Like the time that your brother Alex ordered the murder

22  of your nephew, Jaime?

23  A    That's correct.

24  Q    So those are typical family issues that you had, your

25  brother ordered the murder of your nephew?

CIFUENTES - CROSS - MR. LICHTMAN

1    MR. FELS:  Objection, your Honor.

2    THE COURT:  Sustained.

3  Q    Now, the reason why your brother ordered the murder of

4  Lucia's son was because Jaime had ordered the kidnapping of

5  your mother?

6  A    That's correct.

7  Q    So Jaime ordered the kidnapping of his grandmother.

8  A    That's true.

9  Q    Typical family issues.

10    MR. FELS:  Objection, your Honor.

11    THE COURT:  Sustained.

12  Q    But you and Alex nevertheless both used Jaime to help you

13  deal drugs?

14  A    Yes, sir, that's correct.

15  Q    Now Teresa, you said was not a drug dealer?

16  A    No, sir.

17  Q    Pacho, your older brother, was a drug dealer killed by

18  another narcotics trafficker?

19  A    Yes, sir.

20  Q    And your sister, Dolly, was a drug trafficker?

21  A    Yes, sir.

22  Q    Is she in prison right now?

23  A    She did time here in the United States.

24  Q    She did time in the United States?

25  A    Yes, sir, like five or six years.

3077

CIFUENTES - CROSS - MR. LICHTMAN

1    Q    Is she out of prison now?

2    A    Yes, sir.

3    Q    She cooperated with the Government, didn't she?

4              MR. FELS:  Objection, your Honor.

5              THE COURT:  Sustained.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CIFUENTES - CROSS - MR. LICHTMAN

1   CROSS-EXAMINATION

2   BY MR. LICHTMAN::

3   Q    Now with regard to your mother Carlina, that's her name?

4   A    Yes, sir, Carlina.

5   Q    And she was very much involved in the day-to-day business

6   of your drug trafficking organization?

7   A    Yes, sir.

8   Q    And you would go to her all the time for advice on the

9   smallest details of your drug trafficking problems?

10  A    No, sir.

11  Q    She passed messages between the brothers regarding drug

12  trafficking issues?

13  A    Yes, sir.

14  Q    You went to her for advice on drug trafficking issues?

15  A    That's correct, sir, yes.

16  Q    Now growing up your family wasn't poor, were they?

17  A    Very poor.

18  Q    Very poor.

19  A    Well, seven of us slept in one bed.

20  Q    In one bed seven of you slept?

21  A    Yes, sir.

22  Q    Was that a very large bed?

23  A    We were very small.

24  Q    So you slept -- was it a single bed?

25  A    No, it was a Queen size bed.

CIFUENTES - CROSS - MR. LICHTMAN

1  Q    Did you sleep across or were you side to side?

2           THE COURT:  Mr. Lichtman.

3           MR. LICHTMAN:  Sorry, Judge, I forgot where I was

4  for a second.

5  Q    But there is more to drug dealing than just buying and

6  selling, wouldn't you agree?

7  A    Yes, sir, there are many activities within drug

8  trafficking.

9  Q    Besides transporting drugs and buying and selling, you

10 had to take advantage of any opportunity you could, correct?

11 A    I don't know what you're referring to.

12 Q    That's fair.  That was a bad question.

13          You learned early on that you needed to take

14 advantage of any opportunity to bribe law enforcement.

15 A    That's correct, yes, sir.

16 Q    So that you could move your drugs without being caught?

17 A    Yes, sir.

18 Q    Now your older brother, Pacho, attended a military

19 academy for a few years, correct?

20 A    That's correct, sir.

21 Q    Was that free that military academy, do you know?

22 A    I think so.  I have no idea.  I was small.

23 Q    You don't know that the military academy actually you

24 have to pay a tuition?

25 A    Yes, but I think it was something that -- I don't know, I

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - MR. LICHTMAN

1    know from the photo because I saw him in military uniform, but

2    I don't know because I wasn't in charge of paying his

3    schooling.

4    Q    Understood.  And this was a school where many of the

5    students graduated and went into the military in Colombia?

6    A    Yes, sir.

7    Q    And some of those graduates reached very high positions

8    in the government and in the military in Colombia?

9    A    Yes, sir.

10   Q    And Pacho didn't actually graduate that military academy,

11   isn't that true?

12   A    No, he spent, I don't know, maybe a couple of years

13   there, I don't know.

14   Q    But he made many friends there, correct?

15   A    Yes, sir.

16   Q    And you're aware that his friends went on to very

17   distinguished careers in the Colombian military?

18         MR. FELS:  Your Honor, I object to relevance.

19         THE COURT:  Well, I'm hoping it will wrap up.  I'll

20   give him a little leeway.

21         MR. LICHTMAN:  Thank you, Judge.

22   A    Yes, sir.

23   Q    And Pacho used those connections he made to those friends

24   to bribe them later in life, correct?

25         MR. FELS:  Objection, Your Honor.  May we have a

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3081

CIFUENTES - CROSS - MR. LICHTMAN

1    sidebar?

2            THE COURT:  Okay.

3            (Sidebar conference.)

4            (Continued on the next page.)

SIDEBAR CONFERENCE

1      THE COURT:  You're not going to impeach this

2  witness.

3      MR. LICHTMAN:  No, I'm going to explain why.  He

4  told the government that his brother bribed many of his

5  friends as they grew up and he used the information and the

6  protection to help with his own drug dealing.

7      THE COURT:  Okay.

8      MR. FELS:  That's fine.  The only thing I'm

9  concerned about are some of the names.

10      MR. LICHTMAN:  They're all blacked out.  The only

11  one that is not I think is Betancourt, that's out.  Everyone

12  else is blacked out.

13      MR. FELS:  Okay.

14      MR. LICHTMAN:  I could say Mr. Redacted.

15      THE COURT:  He'll be careful, but the area is

16  legitimate.

17      (End of sidebar conference.)

18      (Continued on the next page.)

19

20

21

22

23

24

25

3083

SIDEBAR CONFERENCE

1           (In open court.)

2           MR. LICHTMAN:  Judge may I?

3           THE COURT:  Please.

4    BY MR. LICHTMAN::

5    Q    When we left off the question was, is that Pacho used the

6    connections he made in the military academy to bribe those

7    friends later in life.

8    A    Yes, sir.

9    Q    While they were in the military and the government?

10   A    Yes, sir.

11   Q    To allow him to move his narcotics without fear of them

12   being seized?

13   A    Yes, sir.

14   Q    Or him being arrested.  No fear of him being arrested

15   when he was bribing his old friends?

16   A    Yes, sir.

17   Q    He gave them boxes of cash that you witnessed?

18   A    Yes, sir.

19   Q    And various generals, colonels, police officers came to

20   see Pacho in his office all the time?

21   A    I saw some officers, yes, sir.

22   Q    They came just to get bribed, to receive money, correct?

23   A    Yes, sir.  And I assume to greet him too.

24   Q    And to greet him as well.

25           And that was what Pacho -- one of things he was

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3084

SIDEBAR CONFERENCE

1  known for was the fact that he had all the connections to

2  corrupt officers in the Colombian military and law

3  enforcement?

4  A    Yes, sir.

5  Q    And you benefited from this as well because you were

6  part -- you were dealing drugs with Pacho?

7  A    Yes, sir, that's correct.

8  Q    And you yourself -- sorry.  You, yourself, bribed any

9  number of high ranking military officers in Colombia?

10  A    No, sir, not as far as I remember.

11  Q    You didn't bribe any one in the military in Colombia?

12  A    Not as far as I remember.  I got those documents from the

13  prison and stuff, but those weren't military people, no.  In

14  Ecuador I did.

15  Q    Excuse me.  I apologize.  You bribed military men in

16  Ecuador?

17  A    Yes, sir.

18  Q    And you had bribed attorney generals in Colombia?

19  A    In Mexico.

20  Q    I apologize, thank you.

21        You bribed an attorney general, a prosecutor in

22  Mexico, correct?

23  A    Yes, sir.

24  Q    And you bribed the police?

25  A    Whenever it was needed, yes, sir.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    Q    Whenever you needed it?

2    A    Yes, sir, for drug trafficking.

3    Q    And part of your skills as a successful narcotics

4    trafficker is your ability to deceive people, correct?

5    A    No, sir.

6    Q    You don't think you need to lie when you're a drug

7    trafficker at your level?

8    A    No, sir.

9    Q    So you didn't lie in your everyday drug dealing

10   activities?

11   A    No, sir.

12   Q    Did you ever lie while you were dealing drugs?

13   A    Yes, sir.

14   Q    Just very infrequently?

15   A    Very rarely.

16   Q    Very rarely you lied?

17   A    Yes, sir.

18              MR. FELS:  Objection.  Asked and answered.

19              THE COURT:  It's easier to let him answer again.

20   BY MR. LICHTMAN::

21   Q    You lied to your sister Lucia, you claimed, by not

22   telling her about her son's drug dealing?

23   A    I'm sorry, can you repeat that.

24   Q    I'll move on.

25              Part of your life was getting fake identification,

3086

SIDEBAR CONFERENCE

1    correct?

2    A    Yes, sir.

3    Q    Honest people don't need fake identification, do they, if

4    you know?

5    A    Well, there are political people who are being persecuted

6    and they use those.  Or when the government gives a new

7    identity to a witness.

8    Q    Were you being persecuted, is that the reason why you had

9    a fake driver's license?

10   A    No, sir.

11   Q    Were you given a fake identity by the government after

12   cooperating, is that why you had a fake driver's license while

13   you were dealing drugs?

14   A    No, sir.

15   Q    The reason you had a fake driver's license were -- was

16   because if you got stopped by law enforcement you can show an

17   ID that it was not your real name.

18   A    That's right, yes, sir.

19   Q    You had credit cards in fake names, correct?

20   A    Yes, sir, that's right.

21   Q    Did you make large purchases with those credit cards in

22   fake names?

23   A    Yes, sir.

24   Q    So that if you made any big purchase law enforcement

25   wouldn't see what you were buying?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    A    Well, that I wasn't the one who was buying it -- well,

2    yes, sir, that's correct.

3    Q    When you were in Geneva in 2001 you bought three Rolex

4    watches.

5    A    Simon Yelenick, Alex and I we did purchase three watches.

6    Q    Did you use a credit card with a fake name to buy your

7    three watches?

8    A    That's not true.

9    Q    You used your credit card with your real name?

10   A    Simon Yelenick paid for them with his own card.

11   Q    Was it a card -- never mind, let me move on.

12        You did use credit cards with fake names as you

13   said?

14   A    Yes, sir, of course.

15   Q    And every time you used a credit card with a fake name

16   that was a crime, wasn't it?

17   A    I did not know.

18   Q    You didn't know that using a credit card in a fake name

19   was a fraud?

20   A    No, sir.

21   Q    What about today, right now as you're testifying, do you

22   think that using a credit card in a fake name is okay?

23        I can't hear you.

24   A    I really do not know, I do not know the law in this

25   country.  I do not know.

3088

SIDEBAR CONFERENCE

1  Q    I'm not talking about the law in this country, I'm

2  talking about the law in any country.

3  A    Man, I mean I don't think so.  Why?

4  Q    After --

5  A    You want me to tell you why.

6        THE COURT:  Wait, you have to let him finish.

7  A    Well, I don't understand.  I mean, I'm not committing

8  fraud.  I mean, I have some money which is part of the drug

9  trafficking proceeds and I'm purchasing something and where is

10 the fraud?  My crime is the source of the money which is the

11 result of the drug trafficking.  So when you are telling me

12 that it's fraud I do not understand.

13 Q    When you hand a credit card with a fake name on it to a

14 merchant and tell the merchant that you're Mr. Gonzalez

15 instead of Mr. Cifuentes, is that a lie?

16 A    Yes, sir, but I am not stealing.

17 Q    Sir, is it a lie?

18 A    Yes, sir, of course it is.

19 Q    Is it a fraud?

20 A    No, sir.

21 Q    So it's a lie but it's not a fraud?

22 A    That's what I understand, yes, sir.

23 Q    There's no question before you, sir.

24 A    I think --

25 Q    Now after you picked up your three Rolex watches in

3089

SIDEBAR CONFERENCE

1   Geneva you flew to Paris on your way to Montreal, didn't you?

2   A    Yes, sir, that's true.

3   Q    You had to finish a 15-ton hashish deal, didn't you?

4   A    Yes, sir.

5   Q    And you were stopped at customs because they thought you

6   were a jewel thief, isn't that what you told the government?

7   A    Yes, sir.

8   Q    And you showed them a Mexican passport, didn't you?

9   A    Yes, sir.

10  Q    And it had a fake name of Sergio Osuna Villareal?

11  A    Yes, sir.

12  Q    You showed that to the customs officer, didn't you?

13  A    Yes, sir.

14  Q    Was that a lie?

15  A    Yes, sir.

16  Q    Was that wrong?

17  A    Yes, sir, that was wrong.

18  Q    It's because you got detained, correct?

19  A    Yes, sir, that's correct.

20  Q    That's why it was wrong?

21  A    No, it was a lie, I mean it's wrong.

22  Q    Because you carried an identification with a fake name on

23  it?

