5757

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        09-CR-00466(BMC)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5              -against-                January 22, 2019
                                        9:30 a.m.
6    JOAQUIN ARCHIVALDO GUZMAN
     LOERA,
7
               Defendant.
8
     ------------------------------x
9
                 TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10              BEFORE THE HONORABLE BRIAN M. COGAN
                    UNITED STATES DISTRICT JUDGE
11                       BEFORE A JURY

12   APPEARANCES

13   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  GINA M. PARLOVECCHIO, ESQ.
                                     ANDREA GOLDBARG, ESQ.
16                              Assistant United States Attorneys

17                              UNITED STATES ATTORNEY'S OFFICE
                                Southern District of Florida
18                              99 NE 4th Street
                                Miami, Florida 33132
19                              BY:  ADAM S. FELS, ESQ.
                                Assistant United States Attorney
20
                                DEPARTMENT OF JUSTICE
21                              Criminal Division
                                Narcotic and Dangerous Drug Section
22                              145 N. Street N.E. Suite 300
                                Washington, D.C. 20530
23                              BY:  ANTHONY NARDOZZI, ESQ.
                                     AMANDA LISKAMM, ESQ.
24

25   (CONTINUED FOLLOWING PAGE)

                    Rivka Teich CSR, RPR, RMR, FCRR
                         Official Court Reporter

5758

```
 1   (APPEARANCES CONTINUED)

 2

 3

 4   For the Defendant:        BALAREZO LAW
                               400 Seventh Street, NW
 5                             Washington, D.C. 20004
                               BY:  A. EDUARDO BALAREZO, ESQ.
 6
                               LAW OFFICES OF JEFFREY LICHTMAN
 7                             11 East 44th Street, Suite 501
                               New York, New York 10017
 8                             BY:  JEFFREY H. LICHTMAN, ESQ.
                                    PAUL R. TOWNSEND, ESQ.
 9
                               LAW OFFICE OF PURPURA & PURPURA
10                             8 E. Mulberry Street
                               Baltimore, Maryland 21202
11                             BY:  WILLIAM B. PURPURA, ESQ.

12                             LAW OFFICES OF MICHAEL LAMBERT, ESQ.
                               369 Lexington Avenue, PMB #229
13                             New York, New York 10017
                               BY:  MICHAEL LEIGHT LAMBERT, ESQ.
14                                  MARIEL COLON MIRO, ESQ.

15

16
     Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
17                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
18
     Proceedings recorded by mechanical stenography.  Transcript
19   produced by computer-aided transcription.

20

21

22

23

24

25
```

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

5759

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1           (In open court.)

2

3           THE COURTROOM DEPUTY:  All Rise.

4           THE COURT:  Let's have the jury.

5           (Jury enters.)

6           THE COURT:  Everyone be seated.  Good morning,

7    ladies and gentlemen.  I hope you had a nice long weekend.

8    We'll continue with direct examination.

9           MR. NARDOZZI:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MR. NARDOZZI::

12   Q     Good morning.

13   A     Good morning.

14   Q     Last week when we met you talked about pricing for

15   marijuana that you were harvesting in the mountains for the

16   defendant Mr. Guzman.  Do you remember that?

17   A     Yes.

18   Q     And in one of the text messages you were talking about

19   the difference in price between 600 and 700, do you recall

20   that?

21   A     Yes.

22   Q     What did 600 refer to, what denominations?

23   A     It was the price per kilo of marijuana that was harvested

24   up in the mountains.

25   Q     600, which currency was it in?

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

LUCERO SANCHEZ LOPEZ - DIRECT - MR. NARDOZZI

1    A    Mexican national currency.

2    Q    Pesos?

3    A    Pesos.

4    Q    Thank you.  I also want to follow up with you about some

5    of the nicknames that the Secretaries that you mentioned for

6    the defendant used for him.  What were some of those

7    nicknames?

8    A    With the defendant they would address him as Tio, Senor,

9    or Gerente.

10   Q    What does Tio mean in English?

11   A    In English I wouldn't know how to say it.

12            THE INTERPRETER:  In English it's uncle.

13   Q    How about Gerente?

14   A    Gerente or manager, the person who manages the company.

15   Q    When we concluded last week we were talking about the

16   area where you emerged from the tunnel after you escaped the

17   home in Culiacan with the defendant.  First of all, can you

18   tell us what kind of a tunnel it was?

19   A    Well, yes, that tunnel, it was a tunnel that would exit

20   toward the waters of Culiacan.  And you would actually use the

21   rain water, it was like a drain.  It was made out of concrete.

22   There was water underground, like underneath.

23   Q    Were there any locations in the tunnel where you could

24   see outside of it?

25   A    Well, I only remember that there was section where you

5761

LUCERO SANCHEZ LOPEZ - DIRECT - MR. NARDOZZI

1   would be crossing like the highway of the city and there were

2   some bars sometimes where the light would seep through, you

3   could also hear the noise from the city outside.

4   Q    Can you tell the ladies and gentlemen of the jury, or

5   describe for them, the area where you emerged from the tunnel?

6   A    Yes.  It was an area that emerges on to the river, the

7   Rio Humaya, in Culiacan.  And it was like there was bushes in

8   that area.

9              MR. NARDOZZI:  For the witness only I'll show you

10  what is marked 815-1.

11             MR. PURPURA:  No objection.

12             THE COURT:  Received.

13             (Government Exhibit 815-1, was received in

14  evidence.)

15  BY MR. NARDOZZI::

16  Q    Ms. Sanchez, looking at what is marked Government's

17  Exhibit 815-1, do you recognize this?

18  A    Yes.

19  Q    What is this that we're looking at?

20  A    It's the map of Culiacan and the area where the house is.

21  And is the area of Guadalupe neighborhood, and also the area

22  where the tunnel is, and where it came out onto.

23  Q    Can you see on the map here where the house was?

24  A    Well, more or less I can look at the spot.  I do know how

25  to locate it where it is.

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

5762

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1    Q    Using the screen in front of you, can you circle for the

2    ladies and gentlemen of the jury the location where the house

3    was?

4    A    Yes.  The house is right there in that place.  It's

5    behind a funeral home that's called San Martin in the

6    Guadalupe neighborhood.

7    Q    Can you see on that map the location where you emerged

8    from the tunnel?

9    A    Yes.

10   Q    Can you also circle that for the ladies and gentlemen of

11   the jury?

12   A    Yes, that's the area where the exit of the tunnel is.

13   Q    In between those two points on the screen can you see a

14   very difficult to see line, correct?

15   A    Yes.

16   Q    This tunnel itself, was it a straight line or was it

17   different than that?

18   A    Well, it didn't have -- what I remember is that we turned

19   right and then left more or less.

20   Q    Towards the top right of this map the length indicator

21   says nearly a kilometer-and-a-half.  Does that sound

22   consistent with the length of the tunnel?

23   A    Yes.

24   Q    After you emerged from the tunnel, what happened next?

25   A    Well, during the time when we were still walking through

                        LUCERO SANCHEZ LOPEZ - DIRECT - MR. NARDOZZI

1    the tunnel, when we were fleeing, Secretary of Senor Joaquin,

2    Condor, was trying to get in touch with a person who would

3    come and pick us up once we came out of the tunnel.

4    Q    Who was he trying to get in touch with?

5    A    With the other Secretary, Picudo.

6    Q    When you emerged from the tunnel, what did you do?

7    A    Well, we were there waiting.  And in fact, he was

8    desperate.  He was telling the guy that we had to steal a car

9    so that we could flee.

10   Q    When you say he was desperate, who are you referring to?

11   A    Mr. Guzman.

12   Q    What happened next?

13   A    We were there for a moment and we could see all the

14   helicopters that were flying all over the city and all the

15   Government people.  And at the end the Secretary Condor told

16   Secretary Picudo the location as to where we were and he came

17   to pick us up in a different vehicle.

18   Q    Showing what you is already in evidence as Government's

19   Exhibit 63.  Remind us who is this person?

20   A    That's Picudo, the other Secretary.

21   Q    What happened next?

22   A    From there he took us to a house where the Senor got

23   dressed.  From there he took us to the city of Mazatlan.

24   Q    I'm going to show you what is marked Government's Exhibit

25   219-33, for the witness only.  Do you recognize this?

5764

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1   A    Yes.

2   Q    What is that?

3   A    That is my signature where I acknowledge the location of

4   the house in the Guadalupe neighborhood.

5   Q    That's the contents of the data on this disk, correct?

6   A    Yes.

7        MR. NARDOZZI:  This is already in evidence.  I'd

8   like to play a brief clip starting at one minute, thirty-three

9   seconds, for the record.

10       THE COURT:  Go ahead.

11  Q    As you watch this video can you describe for the ladies

12  and gentlemen of the jury what you're seeing?

13  A    Yes.  That's the house where I was on that day, which is

14  located in the Guadalupe neighborhood, where the entrance to

15  the tunnel is.

16       MR. NARDOZZI:  Let's start the video.

17       (Video played)

18  Q    Please describe what you see on the screen?

19  A    Yes, that's the inside of the house where we were in

20  Guadalupe neighborhood.  The room where we were that night,

21  and the entrance to the tunnel, the bathtub, the entrance of

22  the tunnel that goes into the tunnel.  That's the tunnel that

23  we actually were at for more than a kilometer.

24  Q    Ms. Sanchez you testified last week that you were in

25  another location with the defendant prior to going to that

5765

                    LUCERO SANCHEZ LOPEZ - DIRECT - MR. NARDOZZI

1   home in Guadalupe, correct?

2   A     Yes.

3   Q     How many other residences did the defendant have in that

4   general area?

5   A     Three, the ones that I knew.

6   Q     I'm going to show what you is in evidence as Government's

7   Exhibit 219-3.  Ms. Sanchez, do you recognize this?

8   A     Yes.

9   Q     What are we looking at?

10  A     That's one of the homes where El Senor, where Mr. Guzman,

11  would stay at.

12  Q     Where is that home located?

13  A     That is located close to the Government palace and it's

14  close to the mechanic shop.

15  Q     What neighborhood is that?

16  A     Well, that's between, I really wouldn't know.  I don't

17  know the name of that neighborhood, but right after Bravo's

18  neighborhood.  You have to go Zapata Street before you get

19  there.

20  Q     Can you describe very briefly what is inside of this

21  home?

22  A     In that home, well, you had like rooms, you have very

23  comfortable surroundings, you had tables, you had TVs, you had

24  the security screens.  You had the bathrooms that were similar

25  to the ones he had in all other homes.

LUCERO SANCHEZ LOPEZ - DIRECT - MR. NARDOZZI

1    Q    When you say security screens, what do you mean by that?

2    A    That in all of the houses he had a camera system.

3    Q    I'm going to show you what is in evidence 219-4.  Do you

4    recognize this?

5    A    Yes.

6    Q    What is this?

7    A    That's one of the houses that is located in Libertad

8    neighborhood, that's where we got out of when we went to the

9    Guadalupe neighborhood.

10   Q    This was the first house you were in that day on

11   February 16, 2014?

12   A    Yes.

13   Q    Can you briefly describe what was inside of this home?

14   A    Well, it's the same thing.  It's pretty much organized

15   just as a normal home for people to live in.  It's got rooms,

16   it's got a living room, it's got a kitchen, it's got tables,

17   it's got similar bathrooms, also with a bathtub, and they also

18   have cameras that look outside.

19   Q    Next slide, showing you what is in evidence as

20   Government's Exhibit 219-5.  Do you recognize this?

21   A    Yes.

22   Q    What is that?

23   A    Another one of Mr. Guzman's houses.

24   Q    Where was this house located?

25   A    At the Libertad neighborhood as well right, across from a

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1  high school.

2  Q    Is the inside of this home the same as the other homes

3  you just described?

4  A    More or less, it's similar with the security cameras and

5  with the similar bathroom.

6  Q    I'm going to show you what is marked 219-2.  What are we

7  looking at here?

8  A    That is the house at Guadalupe neighborhood.

9  Q    Did you go to -- where did you go with the defendant when

10 you were picked up by Picudo?

11 A    To the city of Mazatlan in Sinaloa.

12 Q    How long were you in Mazatlan after you arrived there?

13 A    I was there approximately for about three or four days

14 all the way up to the 20 or 21, I don't remember exactly, in

15 February.

16 Q    What happened after you left the home in the location in

17 Mazatlan?

18 A    I was pretty much arrested the following day, that's when

19 I found out El Senor had been arrested.

20 Q    When you say El Senor, who are you referring to?

21 A    Mr. Guzman.

22 Q    How do you find that out?

23 A    Through the communications.  And also I was asleep and

24 some of my siblings woke me up so I could watch the news.

25 Q    After the defendant was arrested, were you ever contacted

5768

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1    or speak with any of the members of his organization?

2    A    Yes.

3    Q    Who did you speak with after his arrest?

4    A    Well, people from the oficina, from the offices, also one

5    of his partners, Licensiado Damaso.

6    Q    Showing what you is in evidence Government's Exhibit 11A,

7    do you recognize this?

8    A    Yes.

9    Q    Who is that?

10   A    That's Licensiado Damaso.

11   Q    Who is Licensiado Damaso?

12   A    One of Mr. Guzman's partners and also his compadre.

13   Q    When did you meet with Licensiado Damaso?

14   A    I met with him some days after Mr. Guzman's arrest.

15   Q    What was the purpose of your meeting with Licensiado

16   Damaso?

17   A    First of all, it was to find out -- they wanted to

18   interview me so I could tell them what had happened with the

19   Senor, how the Government had come on him, and they just

20   wanted the details of what had happened that day.

21   Q    What else did you discuss with Licensiado Damaso?

22   A    We talked about the different properties belonging to El

23   Senor.  He asked me if I knew properties that he had or people

24   that worked with him.  I said that I didn't.  I only knew

25   family that met with Mr. Guzman at a time when I was sharing a

LUCERO SANCHEZ LOPEZ - DIRECT - MR. NARDOZZI

1   home with him.

2   Q    When you refer to El Senor, you're speaking about the

3   defendant?

4   A    Mr. Guzman, yes.

5   Q    Did you discuss anything else with Licensiado Damaso?

6   A    Yes.  He asked me if I had communication with the wife of

7   another of the partners of Mr. Guzman, Ricon, who was in

8   Ecuador at that time.

9   Q    What was the purpose of asking about that?

10  A    Well, he wanted for me to intercept communications with

11  the wife of Mr. Ricon because they were interested in finding

12  out about some things that she that they were holding.

13  Q    What was it that they were holding, to the best of your

14  understanding?

15           MR. PURPURA:  Objection.

16           THE COURT:  Sustained.

17  Q    Did you discuss, without telling us what you discussed

18  with Licensiado Damaso, did you discuss what those people were

19  holding?

20  A    Yes.

21  Q    Based upon that discussion what were they holding?

22           MR. PURPURA:  Objection.

23           THE COURT:  Overruled.

24  A    Cocaine.

25  Q    Did you assist in helping to facilitate the movement of

5770

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1   this cocaine?

2   A    Not exactly.  What I did was I helped them communicate

3   with each other and put them in contact so they could

4   coordinate.

5   Q    Do you know ultimately what happened with this cocaine?

6   A    No.

7   Q    Last week when you testified you said that you were an

8   elected official, but you lost your job as a result of your

9   relationship with the defendant.  Do you remember that?

10  A    Yes.

11  Q    Can you describe in more detail what you meant by that?

12  A    Well, I lost my job obviously because of my relationship

13  with Mr. Guzman, because it came out in the media.  And the

14  Government became difficult about it logistically because of

15  my situation and I was removed from my post.

16  Q    During the period of time when the defendant was in

17  prison, did you ever see him?

18  A    Yes.

19  Q    When was that?

20  A    I visited him in prison in the month of September,

21  approximately in 2014.

22  Q    How did you come to visit the defendant in prison in

23  September 2014?

24  A    I arrived there through his attorney Manuel Osuna.

25  Q    Did you have any communication with the defendant while

5771

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1    he was in prison after his 2014 arrest?

2    A    Yes.

3    Q    How did you communicate with him while he was in prison?

4    A    Through letters and through his attorney Manuel Osuna.

5    Q    Did you receive letters from the defendant while he was

6    in prison in 2014?

7    A    Yes.

8    Q    For the witness only.  Showing you what is marked as

9    Government's Exhibit 805, do you recognize this?

10   A    Yes.

11   Q    What is this?

12   A    That's one of the letters that Mr. Guzman sent me from

13   the prison.

14         MR. NARDOZZI:  At this time I ask to move

15   Government's Exhibit 805 into evidence without objection.

16         MR. PURPURA:  Without objection.

17         THE COURT:  Received.

18         (Government Exhibit 805, was received in evidence.)

19   BY MR. NARDOZZI::

20   Q    Ms. Sanchez, the content of this letter, which is in the

21   Spanish language on our screen, was personal in nature,

22   correct?

23   A    Yes.

24   Q    Can you read for us the very top the salutation?

25   A    Yes.

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

5772

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1    Q    You can stop there.

2    A    It says there, For my queen who is –– My queen my who is

3    love.

4    Q    You said that this letter was from the defendant, how do

5    you know that?

6    A    Because I recognize his handwriting and his words.

7    Q    Had you received handwritten materials from the past

8    before receiving this letter?

9    A    When I lived with him I would see him write things down

10   in my presence.

11   Q    When you lived with him and when you'd see him write

12   things down in your presence, did the handwriting that you saw

13   in those times match the handwriting that you saw in this

14   letter?

15   A    Yes.

16   Q    Had you ever received written materials from him in the

17   past?

18   A    I received a letter from prison, a card that he made.

19   And through other people he would sometimes dictate cards that

20   he would send to me with flower arrangements.

21   Q    On the letters that he would handwrite himself, did the

22   written words on those letters match the written words on the

23   letter that we're looking at now?

24   A    Yes.  Certainly it was the love words that he would use

25   with me always.

5773

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1  Q    You said that you visited him in prison through his

2  attorney Manuel, correct?

3  A    Yes.

4  Q    Was this during the time that you were an elected

5  official?

6  A    Yes.

7  Q    How did you get to the prison to visit the defendant?

8  A    Well, first of all in this letter he explains that the

9  plan that he had for me to visit him through Manuel Osuna, the

10 first thing was to get an ID for me to go there, a fake ID.

11 Q    Did you in fact get a fake ID?

12 A    His attorney gave to me in Mexico city an ID so I could

13 use that ID to go into the prison to see him.

14 Q    On that identification did it have a different name than

15 your true name?

16 A    Yes.

17 Q    Why did you need a fake ID?

18 A    To be able to get into the prison.  I don't know why El

19 Senor wanted it that way, but the reality was he wanted me to

20 go inside with a false ID.

21 Q    Did you eventually make it to the prison and present that

22 false ID.

23 A    Yes.

24 Q    For the witness only.  Showing you what is marked

25 Government's Exhibit 825.

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

5774

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1    MR. PURPURA:  No objection.

2    THE COURT:  825 is received.

3    (Government Exhibit 825, was received in evidence.)

