1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,      :  09-CR-00466(BMC)
4                                   :
                                    :
5                                   :
          -against-                 :  United States Courthouse.
6                                   :  Brooklyn, New York.
7                                   :
                                    :  November 14, 2018
8    JOAQUIN ARCHIVALDO GUZMÁN      :  9:30 a.m.
     LOERA,.                        :
9                                   :
               Defendant.           :
10
     - - - - - - - - - - - - - - X
11
              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
12            BEFORE THE HONORABLE BRIAN M. COGAN
           UNITED STATES DISTRICT JUDGE, and a jury
13

14                  A P P E A R A N C E S:

15   For the Government:  RICHARD P. DONOGHUE, ESQ.
                          United States Attorney.
16                        Eastern District of New York
                          271 Cadman Plaza East.
17                        Brooklyn, New York 11201
                     BY:  GINA M. PARLOVECCHIO, ESQ.
18                        ANDREA GOLDBARG, ESQ.
                          MICHAEL P. ROBOTTI, ESQ.
19                        Assistant United States Attorneys.

20
                          United States Attorney's Office.
21                        Southern District of Florida
                          99 NE 4th Street.
22                        Miami, Florida  33132
                     BY:  ADAM S. FELS, ESQ.
23                        Assistant United States Attorneys.

24            A P P E A R A N C E S:  (Continued)

25
     For the Government:   Department of Justice, Criminal Division

             Anthony M. Mancuso, CSR    Official Court Reporter

```
 1                    Narcotic and Dangerous Drug Section.
                      145 N. Street N.E.
 2                    Suite 300.
                      Washington, D.C. 20530.
 3              BY:   ANTHONY NARDOZZI, ESQ.
                      AMANDA LISKAMM, ESQ.
 4

 5
     For the Defendant:    BALAREZO LAW
 6                    400 Seventh Street, NW.
                      Suite 306.
 7                    Washington, DC 20004
                 BY: A. EDUARDO BALAREZO, ESQ.
 8

 9
                      LAW OFFICES OF JEFFREY LICHTMAN
10                    11 East 44th Street.
                      Suite 501.
11                    New York, New York 10017.
                 BY: JEFFREY H. LICHTMAN, ESQ.
12                    PAUL R. TOWNSEND, ESQ.

13
                      LAW OFFICE OF PURPURA and PURPURA
14                    8 E. Mulberry Street.
                      Baltimore, Maryland  21202.
15               BY: WILLIAM B. PURPURA, ESQ.

16
                      LAW OFFICES OF MICHAEL LAMBERT, ESQ.
17                    369 Lexington Avenue.
                      2nd Floor - PMB #229.
18                    New York, New York  10017.
                 BY:  ARIEL COLON MIRO, ESQ.
19

20

21   Court Reporter:  Anthony M. Mancuso, CSR
                      Official Court Reporter
22

23   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
24

25                        ooo0ooo
```

Anthony M. Mancuso, CSR    Official Court Reporter

1        (Trial resumed.)

2        (In open court; jury not present.)

3        THE COURT:  Good morning.  Have a seat, please.

4   Okay.  First order of business, Mr. Lichtman, you were going

5   to let us know whether you have or intend to file a reply on

6   motion 420.

7        MR. LICHTMAN:  Yes, your Honor.  There will be no

8   reply.

9        THE COURT:  Second, I've read both parties' letters

10  on the dispute over the defense opening statement that we

11  heard yesterday.  They were very helpful.  Thank you.

12       MR. LICHTMAN:  I'm sorry to interrupt, judge.  We

13  received their letter obviously late last night.  Good reason.

14  It took some time to write.  I think we were bleary eyed when

15  we were writing.  Can I make a brief addition to that?

16       THE COURT:  Sure.

17       MR. LICHTMAN:  It's obvious this is a straight Tyler

18  vs.  Whitney defense.  This is a frame-up by the government.

19  This is something that is upheld by the Supreme Court.  This

20  is not a public authority issue because I never claimed that

21  Joaquin Guzman was dealing drugs during the period of time of

22  the indictment.  It's not a selective prosecution because I

23  never claimed that everybody was doing it and he was being

24  selected unfairly.  I never claimed that he dealt drugs at

25  all.  It's a straight frame-up and it's been done in American

1    courtrooms a thousand times a day.

2         THE COURT:  I read the parties' letters and I

3    disagree with you.   Reading over the opening yesterday I

4    thought there were at least six times that you made what was

5    -- what I will call a deficient selective prosecution

6    argument.   The fact that it's deficient doesn't mean it's not

7    a selective prosecution argument.   The problem we have is

8    you're caught between Scylla and Charybdis.   If it's not a

9    selective prosecution argument then it's almost entirely

10   irrelevant because, for example, what does it matter if the

11   last two presidents of Mexico took bribes if the bribes are

12   not tied to framing the defendant here and there's no evidence

13   or argument that that's the case.   So it is entirely

14   irrelevant.

15        MR. LICHTMAN:  Respectfully, I disagree.

16        THE COURT:   I understand you disagree.   This is my

17   ruling.

18        I think it's remarkable that the government

19   predicted precisely what was going to happen in the opening

20   statement.   I ruled that it shouldn't happen and it still

21   happened.   It's got to be stopped.   If the theory is that

22   somebody else did it, and the defendant didn't do it, then

23   arguments about whether the Mexican or United States

24   governments are prosecuting or declining to prosecute for

25   similar conduct are irrelevant and misleading.

1    It's perfectly permissible to say somebody else did
2    it and you want to try to prove that to the jury or at least
3    cast a reasonable doubt on the government's case as to whether
4    the defendant did it.  That's okay.  But you went far afield
5    of direct or circumstantial proof that that is the case in
6    your opening.
7        The second problem with the opening is we have a
8    different view, Mr. Lichtman, you and I, of the ability to use
9    opinion evidence on character.  The rules say you can get
10   someone to testify usually in an affirmative way about a
11   particular party and maybe a witness' reputation in the
12   community for truthfulness.  You can get their particular
13   opinion as to whether somebody is truthful and you quoted from
14   at least one, I think several emails, where people are giving
15   evaluative opinions of somebody else's credibility, not in the
16   community, just their own personal opinion.  That's not
17   allowed.
18       So --
19       MR. LICHTMAN:  Excuse me.  I don't think that was
20   the case.
21       THE COURT:  I think it was.
22       MR. LICHTMAN:  In terms of the email that I was
23   quoting from, and regarding an agent who said that he had
24   listened to wiretap evidence over a year and he thought that
25   El Chapo was a myth.

Anthony M. Mancuso, CSR     Official Court Reporter

1      THE COURT:  You know, you have a habit of taking

2  things I've said, stating them in other words and your other

3  words -- I don't mean this pejoratively -- it sounds exactly

4  like the same thing to me.  When you say he thought it was a

5  myth, well that's his opinion that this whole thing was not

6  the truth.  But he can't give that opinion.  That's not

7  allowed under the rules.

8      MR. LICHTMAN:  The other part that was objected to

9  was when I mentioned that one of the government's witnesses

10  will say that another government's witness is untruthful.

11      THE COURT:  Yes.  He won't say that, because his

12  opinion is not admissible.

13      MR. LICHTMAN:  So I can ask him what is the

14  reputation for truthfulness in the community.

15      THE COURT:  If you establish that he has a basis for

16  assessing the reputation in the community -- I will note that

17  kind of evidence is almost always affirmatively put in by

18  someone who is seeking to buttress credibility.  It's not

19  limited to that.  You can conceivably call a witness to say I

20  know his reputation for veracity in the community and it's

21  terrible.  You can do that.  You can't get a personal opinion

22  and that is what you are going for.  Your opening statement

23  handed out a lot of promissory notes that your case isn't

24  going to be able to cash.  I want you on notice of that.

25  You're setting yourself up for evidence that's not going to

1   come in.  So, stop.

2          As to what I do about it, I don't know.  The

3   government asked me to strike the opening statement.  That's

4   pretty radical.  I'm inclined, instead, just to instruct the

5   jury, to remind them, that opening statements are not evidence

6   and the only issue they are going to have to determine in this

7   case is whether the government has proven the guilt of the

8   defendant on the charges that have been levied against him

9   beyond a reasonable doubt.

10         Does the government want any more than that?

11         MR. ROBOTTI:  Your Honor, yes.  I think the

12  government would like a curative instruction indicating that

13  certain arguments within the defense's opening were improper

14  and that the defense had an opportunity to raise those

15  arguments with the court beforehand and elected not to do so.

16  And, therefore, the court should completely disregard them.

17         THE COURT:  Without telling the jury which arguments

18  those are?

19         MR. ROBOTTI:  I think we would have to tell them

20  which arguments those are.

21         THE COURT:  It's a little too much in the weeds for

22  me.  It has the effect of emphasizing what shouldn't have been

23  said, rather than just allowing the jury to cabinet and put

24  those arguments aside when they find there's no evidence to

25  support them.

1          MR. ROBOTTI:  Your Honor, but I think it was

2     prejudicial to the government for these arguments to be made

3     that the government here is out to get the defendants and it's

4     outrageous government conduct to do so.  That was the entire

5     thrust of Mr. Lichtman's opening statement.  That's why the

6     government asked that it be struck entirely.  At a very

7     minimum, your Honor, we would ask that the court instruct the

8     jury that that type of argument that the government has

9     engaged in some type of outrageous conduct, and that's what

10    the jury should be considering, that argument should be struck

11    in its entirety and completely disregarded.

12         THE COURT:  Mr. Lichtman.

13         MR. LICHTMAN:  Judge, I disagree. The unbiased and

14    motive alone, I'm allowed to attack the government's

15    credibility because it's in this case.  It doesn't mean I'm

16    not allowed to.  I'm allowed to go after their agent.  I'm

17    allowed to go after their theory.  If you raise that now, that

18    I am not allowed to basically criticize the government's

19    conduct, then where are we?  They have their summation and

20    they can say in their summation they said things in the

21    opening and didn't deliver.  Why can't they say that?

22         MR. ROBOTTI:  Your Honor, I would point the court to

23    the Martha Stewart case which we cited in our reply, the

24    government's first motion in limine.  The Southern District

25    addressed this precise issue where it said that the

Anthony M. Mancuso, CSR    Official Court Reporter

1  government's eagerness to obtain evidence against Ms. Stewart

2  is something that had to be raised pretrial.  The government's

3  motives in obtaining evidence had to be raised pretrial.  The

4  defense in that case didn't do it. They didn't do it here.

5  They had two years to do it and they should be precluded.

6          THE COURT:  Okay.  I will say something about it.

7  I'm going to say that the government's motivations are not on

8  trial here.  The only issue that has to be determined by the

9  jury is the guilt or innocence of the defendant beyond a

10 reasonable doubt.

11         Okay.  Let's have the jury, please.

12         MR. LICHTMAN:  Judge, if I can ask for a brief

13 recess to adjust my opening based on your ruling.  I don't

14 mean to take any more time.

15         THE COURT:  I understand.  That's ten minutes to

16 adjust your opening.

17         MR. LICHTMAN:  Thank you, your Honor.

18         (Recess taken.)

19         (In open court; jury not present.)

20         THE COURT:  Be seated, please.

21         Mr. Lichtman, you wanted a sidebar?

22         MR. LICHTMAN:  Sure.

23         THE COURT:  Let's have the reporter, please.

24         (Sidebar.)

25         MR. LICHTMAN:  I just wanted to make sure that I am

1  not going to run afoul in front of the jury.  What I would

2  like to argue is that Mayo Zambada framed Guzman, made all of

3  his efforts to keep a target on Guzman while he remained free

4  and what I would like to say, and tell me now if I can or

5  can't, he did this by bribing the Mexican government to help

6  him.

7          THE COURT:  You've got evidence of that?  Do you

8  have evidence?

9          MR. LICHTMAN:  Do I have evidence?  Do I have

10  evidence that Mayo Zambada was bribing the government?

11          THE COURT:  For the purpose of deflecting the blame.

12  That's the problem you've got.

13          MR. LICHTMAN:  I hear you.  I mean I understand that

14  there's a little bit of jump to get to that conclusion, but

15  it's an argument.  Why can't I make that argument?

16          THE COURT:  It's an argument if there's any evidence

17  upon which a jury could reasonably find this.  That's why I'm

18  asking if there's evidence.  I have not seen any evidence in

19  the pretrial.  You all know the case better than I.  As I said

20  before, I have to caution you about promising this jury things

21  that you can't deliver on.

22          MR. LICHTMAN:  If I don't promise them something,

23  that is what we do.

24          THE COURT:   It is worse to promise and not deliver

25  than to not promise.

1      MR. LICHTMAN:  I would like to be able to argue that

2   the Mexican government was corrupt.

3      THE COURT:  What's the government's position?

4      MS. PARLOVECCHIO:  Your Honor, we agree with you.

5   There is no evidence that we are aware of that Mayo Zambada

6   bribed the Mexican government for the purpose of keeping the

7   target on the defendant, which I understand the defense is

8   going to argue.  It's seems to me a more appropriate argument

9   for summation.  To the extent there is evidence of this, that

10  the defense intends to present to the jury, we received no

11  notice of it and no discovery.

12     MR. PURPURA:   Judge, Ray Zambada will testify that

13  his brother knew about the first escape and arranged and aided

14  Mr. Guzman to escape in 2001 and then met with him after that.

15  Further, that Ray Zambada has paid off, at the request of

16  Mayo, the now incumbent president of Mexico to the tune of six

17  million dollars or more on two separate occasions at a

18  restaurant so that he can continue during that time to

19  continue trafficking while all this time he is safe in Mexico

20  City or in other cities and that Mr. Guzman is on the run,

21  with a target on his back, in the mountains and that is who

22  the Mexican government is targeting that point.  That's what

23  the evidence is going to show.  From that we can

24  circumstantially argue that there's a purpose behind it.  They

25  are not working together despite what the government said in

1  their opening.  Together meaning Mayo and Mr. Guzman.  Clearly
2  it's going to show through cross-examination that Mayo was
3  separate from Mr. Guzman during the entire time from 1985
4  through 2008.
5        MR. LICHTMAN:  I think the point he's making that
6  Mayo Zambada kept paying the Mexican government, president
7  after president, two in a row, and somehow he remains free and
8  who is the one that's constantly being hunted down, it's
9  Guzman.
10        THE COURT:  How does the bear on whether Guzman
11  actually committed these crimes or not?
12        MR. LICHTMAN:  What it bears on, we're claiming that
13  the Mexican government shaped evidence to go after Mr. Guzman
14  because they were being paid off by Mayo.
15        THE COURT:  They might have been being paid off to
16  leave Zambada alone.
17        MR. LICHTMAN:  They were paid off to leave Zambada
18  alone.  Guzman was being chased year after year, day after
19  day, decade after decade.  The reason he was being chased and
20  Zambada was comfortable and hadn't been arrested in 50 years
21  because he was paying the government.
22        THE COURT:  What's the evidence that shows that your
23  client was or was not guilty of the charges?  It's a
24  distraction.  It's the problem I'm having.  The connection, he
25  pays off the government to leave him alone, Zambada, so he's

1    left alone.  Okay.  That's fine.  What does that have to do

2    with Mr. Guzman?  He's not left alone.  That doesn't mean he

3    did it or didn't do it.

4            MR. PURPURA:  As Mr. Lichtman indicated in his

5    opening that Mr. Guzman did enjoy the notoriety of what the

6    government of Mexico was attributing to him during that period

7    of time.  Clearly we will show that he was living in near

8    poverty in the mountains as a mountain person for at least

9    fourteen years and not as a drug trafficker.

10           THE COURT:  I don't have a problem with the latter

11   part.  I have a problem with the former part.  It seems to me

12   there's no connection between the two.  You can have two drug

13   dealers, one of whom is paying off the government and one of

14   whom is not.  That does not mean the one who is not didn't do

15   the crimes.  Really, I just got to tell you, I'm not going --

16   I really have to stop you from making the argument because

17   it's so misleading to the jury.  It distracts them from the

18   guilt or innocence of the defendant, which is what they have

19   to determine.

20           MR. PURPURA:  Without disclosing whether in fact the

21   defendant is going to testify or not testify, obviously,

22   Mr. Guzman could respond to the particular questions that the

23   court is asking counsel at this point.

24           THE COURT:  Look, it's ill advised for an opening

25   the least.  You can certainly say something about Zambada

1    being the guilty party and Mr. Guzman not being the guilty

2    party, if you want to do that.  Don't go into the details

3    where you are going to hang yourself on your own petard.  You

4    have to walk that line.  I think leading off with this kind of

5    argument right now is going to put you in a box that you can't

6    get out of.  For my purposes, it is going to distract the

7    jury.  I'm not saying you should call your client to testify

8    or not.  If something comes in to support it, you can always

9    make that argument in closing.  I don't think you're going to

10   get much to support it.  I would curtail your opening.

11           I did want to tell you two things.  Number one, it's

12   absolutely impermissible to put in an email from an agent

13   opining on the culpability of a defendant.  That's none of the

14   agent's business.  He has no ability to form that.  On the

15   reputation for veracity or opinion for veracity, if you have

16   something as to that and you can meet the three requirements

17   in Rule 701, principally which has to be helpful to the jury,

18   maybe you'll get that in.  I'm not ruling on that.  I don't

19   know enough about it.  That's the framework.

20           MR. PURPURA:  On that issue as well, if it's a

21   hearsay objection rather than a relevancy objection 801(d)(2)D

22   would apply because that's an agent of the government who is

23   investigating this particular case writes in a report what his

24   conclusions are that, in fact, that Mr. Guzman is not

25   distributing to Chicago as the government thought in the

1    amounts that they thought.  He was the agent involved in that

2    investigation.

3            THE COURT:  I'm going to take arguments on that

4    later.  I'm not sure that a government agent is an agent for

5    purposes of 801(d)(2) D, but I'll look at that.  I'm not

6    positive.

7            MR. PURPURA:    Thank you, your Honor.

8            MR. LICHTMAN:  Thank you, your Honor.

9            (In open court.)

10           THE COURT:  Okay.  Let's have the jury back.  I'm

11   going to give them the brief instruction I alluded to before

12   and then we'll continue with Mr. Lichtman's opening.

13           (Jury present.)

14           THE COURT:  All right.  Everyone please be seated.

15   Good morning, ladies and gentlemen.  Sorry we're a little late

16   this morning.  You know a trial is not like a Broadway play.

17   It's not perfectly choreographed and things happen sometimes

18   that require attention.

19           Before we resume with Mr. Lichtman's opening

20   statement, I wanted to remind you that opening statements, as

21   I told you originally, are not evidence.  They are just

22   intended to let you know what the parties believe will be

23   developed by the evidence in the case.  Particularly, there

24   were some references in Mr. Lichtman's opening to certain

25   conduct by governments that might be considered to be

1   outrageous, generally whether the government has acted

2   inappropriately is something for me to determine, not for you.

3   I just wanted to remind you that the issue in this case that

4   you have to focus on is has the government proven the

5   defendant guilty of the charges against him beyond a

6   reasonable doubt.  That's really what the case is about.

7           All right, Mr. Lichtman, please continue.

8           MR. LICHTMAN:  Thank you, your Honor.

9           Good morning, ladies and gentlemen.  And thank you

10  again for your service.  When I stopped yesterday we were

11  talking about was the fact that Mayo Zambada during the period

12  that Joaquin Guzman was a fugitive from justice from 2001

13  until his recapture in 2014 hiding out in the mountains of

14  Mexico, moving on a daily basis to avoid capture --

15          THE INTERPRETER:   The interpreter cannot hear.

16          THE COURT:  Mr. Lichtman, we need a microphone on

17  you.

18          MR. LICHTMAN:  I have one.

19          What I was discussing was that Mayo Zambada, while

20  Joaquin Guzman was being chased all over Mexico, running on a

21  daily basis, hiding out, Mayo Zambada was comfortable evading

22  capture his entire life as a criminal.

23          Now, when he was finally arrested, Mr. Guzman in

24  2014, he was arrested with his wife and his children's nanny

25  and because Mr. Guzman had twin baby girls at the time you'll

1   hear.  The myth of El Chapo as very strong at this point.  The

2   evidence will show that law enforcement when they captured him

3   had him sign 100 dollar bills for them to show that not only

4   is the myth of El  Chapo strong in Mexico but everybody was

5   impressed by it.  So back into the maximum security prison

6   Mr. Guzman went and we all know, as the government said, there

7   was an escape within a one mile long tunnel that was beneath

8   his jail cell.

9        You can try to figure out if this was done with no

10  one knowing, but Mayo Zambada, the evidence will show, is the

11  one that helped create this tunnel and helped whisk Mr. Guzman

12  to safety.  And back on the run Mr. Guzman went and it was

13  during that period of time you heard the government in their

14  opening talk about a video that was sent to the press that

15  Mr. Guzman made.  Now, what they didn't mention I don't

16  believe was that it was the actor Sean Penn, I don't know if

17  anybody saw Fast Times At Ridgemont High, I guess we're all

18  old enough, some of us, Sean Penn, there was an interview with

19  Mr. Guzman that occurred and this is a crucial piece of

20  evidence in the case.  Clearly, he's on tape and discussing

21  his life.  He's discussing drug dealing.

22       What the evidence will show is that Mr. Guzman was

23  someone who, for better or worse, enjoyed the publicity,

24  enjoyed the notoriety being El Chapo.  Why else would the

25  world's biggest drug dealer make a tape where he supposedly

1    admits his life of crime?  Why would he admit all of those

2    things?  He enjoyed the notoriety.  What you are going to find

3    is that there was an effort by Mr. Guzman to have a book, to

4    have a movie done about him and this was the sort of thing

5    that would allow those things to happen.  Why else would

6    somebody do something as insane as that?  And if Mr. Guzman

7    had said the fact that he was not the drug dealer that

8    everybody thought, that he didn't have the money that many of

9    the witnesses will testify to here, that he was broke, that he

10   needed a bed to sleep in every night because he had no place

11   to stay, would he have gotten the movie?  Would there have

12   been the interest?  Would there have been the book that he was

13   after?

14        In the end you're going to have the trust the

15   government cooperators regardless to convict Mr. Guzman, not

16   just the Sean Penn interview.  That's the reason why they are

17   testifying here, not out of the goodness of the their hearts,

18   it goes to show that they are here because they want to get

19   out of jail by any means necessary.  You're going to find in

20   order to get out of jail-- these are people that have cheated

21   their entire lives.  These are people that have lied and

22   stolen and committed bribery of every local official, to every

23   person in the Army, politicians, whatever.  They do these

24   things because they want to stay free and make money.  They

25   come to America, they don't all of a sudden become human and

1   American and respect the law.  You're going to find that

2   they'll do what they have to do and if that means making the

3   government happy, they'll do what they have to do.

4          And they are going to come in here and testify,

5   every one of them will, that we know we're all facing life in

6   prison and we're all going to get life in prison unless we

7   tell the truth here.  You're going to make the decision,

8   ultimately it's up to you, whether you think that's the truth.

9          As I said, these are people that lie every day,

10  everything is a angle to them.  You're going to see testimony

11  that they don't believe for a second that they are spending

12  the rest of their life in jail.  They expect to get out.  You

13  are going to hear from some of the witnesses they have already

14  discussed what's going to happen when they get out of jail.

15  They are all going to tell you they are facing life.  It's

16  simply not true.

17         They are saying they are represented by lawyers who

18  are fighting for them.  They are advocating for them.  The

19  lawyers don't even show up for the proffers half the time.

20  There's only one party, as you are going to see in the

21  evidence that will come out, only one party can come to the

22  judge and ask the judge to go below the mandatory minimum

23  sentences that they are facing, not their lawyer, not the

24  judge, he can't even do it on his own, he can't go below those

25  mandatory minimums unless one party unilaterally determines

617

1    that they want those witnesses to get a sentence below the
2    mandatory minimum.
3              (Continued on next page.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        MR. LICHTMAN:  (Continuing) and that's the

2   Government.  And you know that every one of these witnesses

3   can come here and they are going to acknowledge that, that

4   they have to please the Government.  If they don't please the

5   Government, they can't get that motion for a sentencing below

6   the mandatory minimums.

7        Now, in terms of talking about some of the witnesses

8   in the case, I can't possibly expect you all, when I mention

9   these names, oh, I remember that or I heard that, because you

10  are completely knew to this.  As the lawyers on this case, we

11  obviously know the names and it is second nature to us.  So I

12  don't mean to throw out too much stuff or you're going to look

13  at me and saying we might as well be reciting the New York

14  White Pages, I can't possibly keep these names straight.  But

15  I'm going to mention them because maybe some of them will take

16  stick in your head.  More importantly, for general purpose.

17       One of the Government's witnesses, Miguel Angel

18  Martinez lied to the Government, lied about his drug use.  He

19  had a four-grams-a-day cocaine habit.  Now, you really have to

20  wrap your head around that, four grams of cocaine a day for

21  like 15 years.  That is an unbelievable amount of cocaine.

22  That's enough that four frat parties on a Saturday night in

23  the '80s might use all combined.

24       But when he -- and the cocaine habit was so bad the

25  inside of his nose basically fell out.  When he was asked

1    about it, he denied that he had any kind of drug problem.

2         Alex Cifuentes, another government witness who has

3    been a criminal since he was a child, he was raised to be a

4    drug dealer in Columbia by his parents.  That is what you have

5    to understand.  What I said at the beginning that you need to

6    forget everything that you know, this family was a proud drug

7    dealing family.  It wasn't like they got a bad kid and, you

8    know, he's selling drugs.  This whole family were proud and

9    famous drug dealers.  They enjoyed it.  You have to appreciate

10   that.  He speaks to his mother on the phone about drug dealing

11   strategy.  His mother is giving him advice.  And you are going

12   to hear that he's proud of what he accomplished as a drug

13   dealer.  Alex and his family worked for the notorious

14   Medillín, Pablo Escobar, and the Cifuentes' family members are

15   killed by their allies, they kill their allies.  But in the

16   end, the drug dealers all stay together as long as they're

17   making money no matter who dies.

18        The evidence will reveal that Alex was the baby in

19   the family, he learned from his brothers, they both had to

20   travel with fake passports.  They had to pay off the Air Force

21   to turn off their radar so that he could get drugs in and out.

22   Paid off the Air Force.  He would get navigation charts that

23   were to show where the military and law enforcement ships were

24   located so they could move their drugs easier in Columbia.  He

25   will testify that he was present when his brother paid off a

1   DEA agent with a box of cash.  That happened.  It's not my

2   witness.  It's not mine.  It's theirs.

3         Alex Cifuentes will testify that he believes his

4   brother was cooperating with the DEA, along with giving them

5   drug money, and none of this had anything to do with Chapo

6   Guzmán.

7         The American Government, the prosecutors in this

8   case, let me leave it at that, stated in its opening that

9   Guzmán was a very dangerous criminal.  You heard that.

10  Horrible things.  Yet, you're also going to hear that somehow

11  Alex Cifuentes was allowed to see Chapo Guzmán face-to-face in

12  prison in New York.  With all of the security attendant to

13  this case, with all of the security attendant to the most or a

14  very dangerous and violent criminal, they say it was a

15  one-in-a-million chance.  You determine whether you think it's

16  okay that it makes chance that one-in-a-million chance came

17  true, where Alex Cifuentes, the Government cooperator was

18  allowed to see Mr. Guzmán in prison and actually say something

19  to him.  There's no chance in this case.  There's no chances.

20        Now, as I said, the Cifuentes family had their own

21  drug dealing empire having nothing to do with Chapo Guzmán.

22  This is not all Chapo Guzmán.  And they will admit to this.

23  Their witnesses will say that.

24        Now, as I said, the Cifuentes family, as I call them

25  the cooperator Cifuentes family, they are basically

1  cooperating, all the ones that are in jail right now.  When

2  they get caught, they cooperate.  They don't cooperate because

3  they think what they're doing is bad; they cooperate because

4  they're planning their next angle.  We got to get out of jail

5  so we can get back to what we were doing.

6           Now, Cifuentes is going to come here and he's going

7  to be very dapper and he is going to be forced to admit that

8  he has lied every day of his life.  He's not violent.  He's

9  never killed anyone.  He is going to say, except he has over

10 and over.  He's not violent, yet he threatens and plots to

11 kill his own family members.  He was terrified of Mr. Guzmán

12 is what he's going to testify to, yet he routinely disobeyed

13 his orders, he'll be forced to admit, and worked behind his

14 back.

15          He will tell you all about the zillions of dollars

16 that Mr. Guzmán supposedly had stashed, but you're not going

17 to hear that any money of Mr. Guzmán's that was found in this

18 case.  You're not going to hear about any of that.

19          Cifuentes, Alex, will also testify that he believes

20 Mr. Guzmán is broke and that he often lied about his wealth

21 and his influence.  So which is it?  Is he a billionaire?  Is

22 he a man of huge influence?  Or is he, as Alex Cifuentes, says

23 a liar and broke.

24          Now, Alex was arrested near Costa Rica at one point

25 on a boat.  This how these people are.  What does he do when

1    he gets arrested?  He gave a fake name, was held for 20 days

2    before being given to the Mexican navy.  Mayo Zambada paid a

3    million dollars in bribes for his release.

4            Jorge Cifuentes, who's his brother, had no problems

5    working with Mayo and he killed his close friend.  Again,

6    these names, I don't want to get you any more confused than

7    you have to be.

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following was sealed by order of the Court.)

2

3          (End of sealed portion - continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. LICHTMAN:  (Continuing) this is what you're
2    dealing with.  This is the type of scum that I mentioned
3    yesterday.  This is what you're dealing with.
4          Jorge will also tell you that he was terrified of
5    Chapo Guzmán, but he had no problem disobeying him if you
6    believe his testimony.  Jorge is a killer as well, a drug
7    dealer, but he expects to be free as well and he expects an
8    American visa and he's not getting it from me.
9          Jorge, you will learn, taught his brother Alex
10   everything about bribing the military, attorneys, crooked
11   attorneys, police, judges, politicians.  All of them.
12         That you'll learn that Jorge, when he was in prison
13   in Brooklyn -- again, high security in this case, such an
14   important case, Chapo Guzmán, very scary, very scary man,
15   Jorge Cifuentes, while he was in prison in Brooklyn, somehow
16   manages to call Alex who was in a Columbian prison cell and
17   just happens to have a phone, calls him from Brooklyn to
18   Columbia.  And there's all the tapes.  There are tapes made of
19   every phone call.  Wouldn't you know it?  This tape was
20   destroyed.  So we don't know what was said on that
21   conversation.  Somehow Jorge Cifuentes managed to call his
22   brother Alex in Columbia and what does he say he was talking
23   about?  Ooh, just to cooperate, nothing about Chapo Guzmán.
24   We don't know what they were talking about.  You think they're
25   going to tell us the truth or are they going to say what they

1    think to in order to get out of jail.

2         When he's not giving weapons Columbian terrorist

3    organizations, Jorge has also seen the evidence that the DEA

4    had against him.  It was presented to him in a PowerPoint

5    presentation by a representative from the U.S. Navy.  Tons of

6    tapes, evidence that the prosecution is using here.  Some of

7    that evidence is part of this case.  And Jorge took notes of

8    this evidence.  So when he's being debriefed by the

9    Government, he already knows what they think the case is.

10   That's a very important point.  It's not that they're just

11   interviewing him blind and taking this information.  What he's

12   doing, he's already knowing what the case is against him.  So

13   of course his testimony is going to be tailored to that.  And,

14   of course, Jorge, being a Cifuentes, offered the Naval officer

15   $10 million to have all of the evidence destroyed.  The naval

16   officer told him he was doing it as a favor for Cifuentes and

17   he would have to kill him if he kept the evidence.  So that's

18   basically what you're dealing with here, the Navy leaking

19   evidence and threatening to kill people.

20        Now, Jorge will tell you that he was put in touch

21   with an American prosecutor in an attempt to bribe his way out

22   of the case, this case.  Jorge will also admit to all sorts of

23   fraud, personal stuff having nothing to do with this case.

24   This is what they do.  It's all about making money.  But, as

25   he said himself, and he's going to testify, everything I

1    breathe and eaten in my life is from drug trafficking.  You're

2    going to enjoy Jorge Cifuentes.  He will be among you pretty

3    soon.

4          Cesar Gastelum is another cooperating witness for

5    the Government.  He's alleged to be the right-hand man of Mr.

6    Guzmán.  If you believe the Government witnesses in this case,

7    Chapo Guzmán has about six right hands.  Cesar Gastelum is

8    another right hand, is what we're being told.  Yet Gastelum

9    also claims that Mr. Guzmán's -- the rumor of his great wealth

10   is a joke.  In fact, he laughed when he was told Mr. Guzmán

11   was supposedly so wealthy.  According to Gastelum, Mr. Guzmán

12   was always asking for a place to stay, claims Mr. Guzmán had

13   nothing, always asking for loans, always asking with his hand

14   out.  Yet he also claims that Mr. Guzmán owes him $90 million.

15   This makes sense.

16         Gastelum will testify everyone in Mexico has been

17   bribed.  And he also bribed presidential candidates in

18   Guatemala.  This is their witnesses.  This is not me saying.

19   Their witnesses will say that  they bribed the presidential

20   candidates in Guatemala.  In exchange, Gastelum was allowed to

21   move narcotics through the ports and airports in Guatemala.

22         He also paid off Honduran officials, including the

23   then president of Honduras.  Now, it's not me that's saying

24   that.  I'm not creating this.  It's their witnesses.  The

25   president of Honduras was paid off by an American cooperating

1    witness.

2         Now, Gastelum like all the other cooperators in this

3    case worked with other drug trafficking organizations having

4    nothing to do with Mr. Guzmán.  He was involved in a plot to

5    kill the president of Honduras and actually did kill a

6    Honduran prosecutor, the Government's witness.  That's when he

7    wasn't bribing them, the judges and the police.

8         He will testify that when he was arrested in Mexico

9    the gun was planted on him because he claims they needed a

10   reason to arrest him, but you're supposed to trust evidence

11   that comes out of Mexico.

12        Gastelum will also learn that one of his

13   subordinates was in the United States talking to an American

14   attorney.  Gastelum found out about it in 2015, threatened the

15   man's life and the lives of his family unless he returned to

16   Honduras.  But now, 2018, three years later, you're supposed

17   to believe that he is reformed and respects the American legal

18   system.  Two thumbs up for that.

19        As I said and the evidence will show, Gastelum was

20   involved in all sorts of violence and drug dealing having

21   nothing to do with Mr. Guzmán.  As I said, there are dozens of

22   drug trafficking organizations in Mexico, Columbia, Ecuador,

23   Guatemala, Central and South America, but these cooperators

24   are cooperating as one man in order to get out of jail,

25   Joaquin Guzmán.

1           And Gastelum will testify that he learned about

2    criminal evidence that was being provided to the United States

3    prosecutors in this case as well, not just Jorge Cifuentes.

4    Now there's two witnesses who have seen some of the evidence

5    in this case.  And if they know what the other witnesses are

6    saying about Mr. Guzmán, how difficult is it for them to just

7    tailor their testimony, so when they're debriefed by the

8    Government here they remember in their head well, if I want to

9    get that motion to get out of jail, my evidence, my testimony

10   will have to match what the other witnesses say.  That's why

11   they're supposed to keep them a part.  So they can't, so a

12   defense lawyer like me in a fancy suit can't get up and say

13   well, you all got your story straight.  That's why they're

14   kept a part.  It's for a reason.

15          Gastelum has even hung out with other cooperators in

16   this case in prisons inside this country, the evidence will

17   show.  He will tell you that they only spoke about their

18   families, because that's what disgusting killer drug dealers

19   who are always manipulating and bribing government officials

20   do when they get together.  They don't talk about their lot in

21   life and how they're stuck in jail and how they desperately

22   want to get out.  They talk about their families and they

23   remember we are not to talk about Chapo Guzmán in prison.  You

24   can't possibly believe that.  Use your commonsense.

25          Now, you're going to hear from a bunch of other

1   witnesses in the case and I know that I'm really I'm going

2   overboard, Damaso Lopez will testify that he had provided info

3   for the United States prosecutors previously and he asked the

4   American prosecutors not to arrest his son, who was his

5   co-conspirator, and to guarantee that he, Damaso, would not be

6   arrested in Mexico after he was released from prison here.

7   That's what he asked the Government.   Here's the question:   If

8   he's facing the rest of his life in prison for killing, for

9   drug smuggling, how does he know that he's going to be in

10  Mexico someday, unless he's in a bag or in the ground?

11  Somehow he knows enough to ask the Government to make sure

12  that he won't be arrested in Mexico when he is released.   He

13  knows.

14          They made sure that they are getting life in prison

15  even if they cooperate.   It's commonsense.   These are the

16  sneakiest, slimiest people.   They know what they're doing.

17          Damaso will testify that Cesar Gastelum, any time he

18  did a drug deal in Columbia, he always falsely claimed it was

19  for Chapo Guzmán because the Chapo Guzmán name had so much

20  power, the myth held so much power.   Gastelum would claim that

21  everything he did was for Joaquin Guzmán.   That's what the

22  Government witnesses will tell you.   The name meant a lot.

23          Now, Damaso will testify that his criminal behavior

24  didn't stop when Mr. Guzmán was arrested in 2016, he even

25  committed murder while Mr. Guzmán was sitting in prison, who

1    sanctioned that murder?  Not Joaquin Guzmán.  Mayo Zambada,

2    the brother and father of the two cooperating witnesses who

3    somehow manages to live freely here while he cooperates.

4           Damaso killed someone in 2017 as well.  That was

5    just an extra before he came to America.  He'll be out amongst

6    you soon as well.  He controls the Mexican Marines to help him

7    with narcotics trafficking.  He controlled local Sinaloa

8    politicians to do his dirty work, as well as federal agency

9    and federal intelligence agencies.  There is no part of the

10   Mexican Government or law enforcement apparatus that Damaso

11   Lopez did not control.  He also kidnapped someone he believed

12   was cooperating with the DEA and brought him to Mayo Zambada

13   for interrogation.  Damaso's son also named Damaso, just if I

14   could, if it's possible, make it more difficult, there are two

15   Damaso's in this case, he may or may not be testifying in this

16   case.  He's not nearly as bad his father, but of course no one

17   possibly could be, but he's bad enough on his own.  He's

18   getting immigration benefits.  That's what he wants, to stay

19   here amongst us.

20          German Rosaro was another lawyer by training, which

21   should tell you how little respect these witnesses have for

22   the law.  His client works for one of the most violent

23   Columbia drug cartels which has ever existed, yet the

24   Government is helping him get visas for himself and his family

25   to live amongst you.  Rosero's main job is to obstruct

1   justice.  He paid off every politician he could in Columbia on

2   behalf of his drug trafficking organization which was

3   responsible for 30 to 50 percent of all of the cocaine coming

4   into America at the time.  And, apparently, while he was in

5   law school he got an A plus in bribing officials class, as

6   Rosaro later paid off the entire Congress of Columbia in order

7   to ensure that the Colombian extradition treaty with the

8   United States would not be enforced retroactively to ensure

9   his boss would not be extradited to America.  That's some

10  pretty good pull.  Don't you think?  That you can change

11  international treaties with a bribe.

12          Rosero will also testify that while dealing drugs in

13  Columbia he worked with the DEA to set up drug deals into the

14  United States where sometimes the drug were seized, sometimes

15  they weren't.  Of course that deal fell apart as well.

16          I'm not going to go through the rest of the

17  witnesses.  We will be here all day and you'll start throwing

18  rotten cabbage at me.  But I'm going to end with Miguel

19  Martinez, he is the one whose nose basically fell off from

20  snorting four grams of cocaine a day for 15 years, but didn't

21  think that qualified as a drug problem.  You're going to hear

22  about some of his other mental issues.  He's refused to

23  cooperate with the Government at one point in the beginning of

24  his cooperations.  He admits that he was paid to lie, used so

25  many fake names that he couldn't even count them all, came

1  into our country with the fake papers, lied to the American

2  prosecutors with an integrate fake personal history, committed

3  bad acts while he was in prison here, and he's actually free

4  amongst of you right now, a Government cooperator in good

5  standing today.  He's cooperating in this case after receiving

6  over $150,000 from you, the taxpayer.  Oh, he admits that he

7  hates Joaquin Guzmán.  You'll enjoy him.

8         Other witnesses in this case are worth $2 billion

9  and tried to kill the prosecutors in this case and pay off

10  judges and they all will deny a host of other violent criminal

11  acts which were provided by the Government, they all provided

12  to the Government, but they all deny it.

13         This case is a mess that you are going to learn due

14  to these cooperators.

15         Now, I have bored you for parts of two days now, so

16  I am going to end my comments here.  I'm not going to have a

17  chance to speak to you again until the end of the case, but

18  I'm going to leave you with this:  When you told people that

19  you had jury duty, and this is when you were still talking

20  about your jury duty, and before you were instructed by Judge

21  Cogan not to, some of you inevitably may have told people that

22  you might be picked for the El Chapo case and that name, for

23  better or for worse, was your focus when you thought about

24  your jury duty.  And try as you might, and you all promised to

25  be open-minded, that's why we picked you, because you promised

1    that you would be open-minded and you wouldn't prejudge Mr.

2    Guzmán, a little part of each and every one of you thinks he

3    is guilty of something.  Try as you might to keep it off your

4    mind, try as you might to ignore that little voice in your

5    head that's nagging at you, there's a little part of you that

6    already thinks he's guilty because the name is that powerful.

7    And if you have trouble getting that out of your heads, I

8    would ask you, I would beg of you, to consider how you would

9    want it if your own family was in this situation, how you

10   would want them treated if they were in trouble and needed to

11   depend on the fairness and open-mindedness of the 12 jurors

12   and 6 alternates in a situation like this.  You wouldn't want

13   your loved-ones to be prejudged due to their name or infamy

14   and what you might have heard about him, people might have

15   heard about him in the press.

16            I am confident that if you keep an open mind you

17   will recognize that this case was built on a foundation of

18   lies, that this case is a product of manipulation and that

19   Joaquin Guzmán is innocent of these charges.

20            Thank you.

21            THE COURT:  Thank you, Mr. Lichtman.

22            MR. FELLS:  Your Honor, may we have a sidebar for a

23   moment?

24            THE COURT:  Yes.

25            (The following occurred at sidebar.)

1          (Sidebar.)

2          (The following was sealed by order of the Court.)

3          MR. FELLS:  Your Honor, I hate to do this,

4    particularly in front of the jury, but in your order, which is

5    docket No. 403, it expressly ruled there would be no ability

6    to cross-examine for Jorge' Cifuentes on his attempts on Mayo

7    Zambada's life.  This was of grave concern to us because were

8    this information to get out publicly in front of the media

9    could cause grave harm to him and his family.  Not only did he

10   violate, he opened on it.

11         THE COURT:  Let's assume that's true, what would you

12   like me to do?

13         MR. FELLS:  Just an admonishment that he follow the

14   Court's orders.

15         MR. LICHTMAN:  I don't want that because what it's

16   doing is making it -- it's negative to the defense and it

17   affects our credibility.  When I said it, obviously I missed

18   it.  I didn't mean to purposely violate the Court's order,

19   which why we came to sidebar before we started to go over

20   things.

21         THE COURT:  I did make a ruling.

22         MR. LICHTMAN:  I understand and I missed it,

23   obviously, clearly.  It wasn't intentional.  But if you're

24   going to highlight it now, then it's going to affect our

25   credibility, then I would've, you know, asked -- maybe when I

1  said it, if you could have stood up and stopped it

2  immediately, we could have dealt with it.

3       THE COURT:  I discourage lawyers from doing that and

4  the cat would have been out of the bag just as much had that

5  happened.  I am not going to give an instruction.

6       MR. LICHTMAN:  I apologize, Judge.  I did not mean

7  to violate that order.

8       THE COURT:  I accept the apology.  There are a lot

9  of orders.  There is a lot of evidence.  A mistake was made.

10      MR. LICHTMAN:  Thank you.

11      MS. PARLOVECCHIO:  There was also, just for the

12  record, Your Honor, a misstatement of the evidence that is

13  expected to come out in this case.  Alex Cifuentes was never

14  placed into a cell with the defendant in New York.

15      MR. LICHTMAN:  I didn't say he was in a cell.  I

16  said he saw him face to face.

17      MS. PARLOVECCHIO:  You said he was put together.

18      THE COURT:  Hold it.  If the evidence doesn't add up

19  to what he said, it's a common technique on closing to say

20  quote the transcript and say did you hear that, ladies and

21  gentleman.  Please go ahead and do that.

22      MS. PARLOVECCHIO:  Yes, Your Honor.

23      MR. FELLS:  Your Honor, but the only thing I would

24  ask is at least that portion of the opening where Mr. Lichtman

25  referenced Jorge Cifuentes' attempt to kill Mayo be placed

1    under seal..

2                MR. LICHTMAN:  I would agree with that.

3                THE COURT:  I mean, there are a bunch of reporters

4    in the room and they all heard it, but I will seal that

5    statement and I will seal this portion of the sidebar that

6    discusses it.

7                MS. PARLOVECCHIO:  Thank you, Your Honor.

8                (Sidebar concluded.)

9                (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2           THE COURT:  The Government may call its first

3    witness.

4           MR. NARDOZZI:  The Government calls Carlos Salazar.

5           THE COURTROOM DEPUTY:  Please raise your right hand.

6           (Witness sworn.)

7           THE COURTROOM DEPUTY:  Please state and spell your

8    name for the record.

9           THE WITNESS:  My name is Carlos Salazar.

10   C-A-R-L-O-S, Salazar is S-A-L-A-Z-A-R.

11          THE COURT:  Before you start inquiring, let me

12   mention to the attorneys, I am going to waive the rule that

13   you've got to stand up to object because I want you to object

14   into the microphone so that everybody can hear it.  So

15   everybody can stay seated when you have anything to say.

16          All right.  Please inquire.

17          MR. NARDOZZI:  Thank you, Your Honor.

18   CARLOS SALAZAR,

19       called by the Government, having been duly

20       sworn, was examined and testified as follows:

21   DIRECT EXAMINATION

22   BY MR. NARDOZZI:

23   Q    Good morning, Mr. Salazar.

24   A    Good morning.

25   Q    Mr. Salazar, I want to direct your attention to May of

1    1990.   Can you tell the ladies and gentleman of the jury where

2    you were working at that time?

3    A     At the time I was assigned to the resident agent in

4    charge office in Phoenix, Arizona.

5    Q     For what?

6    A     At the time it was U.S. Customs, which became ICE.

7    Q     Okay.   How long did you work U.S. Customs?

8    A     My career with them started in 1987 and I retired in

9    2012.

10   Q     When did U.S. Customs become ICE?

11   A     I believe that happened in 2003.

12   Q     Okay.   Going back to 1990, did you have any special

13   training as a U.S. Customs agent?

14   A     Yes.   I went to the global basic training that all agents

15   go to in FLETC, Georgia, then I went to the actual U.S.

16   Customs training school in Marana, Arizona.

17   Q     Just a very brief summary, what does that training entail?

18   A     I mean, everything from firearms to legal to

19   surveillance, all aspects of law enforcement.

20   Q     As a U.S. Customs agent, what were your responsibilities?

21   A     At the Phoenix office, my cases, my, I would say,

22   expertise was narcotics investigations.   And during my time

23   with Customs, including my three previous years with the

24   Bureau of Alcohol, Tobacco and Firearms, I did a lot of

25   undercover work.   (Continued on next page.)

1   BY MR. NARDOZZI:   (Continuing)

2   Q     In 1990, were you doing undercover work then?

3   A     Yes, but not on this specific case.

4   Q     What type of duties were you doing in 1990 in May?

5   A     Narcotics investigations, maybe here or there a fraud

6   case, that sort of thing, but most of my cases were involving

7   narcotics and undercover work throughout the state.

8   Q     And when did you stop working for what was Customs and

9   then became ICE?

10  A     Well, in 2003 was the transition to ICE and then I

11  retired out of San Antonio.  I went over to internal affairs

12  my last ten years which became OPR and, like I mentioned, in

13  June, end of June of 2012 is when I officially retired.

14  Q     Okay.  I want to direct your attention to the date of

15  May 11, 1990.  Were you working as a Special Agent for U.S.

16  Customs at that time?

17  A     Yes.

18  Q     And what were you working on on that date?

19  A     At that time, I was working what we, of course, we were

20  referring as the tunnel case.  I had received information from

21  a source back in March of that year and that developed into an

22  investigation that culminated on May 11th in us discovering

23  the tunnel in Douglas, Arizona.

24  Q     Let's go back to May 11th first preceding the tunnel.

25  Did you discover something else at that time that you're here

1    to testify about in court today?

2    A    Yes.   Prior to the 11th, I believe it was the 9th, we did

3    surveillance amongst three officers, the RAC office in

4    Douglas, the SAC office in Tucson and then our RAC office in

5    Phoenix.   We followed a semi tractor --

6            MR. PURPURA:   Objection, unless it's made clear that

7    this individual witness was in the surveillance, not the "we"

8    part.   Otherwise, it would be hearsay.

9            THE COURT:   No.   Overruled.

10   Q    Continue, Mr. Salazar.

11   A    So we had the information and we followed the tractor

12   rig, with flat bed, all the way from Douglas exiting the metal

13   building which was situated on the Douglas building and

14   supplies business and then it was being passed on to the units

15   out of the Tucson office and if I can clarify, the tractor rig

16   was being followed by a blue van.

17           THE COURT:   Ladies and gentlemen, this testimony is

18   not being offered to show the truth of the information that

19   the witness received.   It simply is background for what he did

20   based on the information he heard.

21           (Continued on next page.)

22

23

24

25

1              MR. PURPURA:  Judge, respectfully, I object.  Can we

2        approach the bench?

3              THE COURT:  You may.  You may.

4              (The following occurred at side bar.)

5              MR. PURPURA:  I won't make this a habit.

6              THE COURT:  That's okay.

7              MR. PURPURA:  The reason I'm objecting is because

8        the drugs were found 214 miles away from the tunnel itself so

9        it's important that he was actually doing the surveillance.

10             THE COURT:  That's great cross, but why does that

11       color the fact that he did what he did based on information

12       that he received?

13             MR. PURPURA:  No, that's -- he's not saying I did

14       that.  He's saying that there was surveillance where the point

15       of the tunnel, the warehouse is, right to where the drugs are

16       going to be seized.

17             THE COURT:  I'll hear from the government.

18             MR. NARDOZZI:  Your Honor, I can cut him right to

19       where what's going to happen at the warehouse.  We don't have

20       to talk about the surveillance.  So I'll take him right to

21       that point.

22             THE COURT:  Let's do that.

23             MR. PURPURA:  That is my concern, the nature of it

24       itself, the tunnel to these particular drugs.  Thank you.

25             THE COURT:  Okay.

1          (In open court; side bar ends.)

2          THE COURT:  I hope that noise isn't terribly

3     annoying.

4          MR. NARDOZZI:  May I, Your Honor.

5          THE COURT:  Please.

6          MR. NARDOZZI:  Thank you.

7     BY MR. NARDOZZI:

8     Q    Mr. Salazar, I want to direct you to the date

9     specifically of May 11, 1990 after the surveillance at the

10    Kenworthy location in Arizona.  Can you tell the ladies and

11    gentlemen of the jury what you encountered on that date?

12    A    That was the 9th.

13    Q    Can you tell us what you encountered on that date?

14    A    Okay.  So we followed the tractor rig after it had

15    separated from the blue van.  The blue van headed south on 110

16    and we followed the tractor rig to a ranch house in the town

17    or city of Queen Creek, Arizona.

18          We saw it back up into a, what were your concrete

19    high wall racquetball courts and backed in to one of the

20    stalls right next to a, a building.  It looked like a

21    cinderblock building.  And we had already set up surveillance

22    which lasted from May 9th into the 11th.  And then after we

23    kind of got all our things in order, we relocated and executed

24    a search warrant on the ranch house.

25    Q    When was that search warrant conducted?

1  A     It was the 11th, May 11th.

2  Q     Very good.

3          MR. NARDOZZI:  Your Honor, may I approach the

4  witness?  I want to present him with some photographs that

5  I'll mark for identification.

6          THE COURT:  You'd rather approach him than put them

7  on the ELMO private to him?

8          MR. NARDOZZI:  Your Honor, I'd like to --

9          MR. PURPURA:  I have no objection to the photographs

10 coming in.

11         THE COURT:  Okay.  You want to just admit them and

12 use them?

13         MR. NARDOZZI:  That's fine, Your Honor, if I can.

14 For the purposes of the Court --

15         THE COURT:  What's the number?

16         MR. NARDOZZI:  I would like it admit Government

17 Exhibit 213-2 through 213-10.

18         THE COURT:  All right.  Those are admitted without

19 objection.

20         Sorry.  Something else?

21         MR. NARDOZZI:  I apologize.  213-18, 213-22, 213-28

22 and 213-29.

23         THE COURT:  All right.  Those are all admitted

24 without objection.

25         MR. NARDOZZI:  Thank you, Your Honor.

1              (Government Exhibits 213-2 through 213-10, 213-18,

2    213-22, 213-28 and 213-29 so marked.)

3    Q     Mr. Salazar, I'm placing on the screen -- let me see if I

4    can make this work -- what is marked for identification in

5    evidence as Government Exhibit 213-2.  Can you tell the ladies

6    and gentlemen of the jury what we're looking at here?

7    A     Those are aerial photos, of course, after we've executed

8    the search warrant.  We have a crew of agents taking the metal

9    plates off the flatbed trailer which revealed bundles of

10   cocaine all the way from the front to the back totally filled

11   up in one solid layer.

12   Q     Okay.

13   A     There's the U-Haul truck that was arranged to be picked

14   up and put there, backed up into that other building that I

15   had mentioned before next to the racquetball court.

16   Q     Okay.  And we see these large kind of gray walls to the

17   left side of the photograph.  Is this what you were describing

18   earlier, the bays that the truck backed into?

19   A     Yes, sir.

20   Q     Okay.  I'm going to place on the screen what I've marked

21   as 213-3.

22              Mr. Salazar, can you tell us what we're looking at

23   here?

24   A     That's the bay where the tractor rig, trailer was backed

25   up into.  What they had done was cut out the cinderblock in

                    CMH      OCR      RMR      CRR      FCRR

1    this window-shaped opening and what they were going to be

2    doing is, so that it would remain out of sight of the front

3    street of the residence, they were just going to offload it

4    from the flatbed of the trailer and just throw it into that

5    window into the building that was on the side.

6    Q    What's on the other side of that hole we see in the

7    photograph?

8    A    It was like a big, like a storage, storage room.  I

9    recall it being empty at the time.  Actually, I do believe

10   they had some cardboard boxes stacked up in there.  That was

11   it.

12   Q    And to the best of your recollection, is that hole always

13   open or is there something that shuts it sometimes?

14   A    They actually left the cinderblocks there, the pieces, so

15   when it was not in use, they would put the cinderblock back in

16   that opening to make it more concealable.

17   Q    Okay.  When you conducted your search warrant, was

18   anything recovered at that time?

19   A    Yes.  We did find some narcotics.  I believe it was

20   cocaine in the separate kind of "ramada" which would have been

21   past the rig, past the U-Haul truck and a little bit further,

22   and as far as I recall it, some, one of the officers actually

23   was looking through, like, the barbecue pit area and he found

24   a package.

25   Q    When you say the "ramada," what do you mean by that?

1  A     It was like a, a slab of concrete and a roof over it.  It

2  was like a gathering place with a barbecue grill type looking

3  thing.

4         MR. NARDOZZI:  Okay.  Your Honor, I'm briefly going

5  to show the witness what's marked as Government Exhibit 213-4

6  through 213-10.

7         THE COURT:  Okay.

8         MR. NARDOZZI:  I'll go in quick order of these and

9  then I'll ask questions after I show the full set of

10  photographs.

11 Q     Mr. Salazar, this is Government Exhibit 213-4, Government

12 Exhibit 213-5, Government Exhibit 213-6, Government

13 Exhibit 213-7, Government Exhibit 213-8, Government

14 Exhibit 213-9 and Government Exhibit 213-10.

15        Mr. Salazar, what do we see in these photographs

16 that we just displayed on the screen?

17 A     Those are the actual brick or kilo wrappings of cocaine

18 that we discovered with different markings on them.

19 Q     Do you recall how many bricks there were, approximately?

20 A     No.  I know that it totaled about one ton of cocaine.

21 Q     Okay.  After you conducted the search warrant at the

22 Kenworthy location, where did your investigation lead you to

23 next?

24 A     Well, there was a pause in the investigation almost a

25 week when we decided to execute the search warrant at the

1  Douglas building and supply business location in Douglas,

2  Arizona.

3  Q    And approximately how far is that from the location where

4  the drugs were seized?

5  A    It's actually 200, about 230 miles.  It's about a

6  four-hour drive from Phoenix to Douglas.

7  Q    What happened when you arrived at that location?

8  A    Well, we already had, of course, surveillance on it.  Our

9  U.S. Customs Office which was barely about two blocks away

10 from this building so that's why we had cameras up and looking

11 at it and that's how we were able to follow that rig out of

12 there, but once we recorded things, we got everything in

13 order, we executed the search warrant and went into the

14 building.

15 Q    What date was that search warrant executed?

16 A    I believe it was the 17th of May.

17 Q    So when you went into the Douglas building supplies and

18 material building, what did you discover?

19 A    It basically looked like a, like a maintenance yard type

20 of metal structure.  It had some irrigation piping, I would

21 say it's probably 4 to, actually 5 to 6 inch diameter piping,

22 and some tools and ladders and that sort of, sort of

23 equipment.  It looked like just a maintenance yard.

24 Q    Warehouse?

25 A    Yes.

1  Q    Okay.  And what else did you find when you went inside?

2  What were you looking for?

3  A    Well, being that we had the information of the tunnel

4  being in existence, or if you look at the flooring, we did see

5  what were two I would call them auto drainage cutouts in the

6  concrete with grates, metal grates over them.  And we, our

7  attention centered on the one closest to the rear of the

8  building and we, again, being that we knew about the tunnel,

9  we took the grate off and started hammering and jackhammering

10 the concrete to get to the tunnel itself.  Once we broke

11 through the concrete, we were able to visibly see the

12 construction of it, the existence of a tunnel.

13 Q    Do you know where that tunnel led to?

14 A    The tunnel led from there on the U.S. side underneath the

15 ground, of course, to Agua Prieta in Mexico.

16 Q    And just, you know, for the ladies and gentlemen of the

17 jury who may not be familiar with Douglas, Arizona and Agua

18 Prieta, Mexico, which I fear may be everyone, how far are

19 those places?

20 A    A fence, a chain link fence at the time.

21       MR. NARDOZZI:  Your Honor, I have what I've marked

22 as Government Exhibit 213-30.  Can I approach the witness with

23 that?

24       MR. PURPURA:  No objection.

25       MR. NARDOZZI:  Thank you.

1          THE COURT:  That's received without objection.

2          (So marked.)

3          MR. NARDOZZI:  And, Your Honor, I move 213-30 in

4   evidence.

5          THE COURT:  Okay.  It's in.

6   Q    Mr. Salazar, we have a video of the surveillance that was

7   conducted at the location.  I'd like to play it now.  What I

8   would like you to do as the video plays is describe for the

9   ladies and gentlemen of the jury what we're seeing in this

10  video.  If we need to, we'll pause it and I'll ask you some

11  follow-up questions.

12         MR. NARDOZZI:  Your Honor, is there any way to dim

13  the lights so we can see?

14         THE COURT:  Yes.  They also have their own monitors

15  so it's clear but for the audience, we'll also dim the lights.

16         MR. NARDOZZI:  Thank you, Your Honor.

17         (Video played.)

18  A    Here we have our agent in charge in the Tucson office,

19  Mr. McDermott pointing out the residence on the Agua Prieta,

20  the Mexico side.  The residence belongs to or belonged to

21  Rafael Camarena.  The building to the, that he's pointing at

22  right now with the brown roof is actually the house where the

23  tunnel exited or started at in Mexico.

24         That's the metal building on the U.S. side.  There's

25  the front entrance after we executed the search warrant.

1          That's the oil drainage that we took the grate off

2    and walked into, in through the concrete to get access to the

3    tunnel.

4    Q    This is on the U.S. side?

5    A    On the U.S. side, correct.

6    Q    Thank you.

7    A    That's what I would call the -- that's called the staging

8    area on the U.S. side of the tunnel once he brought the cargo,

9    let's call it, through the tunnel to the U.S. side.

10          And that's the actual entrance from that room down

11   into the tunnel outfitted by steel laddering, I would call it,

12   to get down.  And now you're actually at the U.S. entrance to

13   the tunnel.  We have conduit on the wall that -- because they

14   did have electric, electrical, you know, lights in there.  I

15   would say from the floor to the top is not more than 5-4,

16   5 feet 5 inches, because when I went through this, I actually

17   had to duck a little bit and I'm 5 foot 8 to get through

18   there.

19          Mr. McDermott is pointing out here are actually

20   markings by the tires that you'll later see on the cart or

21   carts that they would use to load the cargo on and then wheel

22   it through from Mexico through the tunnel to get to the U.S.

23   side and so those are the tire markings as the tire would rub

24   through.

25          There is the cart where they would load the, their

 1   cargo.  And I believe these turned on, like, guides, guides

 2   for the cart.

 3            Now we're on the Mexican side, Agua Prieta and we

 4   discovered this industrial-sized weigh scale.

 5            Now, that is the compressor for the hydraulic system

 6   that was used to lift the flooring where the pool table was at

 7   and this is your, just like you would see in an auto garage,

 8   two large pistons.  So when the system was activated, it would

 9   raise all that platform.  As you see to the left there,

10   there's the pool table that we would move from that flooring.

11   Q    That's what he had his hand on?

12   A    Excuse me?

13   Q    That's what he had his hand on?

14   A    Yes.

15   Q    Okay.

16            What are we seeing here?

17   A    Well, we're actually just seeing how it operated.  It's

18   going straight to its original position.

19            On the lower right corner there, that's where we

20   started to break the flooring, the concrete flooring.  Again,

21   at that point, we didn't know that there was a hydraulics

22   system.  We didn't know that the floor came up from the

23   direction of the tunnel.  We knew it was in this area so we

24   started breaking through the concrete and once we broke

25   through, we could see that's where the staging area, staging

1    room on the Mexican side was.

2             There is the entrance to the tunnel from the Agua

3    Prieta, Mexico side.

4             (Video stopped.)

5             MR. NARDOZZI:  We can put the lights back on, Your

6    Honor.

7    Q    Okay.  So, Mr. Salazar, I want to ask some follow-up

8    questions about what you discovered on the Agua Prieta side in

9    Mexico.

10            What did you discover when you went in?  What is it

11   that you saw when you first entered?

12   A    Well, of course, we had to coordinate things with the law

13   enforcement authorities on the Mexican side, Agua Prieta, I

14   believe it was the locals and also the state police.  And we,

15   as the agents, we went through the port of entry which is only

16   about two blocks to the west of this residence.  We went

17   straight into the residence as it were with -- of course, they

18   went first, the authorities from Mexico, like they were

19   conducting the search.

20            What we did find was that Mr. Camarena had been

21   there probably right before we got there because there were

22   still dinner plates on the table, the dining table.  The food

23   was still hot.  So we figured that somehow he got tipped off

24   or something that we were coming.  So we didn't arrest or had

25   contact with Mr. Camarena at that time.

1        Of course, looking all over, we saw, that's when we

2   saw that building which is basically like a game room separate

3   from the residence and went through this process of removing

4   the table and breaking through the concrete flooring and that,

5   that was a struggle, but then at some point, someone on our

6   enforcement team found a --

7              MR. PURPURA:   Objection.

8              THE COURT:   Sustained.

9   Q    Okay.   Sir, when you -- first of all, when you say the

10  Mexican authorities entered before you, how much longer before

11  you did they enter?

12  A    Oh, we were right behind them.

13  Q    Okay.   All right.   When you entered the facility, was

14  that pool table in a different location than was pictured in

15  the video?

16  A    It was on top of the flooring that you saw raised up.

17  Q    Okay.   And how did you initially try to enter into the

18  tunnel from the Agua Prieta side?

19  A    By removing the pool table from that area because there

20  was actually a different color of rectangle on the flooring,

21  flooring color.   So that's when we started breaking in the

22  concrete floor to get to the tunnel.

23  Q    What type of tools did you use to do that?

24  A    Sledgehammers.

25  Q    Okay.   How long did you work at that floor?

1  A     Oh, gosh, I would say at least 20 to 30 minutes.

2  Q     Okay.  Did you personally have an opportunity to observe

3  how to activate the hydraulic lift?

4  A     Yes.  Once the apparatus or the valve was found to

5  activate the system, yes, I was there when that happened.

6  Q     Okay.  I'm going to show you what we previously marked as

7  Government Exhibit 213-28.

8        Do you recognize this?

9  A     Yes, sir.

10  Q     What is that?

11  A     That's -- I mean it looks like a water valve, normal

12  water faucet valve, but in turning that, and if you see to the

13  right, that's the sliding glass doors that led into that where

14  that pool table was at, once you turned that valve, that would

15  activate the compressor which would activate the pistons and

16  raise the floor from its original position.

17  Q     How far was that located from the compressor system?

18  A     That was probably across the room or was across the room

19  so I would say that room is probably about maybe 20 or 25 feet

20  across.

21  Q     I want to run through a couple more things of the tunnel

22  with you very briefly.

23        I'll put on the screen what's been marked and moved

24  as 213-18.  What is this?

25  A     That's the tunnel and that's the electrical conduit on

1    the wall.

2    Q    And I think you testified before it's about five, maybe

3    five and a half feet high?

4    A    Correct.

5    Q    About how wide is it?

6    A    Oh, it can't be more than somewhere between 3 and 4.

7    Q    Okay.  How wide are the carts, the trolleys that you

8    talked about before?

9    A    That was probably close to three feet wide.

10   Q    I want to show you what's marked as 213-22.  I'll zoom

11   in.  What do we see here?

12   A    It's a little grainy, but that's actually the hydraulic

13   compressor that was being used to lift the flooring and that's

14   actually me standing behind the compressor.  I'm much younger

15   with more hair.

16   Q    Now I want to show you what's marked as 213-29.  This --

17   what are we looking at here, first of all?

18   A    Again, that's after the floor has been raised up on the

19   Agua Prieta, Mexico side, the pulley system that was used to

20   take the cocaine bricks down to the staging room on the

21   Mexican side.

22        The pipe that you see, the black and white pipe,

23   that was for the sump pump because what they would do is they

24   would fill up or there was water -- when we initially went

25   into the tunnel, there was water in the tunnel so to remove

1    that water, we activated that sump pump on the Mexico side to

2    take the water out.

3    Q    I believe our touch screen capabilities work.  Can you

4    just circle that on the screen for the ladies and gentlemen of

5    the jury?

6    A    (Witness complies.)    There's the piping.

7    Q    The corner is white and it looks like the connectors are

8    black, right?  Is that what you're talking about?

9    A    Yes, the black and the white.

10   Q    And this pulley system that you pointed out, what does

11   that pulley system attach to?

12   A    On the Mexican side, I don't recall it.  I don't recall

13   what it was attached to.

14   Q    How about on the U.S. side?

15   A    U.S. side, it was the pulley that was used to lift up the

16   cargo.  It also -- when we went into the tunnel, it was also

17   not attached to anything at the time that I recall.

18   Q    Okay.  Very good.

19         MR. NARDOZZI:  If I can have just one moment, Your

20   Honor.

21         (Pause.)

22         MR. NARDOZZI:  One more follow-up question.

23   Q    Approximately how long was the tunnel?

24   A    I recall the number being used was 30 meters but I, I

25   don't know meters.  In yards, I would say from Mexico to the

1    U.S. origination, it was probably 10, 20, 30, 40 -- somewhere

2    between 40 and 50 yards.

3    Q    Thank you, Mr. Salazar.

4            MR. NARDOZZI:  I don't have any further questions

5    for you.

6            THE COURT:  All right.  Any cross?

7            MR. PURPURA:  I do.  Thank you.

8            THE COURT:  All right.

9    CROSS-EXAMINATION

10   BY MR. PURPURA:

11   Q    Good morning, Mr. Salazar.

12   A    Good morning.

13   Q    Welcome to Brooklyn.

14           Mr. Salazar, let me make sure I have the dates

15   correct.  The tunnel, was the tunnel, the Agua Prieta tunnel,

16   discovered on May 11th of 1990?

17   A    No, sir.  That was on May 17th.

18   Q    Well, if I can just -- let me show you Defense Exhibit 1

19   for identification.

20           MR. PURPURA:  May I approach, Your Honor?

21           THE COURT:  Yes.  Mr. Purpura, you don't want to put

22   it on the screen and show him?

23           MR. PURPURA:  I will learn the screen by lunchtime.

24           THE COURT:  Please do.

25           MR. PURPURA:  Thank you.

1  Q    I'm now showing you Defense Exhibit No. 1 for

2  identification.  Can you identify this document?

3  A    Yes, that's one of our ROI, reports of investigation.

4  Q    And, in particular, is it your report, sir?

5  A    Yes, it is.

6  Q    And on that report itself, you indicate when the --

7            MR. NARDOZZI:  Objection, Your Honor.  Side bar?

8            THE COURT:  No you don't need a side bar.

9            Sustained.

10            MR. NARDOZZI:  Thank you.

11  Q    Does that help you recall when the subterranean tunnel

12  was found?

13  A    My report says on May 11th.

14            MR. NARDOZZI:  Objection, Your Honor.

15            THE COURT:  Well, just answer whether it refreshes

16  your recollection.

17            MR. NARDOZZI:  Your Honor, he hasn't said he doesn't

18  remember.

19            MR. PURPURA:  Judge, if I may, it's prior

20  inconsistent as well.

21            THE COURT:  Yes.  Let him just answer the question.

22            Does that affect your testimony on when it was

23  found?

24            THE WITNESS:  The report says May 11th.

25            MR. PURPURA:  Thank you.

1    Q    And the search of 601 First Street, Douglas, when was

2    that?

3    A    According to my recollection, that would have been on

4    the, the 17th.

5    Q    Thank you.

6         And the search of Kenworthy and Queen Creek, was

7    that also May 11th of 1990?

8    A    That would have been May 11th.

9    Q    And you prepared an affidavit, isn't that correct, sir,

10   in this particular case for Mr. Camarena's extradition?

11   A    Not for his extradition, no, sir.

12   Q    What was the affidavit prepared for?

13   A    The affidavit was for a search warrant, not for

14   Mr. Camarena, not for his residence.  It was for the Douglas

15   Building and Supply.

16   Q    One second.

17        MR. PURPURA:   Again, permission, Your Honor?

18        THE COURT:   Sure.

19   Q    I'm showing you what has been marked as Defense Exhibit

20   No. 3 for identification and although some of the heading is

21   redacted, I'd like you to just take a look at that and see if

22   you recognize that particular document.

23   A    Not really.

24   Q    Take a look at the last page.

25   A    I mean, it's a document that was produced by me, it has

1    my signature, but 28 years later --

2    Q      I understand completely.

3    A      -- I don't remember.

4    Q      I can't remember lunch yesterday.

5                 (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  bY MR. PURPURA:

2  Q    Just take a second, please, and look at the second page

3  of that document, as well as the heading on first page, and

4  I'm going to ask you, again, do you now recall preparing an

5  affidavit for extradition for Mr. Camarena?

6  A    Just by looking at the document, it has my name, it has

7  the facts of the case and it is my signature, so, yes.

8  Q    Thank you.  And just so that we're clear, Mr. Camarena is

9  the gentleman who in fact owns the warehouse on the Douglas

10 Street and the home with the dinner still on the table in

11 Mexico, right?

12 A    Yes, sir.  He did purchase that business, as we later

13 found out.

14 Q    Very good.  I'll get to that in a second.  And in that

15 affidavit you put down what you were involved in these

16 surveillances, the actual surveillance, is that correct, page

17 two, sir?

18 A    Yes, May 9, 1990.

19 Q    And what you actually saw on May 9 of 1990 is that you

20 saw this tractor trailer arrive in Chandler, Arizona, is that

21 correct, sir?

22 A    That's correct.  That would have been the first city as

23 you enter the Phoenix area on I 10.

24 Q    Were you stationed there at that time?

25 A    In Phoenix.

1   Q    Did you just come upon Chandler?  How did you get to

2   Chandler?

3   A    It's a suburb of Phoenix.  It's the metropolitan area.

4   Q    At that time you recorded what your surveillance was, is

5   that correct, sir?

6   A    Correct.

7   Q    At that point you indicate that the tractor trailer

8   stopped and the driver of the tractor trailer exited, is that

9   correct?

10  A    Correct.

11  Q    You saw that with your own eyes, correct?

12  A    Correct.  Well, I stand corrected.  It could have been

13  given to me as information by the surveillance units over the

14  radio that they observed something.  I can't remember who

15  called.  Another agent may have seen the driver exit and go

16  into a residence near looked like a little abandoned gas

17  station.

18  Q    I know it's 28 years ago.

19  A    Right.

20  Q    It was a lot cocaine, right?

21  A    Yes.

22  Q    So it kind of does stand out in your history as a customs

23  agent, correct?

24  A    Correct.

25  Q    And you recall being on surveillance at that point in

1    Chandler, Arizona?

2    A    Yes, I do.

3    Q    And so then you do recall that there was the tractor

4    trailer there, correct?

5    A    Correct.

6    Q    And that eventually that tractor trailer left Chandler,

7    is that correct?

8    A    It went through Chandler to the city of Queen Creek to a

9    house on Kenworthy.  That was the street where we ended up

10   doing the search warrant.

11   Q    And from Chandler, Arizona to Queen Creek, it's

12   approximately 15.6 miles according to Google, is that right?

13   A    Sounds right.

14   Q    And from Douglas, Arizona to where you first saw this

15   tractor trailer in Chandler, that's well over 200 miles, isn't

16   it?

17   A    Actually, visually it's just south of Phoenix on I 10.  I

18   believe it was close to the toll road exit which was just

19   south of Casa Grande, Arizona.

20   Q    So you had the surveillance of this tractor trailer

21   somewhere near Phoenix, Arizona?

22   A    Just south of Phoenix.

23   Q    Your own eyeballs?

24   A    Yes.

25   Q    And Phoenix to the border where this tunnel and

1  warehouse, that's got to be close to 150, 170 miles?

2  A    Well, it's 110 from Phoenix to Tucson and 117 from Tucson

3  to Douglas.  So it's about 200 miles.

4  Q    And you did not have surveillance on this tractor trailer

5  before Phoenix, correct?

6  A    No, sir.

7  Q    And so roughly the amount of miles from the tunnel that

8  you first picked up surveillance on the tractor trailer was

9  how much?

10  A    From Douglas to Phoenix?

11  Q    Yes.

12  A    It would be a total of 207 miles.

13  Q    Now, when I mentioned your direct examination you

14  indicated that the tunnel was not found by accident, correct?

15  A    No.

16  Q    As in many investigations customs, DEA, ATF, FBI, they

17  are aided by informants, correct?

18  A    Correct.

19  Q    And without saying anything informants said you were

20  given information, correct?

21  A    Yes, sir.

22  Q    And that information led you to an investigation

23  involving the Agua Prieta tunnel, is that correct?

24  A    Yes, sir.

25  Q    Actually you called in the department of defense as well,

1    is that correct?

2    A    DOD and DOE.

3    Q    What's DOE?

4    A    Department of energy.

5    Q    You called them in because they can help you, customs,

6    locate a tunnel, correct?

7    A    That's correct.

8    Q    And they actually did soundings in the area of Douglas,

9    correct?

10   A    Yes, they did.

11   Q    And they did these soundings to see if underneath there

12   was a tunnel, correct?

13   A    Correct.

14   Q    And they finally came up with I think three hits, but one

15   which was a true hit, correct?

16   A    That's correct.

17   Q    And based on your experience, 25 years in law

18   enforcement, you know that there's all different reasons for

19   confidential informants to come forward, correct?

20   A    Yes.

21   Q    Some may be personal, right?  Yes?

22   A    Yes.

23   Q    Some may be monetary, correct?

24   A    Correct.

25   Q    And this particular informant had a little of both,

1    correct?  Do you remember?

2    A    Actually, it was more the latter.  It was not monetary.

3    Q    Let's get to that monetary aspect.  He was paid?

4    A    Yes.

5    Q    He was paid the first time at least $500, is that

6    correct?

7    A    That's correct.

8    Q    And the second time at least I think $2,000, is that

9    correct?

10   A    That one I don't recall.

11   Q    Well, let me see if this refreshes your recollection.

12   I'm going to show you Defense Exhibit 5 for identification.

13          Showing you Defense Exhibit 5 for identification.

14   Please don't identify what the document is.  Actually, take a

15   look at the front page.  And then turn to the last page.

16          (Pause.)

17   A    This is not the same person.

18   Q    It's a different person?

19   A    Correct.

20   Q    Different informant on the same incident though, correct?

21   A    Correct.

22   Q    Paid $2,000?

23   A    Correct.

24   Q    Okay.  And again that's not unusual to pay informants

25   cash money for information, correct?

1    A    That is correct.

2    Q    That's an incentive for someone to come forward, correct?

3    A    In some cases.  In most cases, sometimes it just depends

4    on expenses.

5    Q    Now, the investigation doesn't stop when you locate the

6    tunnel, is that correct?

7    A    That's correct.

8    Q    Because you indicated that Mr. Camarena not only had the

9    dwelling on the Mexican side, he also recently purchased 601

10   First Street in Douglas, correct?

11   A    Recently.  Of course he bought the building I'm assuming

12   before they actually started constructing the tunnel.  But at

13   some point he did and I believe he had a partner that they

14   both went in on the purchase of that business, the Douglas

15   building that supplied the metal.

16   Q    And do you recall that you actually looked to see when

17   the building was purchased by Mr. Camarena, is that correct?

18   A    We had several agents assigned to this case, Phoenix

19   agents, Tucson agents and of course the Douglas agents.

20   Everybody had their assignments.  I don't recall me

21   specifically looking at the documents of the purchase or the

22   sale of the property.  I know that I ended up interviewing the

23   previous owner of the business and he basically spelled out

24   how it went about and how all the process that he went

25   through.

1    Q    That's important because we know now that there's a

2    tunnel discovered on May 11, 1990 and I'm sure law enforcement

3    wanted to have some idea how long that tunnel was up and

4    operational, correct?

5    A    Correct.

6    Q    And that's why you interviewed the person who sold the

7    property, the maintenance property, to Mr. Camarena, correct?

8    A    That was, yes.

9    Q    And that's why you and other agents obtained records to

10   verify when the property was sold, correct?

11   A    Again, somebody with that assignment did do that.

12   Q    In fact, what you discovered that the prior owner sold

13   the property on July 22, 1989 to Mr. Camarena, that's the

14   contract of sale, correct?

15   A    I couldn't tell you.  I don't remember.

16            MR. PURPURA:    Defendant's Exhibit 6.

17            MR. NARDOZZI:  Objection, your Honor.

18            THE COURT:  Overruled.  If he recalls, he recalls.

19   He's refreshing his recollection.

20   Q    Without saying what this document is, please take a look

21   at Defense Exhibit 6.  You're the author of that document, is

22   that correct?

23   A    Yes.

24   Q    So, now, after reviewing that document, does it sound

25   accurate to you that, in fact, the contract for the sale was

1    July 22, 1989, is that correct?

2    A     Yes.

3    Q     And from July 122, 1989 to May 11 is about ten months,

4    right?

5    A     I guess, yes.

6    Q     Do you have any idea how long it would take to build a

7    tunnel like that?

8    A     I have no idea.

9    Q     But based on what you saw, it was fairly sophisticated?

10   A     Yes, it was.

11   Q     Height about five foot four inches, width, three to four

12   feet, right?

13   A     Yes.

14   Q     Electrical conduit going through, yes?

15   A     Yes.

16   Q     And 50 yards, that's further than you to me, right?

17   A     Yes.

18   Q     Probably take some time to build it, wouldn't it?

19   A     Yes.  Again it depends on how many workers you have and

20   what equipment you used.

21   Q     And how close was this tunnel to customs?

22   A     To the port of entry or our office?

23   Q     To your office.

24   A     I believe our office was on -- between Third and Fourth

25   Streets.  So 601 would be on Sixth Street.

1  Q    I'm not familiar with Douglas.  Distance-wise, how many

2  blocks would that be?

3  A    Two.

4  Q    Two blocks?

5  A    Two blocks.

6  Q    While you were there in 1989, 1990, did you notice big

7  tractor trailers come up with backhoes to dig out the tunnel

8  or anything like that?

9  A    I was not there in 1989 and 1990.

10 Q    1990 was when the tunnel was discovered?

11 A    But I was not there during the construction of it to see

12 trucks.

13 Q    If customs is just two blocks away from where the tunnel

14 is, do you or to your knowledge did anyone from customs report

15 there must be some training activity because there's some big

16 trucks coming up carting dirt away?

17 A    We didn't learn -- again, we didn't learn about the

18 tunnel until March of 1990.  When we learned and got the

19 information and when we started the initial investigation we

20 later on actually installed cameras at our office in Douglas

21 to keep an eye on the building and that's how we caught on to

22 that rig leaving on May 9.

23 Q    I guess the simple answer is that you didn't notice any

24 unusual activity before May 11, 1990, is that correct?

25 A    I didn't, no.

1  Q    Let me just go to the --

2          THE COURT:  Mr. Purpura, I would like to take a

3  morning break, unless you are almost finished up.

4          MR. PURPURA:   I'm not quite finished.

5          THE COURT:  If you're five on ten minutes away take

6  it.

7          MR. PURPURA:   A little more than that and I could

8  narrow it down if we take a break now, sir.

9          THE COURT:  Let's take a morning break, ladies and

10 gentlemen.  We will reconvene here at ten to twelve by this

11 clock.  Please remember not to talk about the case among

12 yourselves or with anyone else.  Talk about anything else, if

13 you want to.

14          See you in a few minutes.

15          (Jury excused.)

16          THE COURT:  Okay, recess until 11:50.

17          (Recess taken.)

18          (In open court; jury not present.)

19          THE COURT:  Okay.  Let's have the jury, please.

20          (Jury present.)

21          THE COURT:  Please be seated.  Mr. Purpura, you may

22 continue.

23          MR. PURPURA:  Thank you, your Honor.

24 BY MR. PURPURA:

25 Q    Mr. Salazar, just a few more questions, if I may.  I'm

1    placing a document, which is Government's Exhibit 213-4, on

2    the overhead.  And you testified that these are photographs of

3    the kilo packaging, which was seized at 43352 Kenworthy, is

4    that correct, sir?

5    A    That's correct.

6    Q    And the photographs, in the normal course, would be to

7    take these photographs, the purpose is to validate or depict

8    what you are actually seeing at the moment, is that correct,

9    sir?

10   A    Yes, sir.  For inventory and chain of custody purposes.

11   Q    And again, this search was on May 11, 1990, correct?

12   A    Yes, sir.

13   Q    And so this photograph would have been taken

14   contemporaneous with that search, is that correct, sir?

15   A    Yes, sir.

16   Q    I'm now going to show you what is marked as Defendant's

17   Exhibit 8, without objection.  Actually, let me go back one

18   more time.  This is Government's Exhibit 213-4 and if you look

19   at the very bottom there's some red numbers.  Do you see those

20   numbers?  9596?

21   A    Yes, I do.

22   Q    Okay.  Now, I'm going to show you Defendant's Exhibit 8

23   and let's go to the bottom numbers again.

24             THE COURT:   Is this in evidence?

25             MR. PURPURA:   There's no objection by the

1    government.

2              THE COURT:    So you are moving it in without

3    objection?

4              MR. PURPURA:    I apologize, yes.

5              THE COURT:    It's admitted.

6              (So marked.)

7    Q    That is Defense Exhibit 8 and you see that number at the

8    bottom 9595, so sequentially this would be the photograph

9    before 96?  Does that sound about right?

10   A    It sounds right.

11   Q    I guess my question or my concern is this photograph has

12   a date and you see that date there?

13   A    Yes.

14   Q    Can you read that date out for me, please?

15   A    I can't make it out whether it's 14 or 18.

16   Q    Let's make it a little bigger.

17   A    It's May 14.

18   Q    May 14, 1990.  And I thought that you testified that the

19   seizure was May 11, 1990?

20   A    According to my reports, yes, May 11.

21   Q    Any idea why the date on the cocaine would be May 14,

22   1990?

23   A    No, I do not.  The bricks were labeled 826 to 59.  The

24   date was placed there.  I do recall that -- if I recall

25   correctly the cocaine was moved from the search warrant site

1  over to the Arizona DPS compound and later to be transferred

2  to DEA.  They are the ones that were basically the lab

3  technicians that took photographs and did the markings and all

4  that.  I cannot explain why it's 14.

5  Q    Just not being repetitive, so you indicated what proper

6  procedure would be when you take the photographs, you want to

7  take them at the place where the cocaine is seized?

8  A    Correct.

9  Q    To document it?

10 A    Yes.

11 Q    Leaving Defendant's Exhibit 8 up there.  Obviously we see

12 some markings on the cocaine, correct?

13 A    Yes, sir.

14 Q    And the individual packages, those are the kilo packages

15 of the cocaine, is that correct, sir?

16 A    That's correct.

17 Q    And did you document or do you know if anyone documented

18 the markings on the packages?

19 A    I'm sure there was reports describing the packages,

20 describing the writings on them, but we assumed, again this is

21 an assumption also on my part, that they were designated for

22 certain people at the final destination or they belonged to

23 certain individuals at the point of origin.

24 Q    You are one answer before my question.  Good.  The

25 question would be:  The markings are there, based on your

1   experience, probably to designate who the owner or the

2   investor in the cocaine is, especially in a large load, is

3   that correct, sir?

4   A    That's correct.

5   Q    And so we see markings here as OSOP, correct?

6   A    Correct.

7   Q    And we see markings here as MR in big block letters,

8   correct?

9   A    Yes.

10  Q    We see also Yamaha, correct?

11  A    Correct.

12  Q    At least based on my review, those are the only markings

13  that I saw.  Do you have any other markings that you recall?

14  A    From what I see on this photograph, the photos here,

15  that's about right.

16  Q    And what I am interested in, if you have any recollection

17  whatsoever or any report whatsoever of a marking which is a

18  picture or a diagram of a fish?

19  A    In one of the photos when the U.S. Attorney placed them

20  on the screen, I thought I saw some one or a picture or a

21  diagram of not a fish, but a scorpion and now that I saw the

22  picture I said, yeah, I remember that, because I don't want to

23  muddy things up, but I seen that on other cases of other

24  cocaine.

25  Q    The scorpion, correct?

1    A    Correct.

2    Q    What I am asking you in this particular case did you see

3    a picture of a fish as a designation on any of the cocaine

4    here?

5    A    I don't recall.

6    Q    Did you see a picture of a saw, like a regular wood saw,

7    on any of the packages, to your recollection, in this

8    particular case?

9    A    I don't recall that.

10   Q    And finally, probably the easiest of all, did you see

11   triple eights, 888 on any of the packages which are connected

12   to this particular seizure?

13   A    I don't recall seeing that.

14   Q    Thank you.

15        Now, back in 1990 -- seems like a long time ago --

16   were you aware, was there a program either by customs and/or

17   DEA which recorded the impressions or the markings or logos of

18   cocaine seizures such as this?

19        MR. NARDOZZI:  Objection, relevance.

20        THE COURT:  No.  I see the relevance.  Overruled.

21   A    Actually, I'm sure there was intelligence groups that

22   would gather intelligence of any kind of seizures anywhere.

23   Q    And the importance of that will be -- I would assume --

24   to see if let's say this Yamaha comes up in another seizure

25   somewhere else, correct?

1   A    That's correct.

2   Q    That's kind of a way of tracking perhaps who the investor

3   or the merchant is, correct?

4   A    Correct.  If, also, that same investor changes his

5   markings later on.

6   Q    Which he can always do?

7   A    They can always do.

8   Q    Are you familiar with what's called Project Fountain

9   Head?

10  A    Fountain Head?

11  Q    Fountain Head.  F O U N T A I N H E A D.

12  A    No, sir.

13  Q    No?

14  A    No.

15       MR. PURPURA:  No further questions.  Thank you very

16  much.  Enjoy your visit.

17       THE COURT:  Any redirect?

18       MR. NARDOZZI:  A few questions, your Honor.

19       (Continued on next page.)

20

21

22

23

24

25

1  REDIRECT EXAMINATION

2  BY MR. NARDOZZI:

3  Q    Mr. Salazar, just a couple of follow-up questions for

4  you, sir.

5  A    Yes, sir.

6  Q    Looking again at what has been marked as Defense Exhibit

7  8, did you take that photograph?

8  A    Of the cocaine packages, no, I did not.

9  Q    Were you responsible for drawing up this little sign?

10  A    No, I was not.

11  Q    Very good.  Mr. Purpura asked you about the tunnel at the

12  time that it was constructed.  Do you remember that?

13  A    Yes.

14  Q    Are you personally aware of the date that the

15  construction began on the tunnel?

16  A    No, I'm not.

17  Q    Are you personally aware of the date that construction

18  concluded on the tunnel?  --

19          MR. PURPURA:  Objection.  Respectfully, Rule 611(c),

20  I know it's redirect, but it doesn't allow leading.

21          THE COURT:  A little bit.  It's okay.  Go ahead.

22  A    The question again, please.

23  Q    Sure.  Are you personally aware of the date that

24  construction concluded on that tunnel?

25  A    No, I am not.

1    Q      Regardless, moving along to the intentions of your

2    informant, did you recover about a ton of cocaine in the

3    tunnel in May of 1990?

4    A      Yes, we did.

5    Q      That's what I thought.

6                   MR. NARDOZZI:   No more questions.

7                   MR. PURPURA:   Nothing.   Thank you.

8                   THE COURT:   You may step down.   Thank you very much.

9                   (Witness steps down.)

10                   THE COURT:   The Government may call its next

11   witness.

12                   MR. NARDOZZI:   The Government calls Robert Arnold.

13                   THE COURT:   Mr. Purpura, going forward, I give a

14   little leeway on redirect when I think the answers are fairly

15   obvious just to save time.

16                   MR. PURPURA:   Thank you, Your Honor.

17                   THE COURTROOM DEPUTY:   Sir, you may come forward.

18   Please raise your right hand.

19                   (Witness sworn.)

20                   THE COURTROOM DEPUTY:   Be seated.   State and spell

21   your name for the record.

22                   THE WITNESS:   My name is Robert C. Arnold.   Spelled

23   A-R-N-O-L-D.

24                   THE COURT:   Please inquire.

25                   MR. NARDOZZI:   Thank you, Your Honor.

1    ROBERT C. ARNOLD,

2         called by the Government, having been duly

3         sworn, was examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MR. NARDOZZI:

6    Q    Good afternoon, Mr. Arnold.  How are you today?

7    A    I'm fine.  Thank you.

8    Q    Mr. Arnold, because I met you before, I want to remind

9    you to talk slowly because the court reporter is going to take

10   everything down.  Okay?

11   A    Okay.

12   Q    All right.  Mr. Arnold, I want to direct you to 1990.

13   Who were you working for at that time?

14   A    At that time I was working for the Drug Enforcement

15   Administration.

16   Q    In what capacity?

17   A    Drug chemist.

18   Q    How long had you been working for the Drug Enforcement

19   Administration at that time?

20   A    At that time, probably 20 years.

21   Q    When did you start working for the Drug Enforcement

22   Administration?

23   A    Drug Enforcement, which was organized in 1975, and that's

24   when I started.  I was working prior to that.

25   Q    And where were you working prior to that?

1   A      It was the Bureau of Narcotics and Dangerous Drugs for

2   two or three years.

3   Q      And that's what existed before the DEA; correct?

4   A      Correct.

5   Q      What was your job at the Bureau and then at the DEA?

6   A      As a forensic chemist.

7   Q      How long did you work for DEA in total?

8   A      Almost 28 years.

9   Q      Are you retired now?

10  A      I am retired.

11  Q      When did you retire?

12  A      1987.

13  Q      Okay.  Tell the ladies and gentlemen of the jury what

14  your duties were as a forensic chemist.  What's your job?

15  A      As a forensic chemist, essentially I analyze evidence

16  that was for controlled substances that were brought in by law

17  enforcement.  And, if needed, I would testify in a court of

18  law like today.

19  Q      Okay.  And can you explain to the ladies and gentlemen of

20  the jury as a forensic chemist how many different pieces of

21  evidence do you think you've analyzed yourself over the course

22  of your career?

23  A      Cases, probably it was in excess of maybe 10,000.

24  Exhibits, probably in the 20- to 30,000 range.

25  Q      Did you receive any training from DEA to become a

1    forensic chemist?

2    A    I was -- we were trained by the Food and Drug

3    Administration.  I had six months' training prior to joining

4    the Bureau of Narcotics and Dangerous Drugs.  And during the

5    time I was in the Food and Drug Administration, I was at

6    Georgetown University for two semesters.

7    Q    Could you describe that nature of that training to ladies

8    and gentlemen of the jury?

9    A    The Food and Drug Administration was in foods, drugs,

10   pesticides, colors.  At Georgetown University, it was advanced

11   instrumentation.

12   Q    What did you learn in those trainings?

13   A    Essentially how to analyze, you know, about substances

14   that were seized by agencies, federal, state, local.

15   Q    Were there any specific methods that you were taught

16   during the course of those trainings?

17   A    At the Food and Drug Administration, the -- it was the

18   Association of Analytical Chemists was the manual that was

19   used.

20        With the Bureau of Narcotics and Dangerous Drugs, it

21   was essentially you had to establish your own methods of

22   identification because there was none really at that time.

23   Q    Okay.  Have you ever taught or conducted any classes or

24   trainings related to the field that you practice, forensic

25   chemistry?

1  A    During my time in the Bureau of Narcotics, I had trained

2  chemists in probably three different categories, I can tell

3  you that.  I trained military personnel throughout most of the

4  country, Air Force military, Naval, and also Marines.

5           And when I was in the laboratory, I would train

6  future chemists, future forensic chemists.  After that I ended

7  up at Quantico, Virginia as well training larger groups of

8  chemists, probably 20 to 24 chemists at a time.

9  Q    I want to discuss some of your academic training as well.

10 Can you tell the ladies and gentleman of the jury where you

11 went to college?

12 A    I went to a junior college called Erie County Technical

13 Institute for an associate's degree in industrial chemistry.

14 I went to the University of Buffalo and achieved a Bachelor's

15 degree in chemistry.

16          Do you want me to go further?

17 Q    I do.

18 A    Also, with Georgetown University.  I worked in University

19 of Maryland for more advanced training in chemistry.  Also,

20 Brooklyn Poly Technical Institute, University of Georgia,

21 University of Akron, probably San Diego State University.  And

22 I think that probably is about it.

23 Q    Okay.  Have you ever been qualified as an expert prior to

24 testifying here in court today in the field of forensic

25 chemistry?

1   A     Yes, I have.

2   Q     Approximately how many times?

3   A     I would say hundreds of times, probably at least 100

4   times, more likely 200.

5   Q     Can you tell the ladies and gentlemen of the jury some of

6   the places where you have been qualified as an expert in the

7   field of forensics?

8   A     Southern District of New York, Manhattan, the place,

9   also, Massachusetts, Washington, D.C., Virginia, West

10  Virginia, Maryland, Florida, Puerto Rico, Mississippi,

11  Alabama, Georgia.  Did I say Louisiana?

12            And Tennessee, Arkansas, California, Arizona, New

13  Mexico, Washington.  Quite a few states.

14  Q     I should have asked you where you have not been

15  qualified.

16            Sir, other than working in the lab for the DEA, have

17  you ever worked for any other laboratories?

18  A     Prior to my work with the Government, I worked seven

19  years outside the Government independently.

20  Q     Okay.  What type of responsibilities did you have there?

21  A     I worked in Niagra Falls for six months with a place

22  called Hooker Electric Chemical, the largest producer of

23  chlorine in the world.  I was working at a research

24  laboratory.

25            Later on, I worked at American Agricultural Chemical

1    Company as a lab technician, as a chemist, also as a

2    supervisory chemist in Buffalo and also Lakeland, Florida.

3    Q    Okay.

4            MR. NARDOZZI:  Your Honor, at this time I would ask

5    to qualify Mr. Arnold as an expert in the field of forensic

6    chemistry.

7            MR. PURPURA:  Absolutely agree, Your Honor.

8            THE COURT:  He may testify as to his opinions.

9            MR. NARDOZZI:  Thank you, Your Honor.

10   Q    Now, Mr. Arnold, I want to direct your attention to the

11   date of July 18, 1990.  Were you working as a forensic chemist

12   for DEA at that time?

13   A    Yes, I was.

14   Q    And where were you working for DEA at that time?

15   A    Southwest Lab in San Diego.

16   Q    What was your job title on that date?

17   A    Forensic chemist.

18   Q    Did your job duties at that time entail the preparation

19   of written documentation for items submitted for testing to

20   the laboratory?

21   A    If you are referring to an analytical report, yes, I did.

22   Q    Under what circumstances were you responsible for

23   preparing analytical reports?

24   A    As evidence is brought into the laboratory, you're

25   starting your analysis, you would start recording your

1  information on this analytical sheet.

2  Q    And if you were submitted items for testing on that date,

3  July 18, 1990, would you have prepared an analytical report?

4  A    Oh, yes.

5  Q    Okay.

6           MR. NARDOZZI:  Your Honor, I'd like to mark for

7  identification Government Exhibit 213-31 just for

8  identification at this time and just show it to the witness,

9  please.

10          THE COURT:  All right.

11 Q    Mr. Arnold, did you ever see the item that I have placed

12 on the screen?

13 A    It looks like a DEA 7.

14 Q    Okay.

15          MR. NARDOZZI:  What might be easier, the screen kind

16 of cuts off the document, can I walk up a copy to the witness?

17          THE COURT:  If you'd like.

18          MR. NARDOZZI:  Thank you.

19 Q    All right.  Mr. Arnold, I have handed you a copy now of

20 Government Exhibit 213-31.  Again, can you tell the ladies and

21 gentlemen of the jury what this is?

22 A    This is a facsimile of the DEA-7.

23 Q    Can you tell the ladies and gentlemen of the jury are you

24 familiar with this document?

25 A    I am.

1  Q     How are you familiar with this document?

2  A     I'm familiar with a number of different items.  One at

3  the top is a file number.  It's MN900060 and that usually

4  refers to a case as evidence comes into a laboratory.  And

5  also familiar with the fact that under laboratory analysis,

6  which is in the bottom portion, right in this area right here,

7  is kind of a synopsis of the analysis that I did in the

8  laboratory.

9  Q     Looking down at the bottom left corner of that document,

10 is that your signature?

11 A     Yes, it is.

12 Q     And is that your signature above your printed name?

13 A     Yes, also the date that I signed it.

14 Q     What date was that?

15 A     It was 8/21/1990.

16 Q     Okay.  Did you prepare this document or sign this

17 document?

18 A     I signed the document, but I did not prepare the

19 document.

20 Q     Okay.  Was this document made at or near the time that

21 you reviewed submitted evidence?

22 A     Probably within a day or two after I completed an

23 analysis.

24 Q     Would it have been your regular practice to receive a

25 document like this as DEA-7 and signoff on the information

1  contained therein?

2  A    Right.  The information I would sign would be in this

3  area right up here.

4  Q    Okay.

5  A    It's under laboratory analysis comparison report.

6  Q    And we will get to that in a moment.  This document is a

7  document that you would have prepared or would have had input

8  on and maintained in the regular course of regularly conducted

9  business and also had access to; is that correct?

10 A    Yes.

11         MR. NARDOZZI:  Your Honor, at this time I would like

12 to move Government Exhibit 213-31 into evidence if there is no

13 objection.

14         MR. PURPURA:  No objection.

15         THE COURT:  Received.

16         (Government's Exhibit 213-31 received in evidence.)

17 Q    Mr. Arnold, you made some markings.  I am going to clear

18 the screen, okay.  I want to discuss this document with you

19 for a moment.  You indicated a portion when we were speaking

20 before this item was published to the jury that you would have

21 prepared in this DEA-7; is that correct?

22 A    Correct.

23 Q    Can you circle, using your finger, that portion for the

24 jury?

25 A    It doesn't seem to work.

1          MR. NARDOZZI:  If I may, Your Honor, can I...

2    A    Yes.

3    Q    I've circled a portion of this document in, it looks like

4    in blue.  Is that the portion of this document that you would

5    have prepared?

6    A    That's correct.

7    Q    Okay.

8    A    Well, that's essentially taken from my analysis report

9    and then typed on to this DEA-7.

10   Q    Okay.  Did you have an opportunity to review items that

11   were submitted to the lab that are reflected in this portion

12   of the document?

13   A    Yes, I did.

14   Q    What did you review?

15   A    I received part of the gross weight 2,263.74 grams.  And

16   this essentially involved 926 packages that they were in

17   boxes.

18   Q    Okay.  And you performed an analysis on these items?

19   A    Yes, I did.

20   Q    Okay.  So let's walk through for the ladies and gentlemen

21   of the jury how you went about performing analysis on the

22   items that were submitted to you.

23   A    Okay.  My first step is to weigh the evidence.  There was

24   quite a few boxes and quite a few items.  The evidence is

25   brought in weighing a certain amount.  We checked the weight

1    that the agents brought in, compared it with the weights that

2    we have and then we go further on.

3           The next step would be to take out the objects and

4    weigh them in the metric system.  In this case, the metric

5    system was 924.4 kilograms.  Each of the items I have was 926

6    items.  The first thing I would do is take pictures of all of

7    them and then I would start taking each item and open them up,

8    take a little slit and take a portion out of each of the

9    items, and put them into a spot plate, which would probably be

10   in this case, there are 12 -- it's a spot plate about this big

11   and about that thick and had depressions in it.  There's 12

12   little depressions.  In each depression, you would put a small

13   amount of the substance.  In this case, it would be cocaine.

14   And I would do this for all 926 of them and then I would add a

15   color test.  It's called a presumptive test called a cobalt

16   thiocyanate and it gives a blue color.  It's like turning on a

17   Christmas tree.  All these -- you know, as I put the drops in,

18   all these would turn blue.  And this is indicative of that

19   there may be cocaine present.

20   Q    And can you explain to the ladies and gentleman of the

21   jury how the color test actually works, what's happening when

22   the --

23   A    It's essentially a reaction between the thiocyanate with

24   the nitrogen that's within the cocaine molecule --

25   Q    And what does --

1    A      -- that gives off a color reaction.

2    Q      What does that blue color indicate?

3    A      It indicates to me that cocaine could be present.

4    Q      And you did this with each of the 926?

5    A      926 of them.

6    Q      Did you do any conduct any additional testing to the

7    drugs that were submitted?

8    A      Well, the next step, you have 926, you know, packages, so

9    you want to reduce it down to a smaller amount.  So I take

10   anywhere from 20 to 30 of the different packages.  We either

11   call them kilos or bricks.  And what I would do is I would

12   remove the packaging from them so I could come up with a net

13   weight.  The net weight I came up with is 929.4 kilograms,

14   which is roughly about 430 pounds, and then I would perform a

15   couple of other tests on it.  These are called microchemical

16   crystal tests.

17   Q      How does that test work?

18   A      Pardon?

19   Q      How does that test work?

20   A      Essentially I use two of them, one is called platinum

21   chloride and the other one is a gold chloride.

22          What you do is, you have a transparent slide, a very

23   thin slide in which you put the substance on the slide, add

24   the re-agent to it, platinum chloride or gold chloride, and

25   then you look at it under a microscope.  Now, this was done

1  prior to a lot of the testing that the Bureau of Narcotics

2  used to use it as a specific identification for cocaine.

3          So I would take the 20 or 30 different packages that

4  I have and try to reinforce the fact that since I presumed

5  that the other 926 were cocaine that these were also cocaine

6  and these tests showed it.

7  Q    Okay.  And in the first set of tests you did with the 926

8  packages, what are you testing for basically?

9  A    Cocaine.

10 Q    When you do the second test with the smaller amount, what

11 are you testing for?

12 A    Cocaine.

13 Q    What are you looking for specifically?  Are you grading

14 the cocaine in any way?

15 A    I'm not sure how to answer that question.

16 Q    Let me rephrase it.  I asked it in a confusing way.

17         Are you looking for the purity of the cocaine?

18 A    Oh, the purity would be done a little bit later.  I still

19 have to go through a number of steps before I go through the

20 purity.

21 Q    Why don't you take us through the steps?

22 A    Okay.  The next step, I got the larger 926 kilos and I'm

23 down to about 20 or 30.  Each one of these now I've removed

24 from the packaging and I start forming a smaller composite

25 now.  Now, I'm looking to reduce this to probably 300 grams or

1    so, which is probably three-quarters of a pound, and then we

2    go through a process developed by Analytical Association of

3    Chemists called cone and quartering.  The cocaine now is on a

4    sheet of paper and I take it, mix it very well and then I

5    start coning it using with a flat ruler or something, and then

6    I will take one corner of the cocaine and I want to get down

7    to about 20 grams, 25 grams, what we call a composite.

8           So if I have -- I'll go through the whole process

9    again, form coning and quartering, and I'll bring it down to

10   20 or 25 grams.  I will put this in a mortar and pestle and

11   I'll grind it down so it's completely uniformed.  At this

12   time, the cocaine will take on a different color.  The color

13   I've had from the bricks was kind of a very flakey,

14   snowflake-type color.  And when it's ground up, it becomes

15   white.

16          From this, now is my composite.  From this point I

17   can do a quantitative identification and specific

18   identification for cocaine.

19   Q    Okay.  And what did you do in this instance?

20   A    For the quantitation, essentially I found that the

21   cocaine was at 95 percent, which is, you know, nearly pure

22   cocaine.  The remainder could be just moisture or whatever.

23   Q    Okay.  I'm just going to indicate something on the

24   document here:  You noted the term 95 percent.  I put a little

25   white circle around it.  Can you tell us is that where you are

1    getting that figure from?

2    A    Yes.   That was from my analysis worksheet.

3    Q    Okay.   I'm going to use our white circle again and circle

4    another date.   Can you read that date for the jury?

5    A    It looks like July 18, '90.

6    Q    What does that date indicate to you as it relates to this

7    form?

8    A    I can't really read what that means except I think what

9    it is it's the date that it was brought into the laboratory.

10   Q    Okay.   I am going to circle another date too.   I think I

11   just blocked out your -- let me try that again.   What's that

12   date?

13   A    That's the date that I signed it after the analysis, you

14   know, report was completed, the entire portion of that.

15   That's the date that I sign and review that, you know, the

16   particular information that was on the report.

17   Q    That date is August 21, 1990?

18   A    That's correct.

19   Q    That's more than a month after July 18, 1990?

20   A    I couldn't hear you.

21   Q    That's more than a month after July 18, 1990?

22   A    Right.

23   Q    So all this testing, does it happen in one day?

24   A    Correct.   Well, not exactly, because I -- it sounds like

25   it occurred in one day, but you're looking at nearly 1,000

1    packages, and with these packages I have to, you know, I did

2    the initial analysis and then I've got to repackage them,

3    reseal them, take pictures of them, weigh them and, you know,

4    it's not a one-day process.  It could take as many as four or

5    five days.

6    Q    Right.  Now, when items are submitted to the lab and they

7    are tested over multiple days, how are those items stored?

8    A    We have a special room that I have a key to and I lock

9    it.  So if it's going to be in there more than one day, it

10   would be locked in there.  The key would be under my control.

11   No one can get into that room.

12   Q    No one else has access to that room during the course of

13   testing?

14   A    Only the lab director.

15   Q    And that was you in this case?

16   A    No.  That's my boss, or myself, I would have the key.

17   Q    In this instance, did you have the key to that room?

18   A    Yes.

19   Q    Okay.

20        When drugs are submitted to the laboratory, are you

21   instructed as to where those drugs were recovered?

22   A    I'm not sure of that question.

23   Q    I'm sorry.  When you receive a submission to the

24   laboratory, does the submitting agent tell you in anyway or

25   document for you in any way where those drugs were recovered

1    from?

2    A      Ordinarily, no.

3    Q      On this document, is it reflected where the drugs were

4    recovered from that you analyzed?

5    A      I haven't read all of it, but I assume it has been, yes.

6    Q      Can you take a moment to take a look at the document and

7    tell us where the drugs that we're talking here were recovered

8    from?

9    A      Well, initially I would've look at the top part, the

10   MN900060 indicates it came from Arizona.  That would be the

11   only thing I would be interested in.

12   Q      And in that narrative portion, does it indicate

13   specifically where in Arizona the drugs were recovered from?

14          I will circle it for you.

15   A      It says Queen Creek, Arizona.

16   Q      Just a couple of follow-up questions just to make sure I

17   have covered everything.  Can you tell us again what was the

18   date of your retirement?

19   A      It was about 1997, October of 1997.

20   Q      I apologize, sir, if you already answered this, you might

21   have, but what was the net weight of the drugs that were

22   recovered on that date?

23   A      The net weight was 929.4 kilograms.

24   Q      For the non-metric folks like myself, how many pounds is

25   that?

1    A       Approximately 430 pounds.

2               MR. NARDOZZI:  I have nothing further, thank you.

3               THE COURT:  Any cross?  Defense counsel, any cross?

4               MR. PURPURA:  Yes, I apologize.  Thank you, Judge.

5    CROSS EXAMINATION

6    BY MR. PURPURA:

7    Q       Good afternoon, Mr. Arnold.

8    A       Good morning.

9    Q       Is it morning?

10              Not to quibble with your math, a kilo is 2.2 pounds;

11   correct?

12   A       Correct.

13   Q       So if there's 929 kilos --

14   A       Correct.

15   Q       -- there would be how many pounds?

16   A       Are you looking for an exact number?

17   Q       No, ballpark.

18   A       About 420, 430.

19   Q       That's okay.  Anyway, we do know that a kilo is 2.2

20   pounds; correct?

21   A       Correct.

22   Q       To find out the answer of how many pounds, which was

23   asked by Mr. Nardozzi, you would simply multiply 929 times

24   2.2; correct?

25   A       Yes.

1    Q    Thanks.

2         This form that is -- is it on the screen still?

3         THE COURTROOM DEPUTY:   Yes.

4         MR. PURPURA:   If we can we put up Government Exhibit

5    213-31 and publish it just general.

6    Q    This is what's called a DEA-7; correct?

7    A    Yes.

8    Q    And you used that number DEA-7 and basically all DEA-7s

9    would be like this, the report of drug analysis; correct, sir?

10   A    Yes.

11   Q    Okay.  And are you familiar with what a DEA-6 is?

12   A    No.

13   Q    For your purposes, this is your world with the DEA;

14   correct?

15   A    Right.

16   Q    Now, cocaine, you must have countless times analyzed

17   cocaine; is that fair to say?

18   A    Right.

19   Q    As such, you are, I assume, based on all your education,

20   you are aware of the cocaine producing countries; is that

21   correct?

22   A    Some of them, yes.

23   Q    Columbia would be one; correct?

24   A    Yes.

25   Q    Peru would be another; correct?

1    A    Yes.

2    Q    Bolivia would be another; correct?

3    A    Probably.  Yes.

4    Q    Other than those, are you aware any other cocaine

5    producing countries?

6    A    Major manufacturers.

7    Q    Major manufacturers, I should call it.

8    A    Possibly Ecuador.

9    Q    Okay.  And would you agree or not that within those

10   countries, based on certain elevations in different regions,

11   the cocaine processing could be different; correct?  Within

12   the country itself, like within Columbia?

13   A    What do you mean different?  You mean different

14   varieties?

15   Q    That was an inartful question.

16         When you take the cocoa leaf --

17   A    Yes.

18   Q    -- and you try to extract the cocoa from that, you must

19   use a -- there's a processing method that is done; is that

20   correct?

21   A    Yes.

22   Q    And in different regions and different countries use

23   different processing methods, is that fair to say?  Different

24   solvents are used; correct?

25   A    I would agree with that.

1    Q      Okay.  Now, are you familiar, when you were working with

2    the DEA, with the Cocaine Signature Program?

3    A      Somewhat, yes.

4    Q      And with that, the DEA would attempt, especially perhaps

5    on a large shipment like this, to look into, they could look

6    into in greater detail than what you did?

7    A      Correct.

8    Q      And in greater detail, they would attempt to find perhaps

9    the processing methodology for those various kilos of cocaine;

10   correct?

11   A      Probably and more.

12   Q      And by doing that, that is one way to identify perhaps

13   whether the cocaine came from Bolivia, from Columbia, from

14   Peru or from Ecuador; correct?

15   A      Theoretically.

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

1  BY MR. PURPURA:   (Continuing)

2  Q    Are you aware, was that ever done with the cocaine which

3  was given to you for analysis in this case?

4  A    I'm not sure.  I didn't quite hear you.

5  Q    I apologize.

6        Other than the testing which you did, are you aware

7  of any other testing on the cocaine such that we just went

8  through?

9  A    Yes, I did do other tests.

10  Q    What other tests did you do?

11  A    Well, for quantification, I did gas liquid

12  chromatography, infrared spectroscopy and mass spec.

13  Q    I apologize.  That just indicates that it's cocaine,

14  correct?

15  A    Yes.

16  Q    What I'm asking you is were there any other more detailed

17  tests to determine the methodology of the production of that

18  particular cocaine, like we just talked about, like what type

19  of solvents were used, kerosene, gasoline, diesel?

20  A    I would say that -- that's a multi-faceted question.

21  Q    It is.

22  A    As far as solvents go, probably the assess wouldn't, but

23  as far as other components that are within the drug, I may be

24  able to pick up some because what we're looking at is

25  95 percent purity.  My experience is I can smell solvent a lot

1  of times such as acetone or maybe a petroleum ether.

2  Q    If we can stop right there.  The acetone or the ether,

3  that is a solvent which certain areas use and when they take

4  the coca, coca out of the leaf, correct?

5  A    I'm not sure I'm saying certain areas but I'm saying they

6  could be used but they could be used in all those areas.

7  Q    Now, was that done in this case is I guess my final

8  question to your knowledge?

9  A    I don't have any knowledge, no.

10 Q    Thank you.  I have no further questions.  Thank you very

11 much for coming.

12            THE COURT:  All right.  Any redirect?

13            MR. NARDOZZI:  No redirect, Your Honor.

14            THE COURT:  You may step down.  Thank you very much.

15            (Witness excused.)

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25

1          THE COURT:   The government may call its next
2     witness.
3          MS. PARLOVECCHIO:   Your Honor, the government
4     anticipates that its next witness would be rather lengthy so
5     if the Court wants to take a lunch break at this time to swear
6     in the interpreters.
7          THE COURT:   Okay.   We will recess for lunch until
8     say 1:35.   All right.   Remember not to talk about the case,
9     ladies and gentlemen.   Have a good lunch.
10         (Jury exits.)
11         THE COURT:   Okay.   Recess.   1:35.
12         (Luncheon recess.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1                          AFTERNOON SESSION

2              (In open court; outside the presence of the jury.)

3              THE COURT:  All right.  Let's have the jury, please.

4              (Jury enters.)

5              THE COURT:  All right.  Everyone be seated.  I hope

6      you had a good lunch, ladies and gentlemen.

7              We will proceed with the government's next witness.

8              MS. PARLOVECCHIO:  The government calls Jesus

9      Zambada Garcia.

10             THE CLERK:  Please stand and raise your right hand.

11             (The witness is duly sworn/affirmed by clerk through

12     the Interpreter.)

13             THE CLERK:  You may be seated.

14             THE COURT:  And I will note for the record that the

15     witness is being assisted by interpreters who have been

16     previously sworn to interpret accurately.

17             All right.  You may inquire.

18             (Continued on next page.)

19

20

21

22

23

24

25

1    JESUS ZAMBADA GARCIA   ,

2          called as a witness, having been first duly sworn,  was

3          examined and testified (through the interpreters) as

4          follows:

5    DIRECT EXAMINATION

6    BY MS. PARLOVECCHIO:

7    Q    Can you please state your name for the record.

8    A    Jesus Zambada Garcia.

9    Q    Good afternoon, Mr. Zambada.

10   A    Good afternoon.

11   Q    How old are you?

12   A    Fifty-seven years old.

13   Q    What nationality are you?

14   A    Mexican.

15   Q    How far have you gone in school?

16   A    I finished college with a degree in accounting.

17   Q    Have you ever heard of something called Sinaloa?

18   A    Yes.

19   Q    What is it?

20   A    Well, Sinaloa is a state in the Mexican Republic where I

21   was born.

22   Q    Where were you raised?

23   A    In Sinaloa.

24   Q    Have you used the term "Sinaloa" in connection to any

25   other name?

1   A    Yes.

2   Q    What name?

3   A    Sinaloa Cartel.

4   Q    Did you have a relationship with the Sinaloa Cartel?

5   A    Yes.

6   Q    What relationship did you have?

7   A    I was a leader in the Sinaloa Cartel.

8   Q    When did you become a part of the Sinaloa Cartel?

9   A    In the year 1987.

10  Q    How did you become a part of the Sinaloa Cartel?

11  A    I established an accounting system for collecting money

12  from clients, cocaine clients in the United States.

13  Q    Who did you do that for?

14  A    For the organization of my brother, Ismael Zambada

15  Garcia, El Mayo.

16  Q    And did Ismael Zambada Garcia have a nickname?

17  A    Yes.

18  Q    What is it?

19  A    El Mayo.

20  Q    Who is your brother, El Mayo Zambada?

21  A    He's one of the main leaders of the Sinaloa Cartel.  He's

22  a very powerful drug trafficker in Mexico.

23  Q    Now, you testified that you first got involved with the

24  Sinaloa Cartel when you established an accounting system for

25  your brother, Mayo Zambada.  What types of accounts are you

1    referring to?

2    A    It was an accounting system for clients, for collecting

3    from clients who purchased cocaine in the United States.

4    Q    When did you stop working with the Sinaloa Cartel?

5    A    In the year 2008, October 20th.

6    Q    What happened to you on that day?

7    A    I was arrested.

8    Q    And just generally, what were you arrested for?

9    A    For belonging to the Sinaloa Cartel.

10   Q    And for what activity with the Sinaloa Cartel?

11   A    For drug trafficking operations.

12   Q    Now, at the time of your arrest in October 2008, were

13   there any other principal leaders of the Sinaloa Cartel

14   besides your brother?

15   A    Yes.

16   Q    Who else?

17   A    Well, the main one next to him was Joaquin Guzman Loera,

18   El Chapo.

19   Q    Do you see Joaquin Guzman Loera, El Chapo, in the

20   courtroom today?

21   A    Yes.

22   Q    Can you please identify that person by some article of

23   clothing he's wearing?

24            MR. PURPURA:   We will stipulate he identified

25   Joaquin.

1          THE COURT:   All right.   The record so reflects.

2   Q     What is the name by which you refer to the defendant?

3   A     Compa Chapo.

4   Q     What are some of the other names used to refer to him?

5   A     Joaquin.   El Rapido.

6   Q     And why the nickname Chapo?

7   A     Well, this name is used for people who are kind of a

8   normal height or a less than normal height in Mexico.

9   Q     Just generally, how do you know Chapo Guzman?

10  A     As one of the most powerful drug traffickers that there

11  has been in Mexico.

12  Q     What, if any, relationship did Chapo Guzman have with

13  your brother Mayo Zambada?

14  A     They were partners.

15  Q     How do you know that your brother Mayo Zambada and Chapo

16  Guzman were partners?

17  A     My brother told me about it and I used to work for my

18  brother Mayo and for Chapo as well.

19  Q     And when did your brother Mayo Zambada tell you about his

20  partnership with Chapo Guzman?

21  A     Well, he told me that they were going to work, agreed to

22  work together and they were going to establish a partnership,

23  half and half.

24          MR. PURPURA:   Judge, I respectfully object until we

25  get some sort -- I know it's a long time in the indictment,

1    but for relevance, some sort of time reference here.

2            THE COURT:   Do you mind asking him some questions

3    about time?

4            MS. PARLOVECCHIO:   Yes, Your Honor.

5    Q     From approximately 2001 until your arrest in

6    October 2008, what was your understanding of the partnership

7    between your brother Mayo Zambada and Chapo Guzman?

8    A     It was a working relationship, a partnership for the

9    importation of cocaine, drug trafficking.

10   Q     Now, briefly, can you tell the jury the circumstances

11   under which you first Chapo Guzman?

12   A     Well, the first time that I saw him, I was with my

13   brother, my brother and I were helping him escape from an

14   operation held by the military special forces because they

15   were about to capture him.

16   Q     And what was your understanding of why the military was

17   pursuing Chapo Guzman at that time?

18   A     He had just escaped from the prison at Puente Grande some

19   days before and they were about to recapture him.

20   Q     Now, what did you do to help Chapo Guzman escape?

21   A     Well, I found for my brother a place where a helicopter

22   can land to get him out of where he was because the military

23   forces were about to capture him.

24   Q     And just to be clear, to get who out of where they were?

25   A     Mr. Chapo Guzman.   We were rescuing him from a place

1   where he was during his escape because the military were about

2   to recapture him.

3   Q    And we'll talk more about that later but right now, I

4   want to direct your attention to the Sinaloa Cartel itself.

5            You testified that you were a member --

6            THE COURT:  Why don't you wait and let her translate

7   that.

8            MS. PARLOVECCHIO:  I'm sorry.

9            (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. PURPURA:  Your Honor, apologies.  Objection.

2     Can we approach the bench for a brief moment?

3          THE COURT:  Okay.  Briefly.

4          (The following occurred at side bar.)

5          THE COURT:  What's up?

6          MR. PURPURA:  We talked about it so often I seem to

7     have fallen asleep on the "objection" button.  The government

8     has not established a Sinaloa Cartel.  They can do it through

9     this witness, but they're speaking as if it's already been

10    established already.  So until they establish some sort of

11    agreement, some sort of conspiracy, I object to the reference

12    of the Sinaloa Cartel.

13         THE COURT:  Okay.  I'm going to take it subject to

14    connection.

15         MS. PARLOVECCHIO:  Thank you.  We're about to

16    connect it.

17         (In open court; side bar ends.)

18         THE COURT:  Please proceed.

19         MS. PARLOVECCHIO:  Thank you.

20         (Continued on next page.)

21

22

23

24

25

1   BY MS. PARLOVECCHIO:

2   Q     Now, you testified you were a member of the Sinaloa

3   Cartel from 1987 until your arrest in 2008.   What is the

4   Sinaloa Cartel?

5   A     Well, the Sinaloa Cartel is an organization that

6   Spanish --

7              MR. PURPURA:   Objection, Judge.   Rule 602, basis of

8   knowledge.

9              MS. PARLOVECCHIO:   Your Honor, he's testified that

10  he was a member for nearly 20 years of the Sinaloa Cartel.

11             THE COURT:   I agree.   The objection is overruled.

12  Q     You may answer, sir.

13  A     So, the Sinaloa Cartel is an organization that is managed

14  by a group of people to conduct illegal business.   This

15  organization is led by some main leaders.   The objective of

16  the business is to control the market and the prices for the

17  product that the cartel manages and also the services,

18  expenses for the services that are necessary in order to make

19  the product arrive at the consumer.

20  Q     Now, what are these products that you're referring to?

21  A     Well, the main products that the cartel handles are

22  cocaine, heroin, marijuana and methamphetamine.

23  Q     Now, taking each of these drugs one by one, can you

24  explain where they each come from?

25  A     Yes.   Cocaine is imported mainly from Colombia.   Heroin

1    is grown in Mexico.  The plant that produces it and also the

2    processing is there.  Marijuana is also grown in Mexico.  And

3    methamphetamines are mainly imported from Asian countries,

4    mainly ephedrine which is the main product that is used in the

5    process to create them.

6    Q    Now, what is cocaine made from?

7    A    Well, coke, cocaine, comes from a tree and the tree has

8    these leaves.  There comes a time when these leaves can be cut

9    off and then they are crushed to form a kind of flour and it

10   is mixed with other chemical products that are needed so that

11   it can become cocaine.

12   Q    You testified that heroin comes from a plant.  What kind

13   of plant does it come from?

14   A    It is a plant that is called a poppy.  It blooms with a

15   beautiful flower that has in the center something that looks

16   like a little ball.  When this flower reaches its maximum

17   growth, this little ball is slit open and there's a sap that

18   comes out.  That's the opium sap, and this is what's processed

19   in order to obtain heroin.

20   Q    Now, you also mentioned that the Sinaloa Cartel

21   controlled services.  What types of services are you referring

22   to?

23   A    Well, services that are needed to carry out drug

24   trafficking operations.  You need aerial resources, air

25   resources, sea resources, land resources in order to transport

1    the product here to the United States which is the main
2    consumer.
3    Q    Now, you testified that there were individuals who
4    managed the Sinaloa Cartel.  Where are those individuals
5    principally from?
6    A    In Sinaloa.
7    Q    Have you ever heard the Sinaloa Cartel referred to by any
8    other name?
9    A    Yes.
10   Q    What name was that?
11   A    The Federation.
12   Q    And how did you mostly refer to the Sinaloa Cartel?
13   A    Sinaloa Cartel.
14   Q    Now, you testified that you were a member of the Sinaloa
15   Cartel from 1987 to 2008.  During those years, what roles did
16   you serve in the cartel?
17   A    Well, I started in establishing the accounting system for
18   collecting money from clients, cocaine clients here in the
19   United States.  Later, I offered my services with
20   intelligence, security, and I also ended up receiving
21   shipments of cocaine by sea, by air and I also managed the
22   warehouses in Mexico City in order to receive the cocaine from
23   the different places that it came from.
24   Q    Did you do anything else in Mexico City for the Sinaloa
25   Cartel?

1   A    Yes.

2   Q    What did you do?

3   A    I controlled the airport in Mexico City and I controlled

4   the authorities to provide security for the drug trafficking

5   movements that took place in the city and also to give

6   security to the cartel leaders.

7   Q    During this experience, did you learn about the pricing

8   of drugs?

9   A    Yes.

10  Q    How did you learn about it?

11  A    Well, I did my own importing of cocaine from Colombia at

12  some point and I know about the pricing because I was inside

13  the cartel.

14  Q    During this experience, did you learn about the

15  transportation of drugs from Colombia to Mexico?

16  A    Yes.

17  Q    And how about the transportation of drugs from Mexico to

18  the United States?

19  A    Also.

20  Q    How did you learn about the transportation of drugs from

21  Colombia all the way up to the United States?

22  A    Well, I was part of the cartel and I was the leader in

23  Mexico City and that's where I had the warehouses where the

24  cocaine was gathered for the Sinaloa Cartel.

25  Q    And what was your understanding of where that cocaine was

1    going after it reached your warehouse?

2    A     To the United States of America.

3    Q     Now, during this experience, did you learn about whether

4    the Sinaloa Cartel had a leadership structure?

5    A     Yes.

6    Q     How did you learn about that structure?

7    A     I was part of it.

8    Q     And from approximately 1992 until your arrest in 2008,

9    generally, what was the Sinaloa Cartel's leadership structure?

10   A     Well, it was main leaders, sub leaders, workers, the

11   government group which protected the cartel.

12   Q     And that government group, why were they protecting the

13   cartel?

14   A     Because they were bribed to give protection for the drug

15   trafficking operations of the cartel.

16          MS. PARLOVECCHIO:  I'd like to show the witness an

17   exhibit.

18          THE COURT:  All right.

19   Q     I'm showing you what's marked for identification as

20   Government's Exhibit 508-1.

21          Mr. Zambada, is this a fair and accurate

22   representation of what you just described as the Sinaloa

23   Cartel's leadership structure?

24   A     Yes, exactly.

25          MS. PARLOVECCHIO:  Your Honor, the government

1    requests permission it to publish to the jury as a visual aid.

2          THE COURT:  Does that mean you are not seeking to

3    admit it into evidence?

4          MS. PARLOVECCHIO:  We can admit it into evidence.

5          THE COURT:  I am not pushing you one way or the

6    other.  I just need to know.

7          MR. PURPURA:  I object.  It's a demonstrative.  I

8    have no problem with a demonstrative at this point.

9          THE COURT:  Okay.  Let's use it as a demonstrative.

10          MS. PARLOVECCHIO:  May we publish it, please.

11    Q    Mr. Zambada, take a look at Government's Exhibit 508-1.

12    Can you describe what's at the top here in this leadership

13    structure?

14    A    Yes.

15    Q    And who is at the top here?

16    A    The main leaders.

17    Q    And from the period that you were in the cartel, who were

18    the principal leaders?

19    A    Well, at this time, it was Ismael Zambada Garcia, Mayo,

20    Joaquin Guzman Loera, Chapo, Juan Jose Esparragoza, Azul,

21    Amado Carrillo Fuentes.

22    Q    And just generally, what do the principal leaders do in

23    the cartel?

24    A    The main leaders manage the sub leaders in the cartel

25    and, in general, the workers as well.

1    Q    Okay.  Then moving down the chart, we have sub leaders.

2    Just generally what do the sub leaders do?

3    A    The sub leaders are the ones who manage the different

4    plazas in the Mexican Republic.

5    Q    And then moving down the chart, you also described

6    workers.  What types of workers did the Sinaloa Cartel have?

7    A    Sicarios, transporters, pilots, engineers, drivers and

8    security guards.

9    Q    Just taking these one by one, can you explain what each

10   category of workers did for the cartel starting with sicarios?

11   A    Yes, of course.  The sicarios are the ones who, what they

12   do is they have the power to make sure that no other opposite

13   groups come into their plaza.

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. PARLOVECCHIO:

2    Q     How do they do that?

3    A     They do it with weapons.

4    Q     And what do they do with weapons?

5    A     They kill people.  They kill enemies.

6    Q     Going over to transporters, what do the transporters do

7    for the cartels?

8    A     The transporters are the ones that handle the drugs

9    through the Mexican Republic, transporting it by land.  The

10   pilots are the ones that manage the planes, and the fast boats

11   and the boats.

12   Q     How about the engineers, what do they do?

13   A     Well, the engineers establish communication between the

14   drug traffickers long range either to Colombia or to different

15   locations, the interior communication in the cartel and

16   provide security for the communication which the principal

17   leaders of the cartel have.

18   Q     What do the drivers do?

19   A     The drivers are the ones who manage the transport, both

20   the land and maritime, the fast boats above all.

21   Q     The security guards, what do the security guards do?

22   A     The security guards are the ones who provide the security

23   when loads arrive from different locations in the world and

24   also for security of the leaders.

25   Q     Now, looking up here on the chart, you also have corrupt

1    government officials.  What do they do for the cartels?

2    A    Well, the government officials support --

3              MR. PURPURA:    Your Honor, I apologize.  I can't

4    hear the interpreter.

5              THE COURT:  You need to speak up.

6    A    The government guards are the ones who give the security

7    guards support for when they are receiving any kind of loads.

8    Q    When who is receiving any kind of loads?

9    A    The cartel security guards and the members of the cartel.

10   Q    Now, who is the boss of the workers in all the cartels?

11   A    Well, mainly Joaquin Guzman and Mayo.

12   Q    And showing you what's marked for identification as

13   Government's Exhibit 2 A and 2 B.  What are Government's

14   Exhibits 2 A and 2 B?

15   A    It's my brother, Ismael Zambada Garcia and Mayo.

16   Q    How do you know them?

17   A    Well, in that photo where he appears younger, I took him

18   to have that taken because he was getting a passport and the

19   second one that was taken after I was arrested.  But I

20   recognize him, well, because I grew up with him.

21             MS. PARLOVECCHIO:   The government moves to admit

22   Government's Exhibits 2 A and 2 B.

23             THE COURT:   Received without objection.  .

24             (So marked.)

25             MS. PARLOVECCHIO:   May I publish to the jury,

1    please.

2    Q    Mr. Zambada, I'm showing you Government's Exhibit 2 A and

3    Government's Exhibit 2 B, is that the photograph you described

4    as the passport photo?

5    A    Exactly.

6    Q    You testified earlier that your brother's nickname as El

7    Mayo, what is the significance of the name El Mayo?

8    A    Normally, in Mexico, that nickname is given to people

9    whose name is Myan.

10   Q    I would like to show an exhibit just to the witness,

11   please.  I'm showing you what's marked for identification as

12   Government's Exhibit 1 A.    What is this?

13   A    That's Joaquin Guzman Loera, El  Chapo.

14   Q    How do you recognize it as him?

15   A    Well, I lived with him on several occasions.

16            MS. PARLOVECCHIO:   The government moves to admit

17   Government's Exhibit 1 A.

18            MR. PURPURA:   No objection.

19            THE COURT:   Received.

20            (So marked.)

21            MS. PARLOVECCHIO:   May I publish?

22            THE COURT:   You may.

23   Q    Now, you testified about subleaders.   During the period

24   when you were a member of the Sinaloa Cartel, who did you

25   consider a subleader of the cartel?

1    A    Nacho Corotel, Arturo Beltran Leyva, Alfredo Beltran

2    Leyva, Hector Beltran Leyva and me, to name a few of them.

3    Q    And just to be clear, how did you rank in the cartel

4    leadership priority?

5    A    Well, I was under my brother Mayo and I was the leader in

6    Mexico City.

7    Q    Now, did each of these subleaders you described have

8    their own workers?

9    A    That's right.

10   Q    Did the principal leaders and the subleaders ever share

11   workers with each other or did they keep the workers to

12   themselves?

13   A    Everything is always shared among the members of the

14   cartel when one or the other would need it.

15   Q    Did the principal leaders and the subleaders have their

16   own corrupt government connections or did they -- I'm sorry.

17   Did they have their own corrupt government connections?

18   A    Each one has his own government connections.  Well,

19   depending on the moment that's involved, any time that a

20   member of the cartel needs any kind of legal assistance, that

21   support is always given the one to the other.

22   Q    Did you ever participate in meetings with other leaders?

23   A    Yes, of course.

24   Q    In general, what were some of the reasons you would have

25   meetings with other leaders in the cartel?

1  A    Well, work meetings, right, to talk about drug
2  trafficking transactions, social kind of meetings and peace
3  meetings.
4  Q    Did each principal leader and subleader have territory
5  that they oversaw?
6  A    Yes, that's right.
7  Q    Did the principal leaders and subleaders ever share
8  territory with each other or did they keep their territory to
9  themselves?
10 A    No.  The territories are always shared between the
11 subleaders of the cartel with the principal leaders because
12 that's what gives the strength to the cartel.
13 Q    When you say it gives the strength to the cartel, what do
14 you mean?
15 A    Well, for example, if we're talking about drug
16 trafficking, -- well, if we're talking, for example, about
17 importing cocaine by sea, there are different states which can
18 receive that, but they have to be states which have a
19 coastline and these states are managed by different cartel
20 subleaders.
21 Q    And what kind of advantage does this give the cartel?
22 A    It will -- let's say a cocaine load has to arrive through
23 Guerrero, there's a subleader there.  In Chapas there's
24 another leader.  In Jalisco there's another leader.   In
25 Sinaloa there are other leaders.  So the business for the

1    Colombian drug trafficker it doesn't matter where he needs for

2    this to arrive because there's security wherever the load will

3    arrive.

4    Q     Security from what?

5    A     Security from the government authorities in the location

6    to count on the necessary equipment and team in each location

7    which has been set up and also the human personnel which is

8    necessary.

9    Q     You testified that your brother Mayo and the defendant

10   were the principal leaders of the cartel?

11   A     That's right.

12   Q     Did the defendant and your brother Mayo ever share

13   resources in the manner that you just described?

14   A     Totally.

15   Q     What resources did they share?

16   A     Speaking about maritime resources, boats, fast boats,

17   submarines, by air planes, small planes, medium-size planes

18   and jets also.

19   Q     Anything else?

20   A     And land transport.

21   Q     Now, you testified earlier that you're familiar with how

22   the Sinaloa Cartel moved its cocaine from Colombia to Mexico?

23   A     That's right.

24   Q     What are the ways in which the Sinaloa Cartel transported

25   its cocaine from Colombia up to Mexico?

1   A     One of the most common ways is the fast boats.

2   Q     Any other ways?

3   A     Boats, fishing boats and merchant ships, planes, small

4   and big and legal routes, legal business routes through

5   commercial containers.

6   Q     You testified earlier that you did work with receiving

7   cocaine shipments for the Sinaloa Cartel.  Did you ever

8   receive maritime shipments?

9   A     Yes.

10  Q     Where did you do that?

11  A     Well, in Cancun, Quintana Roo.

12  Q     Just showing to the witness please.  I'm going to show

13  you what is marked for identification as Government's Exhibit

14  502.  What is this?

15  A     This is a map of the Mexican Republic and some central

16  American countries which have borders with Mexico.

17  Q     And how do you recognize this?

18  A     It's my country.

19        MS. PARLOVECCHIO:  The government moves to admit

20  Government's Exhibit 502.

21        MR. PURPURA:   No objection.

22        THE COURT:  Received.

23        (So marked.)

24        MS. PARLOVECCHIO:  May I publish, please.

25  Q     Mr. Zambada, using Government's Exhibit 502, can you

1    please show the jury where you personally received maritime
2    shipments of the cocaine?
3            MR. PURPURA:   Objection, again, relevance, time
4    frame of what we're talking about at this point.
5            MS. PARLOVECCHIO:   That was my next question, your
6    Honor.   I can ask it now.
7    Q    When were you receiving cocaine shipments in Cancun?
8    A    In Cancun it was more or less around the year 1992 up
9    until 1994, 1995, perhaps.
10   Q    Can you, now please, show the jury where you were
11   receiving cocaine shipments during that time period?  And you
12   can indicate on your screen, sir.
13   A    Here's the state Quintana Roo, the last one in the
14   republic and specifically here is Cancun.
15   Q    Where I'm indicating my pen is that Cancun?
16   A    Yes, that's right.
17   Q    And using Government's Exhibit 502, can you also please
18   show us where Sinaloa is located?
19   A    Yes, of course.   Sinaloa is here at this point.   Here is
20   Culiacan, which is the capital.
21   Q    Okay.   I'm going to indicate on my screen.   Is that
22   Sinaloa?
23   A    That is Sinaloa.
24   Q    Now, you mentioned something called a fast boat.   What is
25   a fast boat?

1  A     Well, a fast boat is a type of boat.  It's small and

2  manufactured with a special kind of material so that it can

3  carry tons.

4  Q     Tons of what?

5  A     Tons of cocaine precisely to bring from Colombia and it's

6  equipped with 400 horsepower engines and that makes it very

7  fast.  That's why it's called a fast boat.

8  Q     And during this period in the mid-90's, the early to

9  mid-90's, were any other family members of yours receiving

10 fast boat shipments of cocaine in Cancun?

11 A     Yes.

12 Q     Who?

13 A     Javier Diaz and my brother Mayo Garcia for whom I worked.

14 Q     What was Javier Diaz's relationship to you?

15 A     Javier Diaz was the husband of my niece, the other

16 daughter of my brother Mayo.

17 Q     You testified that you were working for your brother in

18 Cancun at this time.  Who was your brother Mayo working with,

19 if anyone, at that time?

20 A     Well, he was mainly working with Amado Carrillo Fuentes,

21 Juan Jose Esparragoza el Azul.

22 Q     Who is Amado Carrillo Fuentes?

23 A     Amado Carrillo Fuentes was one of the most powerful drug

24 traffickers there has ever been in Mexico.

25 Q     Have you ever met Amado Carrillo Fuentes?

1   A      Yes.

2   Q      I want to show an exhibit just for the witness.   I'm

3   showing you what's marked for identification as Government's

4   Exhibit 9 . What is this?

5   A      That's Amado Carrillo Fuentes.

6          MS. PARLOVECCHIO:   The government moves to admit

7   Government's Exhibit 9.

8          MR. PURPURA:   No objection.

9          THE COURT:   Received.

10         (So marked.)

11  Q      What, if any, relationship did Amado Carrillo Fuentes

12  have with your brother Mayo at the time that you were working

13  in Cancun?

14  A      They were partners.

15  Q      And you also mentioned someone name Juan Jose Esparragoza

16  el Azul?

17  A      Yes.

18  Q      Who is that?

19  A      He is another one of the powerful drug traffickers that

20  there have been in the Mexican republic.

21  Q      Did you ever meet him?

22  A      Yes.

23  Q      I would like to show you what's marked for identification

24  as Government's Exhibit 6 . Do you recognize the person in

25  this photograph?

1    A      Yes.

2    Q      Who do you recognize it to be?

3    A      That's Juan Jose Esparragoza el Azul.

4           MS. PARLOVECCHIO:   The government moves to admit

5    Government's Exhibit 6.

6           MR. PURPURA:   No objection.

7           THE COURT:   Received.

8           (So marked.)

9    Q      And just to be clear, did Juan Jose Esparragoza have any

10   nicknames?

11   A      El Azul.

12   Q      Now, what does it mean to receive a fast boat loaded with

13   cocaine?

14   A      Well, you wait until the fast boat has arrived on the

15   Mexican coastline and at that time period they would come to

16   within about 50, 60 meters of the beach and then when the boat

17   would arrive then a human chain would be formed to unload

18   quicker the cocaine that was arriving in that boat.

19   Q      Now, what would happen to the cocaine after it got onto

20   the beach?

21   A      It was taken to the warehouses.

22   Q      How did it get there?

23   A      Ultimately, it was taken by land transport in trucks, six

24   wheels or in suburbans.

25   Q      Who would assist with that transport?

1    A      Well, the workers and it was guarded by government

2    officials from the PGR and the federal highway police.

3    Q      What were some of the terms used to describe the

4    officials from the PGR and the federal highway police?

5    A      Well, the commander of the PGR is usually called Yankee.

6    And the federal highway police Puma, who are the ones who are

7    in command in the entire state.

8    Q      Now, what is the purpose of having those officials go

9    with the cocaine transport?

10   A      It's mainly so that they won't be intercepted by any

11   authority.

12   Q      Now, what did you personally do once the cocaine arrived

13   on land at Cancun?

14   A      It was loaded onto the transport.  It was taken to the

15   warehouses and it was counted.

16   Q      Who did the counting?

17   A      I did it personally.  I separated it by brands and I

18   would count out the exact amount that was received per brand.

19   Q      Were you aware of who was sending this cocaine from

20   Colombia to Cancun?

21   A      Yes.

22   Q      How did you know?

23   A      Well, because I would hear who the providers, the

24   suppliers, were and I knew some of the Colombians.

25   Q      What did you learn about who was sending this cocaine?

1    A      The main supplier was Chupeta and the Valle Cartel.

2           (Continued on next page. )

1    DIRECT EXAMINATION

2    BY MS. PARLOVECCHIO:

3    Q      Who is Chupeta?

4    A      Chupeta was a very powerful drug trafficker who worked

5    for the Valle Cartel.

6    Q      How often would these fast boats arrive from Columbia?

7    A      It would be approximately every three to four weeks, but

8    five, six or seven would arrive together.

9    Q      And how much cocaine did each fast boat carry?

10   A      Three tons, approximately.

11   Q      How much is a metric ton?

12   A      1,000 kilograms.

13   Q      How was cocaine in ton quantities packaged?

14   A      The cocaine is packed in a kind of rubber, we call it a

15   condom.  The block of cocaine is introduced into this rubber

16   and then it's tied up and another one is put on top of that.

17   It's taped up.  Another one is put on.  It's taped up again.

18   It's taped up again, until you are sure that it's not going to

19   get wet if the product falls into the water.

20   Q      Now, you testified that after the cocaine gets to the

21   warehouse, you would count it, separate it, check the brands.

22   What is a brand in the cocaine business?

23   A      When cocaine is produced in Columbia, the block or slab

24   of cocaine is branded.  When it is wrapped up completely on

25   the tape, that brand is also put on.

1    Q     What is the purpose of the brand?

2    A     To know who the producer and the supplier is in Columbia,

3    to be able to deliver the correct cocaine once it arrives here

4    in the United States.

5          And it is also a way to identify the quality of the

6    product.

7    Q     Now, what did you personally do after you counted the

8    kilograms of cocaine at the warehouse?

9    A     I would report to my brother or to the owner that, in

10   particular, what the amount that had arrived was and what the

11   brands were.

12   Q     And what was done with the cocaine after that?

13   A     It was transported to the border.

14   Q     How did it get to the border?

15   A     They used tractor-trailers with gas tankers.

16   Q     And what is a gas tanker truck?

17   A     Well, it is a tank that transports gas, and inside this

18   tank, there is another tank, and that is where the cocaine is.

19         MR. PURPURA:   Your Honor, again, just objection.

20   Again, timeframe.   Are we still in the same timeframe?

21         THE COURT:   You can just say can we have a

22   timeframe.

23         MR. PURPURA:   Thank you.

24         MS. PARLOVECCHIO:   We are still in the same

25   timeframe, Your Honor.   He's describing what would happen to

1    the cocaine in Cancun in the '90s.

2            THE COURT:  Go ahead.

3    Q    You may answer, sir.

4    A    This makes the transport of the cocaine being extremely

5    safe because the tank contains gas.  If authorities stop the

6    transport and they verify whether it has gas inside, the VALVE

7    is opened and gas comes out, which makes it very difficult for

8    them to detect the cocaine.

9    Q    Now, where did this cocaine go after it left Cancun?

10   A    Mainly to Ciudad Juarez or Sonora.

11   Q    I am going to show you Government Exhibit 502, using

12   Government Exhibit 2 can you try to mark on your screen using

13   your finger, could you circle where Ciudad Juarez is?

14   A    Yes.  It's here.  Here is Ciudad Juarez.

15   Q    I will circle it for you here.  That circle in pink, is

16   that Ciudad Juarez?

17   A    Yes, certainly.

18   Q    And what was the significance of Ciudad Juarez?

19   A    Because it was one of the main crossings that was used to

20   crossover cocaine at that time.

21   Q    You also mentioned Sonora.  Could you point out Sonora on

22   this map?

23   A    Yes, certainly.  Senora is here.

24   Q    I am going to circle that.  And the second pink circle,

25   is that Senora?

1  A    That's right.

2  Q    And what was the significance of Senora?

3  A    That here there were also some of the main border

4  crossings that were used to crossover cocaine.

5  Q    Now, you testified that the cocaine was moved up in these

6  tanker trucks.  Who was in charge of the gas tanker trucks at

7  this time?

8  A    The person in charge was Eduardo Quirarte, El Flaco

9  Quirarte.

10 Q    And who did Eduardo Quirarte, El Flaco Quirarte work for?

11 A    For Amado Carrillo.

12 Q    How do you know that?

13 A    Well, I knew Flaco and I knew Amado and I dealt with them

14 in Cancun.

15 Q    Mr. Zambada, do you know the term infrastructure in drug

16 trafficking?

17 A    Yes.

18 Q    What does the term infrastructure mean in drug

19 trafficking?

20 A    It means the resources that the cartel has.

21 Q    Has for what?

22 A    It's the equipment that they have, the sea resources, the

23 air, land, also human resources, also territories, and also

24 the corrupt authorities.  The high-ranking Government officers

25 are very important to the infrastructure for drug trafficking.

1    Q    So, an example we are talking about here when you were

2    receiving cocaine shipments in Cancun, what qualifies as the

3    infrastructure in that example?

4    A    There were boats, fast boats, transport by land,

5    transport by air, human resources, on the part of the cartel,

6    and on the part of the Government authorities.

7    Q    Did each leader of the Sinaloa Cartel have their own

8    infrastructure or did they share infrastructure?

9    A    They share it.

10   Q    What does it mean to share it?

11   A    Sharing infrastructure is strengthening the cartel.

12   Q    When the leaders of the Sinaloa Cartel joined their

13   infrastructure together, did they have to pay each other for

14   that benefit?

15   A    No.

16   Q    Did you have an understanding why not?

17   A    Because it is one cartel, it's one organization and they

18   help each other when that help is needed.

19   Q    Now, you testified earlier that your brother Mayo and the

20   defendant were partners in drug trafficking.  What is the

21   advantage of a partnership in drug trafficking, or in cocaine

22   trafficking specifically?

23   A    Well, talking about infrastructure, it's the sea, the

24   equipment for sea, for the air, and also the capital that is

25   required, the money.

1    Q      Money for what?

2    A      To invest in the cocaine that comes from Columbia.

3    Q      Now, based on your experience, what does it mean to

4    invest in a cocaine shipment?

5    A      To put up the capital, to purchase the product, meaning

6    the cocaine.

7    Q      Are you aware whether leaders of the Sinaloa Cartel

8    invested in cocaine shipments together?

9    A      Yes.

10   Q      And how did you learn about that?

11   A      Well, I belong to the cartel and I had a direct

12   relationship with my brother, he's my brother, and I knew how

13   he operated regularly.

14   Q      Did you yourself invest in cocaine shipments?

15   A      Yes.

16   Q      And what was your understanding of whether leaders of the

17   cartel invested together in cocaine shipments?

18   A      Well, they invested together so that the expense for

19   purchasing it would be easier to do for each of them.

20           THE COURT:   Unless you are almost done, sometime

21   soon we should take a mid-afternoon break.

22           MS. PARLOVECCHIO:   This is actually a convenient

23   place to break.

24           THE COURT:   Ladies and gentleman, remember not to

25   talk about the case.   We will see you back here at 3:15.

1    Thank you.

2              (Jury exits the courtroom.)

3              THE COURT:  Okay, 3:15.

4              (Recess taken.)

5              THE COURT:  All right.  Please bring in the jury.

6              (In open court.)

7              (Jury enters the courtroom.)

8              THE COURT:  Everyone be seated.

9              You may continue, Ms. Parlovecchio.

10             MS. PARLOVECCHIO:  Thank you, Your Honor.

11   EXAMINATION BY (Continuing)

12   MS. PARLOVECCHIO:

13   Q    Mr. Zambada, during the '90s through the early 2000s, who

14   were the main Colombian sources of cocaine supply for the

15   Sinaloa Cartel?

16   A    Among the most important, there was Chupeta, who belonged

17   to the Valley cartel.

18   Q    How did you know about Chupeta?

19   A    Well, I often heard him mentioned by the important drug

20   leaders and traffickers in Mexico and I know his

21   representative who was Treinta at that time.

22   Q    Who were some of the important leaders in drug

23   trafficking that you heard discussed Chupeta?

24   A    Well, I heard my brother Mayo speak about him many times,

25   Juan Jose Esparragoza as well, Amado Carrillo, and at some

1   point I heard Joaquin Guzmán Loera, almost all of them talked
2   about him.
3   Q    Can you just describe the instance when you heard the
4   defendant speak about Chupeta?
5   A    One time that I went to visit him in the mountains when
6   we were speaking about the important Colombians, we discussed
7   Chupeta as one of the most important ones.
8   Q    Now, you mentioned that you had met somebody who worked
9   for Chupeta named 30, who is 30?
10  A    30 was the representative that Chupeta had in Mexico when
11  Amado Carrillo was there and he was still there through 2000.
12  Q    Were you aware of how Chupeta would send cocaine to
13  Mexico?
14  A    Yes.
15  Q    How did you know about this?
16  A    Well, because I was part of the cartel.  He mainly sent
17  it by boat.
18  Q    Any other ways?
19  A    Small planes and large planes, jet planes, and merchant
20  routes.
21  Q    To your knowledge, how did the majority of Chupeta's
22  cocaine get from Columbia up to Mexico?
23  A    A maritime route.
24  Q    Which types of maritime vessels did Chupeta use most
25  often?

1   A      Fishing ships and merchant ships.

2   Q      How much cocaine would the merchant ships carry?

3   A      30 tons.

4   Q      I'm going to direct your attention to 1994.  Were there

5   any problems with any of the large shipping vessel shipments

6   at that time?

7   A      Yes.

8   Q      What happened?

9   A      Well, a ship was coming that was loaded I believe with 20

10  tons and when it was arriving to Mexico off the coast of

11  Nayarit, specifically Puerto Vallarta and Jalisco, it's an

12  area, you know, Puerto Vallarta is an area very close to

13  Nayarit, I'm sorry.

14  Q      What happened to the shipment?

15  A      The crew thought that they were going to be intercepted

16  and they sank it.

17  Q      They sank the ship?

18  A      Yes.

19  Q      How did you learn about this incident?

20  A      Well, I went to visit my brother Mayo in Puerto Vallarta

21  because I had to talk to him and what I found out what he was

22  trying to do was to recover that ship.

23  Q      And what was your understanding what Mayo was trying to

24  do to recover the ship?

25  A      They were going specifically to recover the cocaine using

1    deepsea divers.

2    Q    Were they able to recover the cocaine?

3    A    Yes.   They did recover it.

4    Q    Now, generally, do you know who invested in cocaine

5    shipments from Chupeta?

6    A    Most of the main leaders, like Amado Carrillo, Ismael

7    Zambada Garcia, Juan Jose Esparragoza El Azul, and El Chapo.

8    Q    Now, you also testified that Chupeta sent cocaine

9    shipments using planes.  Do you know who invested in these

10   airplane shipments?

11   A    Yes, certainly.

12   Q    How do you know about that?

13   A    Well, I would hear my brother Mayo and Amado Carrillo

14   talk about it.

15   Q    And who did they say invested in shipments sent by

16   Chupeta?

17   A    Well, Amado Carrillo, my brother Mayo, and Juan Jose

18   Esparragoza El Azul were all working.

19   Q    Did you learn the message by which the leaders of the

20   cartels invested in cocaine shipments during your membership

21   in the cartel?

22   A    Yes, of course.

23   Q    How did you learn about that?

24   A    Well, because I was participating in the cartel and the

25   leader would invest directly and on occasion with the

1    sub-leaders.

2    Q    Now, let's talk about how investing in cocaine shipments

3    worked in the Sinaloa Cartel from 2001 until your arrest in

4    October 2008.   So if we took a 30,000 kilogram shipment like

5    the one you described that Chupeta would send, how did the

6    Sinaloa Cartel leaders invest in a shipment that large?

7    A    Well, let's supposing that it's 30,000 kilos, it would be

8    15,000 kilograms for the Mexicans and 15,000 kilograms for the

9    Colombians, which means 15 tons for each one of the parties,

10   the two parties.   On the Mexican side, let's say, there are

11   five investors, two leaders and three sub-leaders, the cocaine

12   in Columbia has a cost of around $3,000 per kilo, and, so, if

13   it's 15 tons, it's an investment of three tons per liter.

14   It's an investment of $9 million per leader.

15   Q    I am going to stop you there.   So when you say they would

16   invest in those portions, does that mean they would put the

17   money up for those portions of the shipment?

18   A    Exactly.   The capital in cash in U.S. dollars.

19        MS. PARLOVECCHIO:   May I show an exhibit to the

20   witness, please?

21        MR. PURPURA:   Your Honor, may we approach the bench

22   for a moment, please.

23        THE COURT:   Okay.

24        (Continued on next page.)

25

1              (Sidebar.)

2              MR. BALAREZO:  Your Honor, this is Mr. Purpura's

3    witness.  I just would ask the Court to admonish the

4    interpreters to interpret directly what the witness is saying.

5    I believe this interpreter right now is correcting something

6    said, something that he didn't say because he said it wrong.

7    That shouldn't be her job.  She should be interpreting exactly

8    what the witness is saying.  For example, as a very simple

9    issue, he mentioned 30,000 tons.  Whether he meant to say 30

10   tons or not, she translated to 30,000 kilos.  It's not her job

11   to be correcting his mistakes.  She needs to translate

12   directly what he is saying.

13             MS. PARLOVECCHIO:  Ms. Goldbarg is also a native

14   Spanish speaker.  So --

15             MS. GOLDBARG:  I've been listening attentively to

16   the translation.  They have been doing a fantastic job.

17             MR. BALAREZO:  30,000 tons is different from 30

18   kilos.  We can listen to the tape.

19             THE COURT:  I know, but you're asking me to tell

20   them to be more careful and the other side is saying they are

21   being careful.

22             MR. BALAREZO:  All I'm asking is for the Court to

23   instruct the interpreter to translate exactly what the witness

24   is saying.

25             THE COURT:  There is an implication that they are

1  not when you say that and there's a dispute over whether they

2  are not, which I cannot arbitrate.

3            MR. BALAREZO:  I run into this all the time.  It's

4  going to come up.  If they interpret incorrectly, whether they

5  are certified or not, they need to do it right.  I will raise it.

6            THE COURT:  I know, but the Government is saying

7  they also speak Spanish like you and they are doing it right,

8  so what do I do?

9            MR. BALAREZO:  Your Honor, all I am asking you is to

10 instruct the -- remind the interpreters --

11           THE COURT:  Can I have the two interpreters over

12 here, please.

13           MR. BALAREZO:  Even I was talking to a different

14 interpreter over here.

15           MS. GOLDBARG:  Well, it's not a battle of the

16 interpreters.

17           THE COURT:  Come around here.

18           You're both doing a great job.  No one is saying

19 you're doing anything wrong.  We just want you to use your

20 usual care and even being extra careful to make sure

21 everything gets translated accurately as the witness says it.

22 Thank you.

23           MR. BALAREZO:  Thank you.

24           THE INTERPRETERS:  You're welcome.

25           (Sidebar concluded.) (Continued on the next page.)

1              THE COURT:  All right.  Let's continue.

2    BY MS. PARLOVECCHIO:

3    Q    Okay.  I'm showing you, showing you what's marked for

4    identification as Government's Exhibit 508-3.

5              Does this fairly and accurately depict the manner in

6    which cocaine investments were organized by the leaders of the

7    Sinaloa Cartel that you just described?

8    A    That's right.  It's a clear example.

9              MS. PARLOVECCHIO:  The government moves to admit

10   Government Exhibit 508-3.

11             MR. PURPURA:  Your Honor --

12             THE COURT:  Wait.  Let her finish the offer.

13             You are moving this into evidence?

14             MS. PARLOVECCHIO:  Yes.

15             MR. PURPURA:  I don't think there's a basis for this

16   exhibit coming to in.  He hasn't testified to all the parts.

17             MS. PARLOVECCHIO:  I can put it in subject to

18   connection.

19             THE COURT:  Can you lay more of a foundation first

20   and then you can reoffer it?

21             MS. PARLOVECCHIO:  Certainly.

22             THE COURT:  Let's do that.

23   Q    Okay.  So, Mr. Zambada, you testified that the Sinaloa

24   side of the investment would be divided into five parts, is

25   that right?

1   A    Yes.

2   Q    And how much would each investor put in for their

3   portion?

4   A    Well, the cocaine has a price in Colombia of around

5   $3,000 per kilo.  If we take that as a basis, then each

6   investment would have, investor would have to invest

7   $9 million and we, if we add up all five, that would be

8   $45 million, and that's why it facilitates the investment if

9   it's done among partners.

10  Q    Now, you mentioned the Colombian price.  Does the price

11  of cocaine change as it moves north?

12  A    That's right.

13  Q    How does it change?

14  A    Well, if we're talking about the United States,

15  California, for example, the price for cocaine would be about

16  $20,000.

17  Q    $20,000 per what?

18  A    Per kilogram.

19  Q    So how much money would that generate for each Sinaloa

20  Cartel investor?

21  A    If we take in mind, bear in mind the cost of the

22  transport from Colombia up to the United States, up to Los

23  Angeles, California --

24            MR. PURPURA:  Objection.  Relevance.

25            THE COURT:  Overruled.  Go ahead.

1    A       -- it would be around $7,000.  So it would give a profit

2    of $13,000 per kilogram which would be $13 million.

3    Q       13,000 per kilogram.  And what would the profit be per

4    investor?

5    A       $39 million.

6    Q       Now, what kind of profit would that 3,000 kilogram,

7    3,000 kilogram investment translate to if the cocaine is

8    successfully shipped up to Chicago?

9    A       To Chicago, the operational costs would be around $9,000,

10   but in Chicago, the kilogram would be sold more or less around

11   $25,000.

12   Q       And what profit would that yield?

13   A       Well, if it were sold at 25,000, that would be 16,000 per

14   kilo and it would be 16 million per ton.  As a profit, it

15   would be $48 million per investor.

16   Q       Now, what would the profit be if the cocaine was

17   successfully shipped all the way to New York City?

18   A       To the City of New York, it's more or less the same, same

19   operational cost, around $9,000.  The difference is that the

20   kilogram is sold in New York up to around $35,000.

21   Q       And what would that yield per investor?

22   A       That would produce a profit of $26,000 per kilogram, per

23   kilogram which would be $26 million per ton.  And that would

24   produce a profit per investor around $78 million.

25           MS. PARLOVECCHIO:  Your Honor, I would like to show

1    the witness the exhibit.

2             THE COURT:  All right.

3    Q    Mr. Zambada, I'm showing you Government's Exhibit 508-3.

4             Does this fairly and accurately depict the

5    investment model that you just walked us through?

6    A    Correctly.

7             MS. PARLOVECCHIO:  The government moves to admit

8    Government Exhibit 508-3.

9             MR. PURPURA:  Other than the relevancy objection, no

10   other objection to this exhibit.

11            THE COURT:  All right.  Ladies and gentlemen, I'm

12   admitting this exhibit just as a means of helping to

13   facilitate your understanding of the witness' testimony, not

14   that any of these things actually happened.  That you have to

15   determine from other evidence.

16            Go ahead.

17            (Exhibit 508-3 so marked.)

18   Q    Okay.  So, Mr. Zambada, now you mentioned, now we're

19   working from a 30,000-kilogram cocaine shipment.

20            What is the significance of the 3,000 per kilogram

21   figure here?

22   A    The investment cost.

23   Q    Where?

24   A    In Colombia.

25   Q    And now you testified that that would be broken up into

1    two parts.

2    A     Exactly.

3    Q     What -- directing you to the right-hand side of

4    Government's Exhibit 508-3, what does this portion represent?

5    A     It represents the Colombian investment and this is how

6    normally the investment is made, 50 percent for the Colombian

7    cartel, 50 percent for the Mexican cartel.

8    Q     And now as to the Mexican cartel investment, in this

9    case, the Sinaloa Cartel, how would that be divided?

10   A     It's divided in $9 million per investor.

11   Q     So that's five investors?

12   A     Five investors.

13   Q     And you get the $9 million figure from what?

14   A     Three tons of cocaine multiplied by $3,000 per kilogram

15   yields $9 million.  And when you add them all up, they are

16   $45 million in investment.

17   Q     Okay.  I'm now going to show you what's marked for

18   identification as Government's Exhibit 508-2.

19          And does this fairly and accurately depict cocaine

20   pricing as it moves north from Colombia?

21   A     That's right.

22          MS. PARLOVECCHIO:  The government moves to admit

23   Government Exhibit 508-2.

24          MR. PURPURA:  No objection.

25          THE COURT:  Received.

1          (So marked.)

2          MS. PARLOVECCHIO:    Publish?   Thank you.

3     Q     Now, Mr. Zambada, you testified that the price of cocaine

4     in Colombia is $3,000 per kilo?

5     A     About that.

6     Q     And once it hits the beach in Mexico, approximately how

7     much does a kilogram of cocaine cost?

8     A     It's for that cost of $3,000 that it arrives in Mexico.

9     It is after arrival in the United States that the cost goes up

10    depending on what part of the United States the cocaine is

11    going to.

12    Q     Now, you testified earlier that you ran a warehouse in

13    Mexico City.   Approximately how much did a kilogram of cocaine

14    cost in Mexico City during the period of time we're talking

15    about here?

16    A     Between 10 and $13,000.

17    Q     And then you testified earlier that the price of cocaine

18    would go up as it moved north to the United States.

19    A     That's right.

20    Q     So taking Government's Exhibit 508-2, what would the

21    profit margin be -- what would the gross cost per kilo be in

22    LA if the cocaine makes it to LA?

23    A     It would be $7,000.   It rises by $4,000 making it from

24    Mexico to Los Angeles.

25    Q     So what would the gross price be per kilogram if it makes

1    it to Los Angeles?

2    A     $7,000.

3    Q     Is that the cost or is that the gross price per kilo?

4    A     The gross price per kilo is about $20,000.

5    Q     And so if you take away $7,000 for costs, what would the

6    profit be per kilo?

7    A     $13,000 per kilogram.  $13 million per ton.

8    Q     Now, let's go to Chicago.  What would the gross price per

9    kilogram be or what was the gross kilogram price in Chicago?

10   A     The price of arriving in Chicago was $9,000 and the sales

11   price would be approximately $25,000 which gives a profit of

12   $16,000 per kilo and that's 16 million per ton.

13   Q     And now moving to New York, what was the gross price per

14   kilo in New York during this period?

15   A     The operational price of getting it to New York is

16   similar to getting it to Chicago, $9,000, but the price of,

17   for sale in New York is $35,000.  That gives a profit of

18   $26,000 per kilo and that's $26 million per ton.

19   Q     And going back to Government's Exhibit 508-3, just to

20   round out our math here, the cost or the profit per investor

21   in Los Angeles, what would that be?

22   A     $39 million, and for the whole cartel, $195 million.

23   Q     And how about Chicago, what would the profit per investor

24   be in Chicago?

25   A     $48 million which would be $240 million for all five

1    investors.

2    Q     And finally, New York.  What would the profit per

3    investor be if the cocaine reaches New York?

4    A     That would be $78 million per investor and that would be

5    a total of $390 million for all five investors.

6    Q     Why is the biggest profit in New York City?

7    A     Because this -- because the City of New York is the most

8    difficult one to sell it at because the police is very active

9    so it's very complicated to complete an operation 100 percent.

10   Q     Now, when did the Sinaloa Cartel begin using this

11   investment method?

12   A     Approximately from the years '94 or '95 onwards.

13   Q     And what was the purpose of using this investment method?

14   A     Well, for the Sinaloa Cartel, it's the way to strengthen

15   the cartel and to protect the capital of the investors and at

16   the same time, make them powerful financially.

17   Q     Now, how, if at all, does this investment method affect

18   the risks involved in a big cocaine shipment?

19   A     Well, it affected them but minimally because if you are

20   investing $9 million to get a total of 45, to send a total of

21   $45 million in investment, the profit is very, very much for a

22   small risk.

23   Q     So just to be clear, if the 15,000 kilos all make it

24   successfully to Mexico and then makes it to the U.S., what

25   happens?

1  A    They are sold and the money comes back in U.S. dollars to
2  Mexico and to Colombia.
3  Q    But if the leaders invest 15,000 kilos together and the
4  cocaine shipment is lost, what happens?  What's the loss?
5  A    Well, because it -- then it's -- if something is lost for
6  each of them a small amount and they can go ahead and continue
7  investing in another shipment because they protect their
8  capital.  They lose some capital but it's not very much.
9  Q    Now, you testified that you had cocaine investments with
10 other leaders of the Sinaloa Cartel.  What was the largest
11 cocaine investment you ever had?
12 A    As an investor, between two and a half and three tons of
13 cocaine.
14 Q    Were you aware of whether the defendant had investments
15 in cocaine shipments?
16 A    Yes.
17 Q    How did you know?
18 A    Well, he was partners with my brother Mayo and he
19 invested with me on one occasion.  It was a small proportion,
20 but it was an investment.
21 Q    What size investments were you aware of the defendant
22 having?
23        MR. PURPURA:  Your Honor, again, base of knowledge,
24 602, on each of these.
25        THE COURT:  Ask him first how he knows, if he knows

1    and how he knows.

2              MS. PARLOVECCHIO:   Yes, Your Honor.

3    Q    Mr. Zambada, you testified that your brother Mayo Zambada

4    told you about investing with the defendant.   What types of

5    things did he tell you about his investments with the

6    defendant in cocaine shipments?

7              MR. PURPURA:   Time frame, Your Honor, as well?

8    Q    From 2001 until your arrest in 2008, did you have

9    conversations of this nature with your brother Mayo Zambada?

10   A    Yes.

11   Q    What did your brother Mayo Zambada tell you about his

12   cocaine shipments from 2001 until your arrest in 2008?

13   A    That he was working together with Joaquin Guzman Loera,

14   El Chapo, and that they were investing together.

15   Q    Did he tell you about the size of their investments

16   together?

17   A    He, he made me understand that they were half and half.

18   Q    And what time -- what size cocaine investments were you

19   aware of them having together?

20   A    Six tons at different times.

21   Q    Now, you testified earlier that you oversaw a warehouse

22   for the Sinaloa Cartel.   Where was that warehouse located?

23   A    In Mexico City.

24   Q    When did you oversee the warehouse in Mexico City?

25   A    I started in 1998 until 2008.

1    Q    I'm going to show you what's in evidence as Government's

2    Exhibit 502.  Let me zoom in a bit.

3              Mr. Zambada, see if you can mark on your screen.

4    This time you might need to press a bit harder.

5              Can you show the jury where Mexico City is located?

6    A    Here.  (Indicating.)

7    Q    Okay.  Could you circle it, please.

8    A    (Witness complies.)

9    Q    Now, approximately how many warehouses did the Sinaloa

10   Cartel have in Mexico City?

11   A    Usually there were three warehouses.

12   Q    And what was the purpose of these warehouses?

13   A    In one, you would receive; in another one, you would

14   deliver; and in another one, it would be stashed.

15   Q    Now, what were you receiving, delivering and stashing in

16   these warehouses?

17   A    Cocaine shipments.

18   Q    When you were supervising the warehouses, did you learn

19   which leaders of the Sinaloa Cartel had their cocaine

20   delivered, stored and stashed there?

21   A    Mainly, my brother Mayo Zambada and Joaquin Guzman Loera.

22   There were others such as Genaro Payan, Nacho Coronel, Juan

23   Jose Esparragoza, Hector Beltran, Arturo Beltran, Alfredo

24   Beltran.

25   Q    What did you personally do at these warehouses?

1  A     I would receive the cocaine that was coming from Colombia

2  on the ocean route and by plane in the southeastern part of

3  Mexico and in the part in Guerrero.

4  Q     Now, what exactly did you do with the cocaine at these

5  warehouses?

6  A     I would count it, I would separate it by brands and I

7  would change the transport so that it could either go up to

8  the border or go to Culiacan in Sinaloa.

9  Q     Up to which border?

10 A     When it would go straight up from Mexico City to the

11 border, it would be go to Ciudad Juarez in Chihuahua.   And

12 when the cocaine was going to Sonora, it would be sent to

13 Culiacan.   That would be the stopover for it to be sent over

14 to Sonora by the leaders.

15 Q     Okay.   So just showing you, again, Government's

16 Exhibit 502, you just mentioned Ciudad Juarez.   Could you just

17 mark that, please?

18 A     Yes, of course.   (Witness complies.)

19 Q     And Sonora?

20 A     (Witness complies.)

21 Q     And could you just show the jury where Culiacan is

22 located?

23 A     Here in Sinaloa.   It's the capital.

24         (Continued on next page.)

25

1    BY MS. PARLOVECCHIO:

2    Q      Did you supervise anyone at these warehouses?

3    A      Yes.

4    Q      Approximately how many people did you supervise there?

5    A      Five.

6    Q      You testified that you had checked the brands on the

7    cocaine that would arrive in your warehouses.  What are some

8    of the brands of cocaine that would come to your warehouse?

9    A      Well, we could say Reina, Sapphire, Safiro, Saffidi,

10   Condor, Alacran, Packman, Coca Cola, R, B, Corona, Crown, a

11   lot of brands.

12   Q      Did you learn what the Sinaloa Cartel would do with the

13   cocaine once it was in Mexico City?

14   A      They would transport it up to the United States of

15   America.

16   Q      And did you have any role in that transport?

17   A      Well, in the warehouses that I managed, the transport

18   would be changed to either go up to the border or to take it

19   to Culiacan.

20   Q      What is the mode of transportation the cocaine would take

21   to get to your warehouse in Mexico City?

22   A      Well, tractor trailers with gas tankers.

23   Q      During this period which you testified was 1998 to 2008,

24   who owned these gas tanker trucks?

25   A      Ismael Zambada Garcia El Mayo, my brother.

1    Q    Did anyone else use your brother's gas tanker trucks to

2    transport cocaine to Mexico City?

3    A    Yes.

4    Q    How do you know?

5    A    I received it.  The other leaders like Joaquin Guzman

6    Loera El Chapo, Genaro Payan, Arturo Beltran, Nacho Coronel.

7    Q    Now, you testified that the cocaine after it reached your

8    warehouse would either go from Mexico city to the border or

9    from Mexico City to Culiacan to the border with the United

10   States.

11   A    That is right.

12   Q    I'm going to show you Government's Exhibit 502 again.  We

13   just had you circle the cities.  Can you also trace the route

14   that the -- the two routes that the cocaine would take from

15   Mexico City up to the border?

16   A    Yes, of course.  Here's Mexico City.  It would go to

17   Queretaro, Guana Juato, Zacatecas, Durango and Ciudad Juarez

18   and here is Mexico City, Queretaro, Guanajuato, Jalisco,

19   Nayarit, Sinaloa.

20   Q    You testified that after Sinaloa the cocaine would go up

21   to the border in Sonora.  Can you show the jury using

22   Government's Exhibit 502 what that route was?

23   A    Yes, of course.  Here.  This is the border.

24   Q    Thank you.

25        Now, showing just an exhibit to the witness.  I'm

1    showing you what's marked for identification as Government's
2    Exhibit 501.   What is this?
3    A    Well, these are the borders between the United States and
4    Mexico, the border cities which divide one country from the
5    other country.
6    Q    Is this a fair and accurate depiction of the border
7    between the United States and Mexico?
8    A    That's right.
9         MS. PARLOVECCHIO:   The government moves to admit
10   Government's Exhibit 501.
11        MR. PURPURA:   No objection.
12        THE COURT:   Received.
13        (So marked.)
14   Q    Mr. Zambada, using Government's Exhibit 501 can you tell
15   the jury the places where the cartel's cocaine was sent to on
16   the U.S. border?
17   A    Yes, of course.   If we're talking about Baja, California,
18   Afina, Mexicali, in San Luis Rio Colorado, Sephora, Nogales,
19   Narco, Agua Prieta, in Cuala Cuala Juarez, Orinaga and Sura
20   Cuana, that's called Willa, and Pedras Negras, in Tamaulipas,
21   Laredo, Miguel Aliplan, Reynosa, Matamora, the most important
22   ones.
23   Q    Now, based on your experience, approximately how much of
24   the cocaine that the Sinaloa Cartel imported to Mexico was
25   destined for the United States?

1    A      100 percent.

2    Q      Approximately how much cocaine would the Sinaloa Cartel

3    send to the United States through your warehouse per year?

4    A      More or less 80, 80, 100.

5    Q      80, 100 what?

6    A      Tons of coke, cocaine.

7    Q      To your knowledge, did all of that cocaine go to the

8    United States?

9    A      Most of it.

10   Q      How much money did this much cocaine generate for the

11   cartel?

12   A      Billions of dollars.

13   Q      When cocaine was sold in the United States did the buyers

14   use American dollars or Mexican pesos?

15   A      U.S. dollars.

16   Q      Did the money from these drug sales ever come to your

17   warehouse?

18   A      Maybe once.

19   Q      And on that occasion what were the circumstances?

20   A      That they would send the money to Mexico City so I could

21   deliver to a Colombian they were investing with.

22   Q      Who is they?

23   A      The leaders of that Sinaloa Cartel, my brother Mayo,

24   Chapo.

25   Q      And approximately how much money came to your warehouse

1    on that occasion?

2    A    Between 15 and 20 million dollars.

3    Q    Where was your brother Mayo Zambada's principal base of

4    operations during this period?

5    A    In Sinaloa, in Culiacan.

6    Q    Do you know where the defendant was principally based

7    after 2001?

8    A    Yes.

9    Q    Where was he based?

10   A    In Sinaloa, in the mountains between Durango, Sinaloa and

11   Chihuahua.

12   Q    How do you know that?

13   A    Well, I regularly visited him in those areas.

14   Q    Did you know whether the defendant had people in Mexico

15   City who worked directly for him during the period that you

16   were running the warehouses?

17   A    Yes.

18   Q    How do you know?

19   A    Well, I belonged to the cartel and I knew the people.

20   Q    How did you know the people?

21   A    Well, for example, I met his brother Arturo who was in

22   Mexico City, Artur Guzman, Martin Moreno, Arturo Beltran,

23   Hector Beltran, myself.

24   Q    How did you communicate with your brother Mayo when you

25   were in Mexico City and he was in Sinaloa?

1   A      Through Nextel radios and pay phones.

2   Q      Public pay phones?

3   A      That's right.

4   Q      Why public pay phones?

5   A      Well, it's one of the safest ways to communicate, from a

6   public pay phone to a land line.

7   Q      And how would you communicate with the defendant when you

8   were in Mexico City and he was in Sinaloa?

9   A      Through my brother.

10  Q      Any other ways?

11  A      Well, through my nephew, through Juancho, his nephew and

12  there was one time when I said hi to him over the phone.

13  Q      Tell us about that occasion.

14         MR. PURPURA:    Time frame again, if we may.  This is

15  seven years, a little smaller if possible.

16         THE COURT:    I think we've been talking about one

17  time frame.  Please ask the question.

18  Q      What was the time frame when you had this conversation

19  with the defendant over the telephone?

20  A      Well, I greeted him two or three times and with my

21  brother Mayo was in Mexico City with me.  He would talk to him

22  and there were some occasions in which he would hand the phone

23  over just to say hi.  In the year 2008, my brother Mayo and

24  him called me on a cellphone to Mexico City and that was the

25  last time I spoke to him on a cellphone.

1   Q     And what was the subject of that conversation?

2   A     In 2008 the topic of conversation was they called me so I

3   could talk to Arturo Beltran about a peace treaty because

4   there was a war.

5   Q     A war with whom?

6   A     It was a war between Arturo Beltran and Joaquin Guzman or

7   El Chapo and that created a war also for my brother Mayo and

8   for the entire cartel.

9          MS. PARLOVECCHIO:  Your Honor, we have about three

10  minutes left and I'm about to start a new topic.  This would

11  be a convenient time.

12         THE COURT:  Ladies and gentlemen, we're going to

13  send you home now.  I want to remind you of a few very

14  important things.  No research about the case, no talking with

15  anyone about the case, no Instagram, Twitter, nothing at all

16  about this case, don't look into anything having to do with

17  this case, put it out of your minds.  Have a good night's

18  sleep and we'll see you at 9:30 tomorrow morning.

19         Thank you very much.

20         (Jury excused.)

21         THE COURT:  Okay.  Anything further we need to

22  address?

23         MR. PURPURA:  No, thank you.

24         THE COURT:  See you tomorrow at 9:30.

25         (Adjourned to November 15, 2018 at 930 a.m.)

1                    INDEX

2    CARLOS SALAZAR                           637

3    DIRECT EXAMINATION                       637

4    BY MR. NARDOZZI

5    CROSS-EXAMINATION                        657

6    REDIRECT EXAMINATION                     678

7    BY MR. NARDOZZI

8    ROBERT C. ARNOLD                         680

9    DIRECT EXAMINATION                       680

10   BY MR. NARDOZZI

11   CROSS EXAMINATION                        697

12   BY MR. PURPURA

13   JESUS ZAMBADA GARCIA                     705

14   DIRECT EXAMINATION                       705

15

16

17

18

19

20

21

22

23

24

25

Anthony M. Mancuso, CSR    Official Court Reporter

| | | |
|---|---|---|
| 1 | 213-2 through 213-10 | 644 |
| 2 | 213-18 | 644 |
| 3 | 213-22 | 644 |
| 4 | 213-28 | 644 |
| 5 | 213-29 | 644 |
| 6 | 213-30 | 648 |
| 7 | Defendant's Exhibit 8 | 672 |
| 8 | Government's Exhibit 213-31 | 688 |
| 9 | Government's Exhibits 2 A and 2 B | 720 |
| 10 | Exhibit 1 A | 721 |
| 11 | | 721 |
| 12 | Government's Exhibit 502 | 725 |
| 13 | Government's Exhibit 9 | 728 |
| 14 | Government's Exhibit 6 | 729 |
| 15 | | 729 |
| 16 | 508-3 | 748 |
| 17 | 508-2 | 749 |
| 18 | Government's Exhibit 501 | 759 |
| 19 | | |
| 20 | | |
| 21 | 213-30 | 648 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |