3571

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                          09-CR-00466(BMC)
 3    UNITED STATES OF AMERICA,
                                          United States Courthouse
 4                                        Brooklyn, New York

 5          -against-                     December 19, 2018
                                          9:30 a.m.
 6    JOAQUIN ARCHIVALDO GUZMAN LOERA,

 7            Defendant.

 8    ------------------------------x

 9                TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                   BEFORE THE HONORABLE BRIAN M. COGAN
10                   UNITED STATES DISTRICT JUDGE
                             BEFORE A JURY
11

12    APPEARANCES

13    For the Government:       UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  GINA M. PARLOVECCHIO, AUSA
                                     ANDREA GOLDBARG, AUSA
16                                   MICHAEL ROBOTTI, AUSA

17                              UNITED STATES ATTORNEY'S OFFICE
                                Southern District of Florida
18                              99 NE 4th Street
                                Miami, Florida 33132
19                              BY:  ADAM S. FELS, AUSA

20                              DEPARTMENT OF JUSTICE
                                Criminal Division
21                              Narcotic and Dangerous Drug Section
                                145 N. Street N.E. Suite 300
22                              Washington, D.C. 20530
                                BY:  ANTHONY NARDOZZI, ESQ.
23                                   AMANDA LISKAMM, ESQ.

24
      (CONTINUED FOLLOWING PAGE)
25
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

```
1    (APPEARANCES CONTINUED)

2


3
     For the Defendant:          BALAREZO LAW
4                                400 Seventh Street, NW
                                 Washington, D.C. 20004
5                                BY:  A. EDUARDO BALAREZO, ESQ.

6
                                 LAW OFFICES OF JEFFREY LICHTMAN
7                                11 East 44th Street, Suite 501
                                 New York, New York 10017
8                                BY:  JEFFREY H. LICHTMAN, ESQ.
                                     PAUL R. TOWNSEND, ESQ.
9

10                               LAW OFFICE OF PURPURA & PURPURA
                                 8 E. Mulberry Street
11                               Baltimore, Maryland 21202
                                 BY:  WILLIAM B. PURPURA, ESQ.

12

13                               LAW OFFICES OF MICHAEL LAMBERT, ESQ.
                                 369 Lexington Avenue, PMB #229
14                               New York, New York 10017
                                 BY:  MICHAEL LAMBERT, ESQ.
15                                   MARIEL COLON MIRO, ESQ.

16

17

18

19

20

21   Court Reporter:             Georgette K. Betts, RPR, FCRR, CCR
                                 Phone:  (718)804-2777
22                               Fax:    (718)804-2795
                                 Email:  Georgetteb25@gmail.com
23
     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25
```

PROCEEDINGS

```
1                  (In open court; jury not present.)

2                  THE COURTROOM DEPUTY:  All rise.

3                  THE COURT:  Good morning.  Let's have the jury,

4     please.

5                  MR. PURPURA:  Your Honor, the jury is coming in,

6     when Mr. Fels finished, if he finishes perhaps before the

7     break can I get five minutes to set up as well?

8                  THE COURT:  Probably.  It's a little difficult with

9     this witness because I have to send the jury out, but I'll

10    try.

11                 MR. PURPURA:  Thank you.

12                 (Jury enters courtroom.)

13                 THE COURT:  Everyone be seated.  Good morning,

14    ladies and gentlemen.

15                 THE JURY:  Good morning.

16                 THE COURT:  We'll continue with direct examination.

17    Mr. Fels.

18                 MR. FELS:  Thank you, Your Honor.

19    PEDRO FLORES, resumed as a witness, having been previously

20    duly sworn/affirmed, was examined and testified further as

21    follows:

22    DIRECT EXAMINATION(Continued)

23    BY MR. FELS:

24    Q    Before we go back into these calls that you recorded,

25    Mr. Flores, I just wanted to ask you some questions about why
```

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3574

FLORES - DIRECT - FELS

1  you're testifying here today.

2           Sir, are you hoping to receive some sort of

3  reduction in your sentence?

4  A    Yes, I'm hoping.

5  Q    Has anyone promised that you'll get one?

6  A    No.

7  Q    Again, how many years left do you have on your prison

8  term?

9  A    Two years.

10 Q    What's your understanding of what you would need to do

11 just to be eligible for any additional reduction?

12 A    To testify about the truth.

13 Q    And what do you believe would happen if you didn't

14 testify truthfully, would you spend another two years in jail?

15 A    No.  I mean --

16 Q    What do you think would happen?

17 A    That my plea agreement would be revoked and I would spend

18 the rest of my life in prison.

19 Q    Now, we talked about some of the benefits that you and

20 your family received financially.  You're able to keep, I

21 think you testified, between you and your brother you were

22 able to keep $300,000 of the debt, drug debts that you'd

23 collected; is that correct?

24 A    That's correct.

25 Q    What other benefits has your family received because of

FLORES - DIRECT - FELS

1    your cooperation?

2    A    Protection from the government.

3    Q    You're currently in some sort of a special prison

4    program; is that correct?

5    A    Yes.

6    Q    And has the government spent some thousands of dollars in

7    expenses to move your family?

8    A    Yes.

9    Q    What about any sort of immigration benefits that family

10   members have received?

11   A    Yes.  My brother and father have received temporary

12   visas.

13   Q    A temporary visas to do what?

14   A    To live here in the United States.

15   Q    And that's because of your cooperation?

16   A    Yes, sir.

17   Q    Let's go back to those recordings.  I believe where we

18   left off you had identified Government Exhibit 609F as one of

19   the cell phones you used; is that correct?

20   A    That's correct.

21   Q    That was the one referenced in the call that we heard

22   with the (333)131-1113 number, correct?

23   A    Yes.

24   Q    I want to introduce -- I don't believe with any

25   objection, Your Honor -- Government's Exhibit 609J-1, 2, 3 and

3576

FLORES - DIRECT - FELS

1   4, which are all essentially printouts of what was already in

2   evidence as Government's Exhibit 609J.

3           THE COURT:  Those are received.

4           (Government Exhibit 609J-1, 2, 3, 4, were received

5   in evidence.)

6   Q    Sir, have you seen this document before today?

7   A    Yes.

8   Q    And this relates to your -- to the 609F cell phone that

9   you had in your hands yesterday.  Do you recognize what this

10  is?

11  A    Yes.  It's the phone book in the phone.

12  Q    So how many contacts did you have in this phone?

13  A    Just two.

14  Q    So that first one, in Government's Exhibit 609J-1, who is

15  that?

16  A    That's the number of that phone I would just -- for me

17  just to remember, I couldn't remember all the numbers so...

18  Q    Okay.  And then you see there entry two with mobile

19  number (631)318-7735.  Who is that assigned to?

20  A    That's the man's number.

21  Q    And again the man?

22  A    I'm sorry, Chapo Guzman.

23  Q    And I want to go through -- we'll go through the rest of

24  these calls a little bit later, but I want to go through some

25  of the dialed numbers here.

3577

FLORES - DIRECT - FELS

1          In Government's Exhibit 609J-3 you see there is a

2   call at 10/31 5:43 p.m., column number 12 it says, Me?

3   A     Yes.

4   Q     It's a call to yourself?

5   A     Yes, I think it was part of setting up the phone.

6   Q     And there are a bunch of these numbers all right after

7   that, but then on November 12th through the 14th you have

8   these calls just a couple of seconds each to 1-312-588 --

9   A     I can't see it.

10  Q     I'm sorry.  588-2300.  What is that?

11  A     That's the number for Empire Carpeting.

12  Q     Why are you calling Empire Carpet?

13  A     It's just a habit I picked up.  I call a neutral number

14  to make sure the phone is working and I used to always dial

15  that number.

16  Q     All right.  So let's talk about the additional calls,

17  we'll get back to these entries in just a little bit.

18          If everyone can turn to their binders, going back to

19  the same call we were looking at before the break which was

20  609A-1T, page 3.

21          Now, again, there are some letters on the left part

22  of the transcript.  If you can see there is an AG and MF.  Do

23  you understand what those are codes for?

24  A     Yes.

25  Q     Who is AG?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3578
FLORES - DIRECT - FELS

1    A    Alfredo Guzman.

2    Q    That's the man you were referring to as Alfredillo?

3    A    Yes.

4    Q    Then MF is?

5    A    My brother, Margarito.

6    Q    So on line 10 on page 3, your brother, Margarito, says,

7    Hey, how are we going to do this now?  Should I tell Sucio to

8    call this guy back?

9         Who or what is Sucio?

10   A    Sucio is just a name we had given to the courier at that

11   time.

12   Q    So what is it that your brother is explaining to

13   Alfredillo Guzman?

14   A    He's trying to set up for us to pick up the 18 kilos he

15   had -- we were supposed to receive.

16   Q    Eighteen kilos of what again?

17   A    Of heroin.

18   Q    From whom?

19   A    From Alfredillo and the man.  I'm sorry, Chapo.

20   Q    So explain to the jury, how did this work?  You have

21   couriers, so explain the process.  Does each side have

22   couriers, does one side have couriers, how does the process

23   work?

24   A    Yes, both sides have couriers so what they'll do is

25   either we give each other a number and a name and usually give

FLORES - DIRECT - FELS

1    a name on who your calling on behalf of, so that's like the

2    code name, you know.  So on this occasion my courier's name

3    was Sucio.

4    Q    Do you know what Alfredillo and Chapo Guzman's courier's

5    name is at this point?

6    A    No.

7    Q    You don't know?

8    A    Not yet, no.

9    Q    So let's move on to the next call, which is Government's

10   Exhibit 609A-2T.  I'll ask you the same questions that I asked

11   you before, did you review this call prior to today?

12   A    Yes.

13   Q    Is it a true and correct copy of the call?

14   A    Yes.

15   Q    Has it been altered in any way?

16   A    No.

17   Q    It's exactly how it was when you first heard it occur on

18   November 12th, 2008?

19   A    Yes.

20   Q    Now, again, we have a transcript, were you given an

21   opportunity to make changes if you heard something different

22   in the transcript that initially was transcribed?

23   A    Yes.

24   Q    To make sure that it was accurate, correct?

25   A    Right.

3580

FLORES - DIRECT - FELS

1   Q   Let's play this call.  And it starts right at the

2   beginning.

3              (Audiotape played.)

4              MR. FELS:  Pause there for a second.  Pausing it at

5   1:11 or actually 1:12 in the call.

6              (Audiotape stopped.)

7   Q   So who is talking, who can you hear in that exchange?

8   A   I can hear Alfredillo, my brother Margarito, and I can

9   hear myself a little bit too in the background.

10  Q   So you're present during -- while your brother is talking

11  to Alfredillo on the Nextel?

12  A   Yes.

13  Q   And Alfredillo says on line 3, Yeah, well, yeah, then

14  have them pick it up, after all he can pick it up there and

15  we'll wait there.  See if he can pick it up tomorrow because,

16  as you know, it's been a while and they're waiting and they're

17  desperate.

18              What did you understand him to mean they're waiting

19  and they're desperate, desperate for what?

20  A   They were desperate for us to pick up the heroin.  Like I

21  testified yesterday, that this issue with the DEA not wanting

22  to pick up any more kilos of heroin so we can try to push it

23  off as much as we could, but as you can see he was getting a

24  little upset.

25  Q   And why would he be upset that you hadn't acted quicker

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3581

FLORES - DIRECT - FELS

1   to pick up his heroin?

2   A    Because my brother J. had given him his word that we

3   would pick them up.  So a couple of -- I believe a week had

4   passed or something like that and they were wondering what was

5   going on.

6   Q    Was that unusual, a week delay?

7   A    Yeah, whenever they told us to pick up work we

8   immediately picked it up.

9   Q    So let's see what your brother responds, the next page,

10  page 3, line 5.

11            (Audiotape played.)

12            MR. FELS:  Pause there at 1:54.

13            (Audiotape stopped.)

14  Q    Getting back to line 5.  Your brother Margarito says,

15  Okay, man, I'm sorry, okay, I'm sorry -- no, okay, okay, what

16  if I try for tomorrow?  I can tell these guys maybe they might

17  not be as busy tomorrow with receiving a car or something.

18  That's why I was saying until Thursday, but, ah, is it still

19  18 like you had said?

20            Eighteen.  What is your brother talking about, 18

21  what?

22  A    Eighteen kilos of heroin.

23  Q    And Alfredillo responds:  Yes, yes, they are there.  If

24  you want, give me a number so this can be handled tomorrow for

25  sure.

FLORES - DIRECT - FELS

1          What is Alfredillo explaining to your brother?

2     A    Yeah, he's confirming that there is 18 kilos of heroin

3     and he's just asking us to give us -- give him the number for

4     our couriers so they could pick up the heroin.

5     Q    Okay.  I'm sorry, pardon?

6     A    So he could pass the number along to his couriers and set

7     up the pickup.

8     Q    So we'll continue on line 10.

9               (Audiotape played.)

10              MR. FELS:  Pause it there at 2:23.

11              (Audiotape stopped.)

12    Q    Now your brother is saying, Hey, my guy doesn't like to

13    talk on the phone so can you just give me his name and I'll

14    tell him, hey, or I'll tell him, yeah, I'm calling on behalf

15    of Sucio.  What's going on there?

16    A    Yeah, so the norm would be for us to give the couriers

17    numbers so they could speak to each other.  My brother and I

18    tried to put up a wall between our couriers and their

19    couriers.

20    Q    Why is that?

21    A    So if they were ever being recorded or their couriers

22    were working for the DEA or something they would not have any

23    conversation with my courier, you know.  So we called them

24    ourselves from Mexico and I would usually set up the pickup

25    and the drop.

FLORES - DIRECT - FELS

1    Q    So, in other words, were you instructed by your handlers

2    in the DEA to say, hey, have him talk to us, have his courier

3    talk to us?

4    A    Yes.

5    Q    Just to preview for the jury a little bit, did

6    Alfredillo's and Chapo Guzman's courier ultimately talk to

7    you?

8    A    No.  Wait a minute, yes.  I'm sorry.  I did talk to them.

9    Q    We'll get to that call in just a moment.

10          Let's continue on with, I think we're at line 14.

11          (Audiotape played.)

12          (Audiotape stopped.)

13    Q    Alfredillo is saying, Okay, see if you can get that

14    handled.

15          What is he saying?

16    A    Essentially he's saying, you know, so pick up this load

17    already, these kilos of heroin, pick them up.

18    Q    Why don't we continue on -- okay, let me just take a step

19    back.  On line 5, just skip ahead here.  Line 5.  So on line 5

20    if you take a look your brother says, Margarito, hey, yeah, so

21    I can -- I can give it to you tomorrow for sure, man.  Hey,

22    what was I going to tell you, um, about the device, the one I

23    gave you?  I thought El Senor was the friend that was

24    already -- was going to call me and I've been carrying it with

25    me.  I've had that one in my pant pocket every day, but he

3584

FLORES - DIRECT - FELS

1   hasn't called me.

2              What's going on?

3   A    That's page 5, right?

4   Q    Yes, page 5, line 19.

5   A    Yes, oh, he's saying the number we had passed along where

6   Chapo was supposed to call us on, that's what he was referring

7   to.

8   Q    He's saying he hadn't gotten the call yet?

9   A    Yeah, he hadn't gotten the call yet.

10  Q    And Alfredillo says, Oh, maybe he forgot.  I will give --

11  remind him that you asked me.

12             What's he mean by that?

13  A    Maybe Chapo forgot to call us and that he was going to

14  remind his father to call us.

15  Q    Let's skip ahead.  The rest of transcript is in evidence

16  as is rest of the call.  So let's play the next clip.

17             Hold on, I think this is page 8.  Page 8, it should

18  be line 43.  Let's continue on.

19             (Audiotape played.)

20             (Audiotape stopped.)

21  Q    Why don't we pause it at one.  Going back to line 43 on

22  page 8, who is this speaking, that clip that we heard at the

23  top?

24  A    That's me.

25  Q    And you're telling Alfredillo, My brother did ask you

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - FELS

1   about whether El Senor can call us?

2   A    Yes.

3   Q    Again, El Senor?

4   A    Chapo.

5   Q    And you say:  I wanted to talk to him to see if we could

6   come to some sort of an agreement about that because I wanted

7   to tell him if -- if I pay for him, you know, a little in

8   advance or something similar, if I pay for them right away

9   whether he can give me a break on the price.

10            What are you doing there?

11  A    I was just trying to find a way to get Chapo on the

12  phone, so I was telling him that we can negotiate the price of

13  the kilos or I could even pay for some upfront.

14  Q    And then you continue on:  Because, you know, a lot of

15  people have been arriving with that here and they're all at

16  the same number, you know.

17            What do you mean arriving with what?

18  A    With heroin.  There was a lot of people bringing heroin

19  to Chicago at the time.

20  Q    So it's harder to compete right now.  What's most

21  important to us is the quality, I mean for them to be good but

22  we'll have to see what El Senor has to say.

23            Again, explain to the jury what are you explaining

24  to Alfredillo?

25  A    I'm asking him I do want a cheaper price but I don't want

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3586

FLORES - DIRECT - FELS

1   a cheaper quality, so unless they bring something with better

2   quality then I'm happy to pay the same price.

3   Q    And Alfredillo on line 45 says, Of course the number and

4   then we can, and we'll skip ahead to line 50, you pass along

5   that same number again (333)136-1113, right?  And that's --

6   A    Right.

7   Q    -- again the same phone number as in the first call?

8   A    Yes.

9   Q    Why are you passing along that number again?

10  A    Again, so I could have the man call me, Chapo call me.

11  Q    Do you remember, what did you agree to pay Chapo for

12  these 18 kilos, what was the agreement?

13  A    55,000 a kilo.

14  Q    So by saying I wanted to renegotiate, you wanted to get a

15  cheaper price; is that correct?

16  A    Yes.

17  Q    Now you testified earlier that you ultimately did get in

18  touch with Chapo and Alfredillo's courier; is that correct?

19  A    Yes.

20  Q    We're going to skip ahead to call number 609A-3T.

21        Did you review this call prior to today?

22  A    Yes.

23  Q    Is this call a true and accurate copy of the recording

24  that you made?

25  A    Yes.

3587

FLORES - DIRECT - FELS

1    Q    And is it a true and accurate representation of the call

2    that you had with the courier?

3    A    Yes.

4    Q    Has it been altered in any way?

5    A    No.

6    Q    And, again, you were participating in making whatever

7    necessary corrections to the transcription?

8    A    Yes.

9    Q    Why don't we play this call, start with this call.

10              (Audiotape played.)

11              MR. FELS:  Pause it at 15.

12              (Audiotape stopped.)

13   Q    That was the same ringtone that we heard before, wasn't

14   it?

15   A    Yes.

16   Q    Who is it that you were talking to in English?

17   A    To my DEA handler.

18   Q    Again, this at the same time you're making a call with

19   another phone, correct?

20   A    Yes.

21   Q    Let's continue on with the call.

22              (Audiotape played.)

23              (Audiotape stopped.)

24   Q    Why don't we pause there at 1:11.

25              Do you know who you're talking to at this point?

3588

FLORES - DIRECT - FELS

1    A    No.

2    Q    You never identified this individual --

3    A    No.

4    Q    So you don't know where the name Gerardo Baez-Leyva comes

5    from?

6    A    I do remember him, I believe he was indicted in my case

7    as well, yeah.

8    Q    But you don't --

9    A    I don't know him.

10   Q    You didn't identify him?

11   A    No.

12   Q    Let's move on.  But who is this individual, BL, who is

13   this talking or what's his role?

14   A    He's just a courier.

15   Q    And again whose courier is this?

16   A    Chapo's and Alfredillo's.

17   Q    So you say on line 5 on page 2, that you're on behalf of

18   Sucio.  What are you doing there?

19   A    That was the name I had given him, so I'm letting him

20   know that I'm calling on his behalf so they know what I'm

21   talking about.  They're expecting my call.

22   Q    And you say on line 11, I'm going to send the guys.  You

23   tell me because I'm down here, you tell me where I -- I should

24   send them now so that they can get going -- going over there.

25          Let's talk about the "here" and "over there."  I'm

3589

FLORES - DIRECT - FELS

1  going to send the guys because I'm down here.  What does that

2  mean?

3  A    I'm telling them that I was in Mexico and --

4  Q    And you say:  You tell me where I should send them now so

5  they can get going -- going over there.

6           Where is over there?

7  A    In the pickup spot, whatever spot he was going to choose.

8  Q    In which city?

9  A    In Chicago.

10  Q    And he responds:  Tell them they should start heading

11  towards -- over towards Noa Noa.  What is Noa Noa?

12  A    It's a nightclub in Chicago.

13  Q    And you talk about Mannheim and Lake.  What is Mannheim

14  and Lake?

15  A    It's a streets in Chicago, right outside the airport.

16  Q    Which airport?

17  A    O'Hare Airport.

18  Q    And then on line 17 you say:  Over -- over by Mannheim

19  and Lake.  If you want, I can call you when the guys are there

20  and I can call you when they are 15 to 20 minutes from there,

21  we can make the final plans, okay?

22           What are you suggesting to Chapo and Alfredillo's

23  courier there?

24  A    That once my courier gets in that area I was going to

25  call him back so we can make the final arrangements.

3590

FLORES - DIRECT - FELS

1    Q    Why don't we continue on with the call, please.

2              (Audiotape played.)

3              (Audiotape stopped.)

4    Q    What's going on in that portion of the transcript or that

5    portion of the call I should say?

6    A    Well, the courier asked me, um, if my workers didn't have

7    a cell numbers themselves so he can communicate with them.

8    Q    And you say:  No, the thing is I just go ahead and call

9    because I don't like for them to be calling people.

10   A    Yeah.

11   Q    What are you doing there?

12   A    Again, I'm putting up a wall between the couriers, my

13   couriers and his couriers.  And on this occasion my courier

14   was going to be a undercover agent.

15   Q    So why was it important for you to say, Hey, let me go

16   ahead and call because I don't like for them to be calling

17   people?

18   A    I didn't know the agent that was going, I had no

19   communication with him at the time so I didn't want nothing to

20   go wrong.

21   Q    Okay.  And then you arrange, look, when they are about 15

22   to 20 minutes away I'll call you so that you're ready, you say

23   on line 27, page 4.

24              Sir, what did you do immediately after this call?

25   A    I called the agent.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3591

FLORES - DIRECT - FELS

1    Q    And without getting into what he told you happened, was

2    there some piece -- well, put it this way, this call is what,

3    November 13th?

4    A    Yes.

5    Q    Did the agent later report to you later that day about

6    something that had happened?

7    A    Yes.

8    Q    And what did he report to you?

9    A    That the pickup had been made and that 20 kilos were

10   picked up of heroin.

11   Q    Why is it important for the agent to explain to you that

12   there were 20 kilos of heroin that was picked up?

13   A    Because we had agreed that there were going to be

14   18 kilos of heroin.

15   Q    So was it -- that piece of information, was that

16   significant to you?

17   A    Yes.

18   Q    Explain to the jury why.

19   A    Um, there's a mistake on the two kilos and I wanted to

20   make sure they knew to be super clear that I had picked up

21   extra work at the time and that I was, you know, being

22   truthful.

23   Q    And why is that important in the drug business?

24   A    I mean it's your word, that's all you have I mean and

25   sometimes I think they test you to see what you say.  So it's

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3592

FLORES - DIRECT - FELS

1   happened before in other occasions and something -- you know,

2   you never know when they're testing you to see if you're going

3   to be honest.

4   Q    And what would the significance of a supplier sending 20

5   when you only negotiated for 18 you said in a testing you, how

6   could that play out?

7   A    Maybe see what I would respond back to them.  If I call

8   back and said, Okay, I picked up 18, they're going to know I'm

9   lying.

10  Q    Did you talk to Alfredillo after the agent reported to

11  you that there were 20 kilos instead of 18 of heroin?

12  A    Yes.

13  Q    And let's move ahead to that call, which is call number

14  609A-4T.

15             Same questions, you reviewed this call, correct?

16  A    Yes.

17  Q    And it was a true and accurate copy of the call that you

18  had made on your recording device; is that correct?

19  A    Yes.

20  Q    It hadn't been altered in any way?

21  A    No.

22  Q    You made whatever necessary edits to the transcription,

23  correct?

24  A    Yes.

25  Q    Let's go right ahead to that call.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

FLORES - DIRECT - FELS

1          (Audiotape played.)

2          (Audiotape stopped.)

3    Q    Let's pause there, 31 seconds.  Who is on this call?  Who

4    is the AG and who is the PF?

5    A    Alfredillo and myself.

6    Q    So here on line 9, you say -- on page 2 you say, I

7    already -- I already saw Sucio but they gave me two extras.

8          What are you saying there?

9    A    That I had seen the courier already -- well, not myself,

10   that we had picked up the heroin and that they gave me two

11   extra kilos.

12   Q    Let's see what he responds.

13          (Audiotape played.)

14          (Audiotape stopped.)

15   Q    So line 12, page 3, Alfredillo says -- when you say there

16   are two extras, he says, Wow, there's no problem, that's fine.

17   Again, you say on line 13, I just want to confirm, ah, so you

18   know there are 20.  And Alfredillo says, All right, I'll pass

19   your number along later and I'll let you know so you're ready.

20          Again, 20 what?

21   A    Twenty kilos of heroin.

22   Q    And Alfredillo says, All right, I'll pass your number

23   along later and I'll let you know so you're ready.

24          What is he saying there, what does that mean?

25   A    That he was going to pass the number for the cell -- the

3594

FLORES - DIRECT - FELS

1    cell number I had given him where Chapo was supposed to call

2    me.

3    Q    So you're ready for what?

4    A    To receive that call.

5    Q    Did Chapo -- Chapo didn't call you at that point, did he?

6    A    No.

7    Q    Do you think that Alfredillo ever got his father Chapo

8    Guzman to call you?

9    A    I don't know, I can't say.  Who knows.

10   Q    Did you have a call with another individual who you've

11   testified about yesterday relating to the fact that Chapo

12   hadn't called you?

13   A    Yes.

14   Q    Who is that?

15   A    Juancho, Chapo's cousin.

16   Q    Again, just to remind the jury about what you testified

17   yesterday, what role did Juancho play between you and Chapo

18   Guzman?

19   A    He was a person that coordinated shipments of drugs with

20   me and he's the lieutenant, the person I would respond to or

21   talk to.

22   Q    He was -- was he the only person who coordinated

23   shipments from Chapo Guzman or were there others?

24   A    No, they were others.

25   Q    Including Alfredillo?

FLORES - DIRECT - FELS

1    A    Yes.

2    Q    Let's flip right to the next transcript, 609A-5 dated

3    November 15, 2008.

4            Same questions, I know it's little repetitive, but

5    did you listen to this call prior to today?

6    A    Yes.

7    Q    It's a true and accurate copy of the call -- of the

8    recording that you made; is that correct?

9    A    Yes.

10   Q    No edits or alterations?

11   A    No.

12   Q    And you were given an opportunity to and made edits to

13   the transcription where necessary; is that correct?

14   A    Yes.

15   Q    We're going to start right with the beginning of this

16   call, please.

17            (Audiotape played.)

18            MR. FELS:  We'll stop there.

19            (Audiotape stopped.)

20   Q    And who is here in this transcript, PF?

21   A    That's me.

22   Q    JL?

23   A    That's Juancho.

24   Q    And on line 8, after you exchange pleasantries, Juancho

25   says to you, The thing is that, as you know, your brother came

3596

FLORES - DIRECT - FELS

1    over here with the lady.

2            Do you understand this term here "the lady?"

3    A    Yes.

4    Q    What is that?

5    A    He's referring to Mayo Zambada.

6    Q    Why is Mayo Zambada the lady?

7    A    I mean, in context he was referring to -- for me to

8    understand who he was speaking about so he called her the lady

9    or the aunt or whatever.

10   Q    Why the feminine?  Was Mayo Zambada a woman?

11   A    No.

12   Q    So why the feminine?

13   A    I guess just to differ -- to make a difference between,

14   like, his side and their side.

15   Q    Who is his side?  You said Juancho's side, who is

16   Juancho's side?

17   A    Chapo.

18   Q    Who is the other side?

19   A    Is Mayo.

20   Q    So when Juancho would refer to the lady or the aunt, he

21   would be referring to, you said, the other side?

22   A    Yes, mayo.

23   Q    Would it work in reverse as well?

24   A    Kind of, yeah.

25   Q    So when there's a reference to -- when Juancho is making

FLORES - DIRECT - FELS

1    a reference to feminine, he's making a reference -- you

2    understand that he's making a reference to Mayo?

3    A    Yes.  I don't think the feminine part has anything to do

4    with it, just so I know who he's speaking about.

5    Q    And how do you say the lady in Spanish?

6    A    "La Senora."

7    Q    On line 10 -- first of all, what it's mean, your brother

8    came over here with the lady, what does that mean?

9    A    He was referring to the October 2008 meeting that my

10   brother had with -- with Mayo Zambada, Chapo and the rest of

11   the cartel.

12   Q    And Juancho goes on on line 10 to say, It's too bad you

13   guys got involved with the lady, dude.  Well, the thing is

14   that the friend is looking for you guys, dude, looking for

15   you, he wants to answer the phone.

16              What do you understand this to mean?

17   A    Well, he wasn't -- I guess there's a point in that we had

18   agreed to take the heroin from Mayo Zambada's lieutenant,

19   Felipe.

20   Q    And why is that?

21   A    'Cause he didn't like dealing with the heroin too much.

22   Q    So let's -- let's -- but when he says too bad you got

23   involved with the lady, do you know why -- what specifically

24   he's talking about at this point, or we find out later?

25   A    Yes.  I mean, yeah, I know he's speaking about the

3598

FLORES - DIRECT - FELS

1   heroin.

2   Q    Okay, so let's continue on with this call, the next clip

3   I should say.

4              (Audiotape played.)

5              (Audiotape stopped.)

6   Q    Let's go back here.  Are you guys talking in code?

7   A    Yes.

8   Q    So let's continue back on page 3, line 19.  You say,

9   Fine.  That your father he met with me over there about this

10  the stuff you're not interested, right?

11             Who is the father there?

12  A    That's Chapo.

13  Q    How do you know that -- to call him the father as code?

14  A    I just know 'cause that's related to Chapo, so I'm trying

15  to tell him your father, your boss, you know.

16  Q    There's a later reference to uncle.  What's the

17  distinction between father and uncle here with respect to

18  Juancho?

19  A    He's saying the other side, Mayo Zambada, like his uncle.

20  First he referenced him as La Senora, now he calls him Tio.

21  Q    And so father, just to be clear, for Juancho is who?

22  A    Chapo.

23  Q    Uncle is who?

24  A    Mayo Zambada.

25  Q    Okay.  So getting back to line 19 you say, Your father,

FLORES - DIRECT - FELS

1    he met with me over there about the stuff you're not

2    interested in, right?

3           What is that a reference to?

4    A    That's the heroin.

5    Q    Why do you say to Juancho the stuff he's not interested

6    in?

7    A    Because we had had conversations where he had kind of

8    asked me to stay away from it, he didn't really like to get

9    involved with it for some reason.

10   Q    Let's turn to page 4.  You say, Um, well, I just wanted

11   to -- he hasn't really confirmed the number for me, you know.

12          What do you mean by that?

13   A    That the price of the kilos of heroin wasn't really

14   established at that point.

15   Q    Well, were you trying to renegotiate it?

16   A    Yes, that's right, yeah.

17   Q    Then Juancho says, No, but I don't think it was my

18   father, it was my uncle, right?

19          Who is he talking about?

20   A    He's saying I don't think it was Chapo, I think it was

21   Mayo Zambada, right.  Yeah.

22   Q    And then you say, No, that's aside from that, that

23   wasn't -- that was from your father.

24          What are you explaining to him there?

25   A    That that's -- there's two different deals we had made

3600

FLORES - DIRECT - FELS

1   and I'm just letting him know that I also made a deal with his

2   father, we also had picked up some kilos from Chapo.

3   Q    And on line 32 Juancho asks:  But how much did my uncle

4   give you?  And you say, Nah, ah, I think they gave me 10 --

5   10 -- no, 13.

6           What is that talking about?

7   A    That was speaking about the 13 kilos of heroin I had

8   picked up.

9   Q    At some prior point?

10  A    Yes.

11  Q    Was that the same 13 kilos of heroin that you sold five

12  and then threw away the other eight?

13  A    Yes.

14  Q    Then on line 35 you go on to say:  13.  I don't know, I'm

15  not sure, I already have that ready.  Part of that, but the

16  thing is the truth, the truth between us it wasn't that good.

17  Your father's were better.

18          What does that mean?

19  A    I'm telling him that I have the money ready for the 13.

20  And I'm just telling him that the kilos of heroin weren't that

21  great of a quality, but I'm telling him that Chapo's were a

22  lot better quality.

23  Q    And then he says, Oh, my father's were better?  And you

24  say, yes.

25          All right.  Let's continue on.

3601

FLORES - DIRECT - FELS

1    (Audiotape played.)

2    (Audiotape stopped.)

3    Q    What's going on here in line 41, page 5, what are you

4    saying here?

5    A    I'm just trying to explain to him that the quality of

6    heroin I had picked up wasn't good, I'm trying to --

7    Q    From whom?

8    A    From Mayo Zambada from Felipe.

9    Q    But then you say, But what I was thinking over there with

10   your father was, man, the truth was they were really good.

11   A    Yeah.

12   Q    What are you saying there?

13   A    I'm saying that the kilos of heroin I picked up from

14   Chapo were really good quality so that if I could get more or

15   negotiate a better price, I could pay for it out of my own

16   pocket and receive some more from him.

17   Q    He says, Yeah, but the same because they gave me 20?

18   A    Uh-huh.

19   Q    Again, what are you referencing there?

20   A    The 20 kilos of heroin.

21   Q    I'm going to skip ahead a little bit.  Can you just kind

22   of summarize, the next few pages are talking about you

23   shouldn't feel bad about telling the lady about the poor

24   quality.  Just, generally, what's going on there?  What is

25   Juancho trying to encourage you to do?

FLORES - DIRECT - FELS

1   A    He was a little bothered that we had accepted some of

2   these loads and in the past he would reprimand me for always

3   saying yes to them.

4   Q    Why shouldn't you pick up bad quality loads of drugs?

5   A    Because he's saying I was going to get stuck paying for

6   it.

7   Q    What does mean?

8   A    Pay for it out of my own pocket and I take a loss.  And

9   he felt that sometimes they would take advantage of my brother

10  and I always saying yes to him.  He would say, Man, speak up

11  for yourself, tell him you don't want it, send it back.

12  Q    Were in fact the kilos, the 13 kilos that you got of

13  heroin that you got from Mayo's side, were they of poor

14  quality?

15  A    No.

16  Q    So why are you telling Juancho that these 13 kilos of

17  heroin were of poor quality when they weren't?

18  A    There's two reasons:  One, I didn't want them to continue

19  to send the kilos of heroin at that point, I was trying to cut

20  that off.  And the other reason was I was trying to just get

21  him to talk about it on the phone.

22  Q    And you're trying to build a case against Juancho?

23  A    Yes.

24  Q    Did you ever find out what happened to Juancho?

25  A    Yes.

FLORES - DIRECT - FELS

1    Q    What did you hear?

2    A    He was killed.

3              MR. PURPURA:  Objection.

4              THE COURT:  Sustained.

5    Q    So let's skip ahead to page 11, line 115, 115 after these

6    conversations about the quality of the heroin, let's move on

7    and we'll play this next clip which should be minute 6:05 to

8    the end.

9              (Audiotape played.)

10             (Audiotape stopped.)

11   Q    All right.  What's going on?  Can you just briefly

12   describe what's going on in this portion of the call?

13   A    We're just finishing up the call and he's just trying to

14   tell me to fix this issue with Felipe.

15   Q    And that relates to what?

16   A    To the 13 kilos of heroin.

17   Q    But I want to address a point here on page 12, line 117.

18   After Juancho asks you, What do you want from my father,

19   meaning Chapo, correct?

20   A    Yes.

21   Q    You say:  Well, those ones I wanted to arrange, I wanted

22   to see if he can lower it five pesos.

23             What does that mean?

24   A    I'm telling him that I wanted to see if Chapo would drop

25   $5,000 off the price.

3604

FLORES - DIRECT - FELS

1   Q    $5,000 in total?

2   A    No, per kilo.

3   Q    $5,000 per kilo?

4   A    Yes.

5   Q    What did you agree to?

6   A    Fifty-five.

7   Q    And 55 what?

8   A    Thousand dollars a kilo.

9   Q    What were you hoping to have to pay instead?

10  A    Fifty thousand.

11  Q    $50,000?

12  A    Yeah.

13  Q    And Juancho asks you:  Who is giving it to you?  Who is

14  calling to give it to you?  You say, Alfredillo.

15          What's going on there?

16  A    He's asking me who was the person I was speaking to

17  receiving loads and I let him know it was Alfredillo.

18  Q    Okay.  We'll skip ahead.  They're talking about line 139,

19  page 13.  You say:  Okay, look, because I also sent him -- I

20  sent him the new number.  Alfredo was asking for the number

21  like three or four times and I've sent it to him because he

22  was going to call me and I have it in my pocket for nothing,

23  I'm just carrying around a phone.

24          What are you talking about there?

25  A    I'm just referencing the number I had given Alfredillo

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3605

FLORES - DIRECT - FELS

1   saying that he hasn't called me and I'm just -- been waiting

2   around for nothing.

3   Q    Who hasn't called you?

4   A    Chapo.

5   Q    Okay, then the next page, line 14 -- sorry, page 14,

6   lines 142 and 144.  Juancho says:  I don't have communication

7   with him, just with my father.

8          What is he saying there?

9   A    He thought I was telling him that Alfredillo hasn't

10  called me, I believe, and that he only could speak with Chapo.

11  Q    And he says, Just my father but let me tell him.  You

12  say, Well, that's what I mean, with your father.

13          And then on line 48 Juancho says he was going to

14  call you?  Who is that?

15  A    Chapo.

16  Q    And you say, He said he was going to call me, he said

17  Alfredo asked me for the number, right, and I gave it to him

18  and, okay, then he asked for it again and I gave it to him

19  again so that we could negotiate the 20.

20          What are you talking about there?

21  A    The 20 kilos of heroin.

22  Q    And Juancho responds:  He's not going to call you now,

23  not until tomorrow.

24          And then on line 52 he says, but I will tell him, I

25  will tell him.  Okay.

FLORES - DIRECT - FELS

1          Now let's take a look at when this call was.  You

2    see when it was and what time?

3    A    I'm sorry, where is that, at the beginning?

4    Q    That's right at the beginning of the call, the top page.

5    A    Yes.  November 15th, 2008, at --

6    Q    What time?

7    A    1:49 a.m.

8    Q    So it's really --

9    A    In the night.

10   Q    -- basically the night of the day before, correct?

11   A    Yes.

12   Q    So when he's saying I'll call you tomorrow, is he going

13   to call later that day?

14   A    Yeah, later that day.

15   Q    And, in fact, sir, did Chapo Guzman ultimately call you?

16   A    Yes.

17   Q    And how do you think that that came about?

18            MR. PURPURA:  Objection.

19            THE COURT:  Sustained.

20   Q    Let's just go straight to the call then.  Actually, I

21   take that back.

22            MR. FELS:  Before we do that, Your Honor, I

23   apologize, I want to skip ahead to a different call.

24   609A-11T.

25   Q    Sir, did you have any calls with someone representing

FLORES - DIRECT - FELS

1   Mayo's interest relating to the 13 keys of heroin?

2   A     Yes.

3   Q     And who is that with?

4   A     Felipe.

5   Q     And showing you call 609A-11T, which is right at the back

6   of everyone's binder, sir, did you listen to this call as

7   well?

8   A     Yes.

9   Q     And same question, is it a true and accurate copy of the

10  call?

11  A     Yes.

12  Q     It hasn't been altered in any way?

13  A     No.

14  Q     And you worked on the transcript as well?

15  A     Yes.

16  Q     We're not going to go into this in great detail, I'd just

17  like to play a little bit from this call.

18              (Audiotape played.)

19              (Audiotape stopped.)

20  Q     Who is on this call?

21  A     Felipe and myself.

22  Q     Felipe what?

23  A     Sarabia.

24  Q     And PF stands for?

25  A     Pedro Flores.

3608

FLORES - DIRECT - FELS

1   Q    FC?

2   A    FC, Felipe Sarabia.

3   Q    And on line 4, Felipe says to you, Look, that's fine.

4   Look, what I'm going to do is I'm going to talk to your father

5   and find out what -- what number he is working with so I can

6   send you the same one.

7            Do you understand what Felipe is telling you?

8   A    Yes.

9   Q    What?

10  A    He's telling me that he was going to speak with Chapo and

11  he was going to find out what's the purity of the heroin he

12  was handling at the time and he was going to send me the same

13  quality.

14  Q    Now, he says your father, how do you know that your

15  father, Mr. Flores, in context means Chapo?

16  A    Because it's coming from Felipe and Mayo's side, so he's

17  representing, like, maybe Chapo's people.

18  Q    All right.  So were you ever able to get Mayo Zambada on

19  the phone?

20  A    No.

21  Q    And what about Chapo?

22  A    Yes.

23  Q    And when Chapo called you at first, did you pick up the

24  phone immediately?

25  A    No, I missed the call.

FLORES - DIRECT - FELS

1  Q    And tell us the circumstances.

2  A    I was surrounded by a bunch of people when the phone rang

3  and I had the recorder in my other pocket so I couldn't get

4  the recorder out in front of them, so I had to remove myself

5  from them to a safe place and I pulled the recorder out and

6  get the earpiece in so that I could receive the call.

7  Q    Now I'm going to go back and show you Government's

8  Exhibit 609J-1.  We're going to put it right here on the

9  screen.  You previously testified "the man," Chapo, his number

10  was (631)318-7735, correct?

11  A    Yes.

12  Q    Showing you Government's Exhibit 609J-2, what are we

13  looking at on that third row?

14  A    Call log.

15  Q    And so what does it say up here, it says missed calls,

16  what does that mean?

17  A    I missed his call.

18  Q    And what time did that call come in?

19  A    At 8:32 p.m.

20  Q    On what date?

21  A    November the 15th.

22  Q    Do you remember what year that was?

23  A    2008.

24  Q    And showing you again what's been marked 609J-3, you

25  testified that you let the call go through, you missed it but

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3610

FLORES - DIRECT - FELS

1   then you got your recording device and called him back.  Do

2   you see on 609J-3 what row shows that you called him back?

3   A    Row number three.

4   Q    This one right here?(indicating)

5   A    Yes.

6   Q    And what time did you call him?

7   A    8:34 p.m.

8   Q    Two minutes after you missed the call?

9   A    Yes.

10  Q    Ladies and gentlemen, let's turn the transcript binders

11  to 609A-6T.

12            Sir, did you review this call prior to today?

13  A    Yes.

14  Q    Did you verify that it was a true and accurate copy of

15  the recording that you made?

16  A    Yes.

17  Q    And did you verify that this call, this recording is

18  exactly the conversation that you had with the defendant,

19  Chapo Guzman, on the day of November 15th, 2008?

20  A    Yes.

21  Q    Had it been edited or altered in any way?

22  A    No.

23  Q    And did you do the same thing, work with the transcript

24  to make sure that the transcription was accurate?

25  A    Yes.

3611

FLORES - DIRECT - FELS

1    Q    Why don't we go play this call starting from the

2    beginning.

3            MR. FELS:  Ladies and gentlemen, you should have a

4    running transcript on your video screen.

5            (Audiotape played.)

6            MR. FELS:  Let's pause that right there.

7            (Audiotape stopped.)

8    Q    Who is talking right now on this call?

9    A    Myself and Chapo.

10   Q    And when we look at these initials on the transcript, JGL

11   is who?

12   A    Chapo.

13   Q    And PF?

14   A    Myself.

15   Q    And line 5 Chapo says to you -- Chapo Guzman says to you,

16   Fine, fine, nice talking to you.  How's your brother?

17           Who is he talking about there?

18   A    My twin brother J.

19   Q    That's Margarito?

20   A    Yes.

21   Q    And you respond:  Everything is fine over here, too bad I

22   wasn't able to see you the other day.

23           What are you referencing there?

24   A    That October 2008 meeting that my brother attended in the

25   mountains.

3612

FLORES - DIRECT - FELS

1   Q    And you say there on line 8, that was my brother.

2   A    Yes.

3   Q    Meaning whom?

4   A    My brother J.  Margarito.

5   Q    And he says, but we are -- we're here at your service,

6   you know that.

7   A    Uh-huh.

8   Q    What does that mean?

9   A    It's -- it means I was courteous and that's just way the

10  he speaks to people saying like, you know, whatever you need

11  here, we're at your service.

12  Q    Let's continue on please.

13            (Audiotape played.)

14            MR. FELS:  Let's pause there at 1:26.

15            (Audiotape stopped.)

16  Q    So line 10, page 2 you say, Look, I'm bothering you

17  because of what I picked up the other day from over there.

18  What are you referencing?

19  A    I'm referencing the 20 kilos of heroin I had picked up in

20  Chicago.

21  Q    And you say, I wanted to tell you, I have the check

22  ready.  What's the check?

23  A    The cash for the heroin.

24  Q    Are you actually paying him by a personal check?

25  A    No.

3613

FLORES - DIRECT - FELS

1   Q    Why do you say check?

2   A    We just use check, so just code.

3   Q    And you say, I'm not sure, I want to ask you for a favor.

4   He says, tell me.  Do you think we can work something out

5   where you can deduct five pesos from that for me?

6          Again, remind the jury what do you mean by deducting

7   five pesos?

8   A    $5,000 a kilo.

9   Q    And Chapo Guzman asks, Well, what did we agree on?  You

10  say, You're giving it to me at 55.  What is that?

11  A    Means that the price for the kilos for 55,000.

12  Q    And Chapo says, Well, how much are you going to pay for

13  it?  And you say, Well, I'm saying if you do me the favor I'll

14  pay 50 for them, but I have the check ready.

15          What does that mean?

16  A    I'm trying to negotiate that the price of the kilos by

17  telling him that I'll pay for them up front, I'll pay for them

18  right away if he drops the price to 50.

19  Q    Is that a deviation from a normal practice?

20  A    I mean, I was trying to be as normal as routine as

21  possible.  In this situation I was really just trying to talk

22  to him, talk to him about it on the phone.

23  Q    And Chapo says, Well, you have the money already?  You

24  say, Well, I mean if you give it to me with the difference of

25  five, I can pay you right away and if you want to send me

FLORES - DIRECT - FELS

1    more, well...

2              What are you doing there?

3    A    Just trying to get him to continue the conversation.  To

4    be honest, in the normal day that would be our conversation

5    like, look it, I can move work for you, send me more, drop the

6    price now and I'll take more and...

7    Q    You're trying to encourage him to --

8    A    Trying to encourage for him to drop the price and in

9    exchange he's sending more kilos of heroin.

10   Q    Why would that be beneficial for Chapo Guzman to drop the

11   price but then send you more quicker?

12   A    He gets more profit if we move more product.

13   Q    He asks you, Well, how much did they give you?  They gave

14   me, 20.  How much?  20.

15             Again, what's 20?

16   A    Twenty kilos of heroin.

17   Q    And then at the bottom of page 3, line 23, Chapo says,

18   All right.  Then I'll pick up the money tomorrow, that's fine.

19   That price is fine.

20             What's the essence of what he's doing there?

21   A    He's agreeing to my terms.

22   Q    And let's continue on with the call, 1:27.

23             (Audiotape played.)

24             MR. FELS:  Let's pause right there at 1:36.

25             (Audiotape stopped.)

3615

FLORES - DIRECT - FELS

1   Q    You say, I really appreciate it because over there the

2   other man, El Otro Senor, had also given me something that

3   didn't turn out good, so I have to even them out.

4           What are you saying there?

5   A    I'm referencing the 13 kilos of heroin and telling him

6   that -- that Mayo Zambada had given us and I'm trying to

7   explain to him that with the heroin he gave me I'm going to

8   try to even out these bad ones with the good ones.

9   Q    And let's continue on.

10          (Audiotape played.)

11          (Audiotape stopped.)

12  Q    All right.  So continuing on in line 27, page 4 you have

13  a way -- Chapo says, You have a way of bringing that money all

14  the way over here.

15          What's he talking about?

16  A    If there's a way I can bring the cash to Mexico.

17  Q    And you say, All the way over there, of course.  Chapo

18  says, Okay, you'll give it to me here?  Yeah, yeah, man.  And

19  you describe this.  But then on line 31 he says, Look, look,

20  hold on.  Let me talk to someone right now.  If there's

21  someone that can pick up that money over there, I'll call you

22  back.  Hold on.

23          What is he talking about picking up money over

24  there?

25  A    He's saying that he's going to check if he had someone

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

FLORES - DIRECT - FELS

1   that could pick up the money in Chicago.

2            (Continued on the next page.)

FLORES - DIRECT - MR. FELS

1  DIRECT EXAMINATION (Continued)

2  BY MR. FELS:

3  Q    Okay, and he says:  I'll call you back, hold on.

4           Did he, in fact, call you back?

5  A    Yes.

6  Q    Showing you again Government Exhibit 609-J4, your

7  received calls on that phone.

8           Do you see any evidence that Chapo called you back?

9  A    Yes.

10 Q    Which line?

11 A    Nineteen.

12 Q    When did he call you back?

13 A    November the 15th, 2008.  At 9:03 p.m.

14 Q    And let's listen to Government Exhibit GX609A7.

15          Which, again, should be up on your screen.  It's

16 also in your binders, ladies and gentlemen.

17          Now, before we play this call actually, we didn't

18 hear the chirp that you have with the Nextel phones.

19          And did the phone that I showed you yesterday have

20 that push-to-talk feature?

21 A    No.

22 Q    So how were you able to record a call?

23 A    I have an ear piece plugged into a recorder, and the ear

24 piece has a mic in it.

25 Q    Now, when an incoming call comes in, are you able to

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

3618

FLORES - DIRECT - MR. FELS

1   immediately catch the call from the start?

2   A    No.

3   Q    And why's that?

4   A    I have to put the ear piece in.

5   Q    Okay, so I think we're about to see an example of that.

6   Let's play the call, please.

7            (Audio recording played.)

8            Let's pause at seven seconds point three.

9            You kind of jumped right into that call.  Do you

10  know why?

11  A    Yeah, because I was a little late putting the earpiece in

12  my ear.

13  Q    Okay.  So let's at least say what we've gotten here you

14  say on line 1:  Okay, with it right or here.

15           And Chapo says:  No... Well, first of all I didn't

16  go through the process again before.  I apologize.

17           Did you listen to this call prior to today?

18  A    Yes.

19  Q    Is this a true and accurate copy of the recording that

20  you made of this call?

21  A    Yes.

22  Q    Appear to be altered in any way other than the fact you

23  missed the first couple of seconds?

24  A    No, it hasn't been altered.

25  Q    And did you go through the transcript as best you could

FLORES - DIRECT - MR. FELS

1  to make whatever corrections you needed to make to make sure

2  it was accurate?

3  A    Yes.

4  Q    Okay.  Who is PF and who is JGL?

5  A    I'm PF and Chapo's JGL.

6  Q    Okay.  On line 1 you say:  Okay.  Over there is it with

7  right or here, and Chapo says:  No, the one on that side we

8  will pick it up over there.

9            What does he mean?

10  A    Yeah, I was confused whether he still wanted the money in

11  Mexico or in Chicago.

12  Q    And so what's he saying by the one on that side we'll

13  pick it up over there?

14  A    That they pick up the money in Chicago.

15  Q    Okay.  And Chapo says:  Let me put him on and then let's

16  see what happens.

17            Continue, please.

18            (Audio recording played.)

19  Q    Let's stop there at 1:07.

20            Now, who's the person who first says the word

21  "Chicago"?

22  A    Chapo.

23  Q    So by Chapo saying:  Hey, the person's in Chicago, the

24  person over there to pick up the money, what does that tell

25  you about where he understands of where that heroin shipment

3620

FLORES - DIRECT - MR. FELS

1  is going?

2  A    He knows the heroin was in Chicago because that's where

3  he expected it to be.

4  Q    Payment of what?

5  A    Of the heroin.

6  Q    And so you have this conversation where he's talking

7  about, look, you know, you get up in the afternoon, the bank's

8  open during the day.  What's going on there?

9  A    He knows the thing that my brother and I would stay up

10 all night 'til the early morning, and he's referencing saying

11 the banks are going to be open by the time we get up.

12 Q    So he's kind of joking with you a little bit?

13 A    Yes.

14 Q    But he wants to make sure that --

15 A    I make the deposit.

16 Q    And why is that?

17 A    Because they want to pick up the money.

18 Q    So he says to -- a sign to somebody else:  Why don't you

19 give them Laz's number and then he tells you:  Okay, look,

20 someone's going to give you the number of the guy that's in

21 Chicago, okay?

22        And then top of page 4 Chapo says:  It was nice

23 talking to you and say hello to your brother.

24        What's he referencing there?

25 A    Just my brother, Jay.

3621

FLORES - DIRECT - MR. FELS

1  Q    You say:  Okay.  You, too, my brother sends his greetings

2  to you, too.

3            What does he then do?

4  A    He then passes the phone to someone else.

5  Q    Okay.  And let's hear what that conversation is.

6            (Audio recording played.)

7            Let's pause it right there, 115.

8            Sir, there's an "AC" next to the person you're

9  speaking with.  Do you see that?

10  A    Yes.

11  Q    And if you look at the front page, it says that the name

12  is Alex -- AC, is Alexander Cifuentes Villa.

13            Do you know who that is, sir?

14  A    No.

15  Q    Have you ever met him?

16  A    No.

17  Q    To the best of you knowledge, aside from this telephone

18  call, have you ever spoken with him again?

19  A    No.

20  Q    Do you know how that name appeared on the transcript, if

21  you don't know him?

22  A    No.

23  Q    Okay.  Let's see.

24            Alexander Cifuentes is now talking to you and what

25  does he say?  What are you exchanging here?  Okay, what's up?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

3622

FLORES - DIRECT - MR. FELS

1    A    He's greeting them.  He's going to pass me the number for

2    the carrier in Chicago where I'm supposed to drop the money

3    off.

4              MR. FELS:  All right, let's keep playing, please.

5              (Audio recording played.)

6              MR. FELS:  Pause there, 1:50 or two minutes.

7    Q    This is Alexander Cifuentes passes along this number, and

8    you ask:  Who do I ask for?  And he says:  Lazaro.

9              And then:  On behalf of, you're asking.  This is on

10   behalf of Benjamin.

11             What's going on there?

12   A    So once I get the number, I'm just trying to see what

13   name I should give to the courier to drop the money off.  So

14   they can take an account of who's taking the money.

15   Q    So who is "Lazaro"?

16   A    Lazaro is their money carrier in Chicago.

17   Q    And "Benjamin," who is that supposed to be?

18   A    The code.  Just so they know who deposit that money.

19   Q    That's going to be the code for your name?

20   A    Yes.

21   Q    Did you ever ultimately call Lazaro?

22   A    Yes.

23   Q    So that's a real person?

24   A    Yes.

25   Q    And so let's continue on.

FLORES - DIRECT - MR. FELS

1          (Audio recording played.)

2   Q    Let's pause there.

3          So there seems to be some confusion about Colombia

4   at the top page 6, where Alexander Cifuentes says:  Do you

5   have the number of the one to deliver over there in Colombia.

6          What's he talking about?

7   A    I believe he was confused.  And my experience is that he

8   probably believed I was depositing the money in Chicago and

9   then in exchange they're give me the cash from Colombia.

10  Q    Now, based on your experience as a drug trafficker, why

11  would someone do something like that?

12  A    To pay for drugs in Colombia.  They don't accept checks

13  or credit cards, they take bulk cash.

14  Q    So what do you explain to him about whether or not you're

15  doing anything with Colombia?

16  A    All I'm saying is that:  No, that's a mistake.  I was

17  just going to make a deposit in Chicago and I wasn't going to

18  pick up no money.

19  Q    Okay, and then the line 58, Alexander Cifuentes says:

20  All right, call that person Lazaro, that's his name.

21          We're not going to -- you said you did make a

22  recording with Lazaro?

23  A    Yes.

24  Q    We're not going to play that call, but I will say that

25  you asked him if the man is busy.

FLORES - DIRECT - MR. FELS

1          Who are you talking about there on line 63?

2     A     Chapo.

3     Q     Okay, let's continue on to the next clip.  2:51, at

4     minute 2:51 to the end.

5              (Audio recording played.)

6              MR. FELS:  You're out of order with the clip.

7              THE COURT:  Do you wish to take your morning break

8     now?

9              MR. FELS:  Sure.  We'll fix it out.

10             THE COURT:  Let's take until 11:15, ladies and

11    gentlemen.

12             Don't talk about the case.  See you in 13 minutes.

13             (Jury exits the courtroom.)

14             THE COURT:  Okay, recess 11:15.

15             (Whereupon, a recess was taken at 11:04 a.m.)

16             THE COURTROOM DEPUTY:  All rise.

17             THE COURT:  All right, let's get the jury, please.

18             (Jury enters the courtroom.)

19             THE COURT:  Everyone be seated please.

20             Continue, Mr. Fels.

21             MR. FELS:  Thank you, Your Honor.

22             First of all, apologize for the technical

23    difficulty, but we got it all sorted out.

24             THE COURT:  Okay.

25    BY MR. FELS

FLORES - DIRECT - MR. FELS

1    Q    And if everyone can turn in their transcript binders to

2    call 6, GX609A-7.  Page 7.  And we're at line 67.

3          And I think where we left off is that you said that

4    you wanted to talk to man again.  Alexander Cifuentes says:  I

5    want -- he wants to talk to you again.  And that's where we

6    left off, so let's continue the call.

7          (Audio recording played.)

8    Q    Let's pause right there.

9          And what time we're on is we're at 3:17.  Thank you.

10         All right.  So you asked Chapo:  Okay, excuse me, I

11   was going to ask you, I only have three left.  When do you

12   think we can get some more?

13         What are you talking about?

14   A    I was talking about three kilos of heroin and asking when

15   could we expect to receive another shipment.

16   Q    And he says:  What the F, man, didn't you just say you

17   could only get rid of a little bit?

18         What's he referencing there?

19   A    He's referencing a past discussions about how many -- how

20   much heroin we can move.

21   Q    And what were you and your twin brother, Margarito,

22   conveying to Chapo in the past about your capacity to move

23   heroin?

24   A    That we couldn't move the capacity that they wanted to

25   give to us.  And that prior visit to my brother they wanted to

3626

FLORES - DIRECT - MR. FELS

1  send like 50 kilos at a time or something, I don't recall, but

2  it was just too much.  And once you opened that door, it's

3  like they're to keep coming.

4  Q    So he is -- he's -- how would you describe he's being

5  here when you're saying:  I want some more now.

6  A    I was shocked a little bit that they were gone so fast.

7  Q    Line 7 you say:  Ah, the truth is, these turned out good,

8  I can't lie.

9         Let's continue on --

10        What turned out really good?

11 A    The heroin.

12        MR. FELS:  Let's continue on please with the call.

13 3:17.

14        (Audio recording played.)

15 Q    All right.  So let's go back to line 71, Chapo says to

16 you, on page 7:  How many can you get rid of in a month?

17        And you say:  If you want, right now we're doing

18 about 40.

19        What are you and Chapo talking about?

20 A    Forty kilos of heroin.

21 Q    And he says:  Oh, that's good.  Hey, has anyone else sent

22 you, because this guy told me that they were going to send

23 you.

24        What's he referencing there?  What's Chapo

25 referencing there?

FLORES - DIRECT - MR. FELS

1    A    That my friend -- he's referencing Mayo Zambada sending

2    me heroin also.

3    Q    And you say:  Well, yes, but what they sent was not --

4    really not -- not good, not compared to what you had.

5            What are you referencing there?

6    A    Thirteen kilos of heroin that Mayo had sent -- sent us.

7    Q    That you had claimed that weren't very good but they, in

8    fact, were good?

9    A    Yes.

10   Q    And, again, is there a reason, based on the DEA

11   instruction, or based often how you were dealing with law

12   enforcement, that you explained to all these people that the

13   heroin that Mayo sent wasn't very good?

14   A    Yes, because I wanted to -- to get everyone to talk about

15   it on the phone.

16   Q    And, in fact, you did get Juancho to have a lengthy

17   discussion, correct?

18   A    Correct.

19   Q    So now let's go to top of page 8.

20           And he says:  Oh, okay.  Chapo says:  I will send it

21   to you then.

22           And you say:  Yes, but do you think they can have

23   another seven there that they can give me?

24           And Chapo says:  Ah, I'll send you some from this

25   week to the next.

3628

FLORES - DIRECT - MR. FELS

```
1              What is Chapo Guzman agreeing to do then?

2    A    To send me another shipment of heroin.

3    Q    Now, what happened about two weeks after this call?  In

4    November 13th of 2008 was the call.

5              What happened two weeks later?

6    A    I turned myself in to the DEA.

7    Q    And was there ever an opportunity for Chapo Guzman to

8    send you any more kilos of heroin?

9    A    No.

10   Q    And did you ever -- you talked about this $1 million over

11   the payment of 20 kilos of heroin.  1 million, being 22 kilos

12   of heroin times 50,000.

13   A    Twenty kilos of heroin.

14   Q    I'm sorry, 20 kilos of heroin times $50,000?

15   A    Yes.

16   Q    Is how much?

17   A    A million dollars.

18   Q    And did you, in fact, turn that money over to DEA?

19   A    Yes.

20   Q    Do you know if DEA wound up paying someone else for that

21   heroin?

22   A    They didn't.

23   Q    Okay.  And so two weeks after this call, what do you do?

24   A    I turned myself in to DEA in Mexico.

25              MR. FELS:  No further questions.
```

3629

FLORES - CROSS - MR. PURPURA

1          THE COURT:  All right.  Cross-examination.

2          MR. PURPURA:  Your Honor, thank you.

3   CROSS-EXAMINATION

4   BY MR. PURPURA:

5   Q    Mr. Flores, yesterday under oath you were asked by

6   government counsel some questions about Mr. Ledesma.

7          Do you remember that?

8   A    Yes.

9   Q    And in particular, on page 3433, line 5, the question

10  was:  Did you know at the time who he was working for?  And

11  your response was:  No, I didn't.

12          And that's initially you did not know who

13  Mr. Ledesma was working for; is that correct, sir?

14  A    That's correct.

15  Q    Mr. Ledesma, he's the man, was it about two -- 2002, 2003

16  when you met him in Chicago?

17  A    Yes.

18  Q    And at that time, he approached you and he had kind of an

19  unusual offer indicating that he could get you cocaine for

20  less than you were receiving it at that time; is that correct?

21  A    No.  I had a prior discussions with him in Mexico.

22  Q    And those discussions indicated he can give you cocaine

23  at a more reasonable price; is that correct?

24  A    Yes.

25  Q    And that was a thousand dollars less; is that correct?

FLORES - CROSS - MR. PURPURA

1  A    That's correct.

2  Q    But initially you didn't know who, in fact, was in the

3  chain of command with Mr. Ledesma; is that correct?

4  A    Yes.

5  Q    And then you were asked the question was:  Did you later

6  find out?  And your response was:  Yes.

7        Do you remember saying that just yesterday?

8  A    Yes.

9  Q    And that was under oath, right?

10  A    Yes.

11  Q    And then the next question was:  Who told you who was

12  Lupe Ledesma's boss?  And then your answer was:  The man,

13  El Chapo.

14        The defendant in this case, correct?

15  A    Yes.

16  Q    Was he the boss of Mr. Ledesma?

17  A    Yes.

18  Q    And that's what you said under oath literally yesterday,

19  correct?

20  A    Yes.

21  Q    Now let me take you back.  Let me take you back to your

22  very first debriefing.

23        And this is your first debriefing in Monterrey, not

24  the one over the phone, and it is in August of 2008.  So

25  you're still in Mexico.  You're with your attorney.  You're

3631

FLORES - CROSS - MR. PURPURA

1    meeting with the DEA and other government agents at what's

2    called the clandestine spot, so no one sees you, and you speak

3    to them.

4            You remember doing that; is that correct, sir?

5    A    Yes.  I believe it was -- not in August.

6    Q    Would it refresh your recollection if -- do you remember

7    when it was?

8    A    October.

9    Q    Well, let me show you what has been marked as -- it's

10   PF-47, which is Defense Exhibit 328.

11           Just for the witness only, please.

12           I'm just going to direct your attention to line 10.

13           Does that refresh your recollection that that first

14   meeting in Monterrey, Mexico was August 10th of 2008?

15   A    Yes.

16   Q    And at that meeting, do you remember telling the agents

17   that German Olivares, this man here, that German Olivares

18   received all his cocaine from Mayo Zambada.

19           Do you remember telling the agents that?

20   A    Yes.

21   Q    And you have, under oath -- strike that.

22           You have prepared affidavits for years before the

23   United States Grand Jury in the Northern District of Illinois;

24   is that correct, sir?

25   A    Yes.

FLORES - CROSS - MR. PURPURA

1    Q    And by that I mean that you and your lawyer and

2    government counsel prepared actual affidavits, and these

3    affidavits you signed, you signed that this statement is an

4    accurate and truthful summary to the best of my recollection.

5    It does not describe everything that I know about the events

6    described or other events that are not described.

7              Do you remember that?

8    A    Yes.

9    Q    And that was on multiple affidavits you signed prior to

10   your appearance before the United States Grand Jury; is that

11   correct, sir?

12   A    That's correct.

13   Q    And in that United States Grand Jury, you were again

14   sworn in.  Put your hand up and you took the oath; is that

15   correct, sir?

16   A    Yes, sir.

17   Q    And your statement was read into the record; is that

18   correct, sir?

19   A    Yes, sir.

20   Q    Do you remember telling the United States Grand Jury, on

21   June 4th, 2009, as in your statement on June 4th, 2009, that

22   you swore was true:  Eventually I learned that Ledesma and

23   others of my source of supply received all of their cocaine

24   from Olivares.

25             Do you remember telling them that?

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

FLORES - CROSS - MR. PURPURA

1    A    Yes.

2    Q    And that's true; is that correct, sir?

3    A    Yes, sir.

4    Q    And you went on to say that:  Olivares is the chief

5    lieutenant de Mayo.

6         Do you remember that, sir?

7    A    Yes.

8    Q    And so the chain of command with Ledesma would be that

9    you received from Ledesma, Ledesma received from Olivares, and

10   Olivares received from Mayo Zambada; is that correct, sir?

11   Yes or no?

12   A    Yes.

13   Q    And that's what you told the United States Grand Jury

14   under oath; is that correct, sir?

15   A    Yes, sir.

16   Q    You didn't say that Mayo Zambada and Chapo Guzman gave

17   drugs to that one particular person, Ledesma, you said only

18   one person did, and that was Mayo Zambada, correct, sir?

19   A    Yes.

20   Q    And that was in 2009, right?

21   A    Yes.

22   Q    And now is December 2018, right?

23   A    Correct.

24   Q    Mayo Zambada is not on trial; is he?

25   A    No, sir.

FLORES - CROSS - MR. PURPURA

1    Q    Just the man, according to you, right?

2    A    Yes.

3    Q    You also, in your initial meetings with government

4    agents, with your counsel present, said you had another

5    source.  El Musico, correct?

6    A    Correct.

7    Q    And this source was in 2006 to 2008, correct?

8    A    Correct.

9    Q    And this source was -- El Musico's actual source was the

10   ABL organization, Arturo Beltran Leyva organization; is that

11   correct, sir?

12   A    That's correct.

13   Q    You also had a third source.  You had a direct Colombian

14   source during the same period, 2008 -- 2007, 2008, correct?

15   A    Correct.

16   Q    And that source's first name was "Andy"; is that correct?

17   A    Correct.

18   Q    And you were negotiating deals directly with that source

19   as well; is that correct, sir?

20   A    Yes.

21   Q    And when you appeared before the United States Grand Jury

22   on June 4th, 2009, a paragraph was read in to evidence about

23   the first meeting with Mayo Zambada.

24        Do you remember that?  Do you recall that, sir?

25   A    I recall the first meeting, yes.

FLORES - CROSS - MR. PURPURA

1   Q    And just for you right now, let me show you what has been

2   marked as Defense Exhibit 326, which is 326A, an excerpt.

3              MR. FELS:  Objection, Your Honor, as to the form.

4              THE COURT:  I'm not sure what you're using it for,

5   but go ahead.

6   Q    Do you recall telling the United States Grand Jury that:

7   At this meeting, we explain the status of our debt to Ledesma

8   and Olivares and reached an agreement to repay the debt.

9              Do you remember telling them that?

10  A    Yes.

11  Q    Margarito and I informed Mayo Zambada that over time we

12  had purchased and sold between approximately 15 and 20 tons of

13  cocaine for him and that we would pay our debt in full.

14             Do you remember telling them that?

15  A    I remember telling them that -- I remember him telling me

16  that we had moved over 20 tons of cocaine at the time.

17  Q    And you responded back that you believe it was somewhere

18  between 15 and 20.

19             Do you remember that, sir?

20  A    Yes, sir.

21  Q    And that's what you told the United States Grand Jury,

22  correct, sir?

23  A    Yes, sir.

24  Q    And that's the cocaine that you had been receiving

25  through this man here, correct, sir?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

FLORES - CROSS - MR. PURPURA

1    A    Correct.

2    Q    But directly from Mr. Ledesma; is that correct, sir?

3    A    Correct.

4    Q    And at that meeting, in 2005, Mayo Zambada agreed that he

5    was going to be sending you more drugs now that he met you,

6    correct; you and your brother, correct, sir?

7    A    Yes, sir.

8    Q    Now, Mayo Zambada, he was not hiding up in the mountains

9    at that time; was he?

10   A    No, sir.

11   Q    He was there for you to meet; is that correct, sir?

12   A    Yes, sir.

13   Q    And when you met El Musico, who was working with Arturo

14   Beltran Leyva, was he hiding up in the mountains?

15   A    No, sir.

16   Q    Where did you meet him?

17   A    In Guadalajara, at my residence.

18   Q    Mr. Guzman never came to Guadalajara, your residence; did

19   he, sir?

20   A    No, sir.

21   Q    Now, your brother, obviously you are from a fraternal

22   twins; is that correct?

23   A    Identical twins.

24   Q    Identical twins, excuse me.

25        So you and your brother are very close; is that

3637

FLORES - CROSS - MR. PURPURA

1    correct?

2    A    That's correct.

3    Q    You were close growing up; is that correct?

4    A    Yes, sir.

5    Q    And you've been close when you started selling drugs back

6    in 1988, right?

7    A    1998.

8    Q    1998.  1998, correct?

9    A    Yes, sir.

10   Q    And you remain close to this day; is that fair to say?

11   A    I've been away from him for about nine years.  But in

12   spirit, yes.

13   Q    Very good.

14        And during many of the proffer sessions, and you've

15   had, gosh, probably six months consecutive worth of proffer

16   sessions when you initially came in in 2008 to 2009, right?

17   A    Yeah, it was a lot.

18   Q    And by "proffer sessions," I mean meeting with government

19   counsel on a daily basis or phone conferences literally for

20   the first six months after you turned yourself in, correct?

21   A    It was almost all day long for the first couple of

22   months, yes.

23   Q    And many of those proffers, you and your brother were

24   together; is that correct?

25   A    Yes.

                    FLORES - CROSS - MR. PURPURA

1    Q    And many of those proffers when you were talking to the

2    agents, your brother was sitting at that same table when you

3    were talking to the agents, right?

4    A    Yes.

5    Q    And when he was talking to the agents, in fact, you were

6    there and you heard what he had to say as well; is that

7    correct, sir?

8    A    Yes.

9    Q    And during that time period, were you housed together or

10   near him at that point?

11   A    Yes.

12   Q    So you and your brother could discuss what you're saying

13   to the agents, right?

14   A    Yes.  We did.

15   Q    And you did, right?

16   A    Yes.

17   Q    And in preparation for trial, just recently, since this

18   year, you've met at least a dozen times with counsel who

19   presented you to testify; is that correct, sir?

20   A    Yes.

21   Q    Now, I'm going to show you, just for your benefit only at

22   this time, for the witness, Defense Exhibit 337.

23            Do you recognize this area?

24   A    Yes.

25   Q    What is it?

3639

FLORES - CROSS - MR. PURPURA

1    A    That's my neighborhood.  Where I grew up.

2            MR. PURPURA:  I would move Defense Exhibit 337 into

3    evidence at this time.

4            THE COURT:  Received.

5            (Defense Exhibit 337, was received in evidence.)

6            MR. PURPURA:  Thank you.

7            (Exhibit published.)

8    BY MR. PURPURA:

9    Q    And you indicated that you had, I believe, you had

10   multiple customers; is that fair to say?

11   A    Yes.

12   Q    I'm going to show you just for identification, Defense

13   Exhibit 33 -- I'm sorry, was 337 --

14           THE COURT:  It was.

15           MR. PURPURA:  Was it shown?

16           THE COURT:  It was.

17           MR. PURPURA:  Could we put it back up, please.

18           THE COURT:  Sure.

19           (Exhibit published.)

20   Q    And with that I'm going to show, just now for the

21   witness, Defense Exhibit 337 -- 334, excuse me.

22           Do you recognize that photograph?

23   A    Yes, I do.

24   Q    Do you know who that is?

25   A    Yes.

3640

FLORES - CROSS - MR. PURPURA

1    Q    Who is it?

2    A    That's Kato.

3    Q    Who is Kato?

4    A    Rudy Rangel.

5    Q    R-A-N-G-E-L?

6    A    Yes.

7             MR. PURPURA:  Move Defense Exhibit 334 into

8    evidence.

9             MR. FELS:  No objection.

10            THE COURT:  Received.

11            (Defense Exhibit 334, was received in evidence.)

12            (Exhibit published.)

13   Q    Now, Rudy Rangel, he grew up in that same neighborhood as

14   you; is that correct, sir?

15   A    Yes, sir.

16   Q    And Rudy Rangel, I mean you knew him from that

17   neighborhood, correct?

18   A    Yes.

19   Q    And that neighborhood we're talking about is called

20   Little Village, correct?

21   A    Yes, sir.

22   Q    And Little Village is in Chicago, correct?

23   A    Yes.

24   Q    And Little Village is approximately 80 percent or more

25   Hispanic?

FLORES - CROSS - MR. PURPURA

1    A    Yes.

2    Q    Rudy Rangel was a gang member, correct?

3    A    Yes.

4    Q    Rudy Rangel was a gang member in the Latin Kings; is that

5    correct?

6    A    Yes, sir.

7    Q    And are you familiar with the Latin Kings?

8    A    Yes, sir.

9    Q    Do you know is it one of the oldest Latino gangs in the

10   United States?

11   A    Yes.  Also the biggest gang in the United States.

12   Q    You at one point -- strike that.

13        At one point, in the 2001, when apparently cocaine

14   was not flowing, you used him as a source.  He actually

15   supplied you with cocaine; is that correct, sir?

16   A    Yes.

17   Q    And so Rudy supplied you, at least according to what you

18   told the agents, eight to ten times, perhaps 100 to 125 kilos

19   at a time.

20        Does that sound about right, sir?

21   A    Yes.

22   Q    In addition to that, after that time period, based on his

23   connection to the Latin Kings, he was able to find customers

24   for you as well; is that correct, sir?

25   A    Somewhat.

FLORES - CROSS - MR. PURPURA

1  Q    And he gave a finder's fee if you found the customers,

2  correct?

3  A    At times, yes.

4  Q    And that finder's fee, at least I believe what you told

5  the agents, might be as much as a thousand dollars a kilo to

6  that particular customer.

7  A    Yes.

8  Q    You knew that -- you knew that Rudy Rangel had a tattoo

9  on his chest, "Destined Forever My Queen ███████"?

10 A    Yes.

11 Q    Who is ███████?

12             MR. FELS:  Objection, Your Honor.

13             Sidebar.

14             THE COURT:  Sustained.

15             Overruled, let's see what it is.

16             MR. FELS:  Your Honor.  Your Honor.

17             THE COURT:  You need a sidebar?

18             MR. FELS:  Sidebar, please.

19             (Continued on the next page.)

20             (Sidebar conference.)

21

22

23

24

25

SIDEBAR CONFERENCE

1    (The following occurred at sidebar.)

2    THE COURT:  First, what's the relevance?

3    MR. PURPURA:  The relevance is that Rudy Rangel was

4    killed in the summer of 2003.  That this particular witness

5    will tell you, and tell us in a few moments, that Rudy Rangel

6    was a thief, that he was a dangerous person, and the last

7    thing he's going to say in quote, he could not be trusted.

8    The government has received information, which

9    they've given to counsel as part of *Giglio*, is that Rudy

10   Rangel stole 200 kilograms of cocaine from the Flores

11   brothers.  That obviously Mr. Rangel is a thief, even

12   Mr. Flores denied that he did.

13   I believe I can get into that to show, in fact, it

14   did occur and there was motive for him to be killed in

15   retribution for that theft of 200 kilograms.

16   In addition, in addition, the basis for -- and

17   there's another motive as well, which this witness knows about

18   because he discussed it with the agents as well, that the

19   woman I'm referencing, becomes Margarito's wife.  That within,

20   literally within a month, two months at the outset, six weeks,

21   this woman is in Las Vegas with 60 other drug traffickers on

22   the expense whim of Margarito and his brother, Pedro.

23   Which -- and they leave Chicago in 2003, according

24   to this particular witness in his proffer sessions, because

25   the word on the street is that they contracted the murder of

3644

SIDEBAR CONFERENCE

1    Rudy Rangel.  So there's a dual motive which is available.

2              I believe that he's lied to the government counsel

3    when he said he had nothing to do with it, and there's

4    sufficient factual basis to show it, and I can get into it for

5    multiple reasons now.  It goes to the heart of his

6    credibility.

7              MR. FELS:  Here's the problem.  As the defense

8    attorney well knows, because of their client, this man is in

9    witness protection.

10             THE COURT:  Keep going.

11             MR. FELS:  The identities of their wives are

12   supposed to be secret.  And he has just, by talking about the

13   tattoo on his chest, blurted out the name of one of the wives.

14   And that's a massive security risk.

15             What I would -- I don't -- to fix it, I think at the

16   very least we need to move off of that line of

17   cross-examination and move to -- if he wants to get into the

18   motives for the drugs, that's fine.

19             MR. PURPURA:  I can shortcut things.  I do

20   apologize.

21             THE COURT:  It's very obvious it was a mistake.  But

22   I understand why you didn't realize it.

23             MR. FELS:  I understand.  It creates a problem.

24             THE COURT:  It's easy enough for you to clean up.

25   Let's do and not go back into the names, really, which is all

SIDEBAR CONFERENCE

1   that --

2           MR. FELS:  And should we, obviously, seal this

3   portion of the transcript?

4           THE COURT:  We'll redact the name.  If it's

5   mentioned.  I'm not sure we mentioned it, but if we did.

6           No, he mentioned it in cross-examination.  I don't

7   think we mentioned it at sidebar.  If we didn't, then it's

8   just "the wife," and then I don't think it matters.  If he

9   said "the wife," I don't think you have a problem.

10          MR. PURPURA:  Right.

11          THE COURT:  Okay, let's do that.

12          (End of sidebar conference.)

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

3646

FLORES - CROSS - MR. PURPURA

1              (In open court; Jury present.)

2    BY MR. PURPURA:

3    Q    Mr. Flores, I just left off asking you about a tattoo on

4    Rudy's chest, and you indicated that you're familiar with that

5    tattoo; is that correct, sir?

6    A    Yes.

7    Q    Without using any names, he was professing his love for

8    this particular woman, who he said "Forever My Queen,"

9    correct, with the tattoo, right?

10   A    Yes.

11   Q    And you know -- actually, you know that the government,

12   in one of their proffer sessions actually getting ready for

13   trial, they confronted you and approached you with an

14   allegation that that man, Rudy Rangel, stole 200 kilos from

15   you and your brother.

16              Do you remember them asking you about that?

17   A    Yes.

18   Q    And at that point you said:  No, that's not true, right?

19   A    Yes.

20   Q    But you also, in a debriefing to government agents, you

21   described Rudy Rangel as, number one, dangerous.

22              Do you remember that?

23   A    Yes.

24   Q    Number two, you said that Rudy Rangel could not be

25   trusted.

FLORES - CROSS - MR. PURPURA

1      Do you remember that?

2  A    Yes.

3  Q    And number three, you said that Rudy Rangel was a thief.

4      Do you remember that?

5  A    Yes.

6  Q    And that thief, Rudy Rangel, now according to you, did

7  not steal 200 kilos from you then.

8      That's what you're saying, right?

9  A    That's correct.

10  Q   What did he steal from you?

11  A   Nothing.

12  Q   Why do you call the man a thief then?

13  A   I had a relationship with him and I knew him to go and

14  rob other drug dealers and then come and sell the cocaine to

15  me.

16  Q   Now, in 2003, the summer of 2003 -- strike that.

17      You know that Rudy Rangel used to -- you can see his

18  hair, it's neatly trimmed, right?

19  A   Yes.

20  Q   He used to go, literally once a week, to Nationwide Cutz,

21  C-U-T-Z, to get his haircut.  You don't know that?

22  A   That's not correct.

23      No, I owned a barbershop at that time, and he used

24  to go get a haircut to my barbershop.

25  Q   How often?

FLORES - CROSS - MR. PURPURA

1    A    About once a week.

2    Q    And which barbershop was that?

3    A    Millennium Cuts.

4    Q    Is that the barbershop he was killed in in the summer of

5    2003?

6    A    No.

7    Q    You know he was killed in Nationwide Cutz, correct?

8    A    Yes.

9    Q    While he was getting his haircut, right?

10   A    Correct.

11   Q    And you're going to tell this jury you didn't contract to

12   have that happen?

13   A    That's correct.

14        He had an appointment to make -- get a haircut at my

15   barbershop that day.

16   Q    It wasn't your barbershop he was killed in, it was some

17   other barbershop then, right?

18   A    That's correct.

19   Q    Now, when I mentioned that woman, my queen, the tattoo,

20   right?

21   A    Yes.

22   Q    So Rudy is dead by June of 2003.  Do you know, and you

23   did know, that by September 13th, 2003, my queen, Rudy's love,

24   was with your brother Margarito in Vegas -- right?

25   A    Yes.

FLORES - CROSS - MR. PURPURA

1   Q    And they were celebrating with literally 60 other people

2   from your neighborhood, right?

3   A    Yes.

4   Q    You paid for the whole thing.

5   A    Yes.

6   Q    $200,000, correct?

7   A    Might have been more than that, yeah.

8   Q    Because you had 60 rooms at Mandalay Bay, right?

9   A    Yes.

10  Q    You had -- at least according to ███████, you had lobster

11  and steak for everyone.  Well, I'm sorry.  You had lobster and

12  steak for everyone?  Yes?

13  A    Yes.

14  Q    VIP club passes everyone?

15  A    That was arranged before that.  I didn't make the trip,

16  though.

17  Q    Yeah, I know you didn't.  And you missed the fight, too?

18  A    Yes.

19  Q    The De La Hoya/Mosley fight?

20  A    Yes.

21  Q    Good fight.  De La Hoya lost, right?

22  A    Yes.

23  Q    You paid for this, though?

24  A    Yes.

25  Q    And this woman, his -- actually it was his -- she was

3650

FLORES - CROSS - MR. PURPURA

1   pregnant at that time with his baby, right?

2   A    Yes.

3   Q    But she was with your brother, Margarito, at that point,

4   right?

5   A    She was with him on the trip, I believe.  I'm not sure

6   they were together at that point.

7   Q    Well, you know that by the end of 2003, that woman leaves

8   Chicago and goes with your brother to Mexico, right?

9   A    Yes.

10  Q    And you know that woman, who Rudy Rangel had the name

11  tattooed on his chest, ends up marrying your brother, right?

12  A    Yes.

13  Q    And you and your brother didn't kill Rudy Rangel?

14  A    No.

15  Q    Not for the woman, or for 200 kilos?

16  A    That's correct.

17           MR. FELS:  Objection.  Mischaracterizing the

18  testimony.

19           THE COURT:  Overruled.  You can clean it up on

20  redirect.

21  Q    Now, let me talk about the tapes for a second with you.

22  A    Okay.

23  Q    So in November of 2008, you have -- well, strike that.

24           Tell me again who gave you the tape recorder that

25  you were using to capture the tapes you submitted to the

3651
FLORES - CROSS - MR. PURPURA

1  government?

2  A    I bought it at Radio Shack.

3  Q    The DEA did not give that to you?

4  A    No, they gave me a earpiece.

5  Q    They didn't give you a tape recorder?

6  A    No.

7  Q    Did -- other than the phone conversations that we

8  listened to today, have you listened to any other phone

9  conversations?

10  A    Yes.

11  Q    Now, you, in the past, actually starting, I think in

12  December of 2008, you did some controlled calls; is that

13  correct?

14  A    Yes.

15  Q    And what's a "controlled call"?

16  A    A controlled call is when a agent is sitting with you and

17  he has you call someone while he's sitting next to you

18  listening.

19  Q    And he sees what number you're calling, correct?

20  A    Yes.

21  Q    And he hears the conversation along with you, correct?

22  A    Yes.

23  Q    And as soon as the conversation is over, because you've

24  been though this, they take whatever recording device it is

25  and they'll put it in a bag and they'll initial it so they

FLORES - CROSS - MR. PURPURA

1    preserve that piece of evidence, correct?

2    A    Yes.

3    Q    So they can control that.  They don't have you, on a

4    controlled call, take the call and leave the tape recording

5    with you, right?

6    A    Correct.

7    Q    They take it, right?

8    A    Yes.

9    Q    So we know, a jury knows, that the call was made, the

10   agent was present, the little recording is captured and

11   preserved in evidence control, right?

12   A    The only thing, they don't always take the recorder at

13   that time because they use the same recorder over and over.

14   Q    Not the recorder, but what's captured, the little voice,

15   right?

16   A    Yes.

17   Q    And that's so that -- I know you're trustworthy, but

18   someone like you, they can't manipulate, right, if they have

19   control over?

20   A    Yes.

21   Q    Now government counsel showed you 609J-1.

22        (Exhibit published.)

23   Q    Hold on one second.

24        And you indicated this comes from the contacts on

25   the phone that you were using November 2008, correct?

FLORES - CROSS - MR. PURPURA

1    A    Correct.

2    Q    Who typed those contracts -- those contact numbers in?

3    Who put those in there?

4    A    In the phone?  I did.

5    Q    Okay.  And who put the names there, me and Man?

6    A    I did.

7    Q    And that's 2008, correct?

8    A    Yes, sir.

9    Q    And that's after you already decided that you were going

10   to cooperate with the DEA, correct?

11   A    Correct.

12   Q    And that's when you knew that one of the targets you

13   wanted to capture on the phone was Joaquin Guzman, correct?

14   A    Yes.

15   Q    And an agent wasn't present, you just did that yourself,

16   correct?

17   A    Correct.  At their instruction.

18   Q    And when all those recordings were made in 2008, were

19   they controlled calls, like you just testified to?

20   A    No.

21   Q    Those were calls that you had your Radio Shack recorder,

22   right?

23   A    Yes.

24   Q    And those were calls that you maintained custody of what

25   was recorded after it was recorded, correct?

3654

FLORES - CROSS - MR. PURPURA

1    A    Yes.

2    Q    And tell us again, how did you download to your computer,

3    what did you do?

4    A    I never downloaded anything to my computer.

5    Q    What did you do with the recordings actually recorded?

6    A    I just -- I dubbed one, one of my Nextel phones, and I

7    would just give to the agents when they asked me for them.

8    Q    You didn't --

9    A    The whole recording -- recorder.  The whole device.

10   Q    The whole device itself?

11   A    Yes.

12   Q    So what did you actually hand over to the agents?

13   A    The device.

14   Q    The Radio Shack recorder?

15   A    Yes.

16   Q    With what was captured on the Radio Shack recorder,

17   right?

18   A    Yes.

19   Q    Now, you know that you can edit recordings, correct?

20   A    I'm sure you can, yes.

21   Q    So you can manipulate those recordings, if you were

22   devious, right?

23   A    Correct.

24   Q    But you're not devious, right?

25   A    No.

3655

FLORES - CROSS - MR. PURPURA

1          MR. PURPURA:  Can we please play -- I don't have it,

2     I had it and I lost it.

3          Your Honor, we are going to play 705B-3, which is a

4     clip from the known voice of Joaquin Guzman from the Rolling

5     Stone interview.

6          THE COURT:  Is it in evidence?

7          MR. PURPURA:  It is in evidence.  This portion is in

8     evidence.

9          THE COURT:  Who's playing it?

10          MR. PURPURA:  We are right now.

11          (Video recording played.)

12     Q     You recognize that man, correct?

13     A     Correct.

14     Q     That's Joaquin Guzman, correct?

15     A     Correct.

16     Q     Have you heard this clip before?

17     A     I'm not sure.  I've seen some stuff on TV, but I'm not

18     sure if it's that clip.

19          MR. PURPURA:  Can we play it, please.

20          (Video recording played.)

21          MR. FELS:  Objection, Your Honor.  Sidebar.

22          THE COURT:  Okay, let's have a sidebar, please.

23          (Continued on the next page.)

24          (Sidebar conference.)

25

3656

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          MR. BALAREZO:  It might be the wrong clip.

3          THE COURT:  Well, you have to be more careful,

4    Mr. Purpura.  This part is not in evidence.

5          MR. PURPURA:  Right.  I'm not sure, maybe I'll move

6    on.

7          THE COURT:  I'm was just going to say --

8          MR. FELS:  It's not a question of the Spanish, it's

9    the English, it's already out there.

10         THE COURT:  I'm going to direct that it be stricken

11   and the jury just disregard it.

12         Does the government want it stricken, or do you want

13   it just leave it?

14         MR. FELS:  He'll strike it.

15         THE COURT:  Okay.

16         (End of sidebar conference.)

17         (Continued on the next page.)

18

19

20

21

22

23

24

25

3657

                    FLORES - CROSS - MR. PURPURA

1              (In open court; Jury present.)

2              THE COURT:  Ladies and gentlemen, the clip --

3              MR. PURPURA:  Your Honor, I apologize.  We may have

4     an issue whether it is or is not in evidence.

5              THE COURT:  Oh.  Talk to each other, work it out.

6              MR. PURPURA:  One second.

7              (Pause.)

8              MR. PURPURA:  I think we have an accommodation.

9              THE COURT:  Okay, but as to what's been played, is

10    that in or out.

11             MR. PURPURA:  I think that's still up in the air.

12    You know, for whatever reason --

13             THE COURT:  You're withdrawing the offer.

14             MR. PURPURA:  I do.

15             THE COURT:  Ladies and gentlemen, the last part you

16    just heard from this video, you should disregard it.  It's

17    stricken from the record.

18             Okay, let's proceed.

19             MR. PURPURA:  And I'm going to allow the government

20    to pick any clip from the Rolling Stone interview that they

21    wish to play.

22             THE COURT:  Okay.  Do they need a minute?

23             MR. PURPURA:  Thank you.

24             (Video recording played.)

25             MR. PURPURA:  That's government 704D, clip five.

3658

FLORES - CROSS - MR. PURPURA

1         And can we now play the voice recording we heard

2   today, which is Government Exhibit GX609C.  Just the clip.

3         THE COURT:  Isn't technology wonderful, ladies and

4   gentlemen.  We will work this out.

5         (Audio recording played.)

6         MR. PURPURA:  All right.  Just one last time, the

7   very first clip from the Rolling Stone, please.

8         (Video recording played.)

9         MR. PURPURA:  Thank you.

10  BY MR. PURPURA:

11  Q    Now, did you listen to that Rolling Stone clip before?

12  A    I don't believe so, but...

13  Q    To you, to your ear, did it sound like the same voice to

14  you?

15  A    Not really, no.  I mean similar, but not exactly the

16  same.

17  Q    To your knowledge, did the government's 288 voice

18  recognition testing on the tapes you gave them --

19        MR. FELS:  Objection, Your Honor.

20        MR. PURPURA:  To your knowledge.

21        THE COURT:  Overruled.

22  A    Yes.

23  Q    On those tapes, you gave them?

24  A    Yes.

25  Q    They did that?

3659

FLORES - CROSS - MR. PURPURA

1   A    My understanding was they did.

2             MR. PURPURA:  We'd like to have those results.

3             THE COURT:  You asked for his understanding.

4             MR. PURPURA:  Fair enough.  Fair enough.

5   Q    Did they give you any voice biometrics testing?

6   A    All they said was they confirmed that it was his voice,

7   and they were happy.

8   Q    They were happy at least; is that correct?

9   A    Yes.

10            MR. FELS:  Your Honor, just so the jury is not left

11  with this miss --

12            THE COURT:  Excuse me.  Excuse me.

13            Whatever miss they have, you can talk to me about it

14  at sidebar, but you cannot advise the jury why you think

15  they're being misled.

16            Do you want to talk at sidebar?

17            MR. FELS:  Yes, Your Honor.

18            THE COURT:  Okay.

19            (Continued on the next page.)

20            (Sidebar conference.)

21

22

23

24

25

3660

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          MR. PURPURA:  The transcript, it's in evidence.

3          MR. FELS:  Here's the thing.  This is now the second

4    time that they have done this.  They made a big show in front

5    of the jury to try to falsely indicate that there was some

6    information that was not turned over, and in front of the jury

7    say, government, we'd like that.  They could have just as

8    easily come to sidebar and said that now.

9          THE COURT:  The comment was inappropriate.  What

10   would you like to happen?

11         MR. FELS:  That -- that there are no such analyses.

12         THE COURT:  I don't know whether there are or not,

13   okay?  I think it's easy enough to say to this witness:  Did

14   the government -- I don't need to lay out the questions for

15   you.  It's easy enough to establish that his belief is not

16   based on anything that really happened, and that's all you

17   need to do.  You don't need to have a sidebar, just do that.

18         MR. FELS:  Can we just not have the comments.

19         THE COURT:  Look, Mr. Purpura has made mistakes on

20   this examination.  I'm convinced they're good faith mistakes.

21   He's not trying to do anything wrong.  He was as surprised by

22   that answer as you were.  He expected him to say, no, they

23   don't do any voice testing.

24         MR. PURPURA:  Judge.

25         THE COURT:  To my knowledge.

SIDEBAR CONFERENCE

1          MR. PURPURA:  Can I just correct the record,

2     respectfully.

3          THE COURT:  Yes.

4          MR. PURPURA:  I made a mistake on the name that I

5     brought in.  But as far as the transcript, that transcript

6     that I presented is in evidence, and I'll show you.

7          THE COURT:  The video clip.

8          MR. PURPURA:  The video clip is in evidence.  And we

9     have the transcript page.  And if you want to take it out of

10    evidence, you didn't mean to put it in, then that's fine.

11         MS. PARLOVECCHIO:  I don't believe it's in evidence.

12         THE COURT:  You are all going to confer on that

13    later.  The defendant voluntarily withdraws the offer pending

14    resolution of the dispute.  So to the extent I said

15    Mr. Purpura made a mistake, it's not clear that that was a

16    mistake.  The name was a mistake twice.

17         MR. PURPURA:  It was.

18         THE COURT:  The unexpected answer that this witness

19    gave in retrospect was a mistake, but like I said, there's no

20    question they're good faith mistakes, so let's just all try to

21    be careful.

22         MR. FELS:  The only thing we would ask, Judge, if

23    you can at least explain to the jury to disregard the comment

24    to the government about discovery.

25         THE COURT:  I'll do that, if you want.

SIDEBAR CONFERENCE

1          MR. FELS:  Thank you.

2          (End of sidebar conference.)

3          (Continued on the next page.)

                      FLORES - CROSS - MR. PURPURA

 1              (In open court; Jury present.)

 2              THE COURT:  Ladies and gentlemen, you're to

 3   disregard the question that Mr. Purpura just asked the

 4   government saying we'd like that testing.

 5              There's no indication at all that the government has

 6   not met its discovery obligations to turn over to the

 7   defendant in this area what it's supposed to turn over.

 8              All right, let's proceed, Mr. Purpura.

 9              MR. PURPURA:  Thank you.

10   BY MR. PURPURA:

11   Q    Yesterday, government counsel brought out on direct

12   examination that you have a hard time following rules.

13              Do you remember that?

14   A    Yes.

15   Q    And you agreed with that.  Actually, I think that those

16   were your words:  That I have.  You have a hard time following

17   rules, right?

18   A    Yes.

19   Q    And then government counsel brought out the fact that --

20   you know that you, in fact, were doubling dealing, working

21   both sides, working the government and working the narco side;

22   that you were double dealing, correct?

23   A    Yes.

24   Q    And you agreed with that, right?

25   A    Yes.

FLORES - CROSS - MR. PURPURA

1   Q   Because you were double dealing, right?

2   A   Yes.

3   Q   You were committing a fraud on the government while you

4   were still selling drugs, right?

5   A   Right.

6   Q   In 2008, when you started cooperating, right?

7   A   No.

8   Q   No?

9   A   You said I was committing a fraud to the government.

10  Q   Yes, you were lying the government than being nice.

11  A   Yes.

12  Q   Okay, good.

13          Now, the question is:  If you have a hard time

14  following rules, and you do double deal, how about those

15  tapes?  We have you and your brother's voice?

16  A   Yes.

17  Q   Your brother and his girlfriend/future wife left the

18  United States end of 2003, correct?

19  A   Yes.

20  Q   You left the United States in 2004, correct?

21  A   Correct.

22  Q   When you left the United States in 2004, you know you at

23  least had one indictment in the District of Wisconsin; is that

24  correct?

25  A   Correct.

                        FLORES - CROSS - MR. PURPURA

1    Q    And you left the United States because you didn't want to

2    go to jail.

3    A    Correct.

4    Q    You didn't stop dealing drugs.

5    A    No.

6    Q    But you still left the United States, correct?

7    A    Correct.

8    Q    By June 9th, 2008, about four years later, you and your

9    brother had come to a decision which was going to change your

10   life, right?

11   A    Yes.

12   Q    By June 9th, 2008, with your lawyer present, you and your

13   brother, Margarito, reached out to the DEA and to an assistant

14   United States attorney and over telephone call you indicated

15   to your lawyer that you were willing to cooperate, right?

16   A    That process began in April of 2008.

17   Q    The phone call.  The initial phone call was in June 9th

18   of 2008.

19   A    No, I had a phone call in April of 2008 with a DEA agent.

20   Q    And you do recall that there was a conversation in

21   June 9th of 2008 when you reached out to the United States

22   Government, right?

23   A    Yes.

24   Q    Okay.  But that decision, it wasn't just a spur of the

25   moment decision; was it?

3666

FLORES - CROSS - MR. PURPURA

1   A   No.

2   Q   You had to give it a lot of thought, right?

3   A   Correct.

4   Q   You did have an attorney, correct?

5   A   Yes.

6   Q   And that one attorney, and I don't want to know his name,

7   that one attorney represented both your interest and

8   Margarito's interest, correct?

9   A   Yes.

10   Q   And when you eventually spoke to the government, that

11   wasn't the very first day you met that attorney and discussed

12   your possibilities; was it?

13   A   No.

14   Q   You discussed with that attorney your situation before

15   you contacted the government; isn't that fair to say?

16   A   Yes.

17   Q   And your attorney, you felt comfortable with, confident

18   with him, right?

19   A   Yes.

20   Q   And the attorney let you know what the penalties were in

21   the United States for the type of drug trafficking you were

22   involved in, right?

23   A   Yes.

24   Q   And I'm guessing, and you can correct me, he probably

25   even went through with you the United States Sentencing

3667

FLORES - CROSS - MR. PURPURA

1    Guidelines to help you understand what was going on.

2    A    Kind of.  He'd tell me -- all he said was that they're

3    through the roof.  So I knew what he meant.

4    Q    So he told you the penalties were through the roof.  You

5    know you talked about a possibility of a life sentence, right?

6    A    One of a promise of a life sentence.

7    Q    A promise.  All right.

8         And you probably wanted your lawyer to tell you

9    something better than a promise of a life sentence, right?

10   A    I knew what I was doing.

11   Q    But it's all bad news at that point, right?  Here's what

12   you're facing in the United States.  Here's the penalties in

13   the United States.  You can get a life sentence -- not can,

14   you will get a life sentence for this type of drug

15   trafficking, correct?

16   A    Correct.

17   Q    And you knew that in Mexico the people were being

18   extradited at that time to the United States, right?

19   A    Yes.

20   Q    And even before you were extradited to the United States,

21   right?

22   A    Yes.

23   Q    Had to be depressed, right?

24   A    Since I left on the run, I would say it was depressing,

25   yes.

FLORES - CROSS - MR. PURPURA

1  Q    The information you received about a life sentence,

2  extradition, that's got to be depressing, right?

3  A    Yes.

4  Q    But, but there was a silver lining, right?

5  A    You can call that, yes.

6  Q    That silver lining was cooperation, right?

7  A    Yeah, it was a chance; yes.

8  Q    What do they call that on the street?

9  A    Snitching.  Ratting.

10 Q    So you and your brother decided to be a snitch or a rat,

11 right?

12 A    Yes.

13 Q    In fact, as you put in your sentencing letter to the

14 judge who sentenced you, that when your father found out, he

15 called you coward, right?

16 A    Yes.

17              (Continued on next page.)

18

19

20

21

22

23

24

25

FLORES - CROSS - MR. PURPURA

1    CROSS-EXAMINATION

2    BY MR. PURPURA:

3    Q    And as the government brought out, you gave information

4    on over 50 people, correct?

5    A    Yes, correct.

6    Q    You started with information about your own organization,

7    right?  You gave them information about your own organization,

8    is that fair?

9    A    I mean of all my dealings, my personal dealings with...

10   Q    Let me start with your own organization.  The Flores

11   brother's organization, okay?

12   A    Yes.

13   Q    You gave them information, that means names, about people

14   who were in your organization; is that correct, sir?

15   A    Yes.

16   Q    And those people in your organization, as you told the

17   government, they were comprised mostly of your close childhood

18   friends from Chicago and Mexico, right?

19   A    Yeah, the people that were working for me, yes.

20   Q    They had families, right?

21   A    Yes.

22   Q    You gave each and every one of them up?

23   A    I had to, yes.

24   Q    You had to?

25   A    Yes.

3670

FLORES - CROSS - MR. PURPURA

1    Q    You had to because that was the way to get you below a

2    life sentence, right?

3    A    Yes.

4    Q    And you were concerned because you just had a baby and

5    you just got married, right?

6    A    Yes.

7    Q    And you wanted to change your life around, right?

8    A    Yes.

9    Q    You didn't have one bit of concern for any one of your

10   childhood friends who you got involved in this, did you?

11   A    I had concerns for them.

12   Q    All the way to jail for them?

13   A    I mean, it was all or nothing I guess, so...

14   Q    Well it wasn't just your childhood friends, you got

15   credit for customers, right?

16   A    Yes.

17   Q    And as you told the government agents, your customer base

18   was about -- comprised about 15 to 25 large customers, do you

19   remember telling them that?

20   A    Yes.

21   Q    All -- in your words, all black?

22   A    Yes.

23             MR. PURPURA:  For the witness only.

24             THE COURT:  Okay.

25   BY MR. PURPURA:

3671

                    FLORES - CROSS - MR. PURPURA

1   Q    And you testified against these people, your customers

2   before the United States Grand Jury in Chicago, correct?

3   A    Correct.

4   Q    And as part of that testimony and the statements you

5   gave, you identified photographs of these people; is that

6   correct?

7   A    Yes.

8   Q    Do you recognize that man?

9   A    I believe that's Franklin Brown.

10  Q    That would be correct.

11          MR. PURPURA:  I would move defense Exhibit 339 into

12  evidence.

13          THE COURT:  Received.

14          (Defense Exhibit 339, was received in evidence.)

15  BY MR. PURPURA:

16  Q    You were supplying Franklin Brown in the beginning with

17  about 20, 25 kilos every two weeks, right?

18  A    Yeah, we started that way, yes.

19  Q    And then eventually you fronted Mr. Brown the kilos,

20  right?

21  A    Yes.

22  Q    Fronted means he got it for free and he paid you back

23  after he sold them, right?

24  A    Yes.

25  Q    And in the government's sentencing memorandum he,

                    *GEORGETTE K. BETTS, RPR, FCRR, CCR*
                         *Official Court Reporter*

3672

FLORES - CROSS - MR. PURPURA

1   Franklin Brown, was one of the people that you got credit for

2   for the reduction of your sentence, correct?

3   A    Yes.

4   Q    He got 292 months, correct?

5   A    Yeah, I believe so.  Yeah.

6   Q    It's almost double the time you got, right?

7   A    Yes.

8   Q    And you're still hoping to get less, right?

9   A    Yes.

10  Q    Just a couple more.

11          MR. FELS:  Objection to this line, Your Honor.  Can

12  we have a sidebar?

13          THE COURT:  He's moving on and you're too late for

14  what's already happened.

15          MR. FELS:  I agree, but he's saying he wants to do

16  some more.

17          MR. PURPURA:  I do.  I have two more.

18          THE COURT:  I misunderstood.  I thought you were

19  moving on to other -- to one other area of examination, so

20  let's have a sidebar on this.

21          (Sidebar conference.)

22          (Continued on the next page.)

23

24

25

SIDEBAR CONFERENCE

1           THE COURT:  How does it bear on this witness'

2    credibility that people that he informed upon got longer

3    sentences than him?

4           MR. PURPURA:  Well -- and I can tell the Court, that

5    in the government's sentencing memorandum, which he read, the

6    government represented the length of time on multiple

7    defendants in this particular case --

8           THE COURT:  Sure.

9           MR. PURPURA:  -- to the sentencing judge to know the

10   extent of his cooperation.  From that you can assume that, you

11   know, the greater the penalty, it seems like the more you

12   cooperated.  So it really goes down to his bias, his motive

13   for cooperating.

14          THE COURT:  He didn't know when he cooperated what

15   they were going to be sentenced to, right, that didn't affect

16   his cooperation.

17          MR. PURPURA:  What it did affect -- well, just one

18   second.  I tell you what, I don't need to go into the sentence

19   if I thought I would, I would approach the bench -- actually

20   Mr. Alvarez is my third one, when I get to him I think that's

21   appropriate because that's mentioned in the sentencing as

22   well.

23          THE COURT:  So what do you want to narrow your next

24   examination to.

25          MR. PURPURA:  I'll use one more of this example from

SIDEBAR CONFERENCE

1   this particular grand jury, and that's Tommie Jones.  The

2   reason why Tommie Jones is really particularly relevant as

3   well is because this is one where, in fact, Mr. Flores gets on

4   the phone and deceives Tommie Jones that he's still a drug

5   trafficker and to come pick up the drugs and instead of

6   picking up the drugs, the DEA picks him up.  So it shows his

7   ability to continue to be deceitful.

8           THE COURT:  Okay.

9           MR. FELS:  He's being deceitful in aid of his

10  cooperation.

11          MR. PURPURA:  The point is he's a good enough

12  actor -- actually, it's under his cooperation.

13          THE COURT:  I think that's fine.  The sentence is

14  irrelevant.  But the fact that he engaged in a deceptive act

15  as part of his cooperation, that's arguably related.

16          MR. PURPURA:  Thank you, I'll move on.

17          (End of sidebar conference.)

18          (Continued on the next page.)

19

20

21

22

23

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

FLORES - CROSS - PURPURA

1              (In open court.)

2  BY MR. PURPURA:

3  Q    I'm going to show you, for identification only, defense

4  Exhibit 340.  And, again, do you remember identifying this

5  gentleman's photograph before the United States Grand Jury in

6  Chicago as one of your customers?

7  A    Yes.

8  Q    And does that appear to be with the nickname "Old Man?"

9  A    Yes.  Jones, yes.

10 Q    Tommie Jones?

11 A    Yes.

12            MR. PURPURA:  At this time I would move 340 into

13 evidence, please.

14            MR. FELS:  No objection, Your Honor.

15            THE COURT:  Received.

16            (Defense Exhibit 340, was received in evidence.)

17 BY MR. PURPURA:

18 Q    And Old Man was another one of your customers, correct?

19 A    Right.

20 Q    You called him "Grandpa" or "Abuelo?"

21 A    Yeah, we just -- different nicknames when we picked up

22 monies.

23 Q    Another gentleman you fronted cocaine to, correct?

24 A    Correct.

25 Q    And actually when you were working for the DEA in

FLORES - CROSS - PURPURA

1    December of 2008, you were able to set up Old Man, correct?

2    A    Correct.

3    Q    What you did as -- and I'll use the word cooperator, what

4    you did as a cooperator was that you made Old Man believe that

5    the person who was going to pick up the money from him was one

6    of your people, right?

7    A    Right.

8    Q    But it wasn't one of your people, was it?

9    A    No.

10   Q    In fact, the person Old Man handed the money to was a DEA

11   agent, correct?

12   A    Correct.

13   Q    But when you spoke to Old Man and said it was one of your

14   people, you made him believe that it was, right?

15   A    Yes.

16   Q    And he did believe you, right?

17   A    Correct.

18            MR. PURPURA:  Your Honor, I said that was my last

19   one, could I --

20            THE COURT:  You did.

21            MR. PURPURA:  One more?

22            THE COURT:  Is it going to be the same format as you

23   just did?

24            MR. PURPURA:  Yes.

25            THE COURT:  All right, go ahead.

3677

FLORES - CROSS - PURPURA

1          MR. FELS:  Your Honor, we would object.

2          THE COURT:  I understand.  I do think it can be

3    addressed on redirect.

4    BY MR. PURPURA:

5    Q    Same grand jury, last person from that grand jury,

6    Defense Exhibit 341.  Do you recognize that man?

7    A    Yes.

8    Q    Who is it?

9    A    Julian Brown.

10         MR. PURPURA:  And at this point I move into evidence

11   341.

12         MR. FELS:  No objection, Your Honor.

13         THE COURT:  Received.

14         (Defense Exhibit 341, was received in evidence.)

15   BY MR. PURPURA:

16   Q    You actually met him through the deceased Rudy Rangel,

17   the gentleman we showed before, correct?

18   A    No.  He lived down the block from where I was living at

19   the time.

20   Q    It wasn't Armando and Rudy Rangel who you told the grand

21   jury introduced you to?

22   A    My brother was dealing with him.

23   Q    And that's another hidden nickname, Country?

24   A    Yes.

25   Q    And you fronted Country cocaine; is that correct?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

FLORES - CROSS - PURPURA

1    A    Yes.

2    Q    You also tried to get Country out of the country when the

3    law was breathing down his neck, right?

4    A    Correct.

5    Q    Down to Mexico, right?

6    A    Yes.

7    Q    But then you eventually testified against him and

8    identified him before the United States Grand Jury, correct?

9    A    Correct.

10           THE COURT:  All right, Mr. Purpura we'll move on.

11           MR. PURPURA:  I just wanted to ask it, I'm not going

12   to ask it.  All right.

13   Q    Now in addition to your customers -- Alfredo Vasquez, let

14   me ask you about him for a second.  All right.  Alfredo

15   Vasquez, that's the man that was captured on the tape that I

16   believe we heard yesterday involving 276 kilos, correct?

17   A    Correct.

18   Q    And of those 276 kilos, correct me if I'm wrong, 200 of

19   those were yours, right, yours and your brother's?

20   A    Correct.

21   Q    So that was a shipment that was actually going to be your

22   shipment of cocaine coming to you to distribute in Chicago

23   through LA, correct?

24   A    Correct.

25   Q    And Mr. Vasquez wanted to tag on 76 of his own kilos in

3679

FLORES - CROSS - PURPURA

1  that shipment, correct?

2  A    Correct.

3  Q    And despite the fact in November of 2008 that you were

4  cooperating -- and you were cooperating then, right?

5  A    Yes.

6  Q    And when you're cooperating you know you're not supposed

7  to, without the DEA and/or the U.S. Attorney's knowledge

8  distribute cocaine in Chicago or anywhere, you knew that,

9  right?

10  A    Yes.

11  Q    Okay.  And you didn't have permission from the DEA and/or

12  the U.S. Attorney to distribute those 276 kilograms of cocaine

13  during your period of cooperation, did you?

14  A    No.

15  Q    But what you did is you took that or received that

16  276 kilos of cocaine during the period of time that you were

17  cooperating with the United States Government and the DEA and

18  you sent it to your distributors in Chicago, right?

19  A    Yes.

20  Q    276, what was the price of the kilo of cocaine in Chicago

21  in 2008 ballpark?

22  A    Around $30,000.

23  Q    $30,000.  So I did the math with a calculator if you take

24  30,000 times 276 that comes to $8,280,000.  Sound about right?

25  A    No way, no.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

FLORES - CROSS - PURPURA

1   Q    I could be wrong.

2   A    Yeah.

3   Q    Anybody want to do the math?

4   A    Your math is wrong.

5   Q    30,000 times 276.

6        MR. PURPURA:  It's another pause here, Judge, I

7   apologize.

8   Q    I'm right, believe it or not.  $8,280,000, okay.  All

9   right.  It's a lot of money, right?

10  A    Yes.

11  Q    Now you didn't give that cocaine away, right?

12  A    No.

13  Q    And you never paid Mr. Vasquez for his 76 kilos, did you,

14  that just wouldn't make sense?

15  A    No, I didn't pay him, no.

16  Q    No.  So you end up stealing his 76 kilos, right?

17  A    No.

18  Q    Not really?

19  A    No.

20  Q    Did you pay him for it?

21  A    No.

22  Q    You got money for them?

23  A    I got partial payment for some of those kilos, but at

24  that point there's a lot of money that's on the street, sir.

25  Q    Well, Mr. Vasquez didn't get any of that money, right?

FLORES - CROSS - PURPURA

1    A    No.

2    Q    He lost his 76 kilos to you, right?

3    A    Yes.

4    Q    And $8 million -- how much of the $8 million did you

5    collect while you were working for the DEA under the nose of

6    the United States Government?

7    A    I don't recall exactly what it was I collected off that

8    load, but some of that money went back to, like, to pay for

9    more drugs.

10    Q    So was it a million, 2 million, 3 million, do you know?

11    A    I --

12    Q    I'll move on.

13            THE COURT:  Wait, wait, before you move on.  You're

14    talking about 76 kilos?

15            MR. PURPURA:  276 kilos.

16            THE COURT:  Okay, that's what I thought.

17    BY MR. PURPURA:

18    Q    200 yours, 76 of Mr. Vasquez's, right?

19    A    Correct.

20    Q    Dumped into the streets of Chicago after you're

21    cooperating, right?

22    A    Yes.

23    Q    And you intended to collect the money for yourself,

24    right?

25    A    Yes.

FLORES - CROSS - PURPURA

1    Q    And then, then one step further Mr. Vasquez, you

2    testified before -- strike that.  You actually wrote an

3    affidavit for Mr. Vasquez's extradition from Mexico based on

4    that load, 276 kilos, right?

5    A    Correct.

6    Q    And so Mr. Vasquez, who doesn't get any money for his

7    76 kilos, got extradited to United States, right?

8    A    Correct.

9    Q    And Mr. Vasquez -- strike that -- was charged here in the

10   United States for that load, 276 kilos, right?

11   A    Yes.

12   Q    And he got a substantial period of incarceration for

13   that, didn't he?

14   A    Yes.

15   Q    And that's the one that is mentioned in the government's

16   sentencing memorandum at your sentencing, right?

17   A    Yes.

18   Q    That's what the judge had a hard time believing, right?

19            MR. FELS:  Objection.

20            THE COURT:  Sustained.

21            MR. PURPURA:  Your Honor, I'm about to change, it

22   would be a good time to break, if it's appropriate for the

23   Court.

24            THE COURT:  We'll have our lunch, ladies and

25   gentlemen.  Please don't talk about the case.  We'll give you

FLORES - CROSS - PURPURA

1    a change of scene today a little bit.  We'll see you back here

2    at about 1:50.

3              (Jury exits courtroom.)

4              THE COURT:  All right, everyone be seated.  The

5    Marshals can take the witness out.

6              I want to talk to counsel for just a minute.  Give

7    me the government's argument again as to why the two

8    controlled calls that Mr. Purpura examined about are not valid

9    impeachment.

10             MR. FELS:  The two control calls, Your Honor?

11             THE COURT:  Yes.  At the time he was cooperating he

12   made two calls, I forget the second one's name, but -- the

13   first one's name, but the second one's name was Jones and

14   apparently those were controlled calls, if I understand it

15   correctly, or at least they were done at the direction of the

16   DEA.  And I want to know why the government thinks that's not

17   adequate.  I do appreciate Mr. Purpura's argument and I let it

18   in on the basis that it shows that this witness has an ability

19   to deceive, I don't think it's worth much, but it's worth

20   something and I didn't see it as very prejudicial to the

21   government, at least I didn't when it was only one.  When it

22   changed to two I'm not so sure, but I want to hear the

23   government's argument again.

24             MR. FELS:  Well, Your Honor, the main thrust of the

25   argument is, as he testified on direct, he is cooperating with

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

FLORES - CROSS - PURPURA

1    the government at this point.  The government is directing him

2    essentially to pose as something that he is not in an effort

3    to further law enforcement goals.  The fact that he is

4    following the direction of DEA by posing as an active drug

5    trafficker in order to further an investigation, really should

6    not be considered by this jury as an act of deceit.  Really

7    what it is, is it demonstrates his capacity to follow DEA's

8    instructions and as his role as a DEA confidential informant.

9            THE COURT:  Well, I was thinking that's pretty good

10   redirect and argument at closing, if necessary, but that

11   wasn't Mr. Purpura's point.  His point was that the DEA would

12   not direct someone to engage in those calls who they thought

13   couldn't pull it off and, therefore, this witness has the

14   ability to pull it off.  Why is that wrong?  If he has the

15   ability to pull it off there, the argument goes -- and again

16   it's not terribly probative but not terribly prejudicial --

17   maybe he has the ability to do it here.  That's what

18   Mr. Purpura's going for.

19           MR. FELS:  I understand that, Your Honor, I

20   understand the point but I think it's way too attenuated and

21   it is misleading under 403 to the jury.  Because, essentially,

22   they're trying to conflate in this jury's mind the notion that

23   he could both cooperate with the government and tell

24   falsehoods to lure, if you want to use that term, other

25   individuals that law enforcement is investigating versus

1 taking the stand in the Court of law and lying about it.  He's

2 trying to conflate those two points.

3          I think it's very prejudicial, it's very confusing

4 to the jury and that's the basis for us seeking to exclude

5 that evidence.

6          THE COURT:  All right, I'll hear from you,

7 Mr. Purpura.

8          MR. PURPURA:  Judge, I heard from you, you said it

9 pretty good on my argument, I can't add to it.

10          THE COURT:  Okay.  Look, I was willing to let it in

11 when it was one, because I just didn't think it was that

12 weighty and I appreciated Mr. Purpura's argument, then you

13 kind of pulled a fast one on me a little bit by saying I've

14 got one more.  I said, okay, if it's only one more, but it was

15 close enough when I let in the one so I shouldn't have let in

16 the second one.

17          What I will do this, I'm not going to draw it to the

18 jury's attention by striking it.  I think it is at least

19 arguable, although it occurs to me I have not done that or

20 been asked to do that in prior cases with cooperators, but I'm

21 going to direct the defense not to argue those points -- that

22 particular point with regard to these two drug dealers who

23 were brought in at the DEA's request, don't argue that in

24 closing.  That's all I'm going to do with it.

25          MR. PURPURA:  Thank you.

3686

FLORES – CROSS – PURPURA

1           THE COURT:  Anything else the government thinks I

2   need to do with it if I'm not going to strike it, which I'm

3   not?

4           MR. FELS:  No, Your Honor, thank you.

5           THE COURT:  All right.  See you at 1:50.

6           (Luncheon recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3687
Proceedings

1                A F T E R N O O N   S E S S I O N

2              (In open court; jury not present.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Parties wanted a sidebar?

5              Everyone sit down.

6              Okay.  Let's have a sidebar.

7              (Sidebar.)

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3688

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          MR. FELS:  Yes, Your Honor.  Thank you.

4          After one of our sidebars when we explained how

5     critical it was that the name ███████ not be raised, there

6     was, I thought, some sort of understanding that there would be

7     some different way to get to the cross so as not to link

8     anything.  Let me give you an example.  One of the ways to ask

9     that question is simply:  Sir, isn't it true that Kato, the

10    man on his chest, was a man that your brother married.  That

11    could have made the point.  It was gratuitous to put ███████

12    in there.  He went and did it again, and he said what -- what

13    he said he was not going to do was linked them up as the wife

14    now.  I just found that there are articles right now, people

15    in the courtroom who have published articles linking ███████

16    to Margarito Flores.

17         This is a real problem, and there's nothing we can

18    do at this point.  I can't ask that the trial testimony be

19    sealed, because the horse is really out of the barn, but I

20    really do hope that the defense counsel can understand the

21    sensitivity of this and not keep, over and over and over

22    again, overstepping the bounds.

23         THE COURT:  That's a little bit of an overstatement,

24    but you are right, he blew the cover and he did it twice; and

25    as I said before, I have no doubt it was inadvertent, and as

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1   soon as he said it the second time, he practically slapped

2   himself on the side of the head realizing he had done it, it

3   should not have been done, extra care needs to be taken; but

4   like you said, what do we do about it at this stage?  Now, if

5   they have to get somebody a whole new identity, that is very

6   unfortunate, but it's a risk of a case like this.  I will tell

7   you, if I thought that Mr. Purpura was acting in bad faith, I

8   would make it unprofitable for him to stay in this case, I

9   don't care what he's being paid, but I really don't believe

10  that.  I really don't believe it was intentional.  Trial is a

11  tense time and people sometimes slip up.  Government lawyers

12  do it, too.

13            MR. PURPURA:  I just --

14            THE COURT:  The first thing is apologize.

15            MR. PURPURA:  I do apologize.  I always apologize.

16  Obviously, there was no intent to do anything wrong, but I

17  used ██████ -- I guess it's such a generic name.  I knew the

18  last name may be something, but I really --

19            THE COURT:  It ain't that generic.

20            MR. PURPURA:  The other thing is -- well, that was

21  my thought process.  I mean, gosh, I must have dated a half

22  dozen ██████ over the past 60 years; but aside from that,

23  these women, they've obviously coauthored a book out there,

24  they're all on book tours --

25            MR. FELS:  As a pseudonym.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

3690

SIDEBAR CONFERENCE

1        THE COURT:  Don't try to justify it.

2        MR. PURPURA:  I'm not justifying anything, but I

3   just think it's -- you know, I obviously apologize.

4        THE COURT:  Let's leave it at that unless the

5   Government wants me to do something else.

6        MS. PARLOVECCHIO:  No, Your Honor, but, look, I

7   understand that was an inadvertent slip-up, but what we have

8   been noticing increasingly over the course of the last couple

9   weeks are the stray comments on the record, the open-air

10  sidebars, so to speak.  It has gotten out of control --

11       THE COURT:  Open-air sidebars?  Oh, you mean --

12       MS. PARLOVECCHIO:  It's sort of al fresco sidebars

13  in the open courtroom.

14       THE COURT:  Look -- finish.

15       MS. PARLOVECCHIO:  Furthermore, now it's getting to

16  the point where they're basically accusing us -- they're

17  creating the misperception that we've engaged, sort of some

18  misconduct in not turning things over that, you know -- and it

19  risks tainting the jury.  I understand the theatrics, but it's

20  really unfair to the Government.  We've been trying to abide

21  by Your Honor's admonition to hold back on the speaking

22  objections and --

23       THE COURT:  I will give you a chance to reply.  Go

24  ahead.  Is there anything you need to say to that?

25       MR. PURPURA:  I have nothing to say.

3691

SIDEBAR CONFERENCE

1           THE COURT:  Okay.  Let me say this:  First of all,

2    I'm admonishing defense counsel.  If you think you haven't

3    gotten a document, don't say so in front of the jury.  That's

4    not the jury's problem, that's my problem, so bring it to me

5    at a sidebar or whenever else you want.

6           Second, I am considering, as part of the final

7    charge to the jury, giving an instruction that says it's up to

8    me to determine whether the Government has met its discovery

9    obligations and I am instructing you jurors that it has fully

10   met all discovery obligations.  We will talk about that at the

11   charging conference.  We don't need to decide on that now, but

12   I want to tell you I'm considering it.

13          So, again, I will say to defense counsel, be more

14   careful, okay?

15          MR. FELS:  Thank you, Your Honor.

16          MS. PARLOVECCHIO:  Thank you, Your Honor.

17          (Sidebar ends.)

18          (Continued on next page.)

19

20

21

22

23

24

25

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Flores - cross - Purpura

```
 1                    (In open court.)

 2               THE COURT:  Let's have the jury.

 3               (Jury enters.)

 4               THE COURT:  All right.  Everyone be seated.

 5               Please continue, Mr. Purpura.

 6   CROSS-EXAMINATION

 7   BY MR. PURPURA:  (Continued.)

 8   Q    Mr. Flores, you indicated on direct examination that you

 9   allege that you met Mr. Guzman maybe three, maybe four times,

10   correct?

11   A    Yes.  At least four times.

12   Q    Do you remember telling Government agents originally when

13   you interviewed it was three times?

14   A    It was approximately three times.

15   Q    Well, so is it approximately three times or is it more

16   than three times?

17   A    It was more than three times.  They just wanted things I

18   was completely sure of.  It's -- it's instances where I could

19   remember certain things that happened.

20   Q    Well, how many times was it?

21               MR. FELS:  Objection.  Asked and answered.

22               THE COURT:  Overruled.

23   BY MR. PURPURA:

24   Q    If you know.

25   A    At least four times, sir.
```

3693

Flores - cross - Purpura

1    Q    Do you remember telling -- being interviewed on

2    November 6, 2008, and advising Government counsel, as well as

3    DEA agents, that you met with Mr. Guzman approximately eight

4    to ten times?

5    A    Yes.

6    Q    Well, four is -- you have to double four to get to eight,

7    right?  So that's double what you are suggesting now, so which

8    is the truth, I guess?

9    A    It could have been eight times, sir, but I'm only going

10   to testify to four times, because that's what I recall best.

11   Q    Why would you tell the agents back in 2008 when it's

12   probably fresh in your mind that it was eight to ten times?

13   A    At the time, I remembered it was more than four times,

14   but they wanted stuff that I felt a hundred percent sure of,

15   sir.

16   Q    The kidnapping you talked about, do you remember that?

17   A    Yes.

18   Q    The one with the Ledezma, Olivares, the money that was

19   owed?

20   A    To Chapo, yes.

21   Q    Well, the money was owed to Ledezma, Olivares; and

22   Olivares is chief lieutenant de Mayo, correct?  That's what

23   you told the Government, right?

24   A    Yes.

25   Q    Now, who negotiated the release?

Flores - cross - Purpura

1    A    The release of who, sir?

2    Q    You.

3    A    Of me?  My brother did.

4    Q    Who did he negotiate with?  Did he contact someone in

5    particular to negotiate your release who actually negotiated

6    your release for your brother?

7    A    No.  The only person -- the person that finalized that

8    part was Chapo, sir, to my understanding, yes.

9    Q    Well, do you remember, sir, again, August 11th, 2008,

10   when it's closer in time to the actual incident because you

11   were kidnapped in 2005, correct?

12   A    Correct.

13   Q    Do you remember then telling the Government agents, along

14   with your attorney being present, that Alfredo Beltran Leyva

15   negotiated the release of you; and that your brother paid

16   Beltran Leyva $100,000 for the services?  Do you remember

17   telling that to the agent back in 2008?

18   A    No.

19   Q    Okay.  Well, let me see if this does refresh your

20   recollection.

21            MR. FELS:  Objection, Your Honor.

22            THE COURT:  Sustained.

23   BY MR. PURPURA:

24   Q    Do you remember?  I can refresh --

25            MR. FELS:  Objection.  Asked and answered.

Flores - cross - Purpura

1          THE COURT:  No, no.  Listen -- you're sure you

2    didn't tell the agents --

3          MR. PURPURA:  Judge, excuse me.  I apologize.

4    That's not my question.

5          THE COURT:  No, but there's a way for him to

6    answer.  We have to establish whether there's a lack of

7    recollection.  You have not done so now.  If you don't want me

8    to help, that's okay, then the objection is sustained.

9          MR. PURPURA:  The question would be:  Do you

10   remember telling the agents that Alfredo Beltran Leyva

11   negotiated your release and paid $100,000?

12         THE COURT:  Okay.  That was asked almost word for

13   word and he said no.

14         MR. PURPURA:  He doesn't remember.

15         THE COURT:  No, he didn't say that.  He said no.

16   BY MR. PURPURA:

17   Q    Do you remember telling that to the agents?

18         MR. FELS:  Objection.  Asked and answered.

19         THE COURT:  Actually, the question was:  Do you

20   remember telling that to the agents back in 2008 --

21         MR. PURPURA:  That's what I said.

22         THE COURT:  -- and he said no.  Now you can clarify

23   whether he didn't say that to the agent or he doesn't remember

24   saying that to the agent.

25   BY MR. PURPURA:

Flores - cross - Purpura

1  Q    Do you remember saying that to the agents?

2  A    No.

3              MR. PURPURA:  Okay.  Now I can put it in -- thank

4  you.

5              MR. FELS:  Your Honor?

6              THE COURT:  Sustained.  You have not established a

7  lack of recollection.  You might be able to, but you have to

8  ask more questions.

9              MR. PURPURA:  All right.

10  BY MR. PURPURA:

11  Q    Do you remember telling the agents back in 2008 -- do you

12  have any memory of that discussion?  How's that?

13  A    I have a memory of discussing my release with the agents,

14  but what you are telling me, I don't recall saying.

15              THE COURT:  Good enough.

16              MR. PURPURA:  Thank you.

17              MR. FELS:  Your Honor, may we have a sidebar?

18              THE COURT:  Sure.

19              (Sidebar.)

20              (Continued on next page.)

21

22

23

24

25

                    *Denise Parisi, RPR, CRR*
                    *Official Court Reporter*

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3          MR. PURPURA:  I apologize for walking up with the

4    report.  I was going to give it to you before I did it.

5          Page 831, paragraph 31, last sentence, the SOI, who

6    is him, stated:  Alfredo Beltran Leyva negotiated the release

7    of him and the -- and his brother paid Beltran Leyva $100,000

8    for the service.

9          MR. FELS:  And then continues to say:  The SOI's

10   brother made several calls to members of the organization and

11   eventually met with Chapo Joaquin Guzman Loera to discuss the

12   debt.

13          This is not only improper cross --

14          THE COURT:  Stop.  Completeness.

15          MR. PURPURA:  Wait.  Judge --

16          MR. FELS:  That is what he's --

17          THE COURT:  Can I see the thing?

18          MR. FELS:  Certainly.

19          MR. PURPURA:  It's two separate sections of what we

20   are talking about.

21          MR. FELS:  It's the same paragraph.  Mr. Purpura --

22          THE COURT:  Stop.  Don't talk to each other.  You

23   will just end up fighting.

24          MR. PURPURA:  It wouldn't be a fight, Judge.

25          THE COURT:  Heated discussion.

SIDEBAR CONFERENCE

1        You cannot give the impression to the jury that he

2   previously told the agents that Guzman was not involved with

3   the ransom.

4        MR. PURPURA:  I'm not.

5        THE COURT:  What are you going to ask?

6        MR. PURPURA:  Look, he said that Guzman got him

7   released.  That's what he's testifying to, and he's pointing

8   at the man as the person who got him released.  That's the

9   thrust of his testimony on this portion of the kidnapping; and

10  clearly what he told the agents back in 2008, that the man who

11  got him released was Arturo Beltran Leyva who negotiated the

12  release and paid $100,000.  What he goes on to say is that his

13  brother, at best, did talk to Mr. Guzman.  That's actually

14  before he got released.  Just talked to him.  That's it.  He

15  reached out to Guzman, that's how desperate he was, and he

16  said that multiple times.  I've got no problem with that, but

17  I know who got him released.

18        THE COURT:  Actually, I don't know that this

19  paragraph tells you who got him released.

20        MR. FELS:  It doesn't, A -- A, it doesn't; B, it's

21  not an inconsistency; C, how many times -- he said he didn't

22  say this to the agents, and you can't -- he kept working

23  around with the words --

24        THE COURT:  No, no.  He was vague on the last time.

25  The first question was ambiguous, because you could answer

3699

SIDEBAR CONFERENCE

1    that question "no" and it could mean it didn't happen; or it

2    could mean "I don't remember it happening."  The question had

3    the word "remember" in it.  "Do you remember?"  "No."  That

4    may mean "no, it didn't happen," or it may mean "no, I don't

5    remember."

6                    MR. FELS:  I agree.

7                    THE COURT:  You can't tell what that means.

8                    Then he just asked him another question, which I

9    will look at.

10                   (Pause.)

11                   THE COURT:  "I have a memory of discussing my

12   release with the agents, but what you are telling me" -- "what

13   you are telling me, I don't recall saying."

14                   That's not "I didn't say it."  It's saying "I don't

15   recall saying it," okay?  If he had said, "I did not say it,"

16   I wouldn't let him be refreshed, but now he can be refreshed.

17                   And on redirect, you can ask him for the rest of

18   this, and you can get out exactly what happened with regard to

19   this kidnapping according to what he said to the agent.

20                   I will say, I'm not seeing an inconsistency

21   necessarily.  It's a weak inconsistency at best, but it's

22   within your discretion if you want to do that.

23                   MR. PURPURA:  Thank you.

24                   (Sidebar ends.)

25                   (Continued on next page.)

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Flores - cross - Purpura

```
 1              (In open court.)

 2   BY MR. PURPURA:

 3   Q    On the issue of the kidnapping, before I attempt to

 4   refresh your recollection, you indicated that your brother

 5   reached out to Mr. Guzman, amongst other people; is that

 6   correct?

 7   A    Correct.

 8   Q    And that's based on information that your brother told

 9   you, correct?

10   A    Correct.

11   Q    Now, I'm going to show you Bates stamp 831, and just read

12   this to yourself, not out loud, the last sentence -- feel free

13   to read --

14              THE COURT:  The paragraph.

15   Q    -- the paragraph or next paragraph, but I'm going to

16   direct your attention to the last sentence.  And please feel

17   free to read the following paragraph as well.

18              (Pause.)

19   A    Okay.

20   Q    Now, does this refresh your recollection that you told

21   the agents back in 2008 that Alfredo Beltran Leyva negotiated

22   the release of you?

23   A    That's not what it says.  I believe it says that he was

24   one of the --

25              THE COURT:  The question is, does it refresh your
```

Flores - cross - Purpura

1    recollection.  If it doesn't, because you think it's wrong,

2    just say that.

3    A    Yeah, no, it's wrong.

4    Q    It's wrong?

5    A    Yeah.

6    Q    Then he did not negotiate your release?

7    A    I can explain to you, if you want --

8    Q    Hold on one second.  You will be able to explain.

9    A    Okay.

10   Q    The next question was:  Did you tell the agents that

11   Beltran Leyva paid $100,000 -- that your brother paid him,

12   Beltran Leyva, a total of $100,000 for his services?

13   A    That's incorrect.

14   Q    So you didn't tell the agents that?

15   A    That part -- that part's wrong.  It was a Rolex watch

16   that was given to Chapito Lomas who worked for them.

17   Q    Now, turning your attention to assets, particularly your

18   assets, okay, assets that were disclosed by you and/or seized

19   by the Government, okay?

20   A    Okay.

21   Q    You obviously were able to, through your multi million

22   dollars in narcotic trafficking, you did acquire tangible

23   assets as well as money, correct?

24   A    Correct.

25   Q    Now, back in May of 2009, you were specifically

Flores - cross - Purpura

1    interviewed by the Government, along with agents, along with

2    your attorney as to the acquisition of assets.

3            Do you kind of remember that conversation?

4    A    Yes, sir.

5    Q    And what you did tell them, you did have at least one

6    Bank of America in Guadalajara, either Bank of America or HSBC

7    Bank.

8            Do you remember telling them that?

9    A    Yes.

10   Q    And that bank account, you didn't really remember how

11   much money you had in there, but it was under another name,

12   correct?

13   A    Yes.  An alias, yes.

14   Q    And they would not have been able to locate that bank

15   account if you didn't give them the alias; is that fair to

16   say?

17   A    Correct.

18   Q    Because obviously you didn't give -- the bank account

19   wasn't in Pedro Flores' name, you used a pseudonym -- a fake

20   name, right?

21   A    Correct.

22   Q    And they were able to locate that particular bank account

23   because you gave them the best -- you gave them the

24   information, correct?

25   A    If they located the account, yes, correct, yeah.

Flores - cross - Purpura

1   Q    Now, I guess what's to stop you from not having more than

2   one bank account in a fake name?

3   A    At that point, nothing.

4   Q    But there was only one bank account that you disclosed in

5   Guadalajara, Mexico, correct?

6   A    Yes.  That was just a -- just to help with the cover of

7   the new name, you know, have a bank account, IDs, stuff like

8   that, you know.

9   Q    Well, how many bank accounts did you have?

10  A    I believe just that one, yes.

11  Q    Just one bank account?

12  A    Yes, just to go with the new alias I had.

13  Q    You didn't have any bank accounts in any other aliases,

14  let's say, perhaps in other countries to hide your multi

15  millions of dollars?

16  A    No, sir.

17  Q    And the bottom line is we have to believe you on that; is

18  that correct?

19  A    Correct.  I just don't trust the banking system, sir, and

20  I put the money in the bank and it disappears and that's how

21  you get a receipt -- you want to get a receipt for it.

22  Q    You did have houses; is that correct?

23  A    Yes.

24  Q    You had nine houses -- I think nine houses in

25  Guadalajara, correct?

Flores - cross - Purpura

1    A    Yes.

2    Q    You had one house that you purchased for $1.8 million,

3    correct?

4    A    Yes.

5    Q    And another house, as you told the Government, you

6    purchased for $700,000 and put a million dollars in

7    improvements in the house; do you remember that?

8    A    Yes.

9    Q    I'm guessing, in Guadalajara, a million dollars in

10   improvements could -- I guess that could get you a lot of

11   improvements, right?

12   A    Correct.

13   Q    Just share with us, what did you do?

14   A    I redid the whole property, sir.

15   Q    What do you mean by that?

16   A    Everything.  Floors, bathrooms, everything, kitchens.

17   Q    You had two other properties you purchased at 650,000 a

18   piece, correct?

19   A    Yes.

20   Q    You had -- you were -- at least purchased two houses for

21   your mother, correct?

22   A    Correct.

23   Q    And one house was for a half a million, right?

24   A    Correct.

25   Q    Another house for 800,000, approximately?

Flores - cross - Purpura

1    A    Correct.

2    Q    With about another half a million dollars worth of

3    improvements to that house?

4    A    Correct.

5    Q    You had two more houses that you purchased for your

6    brother, right?

7    A    Yes.

8    Q    An older residence, as you describe it, for $600,000,

9    correct?

10   A    Yes.

11   Q    A newer residence for $650,000, right?

12   A    Correct.

13   Q    And you even purchased a house for a, as you

14   determined -- deemed him a criminal associate for 200,000; is

15   that right?

16   A    Yes.

17   Q    About nine houses, as we said, all together, right?

18   A    Correct.

19   Q    Now, all these houses, even though you purchased them,

20   they were not titled in your name, correct?

21   A    Correct.

22   Q    You used what's called a straw purchaser, someone else's

23   name, correct?

24   A    Correct.

25   Q    And you have been able to identify all these properties

Flores - cross - Purpura

1    to the Government, and you have identified them, right?

2    A    Yes.

3    Q    But you know, as was noted in your sentencing memorandum,

4    because the properties were not lawfully titled, the

5    Government was not able to successfully pursue those

6    properties for forfeiture or seizure.  You know that, right?

7    A    Yes.

8    Q    Those properties are still there in Mexico, all nine of

9    them, right?

10   A    Yes.

11   Q    All titled the same way you left them back in 2008,

12   correct?

13   A    Correct.

14   Q    And the United States Government, to at least your

15   knowledge, can't touch them, right?

16   A    Correct.

17   Q    You had a lot of vehicles, right?

18   A    Yes, sir.

19   Q    You had at least three tractor-trailers at 150,000 each,

20   correct?

21   A    Correct.

22   Q    You like the ATVs, it's fair to say, right?

23   A    Yes.

24   Q    I mean, who doesn't like an ATV, right?

25   A    Right.

Flores - cross - Purpura

1   Q    Nobody, right?

2   A    They're fun, yeah.

3   Q    And you had 22 to 26 of them at the cost of 10,000 each.

4   A    Correct.

5   Q    You like your cars.

6   A    Yes.

7   Q    In four years, you purchased 40 cars, right?

8   A    Yeah.  At least, yeah.

9   Q    And one of those cars was, tell me, Ferrari?

10  A    Yes.

11  Q    And you can't live in Guadalajara without bulletproof

12  cars; fair to say?

13  A    Correct.

14  Q    And you had three of those.

15  A    Yes.

16  Q    About 80- to 90,000 a piece, correct?

17  A    Correct.

18  Q    Twelve tractor-trailers, right?

19  A    Yes.

20  Q    150,000 each, yes?

21  A    Yes.

22  Q    And one Lamborghini.

23  A    Yes.

24  Q    So these are assets that you could actually see, touch,

25  feel, take pictures of, and use and find, right?

Flores - cross - Purpura

1    A    Right.

2    Q    You were asked by the Office of Foreign Asset Control --

3    we've used the abbreviation OFAC -- you had a conversation

4    with OFAC, literally was over the phone, you and your brother

5    were wherever you were, and they are calling you from OFAC,

6    from Washington, and they specifically, back on August 5th,

7    2009, they weren't so much interested in your properties

8    because you're a citizen, they were interested in assets held

9    by three people who were not citizens.  They were interested

10   in assets of Arturo Beltran Leyva; they were interested in

11   assets of Mayo Zambada; and they were interested in assets of

12   Joaquin Guzman.

13           Do you remember that?

14   A    No.

15   Q    Let me see if I could refresh your recollection.  You

16   don't remember?  I think I can --

17           MR. PURPURA:  Can I have -- one second.

18           MR. FELS:  Number?

19           MR. PURPURA:  I'm sorry, I apologize.  PF-179, Bates

20   stamp 1481.

21   BY MR. PURPURA:

22   Q    I'm now going to show you what has been marked for

23   identification only, Defense Exhibit 332, and just take a

24   look -- I will -- I'm going to turn some pages for you and see

25   if this helps you a little bit.  Just try to read this first

Flores - cross - Purpura

1    paragraph and let me know when you're finished.

2           In all fairness to you, you have been interviewed a

3    ton of times by many different agencies, correct?

4    A    Correct.

5    Q    And I'm just going to turn to the second page to save

6    some time.

7    A    I actually remember that, yeah.

8    Q    You remember now?

9    A    Yeah.

10   Q    Okay.  Great.  Thanks.

11          So you first gave them information on Beltran Leyva,

12   do you remember that?

13   A    (No verbal response.)

14   Q    I can show you.  Let me see if this helps with your

15   memory, 1482.

16   A    Okay.

17          (Pause.)

18   BY MR. PURPURA:

19   Q    Are you ready?

20   A    Yes.

21   Q    Obviously, this interview was back in 2009, so we are

22   talking nine years ago, and if you need to look at anything to

23   refresh your recollection, please feel free to do so.  We will

24   leave it up there for you.

25   A    Okay.

Flores - cross - Purpura

1    Q    Thank you.

2          But what you told them back in 2009 is that Beltran

3    Leyva Arturo is the owner of large corporations dealing in

4    bottling, plastics production, and cosmetic supplies; sound

5    about right?

6    A    I don't remember, but yeah, I could -- yeah.  I don't

7    remember telling them that, but yeah.  Today, I don't remember

8    it.

9    Q    Fair enough.  If you don't remember today, you don't

10   remember today.

11   A    Yeah.

12   Q    Do you know if Arturo Beltran Leyva had multiple

13   corporations involving bottling, plastics, or cosmetic

14   supplies?

15   A    I'm aware that he had multiple corporations and he was

16   involved in legit businesses as well.

17   Q    And you are aware that you tried to cooperate as honestly

18   as you could with OFAC and give them all the information,

19   correct?

20   A    Correct.

21   Q    Okay.  And do you remember telling the people of OFAC

22   that he also had a large construction company which did

23   Government contracts, public roads, things like that?

24   A    Yes, I could have, yeah.

25   Q    And do you remember indicating that Arturo Beltran Leyva

Flores - cross - Purpura

1    had properties such as ranches which he purchased, literally,

2    every few months?

3    A    I remember that, yes.

4    Q    That he was also the owner of a -- I may pronounce that

5    incorrectly.  What kind of gas station is that?  Pemex?

6    A    Yeah.  Pemex, yeah.

7    Q    Pemex gas station?

8    A    Yeah.  All the gas stations are Pemex in Mexico.

9    Q    Okay.  And do you remember telling them that he's an

10   owner of at least one, if not more, Pemex gas stations?

11   A    Yes.

12   Q    Okay.  That he was the owner of a warehouse behind the

13   Mexico City Airport?

14   A    Yes.

15   Q    So you were able to tell the Government of some of these

16   substantial wealth that Arturo Beltran Leyva, like yourself,

17   was able to acquire through drug trafficking; fair to say?

18   A    Correct.

19   Q    You also told them about some of his lieutenants, but we

20   will skip past that now.  I just want to go over to -- if

21   you -- one second more on Mr. Beltran Leyva.

22            You also indicated that Mr. Beltran Leyva -- Arturo

23   Beltran Leyva, if you recall, had a warehouse in Costa Rica

24   where he was importing steal from China and Africa?

25   A    I see that it says CS2.

Flores - cross - Purpura

1    Q    If you don't remember, then just say I don't remember, I

2    didn't do it.

3    A    Yeah, it's not me, no.

4    Q    Were you together when your brother was also discussing

5    with them at the same time the assets?

6    A    If I recall correctly, it was a bunch of different people

7    that came in and they separated us.

8    Q    Okay.  And you were asked about Mr. Garcia Zambada,

9    correct?  Mayo?

10            MR. FELS:  Objection, Your Honor.

11            THE COURT:  Yes?  Is there an objection?

12            MR. FELS:  Yes, there is an objection.

13            THE COURT:  Sustained.

14   BY MR. PURPURA:

15   Q    Do you recall being asked about the assets of Mayo

16   Zambada Garcia?

17            MR. FELS:  Objection, Your Honor.

18            THE COURT:  Sustained.

19            MR. PURPURA:  Can we approach, Your Honor?

20            THE COURT:  Sure.

21            MR. PURPURA:  Thank you.

22            (Sidebar.)

23            (Continued on next page.)

24

25

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

3713

SIDEBAR CONFERENCE

1           (Sidebar conference held on the record out of the

2    hearing of the jury.)

3           THE COURT:  Can you ask him a substantive question

4    first?  If you want to ask him about Mayo's assets, ask him

5    about Mayo's assets.  If he gives you a contradiction, then

6    you can say to him, didn't you tell something different to the

7    agents.  If he says, I don't remember, then you can refresh

8    him with the notes, but you can't go right to the notes.

9           MR. FELS:  Actually, Your Honor, there's even one

10   more misleading aspect of this, which is, it's evident, and

11   the witness has already indicated that all the conversation

12   with Mayo Zambada relates to the interview with his brother.

13          THE COURT:  Well --

14          MR. FELS:  CS2, not CS1.

15          THE COURT:  -- he has said that.

16          MR. FELS:  I'm looking at the report.  And it also

17   appears that the OFAC never even asked the questions --

18   follow-up questions relating to Chapo Guzman because there's

19   absolutely no mention of it, and there's no indication in the

20   report that they even asked the questions about Chapo --

21          THE COURT:  Look, I don't need to get that far yet

22   because he hasn't done it the first way.  You are going to

23   show him the first way, and then I'm sure you will bring out,

24   and even if you need to in a fair way, if he lacks

25   recollection or says something that's inconsistent with

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

3714

SIDEBAR CONFERENCE

1    something he told the agents, not his brother told the agents.

2              MR. PURPURA:  I was trying to make it go a little

3    faster, but I will go the right way and do it.

4              THE COURT:  I think we are past the fast stage,

5    unfortunately.

6              (Sidebar ends.)

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3715

Flores - cross - Purpura

1              (In open court.)

2    BY MR. PURPURA:

3    Q    Today, sitting here right now, do you know what assets

4    Mayo Zambada had?

5    A    I can think of a couple things.

6    Q    Why don't you think of a couple things and tell us.

7    A    He has land, cattle.  That's pretty much it.

8    Q    And how do you know that?

9    A    Because --

10   Q    Because you saw it?

11   A    No.  He told me.

12   Q    He told you?

13   A    Yeah.

14   Q    So you know he said land and cattle; is that correct?

15   A    Correct.

16   Q    And when it came down to Mr. Guzman, you didn't tell the

17   OFAC people anything about any of these assets, did you?

18   A    That might be correct, yes.

19   Q    Now, you already indicated that when your -- strike that.

20              You became a cooperating confidential source for the

21   DEA in December of 2008; is that correct?  About.

22   A    I believe I signed an agreement in that month, but I was

23   cooperating with the Government since around April 2008.

24   Q    Fair enough.

25              But you didn't actually sign an agreement until

Flores - cross - Purpura

1    December of 2008, right?

2    A    Correct.

3    Q    And I want to show you the agreement and see if you

4    recognize it.

5              MR. PURPURA:  For the Government, it's PF-224.

6    Witness only, please.

7    BY MR. PURPURA:

8    Q    Do you recognize that agreement?

9    A    Yes.

10             MR. PURPURA:  Your Honor, I would, at this point,

11   move this into evidence as Defense Exhibit --

12             MR. FELS:  Your Honor, we would object.

13             THE COURT:  Sustained.

14   BY MR. PURPURA:

15   Q    All right.  Do you remember you promised the Government

16   certain things in that confidential source agreement?  Do you

17   remember that?

18   A    Yes.

19   Q    Okay.  Do you remember telling the Government you would

20   be truthful with information at all times?  Do you remember

21   that?

22   A    Yes.

23   Q    You initialed it, right?

24   A    Correct.

25   Q    And you signed it afterwards, right?

3717
Flores - cross - Purpura

1   A    Yes.

2   Q    Okay.  You weren't truthful with the Government, were

3   you, after you signed that agreement?

4   A    Yes, I was.

5   Q    Yes and no?

6            THE COURT:  No.  He said, "Yes, I was."

7            MR. PURPURA:  I know, but I want to ask the

8   question, was that a "yes" and a "no."

9   A    I didn't come forward with a lot of things at the time

10  because I wasn't asked.

11  Q    Right.  You didn't come forward with the fact that you

12  were collecting -- you and your family were collecting

13  millions of dollars off the street from drug money, right?

14  A    No.

15  Q    And so that's not being truthful, is it?

16  A    Yeah, I called for the collection of the money way before

17  I signed this agreement.

18  Q    And it continued after you signed the agreement, right?

19  A    No.

20  Q    It just stopped then?

21  A    Yes.

22  Q    So while you were cooperating for the United States

23  Government, your family, that's your wife and some of her

24  family members, were collecting drug money, in particular

25  millions of dollars out of Washington, D.C., correct?

Flores - cross - Purpura

1    A    Correct.

2    Q    You didn't tell the Government about it, right?

3    A    Correct.

4    Q    That's when the Government said you were double dealing,

5    correct?  Right?

6    A    Yes.

7    Q    Your wife never got charged with it, did she?

8    A    No.  She received immunity.

9    Q    Immunity means she's not going to be charged, right?

10   A    Correct.

11   Q    Your family members or her family members didn't get

12   charged with it either, did they?

13   A    Yes.

14   Q    They did get charged?

15   A    Yes.

16   Q    Which family -- without giving me a name, just give me a

17   relationship, who got charged?

18   A    Her cousin was indicted.

19   Q    Any other family members other than the cousin?

20   A    No.

21   Q    There were more than the cousin involved; isn't that

22   correct?

23   A    Yes.

24   Q    And they didn't get charged, right?

25   A    Correct.

Flores - cross - Purpura

1    Q    Since you started cooperating with the Government, as

2    Government counsel brought out --

3           MR. PURPURA:  Just for identification, please.

4    BY MR. PURPURA:

5    Q    338.  Do you recognize the type of that car?

6    A    Yes.

7    Q    What kind of car is that?

8    A    A Bentley.

9           MR. PURPURA:  I would just move as a demonstrative

10   338 in.

11          MR. FELS:  No objection.

12          THE COURT:  Received.

13          (Defense Exhibit 338, was received in evidence.)

14   BY MR. PURPURA:

15   Q    And while you are cooperating with the Government, not

16   this particular Bentley, but you did purchase your wife a

17   Bentley with drug proceeds during the time you were

18   cooperating with the Government; isn't that correct?

19   A    Correct.

20   Q    In addition, the money seized your attorney was able to

21   negotiate that your brother and you would receive back for

22   your families $300,000 of the drug money, right?

23   A    Correct.

24   Q    In addition to the $300,000, they also negotiated -- or

25   he or she -- negotiated that the attorneys' fees would also be

Flores - cross - Purpura

1   paid as well; is that correct?  Or a portion of it at least.

2   A    That's correct.

3   Q    Now, you had conversations with the Government wherein

4   the Government informed you that they received information

5   that you and your brother had secreted $20 million of money

6   you haven't told the Government about.

7        Do you remember them asking you that?

8   A    Yes.

9   Q    And your simple response to them was that's not true,

10  right?

11  A    Correct.

12  Q    And that's what you're telling the jury here today,

13  right?

14  A    Correct.

15  Q    You have given every single penny, right?

16  A    Correct.

17  Q    You've had caletas.  You know what a caleta is, right?

18  A    Stash of money.

19  Q    You have used caletas or stash places before, right?

20  A    Yes.

21  Q    You have turned all those stashes into the Government,

22  right?

23  A    Correct.

24  Q    If someone suggested that you had $20 million, and your

25  brother, that would be a lie, right?

3721

Flores – cross – Purpura

1   A     Correct, sir.

2           THE COURT:  Excuse me, Mr. Purpura.  Did you say "a

3   lot" or "a lie"?

4           MR. PURPURA:  I did say "a lie."

5           THE COURT:  A lie, okay, got it.

6           MR. PURPURA:  Not from him, but the person who said

7   he had the money.

8           THE COURT:  The court reporter got "a lot" and I

9   thought you said "a lie."

10          MR. PURPURA:  Thank you.

11  BY MR. PURPURA:

12  Q     Now, the Government brought out -- not maybe, but the

13  Government brought it out on direct examination that somehow

14  you were able to have a conjugal visit with your wife while

15  you're in DEA custody, correct?

16  A     I was not allowed to have a conjugal visit.

17  Q     That you -- bad phrasing.  That you had a conjugal visit

18  with your wife while you're in DEA custody, right?

19  A     Correct.

20  Q     Now, first of all, I -- strike that.

21          What is DEA custody, at least for you?

22          MR. FELS:  Objection, Your Honor.

23          THE COURT:  Sustained.

24  BY MR. PURPURA:

25  Q     I'm not going to ask you for location or places.  Were

3722

Flores - cross - Purpura

1    you in the Bureau of Prisons when this occurred?

2    A    No.

3    Q    And without telling me what state or country, which I

4    don't care about, was it in a house?

5    A    No.

6    Q    We could play 50 questions, but I -- all right.

7              THE COURT:  Maybe you want to ask him an open-ended

8    question to describe it.

9              MR. PURPURA:  Thank you.  I'll do that.

10   BY MR. PURPURA:

11   Q    Without giving any identification away -- state, country,

12   address -- why don't you describe whatever you were being in

13   custody, what it was like.

14   A    I was usually --

15             MR. FELS:  I would object to describing sensitive

16   topic such as this.  If we can stipulate that he was --

17             THE COURT:  Let's have a sidebar, please.

18             (Sidebar.)

19             (Continued on next page.)

20

21

22

23

24

25

3723

SIDEBAR CONFERENCE

1              (Sidebar conference held on the record out of the

2      hearing of the jury.)

3              THE COURT:  If they put him up at the Waldorf

4      Astoria, it's relevant information.  I don't know where they

5      put him up, but I assume the purpose of the question is to

6      show it was a very comfortable custody.

7              MR. PURPURA:  Not only comfortable, the amount of

8      ingenuity he had to use to manage something like this shows

9      his ability to be -- his guile, his trickery.

10             MR. FELS:  I guess what we're asking for is not to

11     elicit details that could allow this place to be discovered.

12     My understanding is that --

13             THE COURT:  Your witness needs to be prepared to

14     testify in a way that does not disclose that information.

15     That doesn't mean there's something wrong with the question,

16     right?

17             MR. FELS:  I wouldn't have anticipated asking a

18     detailed questions about the type of facility that he was

19     placed in, but that's fine.

20             THE COURT:  Like I say, if it were the Waldorf

21     Astoria, it would be relevant.

22             MR. PURPURA:  I will take counsel's word.  If you

23     just want to let me know, maybe I can just phrase it --

24             MR. FELS:  You can ask.  I just want to sort of

25     make --

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1          THE COURT:  You just think you weren't cautious

2     enough before lunch, and now you are being more cautious.

3          MR. FELS:  A little bit, perhaps.

4          THE COURT:  Okay.  Let's be careful, but the witness

5     does have to be prepared not to make disclosures he's not

6     supposed to make if the questions are proper.

7          MR. FELS:  Okay.

8          (Sidebar ends.)

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Flores - cross - Purpura

1              (In open court.)

2    BY MR. PURPURA:

3    Q    Mr. Flores, back to where we were, without giving any

4    identification away, can you generally describe the facility

5    that you were in and the surroundings?

6    A    It was an office building.

7    Q    And is this where you had your debriefings or proffer

8    sessions as well?

9    A    Yes.

10   Q    And were you being housed in this office building to stay

11   there overnight?

12   A    No.

13   Q    And so --

14   A    Want me to explain?

15   Q    I'm afraid if you do, but I wouldn't mind at all.  Go

16   ahead.

17   A    I would be picked up at the BOP and then taken to this

18   place where we debrief.

19   Q    What's your wife doing there?

20   A    For months at a time, I wasn't able to see my family, so

21   I had to complain to DEA about -- about this problem, and they

22   accommodated my brother and I where we could spend a couple

23   hours with our family in the same place where we were

24   debriefing.

25   Q    So when you are being debriefed, as you are giving

3726

Flores - cross - Purpura

1   information to the Government, there's an arrangement that

2   your wife and/or children, family, can meet you for a period

3   of time, correct?

4   A    Correct.

5   Q    And during that period of time, apparently, they're not

6   watching you; is that right?

7   A    They were distracted, yes.

8   Q    All right.  Distracted -- I'm not going to ask the amount

9   of time, but -- so anyway, long story short, they were

10  distracted and -- you may be right, but it -- it feels so

11  good, but it's so wrong.  All right.  It was wrong, right?

12            THE COURT:  Please ask a question.

13  A    I wasn't thinking clearly.

14  Q    Not once, but twice it happened, right?

15  A    Yes.

16  Q    Okay.  I'll move on.

17            And then just little things, little things, little

18  things.  Little things like when Government counsel brought

19  out that, you know, you have a hard time following the rules,

20  you put money in other people's commissary because there's a

21  limit on your commissary, right?

22  A    Correct, sir.

23  Q    And you may have more money than some of the other

24  prisoners, so they have less money in their commissary, right?

25  A    Yes, sir.

3727

Flores - cross - Purpura

1    Q    And so for a fee, they will allow you to put money in

2    there and you help them out either for money or for

3    commissary, correct?

4    A    Correct.

5    Q    And so you're able to manipulate the system that way,

6    right?

7    A    Yes, sir.

8    Q    And you did that and you got caught, right?

9    A    Yes, sir.

10   Q    Didn't stop you, right?

11   A    No, sir.

12   Q    You did it again, right?

13   A    Correct.

14   Q    And you got caught again, correct?

15   A    Correct.

16   Q    Same thing with the phone.  You indicated that there was

17   a phone and you were able to bypass the recording system by

18   using that phone, correct?

19   A    No.

20   Q    I thought -- didn't you testify about a phone which was

21   broken?

22   A    I could explain, yeah.

23   Q    Well, I'm going to see if I can explain for you.

24        There's a phone that's broken, correct?

25   A    Correct.

3728

Flores - cross - Purpura

```
1    Q    And that phone you are able to call out, as you said,
2    anywhere you want to call, correct?
3    A    Correct.
4    Q    And it's not recorded at that point, correct?
5    A    Correct.
6    Q    Now, normally, as in a proper prison in the BOP, all
7    phone calls are recorded, correct?
8    A    Correct.
9    Q    As a matter of fact, in the very first 60 seconds of the
10   phone call, they tell you and the person you are speaking to:
11   This is the Bureau of Prisons, this phone call is being
12   recorded, correct?
13   A    Correct.
14   Q    So you have to be careful, at least on those phones, as
15   to what you say, right?
16   A    Correct.
17   Q    Right?
18   A    Yes.
19   Q    You wouldn't tell someone to move money or hide an asset
20   on a recorded call, would you, if you knew it was recorded, at
21   least?
22   A    Probably not, no.
23   Q    Now, on this other phone you were using, the one they
24   don't have the recording on, who were you talking to?
25   A    To my wife, sir.
```

Denise Parisi, RPR, CRR
Official Court Reporter

Flores – cross – Purpura

1    Q    Just your wife?

2    A    Yes.

3    Q    And she is the unindicted coconspirator in your drug

4    trafficking case, correct?

5    A    Correct.

6    Q    And she's the woman who was collecting money for you,

7    drug money, as you started cooperating for the Government,

8    right?

9    A    She assisted, yes.

10   Q    Did you ask your wife -- strike that.

11          Any attempt on your part at that time to tell your

12   wife to go pick up some more money, go pick up some funds?

13          MR. FELS:  Objection as to the vagueness.  What time

14   are we talking about?

15   BY MR. PURPURA:

16   Q    The time is when you're using the phone that doesn't have

17   the recording device, whenever that is, while you're in the

18   BOP.

19   A    I believe everyone is in prison at this point.  They owed

20   me money.  Everyone owed me money is in prison at this point.

21   Q    And who put the money in the other defendant's inmate's

22   commissaries?

23   A    My family.

24   Q    Knowing it was wrong.

25   A    Correct.

Flores - cross - Purpura

1    Q    Who told them to do that?

2    A    I did, sir.

3    Q    Just a few more questions.

4         Your plea agreement, Government's Exhibit 3500 PF-4,

5    we've talked about the guidelines.  The guidelines are

6    actually inside your plea agreement, isn't that correct, the

7    calculation of the guidelines?

8    A    Correct.

9    Q    And this is Defense Exhibit 3500 PF-4A, which is just for

10   demonstrative; it's just the highlighting of certain portions.

11        You indicated that your base offense level is a 38,

12   in your plea agreement, right?

13   A    Correct.

14   Q    You received a two-level, what's called, an upward

15   adjustment because your offense involved importation of

16   controlled substance, correct?

17   A    Correct.

18   Q    You received another two level upward adjustment because

19   you maintain premises for the purposes of manufacturing or

20   distributing drugs.  Basically, a warehouse, right?

21   A    Correct.

22   Q    You received two more levels for possession of firearm,

23   correct?

24   A    Correct.

25   Q    You received four levels because you, in fact, were

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Flores - cross - Purpura

1    leader and organizer, correct?

2    A    Correct.

3    Q    You received two more levels because importation involved

4    an airplane, correct?  Strike that.

5           It involved importation of drugs from another

6    country, correct?

7    A    Correct.

8    Q    As you indicated accurately on direct examination,

9    page 13 of your plea agreement, the adjusted offense level

10   after you get three levels down for acceptance of

11   responsibility is a level 47, right?

12   A    Correct.

13   Q    And you know under the guideline matrix, that is life

14   right across the board no matter what your criminal history

15   is, correct?

16   A    Correct.

17   Q    The paragraph in your plea agreement which may be the

18   most important paragraph to you would be the -- what's called

19   the C plea portion.  You know what that is, correct?

20   A    Yes, sir.

21   Q    A C plea would be a binding plea to the extent that if

22   the Court does not go along with that plea, you or the

23   Government would have the opportunity to withdraw the plea.

24           Does that summarize what a C plea is?

25   A    Yes, it does.

Flores - cross - Purpura

1    Q    Page 16, the C plea in your particular case was that the

2    parties have agreed that the sentence imposed by the Court

3    shall include a term of imprisonment in the custody of Bureau

4    of Prisons of not less than 10 years, no more than 16 years;

5    is that correct, sir?

6    A    Correct, sir.

7    Q    And, in fact, your cooperation has been -- was made --

8    was disclosed to the sentencing judge; is that correct?

9    A    Correct.

10   Q    The judge took that into consideration when he sentenced

11   you, correct?

12   A    Yes.

13              (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

FLORES - CROSS - PURPURA

1    CROSS-EXAMINATION

2    BY MR. PURPURA:

3    Q    That cooperation involved information you gave about Mayo

4    Zambada, about Mr. Guzman, about people in your own group and

5    about your customers, correct?

6    A    Correct.

7    Q    You received a sentence of 14 years as you testified to,

8    correct?

9    A    Yes.

10   Q    Finally, there is a forfeiture agreement, correct?

11   A    Correct.

12   Q    And you've agreed to forfeit close to a billion dollars,

13   correct?  Right here, that's a big number.

14   A    Correct.

15   Q    So it is -- I don't know if I can say it, $938,000,415,

16   right?

17   A    Yes, that judgment is for everyone on our case.

18   Q    That means you're jointly and severally responsible for

19   that, correct?

20   A    Correct.

21   Q    And because of that --

22        MR. PURPURA:  And, Judge, I think we may have to

23   have a really quick sidebar so I don't do anything

24   inappropriate.

25        THE COURT:  Okay, let's have a really quick sidebar.

FLORES - CROSS - PURPURA

1           (Sidebar conference.)

2           (Continued on the next page.)

SIDEBAR CONFERENCE

1          MR. PURPURA:  Judge, I walked up here with the book

2     and it's covered.  This is the *Cartel Wives*.  It was covered

3     by a white sheet of paper, as I came up here.  All's I want

4     for demonstrative is I want to put this cover on the overhead

5     to display what the book is.  The relevance is that his wife

6     has received 500,000, a half million dollars in proceeds from

7     this book.  And in addition there is a contract for a possible

8     movie, television, whatever afterwards in an undisclosed

9     amount of money.  It is in her name only, not in his name, the

10    proceeds are not subject to forfeiture and it shows a bias --

11         MR. FELS:  What's the bias?

12         MR. PURPURA:  -- credibility.

13         Here's the bias.  The bias is that this book is

14    Bringing Down El Chapo.  The more he talks about El Chapo, the

15    more he talks about bringing down El Chapo the more this book

16    sells, the more his notoriety grows and the future investment

17    in a movie increases.  So that's a certain bias to testify for

18    the benefit of his wife.

19         MR. FELS:  Your Honor, I don't object to the line of

20    questioning about the money that she plans to make, it's the

21    coupling of it with the forfeiture that's problematic because

22    that's misleading.

23         THE COURT:  Well, he wasn't doing that, he moved out

24    of the forfeiture, he's now going to a separate area on the

25    book, then you have no problem, right?

3736

SIDEBAR CONFERENCE

1      MR. FELS:  Is there anything else that he can go

2  into between just to uncouple those two?

3      THE COURT:  We had the sidebar in between.  He's not

4  going to mention the word "forfeiture" again in this line,

5  right?

6      MR. FELS:  That's the problem.

7      THE COURT:  Stop, stop.

8      MR. PURPURA:  I have to think it through.

9      THE COURT:  Let everybody think.

10     MR. PURPURA:  Judge, I'll do whatever the Court

11  wants me to do, but it certainly seems to me that they are

12  connected --

13     THE COURT:  Okay.

14     MR. PURPURA:  -- because he's still living with his

15  wife.  The value of whatever happens in the future, whatever

16  she received right now is going to inure to him as well.

17  She's already put money in his commissary.  This is a way, as

18  we all know, around a judgment against one family member as to

19  receive assets in someone else's name.  And that certainly

20  goes to his credibility.

21     THE COURT:  But how --

22     MR. PURPURA:  It doesn't you believe?

23     THE COURT:  I'm just not seeing how it makes it more

24  or less likely that he's telling the truth on the stand

25  depending on what his wife writes in her book.  I'm just not

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

SIDEBAR CONFERENCE

1    seeing that.

2              MR. PURPURA:  Well, the more or less likely is that

3    the more we talk about -- this book is pointed to the Bringing

4    Down El Chapo, that's the front of it, I mean that's the

5    essence of this book, that's what sold this book and what may

6    sell the future of the movie rights or whatever is going to

7    happen from this.  The more he -- the bias and credibility,

8    the more he points to Chapo --

9              THE COURT:  The more books will be sold.

10             MR. PURPURA:  That's correct.  And the more the

11   movie rights the higher it gets.

12             MR. FELS:  Again, Your Honor, I don't -- we've

13   already litigated this issue about in pretrial motions, I

14   don't think there's a problem with him going down this line of

15   cross, the problem again is coupling it to the lack -- to the

16   900 how many odd millions of that forfeiture.

17             THE COURT:  Let's assume he doesn't do that during

18   questioning, but he says to the jury, yes, he's forfeiting all

19   this money but his wife is walking away Scott clean with all

20   these book proceeds, what's wrong with that.

21             MR. FELS:  It's misleading because the forfeiture

22   judgment is not against her, the forfeiture judgment is

23   against him.

24             THE COURT:  That's his point, he's a beneficiary.

25             MR. FELS:  I could make the same argument, where are

SIDEBAR CONFERENCE

1   these people getting paid.

2           THE COURT:  You could.

3           MR. FELS:  This defendant claimed in a written

4   submission that he had no assets.

5           MR. PURPURA:  It's getting dirty.

6           THE COURT:  Excuse me.  We're going to have a

7   discussion about that because a lot of things I've said, I've

8   heard, I've thought, you know, there's an impression being

9   created that Mr. Guzman has no assets whatsoever, look at all

10  the assets everybody else has.  It may be fair game to say,

11  you know, these people are not publicly appointed, what do you

12  think they're getting paid?  I'm not ruling on that now, okay,

13  we'll deal with that.

14          MR. LICHTMAN:  If that's the case that you're going

15  to rule that our fees are going to come up, I'd like to call

16  back all the witnesses and find out if they have no assets how

17  they paid their lawyers a million and a half dollars in cash.

18          THE COURT:  I will take that request under

19  advisement when we get to that issue, we're not at that issue

20  now.  This was supposed to be a short sidebar.

21          I'm simply going to allow Mr. Purpura to bring out

22  the facts that his wife has a book, she has an income from the

23  book and if he wants to suggest to the witness that his wife

24  will get more money if there is a conviction, he can do all

25  that.  We will save the forfeiture issue for argument and

SIDEBAR CONFERENCE

1  closing --

2           MR. PURPURA:  Fine.

3           THE COURT:  -- where I think it's probably going to

4  be permissible because I think it's logical, but we don't need

5  it through this witness anyway, it's just argument.

6           MR. PURPURA:  Fair.

7           (End of sidebar conference.)

8           (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FLORES - CROSS - PURPURA

1          (In open court.)

2          THE COURT:  So much for short sidebars.  Let's

3    continue, Mr. Purpura.

4          MR. PURPURA:  Judge, thank you.

5    Q    Mr. Flores, showing you what is marked defense exhibit --

6    just you -- 344, as a demonstrative.

7          You certainly recognize that; is that correct, sir?

8    A    Yes.

9    Q    And this is a book that your wife, along with your

10   brother's wife in kind of IN quotes co-authored, correct?

11   A    Correct.

12         MR. PURPURA:  At this point for the demonstrative

13   purpose only, move in Defense Exhibit 344, just the face sheet

14   not the entire book.

15         THE COURT:  As per the sidebar, that is received.

16         (Defense Exhibit 344, was received in evidence.)

17   BY MR. PURPURA:

18   Q    And as you can see it says, *Cartel Wives*.  *A True Story*

19   *of Deadly Decisions, Steadfast Love, and Bringing Down El*

20   *Chapo*, right?

21   A    Correct.

22   Q    And in return for this book you know that your wife, your

23   wife, not you, your wife has received a half a million

24   dollars, correct?

25   A    Correct.

FLORES - REDIRECT - FELS

1    Q    In addition, your wife and your brother's wife have

2    entered into an agreement with a company, which is

3    undisclosed, for future perhaps movie rights or TV rights or

4    production rights, correct?

5    A    Correct.

6    Q    That's also for an undisclosed amount of money, correct?

7    A    Correct.

8    Q    And it helps sell the book and sell the movie with the

9    more dirt we can throw at "The Man," El Chapo, doesn't it?

10   A    I don't know if I agree with you, sir.

11           MR. PURPURA:  I have no further questions.  Thank

12   you.

13           THE COURT:  All right, any redirect?

14   REDIRECT EXAMINATION

15   BY MR. FELS:

16   Q    Sir, good afternoon.

17   A    Good afternoon.

18           THE COURT:  Hang on a second.  Melonie, we need the

19   podium mic.

20           (Pause in proceedings.)

21           THE COURT:  Okay.

22           MR. FELS:  Thank you, Your Honor.

23   Q    Sir, remember on cross-examination Mr. Purpura asked you,

24   what was it three times, was it eight to 10 times and he

25   really didn't allow you to answer and explain.  What did you

FLORES - REDIRECT - FELS

1    want to say?

2            MR. PURPURA:  Objection, Your Honor.

3            THE COURT:  Sustained as to form.

4    Q    What did you want to explain about the four versus the

5    eight to 10?

6    A    It could have been eight times, but I was only asked to

7    testify about the things I could remember that were factual, I

8    said four.

9    Q    Are you aware that your brother --

10            MR. PURPURA:  Objection.  Form.

11            THE COURT:  Well, no --

12   Q    Sir --

13            THE COURT:  -- I'm going to overrule the objection.

14   Q    -- are you aware that your brother has also met Chapo

15   Guzman?

16   A    Yes, more than I have.

17   Q    You're not telling this jury things that he knows but

18   that you don't know, correct?

19            MR. PURPURA:  Objection.

20            THE COURT:  Sustained.

21   BY MR. FELS:

22   Q    All right, I want to move on.  You were asked the

23   question about assets, about Guzman Loera, Beltran-Leyva and

24   Mayo Zambada; is that correct?

25   A    Okay.

3743

FLORES - REDIRECT - FELS

1    Q    Remember, you were asked about that interview?

2    A    Yes.

3    Q    Sir, do you remember if the agents even got to Chapo

4    Guzman in that interview?

5    A    No.

6    Q    So you weren't trying to hide assets that Chapo has, were

7    you?  In other words, you weren't trying to hide information

8    that you had about Chapo's assets, were you?

9    A    No.

10   Q    Are you aware that he has assets?

11   A    Not really, sir, no.

12   Q    Does he own property?

13              MR. PURPURA:  Objection.

14              THE COURT:  Those are not really, I think he's

15   entitled to probe.  Overruled.

16   BY MR. FELS:

17   Q    Do you understand he owns property?

18   A    I believe he owns some land, yes.

19   Q    What about all the weapons that you saw all around those

20   compounds, does that cost money?

21   A    Of course, yes.  Airplanes and stuff like that, yes.

22   Q    Now, let's just talk about your own assets.  You talked

23   about on cross-examination some assets that you had in Mexico.

24   A    Okay.

25   Q    And I think your testimony was you're not -- you don't

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

3744

FLORES - REDIRECT - FELS

1   believe that the United States can even seize those assets in

2   Mexico, correct?

3   A    Correct.

4   Q    Well, what about you, can't you just take these assets

5   once you get out of the prison?

6   A    Yeah, it sounded good but I found out later that the

7   minute I sell any of those assets or touch that money, I can

8   be indicted for money laundering.

9   Q    Would you do that, sir?

10  A    No, sir.

11  Q    Why not?

12  A    I went through all this hell already, I just want to go

13  home.

14          MR. FELS:  Sorry, I think his microphone just went

15  out.

16  A    I'm not trying to --

17          MR. FELS:  Sorry, his microphone just went out.

18          THE COURT:  Hang on a second, one second.

19          MR. FELS:  It's not you Mr. Flores.

20          THE WITNESS:  Okay.  Hello.

21          THE COURT:  Is there a question pending?

22  BY MR. FELS:

23  Q    I think the question was, why wouldn't you take that risk

24  to sell those assets once you got out of prison?

25  A    Because I would be in prison again and --

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

FLORES - REDIRECT - FELS

1            MR. FELS:  Your Honor.

2            THE COURT:  The microphone.

3            THE WITNESS:  Can you hear me?

4            THE COURT:  Hang on a second.

5            (Pause in proceedings.)

6            THE COURT:  Let's try it one more time.

7   BY MR. FELS:

8   Q    Okay.  The question was:  Why wouldn't you try to sell

9   those assets once you get out of prison?

10  A    Because I can be reindicted for money laundering and

11  possibly lose my -- have my plea agreement revoked.

12  Q    And you were saying something about going through hell --

13  A    Yes.

14  Q    -- when the microphone cut out.  What were you saying?

15  A    This whole thing has been a long journey for me and my

16  family, sir.  Very hard for us.  Prison, everything,

17  cooperating.

18  Q    Now you talked about cooperating against your workers, do

19  you remember that?

20  A    Yes, sir.

21  Q    Did you want to do that, sir?

22  A    Of course not, sir.

23  Q    Why did you do it?

24  A    Because I had to.

25  Q    What do you mean you had to?

FLORES - REDIRECT - FELS

1    A    The government eventually sat me down and explained to me
2    that this deal included everything or nothing, and there is no
3    way I was going to be able to pick and choose who went to
4    prison and who didn't.
5    Q    Do you feel badly about turning in your workers?
6              MR. PURPURA:  Objection.
7              THE COURT:  Overruled.
8    A    Of course I did, sir.  The people --
9    Q    Did you feel like you had a choice in the matter?
10   A    No.
11   Q    Now, what would have happened to you and your family if
12   you had told the DEA, no, I'm not cooperating against Franklin
13   Brown, my workers, and other people, I'm not going to do that?
14   A    There would be no deal.  I'd spend the rest of my life in
15   prison.
16   Q    Let's talk about some of the other people you cooperated
17   against.
18              Government's Exhibit 101, Vicente Zambada, did you
19   cooperate against him?
20   A    Yes.
21   Q    Did you submit an extradition affidavit for him?
22   A    Yes.
23   Q    Who is he?
24   A    He's the son of Mayo Zambada.
25   Q    What about this man, Mayo Zambada, did you cooperate

                          FLORES - REDIRECT - FELS

1    against him?

2    A    Yes.

3    Q    Now, sir, were you asked to try to make a call, a

4    recorded call with Mayo Zambada?

5    A    Yes, initially I was.

6    Q    By DEA?

7    A    Yes.

8    Q    Did you think you were going to be able to?

9    A    No.

10   Q    Why?  Why not?

11   A    From my experience with him, he never got on the phone

12   with me.  And I only seen him on the phone on two occasions.

13   Q    So you didn't think it was going to be a reasonable

14   effort to get him on the phone and get him recorded, correct?

15   A    Correct.

16   Q    What about Vicente Zambada, were you able to get him

17   recorded?

18   A    Yes.

19   Q    Are you aware of the existence of a call with him?

20   A    Yes.

21   Q    What about this man, did you cooperate against him man?

22   A    Yes.

23   Q    Who is he?

24   A    Alfredo Vasquez.

25   Q    He's the guy who you did that 276-kilo train route with,

FLORES - REDIRECT - FELS

1    correct?

2    A    Yes.

3    Q    Do you remember what kind of train did you use?

4    A    A box train.

5    Q    Box cars you mean?

6    A    Yeah.

7    Q    Let's talk about some of the violations that you had in

8    jail.  We talked about having the phone, calling your wife?

9    A    Yes.

10   Q    When was that?  What time frame was that when you had

11   access to that broken phone where you were able to call your

12   wife?

13   A    It was like for two weeks in August of this year.

14   Q    August of 2018?

15   A    Yes.

16   Q    I think you testified that you weren't instructing her to

17   go pick up more money because all the people who owed you drug

18   debts were already in prison, correct?

19   A    Correct.

20   Q    And moving the money into commissary accounts, do you

21   remember talking about that?

22   A    Yes.

23   Q    Obviously getting your wife pregnant, you did that too?

24   A    Yes.

25   Q    Let's talk about that a little bit.  Not again to get too

FLORES - REDIRECT - FELS

1    detailed, but how is it that you were allowed to spend some

2    time in a room with your wife?

3    A     Like I said earlier, we were allowed a family visit, a

4    joint family visit with my brother and his family and the DEA

5    was there and there is a lot of agents there.  And the way the

6    room is set up, they were standing by the door, the exit door

7    making sure nobody could come in or out and I took advantage

8    of a moment when they were distracted, and --

9    Q     Where -- what room did you go to?

10   A     I followed my wife in the bathroom.

11   Q     What were you doing in the bathroom besides the obvious

12   that you already testified, what were you doing in the

13   bathroom?

14   A     Washing some baby bottles.

15   Q     Did you have a baby at the time?

16   A     Yes.

17         MR. PURPURA:  I'm sorry.

18   Q     Whose idea was it?

19   A     It was actually my wife's idea.

20   Q     And I wanted to talk to you a little bit about these

21   violations.  You got some sort of prison discipline; is that

22   correct?

23   A     That's correct.

24   Q     Sir, do you know what institution figures out gain time?

25   You testified about gain time on direct, do you know what

3750

FLORES - REDIRECT - FELS

1   institution figures that out?

2   A    No.  What, the good time?

3   Q    Yes, that's right.

4        THE COURT:  You called it gain time, you meant good

5   time.

6        MR. FELS:  I apologize.

7   Q    Good time.

8   A    You get about 54 days a year.

9   Q    But what is the institution that makes that calculation?

10  A    The BOP.

11  Q    What's the institution that has authority over making

12  that calculation?

13  A    Criminal justice.

14  Q    Does your cooperation have anything to do with it?

15  A    No.

16  Q    So you did these violations, how much good time did you

17  lose?

18  A    None, sir.

19  Q    Now when were you separated from your brother, sir?

20  A    On the other question the reason I don't lose good time

21  is because those are small offenses.  They only take your good

22  time for serious offenses.

23  Q    Thank you for adding that.

24       When were you separated from your brother, sir?

25  A    2010 I believe.

3751

FLORES - REDIRECT - FELS

1    Q    And when did you start preparing for trial in this case?

2    A    Sometime last year.

3    Q    Any conversations with your brother about how to prepare

4    for this case?

5    A    No, sir, we're not allowed to speak.

6    Q    You were asked a question about the defendant being

7    Lupe's boss, do you remember that?

8    A    Yes.

9    Q    And that is your testimony, correct?

10   A    Correct.

11   Q    Can you explain the statement that Mayo was supplying

12   Olivares who was supplying Lupe Ledezma, but then Chapo says

13   that Lupe works for me.  Can you explain that for the jury?

14   A    Well, at the time that I was working with Lupe I didn't

15   know Olivares or anyone like that.  And the way I guess I

16   could explain that is it the way me and brother would work

17   with someone else.  I mean, we're equal partners, ultimately

18   equal partners, we have the same interest but who they talk to

19   I mean kind of varies, you know.  But from my understanding is

20   that Lupe was an associate of Chapo's first.

21   Q    So when you said it's like a similar relationship me and

22   brother, to whom and whom?

23   A    To Chapo and Mayo, sir.

24   Q    So what's your -- so is your explanation about this issue

25   with Olivares versus Chapo that -- what's the explanation?

FLORES - REDIRECT - FELS

1   A    I mean that whether Olivares is buying cocaine from Mayo

2   or Chapo is the same thing.

3   Q    There was a question about Musico supplying you, do you

4   remember that?

5   A    Yes.

6   Q    And Musico I think you said worked for Beltran-Leyva?

7   A    Yes.

8   Q    Was this before or after the war broke out between Mayo

9   and Chapo on one side and Beltran-Leyva?

10  A    Before and after.

11  Q    So there was point in which Musico was supplying you

12  kilos on behalf of Beltran-Leyva, correct?

13  A    Correct.

14  Q    After the war broke out?

15  A    Correct.

16  Q    And did that create a security issue for you or safety

17  issue for you?

18  A    Yes, it did.

19  Q    What's that?

20  A    That I was doing business with a rival cartel at the

21  time.

22  Q    And why again?

23         MR. PURPURA:  Objection, speculative.

24         THE COURT:  Sustained.

25  Q    So you remember there was also some confusion or I

FLORES - REDIRECT - FELS

1    should -- let me strike that.  Remember you were asked the

2    question about whether Arturo Beltran-Leyva paid $100,000, I

3    think you said that it actually was paid by Chapito Lomas?

4    A    Yes, I believe he said Alfredo Beltran-Leyva.

5    Q    What was the relationship between the Beltran-Leyvas and

6    Chapo and Mayo at that time in 2005?

7    A    They were all working together at the time.

8    Q    And now remember you were asked and shown a sheet of

9    paper you said was not accurate?

10   A    Yes.

11              MR. PURPURA:  Objection, Judge, to the --

12              THE COURT:  I think the form is wrong.

13              MR. PURPURA:  Not only that but --

14   Q    Sir --

15              THE COURT:  Right.  That's the part of the form

16   that's wrong.

17   BY MR. FELS:

18   Q    -- do you remember reading a portion of that report that

19   you ultimately said was wrong?

20   A    Yes.

21   Q    Does that refresh your recollection as to whether or not

22   you did tell --

23              THE COURT:  Mr. Fels.

24              MR. FELS:  Yes.

25              THE COURT:  Put that down.  Put it down.  Go ahead.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

FLORES - REDIRECT - FELS

1    BY MR. FELS:

2    Q    Does that report that you read refresh your recollection

3    as to whether you did tell the agents about Chapo Guzman's

4    involvement in the release of your kidnapping all the way back

5    in 2008?

6    A    No.  I mean, it was a complicated situation maybe that's

7    why they couldn't write it down right.

8    Q    So explain it.  What happened?

9    A    We had other people that were supplying us with cocaine

10   at the time that we maintained good relationships with and

11   these other sources eventually contacted -- put my brother and

12   Alfredo Beltran-Leyva in contact with each other 'cause he

13   said he could help and negotiate my release.  The person that

14   he introduced him to eventually was Chapito Lomas, which in

15   turn took my brother to the mountains to meet Chapo Guzman and

16   my brother being grateful gave him my watch worth over a

17   hundred grand.

18   Q    Gave who your watch?

19   A    Chapito Lomas.

20   Q    Then after that who did you go see to resolve this whole

21   issue about Lupe Ledezma?

22   A    Well, first my brother went to talk to Chapo and explain

23   the situation with him and that's what led to that meeting

24   with Lupe Ledezma and my brother and eventually Chapo had

25   spoke with the people and had made them release me.

FLORES - REDIRECT - FELS

1  Q    Sir, you were asked to listen to a video -- or actually

2  to watch and listen to a video, do you remember that?

3  A    Yes.

4  Q    Was it apparent to you that Chapo Guzman knew that he was

5  being filmed?

6            MR. PURPURA:  Objection.

7            THE COURT:  Sustained.

8  Q    Was this video a video that, to you, Chapo Guzman didn't

9  know was occurring?

10  A    No, I believe he was giving an interview so he knew the

11  tape was rolling, yeah.

12  Q    And when you called Chapo Guzman and he called you twice,

13  did you tell him, Chapo, I'm recording you now?

14            MR. PURPURA:  We'll stipulate.

15            THE COURT:  No, that's not good enough.  The witness

16  may answer the question.

17  A    Of course not, sir.

18  Q    Do you think there's a difference?

19  A    Yes.  A huge difference.

20  Q    Why?

21  A    I mean, he knew he was being recorded, he's giving an

22  interview.  I'm working for the DEA trying to set him up.

23  Q    In your experience, did that affect maybe how his voice

24  sounds?

25  A    Yes, but I'm also not an expert.  I mean, I could just

FLORES - REDIRECT - FELS

1    tell you the way things sound to me.  I had trouble with that.

2    Q    Sir, as you sit here today, do you have any question in

3    your mind that those two calls that you identified as Chapo

4    Guzman were in fact Chapo Guzman?

5    A    I'm a hundred percent certain it was him.

6    Q    And aside from being able to recognize the voice itself,

7    what on the other calls that we heard right before lead you to

8    conclude that the person you were speaking to was in fact

9    Chapo Guzman?

10   A    The way he greeted me, you know, the small talk, you

11   know.

12   Q    What about references to the deal itself?

13   A    Yes, of course, he was aware of them, the heroin, you

14   know.

15   Q    Immediately before Chapo Guzman called you, who did you

16   ask to have Chapo call you?

17   A    Juancho, Chapo's cousin.

18   Q    When Chapo Guzman did in fact call you the next day or

19   really later in that same day --

20   A    Yes.

21   Q    -- was this a surprise to you?

22   A    No.  I was expecting the call.

23   Q    And why, why were you expecting it?

24   A    Because I had given him the number and as we heard

25   Juancho tell me he was going to call me the next day, which

FLORES - REDIRECT - FELS

1    was later that same day.

2          THE COURT:  Mr. Fels, before you go on, are you

3    close to finishing?

4          MR. FELS:  Yes.

5    Q    Sir, you were asked if it's possible to edit a recording,

6    do you remember that?

7    A    Yes.

8    Q    Do you know how to edit a recording to have Chapo Guzman

9    say, Oh, are you going to deposit in Chicago?

10          Do you know how to do that, sir?

11   A    No, sir.  I just knew how to press record and stop,

12   that's it.

13   Q    Do you know how to edit a recording to say -- to have

14   Chapo Guzman say, So then how should we do it?  Oh, the guy

15   from Chicago should call you, but you get up the afternoon.

16          Do you know how to do that, sir?

17   A    No, sir.

18   Q    Do you know how to edit a recording to add in the voice

19   of a man named Alexander Cifuentes Villa?

20   A    No, sir.

21   Q    Do you even know who that is?

22   A    No, sir.

23   Q    Sir, Mr. Flores, what is your understanding of what could

24   happen if you lie to the jury today?

25   A    Like I testified --

FLORES - REDIRECT - FELS

```
 1              MR. PURPURA:  Objection.

 2              THE COURT:  Sustained.  Sustained.

 3    Q    Sir, are you lying?

 4    A    No, sir.

 5    Q    And how many years do you have left?

 6              MR. PURPURA:  Objection.

 7              THE COURT:  Overruled.

 8    A    I have two years left.

 9    Q    Sir, do you understand the concept of risk/reward?

10    A    Very well, yes.

11    Q    What does that mean to you, sir?

12    A    When you evaluate something and determine if the risk is

13    worth the reward.

14    Q    If, in fact, you do qualify and get some reduction for

15    your time, that's at most what, two years?

16    A    Possibly, yes.

17    Q    At most?

18    A    At most, yes.

19    Q    And what's the down side of testifying falsely?

20    A    I would spend the rest of my life in prison.

21    Q    So potentially two years versus life in prison?

22    A    Yes.

23    Q    What's the risk/reward to you about lying?

24              MR. PURPURA:  Objection.

25              THE COURT:  Sustained.  Save it for closing.
```

FLORES - REDIRECT - FELS

1    Q    I'll just ask one last question.

2              Sir, do you want to be here to testify today?

3              MR. PURPURA:  Objection.

4              THE COURT:  Overruled.

5    A    Of course not.  I have two years left at this point.  I

6    mean if I had a choice I would have chose not to be here

7    today.

8              MR. FELS:  No further questions.

9              THE COURT:  Okay.  All right, ladies and gentlemen,

10   we're going to take our mid-afternoon break, we'll come back

11   here at quarter to four.  Please don't talk about the case,

12   see you in a few minutes.

13             (Jury exits courtroom.)

14             THE COURT:  All right, everyone be seated.  The

15   Marshals make take the witness out.

16             I just want to give the lawyers some guidance on my

17   usual but not rigidly adhered to practice regarding redirect

18   and recross.

19             First of all, just so you know to expedite things,

20   it will -- I allow generally more leading on redirect than I

21   do on direct as long as I think the witness is not having

22   words put into his mouth that he would not have put into his

23   mouth if we went through the more protracted traditional

24   method of redirect examination.  So I'll allow a little bit of

25   leeway on that.

3760
FLORES - REDIRECT - FELS

1          On recross, which we didn't have on this witness but

2    I wanted to mention it on the prior witness, you know, that's

3    purely discretionary whether we're going to do recross or

4    redirect or re-recross or re-redirect and I'm only doing that

5    with regard to questions that not only are limited to what was

6    brought out on redirect, when we get to recross, but also it's

7    even narrower than that because it cannot be a mere repetition

8    of what was brought out on cross.  It's got to be some

9    amplification or some difference, not just getting in the last

10   word.  I will allow a little last word on redirect because

11   you're rehabilitating the witness.  But on recross you're not

12   really re-impeaching the witness with the exactly the same

13   information.  So everybody please bear that in mind.

14          The only other thing I wanted to say was with regard

15   to our discussion at sidebar, I said something to defense

16   counsel primarily about issues concerning the defendant's

17   assets that I know caused defense counsel some concern.  Based

18   on the redirect that I just heard, that's not going to be

19   necessary and we're not going to go there so you need not

20   worry about it.

21          Okay.  See you in 15 minutes.

22          (Recess.)

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

                              FLORES - REDIRECT - FELS

1                     THE COURTROOM DEPUTY:  All rise.

2                     THE COURT:  All right, let's have the jury in,

3          please.

4                     (Jury enters the courtroom.)

5                     THE COURT:  All right.  Be seated, please.

6                The government may call its next witness.

7                     MS. GOLDBARG:  Thank you, Your Honor.

8                The government calls Mario Elias.

ELIAS - DIRECT - MS. GOLDBARG

1              (Witness takes the witness stand.)

2      **MARIO ELIAS**, called as a witness, having been first duly

3      sworn/affirmed, was examined and testified as follows:

4              THE WITNESS:  Yes, I do.

5              THE COURTROOM DEPUTY:  Please state and spell your

6      name for the record.

7              THE WITNESS:  Mario Elias.  E-L-I-A-S.

8              MS. GOLDBARG:  May I inquire, Your Honor.

9              THE COURT:  You may.

10     DIRECT EXAMINATION

11     BY MS. GOLDBARG:

12     Q    Good afternoon.

13     A    Good afternoon.

14     Q    Who do you work for?

15     A    I'm employed by the City of Elgin Police Department in

16     Illinois.

17     Q    What's the biggest city close to Elgin?

18     A    Chicago.

19     Q    How far is Elgin from Chicago?

20     A    Less than 30 minutes.

21     Q    What is your rank with the Elgin Police Department?

22     A    Detective.

23     Q    How long have you been a detective -- or I'm sorry, with

24     the Elgin Police Department?

25     A    Twenty-five years.

ELIAS - DIRECT - MS. GOLDBARG

1    Q    Where are you currently assigned?

2    A    The Drug Enforcement Administration.

3    Q    In what city?

4    A    Chicago.

5    Q    What is your position with the Drug Enforcement

6    Administration in Chicago?

7    A    I'm a TFO.

8    Q    What does TFO stand for?

9    A    Task force officer.

10   Q    And what is a task force officer?

11   A    Task force officer, you're deputized as a federal law

12   enforcement officer, and we work with the DEA investigating

13   narcotics investigations and gathering information and

14   evidence.

15   Q    Do you have any specialty?

16   A    Yes.

17   Q    What is that?

18   A    I'm an undercover.

19   Q    What is an undercover officer?

20   A    As an undercover officer, I play the role sometimes of a

21   narcotics trafficker, a buyer, a seller, sometimes a money

22   launderer, transporter, and I gather evidence and information.

23   I infiltrate narcotics organizations to do so.

24   Q    How long have you been a task force officer with the DEA?

25   A    Fifteen years.

ELIAS - DIRECT - MS. GOLDBARG

1    Q    And how long have you been doing undercover work?

2    A    Twenty-five years.

3    Q    Drawing your attention to 2008, who were you working for

4    at that time?

5    A    The Drug Enforcement Administration.

6    Q    And now more specifically drawing your attention to

7    November 13th, 2018, were you assigned to do something in an

8    undercover capacity on that date?

9    A    Yes, I was.

10   Q    What were you asked to do.

11   A    I was asked to make contact with an unknown subject in

12   Chicago and pick up approximately 18 kilograms of heroin.

13   Q    Who gave you this task?

14   A    Special Agent Durante.

15   Q    And where does Special Agent Durante, who does he work

16   for?

17   A    DEA.

18   Q    And what was the first step you took in this assignment?

19   A    The first step was I met with the agents and we

20   formulated a plan and I placed the phone call to the number

21   that I was given.

22   Q    And do you know who you were calling at that time?

23   A    At that time I did not know who I was calling.

24   Q    What did you discuss in this first call with this person?

25   A    I made arrangements to meet up with the subject at a Home

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

ELIAS - DIRECT - MS. GOLDBARG

1   Depot parking lot in Northlake, Illinois.

2   Q    What happened after you had this conversation?

3   A    After the conversation, I had a debriefing and we came up

4   with a plan on where to meet the subject and how to go about

5   the meeting.

6   Q    What was the purpose of this briefing?

7   A    For one, it's for safe and, number two, during the

8   briefing, they instruct me on where they want me to park so

9   they know exactly where I'm at and they can watch the

10  transaction.

11  Q    When you say "they can watch," who are you referring to?

12  A    The surveillance officer that I'm working with on this

13  case.

14  Q    Who set the location of where you were going to meet?

15  A    Mr. Baez, the gentleman that I was meeting.

16  Q    Before we get to him.  How did you get that information?

17  A    Via telephone, we had a phone conversation.

18  Q    And was that phone conversation recorded?

19  A    Yes, it was.

20       MS. GOLDBARG:  Showing is you for identification, I

21  think without objection, Government's Exhibit 212-10.

22       THE COURT:  All right, that's admitted.

23       (Government Exhibit 212-10, received and published.)

24  Q    What, if anything, do you recognize on this disc?

25  A    I recognize my initials and the date 12/16/18.

ELIAS - DIRECT - MS. GOLDBARG

1    Q    Did you listen to the contents of the CD?

2    A    Yes, I did.

3    Q    And what is on the CD?

4    A    That's a conversation I had with Mr. Baez as far as where

5    we were going to meet to.

6            MS. GOLDBARG:  If I could ask the members of the

7    jury to turn to their binder, and if they can look at, I

8    believe it's the first Tab 212-10T, which is already in

9    evidence.

10           Your Honor, may I approach the witness with a

11   binder.

12           THE COURT:  You may.

13           MS. GOLDBARG:  Thank you.

14           THE WITNESS:  Is that the same one?

15           MS. GOLDBARG:  Let's check.

16           The witness already has one.

17           THE COURT:  Okay.

18   BY MS. GOLDBARG:

19   Q    Now, this is a pretty short call, so I would ask that we

20   play it, and then I'll ask you to let us know what's happening

21   in the conversation.

22           (Audio recording played.)

23   Q    Detective Elias, looking at the second page of this

24   document, which is the first page of the translation, who's

25   talking in this conversation?

ELIAS - DIRECT - MS. GOLDBARG

1    A    Myself and Mr. Gerardo Baez Leyva.

2    Q    So on the transcript when it says "Baez Leyva," is that

3    an indication it's Mr. Leyva -- Mr. Baez is speaking?

4    A    Correct.

5    Q    And Elias, that would be you?

6    A    Yes.

7    Q    Now, when you first pick up the call, you say:  This is

8    Carlos speaking on behalf of Sucio.

9              What are you telling Mr. Baez there?

10   A    That's the code word that they gave me to let him know

11   that I was sent.  Sucio is a nickname.

12   Q    And who are you pretending to be?

13   A    Carlos.

14   Q    And turning to page 3, where you see -- you're asking:

15   So I take Mannheim until Lake.

16             Where is Mr. Baez telling you to go?

17   A    There's a Home Depot right by Mannheim and Lake on North

18   Avenue and North Lake.

19   Q    So after you have this conversation with Mr. Baez, what

20   do you do?

21   A    At that point I travel to Home Depot and pick a spot in

22   the parking lot to set up.

23   Q    What do you mean by that, "to set up"?

24   A    The surveillance guys that are there with me watching,

25   they pick a spot that's appropriate for us, and I will sit

ELIAS - DIRECT - MS. GOLDBARG

1   there and then they watch the transaction.

2   Q    How many other agents were with you doing surveillance at

3   this time, if you recall?

4   A    Probably eight or nine.

5   Q    How do you know this?

6   A    From the report.  That's usually what we have out there.

7   Q    Could you see any of the people that had surveillance on

8   you?

9   A    Yes.

10  Q    Was DEA Special Agent Durante there present as well?

11  A    Yes, he was.

12  Q    Did you meet with Mr. Baez in the parking lot?

13  A    Yes, I did.

14  Q    What happened?

15  A    After I parked, he pulled up next to me.  I called him,

16  let him know I was there.  He pulls up next to me.  And

17  basically he wanted to take my vehicle so he could load the

18  heroin on to it and -- he would take my vehicle, load it up,

19  and then bring it back.

20        I told him that I would need a different vehicle

21  because I wasn't expecting him to do.

22  Q    What kind of vehicle were you driving at that point in

23  time?

24  A    Mercedes-Benz.

25  Q    Why did you not want to just give your Mercedes-Benz over

3769

ELIAS - DIRECT - MS. GOLDBARG

1   to Mr. Baez?

2   A    I wasn't expecting to hand it over, and there's certain

3   things in that vehicle that have police items in there that

4   would give -- that would give my identity away.  So I wanted

5   to go switch the vehicles, get a low profile vehicle that

6   didn't have any kind of police markings in the vehicle.

7   Q    And did you do that?

8   A    Yes, I did.

9   Q    How long did that take you?

10  A    Probably a good 40 minutes to an hour.

11  Q    What did you do next?

12  A    After -- after our conversation, I left, I told him I

13  would call him when I would be back in the area.

14           I went and swapped out a vehicle.  I got a different

15  vehicle to use.

16  Q    What did you do after you got your swapped-out vehicle?

17  A    I went back to the Home Depot parking lot and I placed a

18  call to Mr. Baez to let him know I was there.

19  Q    What about Mr. Baez do?

20  A    Short while later he arrived on the scene.

21  Q    What happened -- and the scene would be where?

22  A    Back to the Home Depot parking lot.

23  Q    What the happened when Mr. Baez returned to the Home

24  Depot parking lot?

25  A    When he returned, I met him in the parking lot.  I

ELIAS - DIRECT - MS. GOLDBARG

1    presented him with the keys to my other vehicle, second

2    vehicle that had a hidden compartment.  I showed him how to

3    open the compartment, in case he wanted to use it.  And then

4    he took the keys and took my vehicle and left and told me just

5    to wait for him there.  And when he was done, he would come

6    back.

7    Q    So what did you do after Mr. Baez took your car?

8    A    After that, I went to the entrance of the Home Depot

9    parking -- the Home Depot store, and I sat there waiting for

10   Mr. Baez to come back.

11   Q    Before we get to that, I would ask to play what's in

12   evidence as Government Exhibit 609A.

13              And if I could ask the jurors to look at, I believe

14   the second tab in the binders, 609A3T.

15              And before we play this, were you asked to listen to

16   this call, Detective Elias?

17   A    Yes, I was.

18   Q    Do you recognize the voice of anyone who was talking in

19   this call?

20   A    Yes.

21   Q    Whose voice do you recognize?

22   A    Mr. Baez.

23   Q    Do you know who he was speaking with?

24   A    He was speaking to one of the Flores brothers, but I'm

25   not sure which one, because I can't tell the difference in

ELIAS - DIRECT - MS. GOLDBARG

1   their voices.

2   Q    When you say "Flores brothers," who are you referring to?

3   A    Pedro and Margarito Flores.

4   Q    And have you listened to this before?

5   A    Yes, I have.

6           MS. GOLDBARG:  If we can play 609A3, please.

7           (Audio recording played.)

8   Q    Detective Elias, on page 3, when Mr. Baez is saying:

9   Tell them they should start heading over towards Noa Noa.

10          Do you know where Noa Noa is?

11  A    No, I'm not sure.

12  Q    And if you look later on, where PF on line 17 says:  Over

13  there by Mannheim and Lake.

14          What is the significance of Mr. Baez referring to

15  Mannheim and Lake?

16  A    That's also by the Home Depot.

17  Q    How long did you have to wait inside of the Home Depot

18  until Mr. Baez returned?

19  A    I believe he was back within 20 to 30 minutes at the

20  most.

21  Q    And what happened when he returned?

22  A    When he returned, I met him in the parking lot.  He

23  handed me back the keys to my vehicle.  And I asked him if

24  there was 18, referring to 18 kilograms of heroin, and he

25  said:  No, he was told to give me 20.  And he said it was in

ELIAS - DIRECT - MS. GOLDBARG

1  the back of vehicle in the black plastic garbage bag.

2  Q    Before we get to the plastic garbage bag, I'd like to

3  show you what's already in evidence at Government

4  Exhibit 212-1.

5        Do you recognize this photo?

6        (Exhibit published.)

7  A    Yes, that's the Home Depot located on North Avenue and

8  North Lake.

9  Q    And when Mr. Baez came back with the car with the black

10  bag in it, what time of day was it?

11  A    It was about 5:30 in the evening.

12  Q    Does this photograph approximate the light conditions

13  when you were there?

14  A    Yes.

15  Q    Now, on the screen in front of you, could you mark where

16  did you park while you were waiting for Mr. Baez?

17  A    (Indicating).  Right about there.

18  Q    So what happened when Mr. Baez came back?  Where did you

19  drive your car to?

20  A    He parked in the same area that I had given it to him.

21  Q    And after you went up to him what, if anything, did he

22  give to you?

23  A    Like I said, he gave me the keys back to my vehicle.  And

24  he advised me that the bag was in the back.

25  Q    So what did you do next?

ELIAS - DIRECT - MS. GOLDBARG

1  A    At that point he left and I went back to my vehicle.  I

2  went to the back of the vehicle and I found at black garbage

3  bag with 20 kilograms of heroin.

4  Q    What did you do actually see inside the bag?

5  A    I actually counted 20 brick-size kilograms of heroin.

6  Q    Do you remember what they looked like?

7  A    No, I -- no, I don't recall how they were packaged.

8  Q    What did you do next?

9  A    At that point I got into my vehicle and met up with

10 Special Agent Durante and Special Agent Bagley and turned over

11 the heroin to them.

12 Q    And where did this happen?

13 A    We picked a parking lot close by, but I don't recall

14 which one it was.

15 Q    And what happened to the black bag with the 20 kilos of

16 heroin in it?

17 A    Special Agent Durante and Special Agent Bagley took

18 possession of it, and that was the extent of my dealings with

19 it.

20 Q    And did you have any further investigation or involvement

21 in this investigation?

22 A    No.

23         MS. GOLDBARG:  I have no further questions.

24         THE COURT:  All right.

25         Any cross?

3774

ELIAS - DIRECT - MS. GOLDBARG

1        MR. PURPURA:  Detective Elias, no questions.  Thank

2   you.

3        THE COURT:  Thank you very much, please step down.

4        THE WITNESS:  Thank you, Judge.

5        (Whereupon, the witness was excused.)

6        THE COURT:  Another a short witness?

7        MS. GOLDBARG:  It should be about 20 minutes, Your

8   Honor.

9        THE COURT:  Let's try it.

10        MS. GOLDBARG:  The government calls Yeison Tapasco.

11        Your Honor, this witness may lean into tomorrow, but

12   I believe it would be worth it to start.

13        THE COURT:  Sure.

14        MS. GOLDBARG:  Thank you.

15        THE COURTROOM DEPUTY:  Please raise your right hand.

16

17

18

19

20

21

22

23

24

25

3775

                    TAPASCO SUAREZ - DIRECT - MS. GOLDBARG

1                 (Witness takes the witness stand.)

2    **YEISON HERNAN TAPASCO SUAREZ**, called as a witness, having been

3    first duly sworn/affirmed through the interpreter , was

4    examined and testified as follows:

5                 THE WITNESS:  Yes.

6                 THE COURTROOM DEPUTY:  Please state your spell your

7    name for the record.

8                 THE WITNESS:  Y-E-I-S-O-N.  A-T-R-N-A-N.

9    T-A-P-A-S-C-O.  S-U-A-R-E-Z.

10                THE COURTROOM DEPUTY:  You may be seated.

11                THE COURT:  All right.  You may inquire.

12                MS. GOLDBARG:  Thank you, Your Honor.

13   DIRECT EXAMINATION

14   Q    Good afternoon.

15   A    Good afternoon.

16   Q    Who did you work for?

17   A    For the Colombian National Police.

18   Q    How long have you worked for the Colombian National

19   Police?

20   A    Fifteen years and six months.

21   Q    What division within the Colombian National Police do you

22   work?

23   A    For the D-I-J-I-N -- by the interpreter -- which is the

24   criminal investigations division and INTERPOL.

25   Q    Is your division known by the initials D-I-J-I-N?

                    *LINDA D. DANELCZYK, RPR, CSR, CCR*
                         *Official Court Reporter*

TAPASCO SUAREZ - DIRECT - MS. GOLDBARG

```
 1   A    Yes, ma'am.

 2   Q    And are you part of a specialized unit within DIJIN?

 3   A    Yes, the special investigations unit, SIU.

 4   Q    Is the SIU a part of any United States law enforcement

 5   agencies?

 6   A    With DEA.

 7   Q    How did you become part of the SIU?

 8   A    I applied to DEA.  I presented a polygraph test, and now

 9   I belong to the group who -- that works with them.

10   Q    How long have you been a part of the DEA SIU?

11   A    Ten years.

12   Q    What year did you join the SIU?

13   A    By August of '08.

14   Q    As part of the SIU, have you received any specialized

15   training by the DEA?

16   A    Yes, ma'am.  I took the course in Quantico, Virginia.

17   Q    What year did you go to Quantico, Virginia?

18   A    The year 2011.

19   Q    What type of training did you receive in Quantico,

20   Virginia?

21   A    We received surveillance and tracking, raids, captures.

22   Interview techniques and undercover agent.

23   Q    How long was this course?

24   A    Forty days.

25   Q    And what are the goals, generally, of the SIU that you
```

3777

TAPASCO SUAREZ - DIRECT - MS. GOLDBARG

1   work for?

2   A    To dismantle organizations that -- drug trafficking

3   organizations that are outside of the law.

4   Q    What is your current rank with the Colombian National

5   Police?

6   A    I'm a deputy -- deputy superintendent.

7   Q    Deputy Tapasco, how many investigations have you

8   conducted as part of the SIU?

9   A    About a hundred.  More or less.

10  Q    Now, in addition to the training you received in

11  Quantico, Virginia, did you receive any other training by the

12  DEA?

13  A    Yes, ma'am.  Interview techniques and undercover agent in

14  the city of Bogota.

15  Q    Now, drawing your attention to January 30th, 2014, were

16  you working on that day?

17  A    Yes, ma'am.

18  Q    Where did you start your workday?

19  A    In the city of Cali Valle.

20  Q    I'd like to show you what's already in evidence as

21  Government Exhibit 506-22.

22            (Exhibit published.)

23            Can you mark on the map where is Cali?

24  A    (Witness complying.)

25  Q    Were you ordered to go anywhere on that day?

TAPASCO SUAREZ - DIRECT - MS. GOLDBARG

1    A    Yes, ma'am.

2    Q    And where were you ordered to go?

3    A    To the city of Ipiales, Narino.

4    Q    And using the same map that's on your screen, can you

5    circle where with Ipiales, Narino is?

6    A    (Witness complying.)

7    Q    What were you orders on that day in Ipiales, Narino?

8    A    To start the investigation of a case of a small plane

9    with drugs.

10   Q    Why were you assigned to this task to go to Ipiales?

11   A    Well, I was available that day, and I was one of the

12   investigators with the most experience in the group.

13   Q    Now, was this your case that you were going to

14   investigate?

15   A    No.

16   Q    Did you, in fact, go to Ipiales on that date?

17   A    Yes, ma'am.

18   Q    How far is it from Cali to Ipiales?

19   A    Between eight to ten hours by road.

20   Q    And how did you get to Ipiales on that day?

21   A    Well, on that day, we went there by plane.

22   Q    Did you have any problems getting to Ipiales that day?

23   A    We had an inconvenience that day because we borrowed a

24   police helicopter, and after about 20 minutes of flying, the

25   weather was not cooperating so we had to return to the Cali

PROCEEDINGS

1    airport.

2    Q    So what happened when you returned to the Cali airport?

3    A    We boarded a National Police plane there and by plane we

4    were able to get there.

5    Q    So was it -- what time was it when you arrived in

6    Ipiales?

7    A    It was between 5:30 p.m. and 6 p.m.

8    Q    Was it light out or dark?

9    A    It was already getting dark.

10   Q    Where did the plane land that you were in?

11   A    At San Luis Airport in Ipiales, Narino.

12   Q    As you were approaching the landing strip at the airport,

13   could you observe anything on the ground?

14   A    Yes.  As we were about to land, me and my working group

15   were able to see on the landing strip a white pickup truck

16   that was fleeing the scene.  And also small plane that was

17   parked there.

18              MS. GOLDBARG:  Your Honor, I'm going to go into a

19   whole series of photos now.  I don't know if this a good time

20   to stop.

21              THE COURT:  All right, ladies and gentlemen, we'll

22   send you home for the evening.

23              Please remember do not talk to anybody about this

24   case.  Do not post anything on social media.  Do not do any

25   research on the case.  Stay away from any media coverage of

3780

PROCEEDINGS

1    the case.  Turn the page, use the remote control, whatever you

2    need to do to keep yourself limited to the information.

3            Have a good night.  We'll see you tomorrow morning

4    at 9:30.

5            (Jury exits the courtroom.)

6            THE COURT:  Okay, anything further?

7            Have a good evening.  See you tomorrow morning.

8                    *    *    *    *    *

9            (Proceedings adjourned at 4:25 p.m. to resume on

10   December 20, 2018 at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3781

```
1                    I N D E X

2   WITNESS                          PAGE

3   PEDRO FLORES

4   DIRECT EXAMINATION    BY MR. FELS      3573

5   CROSS-EXAMINATION     BY MR. PURPURA   3629

6   REDIRECT EXAMINATION  BY MR. FELS      3741

7
    MARIO ELIAS
8
    DIRECT EXAMINATION    BY MS. GOLDBARG  3762
9

10  YEISON HERNAN TAPASCO SUAREZ

11  DIRECT EXAMINATION    BY MS. GOLDBARG  3775

12

13                   E X H I B I T S

14  GOVERNMENT              PAGE
    609J-1, 2, 3, 4         3576
15  212-10                  3765

16  DEFENSE                 PAGE
    337                     3639
17  334                     3640
    339                     3671
18  340                     3675
    341                     3677
19  338                     3719
    344                     3740
20

21

22

23

24

25
```