24  A    That's correct.

25  Q    Now, they detained you and your brother Alex at that

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3090
SIDEBAR CONFERENCE

1    time?

2    A    Yes, sir.

3    Q    He had phony identification too?

4    A    Yes, sir.

5    Q    Took you 14 days to get out of there, didn't it?

6    A    That's right, yes, sir.

7    Q    Did you have to bribe someone to get out?

8    A    No, sir.

9    Q    Well, if you know, did they ever learn your real names?

10   A    No, sir.

11   Q    So you got out with them believing that you were Sergio

12   Osuna Villareal?  Sorry, I just asked --

13   A    They let us go but they would say that...

14   Q    Go ahead.

15   A    They would say that they did not believe that we were

16   those people.  But the investigation deadlines were up so

17   that's why they were forced to releasing us.

18   Q    That's what you were lead to believe?

19   A    Well, I don't know.

20   Q    Now you obviously you had travel documents in fake names,

21   passports, visas?

22   A    Yes, sir.

23   Q    All to help you deal drugs?

24   A    Yes, sir.

25   Q    You had a fake Colombian passport in the name of Elkin

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1   Lopez?

2   A    Yes, sir.

3   Q    And you've used that fake name not just on your passport

4   and visa but you've used it in other areas of your life.

5   A    Yes, sir.

6   Q    By the way, who is Elkin Lopez?

7   A    I have no clue.

8   Q    You just fabricated the name?

9   A    No, Jaime Alberto was the one who got me that identity.

10  Q    Your nephew?

11  A    Yes, sir.

12  Q    Who got you the identification for your Mexican passport

13  in the name of Sergio Osuna Villareal.

14  A    Ruben Reygosa.

15  Q    Did you ever get any of these fake travel documents on

16  your own or did you just purchase them?

17  A    Both.

18  Q    Sometimes you would apply for a travel document in a fake

19  name?

20  A    Yes, sir.  That's correct.

21          THE COURT:  Mr. Lichtman, at a convenient time.

22          MR. LICHTMAN:  Can I get 10 more minutes, Your

23  Honor?

24          THE COURT:  Absolutely.

25  BY MR. LICHTMAN::

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3092
SIDEBAR CONFERENCE

1  Q    Every time you applied for a fake travel document there

2  was a series of steps that you had to take?

3  A    I don't know what you mean, sir.

4  Q    In order to get a fake travel document you would have to

5  show up with fake identification, correct, in somebody else's

6  name not yours?

7  A    That's correct, yes, sir.

8  Q    And you would lie to the government officials when you

9  would submit an application for a travel document in a fake

10  name.

11  A    That's correct, yes, sir.

12  Q    And every time you used a travel document in a fake name

13  you were committing a crime?

14  A    Yes, sir, I guess.

15  Q    You purchase -- you guess or you know?

16  A    I guess.  Well, there is one thing that is when you're

17  actually pretending to be somebody else, that's one thing, and

18  then there's other stuff.  That's not my field, I do not know.

19  Q    When you were dealing drugs and traveling with phony

20  travel documentation, every time you used that phony travel

21  document you were committing a crime, weren't you, sir?

22  A    Yes, sir.

23  Q    You've been cooperating for five years with them, isn't

24  that true?

25  A    Yes, sir.

3093

SIDEBAR CONFERENCE

1   Q    And yet you're still a little wobbly on whether or not

2   using identification, travel documents in fake names is

3   illegal?

4   A    No, sir.

5   Q    You purchased property in fake names?

6   A    Yes, sir.

7   Q    Crime or no crime?

8   A    That's a crime.

9   Q    And other people's names you purchased property?

10  A    Yes, sir.

11  Q    Crime or no crime?

12  A    That's another crime.

13  Q    Now were you born on May 13th, 1966?

14  A    Yes, sir, that's correct.

15  Q    In Colombia?

16  A    Yes, sir.

17  Q    But your Colombian identification documents all state

18  that you were born a year earlier in 1965, isn't that true?

19  A    That is correct, yes, sir.

20  Q    Because you lied and changed the year of your birth to a

21  year earlier in order get a driver's license early?

22  A    Yes, sir, that's true.

23  Q    And so the very first driver's license you ever got as a

24  child you committed a crime to get it?

25  A    Yes, sir, that's correct.

3094

SIDEBAR CONFERENCE

1   Q    A crime involving dishonesty?

2   A    Yes, sir.

3   Q    And your parents knew because they obviously knew how old

4   you were in reality?

5   A    Yes, sir.

6            MR. LICHTMAN:  Judge, we can take a break now.

7   Thank, you.

8            THE COURT:  Okay, we're going to take our lunch

9   break, ladies and gentlemen.  I was premature last week at

10  this time in telling you we had something different for you,

11  this week we definitely have something different for you.

12           Please don't talk about the case during this

13  different lunch, and we'll see you back here at a quarter to

14  two.

15           (Jury exits courtroom.)

16           THE COURT:  We'll have a one-hour lunch recess

17  today.

18           (Luncheon recess.)

19           (Continued on the next page.)

20

21

22

23

24

25

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1          A F T E R N O O N   S E S S I O N

2                      (1:45 p.m.)

3          THE COURTROOM DEPUTY:  All rise.

4          THE COURT:  Let's have the jury back, please.

5          (Jury enters courtroom.)

6          THE COURT:  All right, everyone be seated.

7          I hope you enjoyed lunch, ladies and gentlemen.

8          THE JURY:  Oh, yes.

9          THE COURT:  There is not much we can do for you, but

10   we're doing what we can.

11          All right, please continue, Mr. Lichtman.

12          MR. LICHTMAN:  Thank you, Judge.

13   CROSS EXAMINATION(Continued)

14   BY MR. LICHTMAN::

15   Q    Mr. Cifuentes, when we took a break we were talking about

16   the driver's license, your first driver's license that you got

17   where you lied about your date of birth, correct?

18   A    Yes, sir.

19   Q    And you attended high school in Medellin?

20   A    Yes, sir.

21   Q    Did you graduate from high school?

22   A    No, sir.

23   Q    When did you stop school?

24   A    Fourth year of high school.

25   Q    So you were about 17 or 18 years old when you stopped

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   school?

2   A    Yes, sir, more or less.

3   Q    Now, you have no diploma from any university obviously?

4   A    No, sir.

5   Q    And I meant a real diploma?

6   A    Yes, sir.

7   Q    But you managed to buy some fake ones?

8   A    Yes, sir.

9   Q    You have a false -- excuse me, a fake diploma from a

10  Colombian university?

11  A    Yes, sir.

12  Q    Is it under your name or a fake name?

13  A    Under my name.

14  Q    And what was the purpose of getting that fake diploma

15  under your real name, was it to impress your parents?

16  A    No, to impress my colleagues at work.

17  Q    And so this was a legitimate job, or are you talking

18  work, drug dealing work?

19  A    My drug trafficking work of course.

20  Q    So you wanted to impress your drug dealing friends that

21  you had a university diploma?

22  A    Basically to travel to different countries you need

23  documents, you need credit cards and I thought it would be

24  necessary for my travel to have a university degree.

25  Q    But you said you got this university degree under your

3097

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1  real name?

2  A    Yes, sir.

3  Q    So in order to travel to other countries you needed

4  travel documents --

5  A    Yes, sir.

6  Q    -- passports, visas?

7  A    Yes, sir.

8  Q    So the fact that you were actually Jorge Cifuentes, had a

9  driver's license, had a birth certificate presumably under

10 your real name, you needed a fake diploma as well?

11 A    That's what I did, yes, sir.

12 Q    And is this the one that you paid 6.5 million pesos for?

13 A    Yes, sir.

14 Q    And it was for a fake business degree?

15 A    Yes, sir, that's correct.

16 Q    Was it from a fake university or a real one?

17 A    A real university.

18 Q    And you also bought a fake diploma when you were in

19 Mexico?

20 A    Yes, sir.

21 Q    And this is the one under the name Sergio Osuna?

22 A    Yes, sir.

23 Q    And was that also to impress your drug dealing friends?

24 A    Yes.  And to travel.

25 Q    It was to help you travel under a fake name so you could

                    CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    easier deal your drugs?

2    A     Yes, sir.  That's true.

3    Q     And you obtained a visa under that name -- I don't mean

4    to mispronounce it -- is it Sergio Osuna?

5    A     Yes, sir.

6    Q     Thank you.  You got a visa under that name as well?

7    A     Yes, sir.

8    Q     And you used all that fake identification under the name

9    Sergio Osuna to open bank accounts in that name?

10   A     Yes, sir.

11   Q     And you had credit cards in that fake name as well?

12   A     Yes, sir.

13   Q     And you lied and told people sometimes that you and

14   Sergio Osuna were actually two different people?

15   A     Yes, sir, correct.

16   Q     And you also used a fake name of Santiago Gonzalez?

17   A     Yes, sir.

18   Q     And you used many other fake names as well, I'm not going

19   to go through all of them.

20   A     Yes, sir, that's true.

21   Q     You would agree that every time you used a fake name that

22   was a lie, correct?

23   A     Yes, sir.

24   Q     And you got another fake diploma when you lived in Texas?

25   A     No, sir.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   Q    Do you not recall or are you certain?

2   A    No, I'm sure I don't have a diploma from Texas.

3   Q    You didn't get a university diploma in economics from a

4   Texas university?

5   A    No, sir.

6   Q    After you moved to McAllen, Texas from Mexico?

7   A    No, sir, not as far as I remember.

8   Q    Well maybe I can refresh your recollection.  Showing

9   3500-77, if you can just look at the first paragraph.  Read it

10  to yourself.

11           THE INTERPRETER:  Would counsel like the interpreter

12  to read it?

13           MR. LICHTMAN:  Yes, you'd have to read it to him I

14  suppose.

15           THE COURT:  You have to tell her.

16           MR. LICHTMAN:  Excuse me?

17           THE COURT:  She's not just going to divine that, you

18  have to tell her if you want her to translate it.

19           MR. LICHTMAN:  The first sentence from the

20  beginning.

21           THE INTERPRETER:  Under details?

22           MR. LICHTMAN:  Yes, thank you.

23           THE COURT:  He meant the first and second sentence.

24           MR. LICHTMAN:  It's a long sentences.  I apologize.

25           THE COURT:  No, it's two sentences.

CIFUENTES VILLA – CROSS – MR. LICHTMAN

1          MR. LICHTMAN:  Is it two?  Oh, thank you, Judge.

2     The first two sentences.

3     Q    Let me ask the question if I can.

4          Does that refresh your recollection that while you

5     were in McAllen, Texas you bought a fake university diploma

6     for a degree in economics?

7     A    No, sir.

8     Q    You were debriefed numerous times by prosecutors and

9     agents.

10    A    Yes, sir.

11    Q    You didn't lie to them, did you?

12    A    No, sir.

13    Q    Now when you were in Texas you used the name Jose Luis

14    Garcia Martinez?

15    A    No, sir.  Jose Luis Garcia Ramirez.

16    Q    Oh, thank you.

17          And you used that fake name to purchase a home --

18    A    Yes, sir.

19    Q    -- open bank accounts, take credit cards out?

20    A    Yes, sir.

21    Q    And using those documents you applied for and received a

22    visa in that name?

23    A    Yes, sir.

24    Q    And that allowed you to have indefinite travel in the

25    United States from Mexico?

3101

CIFUENTES VILLA – CROSS – MR. LICHTMAN

1   A    Yes, sir.

2   Q    And although you lived in McAllen, Texas you continued to

3   coordinate the logistics of your planes filled with drugs

4   coming from Colombia going to Mexico on behalf of drug

5   traffickers?

6   A    Yes, sir.

7   Q    You obviously had no problem morally traveling around

8   America dealing drugs under a fake name with a fake visa, did

9   you?

10  A    Yes, sir.  No, sir.

11  Q    No, sir.

12            And in McAllen in your home you once stored two tons

13  of cocaine in your house?

14  A    Yes, sir.

15  Q    In your guest bathroom in the center of the house you

16  fitted a large compartment hidden behind the mirror to conceal

17  money?

18  A    Yes, sir.

19  Q    And you only had two customers in the United States at

20  that point?

21  A    Two main clients, yes, sir.

22  Q    One in Houston and one in New York City, Manhattan?

23  A    Yes, that's correct.

24  Q    The Houston customer was a fellow named Willie?

25  A    Yes, sir.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    Q    Do you remember Willie's last name?

2    A    No, sir.

3    Q    And in early 1991 you moved to Houston from McAllen,

4    Texas?

5    A    Yes, sir.

6    Q    Your girlfriend was pregnant and she wanted to have the

7    baby in Houston, if you recall?

8    A    Yes, sir, that's correct.

9    Q    And while in Houston you visited Willie's house?

10   A    Yes, sir.

11   Q    That's when you saw the drug ledgers that were written in

12   your hand at his house?

13   A    We did it together.  I wrote.

14   Q    But your handwriting was in those ledgers?

15   A    Yes, sir, that's correct.

16   Q    That concerned you?

17   A    Yes, sir, of course.

18   Q    And Willie got arrested soon thereafter by federal law

19   enforcement?

20   A    Yes, that same day.

21   Q    That same day.

22        And all the documents, including the drug ledgers

23   with your handwriting, were seized that day by federal law

24   enforcement?

25   A    I suspect so, but I have no evidence that that's the

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   case.

2   Q    Well, you received a message from Willie from prison?

3   A    Yes, sir.

4   Q    And the message was that if you were asked to give a

5   handwriting example that you should write with your left hand

6   instead of your right hand, your natural hand.

7   A    That's correct, yes, sir.

8   Q    And, in fact, soon thereafter you were arrested by

9   federal authorities on money laundering charges relating to

10  Willie's case?

11  A    We were arrested at the same time at different locations.

12  Q    And you received a message from his prison to your

13  prison?

14  A    No, sir, we were all put together in a cell.

15  Q    But you received that information to write with your left

16  hand instead of your right hand?

17  A    He told me in person.

18  Q    And in fact, you were required at a later time to give

19  handwriting exemplars?

20  A    Yes, sir, that's correct.

21  Q    And you weren't even arrested under your real name, you

22  were arrested under the fake name Jose Luis Garcia Ramirez?

23  A    That's correct, sir.

24  Q    And as you testified on direct, after you gave your fake

25  handwriting exemplars the charges were dismissed?

3104

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   A    First they gave me bail --

2   Q    Sir --

3   A    -- and then they dismissed the case.

4   Q    -- the question is simply, the charges were dismissed

5   after you gave the fake handwriting exemplars?

6   A    Yes, sir.

7   Q    Now do you think you were the first person in the history

8   of America asked to give writing exemplars that used your

9   other hand?

10  A    No, I don't know.

11  Q    But it worked for you, right?

12  A    I assume so, yes.

13  Q    You fooled federal prosecutors, right?

14  A    Yes, sir.

15  Q    You fooled federal agents, didn't you?

16  A    Yes, sir.

17  Q    Now you said that the laws were different back then,

18  didn't you say that on direct?

19  A    In my -- to my understanding.

20  Q    Tell me how they were different.

21  A    I don't have a way to explain it because I'm ignorant

22  about the law.

23  Q    Why don't you try because you talked about it on direct.

24  So explain to the jury, if you can, how the American law has

25  changed in the early '90s until now.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   A    The only reference I have has to do with conspiracy, but

2   it can be a misinterpretation of how the American law applies

3   in Colombia.  Having to do with the criminal charge.  There

4   are two different systems, there is the Roman system.  So for

5   us you have a crime when they catch you with the cocaine in

6   your hands.  But the laws have changed and just -- they can

7   now charge you if somebody just explains -- explains it even

8   though they may not catch you with the evidence, that's my

9   understanding.  But as I said, that can be completely

10  ridiculous, I really don't know the law.

11  Q    You don't know what you're talking about at all, do you?

12            MR. FELS:  Objection.

13            THE COURT:  Sustained.

14  A    I agree with you.

15  Q    Now after you finished the few years of high school in

16  1984 or so, you were very much a drug trafficker?

17  A    Could you repeat, please.

18  Q    By the time you graduated -- excuse me, you didn't

19  graduate high school.  By 1984, you were 18 years old?

20  A    Yes, sir.

21  Q    And you were arrested, as you said on direct, in Colombia

22  in 1984 for a murder charge.

23  A    Yes, sir.

24  Q    And you claim you didn't do it.

25  A    No, sir.

3106

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   Q    You claim that you witnessed the murder but you didn't do

2   it.

3   A    That's correct.

4   Q    And you claim that you were acquitted, correct?

5   A    Yes, sir.

6   Q    And you spent about two years in prison regardless from

7   age 18 to 20?

8   A    Yes, sir.

9   Q    But one of the years that you spent in prison was on a

10  weapons charge, correct?

11  A    Yes, sir, that's correct.

12  Q    And you actually did possess a weapon.

13  A    That's correct.

14  Q    Now, you were in prison in Medellin?

15  A    Yes, sir.

16  Q    The name of that prison was Bellavista?

17  A    Yes, sir.

18  Q    A dangerous prison?

19  A    Yes, sir.

20  Q    And you mentioned yesterday on direct that while you were

21  in prison you were recruited on behalf of a cartel member

22  named El Mexicano?

23  A    Yes, sir.

24  Q    And you were recruited to kill a man named Fernando

25  Lopera?

3107

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   A    That's true, yes, sir.

2   Q    Were you paid for this murder contract?

3   A    Yes, it was a murder contract.

4   Q    How much were you paid?

5   A    They did not pay me, but they offered me 15 million

6   pesos.

7   Q    Now this attempted murder, because the man didn't die,

8   it's even mentioned in your cooperation agreement, correct?

9   A    Yes, sir.

10  Q    That you wouldn't be required to plead guilty to it.

11  A    Yes, sir.

12  Q    And you were debriefed on this attempted murder many

13  times by prosecutors and agents?

14  A    Yes, sir.

15  Q    Do you recall that not once during all of those

16  debriefings on this subject did you mention that you actually

17  were offered money for this murder?

18  A    That's weird, I understand I did.

19  Q    Didn't, in fact, you tell the government that you were

20  given in exchange special treatment in prison for this

21  attempted murder?

22  A    I do not understand what you mean by special treatment,

23  what are you referring to?

24  Q    What I'm saying is you were moved from general population

25  into a special security unit.

3108

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   A    Yes, sir, they did transfer me from second yard to

2   special yard.

3   Q    And you were given better food and allowed to gamble?

4   A    No, the food was the same.  And I don't understand what

5   you mean by gamble.

6   Q    You don't know what the word "gamble" means?

7   A    Well in the jail there were no -- there was no gambling.

8   There was a pool table.

9           MR. LICHTMAN:  3500-96.  If you can just translate

10  for him this bracketed portion -- oh, I'm sorry, Bates numbers

11  1427.

12          THE COURT:  Does the interpreter understand the

13  shorthand, the Greek symbols?

14          THE INTERPRETER:  I do understand some of it, Your

15  Honor.

16          MR. LICHTMAN:  I would just have...

17          (Pause in proceedings.)

18          THE INTERPRETER:  The interpreter is done, Counsel.

19  BY MR. LICHTMAN::

20  Q    Does that refresh your recollection that you were given

21  preferential treatment due to bribing?

22  A    No, sir.

23  Q    And do you recall telling the government that in exchange

24  for favors from El Mexicano that you agreed to kill Lopera?

25  A    No, sir.  I wanted to be part of that organization.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   Q    Do you need your recollection refreshed?

2   A    If you consider that.

3   Q    Eighty-one, page 2.  If you can read paragraph 3.

4            (Pause in proceedings.)

5   Q    Sir, does that refresh your recollection that in return

6   for the favor of moving you from general population to a

7   special security unit you agreed to kill Fernando Lopera?

8   A    That's not what it says there, but they did switch me to

9   the other unit.  That's what my -- my recollection was

10  refreshed in that sense.

11  Q    Now only because you just said it, if you can read just

12  the underlined portion and tell me if that refreshes your

13  recollection that you told agents that in return for the favor

14  of moving you from general population to a special security

15  unit you agreed, after being pressured, to kill Fernando

16  Lopera?

17           MR. FELS:  Objection.  Asked and answered.

18           THE COURT:  Sustained.

19  BY MR. LICHTMAN::

20  Q    Now you testified on direct yesterday that you put

21  cyanide on which you thought were the man's arepas, is that

22  the word?

23  A    Yes, sir.

24  Q    And you said that he ate the wrong arepa?

25  A    Yes, sir.

3110

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    Q    Who ate the right one?

2    A    I actually grabbed it.  I asked his cook to give it to me

3    and I tossed it through the bars of the place.

4    Q    Because you were concerned about hurting somebody?

5    A    Correct.

6    Q    You don't like hurting people?

7    A    Not people who are not in my line of attack.

8    Q    I'm not in your line of attack, am I?

9    A    No, sir.

10   Q    Thank you.

11   A    You're doing your job.

12   Q    This time that you spent in prison at age 18 when you

13   tried to kill a man while being wrongly accused for murder,

14   this was a harrowing experience for you?

15   A    When I was recruited to do this it was really easy for me

16   to say yes I'll do it --

17   Q    Sir, the question --

18   A    -- but I'm going to try to do it.

19   Q    Excuse me, please.

20   A    I'm answering your question.

21   Q    The question I asked, was the two years that you spent in

22   prison from age 18 to 20 in this very dangerous prison, this

23   was a harrowing experience for you, isn't that true?

24   A    Not that much, sir.

25   Q    It wasn't that bad?

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    A    It wasn't that horrible, sir.

2    Q    Was it helped by the fact that you were having sex with

3    the wife of one of the prison guards inside your cell?

4              MR. FELS:  Objection.

5              THE COURT:  Sustained.  Sustained.

6              MR. LICHTMAN:  Basis, Judge?

7              MR. FELS:  Relevance, Your Honor.

8              THE COURT:  If you want a sidebar, we'll have a

9    sidebar.

10             MR. LICHTMAN:  Relevance?

11             THE COURT:  Yes.

12             MR. LICHTMAN:  Not he was manipulating the system.

13             THE COURT:  I didn't get that in the question.

14   BY MR. LICHTMAN::

15   Q    When you were having sex with one of the guard's wives

16   when you were 18 years old in prison, were you manipulating

17   the prison system?

18             MR. FELS:  Objection, Your Honor, relevance.

19             THE COURT:  I'll allow it.

20   A    Yes, sir.

21   Q    And the wife of this prison guard, she caught a beating

22   from her husband when he caught her, correct?

23             MR. FELS:  Objection, Your Honor.

24             THE COURT:  Sustained.

25   Q    You didn't mention any of that on direct examination, and

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    I didn't miss that, did I?

2                MR. FELS:  Objection, Your Honor.

3                THE COURT:  Sustained.

4    BY MR. LICHTMAN::

5    Q    Now you claim that you actually testified in this murder

6    case when you were 18 years old.

7    A    Yes, sir.

8    Q    And you were acquitted?

9    A    Yes, sir.

10   Q    Even though you were caught with a weapon?

11   A    That wasn't the weapon and I did not kill them.

12   Q    You witnessed the murder, didn't you?

13   A    I was in the crime scene, yes.

14   Q    And you would never lie to get out of jail, correct?

15   A    No, sir.

16   Q    But you did bribe a Colombian official later to remove

17   your records relating to your time in the Bellavista prison

18   from the system?

19   A    Yes, sir, that's true.

20   Q    You even bribed a Colombian official to remove your

21   fingerprint cards from the Colombian police database?

22   A    That's true, yes, sir.

23   Q    And remember -- this is unrelated, but remember yesterday

24   you were speaking about that pretty blue helicopter you claim

25   to have given to Mr. Guzman?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    A    Yes, sir.

2    Q    And you mentioned that it crashed when the pilot tried to

3    fly it out of the hangar?

4    A    Yes, sir, that's correct.

5    Q    You didn't mention on direct that in fact you rolled that

6    damaged helicopter off the side of a cliff in an insurance

7    scam, did you?

8    A    Well that's correct, your client gave me the money.

9    Q    You didn't say that on direct, did you?

10   A    The prosecutor did not ask me about that, but it's in my

11   statement.

12   Q    The prosecutor didn't ask you but you're claiming that

13   Mr. Guzman was responsible for it?

14   A    I was in charge of running that operation to cheat the

15   insurance and Mr. Guzman gave me the money to do so so that we

16   could get him a new helicopter.

17   Q    So it's Mr. Guzman's fault that you committed insurance

18   fraud.  I just asked a --

19   A    No, but it benefited --

20   Q    -- very straightforward question.  It's Mr. Guzman's

21   fault that you committed insurance fraud is what your

22   testimony is, yes or no?

23   A    It is both our fault, yes.

24   Q    Thank you.

25         Now you're out of the Bellavista prison about 1986?

                    CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    A    Yes, sir.

2    Q    And you obviously continued your criminal activity, your

3    drug dealing with your family?

4    A    Yes, sir, that's correct.

5    Q    Your brother Pacho had left to live in the Dominican

6    Republic by 1986 dealing drugs?

7    A    Yes, sir.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    BY MR. LICHTMAN::

2    Q    You drove trucks to Ecuador for Pacho's drug trafficking

3    organization?

4    A    No, sir.

5    Q    You don't recall driving trucks to Ecuador for Pacho's

6    drug trafficking organization?

7    A    No, sir.  In what year?

8    Q    About 1986 or so?

9    A    No, sir, I do not remember.

10   Q    I'll refresh your recollection, if I can.  3573, second

11   page, paragraph four, if you can -- excuse me, paragraph five.

12   If you can read from the top through the underlined portion.

13            (Interpreter reading for the witness.)

14            Does that refresh your recollection in addition to

15   Jorge, your brothers Fernando and Alex helped your brother by

16   driving trucks to Ecuador?

17   A    No, sir, I did not drive to Ecuador.

18   Q    But you were responsible for making sure that the ratio

19   and quantity of the chemicals were correct during the

20   processing of cocaine?

21   A    Yes, sir, that's correct.

22   Q    And while you were in Colombia working with Pacho you met

23   Don Efra?

24   A    Yes, sir.

25   Q    His real name was Efrain Hernandez?

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    A    Yes, sir.

2    Q    He was a big cocaine dealer in Cali?

3    A    Yes, sir.

4    Q    You lived with him for two months, you became his

5    bodyguard?

6    A    Yes, sir.

7    Q    He trusted you very much?

8    A    Yes, sir.

9    Q    And asked you to go to Mexico to help run his operation

10    there?

11    A    Yes, sir.

12    Q    He was sending drugs from Colombia to Mexico for final

13    destination in America.

14    A    Yes, sir, that's correct.

15    Q    And while in Mexico you met El Mayo?

16    A    Yes, sir.

17    Q    You also met his sons including Vicente?

18    A    Yes, sir.

19    Q    And you became very close to all of them, didn't you?

20    A    Yes, sir.

21    Q    And Don Efra owned planes that were used to transport the

22    cocaine from Mexico to Colombia.

23    A    That's correct, yes, sir.

24    Q    Your brother Fernando began working for Don Efra in 1989?

25    A    Yes, sir.

3117

CIFUENTES VILLA – CROSS – MR. LICHTMAN

1   Q    He became, Fernando became, Don Efra's general manager?

2   A    That's correct.

3   Q    If you know, Fernando is very trusted by Don Efra?

4   A    Yes, sir.

5   Q    Now if you recall, in 1989 you traveled to Victoria in

6   Tamaulipas, Mexico?

7   A    Yes, sir.

8   Q    With Hernando Restrepo?

9   A    No, on orders of Don Hernando Restrepo, who was Efrain

10  Hernandez's partner.

11  Q    Did you travel to Tamaulipas with Restrepo?

12  A    No, sir.

13  Q    But you went there to steal a drug route from other drug

14  dealers, didn't you?

15  A    Those were the orders I received from my boss.

16  Q    That's what you went to Tamaulipas for, to steal a drug

17  route from other drug dealers, that was the question.

18  A    Yes, sir, correct.

19  Q    When you said that you did it on orders, I asked you if

20  that's what you did.  You said you did it on orders from

21  someone else.  Are you suggesting that a don't have any blame

22  for that?

23  A    I am to blame.  I just wanted to clear that up.

24  Q    Thank you.  To steal a drug route that means to basically

25  finding the people that controlled the area where the drugs

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1  would move.

2  A    Simply to meet the person who was doing it.

3  Q    And bribe him.

4  A    No.

5  Q    Well, you didn't just meet him, you had to get the route

6  from the other drug dealers, correct?

7  A    Mr. Attorney, if you allow me to explain to you what a

8  route is.

9  Q    No.

10 A    Okay.

11 Q    During the trip you bribed people for information?

12 A    Yes, sir.

13 Q    To find out who the point of contact was in Tamaulipas?

14 A    That's correct, yes, sir.

15 Q    Eventually you received a police escort to the home of

16 Police Commander Arturo Cuellar?

17 A    Yes, sir.

18 Q    He was the one, this police commander, controlled the

19 transportation of drugs through Tamaulipas?

20 A    Yes, sir, that's correct.

21 Q    And this was 1989?

22 A    Yes '88 beginning of '89.

23 Q    Now you also told the Government that in 1989 you were an

24 electrical engineering student?

25 A    No, sir.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    Q    When were you an electrical engineering student?

2    A    Never.

3    Q    Do you need your recollection refreshed?

4    A    No, sir.  I never said that.

5    Q    You never told an agent that you were an electrical

6    engineering student?

7    A    No, no, sir.  I don't know anything about electrical

8    engineering.

9    Q    I believe that.  If an agent came in here and testified

10   that you told him that you were an electrical engineering

11   student, he would be lying?

12              MR. FELS:  Objection.

13              THE COURT:  Sustained.

14   Q    You were working for Don Efra in 1989?

15   A    That's correct, sir.

16   Q    That was around the time you also moved to Texas to deal

17   drugs from there.

18   A    Yes, sir.

19   Q    A busy year, 1989, for you -- withdrawn.

20              In 1990 or so you were introduced to Humberto Ojeda?

21   A    Yes, sir.

22   Q    He became your drug trafficking partner and also your

23   great friend?

24   A    Yes, sir.

25   Q    In fact, he and you were so close that you named one of

3120

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   your sons Humberto Jr.?

2   A     No.

3   Q     Is one of your sons name Humberto?

4   A     No, sir.

5   Q     You didn't tell an agent that you named one of your sons

6   Humberto?

7   A     No, sir.

8   Q     But you did say on direct examination that he was like

9   your brother?

10  A     Yes, sir.

11  Q     And with Ojeda you transported cocaine from Colombia to

12  Mexico, which then went to the United States until 1997?

13  A     Yes, sir.

14  Q     You made a huge amount of money with Ojeda during this

15  period, correct?

16  A     That's correct, yes, sir.

17  Q     You received cocaine in Sinaloa, Nayarit and Jalisco,

18  Mexico.

19  A     Yes, sir.

20  Q     That cocaine crossed the border into Nogales, Texas?

21  A     Part of the cocaine.

22  Q     Between 1991 and 1995 the cash flow of your business with

23  Ojeda was approximately $100 million per month?

24  A     For all the organization.

25  Q     You were still in the your 20s.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    A    Yes, sir.

2    Q    Now, you told the Government that you and Ojeda each

3    withdrew approximately $2 million per month for yourselves.

4    A    I was making that at the beginning.

5    Q    You told the Government that you and Ojeda withdrew

6    approximately $2 million per month for over five years?

7    A    I'm not clear on that.

8    Q    3500, 77, page three, paragraph eight, if you can read

9    the underlined portion.  Let me know if that refreshes your

10   recollection that you told the Government between 1991 and

11   1995 that the cash flow of the business with Ojeda was

12   approximately $100 million per month, that you each withdrew

13   approximately 2 million per month for yourselves?

14            MR. FELS:  Objection to the form of the question.

15            THE COURT:  Sustained.  He gave you the first part.

16            MR. LICHTMAN:  I withdraw that.

17   Q    Does the underlined portion -- excuse me.

18            If you could read that, if that refreshes your

19   recollection, that you told the Government that you withdrew,

20   you each withdrew, approximately $2 million per month for

21   yourselves.

22            (Interpreter reading for the witness.)

23   A    Approximately, sir.  So that doesn't refresh my

24   recollection.

25   Q    During this time period you purchased a $2.2 million

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   house in Key Biscayne, Florida?

2   A    4 million.

3   Q    4 million, excuse me.

4        You did this under the fake name Jose Luis Garcia

5   Ramirez.

6   A    Yes, sir.

7   Q    In 1990.

8   A    Yes, sir.

9   Q    You were 24 years old?

10  A    Yes, sir.

11  Q    This is when you just started with Ojeda, this wasn't in

12  the middle or near the end, this was the beginning.

13  A    Yes, sir.

14  Q    The fact is you had a lot of money before you even met

15  Ojeda.

16  A    Yes, sir.

17  Q    Just from drug dealing.

18  A    Yes, sir.

19  Q    Not from green energy.

20  A    No, sir.

21  Q    Not from saving the pygmies in the Amazon.

22  A    No, sir.

23  Q    The indigenous I meant, not the pygmies.

24       Ojeda was a loyal friend to you, wasn't he?

25  A    Yes, sir.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    Q    But he wasn't educated.

2    A    No, sir.

3    Q    You described him as showy, ostentatious?

4    A    No, sir, he was a simple guy.

5    Q    He liked fancy cars and a helicopter?

6    A    Yes, sir.

7    Q    Do you know many regular guys that have a helicopter?

8    A    I don't know, sir.

9    Q    Among many other reasons because of Ojeda's ostentatious

10   nature, Mayo Zambada killed him in 1987?

11   A    Because he didn't follow Amado Carrillo's call.

12   Q    He didn't follow Amado Carrillo's call to come meet with

13   him?

14   A    Yes, sir.

15   Q    And then Carrillo died?

16   A    Yes.

17   Q    It upset Mayo, according to what you said on direct

18   examination, that Ojeda was building a mansion.

19   A    That's what Mayo Zambada told me.

20   Q    That's one of the reasons he killed him, because of his

21   showy ways, ostentatious ways?

22   A    Yes, sir.

23   Q    Do you see how many times I had to ask that question

24   until you finally answered it yes, that was like six times.

25             MR. FELS:  Objection.

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1      THE COURT:  Sustained.

2   Q    Do you believe that when we talk, it's much more

3   difficult than when they were asking you questions?

4      MR. FELS:  Objection.

5      THE COURT:  Sustained.

6   Q    You didn't know who killed -- excuse me, sir, over here.

7   You didn't know --

8   A    I'm listening to the interpreter.

9   Q    You didn't know who killed Ojeda when he died, did you?

10  A    Can you repeat that.

11  Q    When Ojeda was killed, you didn't know who was his

12  murderer was, did you?

13  A    I had very strong suspicions.

14  Q    That was Mayo Zambada?

15  A    Yes, sir, that's correct.

16  Q    You were very close to Mayo Zambada and his family?

17  A    Yes, sir.

18  Q    Remember when you told the story on direct about how you

19  met Chapo in 2002 or 2003?

20  A    Yes, sir, that's correct.

21  Q    You claimed that you were concerned about your safety

22  because after all Ojeda had been killed and he was your

23  partner.

24  A    That's correct, that's right, sir.

25  Q    Mr. Ojeda died in a very bad manner, correct?

3125

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    A    He was murdered.

2    Q    I know he was murdered; his murder was particularly bad,

3    correct?

4    A    Shot.

5    Q    It upset you how he was killed, didn't it?

6    A    Yes, sir.

7    Q    He was in a gas station with his two young children in

8    the car?

9              MR. FELS:  Objection as to relevance.

10             THE COURT:  Sustained.

11             MR. LICHTMAN:  Judge, I can approach and explain?

12             THE COURT:  I'm going to take your word for it.  He

13   may answer.

14   A    Can you repeat the question?

15   Q    Ojeda was with his young children at a gas station, the

16   kids were in the car?

17   A    With one of his children, with Valentino.

18   Q    With you one of his children.  And Mayo's gunmen told him

19   to stop?

20   A    Yes, sir, Alonso.

21   Q    And the gunman shot the car 40 times with the child

22   inside?

23   A    It was an armored car.

24   Q    But one of the bullets went through the lock and hit

25   Ojeda in the heart?

3126

CIFUENTES VILLA – CROSS – MR. LICHTMAN

1    A    That's correct, yes.

2    Q    And Ojeda somehow drove to his house and crashed his car

3    into a tree?

4    A    He was 30 meters away from his house.

5         THE COURT:  Mr. Lichtman are you wrapping this up?

6         MR. LICHTMAN:  Yes.

7    Q    Ojeda's wife came outside and rescued the child?

8    A    That's correct.

9    Q    Ojeda was dead?

10   A    Yes, and the child was locked inside the car.

11   Q    That angered you very much?

12   A    Yes.

13        THE COURT:  Let's have a sidebar.

14        (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (Sidebar conference.)

2          THE COURT:  I just want to make sure, I don't know

3   where your going.  There is it two ways you could be going.

4   One is where you're not supposed to, one is to bring out that

5   that he retaliated.  You're not supposed to.  The other is to

6   suggest that he didn't retaliate and is therefore lying, that

7   would be equally bad.

8          MR. LICHTMAN:  Because I'd be it gilding the lily.

9          THE COURT:  If it's not one of those, what are you

10  going for?

11         MR. LICHTMAN:  I want to show even though was

12  disgusted with Mayo, he continued to deal drugs.

13         THE COURT:  What does that show?

14         MR. LICHTMAN:  It shows that all he cares about is

15  making money from drugs, not the dead friend.

16         THE COURT:  What does that show?

17         MR. LICHTMAN:  He puts drug dealing above any other

18  morale.

19         THE COURT:  It doesn't show that he puts drug

20  dealing above telling the truth on this witness stand here and

21  now.

22         MR. LICHTMAN:  It does.  It shows all he cares about

23  is making money, and he has simply no morals despite the

24  claims he's the good one.

25         THE COURT:  The only thing that matters is whether

3128

SIDEBAR CONFERENCE

1   he's given truthful testimony now or whether he's lied in the

2   past.

3           MR. LICHTMAN:  He's willing to put other things

4   above truth telling in order to get what he wants.

5           THE COURT:  How does this get above truth telling?

6           MR. LICHTMAN:  He doesn't care about anything other

7   than what he wants.

8           THE COURT:  Because he's an immoral person it

9   shows --

10          MR. LICHTMAN:  This is a man he said was his

11  brother.

12          THE COURT:  It's a very bad act.  I'm agreeing with

13  you.

14          MR. LICHTMAN:  Not just the act, the act is -- he

15  didn't commit the act.

16          THE COURT:  I understand.

17          MR. LICHTMAN:  The point is his brother was killed

18  by this man in this horrible manner and still deals drugs with

19  him.

20          THE COURT:  I mean it's a bad act that after the guy

21  he regarded as his brother was killed he went right back to

22  drug dealing.

23          MR. LICHTMAN:  That's what I'm trying to establish.

24          THE COURT:  You don't get bad acts.  You only get

25  the bad acts if they suggest a character for not being

SIDEBAR CONFERENCE

1   truthful.

2          MR. LICHTMAN:  I think if you're willing to do that

3   to your brother's memory, you're to lie on the stand.

4          THE COURT:  What you're saying is any time someone

5   is really, really bad --

6          MR. LICHTMAN:  No.

7          THE COURT:  -- the jury can draw the conclusion that

8   they put, they subordinate truth, to anything else.  That's

9   too far disconnect.

10          MR. LICHTMAN:  Judge, the fact that the man had sex

11   with the guard's wife in prison, does not mean that he's

12   willing to do anything on the stand.  The point I'm making

13   here, is that all this man cared about is making money from

14   drug dealing; and therefore, he right now is on the stand and

15   he will say anything and everything to get what he wants now,

16   which is to get out of jail.

17          THE COURT:  You have to show that through

18   inconsistent statements or history of fabrication, which you

19   have shown a history of fabrication.  This does not contribute

20   to that.  I'm not going to let you go any further.

21          (End of sidebar conference.)

22          (Continued on the next page.)

23

24

25

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1          (In open court.)

2          THE COURT:  Mr. Lichtman, you can have one question

3  to tie it up.  If you want another sidebar I'll tell what you

4  the question is.  You told me.

5          MR. LICHTMAN:  How about I guess it and if I'm wrong

6  you'll tell me.

7          THE COURT:  Go ahead.

8  BY MR. LICHTMAN::

9  Q    Despite the fact that Mayo had killed your brother, you

10  still wanted to deal drugs with him?

11          MR. FELS:  Objection.

12          THE COURT:  I'll allow it.

13  A    Could you repeat that please?

14  Q    Yes.  Despite the fact that Mayo had killed your brother

15  in a horrific fashion, you were still willing to deal drugs

16  with him afterward?

17  A    Are you referring to Humberto Ojeda?  He's not my

18  brother.

19  Q    You referred to him --

20  A    He was just like my brother.

21  Q    You referred to him as if he was your brother.

22          THE COURT:  Rephrase the question, use the name.

23  Q    Even though Mayo had killed Ojeda, someone that you

24  referred to on direct as your brother, in the most horrific

25  manner, you were still willing to deal drugs with Mayo

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    afterward?

2    A    Yes, sir.

3    Q    And while you long suspected that Mayo had killed Ojeda,

4    you asked Mr. Guzman to set up a meeting with Mayo Zambada for

5    you?

6                MR. FELS:  Objection.

7                THE COURT:  It's the last question of this that I'm

8    going to allow.  You've gone this far, I'll allow it.

9    A    Could you repeat the question?

10   Q    You asked Mr. Guzman to set up a meeting with Mayo

11   Zambada so you could learn if it was safe for you to continue

12   deal drugs in Mexico.

13   A    No, sir.  I asked him to get me a meeting with Ojeda's

14   murderer; and obviously, that was with Mayo Zambada.

15   Q    You wanted to meet Mayo Zambada to learn if it was safe

16   for you to be in Mexico to deal drugs after your partner had

17   been killed by him.

18   A    That's correct, yes, sir.

19                THE COURT:  Let's move on.

20   Q    And Mayo, as you testified on direct is that Mayo Zambada

21   said you were family?

22   A    That's correct, yes, sir.

23   Q    And Judge, if I can ask one -- no, I'm not going to do

24   that Judge.

25                Now, you testified on direct that the reason you

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   requested this meeting with Mr. Guzman was because you were

2   concerned about your safety and that you wanted to deal drugs

3   in Mexico, correct?

4   A    Yes, sir, that's correct.

5   Q    But the fact is when you were debriefed by the Government

6   initially you claimed that the main reason you reached out to

7   Mr. Guzman in 2003 was not to resume drug trafficking but to

8   get Mr. Guzman's protection and to find out who had killed

9   Ojeda?

10  A    I said that the main reason was for safety and to traffic

11  drugs.

12  Q    That's two reasons, correct?

13  A    That's correct, yes, sir.

14  Q    Didn't you initially tell the Government that the main

15  reason for reaching out to Mr. Guzman in 2002 was not to

16  resume drug trafficking but only regarding your safety.

17  A    Yes, sir, that's correct.

18  Q    You shaded the truth to the Government initially, didn't

19  you?

20  A    Well, at the meeting I realized that there were other

21  reasons that were my motive.  And that at one point in time

22  they were not clear to me.  I did not want to accept them.

23  And I'm referring to my own greed.  But I did not hide any

24  information regarding the crime.

25  Q    You lied initially when you spoke to the Government about

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1  your motives for this meeting with Mr. Guzman in 2002, didn't

2  you?

3  A    No, sir.  They continued to be the same two reasons.

4  Q    The Government did not tell you later that you had lied

5  to them initially?

6  A    No, sir.

7  Q    You never learned from them that you had mislead them

8  initially about your main reason for going to see Mr. Guzman

9  in 2002?

10  A    Yes, sir, about the main reasons.

11  Q    The main reason you told them when you were debriefed

12  initially for your meeting with Mr. Guzman was your concern

13  over your personal safety in Mexico?

14  A    Yes, sir, that's correct.

15  Q    But the fact is there was a second reason, not just your

16  safety, it was because you wanted to continue to deal drugs in

17  Mexico.

18  A    That's correct, yes, sir.

19  Q    And you started cooperating in 2014?

20  A    Yes, sir.

21  Q    In 2016 you signed a sworn affidavit in connection with

22  Mr. Guzman's extradition here?

23  A    Yes, sir.

24  Q    And you signed it under penalty of perjury, correct?

25  A    Yes, sir.

3134

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    Q    You took an oath, like you took today before you started

2    testifying, to tell the truth, correct?

3    A    Yes, sir.

4    Q    And in that affidavit you said in 2003, I requested a

5    meeting with Joaquin Guzman the leader of the Sinaloa Cartel

6    in order to talk about my concern for my personal safety,

7    correct?

8    A    Yes, sir, that's correct.

9    Q    That was in June 23, 2016; is that correct?

10   A    That's correct, yes.

11   Q    You let that stay for all those years, correct?

12   A    Yes, sir.

13   Q    Because you wanted to hide the fact that you were a

14   greedy drug dealer, correct?

15   A    No, sir.  In the questioning I realized that my main

16   motive was agreed.  But the facts remain the same, the cocaine

17   is the same, the crime is the same.

18   Q    You signed an affidavit --

19   A    There were two reasons.

20   Q    -- you signed an affidavit under oath that the reason you

21   went to visit Mr. Guzman was for your concern over your

22   personal safety, correct?

23   A    Yes, sir, and also to traffic in drugs.

24   Q    In your affidavit you said that the reason you went to

25   see Mr. Guzman was over concern of your personal safety.

3135

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1    Period.  End of statement.  Correct?

2    A     That's correct, yes, sir.

3    Q     The Government got mad about that, they called you on

4    that, didn't they?

5    A     Yes, sir.

6    Q     They didn't rip up your cooperation agreement that you

7    signed a year a full year and change earlier, did they?

8    A     Not yet, sir.

9    Q     Not yet, right?

10   A     Not yet.

11   Q     Do you think they ever will?

12   A     I hope not.

13   Q     Now you claim that you were the -- after your friend

14   Ojeda died you said, that you were tired from narcotics

15   trafficking.

16   A     I took a distance from the direct activities.

17   Q     You were still dealing drugs, you just were paying for it

18   as opposed to doing the day to day, correct?

19   A     That's correct, yes, sir.

20   Q     So you were still dealing drugs, you weren't retired.

21   A     That's correct, yes, sir.

22   Q     If we can get back to Don Efra, he actually retired from

23   dealing drugs in 1996?

24   A     Yes, sir.

25   Q     He did it --

                    CIFUENTES VILLA – CROSS – MR. LICHTMAN

1    A    He was killed.

2    Q    He was killed.  He did it to focus on his legitimate

3    business dealings, that's why he retired?

4    A    Yes, sir.

5    Q    But it was a short retirement because your brother,

6    Fernando, killed him in 1996?

7    A    That's correct, yes, sir.

8    Q    Don Efra, you were his bodyguard at one point, correct?

9    A    Yes, sir, correct.

10   Q    He gave you a big start in this business of yours,

11   correct?

12   A    Yes, sir.

13   Q    You knew that Fernando was going to kill him before he

14   did it, didn't you?

15   A    I asked him for the favor to not do it.

16   Q    You knew about it beforehand and you didn't stop it, did

17   you?

18   A    I tried.

19   Q    You never told the Government in any of your debriefings

20   that you tried to stop this murder, did you?

21   A    I guess I did, in fact I did mention I left the country

22   because of that.

23   Q    You said you left the country because you were afraid of

24   the violence that was going to occur afterward, correct?

25   A    I do not understand.

3137

CIFUENTES VILLA - CROSS - MR. LICHTMAN

1   Q    You moved --

2   A    What date are we talking about?

3   Q    You moved to Australia before Fernando killed Don Efra,

4   didn't you?

5   A    That's correct.

6   Q    You knew Fernando was going to kill Don Efra and you may

7   be killed in response?

8   A    Yes, sir.

9   Q    Sir, I'm going to ask you again, you never told the

10  Government that you tried to stop this murder?

11  A    I don't know, but either way I could not stop it.

12  Q    You didn't want to stop it, did you?

13              MR. FELS:  Objection.

14              THE COURT:  Last question on this.

15  Q    Now you went to Australia to avoid the fallout from the

16  murder of Don Efra by your brother, you traveled under a fake

17  name of course, correct?

18  A    Yes, sir.

19  Q    Are you --

20              THE COURT:  Mr. Lichtman --

21  Q    -- are you saying you had no control over your brother?

22              THE COURT:  -- at a convenient time, which is not in

23  the middle of a question.

24              MR. LICHTMAN:  This is convenient.

25              THE COURT:  Are you sure?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

PROCEEDINGS

1                MR. LICHTMAN:  Yes.

2                THE COURT:  Let's take our 15-minute break.  See you

3     back here at 3:30.

4                (Jury exits.)

5                MR. LICHTMAN:  I'm only going to four because they

6     need to bring in another witness.

7                THE COURT:  Is four enough time to get this person

8     on direct and cross?

9                MS. GOLDBARG:  It's law enforcement.  It's one

10    seizure, about 20 minutes.

11               MR. LICHTMAN:  That's two hours, Judge.

12               MR. PURPURA:  It may be cross too.

13               THE COURT:  I'm worried about the cross.

14               MR. LICHTMAN:  Do you want me to stop at ten of?

15               THE COURT:  I understand -- it's fine with me.  We

16    can break at four and take this witness out of turn.  I want

17    to make sure everyone has allotted enough time if the witness

18    has travel obligations and can't come back next week.  You

19    decided what you want to do and we'll reconvene and make a

20    decision at 3:30.

21               MS. PARLOVECCHIO:  Yes, your Honor thank you.

22               (Brief recess.)

23               THE COURT:  Let's have the jury.

24               (Jury enters.)

25               THE COURT:  Everyone may be seated.

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1    Ladies and gentlemen, we are going to again

2    interrupt the testimony of Mr. Cifuentes.  We have another

3    travel schedule that we're trying to accommodate, so the

4    Government is going to call another witness now.  Then we'll

5    get back to Mr. Cifuentes either this afternoon or Monday.

6    Government is calling...

7            MS. GOLDBARG:  The Government is calling Cliffton

8    Harrison.

9            COURTROOM DEPUTY:  Remain standing and raise your

10   right hand.

11           (Witness takes the witness stand.)

12   CLIFFTON MONTGOMERY HARRISON, called as a witness, having been

13   first duly sworn/affirmed, was examined and testified as

14   follows:

15           THE WITNESS:  I do.

16           COURTROOM DEPUTY:  State your name.

17           THE WITNESS:  Cliffton Montgomery Harrison,

18   C-L-I-F-F-T-O-N, M-O-N-T-G-O-M-E-R-Y, H-A-R-R-I-S-O-N.

19           MS. GOLDBARG:  May I inquire, your Honor?

20           THE COURT:  You may.

21   DIRECT EXAMINATION

22   BY MS. GOLDBARG::

23   Q    Mr. Harrison, good afternoon.

24   A    Good afternoon.

25   Q    What do you currently do for a living?

3140

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1   A    I'm currently in training to be a Diplomatic Security

2   Service Agent.

3   Q    Is that with the Department of State?

4   A    It is.

5   Q    How long have you been with the Department of State?

6   A    Since October of this year.

7   Q    Immediately prior to October of 2018, what did do you?

8   A    I was an active duty officer in United States Coast

9   Guard.

10  Q    How long you were an active member of the United States

11  Coast Guard?

12  A    Fifteen years.

13  Q    When did you start with the United States Coast Guard?

14  A    2003.

15  Q    You left when?

16  A    I left, August 31 was my last day of active duty.

17  Q    What is your current status with the Coast Guard?

18  A    Separated, waiting to joining the Reserves.

19  Q    What did you do before you joined the United States Coast

20  Guard?

21  A    I was a college student.

22  Q    Can you very briefly take the jury through some the

23  training that you received when you became a member of the

24  Coast Guard?

25  A    So you start out in a basic training.  After basic

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1   training I went to Officer Candidate school.  After Officer

2   Candidate school I went to the Boarding Officer school.

3   Boarding Officer school is the law enforcement specific

4   training, that's where we're taught how to safely get on board

5   a vessel, control crew members, look for signs of smuggling

6   and test narcotics.

7   Q    At the time you separated from the United States Coast

8   Guard, what rank did you have?

9   A    Lieutenant.

10  Q    Directing your attention to March of 2007, where were you

11  assigned?

12  A    I was a Deck Watch Officer above the Coast Guard Cutter

13  SHERMAN.

14  Q    What is a Cutter?

15  A    The Coast Guard term for any vessel larger than 65 feet.

16  Q    Specifically March 18, 2007, what happened on that day,

17  if anything?

18  A    That was the day that we conducted the boarding of the

19  MOTOR VESSEL GATUN.

20  Q    MOTOR VESSEL GATUN, what are you referring to?

21  A    A large ship that's propelled by engines.

22  Q    Where did you first encounter the motor vessel catune?

23  A    On the Pacific side of Panama, so south.

24         MS. GOLDBARG:  Your Honor, if I may for the witness

25  although, I don't if it would expedite matter, I've shown them

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1    to defense counsel.  I believe there is no objection.

2              THE COURT:  Recite the numbers.

3              MS. GOLDBARG:  All in the 203 series:  203-51,

4    203-5, 203-30, 203-2, 203-43, 203-31, 203-1, 203-41, 203-35,

5    203-33, 203-4, 203-8, 203-10, 203-9, 203-44, 203-11, 203-12,

6    203-13, 203-14, 203-16 for the photographs.

7              Then for videos it's 203-17 and 203-46.

8              THE COURT:  Those are all admitted into evidence.

9              (Government Exhibit 203-51, 203-5, 203-30, was

10   received in evidence.)

11             (Government Exhibit 203-2, 203-43, 203-31, was

12   received in evidence.)

13             (Government Exhibit 203-1, 203-41, 203-35, was

14   received in evidence.)

15             (Government Exhibit 203-33, 203-4, 203-8, was

16   received in evidence.)

17             (Government Exhibit 203-10, 203-9, 203-44, was

18   received in evidence.)

19             (Government Exhibit 203-11, 203-12, 203-13, was

20   received in evidence.)

21             (Government Exhibit XN          , was received in

22   evidence.)

23             (Government Exhibit 203-17, 203-46, was received in

24   evidence.)

25             (Government Exhibit 203-17, 203-46, was received in

                    CLIFFTON HARRISON – DIRECT – MS. GOLDBARG

1    evidence.)

2    BY MS. GOLDBARG::

3    Q     Showing what you is in evidence Government's Exhibit 51

4    what are we looking at here?

5    A     This would be the location that we initially boarded the

6    MOTOR VESSEL GATUN.

7    Q     When you say you boarded the MOTOR VESSEL GATUN, what do

8    you mean?

9    A     In this photo you see the white vessel is the Coast Guard

10   Cutter SHERMAN, the boat I was assigned.  If you look at this

11   picture you see the orange dot, about midway on the white

12   boat, those are small boats, we have two of them.  We use

13   those to get on board from the white boat to the orange boats.

14   Then we got over to the MOTOR VESSEL GATUN.

15           We gave them orders.  The Master of the GATUN was

16   given orders to lower their ladder, which we climbed on, then

17   got on board.

18   Q     You're describing it events from Government's Exhibit

19   203-5, correct?

20   A     Yes.

21   Q     What happened once you got on board the GATUN?

22   A     Upon getting aboard the vessel, I went directly to the

23   bridge, which is on the blue boat if you look at the white

24   area where the windows are, that's the bridge, that's where

25   you drive the vessel from.

CLIFFTON HARRISON — DIRECT — MS. GOLDBARG

1   Q    Mr. Harrison, can you circle that please on the screen in

2   front of you.  What happened when you got to the bridge?

3   A    We made contact with the Master of the vessel.

4   Q    Master of the vessel, is there another term for that?

5   A    The Captain, Man in Charge.

6   Q    Did you speak with the Captain?

7   A    I did.

8   Q    What language did the Captain speak?

9   A    Spanish.

10  Q    Do you speak Spanish?

11  A    I do.

12  Q    After speaking to the Captain in Spanish, what did you

13  do?

14  A    After that, the boarding team and myself began the actual

15  searching process.

16  Q    Since we have 203-5 on the screen, can you describe what

17  kind of vessel the MOTOR VESSEL GATUN is?

18  A    Yes.  It's a coastal freighter, approximately 300 feet in

19  length.  They are typically used to carry small amounts of

20  cargo close to shore.

21  Q    Do you see anything green on the GATUN in this

22  photograph?

23  A    I do.

24  Q    What are those?

25  A    Those are shipping containers.

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1   Q    Just to make sure the record is clear, this happened on

2   March 18, 2007; is that correct?

3   A    Yes.

4   Q    After you talked to the Captain, what did you do?

5   A    After that we begin doing our search.  So our team of

6   Coast Guard members split up amongst different parts of the

7   boat to make sure it was safe.  We go through systematically

8   searching the GATUN.

9   Q    Any crew members on GATUN?

10  A    Yes.

11  Q    What happened to them?

12  A    As part of the boarding procedures, all crew members are

13  mustered in one part of the vessel so they can be better

14  controlled.  Mustering is gathering everyone in one place.  We

15  have all the crew members come to one area, then we have

16  security over-watch on them.

17  Q    You were able to determine the nationality of the crew

18  members aboard the GATUN?

19  A    We were.  It was a mix of Panamanian and Mexican.

20  Q    How did you determine the nationalities?

21  A    Paperwork on board, passports, identification documents.

22  Q    After you mustered the crew and did a search, what did do

23  you next?

24  A    Once we're going through the vessel we get to the

25  containers.

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1    Q    Those are the green items on this Government's Exhibit

2    203-5?

3    A    Yes.

4    Q    What happens with you get to the containers?

5    A    So the containers were held in place with chains.  We

6    popped the lock on one of the containers.  It was only able to

7    be opened about that far apart.

8    Q    Is that about 2 feet that you're indicating with your

9    hands?

10   A    Approximately.

11   Q    Then what happened when you were able to open the door

12   about 2 feet?

13   A    Being one of the thinner people on the team we

14   approximated I would be able to get into the container.  So I

15   took off my body armer, handed over my shotgun, put an oxygen

16   sensor around my neck, and grabbed the camera and climbed into

17   the contain.

18   Q    Why did you put an oxygen monitor on yourself before the

19   container?

20   A    Anytime you go into a confined space you can't ascertain

21   the amount of air in an area you, by policy, have to have an

22   oxygen sensor with you.  If you get to an area with low levels

23   of oxygen it will alert, so you know when to get out of there.

24              THE COURT:  Why couldn't you open it any wider?

25              THE WITNESS:  The way the container was placed on

CLIFFTON HARRISON – DIRECT – MS. GOLDBARG

1    deck in order to stop the container from moving they had

2    chains that were holding it into place.

3    BY MS. GOLDBARG::

4    Q    Now there were more than just how many containers were on

5    the ship?

6    A    Four I believe in total.

7    Q    I'm going to show you Government's Exhibit 203-30.  What

8    are we looking at here?

9    A    So this is one of the containers that had the actual

10   manifest cargo on board.  What you're looking at is legitimate

11   cargo.

12   Q    You just testified that you were able to get one of them

13   opened about 2 feet, then you were the skinny one chosen to go

14   inside is that what you saw the first one you went in?

15   A    No.

16   Q    Showing you what is in evidence as Government's Exhibit

17   203-2.  What are we looking at here?

18   A    So this is a container, the first container we opened

19   that was filled to the top with suspected contraband.

20   Q    You were the one that crawled through there?

21   A    Yes.

22   Q    Showing what you is in evidence as Government's Exhibit

23   203-31, what are we looking at there?

24   A    This shows you how high the suspected contraband was

25   piled in the container, nearly touching the ceiling of the

3148

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1   contain.

2   Q    How did you get around inside?

3   A    The only way for me to fit was to low crawl in that small

4   space you see.  So low crawling is basically on your stomach,

5   hand-over-hand, pulling yourself along.

6   Q    How comfortable is that?

7   A    Not comfortable at all.

8   Q    Showing you 203-31, what are we looking at there?

9   A    This is more photos of the suspected contraband.

10  Q    Once you discovered these objects inside the container

11  what did you do?

12  A    The next thing I did was remove one of the bales from the

13  container to ascertain what was inside.

14  Q    What did you find inside of the containers -- the bales,

15  I'm sorry.

16  A    Inside those burlap sacks were small bricks.

17  Q    Showing you what is in evidence as Government's Exhibit

18  203-41, what are we looking at here?

19  A    This is one of the bricks we pulled from one of the

20  burlap sacks.

21  Q    What did you do with this brick that you took out of the

22  burlap sack?

23  A    We made a small incision in order to test some of the

24  substance that was inside.

25  Q    Were you present for that test?

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1    A    Yes.

2    Q    Showing you what is in evidence as 203-35, what is

3    happening here?

4    A    We're conducting a narcotics identification kit test.

5    Q    Any of your body parts in this photo?

6    A    The glove in the right-hand corner is mine.

7    Q    Can you circle it, please?

8    A    It doesn't seem to be working -- there it goes.

9    Q    What was the result of this preliminary test?

10   A    The test came back positive for cocaine.

11   Q    Looking at 203-33, what do we see here?

12   A    This is a positive result narcotics identification kit.

13   Q    So now that you've tested one of the bricks inside of the

14   burlap sack, what do you do next?

15   A    So then the next step is to account for all of the

16   contraband we've discovered.

17   Q    Showing you in evidence 203-4, what are we looking at in

18   this photograph?

19   A    So this is the off-load of the contraband.  So from here

20   you can see the totality of the burlap sacks are removed.

21   Q    There are two red items kind of going in a diagonal, do

22   you see those?

23   A    Yes.

24   Q    What are those?

25   A    Cranes used for taking on and dropping off cargo.

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1   Q    Can you circle them for the jury, please?

2   A    (Indicating.)

3   Q    Those are the two vertical, diagonal red shapes.  Were

4   those working on the GATUN?

5   A    They were not.

6   Q    Looking at Government's Exhibit 203-38, you said that you

7   removed the bales, how many bales did you remove from this

8   container?

9   A    It was over 700.

10  Q    How long did it take you and the rest of the boarding

11  crew to remove 700 bales from this container?

12  A    It was an overnight evolution of several hours.

13  Q    How did you do it, showing you 203-10, what are we

14  looking at here?

15  A    We formed what you call a daisy chain.  It's just manual

16  labor.  Everybody spaces themselves evenly.  You just pass

17  bales from one person to another and then we try and stack

18  them evenly to get an accurate account.

19  Q    Showing you also Government's Exhibit 203-9, what are we

20  looking at here?

21  A    This is another aspect of the stacks of bales.

22  Q    You removed all 700 bales from the container, what did

23  you do next?

24  A    So once all of the contraband was accounted for, we made

25  our reports to our higher-ups, then we took full control of

CLIFFTON HARRISON – DIRECT – MS. GOLDBARG

1   the MOTOR VESSEL GATUN.

2   Q     What does that mean?

3   A     As you can see in this image, this is what an escort

4   looks like.

5   Q     This is Government's Exhibit 203-5.

6   A     So at this time the Coast Guard is actually driving the

7   MOTOR VESSEL GATUN.

8   Q     At some point in time are you driving the GATUN?

9   A     Yes.

10  Q     What happens to the 700 bales that you found aboard the

11  GATUN?

12  A     Those bales are taken over to the Coast Guard Cutter

13  SHERMAN to be locked down for evidentiary purposes.

14  Q     How did you get the 700 bales from the GATUN that's in

15  the forefront to the Cutter SHERMAN?  Was that an easy fete?

16  A     It was not.  It had to be done loads at a time on those

17  same orange points I pointed out earlier.  That boat had to

18  make dozens of trips back and forth, bales lowered by hand,

19  then they would come back, load them up again and go back

20  over.

21  Q     How long did it take for you and the rest of your team to

22  transport the 700 bales from the GATUN to the Cutter SHERMAN?

23  A     It was several hours.

24  Q     Looking at Government's Exhibit 203-11, where are the

25  bales of cocaine now?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CLIFFTON HARRISON – DIRECT – MS. GOLDBARG

1  A    Now they are on board of Coast Guard Cutter SHERMAN.

2  Q    What is the happening to the bales now?

3  A    They are being counted for storage.

4  Q    Showing you 203-12, what do we see here?

5  A    This is the manner in which we take accountability.

6  Q    Are they grouped 100 at a time?

7  A    Yes.

8  Q    Showing you 203-13, what do we see here?

9  A    This is the process.  We would get everything on deck,

10  then we would organize them.  That's how they would make

11  accurate counts.

12  Q    Last, 203-14?

13  A    Same process.

14  Q    That's someone standing in a sea of bales holding up a

15  clip board, correct?

16  A    Yes.  It's our policy that we don't show faces in these

17  pictures.

18  Q    203-16, what are we looking at here?

19  A    This is the totality of the contraband that was seized

20  from the MOTOR VESSEL GATUN.

21  Q    The 700 bales that were taken off the container?

22  A    Over 700, yes.

23  Q    I would like to play two clips from 203-17, please.

24  Mr. Harrison, could you narrate for us in this first clip what

25  we're seeing?

3153

CLIFFTON HARRISON – DIRECT – MS. GOLDBARG

1  A    This is an overflight from a Coast Guard Helo, the

2  SHERMAN escorting the GATUN.

3  Q    What is a Helo?

4  A    Helicopter.

5  Q    What are we looking at about 17 seconds?

6  A    Here you're seeing the MOTOR VESSEL GATUN under Coast

7  Guard control with bales on deck.

8  Q    Now the second clip, right about three seconds, what are

9  we looking at here?

10  A    Same video, different aspect.  You have the Coast Guard

11  Cutter SHERMAN on the back.

12  Q    At ten seconds, what are we looking at?

13  A    The totality of the contraband on deck of the MOTOR

14  VESSEL GATUN.

15  Q    Once you were able to remove the bales of cocaine from

16  the GATUN to the Cutter SHERMAN, where do you go next, what

17  happens?

18  A    Once the bales are taken below deck and locked under key

19  and guard, then we take the MOTOR VESSEL GATUN to be turned

20  over to Panama.  It was a Panamanian flagged vessel.  And the

21  contraband and the ship return to home port in Alameda,

22  California.

23  Q    Where is Alameda, California?

24  A    Near San Francisco, California.

25         (Continued on next page.)

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1    DIRECT EXAMINATION

2    BY MS. GOLDBARG::

3    Q    Now when you get to Panama, what do you leave in Panama?

4    A    In Panama we leave the MOTOR VESSEL GATUN and a

5    representative sample of the contraband that we seized.

6    Q    What about the crew members that were abroad the GATUN?

7    A    The crew members were turned over to Panamax DEA.  And so

8    the Panamanians went to Panama and the rest went to DEA.

9    Q    Now how long did it take you to get from Panama to your

10   base in Alameda, California?

11   A    It was about a week.

12   Q    And what happened once you got to your base in Alameda,

13   California?

14   A    We conducted an offload of all of the contraband.

15   Q    Was there a video taken of that?

16   A    There was.

17   Q    If we can play Government's Exhibit 203-46.  This is sped

18   up, correct?

19   A    Yes.

20   Q    If you can play 203-46 and if I can ask you Mr. Harrison

21   to please narrate.

22   A    So you can see this is the sped up video so the daisy

23   chain that I mentioned before is the same process we had to

24   use to move all the contraband from the lower part of the

25   Coast Guard Cutter SHERMAN on to shore.

3155

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1    Q    So here at 18 seconds, what are we seeing?

2    A    So this is the bail that you saw pulled from what was

3    once a sonar room on the Sherman, it's pulled out and this is

4    the route that a bail has to take in order to get off the ship

5    and then on to shore to be stacked and accounted for.

6    Q    And so this is an actual live daisy chain that we're

7    looking at?

8    A    This is a daisy chain, yes, ma'am.

9    Q    Sped up.  We're at minute and 46.  And each one of the

10   700 plus bails of cocaine were taken off of the Cutter Sherman

11   in this way?

12   A    Yes.

13   Q    What's happening to the bails once they're taken off the

14   Cutter Sherman?

15   A    They are being stacked and accounted for, so every row

16   should have the same amount --

17   Q    A minute -- I'm sorry, sir.  So at a minute 14 we see at

18   the bottom or actually right now at 1:20, what are we looking

19   at there?

20   A    This is the organization of the bails.  They're starting

21   to prepare the bails for shipment.

22   Q    So what's happening to the bails right now?

23   A    Right now they're being placed on pallets and they're

24   being packaged for transportation.

25   Q    How are they packaged in the pallets?

CLIFFTON HARRISON - DIRECT - MS. GOLDBARG

1    A    So that they put the bails on the pallets, they strap

2    them down with Saran wrap --

3    Q    At two minutes.

4    A    -- as you see here.

5    Q    I'm sorry.  At two minutes of the video what are we

6    looking at there?

7    A    This is how the package the contraband for travel.  On

8    a -- via semi trucks and eventually aircraft.

9    Q    Now at two minutes 15 what's happening to the cocaine at

10   this point in time?

11   A    So this is a police escort to the airport of the

12   contraband.

13   Q    Is that the tractor trailer that we see in the rearview

14   mirror --

15   A    It is.

16   Q    -- at about two minutes 30 seconds?

17   A    Yes.

18   Q    And at about two minutes 40 seconds, what do we see

19   there?

20   A    Here we see the aircraft that will be used to transport

21   the cocaine, that is a Coast Guard C130 aircraft.

22   Q    How many C130 aircraft do we see in there?

23   A    Two I believe.

24   Q    That's at about two minutes 50 seconds.

25         What's happening to the cocaine that was on board

HARRISON - CROSS - PURPURA

1   the tractor trailers?

2   A    It's going to be loaded on the aircraft and taken for

3   transfer to DEA.

4   Q    At three minutes 15 seconds, what are we seeing?

5   A    This is being prepped to be put into the aircraft.

6   You're looking at loadmasters making sure that everything is

7   put properly into the plane to not cause any incidents.

8   Q    And as we see here in three minutes 33 seconds those are

9   the pallets, and now three minutes 37 seconds, what are we

10  looking at there?

11  A    That's the aircraft taking off.

12  Q    Did you have any further involvement in this

13  investigation Mr. Harrison?

14  A    No.  I completed my case package and turned it in.

15  Q    In the 15 years that you were with the United States

16  Coast Guard, how does this seizure rank amongst those?

17  A    This is the -- remains the largest maritime drug seizure

18  by the Coast Guard.

19        MS. GOLDBARG:  The government has no further

20  questions.

21        THE COURT:  Any cross?

22        MR. PURPURA:  Yes, thank you, Your Honor.

23  CROSS-EXAMINATION

24  BY MR. PURPURA::

25  Q    Good afternoon, Mr. Harrison.

                    HARRISON - CROSS - PURPURA

1    A    Afternoon.

2    Q    Sir, back in 2007 what was your rank in the Coast Guard?

3    A    I was an ensign.

4         MR. PURPURA:  And if I may have the Government's

5    Exhibits.

6         MS. GOLDBARG:  Sure.

7    BY MR. PURPURA::

8    Q    Just showing you Government's Exhibit GX203-5, which is

9    in evidence.  I don't think you mentioned, what was the --

10   what's the basis the Coast Guard has to board a ship at sea in

11   this particular case?

12   A    So this vessel was boarded using a bilateral agreement

13   with the nation of Panama.

14   Q    Which means --

15   A    Which means --

16   Q    -- what?

17   A    -- that we have agreements with countries that under

18   certain circumstances we can board vessels flying under their

19   flag or sailing under their flag.

20   Q    This vessel had an appropriate Panamanian flag; is that

21   correct?

22   A    Yes, sir, they are flying a Panamanian flag.

23   Q    And without getting any detail at all, just what were the

24   special circumstances in this particular case in March of 2007

25   for the United States Coast Guard to interdict this particular

HARRISON - CROSS - PURPURA

1    vessel?

2              MS. GOLDBARG:  Objection.

3              THE COURT:  I need a sidebar.

4              (Sidebar conference.)

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1              THE COURT:  It just seems to me that Mr. Purpura may

2     have a theory as to why this is with the scope of cross

3     examination.

4              MR. PURPURA:  Well, I appreciate that, Your Honor.

5              THE COURT:  I couldn't think of one, but I thought

6     maybe you did.

7              MR. PURPURA:  Well, first of all, I'm assuming I

8     believe it's going to be an innocuous answer, that there is

9     some sort of basis that they have and I think that would be

10    helpful to the jury since we talk about interdicting these

11    vessels at sea there's usually a reason for that as they know

12    from their own experience when vehicles get stopped locally

13    there is usually a reason for that.  I was going to bring that

14    out just generally as to why the ship is being stopped.

15             MS. GOLDBARG:  This witness would not have any

16    knowledge of that.

17             MR. PURPURA:  If he doesn't, he says it.  Okay.  Why

18    don't I just follow up and say it's my understanding there was

19    a basis, you don't have knowledge, is that fair?

20             MS. GOLDBARG:  Again, I don't see the relevance of

21    that.

22             MR. PURPURA:  Oh.

23             THE COURT:  It's a question, I always allow one

24    question unless it's really harmful.  This is not harmful.

25    Let's do this.

SIDEBAR CONFERENCE

1          MR. PURPURA:  Thank you.

2          (End of sidebar conference.)

3          (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HARRISON – CROSS – PURPURA

1          (In open court.)

2    BY MR. PURPURA::

3    Q    Mr. Harrison, can we assume that there was an appropriate

4    reason but based on your position as an ensign you may not

5    know what the reason was for the interdiction?

6    A    That is accurate, sir, I do what I'm told directly.

7    Q    You and me both usually.  Thank you.

8          Now, let me just -- this seizure you indicated was,

9    obviously, the largest seizure that you were involved in and

10   to your knowledge the largest seizure the United States Coast

11   Guard is involved in as well; is that correct, sir?

12   A    Yes, sir.

13   Q    We can see from all those photographs there was just a

14   huge amount of cocaine, fair to say, sir?

15   A    Yes, sir.

16   Q    Now, I know this is -- strike that.  You met with

17   government counsel just a short time, I'm sure, just to

18   prepare your testimony, is that fair to say?

19   A    Yes.

20   Q    You've reviewed these photographs and the videos prior to

21   today's date; is that correct, sir?

22   A    Yes.

23   Q    Do you know how many times these photographs and these

24   exhibits were used in other cases?

25          MS. GOLDBARG:  Objection.

HARRISON - CROSS - PURPURA

1          THE COURT:  Sustained.

2          MR. PURPURA:  Maybe we should have a sidebar.

3          THE COURT:  Sure, if you want, that's fine.

4          (Sidebar conference.)

5          (Continued on the next page.)

SIDEBAR CONFERENCE

1            MR. PURPURA:  Your Honor, the relevance of this

2   information coming in is that they're going to suggest that

3   Joaquin Guzman was responsible for the cocaine in this

4   particular shipment.  I can tell the Court that I've been in

5   at least two other cases where this boat has been used to show

6   that Beltran-Leyvas are the responsible party and that the

7   Norte Valle cartel is responsible for --

8            THE COURT:  The origination.

9            MR. PURPURA:  Yes.  And the Norte Valle in another

10  case -- is it Restrepo?  I forgot his name.  I'm sorry.

11           MR. BALAREZO:  Carlos Patino.

12           MR. PURPURA:  Carlos Patino Restrepo, in his case

13  here in this district nine years ago was used again to

14  demonstrate that the Norte Valle was the supplier of this

15  cocaine.

16           MS. GOLDBARG:  I don't believe that's accurate.

17  There is also --

18           MR. PURPURA:  I was the lawyer in that case so was

19  Mr. Balarezo and we have notes on it.  We have actually the

20  government's discovery letters on it.

21           MS. GOLDBARG:  Again, I don't think he would have

22  any firsthand knowledge of that so I don't think he has a

23  basis to answer that question.  And I also -- there has been

24  evidence already presented in trial through one of the first

25  witnesses Jesus Zambada who testified about the seizure

Georgette K. Betts, RPR, CSR, FCRR
Official Court Reporter

SIDEBAR CONFERENCE

1    belonging to members of the Sinaloa cartel, which included the

2    defendant as well as the Beltran-Leyvas and the Zambadas.

3            THE COURT:  I don't want to get into the defense's

4    substantive theory of this, I will only note that the Sinaloa

5    cartel it's like, think of OPEC, it's a bunch of people that

6    get together, that's what I'm hearing in the evidence, so the

7    fact that it was used for somebody else does not mean it

8    excludes the defendant.  I think without passing upon whether

9    the defendant's theory is viable as a substantive matter, and

10   I'm not doing that at all, I just am not seeing the relevance

11   to the fact it was used in some other case for purposes we

12   don't know.

13           On the other hand, I agree with you this witness is

14   going to say, I don't know probably, unless he was the guy

15   that testified in the other cases, but if he says, yes, I was

16   the guy who used it in two other cases, I'm not going to let

17   you say who was charged in that case, who did you testify

18   against.

19           MR. PURPURA:  I understand.

20           THE COURT:  If you want this little piece --

21           MR. PURPURA:  I'll go quick, just that piece.

22           MS. GOLDBARG:  Your Honor, I do believe he will

23   testify that he was called to testify in Tampa, Florida for

24   the crew members, nothing related to the case that was in the

25   Eastern District of New York, nothing related to the

3166

SIDEBAR CONFERENCE

 1    Beltran-Leyvas --

 2                MR. PURPURA:  I'm sure --

 3                MS. GOLDBARG:  If you let me finish.  Nothing

 4    related to Beltran-Leyva, so the relevance of him having been

 5    called in the Middle District of Florida to testify against

 6    the 10 crew members that were arrested is not relevant to, I

 7    don't believe, to his line of inquiry here.

 8                THE COURT:  I'll let you ask him on redirect, that

 9    was the case against the crew members, right.

10                MS. GOLDBARG:  Okay.

11                MR. PURPURA:  I'll make it clear in my question I'm

12    not referencing the crew members.  That will not be an issue.

13                THE COURT:  Okay.

14                MS. GOLDBARG:  Fine.

15                MR. PURPURA:  I'll move on, Judge.

16                THE COURT:  Okay.

17                (End of sidebar conference.)

18                (Continued on the next page.)

19

20

21

22

23

24

25

HARRISON - CROSS - PURPURA

1        (In open court.)

2   BY MR. PURPURA::

3   Q    Mr. Harrison, let me be a little clear with my question.

4   I'm not going to reference of whether you have been ever

5   called to testify or these photographs have been admitted in

6   cases involving crew members, I'm asking you, have you ever

7   been called to testify involving, let's say sources of supply

8   of this cocaine to larger cartel members, have you?

9   A    Have I been -- I've been called to testify prior but I'm

10  not sure what you mean by supply.

11  Q    Well, aside from the call you might have had in Tampa,

12  Florida, have you ever been called in or been prepared to

13  testify in the United States District Court for the District

14  of Columbia for these particular photographs?

15  A    I believe I was called upon, I wasn't identified to

16  testify but there was a discussion in the District of Columbia

17  at one point.

18  Q    Also how about a prior discussion in the Eastern District

19  of New York, right here, and/or in Long Island?

20  A    I don't recall that specific.

21  Q    Fair enough.  Let me -- final couple of questions.

22  Government's Exhibit GX203-13.  What we're looking at is the

23  outside bails; is that correct?

24  A    That is correct.

25  Q    Now did the United States Coast Guard put these

HARRISON - CROSS - PURPURA

1  particular markings on the bails, 20, 20, it's probably a 20

2  here upside down?

3  A    No, sir, they did not.

4  Q    How many of the bails, to your knowledge, were marked

5  with the number 20?

6  A    We did not take note of that, sir.  I have no idea how

7  many had the number 20 on them.

8  Q    Did you take note whether any of the bails or the kilos

9  themselves had the markings of 888 on it, triple eight?

10  A    I do not recall nor was I looking for specific numbers on

11  bails, sir.

12  Q    And how about any pictures such as a picture of a fish?

13  A    No, sir.  We only opened up one bail minimally as to not

14  disturb evidence.

15  Q    And you don't know whether anyone else followed up on any

16  of the markings, if any, in this particular case?

17            MS. GOLDBARG:  Objection.

18            THE COURT:  Well, you can ask if he knows.

19  BY MR. PURPURA::

20  Q    Yes, that's what I said, do you know.

21  A    I do not, sir.

22            MR. PURPURA:  Thank you.  No further questions.

23  Have a good weekend.

24            THE COURT:  Any redirect?

25            MS. GOLDBARG:  No redirect.

Georgette K. Betts, RPR, CSR, FCRR
Official Court Reporter

PROCEEDINGS

1           THE COURT:  All right.  You may step down.

2           THE WITNESS:  Thank you, Your Honor.

3           (Witness excused.)

4           THE COURT:  I think we're going to stop.  Ladies and

5    gentlemen, a couple of things.  Number one, just in case

6    you're wondering, we're still making really good progress.  It

7    might not seem it to you, but I think you're going to be here,

8    no guarantees, but I think you're going to be here a lot less

9    than we thought you were going to be here when we started so

10   you know.  That's the first point.

11          The second point is stay away from media coverage,

12   do not do any research in this case, do not talk to anybody

13   about the fact that you're sitting as a juror in this case,

14   don't communicate over social media, don't use any search

15   engines to find out things.  All the information you're

16   supposed to have to decide this case we're going to give you

17   in this courtroom and we have to make sure you don't bring in

18   any from any place else.

19          Now other than that, have a very good weekend.  We

20   will see you on Monday morning.

21          (Jury exits courtroom.)

22          THE COURT:  Be seated, please.  Just a couple of

23   housekeeping things I want to go over.

24          First, Mr. Lichtman, any nonbinding, good faith

25   estimate about how long you're going to be Monday morning?

3170

PROCEEDINGS

1          MR. LICHTMAN:  Two or three hours.  It depends

2     largely on him, as you can see.

3          THE COURT:  I don't know if that's right.  I think

4     for the most part he was answering the questions, not all of

5     them but most of them.

6          MR. LICHTMAN:  Maybe two hours, Judge.

7          THE COURT:  Second, I wanted to ask, has the

8     government been able to fill in the end of next week with

9     properly disclosed witnesses or does it look like we're not

10    going to make it through the entire week.

11         MS. PARLOVECCHIO:  Your Honor, we might need tonight

12    to figure that out.  Just the length of cross is going longer

13    than had originally been represented, so we'll go over that

14    tonight.  We can give a call to Ms. Clarke to let her know to

15    give the Court a sense and we can let defense counsel know.

16              Just to put on the Court's radar, we do have another

17    travel issue, unfortunately.  On Monday we have law

18    enforcement officers traveling from Ecuador who have to get on

19    and off on Monday due to their visa issues.  So it's quite

20    possible if Mr. Lichtman sticks to his estimate that we can

21    get them all on and off without having to take them out of

22    order, but that was something I wanted to put on the Court's

23    radar.

24         THE COURT:  Well, I think you were wise not to start

25    this witness at four because I don't think we would have

PROCEEDINGS

1    finished him if we started at four and you may want to keep

2    going out of turn and delay the cross-examination on Monday

3    and get these two other witnesses out of the way if they're

4    short and you're definitely going to be ready for late

5    morning.

6            MR. LICHTMAN:  Judge, I'm not going to take the

7    entire day with this witness and I --

8            THE COURT:  You want to do it.

9            MR. LICHTMAN:  Chopping it up isn't helpful, it

10   slows down the momentum.

11           THE COURT:  I agree with that.  We will do the best

12   we can, but please try to be as efficient as you can because

13   we will have to cut you off, we have to get these witnesses

14   on.

15           MR. LICHTMAN:  Judge, I looked at what I have left,

16   I don't think it's that great.

17           THE COURT:  Okay.  All right.  And then the third

18   thing I wanted to cover -- hang on one second.  There's filing

19   deadlines tonight.  The government has some things due.

20           MS. PARLOVECCHIO:  Yes.

21           THE COURT:  That's not what I wanted to cover.  The

22   final thing I wanted to cover was I wanted to rule on the

23   local Rule 23.1(c) issue.  The government has asked me to

24   admonish defense counsel not to violate that rule.  I'm not

25   really inclined to do that.  First of all, the only defense

PROCEEDINGS

1    counsel who have been accused of violating the rule,

2    potentially, are Ms. Colon and Mr. Balarezo.  I listened to

3    the interview that Ms. Colon gave, I really don't see it as a

4    rule violation.

5            Mr. Balarezo's tweets displaying his indefatigable

6    sense of humor come closer to doing that.  I think,

7    Mr. Balarezo, at least one of those tweets it seemed to me it

8    could create a substantial likelihood that it would interfere

9    with a fair trial, with the process of a fair trial.  I've

10   already told you you've had one instance of conduct that I

11   didn't approve of.  I can't say that about these because I

12   don't think you violated the rules, but I will tell you you've

13   got to keep it more in check and be a little more careful.  I

14   don't want to admonish any lawyers, I don't want to sanction

15   any lawyers, but I will if I have to and I don't think the

16   defendant should feel they can do and say anything because

17   there are restrictions on them in the local rules.  I'm not

18   going to enhance those restrictions, I'm just saying

19   everybody, both sides, be a little careful.

20           MR. BALAREZO:  Your Honor, if -- I'm sure the

21   government has noticed I've limited to my tweeting to Donald

22   Trump and the Barcelona Soccer clubs, so it shouldn't be an

23   issue.  But I would like to know which is the one that the

24   Court is talking about so I have an idea which tweet is the

25   offensive tweet.

PROCEEDINGS

1          THE COURT:  They were all arguable, some were worse

2     than others, but I'm not finding you violated it, I don't

3     think you did in the tweets, but I guess I'm just going to say

4     generally be careful, that's all.

5          MR. BALAREZO:  I understand, Your Honor.

6          THE COURT:  All right.  I think that's all I've got.

7     Anyone else have anything?

8          MS. PARLOVECCHIO:  Briefly, Your Honor, you

9     mentioned some of the filing deadlines that we have this

10    evening.  The government had filed a motion docket number 491

11    last week and I just want to put on the Court's radar that we

12    anticipate calling some witnesses related to that motion at

13    the end of --

14         MR. PURPURA:  We can't hear a word you're saying.

15         THE COURT:  What she says is that the pending motion

16    in limine is going to pertain to witnesses called at the end

17    of next week so I really have to rule on it sooner than that.

18    I take that point and I will do that.

19         MS. PARLOVECCHIO:  Thanks.

20         THE COURT:  Anything else?  Okay, have a good

21    weekend everybody.

22         (Whereupon, the trial adjourned at 4:20 p.m. to

23    resume Monday, December 17, 2018 at 9:30 a.m.)

24

25

3174

```
1                          I N D E X

2     WITNESS                              PAGE

3

      JORGE MILTON CIFUENTES VILLA
4     DIRECT EXAMINATION     BY MR. FELS      3018

5     TODD SMITH
      DIRECT EXAMINATION     BY MR. FELS      3049
6     CROSS-EXAMINATION      BY MR. PURPURA   3062

7     CLIFFTON MONTGOMERY HARRISON
      DIRECT EXAMINATION     BY MS. GOLDBARG  3143
8     CROSS-EXAMINATION      BY MR. PURPURA   3161

9                          I N D E X

10                         EXHIBITS

11    GOVERNMENT              PAGE
      3500-JMCV-4             3025
12    703-A                  3032
      703A-3                 3033
13    703A-2                 3034
      609K                   3056
14    212-1                  3056
      212-3                  3058
15    212-9                  3058
      212-2                  3060
16    212-8A & 212-8B        3061
      203-51, 203-5, 203-30  3146
17    203-2, 203-43, 203-31  3146
      203-1, 203-41, 203-35  3146
18    203-33, 203-4, 203-8   3146
      203-10, 203-9, 203-44  3146
19    203-11, 203-12, 203-13 3146
                             3146
20    203-17, 203-46         3146
      203-17, 203-46         3146
21

22

23

24

25
```

3175

```
 1              I, RIVKA TEICH, hereby certify that:

 2   (A) The foregoing pages represent an accurate and complete

 3   transcription of the entire record of the proceedings before

 4   the UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF

 5   NEW YORK, JUDGE BRIAN M. COGAN PRESIDING, in the matter of

 6   UNITED STATES OF AMERICA V. JOAQUIN GUZMAN LOERA, 09-CR-466,

 7   held on December 13, 2018;

 8   And (B) these pages constitute the original transcript of the

 9   proceeding.

10

11
     _____
12   Rivka Teich, CSR, RPR, RMR, FCRR
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```