4    MR. NARDOZZI:  Thank you, your Honor.

5 BY MR. NARDOZZI::

6 Q    Ms. Sanchez, can you tell us what we're looking at here

7 in Government's Exhibit 825?

8 A    Yes, that's me in the prison visiting Mr. Guzman.

9 Q    Focusing on the photograph to the right of this exhibit,

10 that is your face, correct?

11 A    Yes.

12 Q    Is this the identification that you're holding up?

13 A    Yes.

14 Q    Then focusing on the photograph on the left, with the

15 yellow circle and the red circle, who is behind the yellow

16 circle?

17 A    Mr. Guzman, behind some bars.

18 Q    You can't really see his face in the photograph, but how

19 do you know that?

20 A    Because I looked at him; I was there.

21 Q    Okay.  The conversation you had with Mr. Guzman that day

22 was primarily personal in nature, correct?

23 A    Yes.

24 Q    What happened to you as a result of this visit with the

25 defendant in prison?

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

5775

LUCERO SANCHEZ LOPEZ – DIRECT – MR. NARDOZZI

1  A    The photos were revealed and the relationship that I had

2  with the defendant came out, the one that I had had with him

3  and still had.

4  Q    When you say the photos were revealed, are you discussing

5  these photographs in Exhibit 825?

6  A    Yes.  They were published in the media in TV in Mexico,

7  and from there the whole problem starts.

8  Q    Were you ever asked publicly by any members of the media

9  about the photographs that we're looking at in Government's

10  Exhibit 825?

11  A    Yes, on many occasions.

12  Q    What did you tell them?

13  A    I always publicly denied the relationship with Mr. Guzman

14  always.

15  Q    Why?

16  A    Out of fear.

17  Q    Of what?

18  A    Afraid of his enemies and afraid of being attacked,

19  because the truth is like days after this came out I started

20  receiving death threats from El Senor's enemies.

21  Q    After you visited him in the prison -- where was the

22  prison located by the way?

23  A    In the city of Toluca.

24  Q    Do you know the name of the prison?

25  A    Almoloya.

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1  Q    After you visited him in the prison, did you ever see him

2  again?

3  A    Yes, after he escaped from prison in 2015.

4  Q    How many times did you see him after he escaped from

5  prison in 2015?

6  A    Twice.

7  Q    When were those times?

8  A    It was at the end of 2015 and beginning of 2016 that I

9  saw him.  I was with him for New Years.

10 Q    During those meetings did you ever discuss with him the

11 effect that this photograph or these photographs had on your

12 job?

13              MR. PURPURA:  Objection, your Honor.  401 and 403.

14              THE COURT:  Sustained.

15              MR. NARDOZZI:  Thank you, your Honor.

16 Q    When were these photographs published?

17 A    It was in April, if I remember correctly, April 2014 --

18 no, 2015.

19 Q    When were you impeached from your public office?

20 A    In September 2016.

21              MR. NARDOZZI:  No further questions, your Honor.

22              THE COURT:  All right.  Cross-examination.

23              MR. PURPURA:  Yes, thank you.

24 CROSS-EXAMINATION

25 BY MR. PURPURA::

5777

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    Q    Good morning, Ms. Sanchez.

2    A    Good morning.

3    Q    You were just shown Government's Exhibit 805, which is in

4    evidence, and this is the letter that is in Spanish, correct?

5    A    Yes.

6    Q    And for some of us who are just monolingual, we would

7    have trouble reading that, but if could you read Spanish, that

8    would be a kind of a romantic letter; is that fair to say?

9    A    Yes.

10   Q    There is nothing nefarious in that letter that he's

11   asking you to do or asking to you do something wrong, is

12   there?

13   A    He only explained to me the plan that was put in place

14   for me to go see him at the jail.

15   Q    And in fact, this letter is in response to a letter that

16   he sent you; is that correct -- that you sent to him, excuse

17   me.

18   A    Not exactly.

19   Q    Well, the first sentence reads, I am answering your

20   letter with great pleasure.  Doesn't it?

21   A    Yes.

22   Q    So he's responding to a letter you sent; is that correct

23   Ms. Sanchez?

24   A    Yes.

25   Q    He goes on to say, With great love hoping that when you

5778

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    receive my letter it finds you and the whole family well.

2    He's wishing you good wishes you and your family correct,

3    ma'am?

4    A    Yes.

5    Q    You spoke briefly about Damaso, correct?

6    A    Yes.

7    Q    Government's Exhibit 11A.  Now, how many times have you

8    met with Damaso?

9    A    Twice.

10   Q    You indicated today on direct examination that you knew

11   that Damaso was talking about cocaine; is that correct?

12   A    Yes.

13   Q    When you were interviewed by the United States

14   Government, by counsel who presented you, Mr. Nardozzi, and

15   other agencies from the United States Government back on

16   June 21, 2018, you were again asked about this meeting with

17   Damaso; is that correct, ma'am?  Do you remember that?

18   A    Not exactly.

19   Q    You recall being asked questions about Damaso in prior

20   proffer meetings with the Government, yes or no?

21   A    Yes.

22   Q    At that time, back on June 18, 2018, you claimed you

23   didn't know anything about drugs or type of drugs, so you

24   didn't know what kind of drugs it was they were talking about.

25   Do you remember telling that to Mr. Nardozzi, the person who

5779

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1   presented you today and other United States agents?

2   A    Yes.

3   Q    It's not until you're called to testify against this man

4   that now you remember it must be cocaine that you talked with

5   Damaso about, correct?

6   A    Yes.

7   Q    On Thursday you were shown Government's Exhibit 516,

8   which was the Power Point for the electronic communications

9   which were admitted into evidence, do you remember that,

10  ma'am?

11  A    Yes.

12  Q    We listened to a few of those correct -- strike that.

13       A few were read into evidence, correct?

14  A    Yes.

15  Q    In total I believe the exhibit contains somewhere around

16  236 electronic messages between yourself and Mr. Guzman, does

17  that sound about, right?

18  A    Yes.

19  Q    But you'd agree with me that this, Government's Exhibit

20  516, is just merely a snapshot of thousands of messages which

21  were communicated between yourself and Mr. Guzman

22  electronically; is that correct, ma'am?

23  A    Yes, that I recognize.

24  Q    When I say thousands, there were over 6,000 electronic

25  messages between yourself and Mr. Guzman, does that sound

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    about, right?

2    A      Probably.

3    Q      You know that Mr. Guzman, when you were with him from

4    2011 through 2012, he was hiding and running from both the

5    United States authorities and Mexican authorities, correct?

6    A      Yes.

7    Q      You know that his running and hiding didn't start when he

8    met you; that's he's been doing that for years, correct?

9    A      Yes.

10   Q      And you know from your experience that some of the places

11   or the areas that he was hiding would be the desolate areas in

12   the Sinaloa mountains, correct?

13   A      Yes.

14   Q      When he came to Culiacan, he would hide in a house in

15   Culiacan, correct?

16   A      Yes.

17   Q      So much so, that as you indicated, that you would have to

18   from time to time go out and get his clothes, his shirts, his

19   pants, even underwear, correct?

20   A      Yes.

21   Q      Because he didn't want to get caught, right?

22   A      Yes.

23   Q      In fact, he's in Mexico in Culiacan in Sinaloa, he was

24   infamous or famous, would you agree with that?

25   A      Yes.

5781

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1   Q    There was a $5 million reward by the Mexican and United

2   States authorities for his capture, correct?

3   A    I never paid attention to that.

4   Q    You knew there were songs about him narco credos,

5   correct?

6   A    Yes.

7   Q    You also know that he never shied away from publicity,

8   did he?

9   A    Yes.

10  Q    He was interested in Kate Del Castillo, a soap opera

11  actress from Mexico?

12  A    Towards the end of the year, 2013.

13  Q    He actually spoke to you that he wanted to produce some

14  program or movie about his life, correct?

15          MR. NARDOZZI:  Objection.  401.

16          THE COURT:  Overruled.

17  A    Well, really he never spoke to me about that.  I heard

18  comments, but he never told me directly.

19  Q    And you knew that he was in contact with writers from the

20  United States and from other countries to write about his

21  life, correct?

22  A    I heard that.

23  Q    And you know from being with him and living in Culiacan

24  and Sinaloa that Mr. Guzman has been on the run ever since

25  1993 when he was wrongfully charged with the murder of the

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    cardinal, correct?

2    A    I know that he has been running since the time I met him;

3    however, I haven't really studied all his background.

4    Q    He even -- when he was in contact with you he didn't

5    switch phones or have you switch phones every two weeks so the

6    phone you had couldn't be intercepted, apparently, by

7    authorities, correct?

8    A    He would switch mine through other people.

9    Q    The tunnel that we're talking about, the tunnel that you

10   and he ran through for that mile in Culiacan, is that the

11   first time you saw that tunnel; is that correct?

12   A    Yes.

13   Q    You never saw anything like that before where a bathtub

14   would open up with hydraulics and open up to a tunnel,

15   correct?

16   A    No.

17   Q    You have no idea who installed that tunnel, do you?

18   A    No.

19   Q    You have no idea how long that tunnel was there before

20   you and he used it in 2014, did you?

21   A    No.

22   Q    And the houses which Government counsel showed you in

23   Culiacan, you don't know who owns those houses, who is the

24   title to those houses, do you?

25   A    No.

5783

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1  Q    In fact, you spoke in your testimony on Thursday about

2  front companies or straw companies, do you remember that?

3  A    Yes.

4  Q    When someone like Pancho would loan his name to a

5  company, correct?

6  A    Yes.

7  Q    Mr. Guzman never asked you to loan your name to any house

8  which he was going to buy, did he?

9  A    No.

10            (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

5784

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    BY MR. PURPURA:

2    Q    Mr. Guzman never told you to find someone like Poncho to

3    put that person's name on a house, correct?

4    A    No.

5    Q    And is it fair to say from the period of time, from 2011

6    to 2012, you only had a modest, a small amount of contact with

7    any of the properties in Culiacan, correct?

8    A    Well, I was pretty much living there for like over a year

9    in those properties.  That's where we interacted.

10            MR. PURPURA:  One second, please.

11   BY MR. PURPURA:

12   Q    Showing you what has been admitted into evidence as

13   Government's Exhibit 2A, you've seen this photograph before,

14   correct?

15   A    Yes.

16   Q    And you've never met the person who is depicted in this

17   photograph, have you?

18   A    Not in person.

19   Q    And this person is Mayo Zambada, correct?

20   A    Yes.

21   Q    And showing you what has been admitted into evidence as

22   Government Exhibit 101, you can recognize that photograph; is

23   that correct?

24   A    Yes.

25   Q    But again, you've never met that person in person before,

David R. Roy, RPR – Official Court Reporter

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    have you?

2    A    No.

3    Q    And that is Vicente Zambada, correct?

4    A    Yes.

5    Q    And those are photos government counsel showed you in the

6    past; is that correct?

7    A    Yes.

8    Q    In all the time, as you've just discussed, in Culiacan

9    when you're there for close to a year in those houses, that

10   man, Mayo Zambada, in 2011 and 2012 never came to those

11   houses, at least not when you were there, correct?

12   A    No.

13   Q    No, he did not come, correct?

14   A    No, he didn't go.

15   Q    It's obvious that Mr. Guzman did not want to be arrested

16   by the combination of the United States authorities and

17   Mexican authorities, correct?

18              MR. NARDOZZI:  Objection.

19              THE COURT:  Sustained.

20              MR. PURPURA:    As asked and answered?

21              THE COURT:  No, foundation.

22              MR. PURPURA:  All right.

23   BY MR. PURPURA:

24   Q    As you testified before, Mr. Guzman did not want to be

25   apprehended regardless by any authorities, correct?

David R. Roy, RPR - Official Court Reporter

5786

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    A     Yes.

2    Q     And in particular, he was afraid about the United States

3    authorities, correct?

4    A     Well, he was afraid of the authorities.  He never told me

5    which authorities.

6    Q     So afraid that when the banging on the door came in 2014,

7    he ran out, climbed through that tunnel just stark naked,

8    right?

9    A     Yes.

10   Q     He didn't even pause to grab his pants or shirt?

11   A     No.

12   Q     All right.  I'm going to take you to probably an

13   unpleasant day, June 21, 2017.

14         Do you remember that day?

15   A     June 21, 2017?  Yes.

16   Q     The day that you were about to come into the

17   United States?

18   A     Yes.

19         MR. PURPURA:  Without objection, Your Honor, showing

20   you government's exhibit -- or Defense Exhibit 469-A.

21         THE COURT:  Are you offering it into evidence?

22         MR. PURPURA:  I am, Your Honor without objection.

23         MR. NARDOZZI:  No objection.

24         THE COURT:  Received.

25         (Defendant Exhibit 469-A, was received in evidence.)

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1          MR. PURPURA:  Thank you, Your Honor.

2          And I'm also going to show you without objection and

3   offer into evidence Government's Exhibit 469-B.

4   BY MR. PURPURA:

5   Q    Now, you attempted to come into the United States at the

6   entrance at Tijuana, correct?

7   A    Yes.

8   Q    And that's the Alta Mesa cross border Express, correct?

9   A    No.  I tried to come in through San Diego.

10  Q    Right.  But there an entrance somewhere between the

11  border and San Diego, correct?

12         MR. NARDOZZI:  Speculate, Your Honor.

13         THE COURT:  All right.  That's a fact, but I don't

14  know if she knows that.

15         MR. PURPURA:  All right.  Fair enough.

16  BY MR. PURPURA:

17  Q    And I'll come back to that in a second.

18         So the bottom line is on June 21st, 2017, you were

19  applying for admission the United States, correct?

20  A    Yes.

21  Q    And you had -- you did not expect to be stopped; is it

22  fair to say?

23  A    No.

24  Q    Now, I'm going to take you back for a second.  I'm going

25  to take you back to where you were born.

David R. Roy, RPR - Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1        You were born in Cosala; is that correct?

2    A    Yes.

3        MR. PURPURA:  Your Honor, without objection and

4    seeking to admit Defense Exhibit 470.

5        THE COURT:  Received.

6        (Defendant Exhibit 470, was received in evidence.)

7    BY MR. PURPURA:

8    Q    This is a map which shows portions of Sinaloa, the state,

9    and you can see where your town that you came from, correct?

10   A    Yes.

11   Q    And your family as you've indicated to government

12   counsel, they were not your mother and father; you were not

13   brought up in a Narco trafficking family, were you?

14   A    No.

15   Q    As a matter of fact, the area around Cosala, that is a

16   mining area; is that correct?

17   A    Yes.

18   Q    And your family struggled to get by through mining and

19   livestock; is that correct?

20   A    Yes.

21   Q    At a very early age, age eight, you were already working

22   the countryside as a street vendor selling empanadas, correct?

23   A    Yes.

24   Q    By the age of ten, you were then old enough to work in

25   the fields where –– there in the area around Cosala, there's

David R. Roy, RPR – Official Court Reporter

5789

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1   corn, tomatoes, and cucumber to be harvested, correct?

2   A    Yes.

3   Q    And by the time your -- or strike that.

4           You were able to -- I believe, you worked in morning

5   and you tried to attend school in the afternoon; is that also

6   fair to say?

7   A    Yes.

8   Q    And in the area where you're from they have program

9   called Conafe, C-O-N-A-F-E, correct?

10  A    Yes.

11  Q    And that study program would allow someone to work and

12  study and eventually become a teacher, correct?

13  A    Yes.  I was an early childhood teacher in the Conafe

14  system.

15  Q    Very good.  And you were doing that by the age of 14, I

16  believe; is that right?

17  A    Yes.

18  Q    But then there became a bump in the road.  By the time

19  you were 16 years old, you met a person who you entered into a

20  common-law marriage with; is that correct?

21  A    Yes.

22  Q    And this person did not live in Cosala, correct?

23  A    No.

24  Q    He lived in the neighboring state of Durango, correct?

25  A    Yes.

David R. Roy, RPR - Official Court Reporter

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    Q    And I believe --

2              THE COURT:  Hang on one second, Mr. Purpura.  I

3    think we lost the mics.

4              Have we?  That sounds fine.

5              Can you hear okay?

6              (Pause in proceedings.)

7              THE COURT:  And maybe pull yours a little closer to

8    you, too.

9              Okay.  Go ahead.  I'm sorry.

10             MR. PURPURA:  She has the hair problem that I don't

11   have.

12   BY MR. PURPURA:

13   Q    And as I mentioned, was the area that your husband's

14   from, was it Tapihuahua?

15   A    Yes.

16   Q    All right.  That's T-A-P-I-H-U-A-H-U-A.

17   A    Tapihuahua.

18   Q    Tapihuahua?

19   A    Durango.

20   Q    And unlike Cosala, which was a mining area, this area was

21   a marijuana growing area, right?

22   A    Yes.

23   Q    And as you indicated to government counsel when you were

24   interviewed, that literally everyone in that Durango area of

25   Tapihuahua was -- no, was harvesting and selling marijuana,

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    correct?

2    A    Yes.

3    Q    That that was a very poor area and this was a cash-crop

4    that the peasants needed, correct?

5    A    Yes.

6    Q    But what happened was that unfortunately, the person you

7    were with was abusive physically and the relationship -- you

8    left the relationship, correct?

9    A    Yes.

10   Q    And as you indicated sometime in late 2011 starting 2012,

11   you met Mr. Guzman for a period of time; is that correct?

12   A    Yes.

13   Q    And then from approximately 2012 to 2016, again, you

14   pulled yourself up by your bootstraps and you became a

15   congress person from your state, correct?

16   A    Yes.

17   Q    I'm going to take you back again to June 17th or

18   June 21st, 2017 at the border crossing.  Now, you know as

19   you've testified when you entered the prison, that people can

20   use and do use fake identification, correct?

21   A    Can you repeat the question?

22   Q    Sure.

23        That people who don't want to be identified can and

24   do use fake identification, such as fake driver's licenses,

25   fake voting cards, fake passports, correct?

David R. Roy, RPR - Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1   A    Yes.

2   Q    And just as an example --

3        MR. PURPURA:  This is already in evidence yourself,

4   Defense Exhibit 239-B, which is a snippet of 239.

5   Q    You didn't have a fake passport or a fake credit card or

6   a fake driver's license or identification card when you

7   attempted to come into the United States in June 21st of 2017,

8   did you?

9   A    No, I didn't have any.

10  Q    And you didn't have a fake passport from another country?

11       MR. PURPURA:  239C already in evidence, snippet.

12  Q    No?

13  A    No.

14  Q    You used your own name and appropriate identification

15  when you attempted to enter the United States; is that

16  correct?

17  A    Yes.

18  Q    You didn't try to physically change your appearance when

19  you came into the United States?

20       MR. PURPURA:  Defense Exhibit 228 already in

21  evidence.

22       MR. NARDOZZI:  Objection, Your Honor.

23       THE COURT:  Sustained.

24       MR. PURPURA:  All right.

25       THE COURT:  Received, but no.

David R. Roy, RPR – Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    BY MR. PURPURA:

2    Q    You didn't try to physically change your appearance, did

3    you, ma'am?

4    A    No.

5    Q    You didn't try to dye your hair a different color or wear

6    big sunglasses or anything else, did you?

7    A    No.

8    Q    Okay.  And you certainly didn't have plastic surgery, did

9    you?

10          MR. NARDOZZI:  Objection.

11          THE COURT:  Sustained.

12   BY MR. PURPURA:

13   Q    Did you have any cocaine on you when you came to the

14   United States?

15   A    No.

16   Q    You didn't have any methamphetamine on you, did you, or

17   marijuana?

18   A    No.

19   Q    You didn't have large sums of money you were trying to

20   smuggle into the United States, did you?

21   A    No.

22   Q    So when you came to the initial inspection booth at the

23   customs and border protection office, they took your

24   identification and they went into a database; do you remember

25   that?

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1          MR. NARDOZZI:  Objection, Your Honor.

2          THE COURT:  If she knows.  If she knows.

3     A    Yes.

4     Q    Okay.  And soon after you gave the identification, they

5     were going to apprehend you, they wanted to stop you, correct?

6     A    Yes.

7     Q    By "they," I mean the United States authorities, border

8     and customs, correct?

9     A    Yes.

10    Q    And it's fair to say you became extremely frightened and

11    you tried to run, get away; you wanted to run back to Mexico,

12    right?

13    A    Yes.

14    Q    But customs, they weren't going to let you run back to

15    Mexico, were they?

16    A    No.

17    Q    You were physically taken down, correct?

18    A    Yes.

19    Q    And you were even injured during that scuffle, weren't

20    you?

21    A    Yes.

22    Q    And the next thing you know you're in a detention center

23    in San Diego, correct?

24    A    Yes.

25    Q    You were being held in custody, correct?

5795

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    A    Yes.

2    Q    You were brought to the United States District Court for

3    the Southern District of California where you appeared before

4    a United States District Court Judge, correct?

5    A    Yes.

6    Q    And on July 18th, 2017, you were arraigned on an

7    out-of-state indictment, out-of-jurisdiction indictment; do

8    you remember that?

9    A    Yes.

10   Q    And your plea was not guilty, correct?

11   A    In California?

12   Q    Correct.

13   A    Yes.

14   Q    You knew that -- or strike that.

15        You were then to be moved from San Diego, Southern

16   California all the way across country to Washington, D.C.,

17   correct?

18   A    Yes.

19   Q    And your counsel in San Diego and you fought that; you

20   didn't want to leave Southern California, you wanted to stay

21   there; is that fair to say?

22   A    Yes.

23   Q    You lost that battle, right?

24   A    Yes.

25   Q    And you were either taken in a bus or a plane and you

David R. Roy, RPR - Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1   were transported to Washington, D.C., correct?

2   A    Yes.

3   Q    And then again, you appeared this time before a

4   United States Magistrate Judge in the United States District

5   Court for the District of Columbia; do you remember?

6   A    Yes.

7   Q    And again, you were denied conditions of release; you

8   were detained, right?

9   A    Yes.

10  Q    And it's obvious, I believe, that for your family to

11  visit it's easier to visit in San Diego while you were

12  detained then all the way across the country in

13  Washington, D.C., correct?

14          MR. NARDOZZI:  Objection.  Relevance.

15          THE COURT:  I will allow it.

16          If you could, pick it up a little.  I see where

17  you're going.

18          MR. PURPURA:  I hope so, too.

19  A    Yes.

20  Q    On that day of June 21st, 2017 when you attempted to gain

21  access into the United States, at best, you knew that years

22  before, you had a romantic relationship with Mr. Guzman,

23  correct?

24  A    Yes.

25  Q    And you knew, as you testified before, that the

5797

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    United States and Mexico for years had been targeting

2    Mr. Guzman, not you?

3    A    Yes.

4    Q    And in fact, when Mr. Nardozzi, the gentleman that put

5    you on direct examination, interviewed you back on

6    November 15th, 2017, he asked you, Why do you think you got

7    arrested at the border crossing?

8    A    Yes.

9    Q    And your response in quotes was, Primarily I thought it

10   was because of everything that was coming out in the press

11   that I supposedly had a relationship with him --

12            MR. NARDOZZI:  Objection, Your Honor.

13            THE COURT:  Sustained.

14
     BY MR. PURPURA:
15   Q    Do you recall telling government counsel and the agents

16   back on November 15th, 2017 that you thought you were being

17   stopped because, primarily, I thought it was because of

18   everything --

19            MR. NARDOZZI:  Same objection, Your Honor.

20            THE COURT:  Overruled.

21   BY MR. PURPURA:

22   Q    Primarily, I thought it was because of everything that

23   was coming out in the press that I supposedly had a

24   relationship with him, everything that's been said about as it

25   relates to him, I believe it had everything more to do with

David R. Roy, RPR – Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1  things than our relationship.  I wouldn't have come to the

2  United States if it did?

3  A     Yes.

4  Q     And you weren't trying to lie to Mr. Nardozzi and

5  government agents back in 2017, that's really what you

6  thought, right?

7  A     Yes.

8  Q     Based on what you considered, at least at that time in

9  2017, as a noncriminal relationship with Mr. Guzman, you were

10 being pointed out by the Government, correct?

11 A     Yes.

12 Q     You received an indictment, correct?

13 A     Yes.

14        MR. PURPURA:  Defense Exhibit 476, move to admit

15 without objection.

16        THE COURT:  Received.

17        (Defendant Exhibit 476, was received in evidence.)

18 BY MR. PURPURA:

19 Q     And this is the indictment that came from the

20 United States District Court from the District of Columbia,

21 correct?

22 A     Yes.

23 Q     And I know it's in English now, but the two lawyers that

24 were assigned to you both spoke Spanish and they reviewed this

25 indictment with you; is that correct?

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    A    Yes.

2    Q    And I know Ms. Schaner and I really know Ms. Hernandez,

3    and they had that translated in Spanish for you; is that

4    correct?

5              MR. NARDOZZI:  Objection, Your Honor, to counsel's

6    names.

7              THE COURT:  Sustained.  Really.

8              MR. PURPURA:  They're good lawyers.  What can I say?

9              THE COURT:  We now know you think they are good

10   lawyers.  I suspect they may be.  I have not met them.

11             MR. PURPURA:  Okay.

12             THE COURT:  Both of your opinions are equally

13   irrelevant.  The question is were they translated.

14             MR. PURPURA:  Fair enough.

15   BY MR. PURPURA:

16   Q    The indictment, the important part of the indictment is

17   five kilograms or more of a mixture of a substance containing

18   a detectable amount of cocaine; that was important, right?

19   A    Yes.

20   Q    Because you were told that's what triggers the mandatory

21   minimum of ten years up to life, correct?

22   A    Yes.

23   Q    And they told you that in the federal system there's no

24   parol, right?

25   A    Yes.

David R. Roy, RPR - Official Court Reporter

5800

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    Q    And then they -- well, strike that.

2          They also explained to you about the United States

3    Sentencing Guidelines, correct?

4    A    Yes.

5    Q    And that the Government was insisting upon a plea where

6    you were at the highest level of those guidelines, a level 38?

7    A    Yes.

8    Q    For the criminal activity as you explained to us for the

9    marijuana acquisitions in Sinaloa and Durango; is that

10   correct?

11   A    Yes.

12   Q    For the corporation that you helped set up, which was

13   never even used, correct?

14   A    Yes.

15   Q    And for some messages that were passed, correct?

16   A    Yes.

17   Q    And yet, they wanted to put you at the highest base

18   offense level under the guidelines?

19          MR. NARDOZZI:  Objection.

20          THE COURT:  Sustained.

21          How are you doing on time?

22          MR. PURPURA:  If you just give me another couple

23   minutes and then take a break, and then I'll speed up.

24          THE COURT:  Okay.  Fine.

25          MR. PURPURA:  Okay.

David R. Roy, RPR – Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    BY MR. PURPURA:

2    Q    This was in 2017, the first time you were ever arrested,

3    correct?

4    A    Yes.

5    Q    As your lawyers explained to you and as you now know, you

6    were facing, based on this indictment and the Government plea

7    offer, substantial, very substantial incarceration, correct?

8    A    Yes.

9    Q    You are 29 years old today, right?

10    A    Yes.

11    Q    Obviously, you want to get out of prison, correct?

12    A    Yes, that's the truth.

13    Q    And more than anything, you would like to be home with

14    your children, correct?

15    A    Yes.

16    Q    And you want, if possible, to put all of this behind you

17    as soon as you can, correct?

18    A    Yes.

19    Q    And literally, one month before we started this trial,

20    one month, in October of 2018, you changed your plea from not

21    guilty to guilty; is that correct?

22    A    Yes.

23    Q    And as part of that deal, you agreed to the Government,

24    the Government's counsel one month before we started this

25    case, to cooperate against Mr. Guzman, correct?

David R. Roy, RPR – Official Court Reporter

5802

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    A    Yes.

2              MR. PURPURA:  Thank you, Your Honor.  This would be

3    a good place for a break.

4              THE COURT:  Okay.  We'll take our morning break,

5    ladies and gentlemen.  Come back here at 11:20.

6              Please remember not to talk about the case amongst

7    yourselves.

8              (Jury exits the courtroom.)

9              (The following matters occurred outside the presence

10   of the jury.)

11             THE COURT:  Okay, 11:20.

12             (Break was taken.)

13             THE COURTROOM DEPUTY:   All rise.

14             THE COURT:  Please bring in the jury.

15             (Jury enters the courtroom.)

16             (Jury present.)

17             THE COURT:  All right.  Everyone be seated.

18             Sorry for the slight delay, ladies and gentlemen.

19   We had a technical malfunction with the computers in the

20   courtroom.  That is now fixed and we are prepared to counsel

21   cross-examination.

22   BY MR. PURPURA:

23   Q    Ms. Sanchez, you did not grow up to be a marijuana

24   purchaser or a Narco trafficker; is that fair to say?

25   A    Yes.

David R. Roy, RPR – Official Court Reporter

5803

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1   Q    You didn't?

2   A    I did not grow up for that.

3   Q    And you never went in to, like, continuing education for

4   purchasing marijuana or Narco trafficking, did you?

5   A    No.

6   Q    So what occurs sometime in 2012 is that as the Government

7   suggests, the very head of the Sinaloa cartel, Mr. Guzman,

8   comes to you, with all due respect, a 20-something nonNarco

9   trafficker, and asks her to go purchase marijuana in the

10  Golden Triangle?

11  A    Yes, in 2011.

12        MR. PURPURA:  And the Government Exhibit 502, which

13  is already in evidence.

14        THE INTERPRETER:  Counsel, we don't have anything on

15  the screen here.

16        Thank you.

17  BY MR. PURPURA:

18  Q    I don't believe that the Golden Triangle has moved, but

19  it goes in the states of Chihuahua, Durango, and Culiacan,

20  roughly right here in this area (indicating), correct?

21  A    Sinaloa, Chihuahua, and Durango, yes.

22        THE COURT:  Mr. Purpura, you need to push the button

23  on your mic.

24        Thank you.

25        MR. PURPURA:  Let's leave that up for a second,

David R. Roy, RPR – Official Court Reporter

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    please.

2    Q    And specifically, your familiarity with the marijuana

3    fields in that area came from the relationship you had with

4    your first common-law husband, correct?

5    A    Yes.

6    Q    And so as you told the jury then, the -- as

7    the Government suggests, the head of the Sinaloa cartel asked

8    you with no experience to go to this area where your in-laws

9    reside and to purchase marijuana on credit?

10   A    Yes.

11   Q    And at that time, as the Government suggests, 0the head

12   of the Sinaloa cartel doesn't have enough money to pay even

13   the salaries of his employees like a housekeeper or cook,

14   correct?

15   A    Yes, he didn't have any.

16   Q    Okay.  And you decided that it wouldn't be fair to the

17   peasants to buy the marijuana on credit because they probably

18   wouldn't receive the small amount of money they do; is that

19   right?

20   A    Yes.

21   Q    Didn't Mr. Guzman tell you that he, as the head of the

22   Sinaloa cartel, he controls the whole Golden Triangle, the

23   whole area up there; didn't he tell you that?

24   A    No.

25   Q    He didn't tell you that he had hectors, or acres, of

5805

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1   marijuana plantations under his control in that area, did he?

2   A    No.

3   Q    Because he didn't, right?

4   A    Not that I know of.

5   Q    And, in fact, what you told the Government that there was

6   a gentleman in that area --

7              MR. PURPURA:  Mr. Nardozzi.

8              Your Honor, without objection, move to admit Defense

9   Exhibit 480.

10             THE COURT:  Received.

11             (Defendant Exhibit 480, was received in evidence.)

12             MR. PURPURA:  Thank you, Your Honor.

13   BY MR. PURPURA:

14   Q    You told the Government that a gentleman by the name of

15   Guero Trankas, T-R-A-N-K-A-S, controlled the marijuana

16   production from Chicala to Alamos?

17   A    Alamos, yes, sir.

18   Q    You never told the Government that Joaquin Guzman

19   controlled that entire area because he doesn't, right?

20   A    Yes.

21   Q    And you had to go -- well, strike that.

22             We don't have a -- just demonstrative, Your Honor,

23   Defense 479.  All right.  Let's see...

24   BY MR. PURPURA:

25   Q    All right.  I assume that Guero, meaning "white,"

David R. Roy, RPR – Official Court Reporter

5806

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1   Trankas, 479, or light skinned, he doesn't -- obviously that's

2   not him, correct?

3   A    That he's not whom?  I'm sorry.

4   Q    Strike the question -- or actually, I have to have the

5   question.

6            This is not a picture of Guero Trankas, correct?

7   A    No.

8   Q    But, obviously, that's his name on the picture, right?

9   A    Yes.

10  Q    Okay.  So, in essence, what you, a 20-something-year-old

11  woman has to do is go speak to Guero Trankas, who is up here,

12  to get permission to buy marijuana for this guy here,

13  Mr. Guzman, right?

14  A    Yes.

15  Q    But the bottom line was that Guero's marijuana was -- I

16  think he wanted too much money that Guzman didn't want to

17  spend, right?

18  A    Could you repeat the question?

19  Q    That Guero's marijuana was expensive and Mr. Guzman

20  wasn't interested in paying the price that Guero wanted for

21  his marijuana in his hectors and acres of fields?

22  A    Yes.

23  Q    As a matter of fact, and there's a conversation that

24  Mr. Guzman was looking to purchase marijuana somewhere between

25  500 and 550 pesos, correct?

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1   A    650, yes.

2   Q    650.  But just as a point of reference, if you know, back

3   in 2012 a pesos was about seven cents, one pso?

4   A    Yes, I think so.  I don't really know exactly like in

5   dollars.

6   Q    Right.  Well, let's assume since you think so, that the

7   pso is valued approximately at seven cents in 2012.  As a

8   point of reference if you do the math, that 500 pesos would be

9   about $35?

10          MR. NARDOZZI:  Objection basis.

11          THE COURT:  You need something more for that.

12          MR. PURPURA:  All right.

13  Q    All right.  Do you know, what's more valuable a pso or a

14  dollar?

15  A    Well, actually if I understand, a dollar.

16  Q    Okay.  So actually, you're not even familiar with that

17  currency that much, are you?

18  A    With a dollar?  No.

19  Q    All right.  So then is it fair to say that you recall

20  that Mr. Guzman, as you told the Government, actually wanted

21  you to try to purchase the marijuana for about 250 pesos for a

22  kilo, correct?

23  A    Yes.

24  Q    Okay.  And you actually thought that the currency

25  exchange of $17.50 was too little for a kilo of marijuana,

5808

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    correct?

2    A    I was never -- it was never spoken the fact about the

3    dollars, we never talked about that.

4    Q    Fair enough.  But you thought that 250 pesos was too

5    little and the peasants wouldn't make any money at all,

6    correct?

7    A    Yes.

8    Q    And as far as --

9              MR. PURPURA:  Government exhibit again, please,

10    502 --

11    Q    As far as landing strips in that Golden Triangle area,

12    plain landing strips, Mr. Guzman never said he owned any

13    landing strips and we can use them any time he wanted to, did

14    he?

15    A    No.

16    Q    As a matter of fact, what you told us in your testimony

17    on Thursday was that you spoke to someone and you told

18    Mr. Guzman that this person was not using his landing strip

19    and Mr. Guzman could borrow it, correct?

20    A    Yes.

21    Q    You were asked to the best of your knowledge, when one of

22    those 20 to 30 proffers, what was the profit margin; how much

23    profit could you make.  Do you remember being asked something

24    like that, for a kilo?

25    A    I don't remember having ever been asked that.

5809
LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    MR. PURPURA:  May I have Defendant's Exhibit 470 --

2    it's okay.

3    BY MR. PURPURA:

4    Q    I'm going to show you what has been marked as Defense

5    Exhibit 475, which is Government's Exhibit LSL-17.

6         And I'd ask the interpreter please to read to the

7    witness just this line here, starting with Sanchez Lopez.

8         (Interpreter complies.)

9    Q    Okay.  Does that refresh your recollection that you told

10   the Government that you estimated that you did probably profit

11   three times the purchase price?

12   A    Well, yes.  But when I was referring to that, I was not

13   talking about us who were purchasing that, but rather

14   Mr. Guzman who would then sell it at a much higher price.

15   Q    Approximately three times the purchase price, correct?

16   A    Yes, that he would make.

17   Q    And you were asked specifically where the marijuana was

18   going.  Do you remember that?

19   A    Yes.

20   Q    And what you said is that --

21   MR. PURPURA:  May I have Government's Exhibit 502 on

22   display again?

23   BY MR. PURPURA:

24   Q    -- what you said is that to your knowledge, the marijuana

25   was being moved from the hills or the mountains of Durango and

David R. Roy, RPR - Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    Sinaloa being flown to Culiacan, correct?

2    A    Yes.

3    Q    And after that, you had really no knowledge of whether

4    the marijuana was being sold in Culiacan, do you?

5    A    No, not in Culiacan.

6    Q    Okay.  Well, you don't have any knowledge whether the

7    marijuana was sold in Europe, do you?

8    A    No.

9    Q    Canada?

10   A    No.

11   Q    The only thing you know is that the marijuana was

12   transported from the hills down to Culiacan, correct?

13   A    Yes.

14   Q    And you also know that the price of the marijuana from

15   your limited experience increases from when they move it from

16   the mountains down to the city, correct?

17   A    Yes.

18   Q    The fronting of a business, do you remember testifying

19   about that?

20   A    Yes.

21   Q    Okay.  The only knowledge you have about that is a time

22   period starting June 2012 for about three months, right?

23            (Continued on the next page.)

24

25

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    BY MR. PURPURA: (Continued.)

2    Q    And the only thing that you did was you were helping this

3    person Pancho with the paperwork to start this corporation,

4    correct?

5    A    Yes, under the orders of Mr. Guzman.

6    Q    That's fair.

7         And that's all you did, though, correct?

8    A    Yes.

9    Q    And you testified that, at least to your knowledge, in

10   those three months, just three months, that no juice went

11   through this corporation, correct?

12   A    Yes.

13   Q    And by "juice," the corporation was set up to apparently

14   sell juice, correct?

15   A    Yes.

16   Q    And in those three months, as you testified, that -- no

17   money flowed through that corporation, correct?

18   A    Yes.

19   Q    And to your knowledge, to your limited knowledge, the

20   purpose of the corporation is to allow illegal money to flow

21   through and take out hopefully what looks like legitimate

22   money on the other side, right?

23   A    Yes.

24   Q    But from your own immediate interaction, that never

25   occurred with this corporation, correct?

Denise Parisi, RPR, CRR
Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1   A   No.

2   Q   But you did mention, you did mention in that three-month

3   period of time, that Pancho was handing out money, right?

4   A   Yes.

5   Q   Now, you described Pancho as an illiterate peasant,

6   correct?

7   A   Yes.

8   Q   And so according to you, then, rather than use the

9   corporation which is being set up, this illiterate peasant is

10  passing U.S. currency and Mexican pesos on to other people,

11  correct?

12  A   Yes.  Money that reach his hands under the orders of

13  Mr. Guzman.

14  Q   Well, you would agree with me, that doesn't launder the

15  money; that doesn't make what would be illegal money legal by

16  him just passing it on, does it?

17  A   Yes.

18  Q   You would agree, it just doesn't make sense, does it?

19          MR. NARDOZZI:  Objection.

20          THE COURT:  Sustained.

21          Let's have a sidebar.

22          MR. PURPURA:  Judge, I'll move away.  I will move

23  away.

24          THE COURT:  Okay.

25  BY MR. PURPURA:

Denise Parisi, RPR, CRR
Official Court Reporter

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    Q    You also spoke about another corporation involving a

2    woman named Angie in Los Angeles, right?

3    A    Yes.

4    Q    And specifically on direct examination, you spoke about a

5    meeting involving that corporation, correct?

6    A    Yes.

7    Q    When apparently Angie wanted a razor, and you've defined

8    that as an ATV, an all-terrain vehicle, right?

9    A    Yes, something of that nature.

10   Q    And you really didn't know much else about that other

11   than the fact that, according to you, Joaquin Guzman's partner

12   was at that meeting, correct?

13   A    Yes.

14        MR. PURPURA:  Government's Exhibit 2-A, please.

15   It's already in.

16        (The above-referred to exhibit was published.)

17   BY MR. PURPURA:

18   Q    That partner at the meeting, that wasn't Mayo Zambada,

19   was it?

20   A    No.

21   Q    Just a couple more questions.

22        Would you -- respectfully, would you agree with me

23   that you do have some credibility/believability issues?

24        MR. NARDOZZI:  Objection.

25        THE COURT:  Sustained.

Denise Parisi, RPR, CRR
Official Court Reporter

5814

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1   BY MR. PURPURA:

2   Q    Would you agree with me that you have motive to stretch

3   the truth?

4            MR. NARDOZZI:  Objection.

5            THE COURT:  Sustained.

6   BY MR. PURPURA:

7   Q    Do you remember, as you testified on direct examination

8   just a short while ago, that --

9            MR. PURPURA:  Government's Exhibit 825, please.

10            (The above-referred to exhibit was published.)

11   BY MR. PURPURA:

12   Q    -- you went to a prison, correct?

13   A    Yes.

14   Q    This is the year 2015, I believe; is that correct?

15   A    Yes.

16   Q    And I know you indicated to the jury that you did not

17   prepare the false identification, but, in fact, you used it;

18   is that fair to say?

19   A    Yes.

20   Q    And then, as you testified to, soon after that --

21            MR. PURPURA:  Defense Exhibit 481 without objection.

22   BY MR. PURPURA:

23   Q    -- the Mexican media and the Internet picked up

24   photographs of you at that prison, correct?

25   A    Yes.

5815

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1  Q    And when you addressed those allegations by the Mexican

2  press, and there's -- there was a lot of them, right?

3  A    Yes.

4  Q    Each time you spoke right to them, you said, "I did not

5  go to that prison," correct?

6  A    Yes.

7  Q    You also had a Facebook account, correct?

8  A    Yes.

9  Q    And in your Facebook, in your professional capacity as a

10 diputada, you responded to these allegations about a

11 relationship with Mr. Guzman, correct?

12 A    Referring to what?  Can you clear up the question?

13 Q    I can.

14        Defense Exhibit 482 without objection, move to

15 enter.

16        THE COURT:  Received.

17        (Defendant Exhibit 482, was received in evidence.)

18 BY MR. PURPURA:

19 Q    Now, does that clear it up a little bit?

20 A    Yes.

21 Q    And you can read what you wrote in your Facebook page

22 about the allegations, correct?

23 A    Yes.

24 Q    And without objection, Defense Exhibit 482-A, which is a

25 translation, and your response was:  "I see that my personhood

Denise Parisi, RPR, CRR
Official Court Reporter

LUCERO SANCHEZ LOPEZ - CROSS - MR. PURPURA

1    is attacked since I started this process.  There hasn't been

2    any evidence against me.  Likewise, several authorities have

3    stressed that there is no existence of a link and the presence

4    of myself in the events to which I am linked.  I am confident

5    that justice will be done and everything will be resolved,"

6    correct?

7    A    Yes.

8    Q    And there were more responses in your Facebook page --

9    these allegations -- in your professional capacity, correct?

10   A    I don't remember all of them since I didn't manage my

11   Facebook account.

12             MR. PURPURA:  Well, without objection, move to enter

13   Defense Exhibit 483.

14             THE COURT:  Received.

15             (Defendant Exhibit 483, was received in evidence.)

16   BY MR. PURPURA:

17   Q    Again, this comes from your Facebook.  This is a picture

18   of you actually in your professional capacity as diputada,

19   correct?

20   A    Yes.

21   Q    And the translation 483-A.

22             What you suggest in the Facebook is:  "The events of

23   today are just one more step to prove what I've been saying

24   for a long time, my innocence in the charges that are imputed

25   to me," correct?

LUCERO SANCHEZ LOPEZ – CROSS – MR. PURPURA

1    A    Yes.

2    Q    In addition to Facebook and speaking to the press, you've

3    made public statements to your constituents in the Sinaloa

4    area, correct?

5    A    Yes.

6    Q    And one statement was made on June 18th, 2015, and just a

7    portion of it --

8              MR. PURPURA:  Without objection, Defense Exhibit 484

9    in English and Spanish.

10             THE COURT:  Received.

11             (Defendant Exhibit 484, was received in evidence.)

12             (The above-referred to exhibit was published.)

13   BY MR. PURPURA:

14   Q    You indicate to your constituents:  "I have two children

15   that I already mentioned as a result of a marriage where my

16   husband already passed away.  I am not a girlfriend, nor do I

17   know, nor do I want to know another person much less if he's

18   part of organized crime.  I end by saying the following:

19   Faced with this lie so harmful to me," correct?

20   A    Yes.

21   Q    And the final public statement that I'm going to show you

22   is January 14th, 2016, a year later.

23             MR. PURPURA:  Defense Exhibit 485, I move to enter

24   without objection.

25             THE COURT:  Received.

Denise Parisi, RPR, CRR
Official Court Reporter

LUCERO SANCHEZ LOPEZ - REDIRECT - MR. NARDOZZI

1          (Defendant Exhibit 485, was received in evidence.)

2          (The above-referred to exhibit was published.)

3    BY MR. PURPURA:

4    Q    "Question by the press:  Do you know Chapo, Lucero?

5          "Answer:  I do not know him that way, but I've seen

6    him sometimes, but not close.

7          "Have you ever talked to him?"

8          And your response on January 14, 2016, was no,

9    correct?

10   A    Correct.  I don't remember that conversation.

11   Q    You don't deny that; is that correct?

12   A    No.

13         MR. PURPURA:  I have nothing further.  Thank you and

14   good luck to you.

15         THE COURT:  Any redirect?

16         MR. NARDOZZI:  Briefly, Your Honor.

17         THE COURT:  Okay.

18   REDIRECT EXAMINATION

19   BY MR. NARDOZZI:

20   Q    Ms. Sanchez, Mr. Purpura just showed you a series of

21   exhibits, Defense Exhibits 482 through 485.  They were

22   statements on Facebook and to members of the media.  In those

23   statements, you denied any relationship with the defendant.

24   Why did you deny your relationship to the defendant?

25         MR. PURPURA:  Objection, Your Honor.  This was asked

LUCERO SANCHEZ LOPEZ – REDIRECT – MR. NARDOZZI

1    and answered.  It's been through.

2            THE COURT:  No, it hasn't.

3    A    Out of fear, because first and foremost, I love my

4    family, and I was afraid that an enemy of Mr. Guzman might

5    hurt them or might hurt me; and Mr. Guzman knew that I was

6    never going to acknowledge that relationship in public.

7    Q    Were you still in public office at the time of some of

8    these statements?

9    A    Yes.

10   Q    Were you facing any charges at the time of some of these

11   statements?

12   A    Yes.

13   Q    What were those charges?

14   A    Use of fake documentation.

15   Q    And is that from the use of a fake documentation at the

16   prison that we saw in Government's Exhibit 825?

17   A    Yes.

18   Q    So were those statements made in the context of questions

19   about those charges?

20   A    Yes.

21   Q    On cross-examination, you were asked a series of

22   questions about profit margins as it related to marijuana.

23   Did you ever discuss profit margins directly with the

24   defendant?

25   A    No, not that I remember.

                    LUCERO SANCHEZ LOPEZ - REDIRECT - MR. NARDOZZI

1    Q    So do you even know really what the profit margins were

2    for the marijuana purportedly sold by the defendant?

3              MR. PURPURA:  Objection.

4              THE COURT:  Overruled.

5    A    Well, not exactly, but I do know that he will make much

6    more compared to the price that he would buy it at.

7    Q    You were also asked a series of questions on

8    cross-examination about the front businesses that you helped

9    to incorporate.  Did you personally monitor the bank accounts

10   of those corporations, particularly the juice company?

11   A    Yes.

12   Q    Your role in those corporations was limited to setting up

13   the corporations --

14             MR. PURPURA:  Objection.

15   BY MR. NARDOZZI:

16   Q    -- and communicating, correct?

17             MR. PURPURA:   Objection.  611C.

18             THE COURT:  Sustained.

19   BY MR. NARDOZZI:

20   Q    What was your role in those -- your involvement in the

21   corporations?

22   A    I was the person organizing things.  I was the person in

23   charge of telling them where to go, what errands to run,

24   pretty much in charge of logistics for the company; and I did

25   everything under the orders of Mr. Guzman.

5821

LUCERO SANCHEZ LOPEZ - REDIRECT - MR. NARDOZZI

1   Q    On cross-examination at the very beginning, you were

2   asked about a cocaine load.  Do you recall that?

3   A    Yes.

4   Q    That cocaine load, was that a basis for your plea in

5   Washington, D.C. in October of 2018?

6   A    Yes.

7   Q    So here in court it was not the first time that you have

8   discussed that cocaine load with the Government, is it?

9   A    No.

10  Q    And, in fact, leading up to your guilty plea, did you

11  discuss your criminal activity with the Government?

12  A    Yes.

13  Q    What is your understanding of what happens to your case

14  if you were to lie here in court today?

15  A    Well, I would have to serve -- I would have to serve a

16  very high sentence, and the agreement that I made with the

17  Government would not follow through.

18  Q    Okay.

19           MR. NARDOZZI:  I don't have any further questions.

20           MR. PURPURA:  Nothing further.  Thank you, Your

21  Honor.

22           THE COURT:  All right.

23           Feel like an early lunch, ladies and gentlemen?  Do

24  you want to go to the next witness?

25           I'm getting mixed reviews.

PROCEEDINGS

1           Let's go to the next witness, but I need you to line

2     up outside for just a minute while we set up the courtroom.

3           (Jury exits.)

4           THE COURT:  Marshals, will you please take this

5     witness out, and the Government will call the next witness.

6           (Witness excused.)

7           MS. LISKAMM:   Your Honor, the Government calls

8     Damaso Lopez Nunez.

9           (Witness takes the stand.)

10          THE COURT:  All right.  We'll bring in the jury.

11          (Jury enters.)

12          THE COURT:  All right.  Everyone except the witness

13    may be seated.

14          THE COURTROOM DEPUTY:  Please raise your right hand.

15          (Witness sworn.)

16          THE WITNESS:  Yes.

17          THE COURTROOM DEPUTY:  Please state and spell your

18    name for the record.

19          THE WITNESS:  Damaso Lopez Nunez, D-A-M-A-S-O

20    L-O-P-E-Z N-U-N-E-Z.

21          THE COURTROOM DEPUTY:  You may be seated.

22          THE COURT:  I want to make sure the mic is

23    positioned so they can hear both.  That will help, too.

24          You may inquire.

25          MS. LISKAMM:  Thank you, Your Honor.

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1          (Witness takes the witness stand.)

2    DAMASO LOPEZ NUNEZ, called as a witness, having been first

3    duly sworn/affirmed, was examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MS. LISKAMM:

6    Q     Good afternoon, Mr. Lopez.

7    A     Good afternoon.

8    Q     How old are you?

9    A     Fifty-two years and 11 months.

10   Q     And where are you from?

11   A     From a town called Portaceli in the El Dorado township,

12   the municipality of Culiacan, Sinaloa state, Mexico.

13   Q     And how far did you go in school?

14   A     I did three years of law in -- at the university.

15   Q     Do you understand any English?

16   A     Very little.

17   Q     What language are you most comfortable testifying in here

18   today?

19   A     In Spanish.

20   Q     Where do you live right now?

21   A     In the United States.

22   Q     Where?

23   A     In a jail in the United States.

24   Q     When were you arrested?

25   A     May 2nd, 2017.

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    Q    Okay.  And where?

2    A    Mexico City.

3    Q    Prior to your arrest, what did you do for a living?

4    A    I work -- I worked with my compadre in his drug

5    trafficking business.

6    Q    And what cartel did your compadre work for?

7    A    Sinaloa.

8    Q    What was your compadre's role in the Sinaloa Cartel?

9    A    He was a leader just like Mr. Ismael Zambada.

10   Q    And what specifically did you do for your compadre?

11   A    At first, I helped him to get houses, rents; and then

12   later, I helped him with some relationships with government

13   officials; and then later, he asked me to help him with

14   logistics, communications for some shipments of drugs from

15   South America to Sinaloa.

16   Q    You mentioned some relationships with the government.

17   What do you mean by that?

18   A    Yes, that the government would give you -- give us

19   information when it came to operations.

20   Q    Okay.  Besides a working relationship, what type of a

21   relationship did you have with your compadre?

22   A    Well, he was my son's godfather at his wedding; and I was

23   the godfather of one of his daughters -- one of his twin

24   daughters at her baptism.

25   Q    How close were you with your compadre?

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    A    Very close.

2    Q    Do you recognize anyone in this courtroom as your

3    compadre?

4    A    Yes.

5         MR. BALAREZO:  Your Honor, I will stipulate that he

6    knows Mr. Guzman.

7         THE COURT:  All right.

8    BY MS. LISKAMM:

9    Q    What nicknames or code names have you heard used for the

10   defendant?

11   A    People used to call him Chapo.  I used to call him Javier

12   or Compadre.

13   Q    And you said before that he was one of the co-leaders of

14   the Sinaloa Cartel with Mayo.  Who is Mayo?

15   A    It's Mayo Zambada Garcia.

16   Q    How many times have you met Mayo?

17   A    Several times.

18   Q    Showing you what's already in evidence as Government's

19   Exhibit 2-A, who is that?

20        (The above-referred to exhibit was published.)

21   A    Mr. Zambada.

22   Q    Okay.  What nicknames or code names is Mayo Zambada known

23   by?

24   A    Mayo.  We would call him La Dona, La Senora, La Cocina.

25   Q    Based on your knowledge of the cartel, what was the

5826

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    working relationship like between the defendant and Mayo

2    Zambada?

3    A    They always helped one another in partnership.  If my

4    compadre did a job, then Mayo would help him in a partnership

5    at 50 percent, and the same way the other way around.

6    Q    And when you say your compadre, who are you referring to?

7    A    My Compadre Joaquin.

8    Q    Okay.  Did you, yourself, have any nicknames or code

9    names that were used?

10   A    Liscensiado, Lic, Felizardo.

11   Q    Showing you Government's Exhibit 11-A, which is already

12   in evidence.

13           (The above-referred to exhibit was published.)

14   BY MS. LISKAMM:

15   Q    Who is that?

16   A    That's me.

17   Q    All right.  So I want to take a moment and talk a little

18   bit about your case.

19           You previously said you were in custody in the

20   United States.  Why is that?

21   A    I was charged with the crime of drug trafficking.

22   Q    And what is the status of your case?

23   A    I have been sentenced.

24   Q    What was your sentence?

25   A    Life.

5827

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   Q    And did you plead guilty?

2   A    Yes.

3   Q    What crime did you plead guilty to?

4   A    Drug trafficking.

5         MS. LISKAMM:  Showing just to the witness only.

6   BY MS. LISKAMM:

7   Q    I'm showing you what's been marked as Government's

8   Exhibit 3500 DLN2, -3, and -4.

9         MR. BALAREZO:  No objection.

10        THE COURT:  It is received.

11        (Government Exhibit 3500 DLN2, 3, 4, was received in

12   evidence.)

13        MS. LISKAMM:  Thank you.

14        (The above-referred to exhibit was published.)

15   BY MS. LISKAMM:

16   Q    Mr. Lopez, what is this?

17   A    That is the agreement I signed.

18   Q    Okay.  And turning to the last page, whose signature is

19   that?

20   A    That is my signature.  Mine.

21   Q    Based on the terms of your plea agreement, what are your

22   obligations?

23   A    To tell the truth.

24   Q    Okay.  And what is your understanding of the Government's

25   obligations under the plea agreement?

5828

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   A    None.

2   Q    Okay.  What do you hope happens after your cooperation is

3   complete?

4   A    I have the hope to be recommended so that my sentence is

5   reduced.

6   Q    Who ultimately will decide if your sentence is reduced?

7   A    The judge.

8   Q    Has anyone promised you that your sentence will be

9   reduced in any way?

10  A    No.

11  Q    Pursuant to your plea agreement, did you agree to forfeit

12  any money to the United States?

13  A    Yes.

14  Q    How much money?

15  A    $25 million.

16  Q    And to date, how much of that money have you paid?

17  A    Nothing.

18  Q    Did the Government agree to provide you or your family

19  with any immigration benefits?

20  A    My family is in the United States for safety reasons.

21  Q    Okay.  Has the Government made any other promises to you?

22  A    No.

23  Q    Okay.  I want to direct your attention now to 1999.

24  Where were you working at that time?

25  A    I worked at the federal -- maximum security federal

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    penitentiary of Puente Grande, Jalisco.

2    Q    What position did you have at that prison?

3    A    I was the deputy director of security and custody.

4    Q    And what were your responsibilities in that role?

5    A    I was responsible for internal security of the

6    penitentiary.

7    Q    As a deputy director, were you familiar with the layout

8    of the prison?

9    A    Yes.

10   Q    Generally, how was the prison set up?

11   A    Eight different security units, an area of observation

12   and classification of inmates, a small hospital, an area for

13   special conducts, and the government area.

14   Q    Who controlled the doors to these eight security units?

15   A    Personnel under my command.

16   Q    Okay.  And the personnel under your command that

17   controlled these doors, where were they located in the prison?

18   A    One was at the diamonds.

19   Q    What is a diamond?

20   A    A place fenced by see-through glass.  Inside of it, there

21   is security personnel who have the visibility from there to

22   four other units.

23   Q    Okay.  And showing you --

24        MS. LISKAMM:  I believe there's no objection.

25   BY MS. LISKAMM:

Denise Parisi, RPR, CRR
Official Court Reporter

5830

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    Q    Showing you what's been marked as Government's

2    Exhibit 818.

3              MR. BALAREZO:  No objection.

4              THE COURT:  It is received.

5              MS. LISKAMM:  Thank you.

6              (Government Exhibit 818, was received in evidence.)

7              (The above-referred to exhibit was published.)

8    BY MS. LISKAMM:

9    Q    Mr. Lopez, what are we looking at here?

10   A    It is an aerial photograph of the Puente Grande prison.

11   Q    Could you, on the screen in front of you, circle where

12   the diamonds are you were referring to?

13   A    (Indicating.)

14   Q    Okay.  Thank you.

15             Now, while you were working at this prison, was the

16   defendant housed there?

17   A    Yes.

18   Q    Okay.  Did you have any contact with him while you were

19   there?

20   A    Yes.

21   Q    What type of contact?

22   A    He sent some requests to me asking me for shoes, change

23   of clothes.

24   Q    And were these requests handwritten or typed?

25   A    Every inmate who could read and write, they would write

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    it -- they would hand write the request themselves.

2    Q    Okay.  And was there anything else required on these

3    requests?

4    A    They had to be signed by every inmate.

5    Q    Okay.  Approximately how many requests did you receive

6    from the defendant?

7    A    Some -- some five or six, approximately, that I remember.

8    Q    And were all of these five or six requests handwritten?

9    A    Yes.

10   Q    And were all of these requests signed by the defendant?

11   A    Yes.

12   Q    At a certain point in time, did you have an opportunity

13   to meet with the defendant?

14   A    Yes.

15   Q    Okay.  And what was discussed at that meeting?

16   A    On that occasion, my compadre asked me to help him so

17   that one of his wives could go in, Griselda.

18   Q    And did you discuss with the defendant why he needed your

19   help getting a wife into the prison?

20   A    Yes, because by then, a wife of my compadre was already

21   going in, her name was Alejandrina, and she had already been

22   authorized by the technical counsel of the penitentiary, so

23   that for Ms. Griselda to be able to come in, it would have to

24   be done clandestinely or to erase Alejandrina from the

25   registry and write down Griselda on the registry.

Denise Parisi, RPR, CRR
Official Court Reporter

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   Q    Did you agree to help the defendant with this?

2   A    Yes.

3   Q    At a later point in time, did you ever know Griselda by

4   any other names?

5   A    Years later, I heard that they would call her Roke.

6   Q    Okay.  Did the defendant make any other requests of you

7   while you were working at the prison?

8   A    Yes.

9   Q    What did he ask of you?

10  A    My compadre wanted to have a phone with him.

11  Q    And did you grant him this request?

12  A    Yes.

13  Q    Did you have any conversations with him about the phone

14  later on?

15  A    Yes.  I remember that my compadre mentioned to me later

16  that he was able to check his e-mail with that phone.

17  Q    In exchange for granting these requests for the

18  defendant, did you receive anything in return?

19  A    Yes.

20  Q    What did you receive?

21  A    Money.

22  Q    How much?

23  A    I don't remember exactly, but on one occasion, he gave me

24  $10,000.  When I needed anything, I would ask and he would

25  give it to me.  On one occasion, he helped with the expenses

Denise Parisi, RPR, CRR
Official Court Reporter

5833
DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   of one of my -- one of my children who had been in an

2   accident; and he also gave me -- my compadre also gave me a

3   house as a gift.

4   Q    How much was that house for?

5   A    I remember that the lawyer told me that it had been sold

6   for about 1.5 million pesos.

7   Q    Did you ever speak to the defendant about whether he was

8   paying anyone else at the prison?

9          MR. BALAREZO:  Objection.  Hearsay, Your Honor, at

10   this point.

11          THE COURT:  The question was, did he ever ask the

12   defendant.  Overruled.

13   A    Yes.  He would pay the guards.

14   Q    Okay.  And you mentioned before that the defendant had

15   requested that a wife, Griselda, could visit him at the jail,

16   correct?

17   A    Yes.

18   Q    Did the defendant ever request that anyone else be

19   allowed into the prison to visit him?

20   A    Yes.

21   Q    And who did he request visit?

22   A    To me?

23   Q    Correct.

24   A    What person?  Excuse me?

25   Q    Correct.  Which people did the defendant request be

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    allowed to visit him in the prison?

2    A    Arturo -- may he rest in peace -- my compadre's brother;

3    Marcelo Pena, who had been an ex brother-in-law of my

4    compadre's.

5    Q    Did you ever know Arturo by any other names?

6    A    Yes.  They used to call him El Pollo.

7    Q    Did you authorize these visits with Arturo and Marcelo

8    Pena?

9    A    Yes.

10   Q    How long did you work at the prison?

11   A    Approximately a year and seven months.

12   Q    And why did you leave?

13   A    Because there was a -- the federal government was

14   conducting some investigations about corruption cases in the

15   penitentiary, so I decided to resign.

16   Q    When did you resign?

17   A    If I remember correctly, in September 2000.

18   Q    After resigning from the prison, did you ever go back to

19   meet with the defendant?

20   A    There was one time when I did return to the penitentiary,

21   yes.

22   Q    And what did you discuss with him at that time?

23   A    My compadre was worried.  He wanted me to speak to the

24   director so that things would not affect him.

25   Q    What does that mean?

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   A    That they should not be energetic; that they should

2   continue to give him some benefits.

3          THE INTERPRETER:  Interpreter correction.

4   A    They shouldn't be so harsh.

5   Q    Okay.

6          Did you agree to assist the defendant with this?

7   A    Yes.

8   Q    How did you do that?

9   A    I spoke to the director.

10  Q    Okay.  After resigning from the prison, were you able to

11  find another job?

12  A    No.  I wasn't able to get a job.

13  Q    Okay.  When is the next time that you saw the defendant?

14  A    I saw him about sometime after my compadre had fled --

15  had escaped, about seven or eight months after his escape.

16          (Continued on the following page.)

17

18

19

20

21

22

23

24

25

5836

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    BY MS. LISKAMM::

2    Q    Approximately what year is this?

3    A    2001.

4    Q    Where did you meet with him?

5    A    In the mountains in Nayarit.

6    Q    What did you discuss with him at that time?

7    A    I remember my Compadre asked me what I knew about the

8    guards who had been detained.  He told me that they had been

9    unjustly detained because they were innocent.

10   Q    What had they been detained for?

11   A    They were accused of helping in my Compadre's escape.

12   Q    Approximately how many guards?

13   A    I'm not sure if it was 50 or 70, there were several of

14   them.

15   Q    What did the defendant say he was going to do for those

16   guards?

17   A    He felt a moral commitment to help them; and through his

18   lawyer he was helping them.

19   Q    Did you have an opportunity to speak with the defendant

20   about his escape from the prison?

21   A    Yes.  He told me that the only person responsible for

22   that escape had been Chito.

23   Q    Who is Chito?

24   A    Chito was an employee at the penitentiary.  He was in the

25   area of laundry, general services.

5837

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   Q      What did your Compadre say about how Chito was able to

2   get him out the of the prison?

3   A      That he had taken him inside a laundry cart that was

4   picking up dirty laundry.  And that he had transported him to

5   the parking lot where the vehicles were.  That he had put him

6   in the trunk of his car, Chito's.  And that Chito had driven

7   out of the parking lot towards a guard booth that was already

8   at the exit of the penitentiary.  There they went, they

9   stopped because there was a lift gate there in which it was

10  necessary to stop for it for anyone who was coming out.  And

11  the guards that were in that area only searched the inside of

12  the vehicle and not the trunk.

13  Q      You mentioned a lift gate, what is the term for that lift

14  gate?

15  A      It's a pluma a steel bar that has a stop sign on it.

16  Q      What, if anything, did the defendant say about the timing

17  of his escape?

18  A      I remember asking my Compadre that if I had been at the

19  penitentiary would he have escaped then.  He told me no.  He

20  told me that really the plan for his escape was spontaneous.

21  This was because some friends of his in the federal Government

22  had notified him that an extradition order had been issued

23  against him.

24  Q      Did you meet with the defendant again after this meeting?

25  A      Yes.

5838

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    Q    What did you discuss?

2    A    My Compadre asked me again if I had been able to get a

3    job.  By that point it was becoming more difficult because the

4    media was linking me to the escape.  I said no.  He offered me

5    a job.

6    Q    Did you accept his offer?

7    A    Yes.

8    Q    What job did you accept?

9    A    At first it was a matter of getting houses and ranches to

10   rent out.

11   Q    How long did you find houses and ranches for the

12   defendant?

13   A    I think approximately some three years.

14   Q    At that point did you start transitioning into new jobs

15   for the defendant?

16   A    Yes.

17   Q    What did you start doing for him?

18   A    I started to have communication with some public servants

19   in the federal Government.  They would give me information

20   about operations that were going to happen against the Sinaloa

21   Cartel.  And after that, my Compadre asked me to help him to

22   get in communication with some Colombians.  That was because

23   he was up in the mountains and the communications were not

24   secure, in the sense the communication was actually happening

25   and getting through there was not a good signal.

5839

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1        So under the orders of my Compadre, people would

2   come to Culiacan, I would meet with them, then establish

3   communication.

4   Q    When did you start communicating with the Colombians on

5   behalf of the defendant?

6   A    If I remember correctly, 2004 approximately.

7   Q    What specifically were you communicating with the

8   Colombians?

9   A    Drug shipments to Sinaloa.

10  Q    Were you providing any information to Colombians as to

11  where the boats were supposed to go?

12  A    Yes, yes.  I would give them the information about the

13  coordinates.

14  Q    Who provided that information to you?

15  A    My Compadre would give it to me, or someone would send

16  directly to the Colombians that information.

17            MR. NARDOZZI:  I think the mics went out.

18            THE COURT:  That's a good time to break for lunch.

19  Come back at 1:45.  Remember not to talk about the case.

20            (Jury exits.)

21            (Lunch recess.)

22  *              *              *              *

23            (Return from lunch recess.)

24            THE COURT:  Let's have the jury please.

25            (Jury enters.)

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1          THE COURT:  Everyone be seated.  Continue with

2   direct examination.

3          MS. LISKAMM:  Thank you, your Honor.

4   BY MS. LISKAMM::

5   Q    Mr. Lopez, before the break we were talking about you

6   coordinating loads with the Colombians.  Do you remember that?

7   A    Yes.

8   Q    How were these loads being transported from Colombia?

9   A    Some of them took place by submarine, boats, and planes.

10  Q    Did you ever talk to the defendant about whether there

11  was anyone else coordinating loads for him?

12  A    Yes.

13  Q    Who did he say was also coordinating loads for him?

14  A    Juancho, one of my Compadre's cousins.

15  Q    What did Juancho do for the defendant?

16  A    He coordinated with Mr. Zambada, Julio Beltran, Nacho

17  Coronel, Nene Jaramillo, and Vicente Zambada.

18  Q    Showing what you what is in evidence as Government's

19  Exhibit 58, who is this?

20  A    Juan.

21  Q    What is his full name?

22  A    Juan Guzman Rocha.

23  Q    What nicknames do you know him by?

24  A    Virgo and Juancho.

25  Q    You mentioned that you were coordinating loads that came

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

5841

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   by way of submarine, what was your role with respect to those

2   loads?

3   A    I was in coordination with the person from Colombia.  And

4   when the submarine left sail he, let me know and I would in

5   turn let my Compadre know.

6   Q    How many submarine loads do you recall?

7   A    Two.

8   Q    Who was involved in these submarine loads?

9   A    My Compadre, Mayo, Pollito was a person from Colombia who

10  was the one who sent them out, Vicente Zambada and myself.

11  Q    You mentioned Vicente Zambada, who is that?

12  A    Vicente Zambada Niebla, Ismael Zambada's son.

13  Q    What was his role with respect to these submarine loads?

14  A    He settled the receiving of them in the open sea.

15  Q    Showing what you is in already in evidence as

16  Government's Exhibit 101.  Who is this?

17  A    Vicente Zambada.

18  Q    By what names did the defendant refer to Vicente?

19  A    La Mesera.

20  Q    Who was Vicente close to in the cartel?

21  A    He had a good friendship, he was close to Juancho.

22  Q    Going back to the submarine loads, what was shipped in

23  the submarine?

24  A    Cocaine and base.

25  Q    What is base?

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   A     Base is cocaine prior to being processed.

2   Q     How much cocaine and base was shipped in these submarine

3   loads?

4   A     Approximately 6 tons, I'm not sure about the amount.

5   Q     Who owned the cocaine on these submarine loads?

6   A     My Compadre and Mr. Zambada.

7   Q     What happened once the submarine loads were received?

8   A     The base was processed into cocaine.  And the cocaine, we

9   look for people to sell it to.

10  Q     Did you ever have any conversations with anyone about how

11  much a submarine cost?

12  A     Yes.  The Colombians said that it was, that they cost a

13  million dollars.

14  Q     Who paid for the submarines that were used in these

15  loads?

16  A     My Compadre paid for it.  But in the end because with the

17  transportation, there was a discount on the payment.

18  Q     What does that mean?

19  A     That the money had to be sent in advance so that the

20  submarine could be built, but that it would be recovered

21  later.

22  Q     Okay.  Now you mentioned before that some the loads that

23  you were coordinating with the Colombians were shipped by

24  plane; is that correct?

25  A     Yes.

5843

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    Q    Did you ever speak with the defendant about any specific

2    types of planes that he was using?

3    A    Yes.  Someone had recommended to my Compadre that there

4    was a plane type, Lancair type, which had been built out of

5    carbon fiber, which made it impossible to be located by radar.

6    Q    Did you ever discuss with the defendant whether these

7    planes ever successfully transported cocaine?

8    A    Three planes were sent, and only one made it

9    successfully.

10   Q    Do you know who the pilots were on the unsuccessful

11   loads?

12   A    One went by the name Loco Salvaje, the other one they

13   used to call Tommy.  And there was one more, Tomas, who was

14   the only one who made it successfully.

15   Q    In your conversations with the defendant about these

16   planes, did you learn what the plan routes were for the

17   airplanes?

18   A    Well, the pilots requested a place to refuel and we had

19   located an air strip in Villa Hermosa Tabusco, Mexico.  And

20   yet the successful pilot made it straight from Colombia to

21   Sinaloa.

22   Q    Where in Sinaloa did the plane land?

23   A    Villa Juarez.

24   Q    Who owned that landing strip?

25   A    The gentlemen's name was Arturo Garcia, I think the

5844

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   gentleman already died.

2   Q    Approximately when did these Lancair plane loads occur?

3   A    2005 approximately.

4   Q    So we've talked about shipments by sea and by air, did

5   you ever talk to the defendant about any transports that were

6   being done by land?

7   A    Yes.

8   Q    Who did the defendant say was trafficking by land?

9   A    Cesar Gastellum.

10  Q    Where was Cesar Gastellum transporting drugs?

11            THE INTERPRETER:  Repeat the question.

12  Q    Where was Cesar Gastellum transporting drugs from and to?

13  A    So Cesar had his operational base in Honduras.  So

14  regularly he would receive drugs there and then move it by

15  land to Sinaloa.

16  Q    Okay.  Showing you what is in evidence as Government's

17  Exhibit 55.

18  A    Cesar Gastellum.

19  Q    Is that who you're identifying in the photo?

20  A    Yes.

21  Q    What other names is Cesar Gastellum known by?

22  A    My Compadre and myself used to refer to him as Enrique,

23  but people in Culiacan used to call him El Marisquero.

24  Q    Who's cocaine was Cesar trafficking?

25  A    Cesar trafficked his drugs and he would give some kilos

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

5845

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    to my Compadre.

2    Q    What, if any, instructions did the defendant give you

3    about the drugs that Cesar was trafficking?

4    A    When Cesar arrived in Culiacan with the drugs he would

5    deliver them to me and I would make sure that they got to my

6    Compadre.

7    Q    Mr. Lopez did you have any involvement in coordinating

8    loads for the defendant here in the United States?

9    A    Yes.

10   Q    What was your role?

11   A    Just the same, communication.

12   Q    Who were you coordinating with?

13   A    I had to coordinate with a few of the Dominicans.

14   Q    What sorts of drugs were you coordinating with the

15   Dominicans?

16   A    Cocaine and heroin.

17   Q    What specifically were you coordinating with these

18   Dominicans?

19   A    Only to exchange phone numbers so they could pick up the

20   drugs.

21   Q    Where were the drugs being delivered?

22   A    New York.

23   Q    Who owned the drugs that were being delivered to New

24   York?

25   A    My Compadre.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

5846

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1  Q    Who introduced the defendant to the Dominicans?

2  A    Panchito.

3  Q    Who is Panchito?

4  A    He's a Colombian guy who's name is Alex Cifuentes.

5  Q    What was his role in the cartel?

6  A    Panchito was for a long time with my Compadre in the

7  highlands; and his role was that of a Secretary to my Compadre

8  basically.

9  Q    Showing you what is already in evidence as Government's

10 Exhibit 39, who is that?

11 A    Panchito.

12 Q    What names did the defendant call Panchito?

13 A    Godson.

14 Q    What is that in Spanish, for the interpreter?

15       THE INTERPRETER:   Ahijado.

16 Q    Did you ever have any conversations with the defendant or

17 Panchito about drugs being shipped to Canada?

18 A    Yes.

19 Q    Who did you speak with?

20 A    With the two of them, with my Compadre and with Panchito.

21 Q    Based on those conversations, who was in charge of those

22 drug shipments to Canada?

23 A    Panchito was.

24 Q    How were the drugs being shipped to Canada?

25 A    On occasion they would use model homes, I think on two

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    occasions.  And then later among the load of trailers.

2    Q    Who's drugs were being shipped to Canada?

3    A    My Compadre's.

4    Q    Did you ever talk to the defendant about a plan to obtain

5    property near the U.S. and Canadian border?

6    A    Yes.  On one occasion my Compadre mentioned to me that he

7    had plans to get a ranch on the U.S. side and the other one on

8    the Canada side.

9    Q    For what purpose?

10   A    To cross drugs.

11   Q    Did he say if he wanted the ranches near anything

12   specific?

13   A    He had a certain preference for water.

14   Q    When is the last time that you saw Panchito?

15   A    I think it was in 2013.

16   Q    Have you ever met any of his family members?

17   A    I met one of Panchito's brothers.

18   Q    Who is that?

19   A    Jorge Cifuentes.

20   Q    Who is Jorge Cifuentes?

21   A    He's also from Colombia.  And on some occasions he made

22   deals with my Compadre to import drugs from South America to

23   Sinaloa.

24   Q    Showing what you is already in evidence as Government's

25   Exhibit 42.  Who is that?

5848

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    A    Jorge Cifuentes.

2    Q    Have you ever heard Jorge go by any other names?

3    A    Simon.

4    Q    Have you ever heard him referred to as J?

5    A    Yes, that too.

6    Q    Who calls him that?

7    A    My Compadre.

8    Q    When is the last time that you saw Jorge?

9    A    I'm not quite sure, but I think it was between 2008 or

10   2007.

11   Q    Did you ever have any conversations with the defendant

12   about any gifts that Jorge gave to him?

13   A    Yes, Jorge gifted my Compadre with a helicopter.

14   Q    Did you ever see that helicopter?

15   A    Yes, I did see it.

16   Q    What did it look like?

17   A    It was a helicopter that didn't have a tail rotor.  It

18   had a turbine.  It was blue in color.

19   Q    Showing you what is already in evidence as Government's

20   Exhibit 814.  Mr. Lopez, does that look like the helicopter

21   that you saw?

22   A    It's very similar to that one.

23   Q    What, if anything, did the defendant tell you about what

24   happened with this helicopter?

25   A    The pilot crashed it.

5849

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   Q    What did the defendant say happened?

2   A    That the pilot wanted to fly the helicopter out of the

3   interior of a warehouse.  And as he was exiting, there came

4   some crosswinds.  It shook the helicopter, and that's how it

5   crashed.

6   Q    Who owned the property where the helicopter crashed?

7   A    The ranch belonged to a woman by the name of Laura.

8   Q    Who is she?

9   A    A woman who lives in Mexico.

10  Q    Who was her husband?

11  A    I know that they used to call him El Robachivas.

12  Q    What happened to him?

13  A    He was killed.

14  Q    Who killed him?

15  A    Mr. Mayo had told me that under the orders of Amado

16  Carrillo, he had killed him.

17  Q    The respect to where the helicopter crashed, what had the

18  property previously been used for?

19  A    Before it used to be an ostrich farm.

20  Q    You previously said that you were involved in talking to

21  Government contacts for the defendant, correct?

22  A    Yes.

23  Q    What specifically did you do for the defendant?

24  A    I would receive the information and I would pass it on to

25  him.

5850

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   Q     Did you receive that information directly from the

2   Government contacts?

3   A     No, there were people who worked, well, they were the

4   ones who had the direct communication with them.

5   Q     Who were the people that provided that information to

6   you?

7   A     Javi, one of them we would call him Javi.  Another one

8   Roberto.

9   Q     Let's take them one at a time.  Who did Javi have contact

10  with within the Government?

11  A     He had contacts with people from the army, federal

12  police, the PGR, the marines.

13  Q     You mentioned the PGR, what is that?

14  A     That is the Attorney General's office.

15  Q     So Javi would obtain information and provide it to you,

16  is that what I'm understanding?

17  A     Yes, he would pass it on to me, then I would pass it on

18  to my Compadre.  And then later on, Javi would just give it

19  directly to my Compadre.

20  Q     Why would these Government contacts provide information

21  to Javi?

22  A     Well, because we required that in order for us to know

23  what their movements were, and of course we would pay them.

24  Q     Did you have any conversations with the defendant about

25  payments for Javi's Government contacts?

5851

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    A    Yes.

2    Q    What did he tell you?

3         THE INTERPRETER:  Interpreter needs to clarify.

4    A    Javi would pay more than $100,000 to the contacts per

5    month.

6    Q    Who provided that money to Javi?

7    A    My Compadre.

8    Q    You also mentioned someone else named Roberto, who is

9    Roberto?

10   A    Roberto is also another person who worked at the Empressa

11   with my Compadre.  He also had his own contacts with the

12   federal police, roadway federal police, also the nation's

13   Attorney General's office, the army.

14   Q    What was Roberto's last name?

15   A    I think it was Garcia -- actually, excuse me, Beltran.

16   Q    Did you ever discuss with Roberto how much he was paying

17   per month to these Government contacts?

18   A    Yes.  Roberto told me he would pay more than $1 million

19   per month.

20   Q    Have you ever heard the term Yankee before?

21   A    Yes.

22   Q    What does it mean?

23   A    It is an employee with the nation's Attorney General

24   office, who is the commander at a plaza in any city.

25   Q    Let's switch topics and talk about the defendant's

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    security.  Who were the defendant's head sicarios?

2    A    El Negro, Fantasma, El Cholo.

3    Q    Let's just talk about them one at a time.  Who is El

4    Negro?

5    A    El Negro was a person who had previously been part of the

6    Mexican army.  He had resigned the army; he started working

7    with my Compadre.

8    Q    Showing what you is already in evidence as Government's

9    Exhibit 105, who is this?

10   A    El Negro.

11   Q    Did Negro go by any other names?

12   A    Bravo.  And his name was Omar.

13   Q    You also mentioned Fantasma, who was that?

14   A    Just like Negro, Fantasma started working with my

15   Compadre out of Negro's recommendation.  And he had also been

16   a member of the Mexican army.

17   Q    Showing what you is in evidence as Government's Exhibit

18   91.  Who is this?

19   A    Fantasma.

20   Q    Lastly, you mentioned someone named Cholo, who is that?

21   A    Cholo worked with my Compadre's security and before that

22   in fact his father also did that.  And then later on my

23   Compadre put him in charge of the plaza in Guamuchil.  But

24   whenever my Compadre needed him, he would take him.

25   Q    Showing what you is in evidence as Government's Exhibit

5853

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1  56.  Who is this?

2  A    El Cholo.

3  Q    Let's turn and talk briefly about the defendant's family.

4  Do you know the defendant's oldest sons?

5  A    Yes, I do know them.

6  Q    What are their names?

7  A    One his name is Ivan, another one is Alfredo.

8  Q    Showing what you is in evidence as Government's Exhibit

9  59.  Who is this?

10 A    That's Ivan.

11 Q    What nicknames is Ivan known by?

12 A    My Compadre would call him Tocayo.

13 Q    Showing you what is in evidence as Government's Exhibit

14 60, who is that?

15 A    Alfredo.

16 Q    What nicknames is he known by?

17 A    Menor.

18 Q    Showing you what is already in evidence as Government's

19 Exhibit 219-15, who are the two individuals in the upper

20 right-hand corner of this photo.

21 A    Ovidio and Joaquin.

22 Q    Who is their father?

23 A    My Compadre.

24 Q    What nicknames do you know them by?

25 A    Ovidio was called Raton, and Joaquin was called Guerro.

5854

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    Q    You previously said that you were the godfather to one of

2    the defendant's twins?

3    A    Yes.

4    Q    Who is the mother of those twins?

5    A    My Comadre, Emma.

6    Q    Showing you what is in evidence as Government's Exhibit

7    45, who is this?

8    A    Emma.

9    Q    What nicknames did the defendant call Emma?

10   A    At times I would hear him call her Mi Reina, My Queen.

11   Q    Do you know someone by the name Aureliano Guzman?

12   A    Yes, I know him.

13   Q    Who is that?

14   A    My Compadre's brother.

15   Q    Showing you what is already in evidence as Government's

16   Exhibit 20, who is that?

17   A    Aureliano.

18   Q    What other names he known by?

19   A    El Guano.

20   Q    What did he do for the cartel?

21   A    He did drug trafficking up in the mountains it was like

22   marijuana fields and the poppy fields.

23   Q    Did you ever know any of the defendant's nephews who

24   worked for the defendant?

25   A    Yes, I met several nephews.

5855

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   Q    Who specifically did you meet?

2   A    I met one who was called Alfredo, we called him 02 as

3   well.  I met Chinakate, and he would call him Tio, and I think

4   he was also his nephew.  And several others that I do not

5   recall their names.

6   Q    Let's talk about Alfredo, what did Alfredo do for the

7   defendant?

8   A    My Compadre would send Alfredo at times to other

9   countries so he would meet up with other people.

10  Q    What countries?

11  A    Ecuador, Colombia.

12  Q    Showing what you is already in evidence as Government's

13  Exhibit 703A-2, who is that?

14  A    Alfredo.

15  Q    You mentioned that he also went by the code name 02, did

16  you know any other names that he was called?

17  A    Tomas, they would also call him Tomas.

18  Q    Who referred to him as Tomas?

19  A    Panchito.

20  Q    You also mentioned someone named Chinakate?

21  A    Yes.

22  Q    Was there anything distinctive about Chinakate?

23  A    He was a red head.

24  Q    Let's just briefly talk about the defendant's

25  Secretaries.  Do you recall any of their names?

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   A    Yes.

2   Q    Who do you recall?

3   A    Picudo, El Condor.

4   Q    Showing you what is marked and in this evidence as

5   Government's Exhibit 68, who is that?

6   A    Picudo.

7   Q    Showing you what in evidence Government's Exhibit 63, who

8   is that?

9   A    Condor.

10  Q    What did the defendant's Secretaries do for him?

11  A    They were in charge of the radio and communications.

12  Q    How would you and other members of the cartel communicate

13  with one another?

14  A    By radio and by phone.

15  Q    Are you aware of a period where the defendant had his own

16  network to communicate on?

17  A    Well, there was a time when Colombian man was hired and

18  he got server started so that we could have private

19  communication.

20  Q    Who brought this Colombian to meet with the defendant?

21  A    Panchito.

22  Q    Where was the server set up?

23       MR. BALAREZO:  Objection.

24       THE COURT:  Overruled.

25  A    It was Europe, but I don't know exactly what country.

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    Q    Did you ever use this system yourself?

2    A    Yes.

3    Q    How did it work?

4    A    It was an extension number, three digits, and it was

5    through the Internet.

6    Q    What time period was the server being used?

7    A    If I'm not mistaken it was around 2011, 2010, around that

8    time, more or less.

9    Q    Did you ever talk to the defendant about what happened to

10   the technician who set up this server?

11   A    Yes, that he had had problems with the Government and

12   that he had been arrested.

13   Q    Did the defendant tell you anything else about this

14   technician?

15   A    That he wasn't reliable because he was passing

16   information onto the Government and that we could not use that

17   system anymore.

18   Q    Have you ever heard of something called the office

19   system?

20   A    Yes.

21   Q    What is it?

22   A    In order for one not to have direct communication with

23   the contacts, middle office was installed, so that you could

24   be in touch with a different contacts through that office.

25   And in that way you would not have to direct communication

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    with the contacts.

2    Q    Why would you not want to have direct communication with

3    other contacts?

4    A    To avoid those contacts who were not loyal and who could

5    pass information onto the Government.

6    Q    Did you yourself use the office system?

7    A    Yes.

8    Q    What type of program was used to send messages on the

9    office system?

10   A    Blackberry.

11   Q    I believe there is no objection to this. I seek to move

12   Government's Exhibit 515-4 into evidence, I believe with no

13   objection.

14           MR. BALAREZO:  No objection.

15           THE COURT:  Received.

16           (Government Exhibit 515-4, was received in

17   evidence.)

18           MS. LISKAMM:  For the record the Power Point has

19   transcripts in it, 610N-2AT, 2BT, 2DT, 2ET.

20   Q    We're going to turn to slide two.  And on the left-hand

21   side of the page there are some names written there, do you

22   see that?

23   A    Yes.

24   Q    What is that?

25   A    The names by which we were known on the Blackberry, on,

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    the screen.

2    Q    Also known as a screen name?

3    A    Exactly.

4    Q    On this slide, slide two, for paragraph six and seven the

5    name says Fernando, who is sending the message where it says

6    Fernando?

7    A    Myself.

8    Q    The conversations that we're going to go through here on

9    the Power Point, who are these conversations between?

10   A    Between my Compadre and myself.

11   Q    Is that through using the office system?

12   A    Yes.

13   Q    So let's start with paragraph six.  It says, I already

14   sent for 2 kilos of tetr to be washed.

15        What is tetr?

16   A    It is a chemical product that we use as a cut to use with

17   cocaine.

18   Q    The reference to kilos is what?

19   A    It was 2 kilos of tetr that had been cleaned up, because

20   tetr arrived dirty.

21   Q    Further down on paragraph six it says, I will send them

22   to Cleto so he can do his tests.

23   A    Yes.

24   Q    Who is cleto?

25   A    Cleto is someone who helped with the making of synthetic

5860

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    heroin.

2    Q    What tests are you referring to here?

3    A    Tests were going to be conducted to see if the cut worked

4    with the heroin.

5    Q    Going on to paragraph seven, just reading the first

6    sentence, On the other hand Polito is still looking for the

7    taxis and the 03s over there.

8              What are you referring to here?

9    A    My Compadre had asked me to tell Polito to get a ship and

10   a plane.

11   Q    Is this the Polito that we discussed previously?

12   A    Yes.

13   Q    And what word is used to reference the planes?

14   A    Taxi.

15   Q    We're going to move on to slide five on this page.  I see

16   names on the left-hand side of the screen.  Where it says

17   office one, who is sending that message?

18   A    My Compadre.

19   Q    So let's read that paragraph 28, Compadre once the kilo

20   is ready with the 333, like we agreed, send it to me with

21   Picudo.

22   A    Yes.

23   Q    What is being discussed here?

24   A    We were conducting studies to make synthetic heroin --

25   synthetic cocaine.

5861

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    Q    What is the 333 a reference to.

2    A    333 grams.

3    Q    Of what?

4    A    Cocaine.

5    Q    Who is the Picudo referenced here?

6    A    Picudo was one of my Compadre's Secretaries who later

7    became a person in charge of some sicarios in Culiacan.

8    Q    The next paragraph 29 says, Fernando.  Is that again you?

9    A    Yes.

10   Q    In that paragraph, you wrote, I sent the technicians over

11   to improve the bean of the two and so they can make the 333.

12            What are you referring to?

13   A    Bean of the two is when we are speaking about synthetic

14   cocaine.  And 333, what I just explained to you.

15   Q    Who are the technicians that are referred to here?

16   A    Colombian guys who knew how to make the cocaine.

17   Q    There is a reference to the word bean here, what is that

18   word in Spanish, for the interpreter?

19   A    We use that word as a code to refer to cocaine.

20   Q    The Spanish word for bean is frijol?

21   A    I did not understand.

22            MR. BALAREZO:  We'll stipulate.

23            MS. LISKAMM:  Thank you.

24   Q    Further down on that paragraph, there is a reference to

25   Nariz, who is that?

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    A    Someone who used to help my Compadre with errands.

2    Q    Now turning to slide eight, we're going to look at

3    paragraph 59.  This is a message from who?

4    A    From my Compadre.

5    Q    It says, It will no longer be made of 250.  It will be

6    made of two kinds of 333 and pure synthetic.

7          What are you talking about, what is the defendant

8    talking about here?

9    A    First we had thought about putting in 250 grams, and then

10   later we decided that it would 333 grams.  That's for the cut

11   to the cocaine, the rest is just synthetic.

12   Q    Turning to slide 13, looking at --

13         MS. LISKAMM:  If I could have one moment.

14         THE COURT:  We're here.

15   Q    We are going to turn to slide 16, looking at paragraph

16   35.  The names on the left-hand side of this page say Juan and

17   Office 1, who is that?

18   A    Juan is me, Office 1 is my Compadre.

19         (Continued on next page.)

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    BY MS. LISKAMM:

2    Q    Okay.  So in Paragraph 35 where it says, Juan, who is

3    sending that message?

4    A    I am.

5

6    Q    Okay.  And so it says.  Okay.  Compadre, I'm going to

7    deliver 185, the 100 that were pending and 85 of the half of

8    to 170.  It would be 155 and 35 with me?

9    A    Yes.

10   Q    What are you talking about here?

11   A    About cocaine.

12   Q    Okay.  So the references is to 185, 100, basically all

13   the numbers, what are those references to?

14   A    To cocaine.  But it was just that part of it had arrived

15   from one person, the rest from another person, and we needed

16   to distinguish one from the other.

17   Q    The numbers reference what quantity of cocaine?

18   A    170.

19   Q    170 what?

20   A    Kilos.

21   Q    Okay.  And the reference to the 150 sky and 35 whiskey,

22   what is that?

23   A    That -- that's cocaine.  All the references there are to

24   cocaine.

25   Q    But specifically, the word, "sky" and "whisky," what does

David R. Roy, RPR – Official Court Reporter

5864

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    that mean?

2    A    150 kilos were going to be branded on the outside of the

3    package with a letter of sky.  And 35 kilos were also going to

4    be branded with a letter that would read whisky.

5    Q    Okay.  And the paragraph below that, Paragraph 36, says

6    it's from OFIS1.  So who is sending that message?

7    A    My compadre.

8    Q    And it says, I'm going to go meet with the lady at the

9    beginning of the week.  Compadre, better you let me finish

10   that thing about Ruben with the lady.  I already gave the lady

11   in advance with the black.

12        Who is the lady that's referenced?

13   A    Mayo.

14   Q    Okay.  And the word "black," what is that a reference to?

15   A    Blackberry.

16   Q    Okay.  Let's now turn to Slide 19.

17        Okay.  This is a message that you're sending?

18   A    Yes.

19   Q    Okay.  It says, On the other hand, Rene spoke personally

20   with the mayor of La Calma.  She's one of the favorites as

21   candidate for the state government for the PRI.  She wants us

22   to remove, denouncing a cop that has been bothering her and is

23   affected her politically.  She is on board, that in time she

24   would also need support with the campaign.

25        What are you telling the defendant here?

David R. Roy, RPR - Official Court Reporter

5865

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   A    That Rene was in charge of the plaza in Baja, California

2   Sur, and he had sent me a message from a lady who was the

3   mayor of La Paz, who according to her, she had the probability

4   of becoming a candidate to governor, but she had a problem

5   with -- there was a cop that was bothering her.  So she

6   approached Rene and asked him to do me a favor whether that

7   cop could be killed so that she wouldn't be affected; and at a

8   given time, she would also request support for the campaign.

9   Q    Okay.  Where it says in there, La Calma, what is that?

10  A    The president or mayor of La Paz.

11  Q    And where it says, she wants us to remove, what does that

12  mean?

13  A    That the cop be killed.

14  Q    Okay.  And there's also a reference to the PRI.  What is

15  that?

16  A    The PRI is the political party to -- of which the lady,

17  the mayor is a member of, the Institutional Revolutionary

18  Party.

19  Q    Okay.  Turning to the next slide, Slide 20,

20  Paragraph 102.  This is a response from the defendant?

21  A    Yes.

22  Q    Okay.  And it says, Yes.  She is the favorite and we

23  should do her the favor.  Maybe like when the cop is leaving

24  his house as a revenge for some gang banger.  Don't be seen,

25  not with a rifle, but with a pistol so it doesn't look

David R. Roy, RPR – Official Court Reporter

5866

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   violent.  But when will it be known if she wins or not?  One,

2   there is one thing, no one knows who the mayor will be or the

3   elections in July.

4              What is the defendant telling you here?

5   A     That if she was the favorite, then we had to do her the

6   favor, meaning for me to tell Rene that he does the favor of

7   killing the police officer.  And so that the killing of the

8   cop wouldn't look violent, not to use firearms.  But rather,

9   to make it look as if it was the revenge of a gang banger.

10  Q     Okay.  We're now going to turn to Slide 23, and

11  Paragraph 1.  Again, it says OFI.

12             This is coming from who?

13  A     From my compadre.

14  Q     And at the bottom of the Paragraph 1, it says, I'm going

15  to talk to flour guy next week.  What type of flour is being

16  referred to here?

17  A     Fish flour.

18  Q     And what was the plan with this fish flower?

19  A     To mix the base with fish flour to transport it to

20  Sinaloa.

21  Q     And what country was this going to be done in?

22  A     In Ecuador.

23  Q     Okay.  And going down to the next paragraph,

24  Paragraph 176, it says, Well, Cayo.  Must have gone to buy the

25  flour today.  Who is Cayo?

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   A    One of my compadre's workers.  I don't know him.

2   Q    Where did he work?

3   A    In Ecuador.

4   Q    And again, the reference to flour here is to what type of

5   flour?

6   A    Fish flour.

7   Q    Okay.

8        And turning to Slide 24, about halfway through the

9   paragraph on Paragraph 13, it says, I'm going to see Roque in

10  person.  Who is Roque?

11  A    Mrs. Griselda.

12  Q    Okay.

13       Okay.  Now, Mr. Lopez, when you were using the

14  office system, did you have a way to send other members of the

15  cartel a new PIN number when your PIN changed?

16  A    Yes.

17  Q    How would you do that?

18  A    At times we did it in person but a closed envelope.  And

19  at times we would send the numbers with a code.

20  Q    What was the name of this code?

21  A    We would call it tango alpha.

22  Q    And how would the tango alpha code work?

23  A    Well, the number that we would pass on, let's say it was

24  a 7, which we would send a 3.  That is to say, because, you

25  know, by using 3 and by adding 7, then you would get to 10.

David R. Roy, RPR - Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   The number that we would pass on would always have to be added

2   so that we would get to 10.  Number 5 and 0 were to remain the

3   same.

4   Q    Okay.  Showing you what's already in evidence as

5   Government's Exhibit 610N-2BT, specifically Page 3,

6   Paragraph 11 which I've highlighted on the screen, it says,

7   Good afternoon.  El Ing, you are sending this PIN.  He says

8   that Nene is sending it because he needs to talk to you.  And

9   there's a PIN number in parenthesis.  The last three numbers

10  are tango alpha.

11  A    Uh-huh, yes.

12  Q    Okay.  And so what does, the last three numbers are tango

13  alpha mean?

14  A    That the numbers 4, number 2, and number 2, meaning the

15  last three numbers they were converted.  That is to say that

16  for number 4, the real number would be number 6, and for

17  number 2, the real number would be number 8.

18  Q    Okay.  In addition to using the tango alpha code system,

19  did you use codes -- or code words to refer to specific

20  locations?

21  A    Yes.

22  Q    What code word was used for Nogales?

23  A    We would call it El Nogal, El Arbol.

24  Q    Okay.  How about Venezuela?

25  A    With the loco, the crazy man.

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    Q    And Ecuador?

2    A    Eduardo.

3    Q    And Guatemala?

4    A    With Charlie.

5    Q    And have you ever heard the term "three" used to refer to

6    a location?

7    A    Three was an airstrip.

8    Q    Where was that airstrip located?

9    A    In the municipality of Navolato.

10   Q    And who used that airstrip?

11   A    My compadre.

12   Q    Okay.

13        Okay.  We're going to switch topics completely.  Do

14   you know someone named Rodolfo Carrillo?

15   A    I didn't meet him, but I know that he was brothers with

16   Amado and Vicente Carrillo.

17   Q    What happened to him.

18        MR. BALAREZO:  403, Your Honor.

19        THE COURT:  Sustained.

20        MS. LISKAMM:  Your Honor, could we have a sidebar?

21        THE COURT:  403?  Overruled.  That's not it.

22        MR. BALAREZO:  401.

23        THE COURT:  No.  No.

24        Go ahead.

25        MS. LISKAMM:  Thank you.

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    BY MS. LISKAMM:

2    Q     What happened to Rodolfo Carrillo?

3    A     He died.

4    Q     When?

5    A     September 11, 2004.

6    Q     Who was in charge of the defendant's security at that

7    time?

8    A     Licensiado Rios.

9    Q     Did you have any conversations with Licensiado Rios about

10   the events leading up to Rodolfo's murder?

11   A     Yes.

12   Q     And what did he tell you?

13   A     Well, he told me Licensiado is actually from Navolato,

14   and the gunman who were my compadre, they were also from

15   Navolato.  Rodolfo and his own gunmen who were also from

16   Navolato would threaten the Licensiado Rios's Sinaloa gunmen.

17   And, in fact, they would refer in an offensive manner toward

18   my compadre and they did not respect.  And that led to some

19   meetings that took place with Rodolfo Carrillo and my compadre

20   was present.  El Mayo was also present.  And I think that at

21   one point or another, Vicente Carrillo was also present

22   according to what Licenciado told me?

23   Q     And were those meetings about to resolve this conflict?

24   A     Well, you know, Rodolfo said that he was going to respect

25   him, and that he was also going to order his hitmen to respect

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   others, but they never followed through.  And there was a need

2   for other meetings to be held, and Rodolfo once again would

3   commit to behaving properly, but he did not comply.

4          So since my compadre saw that Rodolfo was not --

5   never going to follow through --

6          MR. BALAREZO:  Your Honor, basis.

7          THE COURT:  Sustained.

8   Q    Did you have any conversations with the defendant about

9   Rodolfo Carrillo?

10  A    Yes.

11  Q    And what did he tell you?

12  A    My compadre said that we were pretty much waiting for

13  Rodolfo to hurt us or to hurt him, and just because he didn't

14  know -- he knew that he was not respecting them, that there

15  was, you know, something that needed to be done.

16  Q    So what did the defendant say was going to happen next?

17  A    That there was going to -- that they needed to find a way

18  to locate him in order to kill him.

19  Q    Did the defendant say whether or not he had any

20  conversations with Mayo about this?

21  A    Yes.  El Mayo also offered my compadre to help him as

22  well, but my compadre appreciated -- and said that he

23  appreciated his gesture but there was no need.  And he said,

24  well, are you familiar with the family.

25         MR. BALAREZO:  Objection, Your Honor.

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1          THE COURT:  Overrule.

2    A     So then you don't -- don't get involved.

3    Q     Okay.  At this time how would members of the cartel

4    communicate with one another?

5    A     By radio and phone.

6    Q     At this time did the defendant personally communicate

7    over the radio himself?

8    A     No.  The secretary who was right next to him would use

9    the radio.

10   Q     Okay.  Where were you on the day that Rodolfo was killed?

11   A     That -- that day I was meeting with my compadre at a

12   finca that I think belonged to them, to my compadre.  And that

13   was located in the rural area in the north of Culiacan.

14   Q     What happened while you were meeting with the defendant

15   that day?

16   A     I heard that the secretary was reporting to my compadre

17   what he was listening on the radio as to the event where they

18   were about to attack Rodolfo Carrillo.

19   Q     What did the secretary tell the defendant about what

20   happened that day?

21   A     Could you repeat the question, please.

22   Q     Let me ask you a different question.  Who was -- who was

23   present that day that Rodolfo Carrillo was killed?

24          MR. BALAREZO:  Objection.

25          THE COURT:  Sustained.

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   Q    What did you hear the secretary report to the defendant

2   about the events that occurred that day?

3   A    Well, he reported that he was leaving the movie theater

4   because Rodolfo and his wife were at the movies, and he

5   reported that once they had him on-site, they had shot at

6   Rodolfo.  And then Rodolfo's head of security also reacted

7   again to my compadre's gunmen as well.

8   Q    Who was the -- Rodolfo's head of security that day?

9   A    Pedro Perez.

10  Q    And what was Pedro Perez's role, other than providing

11  security to Rodolfo Carrillo?

12           MR. BALAREZO:  Objection.

13           THE COURT:  Sustained.

14  Q    Do you know who Pedro Perez is?

15  A    Yes.

16  Q    How do you know?

17  A    I met him because he worked with the judicial police.

18  Q    Okay.  You mentioned that Rodolfo's wife was there.  What

19  did you hear the secretary report to the defendant about

20  Rodolfo's wife?

21  A    That unfortunately, she had also been wounded.

22  Q    Okay.  And what did you hear the secretary report to the

23  defendant about Rodolfo?

24  A    That he had fallen.

25  Q    What does that mean?

David R. Roy, RPR - Official Court Reporter

5874

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    A    That it seemed he had died.

2    Q    Okay.  What did the secretary report to the defendant

3    about which gunmen were at the location?

4    A    The gunmen detected that the Government was already in

5    the move of going to the place of the events, and that's why

6    they decided to flee.

7    Q    And what was reported to the secretary about their flight

8    from the location?

9              MR. BALAREZO:  Objection.

10             THE COURT:  Reported to the secretary by defendant,

11   correct?

12             MS. LISKAMM:  Correct.  What was reported from the

13   secretary to the defendant about the gunmen's flight.

14             THE COURT:  Ask the question again.

15             MS. LISKAMM:  I'm sorry?

16             THE COURT:  Ask the question one more time.

17             MS. LISKAMM:  Okay.  Would you like me to rephrase

18   it or just repeat it?

19             THE COURT:  I heard two different questions the

20   first and second time.

21             MS. LISKAMM:  Okay.

22             THE COURT:  Could be me, could be you, but if you

23   start fresh, it will be neither of them.

24             MS. LISKAMM:  Understood, Your Honor.

25   Q    What did the secretary report to the defendant about the

David R. Roy, RPR - Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    gunmen's flight from the location?

2    A    That they were being persecuted by some people that

3    belonged to the Government, and the Government people who were

4    actually on the side of Chapo Isidro, they actually noticed

5    that there were more reinforcements that was coming closer to

6    them in such a way that then there came a time when the people

7    from the judicial police outnumbered the gunmen.  And there

8    was a shootout between them in the rural area.  And the gunmen

9    felt that they were at a disadvantage because there were a lot

10   of people from the Government who were riding, and so they

11   told my compadre's secretary and the secretary told my

12   compadre who said, You know, look for Mayo so that Mayo could

13   do them the favor of speaking to the director of the judicial

14   police, and so that also they would do the favor of returning

15   those officers.

16   Q    Okay.  And what did you hear the secretary report to the

17   defendant about what happened next with the federal police

18   officers?

19   A    In fact after that, the judicial police personnel left

20   the location.

21   Q    Okay.

22        MS. LISKAMM:  Your Honor, I don't know about your

23   timing, but this might be a good time for a break.

24        THE COURT:  This is a good time.

25        Please don't talk about the case, ladies and

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    gentlemen.  We'll come back at 3:25.  3:25.

2                (The following matters occurred outside the presence

3    of the jury.)

4                (Recess taken.)

5                THE COURTROOM DEPUTY:   All rise.

6                THE COURT:  Let's bring in the jury.

7                (The jury enters the courtroom.)

8                (Jury present.)

9                THE COURT:  Okay.  We'll continue.  Everyone can be

10   seated.

11   BY MS. LISKAMM:

12   Q    Mr. Lopez.  I want to talk to you a little bit about the

13   relationship between the defendant and the Beltran-Leyvas.

14   A    Yes.

15   Q    What was the relationship like prior to 2008?

16   A    Good.

17   Q    And what happened with respect to the Beltran-Leyvas in

18   2008?

19   A    In January of 2008, the military arrested Alfredo Beltran

20   in Culiacan.

21   Q    And where were you when this happened?

22   A    In Culiacan.

23   Q    Okay.  What happened next in Culiacan?

24                MR. BALAREZO:  I have an objection, Your Honor.

25                THE COURT:  Overruled.

David R. Roy, RPR - Official Court Reporter

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    Q    What happened next in Culiacan?

2    A    Arturo Beltran was blaming my compadre saying that he had

3    turned in the -- that he had turned into the Government

4    Alfredo and that's why they had arrested him.  He had snitched

5    on him.  And based on that, I told Beltran -- and no one could

6    make him come to reason about it.  He held on to this, that my

7    compadre was behind it, and he decided to fight against my

8    compadre, to make war.

9    Q    Okay.  What happened in Culiacan in the beginning of

10   2008?

11   A    There was fighting between the people, Arturo Beltran's

12   people, against my compadre and those of us who worked for my

13   compadre, as well as against Mayo and Nacho Coronel.

14   Q    And I just want to go back.  You said that Alfredo

15   Beltran had been arrested?

16   A    Yes.

17   Q    Did you know any nicknames that Alfredo was called?

18   A    Mochomo.

19   Q    Okay.  So you said that there was fighting going on

20   between the defendant's people and the Beltran-Leyvas,

21   correct?

22   A    Yes.

23   Q    When did that fighting start?

24   A    After Alfredo's arrest.  It must have been around the

25   month of April, more or less.

David R. Roy, RPR - Official Court Reporter

DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1    Q    Okay.  Was there a specific date that you recall?

2    A    Yes, April 30th.

3    Q    And is there a holiday on April 30th of 2008?

4    A    That's the reason precisely why I remember it, because

5    that day we celebrate children in Mexico.

6    Q    And where were you on April 30 of 2008?

7    A    In Culiacan.

8    Q    And at that time, how were you communicating with other

9    members of the cartels?

10   A    On the radio and over the phone.

11   Q    And what happened on April 30th?

12   A    On April 30th there was a shootout between the federal

13   police and the Beltran's gunmen.  My compadre was trying for

14   it -- for there not to be any shootouts or confrontations

15   between him gunmen and the Beltran's gunmen.  He preferred for

16   the Government to be the one that did the work.  So they would

17   receive the locations where the gunmen for the Beltrans were

18   located, this was given to the federal police with which there

19   was a relationship already.

20   Q    So you said there was a shootout on April 30th?

21   A    Yes.

22   Q    What happened next --

23          THE COURT:  Excuse me.  I am starting to get

24   Mr. Balarezo's point.  Is there anything new that this witness

25   brings to what we have heard?

David R. Roy, RPR - Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1        MS. LISKAMM:  Yes, Your Honor.  I am getting to it.

2        THE COURT:  I will take your word for it.

3        MS. LISKAMM:  Thank you.

4   Q    What happened next?

5   A    The federal police arrived in a residence in the

6   Guadalupe residence in the city of Culiacan where there were

7   some of the Beltrans' gunmen, but they received the federal

8   police with bullets.  There was a shootout among them.

9   Q    Okay.  During the war with the Beltran-Leyvas, who was

10  the defendant targeting?

11  A    Well, everyone who worked for the Beltrans.  As for the

12  Beltrans were all of us who worked for my compadre.

13  Q    I want to show you what's already in evidence as

14  Government's Exhibit 704-D.  Mr. Lopez, do you recognize this

15  disk?

16  A    Yes.

17  Q    Okay.  And are your initials on this disk?

18  A    Yes, I wrote on it personally.

19  Q    Okay.  And why did you write on the disk?

20  A    To know what it was and what the contents on that disk

21  were.

22  Q    And did you have an opportunity to review this disk?

23  A    Yes.

24  Q    Okay.  What did you observe on this disk?

25  A    It was an interrogation that my compadre did of one

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   person --

2   Q    And --

3   A    -- who was handcuffed.

4   Q    Okay.  And we're just going to play a very brief clip

5   from this disk.

6              MR. BALAREZO:  403, Your Honor.

7              THE COURT:  I said I'm trusting Ms. Liskamm to give

8   us something new soon.

9              MS. LISKAMM:  And we will, Your Honor.

10             THE COURT:  All right.

11  Q    And this clip will start at one minute and 12 seconds and

12  go to one minute 30 seconds.

13             MR. BALAREZO:  What was the time you're saying?

14             MS. LISKAMM:  One minute and 12 seconds to one

15  minute 30 seconds.

16             (Video plays.)

17             (Video stops.)

18             MS. LISKAMM:  Thank you.

19  Q    Mr. Lopez, do you recognize the location where this video

20  was shot?

21  A    Yes, it's a place that I own.

22  Q    Okay.  What is the name of that place?

23  A    We called it Los Lichis.

24  Q    And why was the defendant on your property?

25  A    I would always lend it to him.

David R. Roy, RPR – Official Court Reporter

5881

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1   Q    Do you recognize the individual whose being interrogated

2   in this video?

3   A    No.

4   Q    Can you tell what cartel they worked for?

5        MR. BALAREZO:  Objection.

6        THE COURT:  Well, you can answer that question yes

7   or no.

8   A    Yes.

9   Q    How can you tell what cartel they worked for?

10  A    Because of the places where they're saying that they're

11  receiving people, gunmen.

12  Q    What places?

13  A    Mochis.

14  Q    And who controlled those Mochis?

15  A    The Beltran-Leyvas were at Los places.  They had function

16  over those places.

17  Q    And who is the individual who was walking around and

18  asking questions in the video?

19  A    My compadre.

20  Q    Okay.  Going back to the war with the Beltran-Leyvas, did

21  you ever talk to the defendant about any particular gunmen

22  that the defendant was targeting during the war?

23  A    Yes.

24  Q    And who did the defendant say he was targeting?

25  A    My compadre was mainly looking for the head of the gunmen

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    for the Beltrans.  Those were Gonzalito Araujo and El Guacho.

2    Q    And did the defendant tell you why he was looking for

3    these head sicarios of the Beltran-Leyvas?

4    A    Yes.  Because they were the ones who hired the gunmen

5    there in Culiacan, and they were the ones that were fighting

6    against my compadre and against all of us who worked for my

7    compadre.  So the same way they were looking for us, my

8    compadre was looking for them.

9    Q    What, if any, conversations did you have with the

10   defendant about Gonzalito?

11   A    He told me that someone had given him a reference for the

12   location where he was.

13   Q    And what did the defendant say happened to Gonzalito?

14   A    He had been killed.

15   Q    And what did the defendant say as to who ordered

16   Gonzalito's murder?

17   A    The gunmen.

18   Q    And who ordered the gunmen to carry out the murder?

19   A    My compadre.

20   Q    Let's just make sure we get the question finished in

21   Spanish.

22        Who ordered the gunmen to kill Gonzalito?

23   A    My compadre did.

24   Q    And when was this?

25   A    In 2008.  I don't remember the exact date.

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1          THE COURT:  I'm still not clear on how he knows

2    that.

3    BY MS. LISKAMM:

4    Q    Mr. Lopez, did you have conversations with the defendant

5    about what happened to Gonzalito?

6    A    Yes.

7    Q    And who told you that Gonzalito was murdered?

8    A    My compadre did.

9    Q    And who told you that your compadre ordered Gonzalito

10   killed?

11   A    My compadre did.

12   Q    You also mentioned another head of the sicarios for the

13   Beltran-Leyva named Guacho?

14   A    Yes.

15   Q    Who is Guacho?

16   A    Guacho had worked for my compadre earlier.  He was

17   secretary for my compadre in the mountains.  But when the war

18   came about between the Beltrans and my compadre and those of

19   us who worked for my compadre, the -- Guacho would hire gunmen

20   to fight against us basically.  He was the one who directed

21   them, and we had to go looking for him because he was the

22   boss.

23   Q    Okay.  Showing you what's already in evidence as

24   Government Exhibit 87B.  Who is this?

25   A    El Guacho.

David R. Roy, RPR – Official Court Reporter

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    Q    Okay.  Did you have any conversations with the

2    defendant's about Guacho?

3    A    Yes.

4    Q    And what did the defendant tell you?

5    A    That a friend of his, of my compadre's had said that

6    Guacho was in a place in the neighborhood in a house, and the

7    neighborhood of Villa Del Rio in Culiacan.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    DAMASO LOPEZ NUNEZ - DIRECT - MS. LISKAMM

1   BY MS. LISKAMM:  (Continued.)

2   Q    What happened once the defendant learned this

3   information?

4   A    He ordered him lifted.

5   Q    And whose property was Guacho brought to?

6              MR. BALAREZO:  Objection.  602.

7              MS. LISKAMM:  Is Your Honor sustaining that?

8              THE COURT:  I'm suggesting to you that you need to

9   do a better job of eliciting the basis of the witness's

10  knowledge when you introduce new information.

11             MS. LISKAMM:   Thank you, Your Honor.

12  BY MS. LISKAMM:

13  Q    Damaso, at some point -- Mr. Lopez, at some point, did

14  you see Guacho after he had been picked up?

15  A    Yes.

16  Q    Where did you see him?

17  A    In a ranch that belonged to me.

18  Q    And what was the name of that ranch?

19  A    We called it Las Canitas.

20  Q    Who else was present at Las Canitas when Guacho was

21  brought there?

22  A    My compadre, my compadre's sons, Juancho, Negro, my son,

23  myself, and there were many people there.

24  Q    What happened when Guacho was brought to Las Canitas?

25             MR. BALAREZO:  Objection.  403.

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1          THE COURT:  Overruled.

2    A    My compadre interrogated him.

3    Q    Were you present?

4    A    Yes.

5    Q    Where was Guacho placed?

6    A    In a warehouse right there inside the ranch.

7    Q    And what did you hear the defendant asking Guacho?

8    A    He would ask him if there were more gunmen in Culiacan,

9    whether he had located some targets.  Mainly, that's what I

10   remember.

11   Q    Okay.  What, if any, conversations did you have with the

12   defendant about what ultimately happened to Guacho?

13   A    He had been killed.

14   Q    Who told you that?

15   A    My compadre.

16   Q    Okay.  Are you aware of a video being made of Guacho

17   before he was killed?

18   A    Yes.

19   Q    Okay.  Showing you what's already in evidence as

20   Government's Exhibit 702-C, do you recognize this?

21   (The above-referred to exhibit was published.)

22   A    Yes.  I wrote on it.

23   Q    Okay.  And why did you write on it?

24   A    Because I looked at the accountant and to have a

25   reference.

DAMASO LOPEZ NUNEZ – DIRECT – MS. LISKAMM

1    Q    And what is the video of?

2    A    Guacho's interrogation.

3    Q    Is this the same interrogation that you just described to

4    us?

5    A    No -- well, it is about Guacho, but it isn't where my

6    compadre was interrogating him.

7    Q    Okay.  And who was interrogating Guacho in this video?

8    A    Javi.

9    Q    Is this the same Javi we discussed previously?

10   A    Yes.

11   Q    And who did Javi ultimately report to?

12   A    To me and also to my compadre.

13          MS. LISKAMM:  And, Your Honor, if we could dim the

14   lights and play Government's Exhibit --

15          MR. BALAREZO:  Objection, Your Honor.  It's already

16   been played.  403.

17          THE COURT:  Let's have a sidebar.

18          (Continued on the next page.)

19

20

21

22

23

24

25

5888

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3          THE COURT:  It's a close question, but the problem

4    is, the defense is attacking the credibility of each one of

5    the cooperators and, therefore, corroboration becomes very

6    important; and I know it seems like the Government is piling

7    on, but it's really just having one witness when you've

8    attacked support, another witness who you are going to attack,

9    which is not an illegitimate approach.

10          I will say, there are certain things at this point

11   that this jury either knows or is never going to know and I

12   implore, not order, because I like to let parties try their

13   cases, to cut it down where you can.  If you think the jury

14   knows this already and really hasn't had any serious doubt on

15   a cooperator who authenticated something earlier, then there's

16   no reason to just take more time doing it again, but at this

17   point, I'm leaving the decision to the Government.

18          MS. LISKAMM:  Thank you, Your Honor.

19          (End of sidebar conference.)

20          (Continued on the next page.)

21

22

23

24

25

LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1          (In open court.)

2          MS. LISKAMM:  If we could dim the lights so we could

3   play Government's Exhibit 702-C.

4          (Video played.)

5          (Video stopped.)

6   BY MS. LISKAMM:

7   Q    Mr. Lopez, generally, what did we just see in the video

8   here?

9   A    Guacho's interrogation.

10         MR. BALAREZO:  Objection.

11         THE COURT:  Sustained.

12  Q    Mr. Lopez, there is a reference in the video to

13  Los Senores.  Who is that a reference to?

14  A    He's referring to Alfredo and my compadre.

15  Q    And there were a few references to La Prima.  Who is

16  that?

17  A    Arturo in a demeaning way, that's how he referred to my

18  compadre.

19  Q    Okay.  Now, I want to direct your attention to 2009.  Who

20  controlled Guasave?

21  A    Beltrans.

22  Q    And who specifically controlled that plaza?

23  A    Chapo Isidro.

24  Q    Who is Chapo Isidro?

25  A    A worker for the Beltrans who was very close, from what I

LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1    knew, to -- to Alfredo Beltran.

2    Q    Are you aware of a conflict between Chapo Isidro's people

3    and the defendant's people in 2009?

4    A    Yes.

5    Q    How did you learn about this?

6    A    My compadre told me that year -- that year to look for

7    El Tigre and to tell him to get in touch with -- and

8    coordinate with El Negro, with Fantasma, and with Cholo so

9    that with all their gunmen going to Guasave to -- to try to

10   locate Chapo Isidro and his gunmen.

11   Q    You mentioned Tigre.  Who is that?

12   A    Tigre had been the director of the municipal police in

13   Navolato, and he had problems with the Carrillo Fuentes

14   family.  When he ended his job with the police, he sent,

15   through me, a request for work to my compadre.  My compadre

16   told me to speak to Tigre and to tell him that it was fine for

17   Tigre to take charge of the Navolato Plaza, so Tigre requested

18   vehicles, communication, weapons, and payroll to pay his

19   gunmen.  That was authorized by my compadre.

20   Q    Okay.

21   A    And the person who had communications with Tigre was me.

22   Q    Okay.  Just going back, you said that the defendant asked

23   you to relay this message to the head sicarios.

24   A    To Tigre.

25   Q    And did you relay that message?

Denise Parisi, RPR, CRR
Official Court Reporter

                    LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1    A    Yes.  I let Tigre know.

2    Q    Okay.  Did you speak to anyone after you relayed that

3    message about what had happened?

4    A    After they went to Guasave, I met with El Tigre and Tigre

5    told me everything that had happened.

6    Q    And what did he say?

7    A    He told me that before leaving, they had -- they had

8    marked their cars with an X, meaning before leaving towards

9    Guasave, to avoid any confusions among themselves.  Once they

10   got to Guasave, Chapo Isidro's gunmen were waiting for them,

11   and there was a confrontation or a shootout between them at a

12   gas station located in El Burrion.  That place is located on

13   the highway before getting to Guasave going from south to

14   north.

15   Q    Okay.  And did Tigre say if there had been any casualties

16   in that shootout?

17   A    Yes.  That there had been death at that place and that

18   there had also been other shootouts in the rural area between

19   the towns; and that, in fact, the municipal police from

20   Guasave were fighting on the Guasave side against Tigre,

21   Cholo, Negro, Fantasma, and their gunman.

22   Q    Okay.  I want to switch topics and ask you, have you ever

23   seen the defendant armed before?

24            MR. BALAREZO:  Objection.

25            THE COURT:  It's the point I made at sidebar.

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1          Go ahead.

2          MR. BALAREZO:  Can I have a standing objection so I

3   don't keep interrupting?

4          THE COURT:  As far as I'm concerned, you can.

5          MR. BALAREZO:  Thank you.

6          THE COURT:  Go ahead.

7   A    Yes.

8          THE COURT:  I have not sustained an objection.

9          MS. LISKAMM:  Understood.  Thank you, Your Honor.

10  BY MS. LISKAMM:

11  Q    What was he armed with?

12  A    I would usually see him carrying a handgun.

13  Q    And what type of handgun?

14  A    A gun that had a handle with diamonds, I believe, and

15  with the print of a panther or an animal.

16  Q    What color was the panther or animal on the hand grip?

17  A    The animal was yellowish with white.

18  Q    Showing you what's already in evidence as Government's

19  Exhibit 1-K, do you recognize the weapon in this photo?

20  (The above-referred to exhibit was published.)

21  A    Yes.

22  Q    Is this the gun that you just described?

23  A    Yes.

24  Q    Okay.  And similarly showing you --

25          MS. LISKAMM:  And I believe there's no objection to

LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1    Government's Exhibit 1-KA?

2                    THE COURT:  Received.

3                    MS. LISKAMM:  Thank you, Your Honor.

4                    (Government Exhibit 1-KA, was received in evidence.)

5                    (The above-referred to exhibit was published.)

6    BY MS. LISKAMM:

7    Q    Is this just a zoomed in photo of the handle of the gun

8    in Exhibit 1-K?

9    A    Yes.

10   Q    Okay.  And Mr. Lopez, how often would you see the

11   defendant armed?

12   A    Every time I saw him, he carried his gun.

13   Q    And in Culiacan, was there a term that was used to refer

14   to fully automatic weapons?

15   A    Yes.  Rafaga.

16   Q    All right.  Let's switch topics.

17                   We previously talked about someone named Juancho.

18   A    Yes.

19   Q    What happened to Juancho?

20   A    He died.

21   Q    When?

22   A    2011, December.

23   Q    Did you have any conversations with the defendant prior

24   to Juancho's murder?

25   A    Yes.

Denise Parisi, RPR, CRR
Official Court Reporter

LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1    Q    And what did you discuss with him?

2    A    That day, my compadre and I were together at a ranch that

3    belonged to me, Los Nopales, which was in the outskirts of

4    El Dorado.  We were precisely talking and I ask him about

5    Juancho.  My compadre told me that Juancho had told him that

6    he was out of town; that he had not seen him.  By coincidence

7    at that time, a guy who worked with me send me a message

8    saying, "Listen, I just saw Juancho."

9         So I mentioned that to my compadre, so my compadre

10   goes, "Where did he see him?"  And then I explained to him

11   that the person was telling me that he had seen him at a

12   public parking in Culiacan.  My compadre became angry because

13   Juancho had been lying to him.  He said, "Precisely today I

14   spoke to him and he told me that he was out of town."  So he

15   ordered Negro that Juancho -- for Juancho to be picked up, but

16   Negro was in El Dorado area, so then also was ordered and also

17   did pick up Juancho in Culiacan.

18        When he picked him up, Juancho was with Guero

19   Bastidas.  Then later, Negro picked him up, I don't know

20   where, and he gets to Los Nopales where my compadre and I

21   were, he came up to my compadre and said, "Compadre, I have

22   Juancho here."  My compadre said, "And what is that -- and

23   what is that rascal saying?"  El Negro responded, "Compadre,

24   he offered me a lot of money to let him go.  Are you going to

25   speak to him, compadre?"  Negro asked my compadre.  "No, I'm

LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1    not going to speak to him," he said.  He ordered him to take

2    him towards Culiacan to kill him and to leave him in the

3    outskirts of Culiacan.  Negro asked, "What about Guero

4    Bastidas?  What should I do with him?"  My compadre responded

5    that Guero Bastidas was Juancho's secretary and therefore he

6    knew everything about Juancho and that he had to suffer the

7    same fate.  They were both killed.

8    Q    Do you know somebody named Polo Ochoa?

9    A    I met him.

10   Q    Actually, sorry, before we turn to Polo Ochoa, when you

11   were discussing what happened with Juancho, you mentioned that

12   he had been picked up.  What does that mean?

13   A    To pick up is to take someone by force.

14   Q    Okay.  All right.

15        So now turning to Polo Ochoa.  Who is Polo Ochoa?

16   A    Well, I saw Polo Ochoa several times, and I knew that he

17   was a drug trafficker.

18   Q    Who did he work with?

19   A    He was very close to Mr. Mayo.

20   Q    And who did he traffic drugs with?

21   A    He worked very closely with Enrique, with Cesar.

22   Q    Okay.  Showing you what's already in evidence as

23   Government's Exhibit 77, who is that?

24        (The above-referred to exhibit was published.)

25   A    That's Polo Ochoa.

LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1    Q    Okay.  Did you have any conversations with the defendant

2    about Polo Ochoa and Cesar?

3    A    Yes.

4    Q    And what did the defendant tell you?

5    A    My compadre had information that Polo and Cesar had

6    reached an agreement with the Government to pass on

7    information about my compadre and locate him, and in exchange,

8    they would solve their problems and they would also save their

9    properties.

10   Q    What did the defendant say that he wanted to do because

11   of this?

12   A    He couldn't forgive that after him having helped them so

13   much that they would betray him and he was looking for them to

14   kill them.

15   Q    Okay.  What happened to Polo Ochoa?

16   A    He died.

17   Q    How did you learn that?

18   A    I heard it on the radio when they notified that Polo

19   Ochoa was dead.

20   Q    Did you have any conversations with the defendant about

21   this murder?

22   A    Yes.  My compadre told me that Polo Ochoa was hiding out

23   very well, but that Mayo had given information that he was in

24   Culiacan.

25   Q    Okay.  And did the defendant tell you anything about who

LOPEZ NUNEZ- DIRECT - MS. LISKAMM

1    killed Polo Ochoa?

2    A     Yes.  My compadre's gunman.

3    Q     Okay.  And did he say who ordered the gunman to kill Polo

4    Ochoa?

5    A     He ordered Negro.

6    Q     Who is "he"?

7    A     My compadre ordered Negro.

8    Q     Okay.  And we previously talked about Cesar.  Did you

9    have any conversations with the defendant about Cesar?

10   A     Yes.

11   Q     And what did he tell you?

12   A     Well, my compadre was very upset at Cesar because Cesar

13   was also reaching an agreement with the Government, and he was

14   looking for him to kill him.  Well, and so I told my compadre

15   at one time, why not look for Cesar, and if Cesar made a

16   commitment to tell the truth about his arrangement, my

17   compadre told me that if Cesar would show -- would show up --

18   show his face, that he would grant him his life.  I looked for

19   Cesar.  I had communication with him over the phone.  I told

20   him about that, that if he came to my compadre and explained

21   everything to him, that he wouldn't have any problems, but

22   that he should tell the truth when he was with him.  My

23   compadre gave the word that he was going to respect him, but

24   because Cesar never complied, he never came, then the order

25   was put out to look for him -- look for Cesar.

5898

PROCEEDINGS

1  Q    Okay.

2           MS. LISKAMM:  Your Honor, I have a brief PowerPoint

3  next.  I don't know if this is a good time to break or if

4  there's time to put the PowerPoint in.

5           THE COURT:  Is your PowerPoint less than five

6  minutes?

7           MS. LISKAMM:  I can talk fast, but I don't know if

8  it's that fast.

9           THE COURT:  We'll pick it up tomorrow morning.

10          Ladies and gentlemen, remember, stay away from any

11  media coverage of the case, don't tell anyone anything about

12  this case, no communication between yourselves, your family

13  members, just that you are a juror sitting in a case.  Don't

14  do any research on anything you may have heard that interests

15  you.  There will be time for that when the case is over.  No

16  Googling, no Binging, no search engines, no Facebook, no

17  posting of anything at all.  See you here tomorrow morning at

18  9:30.  Thanks for your careful attention.

19          (Jury exits.)

20          THE COURT:  All right.  The marshals can take the

21  witness out.  Everyone else can be seated.

22          (Witness excused.)

23          THE COURT:  What's the Government's plan for

24  tomorrow?  Do we have a plan for tomorrow?

25          MS. PARLOVECCHIO:  We anticipate that this witness

Denise Parisi, RPR, CRR
Official Court Reporter

PROCEEDINGS

1    will take us through to either the morning break or lunch.  We

2    should finish in the morning, and then of course there will be

3    cross.  We have another expert witness that will be going on

4    after that, and actually we anticipate that we will be able to

5    rest either late Thursday or the beginning of Monday, which

6    actually, if Your Honor will indulge me --

7            THE COURT:  Go right ahead.

8            MS. PARLOVECCHIO:  -- my next topic, if we finish

9    Monday morning, that means the defense will be starting their

10   case Monday afternoon.  We've yet to receive additional

11   information on those witness names that the defense provided

12   us, and I don't know if we will be provided anything today.

13           THE COURT:  Say something.

14           MR. BALAREZO:   "Something," Your Honor.

15           THE COURT:  No.  Say more than "something."

16           MR. BALAREZO:  Your Honor, I did provide a name last

17   week, and I was supposed to meet with the person yesterday.

18   That meeting, for some reason, didn't happen.  I'm hoping to

19   meet with him today, and I will pass on that information as

20   soon as I have it.  If not, I understand the Court's position,

21   and I'm not going to quibble about it.

22           THE COURT:  Okay.  Like I said, I'm not going to

23   have the Government ambushed, and I'm not going to delay the

24   case for you to find witnesses.  The defense is on notice to

25   be ready by Monday afternoon, okay?  Maybe Monday morning.  So

5900

PROCEEDINGS

1    you've got to get the Government the information they are

2    entitled to.

3              MR. BALAREZO:   Your Honor, the only other thing is

4    that the witness that was being writted in, my understanding

5    is that he's still in Oklahoma.

6              THE COURT:  I will see what I can do about that.

7              Okay.  Anything else we need to do?

8              MS. PARLOVECCHIO:  Nothing from the Government, Your

9    Honor.

10             THE COURT:  Okay.  Have a good night.

11             MS. PARLOVECCHIO:  Thank you.

12             MR. BALAREZO:  Thank you.

13        (Matter adjourned to January 23rd, 2019, at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

5901

I N D E X

WITNESS                                    PAGE

LUCERO SANCHEZ LOPEZ

DIRECT EXAMINATION    BY MR. NARDOZZI    5762
CROSS-EXAMINATION     BY MR. PURPURA     5779
REDIRECT EXAMINATION  BY MR. NARDOZZI    5821


DAMASO LOPEZ NUNEZ
DIRECT EXAMINATION    BY MS. LISKAMM     5826


I N D E X


EXHIBITS

GOVERNMENT                 PAGE
815-1                      5764
805                        5774
825                        5777
3500 DLN2, 3, 4            5830
818                        5833
515-4                      5861
1-KA                       5896


EXHIBITS

DEFENDANT              PAGE
469-A                 5789
470                   5791
476                   5801
480                   5808
482                   5818
483                   5819
484                   5820
485                   5821

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter