3782

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        09-CR-00466(BMC)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5            -against-                  December 20, 2018
                                        9:30 a.m.
6   JOAQUIN ARCHIVALDO GUZMAN LOERA,

7            Defendant.

8   ------------------------------x

9            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
             BEFORE THE HONORABLE BRIAN M. COGAN
10                UNITED STATES DISTRICT JUDGE
                       BEFORE A JURY
11

12  APPEARANCES

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
14                           271 Cadman Plaza East
                             Brooklyn, New York 11201
15                           BY:  GINA M. PARLOVECCHIO, AUSA
                                  ANDREA GOLDBARG, AUSA
16                                MICHAEL ROBOTTI, AUSA

17                           UNITED STATES ATTORNEY'S OFFICE
                             Southern District of Florida
18                           99 NE 4th Street
                             Miami, Florida 33132
19                           BY:  ADAM S. FELS, AUSA

20                           DEPARTMENT OF JUSTICE
                             Criminal Division
21                           Narcotic and Dangerous Drug Section
                             145 N. Street N.E. Suite 300
22                           Washington, D.C. 20530
                             BY:  ANTHONY NARDOZZI, ESQ.
23                                AMANDA LISKAMM, ESQ.

24
    (CONTINUED FOLLOWING PAGE)
25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

```
1    (APPEARANCES CONTINUED)

2

3
     For the Defendant:        BALAREZO LAW
4                              400 Seventh Street, NW
                               Washington, D.C. 20004
5                              BY:  A. EDUARDO BALAREZO, ESQ.

6
                               LAW OFFICES OF JEFFREY LICHTMAN
7                              11 East 44th Street, Suite 501
                               New York, New York 10017
8                              BY:  JEFFREY H. LICHTMAN, ESQ.
                                    PAUL R. TOWNSEND, ESQ.
9

10                             LAW OFFICE OF PURPURA & PURPURA
                               8 E. Mulberry Street
11                             Baltimore, Maryland 21202
                               BY:  WILLIAM B. PURPURA, ESQ.

12

13                             LAW OFFICES OF MICHAEL LAMBERT, ESQ.
                               369 Lexington Avenue, PMB #229
14                             New York, New York 10017
                               BY:  MARIEL COLON MIRO, ESQ.

15

16

17

18

19

20
     Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
21                             Phone:  (718)804-2777
                               Fax:    (718)804-2795
22                             Email:  Georgetteb25@gmail.com

23

24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

                                                                3784
                        TAPASCO - DIRECT - GOLDBARG

 1              (In open court; jury not present.)

 2              THE COURTROOM DEPUTY:  All rise.

 3              THE COURT:  Good morning.  Let's have the jury,

 4    please.

 5              (Jury enters courtroom.)

 6              THE COURT:  Everyone be seated.  Good morning,

 7    ladies and gentlemen.

 8              THE JURY:  Good morning.

 9              THE COURT:  We'll continue with the direct

10    examination.

11              MS. GOLDBARG:  May I inquire, Your Honor?

12              THE COURT:  Yes.

13              MS. GOLDBARG:  Thank you.

14              (Witness sworn.)

15    YEISON TAPASCO SUAREZ, called as a witness, having been first

16    duly sworn/affirmed, was examined and testified as follows:

17    DIRECT EXAMINATION(Continued)

18    BY MS. GOLDBARG:

19    Q    Good morning.

20    A    Good morning.

21    Q    Can you please remind the jury your title with the

22    Colombian National Police, please.

23    A    I am an officer as deputy superintendent.

24    Q    And Officer Tapasco, how long have you been with the

25    Sensitive Investigation Unit again?

TAPASCO - DIRECT - GOLDBARG

1    A    Ten years.

2    Q    And do you receive a financial stipend from the DEA for

3    participating in this unit?

4    A    Yes.

5    Q    How much is that?

6    A    $200.

7    Q    How frequently?

8    A    Monthly.  Every month.

9    Q    Showing you what's in evidence as 506-22.  Officer

10   Tapasco, you testified yesterday that you were ordered to go

11   to Ipiales, Narino.

12            Can you mark on the map where that is.

13            (Witness complies.)

14   Q    Thank you.  I believe before we left off you were talking

15   about the plane that you were in that was about to land at the

16   airport.  Can you remind the jury what it is that you saw from

17   the plane?

18   A    Well, when we were about to land with my team, I observed

19   a white truck with a tarp fleeing the area, the air strip and

20   at the airport.

21   Q    Now what did you do --

22            THE INTERPRETER:  I'm sorry, the interpreter would

23   like to correct herself.  And a small plane.

24   BY MS. GOLDBARG:

25   Q    What did you do when the plane landed?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

TAPASCO - DIRECT - GOLDBARG

1  A    When I landed, I approached the truck, which was on the

2  side of the airstrip in a green area.  It was sort of stuck

3  there.

4  Q    Where was that truck in relation to the airstrip?

5  A    Well, it was on the side of the airstrip, it was actually

6  stuck there.  It seems that when the driver was fleeing the

7  scene it sort of went towards the green area and it got stuck

8  there.

9  Q    What happened when you approached the truck?

10  A    Well, when I approached, the driver was right there, he

11  was very scared, like scared.  When I saw the back I saw

12  containers.  There was some blue and yellow containers there,

13  was a large black hose and a motor pump.

14  Q    Did you take -- were photographs taken of the items that

15  you saw in the back of this truck?

16  A    Yes, ma'am.

17  Q    And for purposes of efficiency, were photos taken of the

18  events that happened at the Ipiales Airport that day?

19  A    Yes, ma'am.

20        MS. GOLDBARG:  Your Honor, if I could have these

21  identified, I believe without objection, I can move through

22  them.

23        THE COURT:  Okay.

24        MS. GOLDBARG:  I'm going to do then in reverse

25  order, hopefully slowly.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

TAPASCO - DIRECT - GOLDBARG

1      Government's Exhibit 210-14.  This is just for

2  identification purposes now, then I will publish them.

3  Government Exhibit 210-4; Government Exhibit 210-26.  Sorry.

4  Government Exhibit 210-25; government Exhibit 210-23;

5  Government Exhibit 210-20; Government Exhibit 210-18.

6           MR. LICHTMAN:  No objection.

7           MS. GOLDBARG:  Still going.

8           MR. LICHTMAN:  Still no objection.

9           MS. GOLDBARG:  Government Exhibit 210-22; Government

10  Exhibit 210-21; Government Exhibit 210-19; Government

11  Exhibit 210-17; Government Exhibit 210-16; Government

12  Exhibit 210-12; Government Exhibit 210-10; Government

13  Exhibit 210-11; Government Exhibit 210-9; Government

14  Exhibit 210-8; Government Exhibit 210-13; Government

15  Exhibit 210-7; Government Exhibit 210-6; Government

16  Exhibit 210-5; Government Exhibit 210-15; Government

17  Exhibit 210-24; and finally Government Exhibit 210-14.

18           THE COURT:  All right.  Those are received.

19           (Government Exhibits 210-4 through 26, were received

20  in evidence.)

21  BY MS. GOLDBARG:

22  Q    Officer Tapasco, do you recognize all these photos we

23  just showed on the screen?

24  A    Yes, ma'am.

25  Q    Let's start, and if we can publish this to the jury.

3788

TAPASCO - DIRECT - GOLDBARG

1          (Exhibit published.)

2  Q    Government Exhibit 210-14, can you explain to the jury

3  what we're looking at here.

4  A    That was the truck that was fleeing the place at the

5  moment that we were approaching the airstrip to land.

6  Q    Next moving on to Government Exhibit 210-24, what are we

7  looking at in this photograph?

8  A    That's what the truck had in the back.  Those are the

9  fuel containers, the hose and the motor pump.

10  Q    Can I ask you, Officer Tapasco, to please circle the

11  containers.

12          (Witness complies.)

13  Q    What color were the containers?

14  A    Blue and there was a small one that was yellow.

15  Q    Could you please circle the small yellow container.

16          (Witness complies.)

17  Q    You also mentioned that there was a hose there.  Can you

18  circle the hose that we see in this photograph.

19          (Witness complies.)

20  Q    You also mentioned that there was a motor pump in there,

21  can you show where it is that we're looking at the motor pump?

22          (Witness complies.)

23  Q    Thank you.

24          Officer Tapasco, did you search the inside of the

25  blue containers?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

TAPASCO - DIRECT - GOLDBARG

1   A      Yes, ma'am.

2   Q      And what did you find inside?

3   A      Fuel, gas.

4           MS. GOLDBARG:  Just so the record reflects, he's

5   circled a small circle around the yellow image in the

6   forefront of the photograph, the hose is on the left-hand

7   side, a smaller circle around the red motor pump and a larger

8   circle around the blue containers.

9   Q      Now after you searched the truck, what did you do next?

10  A      Well after that with my team I went to where the small

11  plane was parked.

12  Q      And where was the small plane parked?

13  A      Towards the back of the airstrip.

14  Q      What did you do when you got to the small airplane?

15  A      There I actually observed our surroundings.

16  Q      For what purpose?

17  A      Well, the purpose was to verify if there were any other

18  people that might be involved in the case and also because of

19  our own safety.

20  Q      Did you find any other people around the plane?

21  A      No.

22  Q      So what did you do next?

23  A      After that I went to the front of the plane to the cabin

24  to search it.

25  Q      Did you search the front of the plane?

TAPASCO - DIRECT - GOLDBARG

1   A     Yes, ma'am.

2   Q     What, if anything, did you find?

3   A     Well, inside the cabin there were white bags that

4   contained -- there were packages and the packages contained

5   like potatoes, food, cookies, soda.

6   Q     Did you search the rest of the plane?

7   A     Yes, ma'am.

8   Q     What did you find?

9   A     In the back there were some gray and black bags.

10  Q     What did you do with the bags?

11  A     Together with my team we started unloading them from the

12  aircraft and we put them aside.

13  Q     How many gray and black bags did you find inside this

14  small plane?

15  A     Seventeen.

16  Q     And after you unloaded the 17 bags from the small plane,

17  what did you do next?

18  A     From there I proceeded with my team to open them and to

19  verify the content of each bag.

20  Q     And what did you find inside of the bags?

21  A     Inside there were some rectangular packages that were

22  wrapped around with beige tape and the total was 403.

23  Q     Now at this point in time, how many years had you been

24  with the Sensitive Investigation Unit?

25  A     At that time I had been there for six years.

3791

TAPASCO - DIRECT - GOLDBARG

1   Q    And how many narcotics investigations approximately had

2   you done up until that point?

3   A    More or less approximately 80.

4   Q    And had you seen packages like this before in those 80

5   investigations that you had conducted?

6   A    Yes, in all of them.

7   Q    And what did this indicate to you?

8   A    Well, because of the way in which the packages were the

9   wrapping, the smell, the different characteristics that

10  indicated to me that it was chlorohydrate of cocaine, cocaine

11  chrlorohydrate rather.

12  Q    Was a test conducted on any of those 403 packages?

13  A    Yes.

14  Q    What was the result of that analysis?

15  A    It was positive for cocaine chlorohydrate byproduct.

16  Q    Is that another way to say cocaine?

17  A    Yes, that is the test, that's the preliminary test, it's

18  called the standardized identification test, the PIPH that is

19  performed by technicians.

20  Q    In addition to the 403 packets, did you find anything

21  else in these gray and black bags?

22  A    Yes.

23  Q    What did you find?

24  A    In one of the bags there were 49 40-millimeter grenades,

25  and three anti-tank RPG grenades.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3792

TAPASCO - DIRECT - GOLDBARG

1   Q    I'd like to show and publish to the jury Government

2   Exhibit 210-5 in evidence.

3          Can you explain to the jury what we're looking at

4   here, Officer Tapasco?

5   A    That was the small plane that was parked at the San Luis

6   Airport which I searched.

7   Q    Showing you 210-13.  What are we looking at in this

8   photograph?

9   A    That's the cabin, the aircraft cabin.

10  Q    What did you find inside the aircraft cabin?

11  A    That is where we found the bag that contained all the

12  groceries, the food, the potatoes, the cookies, the soda.

13  Q    Can you please circle the white -- the bags that you were

14  discussing that you found.

15          (Witness complies.)

16          MS. GOLDBARG:  Let the record reflect he's marked a

17  circle in between the two blue chairs.

18  Q    Showing you Government Exhibit 210-6, what are we looking

19  at in this photograph?

20  A    That is the back of the small plane where the other bags

21  were.

22  Q    When you say the other bags, which ones are you referring

23  to?  If just circle it.

24  A    The 17 bags that my team and I unloaded from the

25  aircraft.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

TAPASCO - DIRECT - GOLDBARG

1    Q    Showing you in evidence Government Exhibit 210-7, what
2    are we looking at in this photograph?
3    A    Well, here you have the small plane there and my team is
4    there.  I am there.  We are conducting the investigation.  You
5    also have there the 17 bags and a container with fuel.
6    Q    Officer Tapasco, could you circle where you are in this
7    photograph, please.
8             (Witness complies.)
9    Q    So you're the individual on the left-hand side?
10   A    Okay.
11   Q    Could you also circle one of the gray and black bags.
12            (Witness complies.)
13   Q    And could you also circle the container that you found
14   gas in.
15            (Witness complies.)
16   Q    You circled the plastic item in the middle, where did you
17   find that item?
18   A    Plastic?
19   Q    The container.  I'm sorry.
20   A    It was in the back, right here.(indicating)
21   Q    In the back of what?  I'm sorry.
22   A    The back of the small plane.
23   Q    Government Exhibit 210-8, what are we looking at there?
24   A    That's one of the bags that we found in the back of the
25   small plane.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3794

TAPASCO - DIRECT - GOLDBARG

1  Q    Government Exhibit 210-9, what do we see in this

2  photograph?

3  A    Here you have three packages that were rectangular-shaped

4  and you have the experts who are conducting the PIPH field

5  test.

6  Q    And how many of these rectangular packages again did you

7  recover from the 17 bags?

8  A    403.

9  Q    Government Exhibit 210-10, what are we looking at in this

10  photograph?

11  A    We can see the result here of the PIPH field test that

12  the technicians had conducted.

13  Q    How many tests were done?

14  A    Three tests.

15  Q    And in this photograph how many vials are we seeing?

16  A    Two.

17  Q    What are those two vials indicate?

18  A    The one with the turquoise blue color indicates that's a

19  positive field test for cocaine.

20  Q    Can you circle that one.

21        (Witness complies.)

22  Q    That would be the vial on the left-hand side?

23  A    Yes.

24  Q    And on the right-hand side what are we seeing there?

25  A    That is one that gave a negative result for other drugs,

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3795

TAPASCO - DIRECT - GOLDBARG

1   let's say, heroin or marijuana.

2   Q    So what did this indicate to you?

3   A    That the contents of the packages was cocaine.

4   Q    And showing you Government Exhibit 210-12, what are we

5   looking at in this photograph?

6   A    We can see here the bag that contained the 49

7   40-millimeter grenades and the three anti-tank RPG grenades.

8   Q    What are we looking at specifically in this photograph?

9   A    We can see here one of the anti-tank RPG grenades.  When

10  we pulled them out of the bag they came in individual plastic

11  containers so we, before taking a photograph, removed the

12  plastic container.

13  Q    Could you please circle the RPG grenade that you found

14  inside the bag.

15          (Witness complies.)

16          MS. GOLDBARG:  Let the record reflect he circled the

17  brown object at the bottom of the photograph.

18  Q    So after you removed all of these items from the ground

19  and from the plane, as we see in 210-7, what happens to these

20  items?

21  A    We emptied them completely.  We proceeded to count them

22  and then we proceeded to conduct the PIPH field test.

23  Q    And afterwards what did you do with this evidence?

24  A    Then later we placed them, along with my working group,

25  on a pickup truck belonging to the institution.  For security

TAPASCO - DIRECT - GOLDBARG

1   reasons I went along with my working group to the headquarters

2   of the anti-narcotics unit there in Narino.

3   Q    What happened once you got to the anti-narcotics unit in

4   Ipiales?

5   A    There we, again, proceeded to do a counting of the items

6   to verify the elements of proof.

7   Q    Did you end up weighing the 403 packets that were found

8   inside these bags?

9   A    Yes.

10  Q    What was the total amount of the weight?

11  A    423 kilograms.

12  Q    Showing you Government's Exhibit 210-16, what are we

13  looking at in this photograph?

14  A    We can see there the 17 bags that we found in the back of

15  the small plane.

16  Q    Where are these bags located, is this at the

17  anti-narcotics office?

18  A    Yes, the anti-narcotics office.

19  Q    Looking at Government's Exhibit 210-17, what are we

20  looking at in this photograph?

21  A    We can see here the 403 packages with the substance,

22  drugs, the three RPG grenades, and the 49 40-millimeter

23  grenades.

24  Q    Showing you Government Exhibit 210-19, what are we

25  looking at in this photograph?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

TAPASCO - DIRECT - GOLDBARG

1    A    We can see here the 49 40-millimeter grenades, one of the

2    RPG grenades, and some of the kilos of the substance the

3    drugs.

4    Q    Officer Tapasco, could I ask you to circle one of the

5    40-millimeter grenades that we see in this photograph.

6          (Witness complies.)

7    Q    That's a green base and a silver/gold top on the

8    right-hand side of the photograph.

9          Could you circle one of the RPGs.

10          (Witness complies.)

11    Q    And could I ask you to circle one of the packages of

12    cocaine.

13          (Witness complies.)

14          MS. GOLDBARG:  So you circled a rectangular tan

15    package on the left-hand side and the RPG would be the long

16    brown object on the bottom, for the record.

17    Q    Moving on to Government Exhibit 210-21, what are we

18    looking at in this photograph?

19    A    We can see here again the experts conducting the second

20    PIPH field test at the anti-narcotics base.

21    Q    What was the result of that field test?

22    A    It was preliminarily positive for cocaine and byproducts.

23    Q    Moving on to Government Exhibit 210-22, what do we see

24    here?

25    A    We can see here the 49 40-millimeter grenades and the

3798

TAPASCO - DIRECT - GOLDBARG

1   three anti-tank RPG grenades.

2   Q    Government Exhibit 210-18, what are we look at in this

3   photograph?

4           MR. LICHTMAN:  Judge, objection, 403.

5           THE COURT:  I agree.  Do we need so much of this, so

6   much detail?

7           MS. GOLDBARG:  It will tie up to the next witness,

8   Your Honor.

9           THE COURT:  Don't you have enough to tie up to the

10  next witness?  We have the RPG in three other pictures, we

11  need another picture?

12          MS. GOLDBARG:  I will do it through the other

13  witness, Your Honor.

14          THE COURT:  Just to shorten it just because it's

15  cumulative.

16          MS. GOLDBARG:  Yes, Your Honor.

17  Q    Showing you Government Exhibit 210-25, what are we

18  looking at here.

19  A    That's the container with fuel that we found in the back

20  of the small plane.

21  Q    And, lastly, for photographs 210-26.

22  A    That's the motor pump that we found in the back of the

23  truck.

24  Q    Officer Tapasco, did you check to see if there was a

25  flight plan for this aircraft?

3799

TAPASCO - DIRECT - GOLDBARG

1    A    Yes.

2    Q    Was there one?

3    A    No.

4    Q    In your experience, have you conducted a search of this

5    nature previously?

6    A    Yes.

7    Q    And the motor pump and the hose and the container of gas,

8    what did that indicate to you?

9              MR. LICHTMAN:  Objection.

10             THE COURT:  A little more.

11   BY MS. GOLDBARG:

12   Q    How many times have you seen items of the nature in

13   Government Exhibit 210-24?

14   A    Five or six times, more or less.

15   Q    Were these also narcotics investigations?

16   A    Yes.

17   Q    Does your investigation of narcotics involve things

18   beyond just the production of cocaine?

19   A    Yes.

20   Q    Does it involve also how cocaine is transported in

21   various methods?

22   A    Yes.

23   Q    Does it also include how planes were sometimes used to

24   transport cocaine?

25             MR. LICHTMAN:  Objection.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

TAPASCO - DIRECT - GOLDBARG

1          THE COURT:  Overruled.

2  A    Yes.

3  Q    Based on that experience, what conclusion did you draw

4  when you saw these items in Government Exhibit 210-24?

5          MR. LICHTMAN:  Objection.

6          THE COURT:  Overruled.

7  A    This truck was used to refuel the small plane so that it

8  could arrive to its destination with the drugs.

9  Q    Now after counting and retesting all of the items, what,

10 if anything, did you do with the three RPGs and 49

11 40-millimeter grenades that we see in Government's

12 Exhibit 210-22?

13 A    Well, after the elements are counted, they are labeled,

14 they are given a chain of custody and they are then given to

15 an explosive technician so that he can investigate the status

16 of the articles, whether they are operational.

17 Q    Did you provide these items in Government Exhibit 210-22

18 to the explosives technician?

19 A    Yes, ma'am.

20 Q    Was an analysis conducted of those items?

21 A    Yes.

22 Q    Now going back to the 403 packages of cocaine that you

23 found, what happened to those items?

24 A    A PIPH field -- test was requested from the technicians

25 for those items, 23 samples were taken to be sent to the

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

TAPASCO - DIRECT - GOLDBARG

1    criminal investigation division of DIJIN.

2    Q    Was a full analysis of those samples conducted?

3    A    Yes.

4    Q    Showing you Government Exhibit 210-4, what are we looking

5    at in this item?  Is this the results of the lab analysis?

6    A    Yes.

7    Q    What was the result of the analysis conducted?

8    A    The result was positive for cocaine.

9    Q    What happened to the 403 packages of cocaine?

10    A    Later, and in accordance with Colombian law, we

11    coordinated with the Attorney General's office in Ipiales to

12    proceed to the destruction of the drugs.

13    Q    Were you present when the drugs were destroyed?

14    A    Yes.

15    Q    And why were the drugs destroyed?

16    A    It is the protocol that we have to follow when we conduct

17    seizures in Colombia.  The seizure is conducted, then PIPH

18    tests are conducted, 23 random samples are taken from the

19    packages to be sent to the DIJIN lab to have a final

20    certification, and then later we proceed to the destruction of

21    the substance for reasons of safety and health.

22    Q    How were these 403 packages of cocaine destroyed?

23    A    They were destroyed in an oven, in an oven that is used

24    to make bricks and tiles.

25    Q    Was anything done to the packages of cocaine before they

3802

TAPASCO - CROSS - LICHTMAN

1    were put into this special oven?

2    A    Well, we have our protocol which dictates that we conduct

3    another preliminary PIPH test at the destruction site in order

4    to confirm and verify that we are in fact destroying the drugs

5    and that they were not exchanged or switched.

6    Q    And was that carried out in this case?

7    A    Yes, ma'am.

8    Q    After the destruction of the drugs, did you have any role

9    in the larger investigation in this case?

10   A    No.

11          MS. GOLDBARG:  The government has no further

12   questions.

13          THE COURT:  All right.  Cross examination.

14          MR. LICHTMAN:  Judge, very briefly.  I can do it

15   here.

16   CROSS-EXAMINATION

17   BY MR. LICHTMAN:

18   Q    Officer, you had mentioned that you had joined the SIU in

19   2008.

20   A    Yes, sir.

21   Q    And the SIU stands for Sensitive Investigative Unit?

22   A    Yes.

23   Q    And the SIU was actually created and funded and trained

24   by the American DEA?

25   A    Yes.

3803

TAPASCO - CROSS - LICHTMAN

1    Q    And you've been with the SIU since from 2008 until today?

2    A    Yes.

3    Q    And you said you were not involved in the greater

4    investigation pertaining to this seizure that you just

5    testified to.

6    A    I don't understand the question.

7    Q    Did you interface with the American prosecutors in

8    connection with this investigation?

9         MS. GOLDBARG:  Objection, Your Honor, may we

10   approach.

11        THE COURT:  I'll sustain the objection.

12   BY MR. LICHTMAN:

13   Q    You've met with the prosecutors in this case pertaining

14   to this investigation?

15        MS. GOLDBARG:  Objection, Your Honor, may we

16   approach.

17        THE COURT:  Yes.  Let's have a the sidebar.

18        (Sidebar conference.)

19        (Continued on the next page.)

20

21

22

23

24

25

3804

SIDEBAR CONFERENCE

1         THE COURT:  Go ahead.

2         MS. GOLDBARG:  It may be semantics, Your Honor, but

3   the witness testified that he was involved in this seizure not

4   the investigation.  And so when Mr. Lichtman is asking about

5   his involvement in the investigation, it seems that it's vague

6   and confusing.

7         THE COURT:  I found it confusing because I couldn't

8   tell if you were talking about the prosecution of this case or

9   some other case or the -- what is the investigation that

10  you're going for?

11        MR. LICHTMAN:  I'm trying to find out how far his

12  involvement was in this investigation, because it's one thing

13  to say that they're not involved on a larger investigation,

14  but this is only part of that investigation for this case.

15  I'm trying to nail down what his involvement was in connection

16  with the Guzman case.

17        MS. GOLDBARG:  Your Honor, I believe that the

18  officer testified yesterday that this was not his case, he was

19  told to go to Ipiales because he was around and a more

20  experienced person, but it was not his case.  He just

21  testified he didn't have a role in the larger investigation.

22        THE COURT:  I think Mr. Lichtman is entitled to

23  probe that a little bit and confirm that that is, in fact, the

24  case by asking a more detailed question than you asked on

25  direct, but the question you asked is not it.  Because the

3805
SIDEBAR CONFERENCE

1   American prosecutors, the investigation, we don't know there

2   were American prosecutors involved in this particular seizure,

3   there's nothing to indicate that.

4           MR. LICHTMAN:  Well, not involved in the seizure,

5   but obviously in connection with what occurred after the

6   seizure.

7           THE COURT:  Well, I think you're going have to be

8   more specific in your question.  The form is wrong.  He

9   doesn't have to take what he says as true, he can probe and

10  say, well, what else did you do in connection with this

11  seizure, if anything, or however you want to phrase it but not

12  the way you did phrase it.

13          MR. LICHTMAN:  All right.

14          MS. GOLDBARG:  Correct.  I would note, however, to

15  avoid another sidebar bring to the Court's attention in your

16  order where the government moved in limine to preclude

17  cross-examination on sensitive investigative techniques,

18  docket 390, paragraph 33.  The Court did grant the

19  government's motion to preclude anything --

20          THE COURT:  I don't see him going there.

21          MR. LICHTMAN:  I don't know what the investigative

22  techniques would have been.

23          THE COURT:  Wait, we're just trying to find out what

24  else, if anything, he had to do with this seizure and the

25  cocaine relating to it.

3806

SIDEBAR CONFERENCE

1        MS. GOLDBARG:  Okay.

2        THE COURT:  Right?  That's what you --

3        MR. LICHTMAN:  Yeah, obviously he's been interviewed

4   by these prosecutors, that's just the limit of it.

5        THE COURT:  That's a separate area of inquiry, I

6   couldn't tell which one you were going to.  Does he do

7   anything else with the seizure, was he involved in any other

8   aspect?  Fine, you can ask him about that.  You can then ask

9   him about did the prosecutors prepare him for his testimony in

10  this case, that's a separate thing.  Both of those are okay if

11  you phrase them right.

12       MR. LICHTMAN:  That's fine.

13       MS. GOLDBARG:  Thank you.

14            (End of sidebar conference.)

15            (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

TAPASCO - CROSS - LICHTMAN

```
 1              (In open court.)

 2              MR. LICHTMAN:  Thank you, Judge.

 3    Q    Sir, with regard to this seizure which occurred on

 4    January 30th, 2014; is that correct?

 5    A    Yes.

 6    Q    Did your work in connection with this investigation --

 7    excuse me, in connection with this seizure, did it begin and

 8    end on that day?

 9    A    On the 31st.

10    Q    Of January 2014, the next day?

11    A    Yes, the next day.

12    Q    Then you had no other -- you did no other work in

13    connection with that seizure other than meeting with

14    prosecutors on this case about?

15    A    With prosecutors?

16    Q    These prosecutors.

17    A    Like on what date or?

18    Q    Any time after January -- my bad.  Any time after

19    January 31st, 2014, did you have -- did you do anything in

20    connection with this seizure?

21    A    I guess you are asking an open question, but I mean what

22    things do you think I would have been able to do afterwards?

23    Q    That's what I'm asking you, other than meet -- you met

24    with these prosecutors in October 2017 to prepare your

25    testimony for today?
```

TAPASCO - CROSS - LICHTMAN

1   A    Oh, yes, yes.

2   Q    And how many times did you meet with them?

3   A    Twice in Bogota and once here.

4   Q    And is that the sum total of all of your work in

5   connection with this January 30th, 2014 seizure?

6   A    Yes.

7   Q    So you worked on January 30th and 31st, 2014 in

8   connection with this seizure, you met with the -- that was a

9   yes, I'm sorry.

10  A    Yes.

11  Q    You met with the prosecutors and agents in this case you

12  say two times in Bogota?

13  A    Yes.

14       MS. GOLDBARG:  Objection.

15  Q    You met with them twice in New York?

16       MS. GOLDBARG:  Objection, Your Honor.  Asked and

17  answered.

18       THE COURT:  Sustained.

19  BY MR. LICHTMAN:

20  Q    And that's it, you had no other --

21       MS. GOLDBARG:  Objection, Your Honor.

22  Q    -- dealings?

23       THE COURT:  I'll let him answer.

24  A    No.

25  BY MR. LICHTMAN:

3809

TAPASCO - CROSS - LICHTMAN

1    Q    Aware of any allegations of corruption in the SIU in

2    connection with this case?

3                MS. GOLDBARG:  Objection, Your Honor.

4                THE COURT:  Sustained.

5                MR. LICHTMAN:  No further questions.

6                THE COURT:  Any redirect?

7                MS. GOLDBARG:  No, Your Honor.

8                THE COURT:  You may step down.  Thank you very much.

9                (Witness excused.)

10               THE COURT:  The government may call its next

11   witness.

12               MS. GOLDBARG:  Yes, Your Honor, the government calls

13   Samuel Suarez.

14               (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

3810

SUAREZ – DIRECT – MS. GOLDBARG

1          THE COURTROOM DEPUTY:  Please raise your right hand.

2          (Witness takes the witness stand.)

3  SAMUEL SAUL SUAREZ SARMIENTO, called as a witness, having been

4  first duly sworn/affirmed through the interpreter, was

5  examined and testified as follows:

6          THE WITNESS:  I do.

7          THE COURTROOM DEPUTY:  Please state and spell your

8  name for the record.

9          THE WITNESS:  Samuel, S-A-M-U-E-L.  Saul, S-A-U-L.

10  Suarez, S-U-A-R-E-Z.  Sarmiento, S-A-R-M-I-E-N-T-O.

11          THE COURT:  All right.  You may inquire.

12          MS. GOLDBARG:  Thank you, Your Honor.

13  DIRECT EXAMINATION

14  BY MS. GOLDBARG:

15  Q     Good morning.

16  A     Good morning.

17  Q     Who do you work for?

18  A     For the Colombia National Police.

19  Q     How long have you worked for the Colombia National

20  Police?

21  A     Twenty-four and a half years.

22  Q     What division within the Colombia National Police do you

23  work?

24  A     Judicial police and INTERPOL.

25  Q     Is that known by the initials DIJIN, D-I-J-I-N?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

3811

SUAREZ – DIRECT – MS. GOLDBARG

1    A    DIJIN, yes.

2    Q    What city are you currently assigned to?

3    A    Pasto, Narino.

4    Q    Showing you what's in evidence as Government

5    Exhibit 506-22.

6            Can you please circle where it is that you see

7    Pasto, Narino?

8    A    (Witness complying.)

9    Q    And where is Narino in relation to Colombia?

10   A    The south of Colombia, right at the border with Ecuador.

11   Q    Is your office in Narino also called DIJIN, D-I-J-I-N?

12   A    Yes.

13   Q    What is it called?

14   A    The criminal investigation sectional, S-I-J-I-N.

15   Q    What's the difference between DIJIN and SIJIN?

16   A    DIJIN is the director -- is the national directory.

17           SIJIN is at a regional level, at the level of the

18   department.

19   Q    How long have you been assigned to Pasto, Narino?

20   A    Eleven years.

21   Q    What unit are you currently assigned to?

22   A    To the anti-explosives and antiterrorist unit.

23   Q    Is that known by any initials?

24   A    Yes.   UNATE.

25   Q    Is that U-N-A-T-E?

SUAREZ – DIRECT – MS. GOLDBARG

1   A    Correct.

2   Q    What is your current position with UNATE?

3   A    I'm the unit chief.

4   Q    And what is your current rank with the Colombia National

5   Police?

6   A    I am the chief superintendent.

7   Q    How long have you been the unit chief of UNATE?

8   A    Eleven years.

9   Q    Chief Suarez, did you receive any specialized training to

10  become a member of UNATE?

11  A    Yes.

12  Q    How long was that training?

13  A    One year.

14  Q    What did you learn in that year of training?

15          MR. PURPURA:  We accept his expertise.

16          THE COURT:  She may want to bring it now anyway.

17          MS. GOLDBARG:  I do.

18          THE COURT:  Thank you anyway.

19  A    Well, I learned how to recognize explosives.  What kind

20  of safety measures to take with explosives.  All the

21  techniques regarding explosives.  All the activities

22  post-explosions.  And how to neutralize explosives.

23  Q    What was the name of this course?

24  A    Explosives course.

25  Q    And did you receive a title as a result of completing

SUAREZ - DIRECT - MS. GOLDBARG

1    this course?

2    A    Yes.  Professional technician in explosives.

3    Q    And what does this title allow you to do?

4    A    Everything that deals with explosives.  Cases that deal

5    with explosives, and all of the studies that deal with the

6    technical explosives materials.

7    Q    In what year did you receive this training and this

8    title?

9    A    2004.

10   Q    And since 2004, how many explosives investigations have

11   you been involved in?

12   A    Approximately a hundred to 120.

13   Q    You testified earlier, Chief Suarez, that you are the

14   chief of UNATE.  What are your responsibilities there?

15   A    Well, I have -- under me I have two more colleagues, two

16   technicians.  And I have to take care of all of the

17   requirements that are related to explosives.

18   Q    Drawing your attention specifically to January 30th,

19   2014.

20            Were you working on that day?

21   A    Yes.

22   Q    Where did you start your workday?

23   A    At the explosives office with the criminal investigations

24   section in Narino.

25   Q    In what city?

3814

SUAREZ – DIRECT – MS. GOLDBARG

1    A    Pasto.

2    Q    On the map in front of you, Government Exhibit 506-22,

3    can I ask you to circle Pasto again, please?

4    A    (Witness complying.)

5    Q    Chief Suarez, were you ordered to go to another city for

6    an investigation on that day?

7    A    Yes.

8    Q    Where did you go?

9    A    To the municipality of Narino.

10   Q    What city?

11   A    Ipiales.

12   Q    Can I ask you to circle Ipiales on the map, please.

13   A    (Witness complying.)

14   Q    Did you go to Ipiales that day?

15   A    Yes.

16   Q    How far is Pasto to Ipiales?

17   A    Two hours by car.

18   Q    When you arrived in Ipiales, where did you go?

19   A    To the anti-narcotics unit with the National Police.

20   Q    And what happened when you arrived at the anti-narcotics

21   unit?

22   A    I waited for approximately two hours, and later on some

23   colleagues from the National Police came.  They were in

24   uniform, as well as some colleagues in the sectional office,

25   and they all came with some bags.

SUAREZ - DIRECT - MS. GOLDBARG

1    Q    Can you describe the bags that they were carrying?

2    A    They were some fabric-made bags and the color was gray

3    and black.

4    Q    Showing you what's already in evidence as Government

5    Exhibit 210-16.

6            What are we looking at here?

7            (Exhibit published.)

8    A    Those are the gray bags.

9    Q    Are these the same ones that you saw the officers

10   bringing in to the anti-narcotics office that day?

11   A    Yes.

12   Q    What did you observe happen with these bags?

13   A    Then later in the same room, they extracted some

14   materials from inside the bag.

15   Q    Did you observe that yourself?

16   A    Yes.

17   Q    Showing you what's in evidence as Government

18   Exhibit 210-19.

19           Can you tell us what we're looking at here?

20           (Exhibit published.)

21   A    Some grenades.

22   Q    Were any of these items of interest to you?

23   A    Yes, they are grenades.

24   Q    How many different types of grenades are we looking at

25   here in Government Exhibit 210-19?

3816

SUAREZ - DIRECT - MS. GOLDBARG

1    A    Two types.

2    Q    What types of grenades are we looking at?

3    A    RPG grenades and 40-millimeter grenades.

4    Q    On the screen next to you, can I ask you to circle the

5    RPG grenades?

6    A    (Witness complying.)

7    Q    That's the item listed on the chart.

8         I also ask you to circle one of the 40-millimeter

9    grenades.

10   A    (Witness complying.)

11   Q    That would be the green and gold item right above it.

12        Who provided these items to you?

13   A    Patrolman Yeison Tapasco.

14   Q    Showing you what's in evidence Government Exhibit 210-22.

15        What did you do with these items?

16        (Exhibit published.)

17   A    I received them to conduct a technical study.

18   Q    What do you mean by that?

19   A    To verify that the articles came inside the original

20   items from the factory.  And also to verify that they were --

21   they were operational.

22   Q    In this Exhibit 210-22, what are we looking at here?

23   A    We see three RPG grenades and 49 40-millimeter grenades.

24        MR. PURPURA:  Your Honor, we offer a stipulation

25   they are what he says they are.  They were operable.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

SUAREZ – DIRECT – MS. GOLDBARG

1              THE COURT:  Yes, I think everyone in the courtroom

2       knows what these are.  Let's go on to something else.

3              MS. GOLDBARG:  Thank you.

4       BY MS. GOLDBARG

5       Q    Can you described what you did next, please?

6       A    After receiving them properly packed, labeled and with

7       the chain of custody, I proceeded to photograph them, measure

8       them, weigh them.  Then to conduct the test to make sure that

9       they were, in fact, grenades.

10      Q    What do you mean by that, sir?

11      A    That they contain all their parts and that they were able

12      to be operated.

13      Q    As a result of the inspection, let's start with the three

14      RPGs.

15             What did your analysis conclude?

16      A    That they were operational and that they came originally

17      from the factory.

18      Q    What do you mean that they were operational?

19      A    That they are lethal weapons and that they contain all

20      the necessary parts to work.

21      Q    Showing you Government Exhibit 210-20.

22             What are we looking at here?

23             (Exhibit published.)

24      A    A 40-millimeter grenade.

25      Q    And then looking at 210-23, what are we looking at in

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

SUAREZ – DIRECT – MS. GOLDBARG

1    this photograph?

2              (Exhibit published.)

3    A    The bottom part of the grenade where we can see the

4    letters "IM".

5    Q    Have you seen this type of grenade before?

6    A    Yes.

7    Q    On how many occasions?

8    A    On many occasions since they are -- they are fabricated

9    in Colombia.  They are by Indumil.

10   Q    What is Indumil, I-N-D-U-M-I-L?

11   A    Colombian military industry.

12   Q    So what does that indicate to you when you see those

13   initials?

14   A    That they have been -- that they were made in Colombia.

15   Q    What analysis did you do on these 40-millimeter grenades?

16   A    That they had all their components originally from the

17   factory, and that they were operational.

18   Q    Were you able to determine anything about the explosive

19   material within the grenade?

20   A    No.

21   Q    Now, after you conducted this analysis, what did you do

22   next?

23   A    Then later the technical study was delivered to Patrolman

24   Yeison Tapasco.

25   Q    And what happened to the weapons next?

SUAREZ - DIRECT - MS. GOLDBARG

1    A    I transported them to Pasto where there's a special place

2    to store explosive materials.

3    Q    And after these were stored, what did you do next?

4    A    Then later we -- a previously given order by the

5    prosecutor, we proceeded to their destruction.

6    Q    Did you personally participate in the destruction of

7    these grenades?

8    A    Yes.

9    Q    And were photographs taken of that destruction?

10   A    Yes.

11         MS. GOLDBARG:  Showing you for identification

12   purposes only, Government Exhibit 210-2.

13         MR. PURPURA:  No objection.

14         THE COURT:  Received.

15         (Government Exhibit 210-2, was received in

16   evidence.)

17         (Exhibit published.)

18   Q    Can you describe the process of destroying -- let's start

19   with this:

20         What were you destroying first?

21   A    The RPGs.

22   Q    And where did you take these items to have them

23   destroyed?

24   A    To a stone quarry, which is located in the outskirts of

25   the city of Pasto.

3820

SUAREZ - DIRECT - MS. GOLDBARG

1   Q    And why did you take them there?

2   A    Because it is an uninhabited place that -- which

3   represents no risk to the population.

4   Q    Now, you said that you destroyed the RPGs first.

5        How many RPGs did you find again?

6   A    Three.

7   Q    Okay.  And did you destroy all three of them together or

8   individually?

9   A    Individually.

10  Q    Can you describe the process.

11  A    We attached to each RPG a detonating wire.  We attached

12  to that a fuse, a non-electrical fuse with one meter of a

13  safety wick.  You light up the wick, the personnel moves away

14  from that.  Sometime later, you hear a strong explosion

15  verifying that the material has been described.

16       THE COURT:  401 402 objection?

17       MR. PURPURA:  Yes.

18       THE COURT:  Short.  I see the relevance, but it's...

19       MS. GOLDBARG:  Yes, Your Honor.

20       Let's publish to the jury 210-2.

21  Q    Can you tell us what the three photos that we're looking

22  at here quickly?

23       (Exhibit published.)

24  A    The RPGs, each one of them at the moment of their

25  destruction.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

3821

SUAREZ - DIRECT - MS. GOLDBARG

1    Q    Now, you mentioned that you heard an explosion.  Did you

2    go back to this site?

3    A    Yes.  We verified that in fact the material had been

4    destroyed and that it was operational.

5    Q    How were you able to determine that these were

6    operational by looking at the explosion site?

7    A    Because they were completely destroyed and no -- nothing

8    of the material was found.

9    Q    Going to the first page of 210-2.

10            What was the next thing that was destroyed?

11            (Exhibit published.)

12   A    The 49 40-millimeter grenades.

13   Q    And we're looking at nine photographs on this page.

14            What are we looking at here?

15   A    The groups of five grenades each that we put together for

16   their destruction.

17   Q    And did you follow the same process for destroying all of

18   these groups as you did with the RPGs?

19   A    Correct.

20   Q    And did you go back to the site after they exploded?

21   A    Correct.

22   Q    And what did you observe when you went back to each of

23   these sites?

24   A    No trace of the material was found, since it had been

25   completely destroyed, verifying that they had been

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

3822

SUAREZ – DIRECT – MS. GOLDBARG

1    operational.

2    Q    Showing you the second page.

3          Chief Suarez, did you have any other involvement in

4    this investigation after these items were destroyed?

5    A    No.

6          MS. GOLDBARG:  The government has no further

7    questions, Your Honor.

8          THE COURT:  All right.

9          Cross-examination?

10          MR. PURPURA:  Chief Suarez welcome.  No questions.

11          THE COURT:  Okay.

12          All right.  You may step down.

13          Thank you very much.

14          (Whereupon, the witness was excused.)

15          THE COURT:  Why don't we take our morning break now.

16    Ladies and gentlemen, we'll come back in 15 minutes at 11:10.

17          Please don't talk about the case.

18          (Jury exits the courtroom.)

19          THE COURT:  Okay, 11:10.

20          (Whereupon, a recess was taken at 10:55 a.m.)

21          THE COURTROOM DEPUTY:  All rise.

22          THE COURT:  Please bring in the jury.

23          (Jury enters the courtroom.)

24          THE COURT:  All right.  Be seated, please.

25          Government's next witness.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

VELASQUEZ ARDILA - DIRECT - MR. FELS

1          MR. FELS:  Thank you, Your Honor.

2          The government calls Humberto Velasquez Ardila.

3          THE COURTROOM DEPUTY:  Please raise your right hand.

4          (Witness takes the witness stand.)

5     **HUMBERTO VELASQUEZ ARDILA**, called as a witness, having been

6     first duly sworn/affirmed through the interpreter, was

7     examined and testified as follows:

8          THE WITNESS:  Yes, I do.

9          THE COURTROOM DEPUTY:  Please state and spell your

10    name for the record.

11         THE WITNESS:  Humberto Velasquez Ardila.  Humberto,

12    H-U-M-B-E-R-T-O.  Velasquez, V-E-L-A-S-Q-U-E-Z.  Ardila,

13    A-R-D-I-L-A.

14         THE COURTROOM DEPUTY:  Please be seated.

15         THE COURT:  All right.  Please proceed.

16         MR. FELS:  Thank you, Your Honor.

17    DIRECT EXAMINATION

18    BY MR. FELS:

19    Q    Good morning, Mr. Velasquez.

20    A    Good morning.

21    Q    Mr. Velasquez, for whom do you work?

22    A    I work for Colombia immigration.

23    Q    And what's the official title of your position?

24    A    I am the national immigration control subdirector.

25         MR. FELS:  Your Honor, I think the microphone may

VELASQUEZ ARDILA - DIRECT - MR. FELS

1    not be on.

2            THE COURTROOM DEPUTY:  One moment.

3            (Pause.)

4    BY MR. FELS:

5    Q    I think you said you were the subdirector, and then I

6    couldn't hear.

7    A    Okay.  So I am the immigration control subdirector.  At

8    the national level.  My responsibility includes 42 different

9    exit and entry points in the country.

10   Q    And, sir, where are you based out of?

11   A    In Bogota, Colombia.

12   Q    You came to New York to testify today?

13   A    Yes, sir.

14   Q    Now, you said that your responsibilities are over these

15   ports.

16           What do you mean by that?

17   A    I am in charge of regulations and writing guidelines

18   regarding the exit and the entry of any citizen that is

19   Colombian citizen or a foreign national who comes into our

20   country or who leaves our country.

21   Q    Sir, is there some sort of records kept of entrances and

22   exits into your country of Colombia?

23   A    Yes.  Yes.  Every person, every citizen who comes into

24   the country or who leaves the country generates a record.  We

25   keep digital databases which are available to law enforcement

VELASQUEZ ARDILA - DIRECT - MR. FELS

1  or users.

2  Q    And do those records date back all the way to 2003?

3  A    Well, actually, they started long before.  We used to

4  work for DAS, which is the security administrative division.

5  And we could probably keep records still from 1995.

6  Q    Okay.  So in other words, the period of time between 2003

7  and 2012 would be among the digital records that your agency

8  maintains; is that correct?

9  A    Yes.

10  Q    And are these records, these digital records of the

11  comings and goings of Colombian citizens, maintained within

12  the ordinary course of business for your agency?

13  A    Yes.  We collect and we have a permanent custody of said

14  records.

15  Q    Now, can you explain to the jury how, do these records

16  get generated when there's a voyage?

17  A    When a traveler arrives to an immigration control post

18  where there are immigration officers who work for my office,

19  immigration control, they must present a travel document,

20  usually a passport.

21       And from there, we extract information, electronic

22  information, usually the passport has a chip and it can be

23  read mechanically.  And this information is compared vis-a-vis

24  other databases that belong to judicial records, INTERPOL and

25  administrative records, and if there is no hit, then we

VELASQUEZ ARDILA - DIRECT - MR. FELS

1    maintain them in our databases.

2    Q    I see.  Now, let's talk a little bit and run through some

3    different scenarios, please.

4         Let's say that you have a traveler who is using a

5    Colombian passport and travels from Colombia to Panama

6    directly.  What kind of record would you generate regarding

7    that trip?

8         I'm sorry, within your migratory records.

9    A    So what we would include is the first name, the middle

10   name, the last names.  The ID number.  We would include the

11   country of origin, or rather the place of origin of that

12   flight, and the immediate final destination for that flight.

13   And we would say that that person is emigrating, meaning

14   leaving the country.

15   Q    Okay, let me change it slightly.

16        Let's say that instead of staying in Panama, they

17   use a different flight on a different airline to fly to

18   another country.  Let's say, for example, Mexico.

19        Would your records keep a record to show that they

20   went all the way to Mexico or just to Panama?

21        MR. LICHTMAN:  Objection.

22        THE COURT:  Overruled.

23   A    We would only have a record that the person made it to

24   Panama.  The other information we could not have.

25   Q    Okay.  Let me give you another question in that same

3827

VELASQUEZ ARDILA - DIRECT - MR. FELS

1    vein.

2            Let's say that your Colombian citizen, once in

3    Mexico, decides to travel to another country, say Madrid --

4    Spain.

5            Would your migratory records note the travel between

6    Mexico and Spain where there was no stop in Colombia?

7    A    No.  For a flight from Mexico to Spain, we would not be

8    able to have access to that information.

9    Q    Okay.  I'm going to show you, just for the witness only,

10   Your Honor, a document that's been identified as Government

11   Exhibit 801.

12           And I will stipulate that some information relating

13   to a cedula number and dates of birth has been blacked out for

14   identification purposes.

15           Do you recognize this document?

16   A    Yes.  It's an official and ordinary record that Colombian

17   immigration provides to certain citizens and users.

18   Q    Now, can you read for whom this is a migratory record of,

19   which Colombian citizen?

20   A    It corresponds to Jorge Milton Cifuentes Villa.

21   Q    And for which dates is there a record of Mr. Cifuentes

22   Villa's travel?

23   A    The records that were researched pertain to the period

24   from February 1st, 2003 to November 30th, 2012, and included

25   78 trips.

VELASQUEZ ARDILA – DIRECT – MR. FELS

1    Q    And, sir --

2         MR. FELS:  At this point, Your Honor, we move to

3    introduce Government Exhibit 801?

4         MR. LICHTMAN:  No objection.

5         THE COURT:  Received.

6         (Government Exhibit 801, was received in evidence.)

7         MR. FELS:  And published to the jury.

8         (Exhibit published.)

9    Q    So this is the migratory record that you were discussing

10   for Jorge Milton Cifuentes Villa?

11   A    Yes, sir.

12   Q    Okay.  And, again, Government Exhibit 801, I want to just

13   give you one example to walk through so you can help the jury

14   understand this document, okay?

15        And I apologize for the small writing.  I'll try to

16   make it as large as I can.

17        The first column obviously it says "nombres".

18        And what does this column represent, this first

19   column?

20   A    The name.  The identity of the traveler.

21   Q    Okay.  The next column "fecha," and I'm having a hard

22   time reading it, let's see if I can blow it up.  "Fetcha de

23   ahe."

24        Did I say that right?

25   A    Yes.  And we first indicate the day, then the month, then

VELASQUEZ ARDILA - DIRECT - MR. FELS

1    the year.

2    Q    Okay, and so what is this?  What does this represent?

3    A    The day in which the trip was taken.

4    Q    Okay, now the next column here, it says "E/I".

5         What does this represent?

6    A    E represents that the trip was taken out of Colombia.

7    And the I represents that the trip was arriving in Colombian

8    territory.

9    Q    Okay.  And then this next column here, again, not so easy

10   to read, but "destino."  And maybe blow it up.

11              THE COURT:  She can see it.

12   A    Yes, sir, affirmative.

13   Q    So what does this column designate?

14   A    Well, that is the city to which the flight is going to,

15   or as well, it indicates the places where -- the last place

16   where that flew into the country.

17   Q    All right, so let's use this, these first two as an

18   example.  So you can help us interpret these records.

19              So what can you tell us, just based on the

20   information that you see in these first two rows of Government

21   Exhibit 801?

22   A    In the first line you have that Mr. Jorge Milton flew out

23   of the country on February 16th, 2003, with a final

24   destination of Mexico.  Meaning Mexico City.

25   Q    Now, you say Mexico City.  How do you know that it's

VELASQUEZ ARDILA - DIRECT - MR. FELS

1    Mexico City?

2    A    From Colombia there are only two flights that go into the

3    country of Mexico.  One goes to Mexico City and the other one

4    goes to Cancun.  So if it were a flight that goes to Cancun,

5    it would then indicate Cancun.

6    Q    I see.  Now, let's take a look at the second column.

7              How can we interpret what's happening in this

8    voyage?

9    A    Mr. Cifuentes Villa arrives in Colombia on June 4th, 2003

10   from a flight that came directly from Panama.

11   Q    And do we know how Mr. Cifuentes Villa got from Mexico to

12   Panama?

13   A    It's not possible to know it from my -- my entity.

14   Q    Okay.  So -- and the reason for that is because of what

15   you said earlier?

16   A    Yes.  Because the records generated for the immediate

17   destination of that flight.

18   Q    So in other words, if he flies from Mexico at some point

19   to Panama, that wouldn't show up on your records, correct?

20   A    It would not show.

21   Q    Okay.  I just want to move this column all the way to the

22   right just to talk about the last column here.  This last

23   column reads, which it's hard to read, but can you tell us

24   what is being represented in these columns, the last column?

25   A    The heading is PCM, which means the migratory control

VELASQUEZ ARDILA - CROSS - MR. LICHTMAN

1    site.

2              So this person traveled from the Bogota airport.

3    The first trip he made from the Bogota airport.  And came back

4    through the Medellin airport.

5    Q    Thank you.

6              MR. FELS:  I have no further questions.

7              THE COURT:  All right.  Any cross?

8              MR. LICHTMAN:  Very brief.

9    CROSS-EXAMINATION

10   BY MR. LICHTMAN

11   Q    Good morning, sir.

12             If I can give you another scenario.  Let's say that

13   Jorge Cifuentes Villa had travel documents that were not in

14   his name.  Have you heard of such a thing where people will

15   travel into and out of your country carrying travel documents

16   that are real but are not in their actual name?

17   A    That's possible.

18             Our agency, though, has expert officers who could

19   detect that during an interview.  But that's a possible case.

20   Q    You have expert officers that you use to detect if

21   someone is traveling under false documentation?

22   A    Yes.  They are expert rethologists (sic), experts in

23   documents, and experts in fingerprints.  And the same way

24   currently the experts compare the information from the chip to

25   the information that is visual, that you can see.

VELASQUEZ ARDILA – CROSS – MR. LICHTMAN

1   Q    These are safeguards, but you don't believe that you

2   catch every single person that travels into and out of your

3   country when they're carrying fake documentation; do you?

4   A    There is always the risk -- a risk margin that a fake

5   documentation could be presented and it is not detected.

6   Q    And similarly, if someone who is not Jorge Milton

7   Cifuentes Villa was carrying documentation for him, you may

8   not catch that either, correct?

9   A    It's not easy for that to happen.  The person would have

10  to be the other person's identical twin, otherwise it's not

11  possible for that to happen.  It would have to be not just an

12  ideological but a material defect on the document.  Other than

13  that, the experts can always detect that in the documents.

14  Q    But there is some slippage; wouldn't you agree?  That

15  states that?

16  A    Yes, a low risk.

17  Q    And just curious.  Have you ever heard of, let's say,

18  identical twins that are also narco traffickers?

19  A    In my country, there were a couple of brothers, identical

20  twins, they were very well known.  The brothers.  Mejia

21  Munera.  M-E-J-I-A, M-U-N-E-R-A by interpreter.

22  Q    And lastly, were you asked to check any travel records

23  for Joaquin Guzman Loera into and out of the country.

24           MR. FELS:  Objection, assumes fact not in evidence.

25           THE COURT:  You're asking 403?  Overruled.

VELASQUEZ ARDILA – CROSS – MR. LICHTMAN

1          You can answer the question yes or no.

2    A    I could not tell whether they were requested.  We receive

3    many requests and there are many travelers.  I was not asked

4    to bring documentation, such documentation to this hearing.

5    Q    In preparation for your testimony?

6    A    In preparation for my testimony.

7              MR. LICHTMAN:  No further questions.  Thank you.

8              THE COURT:  Any redirect?

9              MR. FELS:  No redirect, Your Honor.

10             THE COURT:  All right, you may step down.

11             The government may call its next witness.

12             (Whereupon, the witness was excused.)

13             MR. FELS:  Your Honor, the government calls Maurico

14   Gomez Vega.

15             THE COURT:  Okay.

16             THE COURTROOM DEPUTY:  Please stand and raise your

17   right hand.

18             (Witness takes the witness stand.)

19

20

21

22

23

24

25

3834

MAURICO VEGA GOMEZ – DIRECT – MR. FELS

1    **MAURICO VEGA GOMEZ,** called as a witness, having been first

2    duly sworn/affirmed through the interpreter, was examined and

3    testified as follows:

4            THE WITNESS:  Yes, I do.

5            THE COURTROOM DEPUTY:  Please state and spell your

6    name for the record.

7            THE WITNESS:  My name is Maurico Vega Gomez.

8    M-A-U-R-I-C-I-O.  V-E-G-A.  G-O-M-E-Z.

9            THE COURTROOM DEPUTY:  You may be seated.

10           (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vega – Direct/Mr. Fels

1          THE COURT:  You may proceed.

2          MR. FELS:  Thank you, your Honor.

3    DIRECT EXAMINATION

4    BY MR. FELS:

5    Q    Good morning, Major Vega.

6          Sir, with whom do you work?

7    A    I'm an officer in the Colombian National Police.

8    Q    And how long have you been with the Colombian National

9    Police?

10   A    17 years, sir.

11   Q    Now, what rank have you attained?

12   A    I'm a major.

13   Q    And what is your current assignment?

14   A    At this point, I'm the Chief of the Control in the

15   Utilization of Chemical Substances.

16   Q    Where are you currently assigned, Major Vega?

17   A    To the antinarcotics direction.

18   Q    In which city?

19   A    Bogota.

20   Q    And are you a member of what's called the SIU?

21   A    Yes, sir.

22   Q    And as a member of that, of the SIU, do you receive some

23   additional monies from the United States Government?

24   A    Yes, sir.

25   Q    And what is that?

3836

Vega - Direct/Mr. Fels

1  A     For my personal expenses and activities related to my

2  service.

3  Q     Do you know approximately how much that is a month?

4  A     Yes, sir, $200.

5  Q     Now, you came from Colombia to testify in this case; is

6  that correct?

7  A     Yes, sir.

8  Q     I want to take you back to 2010.

9        Where were you working at that time?

10 A     The Sensitive Investigations Unit as the chief of the

11 Cali office.

12 Q     And, again, Sensitive Investigations Unit, is that SIU?

13 A     Yes, sir.

14 Q     And what was your responsibility back in 2010 working in

15 Cali, Colombia?

16 A     I was in charge of supervising and carrying

17 investigations that had to do with drug trafficking, and to

18 also carry out support activities to the other SIU offices in

19 Colombia.

20 Q     Now, I'm going to show you what's already in evidence as

21 Government's Exhibit 506-22.

22       Major Vega, do you recognize what's being depicted

23 in Government's Exhibit 506-22?

24 A     Yes, of course, that's my city.

25 Q     Colombia, correct?

Vega - Direct/Mr. Fels

1    A    Yes, sir.

2    Q    Do you mind using your finger on the screen to circle the

3    City of Cali?

4    A    (Marking).

5    Q    Thank you.

6              So, I want to direct your attention, specifically,

7    to a date of May 16, 2010.  What was your assignment on

8    May 16, 2010, sir?

9    A    I was leading the Sensitive Investigations Unit Office in

10   Cali that day.

11   Q    And without getting into the details of what you heard,

12   can you say what kind of assignment you received?

13   A    I received a task that day from the office in Medellin to

14   carry out surveillance and tracking of an objective that they

15   were -- of an investigation they were conducting of someone

16   who was to arrive to the airport.

17   Q    And do you understand the source of that investigation,

18   meaning, how your counterparts in Medellin knew that this man

19   would be arriving in Cali.

20   A    Yes, they have been conducting an investigation in

21   Medellin and they knew about certain activities and

22   characteristics that were going to take place in Cali which is

23   the city where I was.

24   Q    And as long as we have Government's Exhibit 506-22 in

25   front of us, do you mind circling with your finger the City of

Vega - Direct/Mr. Fels

1    Medellin?

2    A     (Marking).

3    Q     Thank you.  So did you actually conduct surveillance on

4    this day of May 16, 2010?

5    A     Yes, sir.

6    Q     Did you ultimately learn who this individual who were you

7    conducting the surveillance was?

8              MR. PURPURA:  Is it objection.  Objection.  801.

9              THE COURT:  I know.  It's not being offered for the

10   truth, it's being offered to show what he did next.

11   Q     Sir, do you know the name of the target that asked to

12   surveil?

13   A     I was informed that it was a man by the name alias Tomas.

14   Q     And did you observe the man with alias Tomas ultimately

15   meet with some individuals?

16   A     Yes, sir.

17   Q     And where did you observe -- did you personally observe

18   this man, alias Tomas, meet with these individuals at a

19   particular location?

20   A     Yes, sir.

21   Q     And what was that location?

22   A     The Palmetto Plaza Shopping Center in the City of Cali.

23   Q     And what did you -- were you there with other individuals

24   from the SIU?

25   A     Yes, sir.

3839

Vega - Direct/Mr. Fels

1    Q    And what did you do to memorialize this meeting between

2    alias Tomas and other individuals at they Centro Comercial in

3    Palmetto in Cali?

4    A    We filmed several videos throughout the entire

5    surveillance and of all the people that they met up with.

6    Q    And I'm going to show you a video, if you don't mind,

7    of -- that's already in evidence as Government's Exhibit

8    703-A-6.  Folks, you should be?

9            MR. PURPURA:  Your Honor, can we stop -- objection.

10   Can I speak to counsel for one second.

11           THE COURT:  Sure.

12           MR. PURPURA:  Can we approach, your Honor, very

13   briefly.

14           (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  What's the problem?

5          MR. PURPURA:  Thank you.  We've already seen these

6    videos, so it's 403.  You can't have two different witnesses

7    and play the same recordings.

8          THE COURT:  What additional insight is this witness

9    bringing to the video.

10         MR. FELS:  Just authenticating the video.

11         THE COURT:  It's already authenticated, you don't

12   have to do it.

13         MR. FELS:  Do you have a problem with me showing the

14   photographs?

15         MR. PURPURA:  I do.  We've already seen it.

16         THE COURT:  What's the point?  There's more than one

17   person who recognizes the photographs.

18         MR. FELS:  The point is they have attacked the

19   credibility pretty harshly of the witness from whom these

20   videos came in.

21         THE COURT:  Oh.

22         MR. FELS:  This is essentially an attempt to

23   demonstrate that these videos are what that previous witness

24   said they were and help rehabilitate at least.

25         THE COURT:  It was cooperators before that.

SIDEBAR CONFERENCE

1          MR. FELS:  It was a cooperator.  I don't think this

2     is 403, it doesn't have the defendant's video on it.

3          THE COURT:  I understand the point.  Do what you

4     need to do but do it briefly.  He is correct that they're

5     allowed to corroborate once you raise the question of whether

6     the cooperators are saying the truth about anything.  So is it

7     if the police officer says it maybe it gives it more weight.

8     I think that's legitimate.

9          MR. FELS:  Okay.

10          (Sidebar concludes.)

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vega – Direct/Mr. Fels

1           (In open court.)

2    DIRECT EXAMINATION

3    MR. FELS:

4    (Continuing.)

5    Q    I'm going to show you.  Sir, did you review those videos

6    recently?

7    A    Yes, sir.

8    Q    And these were the videos, Government's Exhibit 703-A-6,

9    these were the videos that you and your team took?

10   A    Yes, sir.

11   Q    And we don't have to play those again, they're already in

12   evidence.  But I do want to show you two still photographs

13   from that video, okay?

14          Sir, you mentioned a man named Tomas that you were

15   surveilling.  I'm sorry, I should identify the photographs.

16   GX-703-A-2 on the right and GX-703-A-3, on the left.  I'm

17   sorry, did I say 703-A-2 and 703-A-3.

18          Sir, do you recognize these photographs from that

19   surveillance that you took.

20   A    Yes, sir.

21   Q    Do you recognize the individual in 703-A-2 as one of the

22   individuals that you were surveilling that day?

23   A    Yes, sir.

24   Q    And who was that?

25   A    Alias Tomas.

Vega – Direct/Mr. Fels

1   Q    Were you asked, or I should say, were you tasked with a

2   second surveillance on May 19th of 2010?

3   A    Yes, sir.

4   Q    And where was this surveillance?

5   A    At another shopping center in the City of Cali by the

6   name Uni Central exactly right at the outside of that place.

7   Q    And, same process, you assembled a team of other officers

8   that helped you with the surveillance?

9   A    That's right.

10  Q    And were you able to memorialize this surveillance on the

11  19th of May of 2010 in some fashion?

12  A    Yes, sir, by video.

13  Q    And, sir, have you recently reviewed the video from that

14  surveillance?

15  A    Yes, sir.

16  Q    Again, this is already in evidence as Government's

17  Exhibit 703-B.  I'm going to show you what's already in

18  evidence as Government's Exhibit 703-B-14.

19        Do you recognize this still photograph?

20  A    Yes, sir.

21  Q    This is from the surveillance that you took?

22  A    Yes, sir.

23  Q    Do you recognize the individuals in this photograph?

24  A    Yes, sir.

25  Q    Who?

Vega - Direct/Mr. Fels

1    A    On the right, the person is Tomas.  And this is another

2    target that the Medellin office was focusing on.

3            MR. FELS:  I have no further questions, your Honor.

4            THE COURT:  All right.

5            MR. PURPURA:  Thank you.  No questions.

6            THE COURT:  All right.  You may step down, sir.

7    Thank you.

8            (Witness leaves the witness stand.)

9            THE COURT:  Government may call its next witness.

10            MR. FELS:  Thank you, your Honor.  Government calls

11    John Hincapie.

12            (Witness takes the witness stand.)

13            COURTROOM DEPUTY:  Please raise your right hand.

14    JOHN HINCAPIE, called by the Government, having been first

15    duly sworn, was examined and testified as follows:

16            THE WITNESS:  I do.

17            COURTROOM DEPUTY:  Please state your full name for

18    the record.

19            THE WITNESS:  My name is Raul Lozano.

20            MR. FELS:  We have a little bit of an issue.

21            THE COURT:  All right.  We'll switch something up a

22    little bit.

23            MR. FELS:  I don't want to proceed like this.

24            THE COURT:  Do you want to stick with this witness.

25            MR. FELS:  We'll stick with Mr. Hincapie.  If you

Vega – Direct/Mr. Fels

1    might stand down, we'll bring in the witness.

2              THE COURT:  You may step out, sir.  We called you at

3    the wrong time we'll bring in someone else.

4              (Witness takes the witness stand.)

5              THE COURT:  Okay.  We're going to give this another

6    60 seconds.

7              COURTROOM DEPUTY:  Please raise your right hand.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hincapie - Direct/Mr. Fels

1                (Witness sworn.)

2    JOHN HINCAPIE, called by the Government, having been first

3    duly sworn, was examined and testified as follows:

4                THE WITNESS:  I do.

5                COURTROOM DEPUTY:  Okay.  Please state and spell

6    your name for the record.

7                THE WITNESS:  John Fredi Hincapie Guevara.

8                COURTROOM DEPUTY:  Spell that.

9                THE WITNESS:  John, J-o-h-n.  Fredi, F-r-e-d-i.

10   Hincapie, H-i-n-c-a-p-i-e.  Guevara, G-u-e-v-a-r-a.

11               COURTROOM DEPUTY:  You may be seated.

12               THE COURT:  All right.  You may inquire.

13               MR. FELS:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. FELS:

16   Q    Good morning, Mr. Hincapie.

17   A    Good morning.

18   Q    Can you please tell us with whom do you currently work?

19   A    Currently, I work with the National Colombian Police, the

20   Antinarcotics Division.

21   Q    And how long have you worked there with the Colombian

22   National Police?

23   A    22 years, 4 months, and a few more days.

24   Q    And what is your responsibility with the Colombian

25   National Police, specifically?

Hincapie - Direct/Mr. Fels

1  A    Currently, I am responsible for a unit that is based in

2  the City of Medellin that conducts investigations against drug

3  trafficking organizations.

4  Q    And what is your current title?

5  A    My rank is superintendent.

6  Q    Thank you.  So may I refer to you as

7  Superintendent Hincapie?

8  A    Yes.

9  Q    Thank you.  I want to direct your attention back to 2009.

10        Where were you working there,

11 Superintendent Hincapie?

12 A    In the City of Medellin, with the same group where I

13 currently work.

14 Q    And do you remember, was there a particular investigation

15 that you were working throughout that year of 2009?

16 A    Yes.

17 Q    And what was that investigation?

18 A    That investigation was part of a drug organization that

19 was the Cifuentes Villa.

20 Q    As part investigation into the Cifuentes Villa Drug

21 Organization, were there surveillances that were done?

22 A    Yes.

23 Q    What about electronic surveillance or wiretaps, were

24 those also done?

25 A    Yes.

3848

Hincapie – Direct/Mr. Fels

1    Q    Can you explain to the jury how does the process for

2    obtaining an authorization to do a wiretap in Colombia work?

3    A    Yes.  As an investigator, I draft a report that is

4    addressed to the investigations prosecutor.  In that report, I

5    narrate the reason, the need, and why it is this we need to

6    intercept that specific phone number.  And the prosecutor

7    issues the wiretap order and I receive that order, I process

8    it, and I send it to the communications unit with the

9    antinarcotics division.

10         The chief of that area receives and processes that

11   order and he would send that to the communications and

12   wiretapping division and that division is known as Plataforma,

13   platform, or Esperanza, hope.

14         And that division or Esperanza system would make the

15   application with the cellular phone carrier and the signal is

16   rerouted from the carrier to our system, to our wiretapping

17   office.  And there we have an officer who is the

18   communications analyst and who has a special software.  And

19   that person will then gather all the files in WAP files and

20   will burn DVDs or CDs that are later on sent to our evidence

21   vault.

22   Q    And they're kept in your evidence vault; is that correct?

23   A    Yes.

24   Q    Now, is there a point in which a judge will get involved?

25   A    Yes.

Hincapie - Direct/Mr. Fels

1   Q    Can you explain how that happens?

2   A    At the end of the wiretapping, at the end of the

3   wiretapping -- well, currently, we have a period of 180 days

4   to wiretap.  In 2010, that period only was 90 days.  So at the

5   end of those 90 days, or at the end of the wiretap, or when

6   the user stops using that cell phone, the investigator

7   together with the analyst would draft a report with the

8   results and that report we would also transcribe some of the

9   calls or the most important calls which we call "dirty calls."

10          And, at times, there are so many dirty calls or

11   calls with relevant information that we then extract the most

12   important ones and we add them to the report that we submit to

13   the prosecutor and the prosecutor would request a hearing with

14   the constitutional rights judge and that judge would then go

15   ahead and do a formal and official review of the materials and

16   all the results.

17   Q    Now, is there an opportunity, if you said you were

18   listening for 90 days, to renew a wiretap for an additional

19   period of time in Colombia?

20   A    Yes.

21   Q    And, again, is the process the same when you are trying

22   to update a wire that you still have to pass along the number

23   to the cell phone companies to obtain the data?

24   A    Yes.

25   Q    And, again, same.  You maintain these disks in the

Hincapie - Direct/Mr. Fels

1    evidence vault?

2    A    Yes.

3    Q    I want to go forward a few more years.

4          Were you asked to obtain copies of some of those

5    evidence disks in the Jorge Cifuentes Villa investigation?

6    A    Yes.

7    Q    And where did you -- did you send them to the

8    United States?

9    A    Yes.

10   Q    I'm going to show you what's marked for identification

11   purposes as 606-A.

12         MR. FELS:  Just for the witness, your Honor.

13   Q    Sir, showing you both the disk, 606-A, as well as this

14   green envelope, do you recognize the writing on the envelope,

15   sir?

16   A    Yes.

17   Q    Whose writing is that?

18   A    Mine.

19   Q    And there's a writing here that say Jota O Penultimo?

20   A    Yes.

21   Q    Does that tell you whose calls are in Government's

22   Exhibit 606-A.  In other words, whose line were you recording?

23   A    Yes.

24   Q    And who is it?

25   A    Jota O Penultimo or Simon.

Hincapie - Direct/Mr. Fels

1   Q    How did you know it was Simon?

2   A    Because that's how the other members of the organization

3   referred to him.  Either the Penultimo or Simon.

4   Q    And also Jota?

5   A    Yes, Jota.

6   Q    Did you know who these are all nicknames for, what

7   person?

8   A    Yes.

9   Q    Who was that?

10  A    Jorge Milton Cifuentes Villa.

11  Q    We'll run through a couple more of these.

12       Showing you what's been marked for identification

13  purposes as Government's Exhibit 606-B.

14       MR. LICHTMAN:  Judge, we have no objection to the

15  introduction of any of these.

16       MR. FELS:   Your Honor, we're not going to introduce

17  these into evidence.  What we're going is we're showing for

18  demonstrative purposes to lay the groundwork for the documents

19  that we'll introduce into evidence.

20       THE COURT:   I'm no sure I understood all that but

21  understood.

22       MR. FELS:  We'll go through quickly, your Honor.

23  EXAMINATION BY

24  MR. FELS:

25  (Continuing.)

Hincapie - Direct/Mr. Fels

1   Q    606-B.  This is one of the disks that you made from the

2   originals?

3   A    Yes.

4   Q    606-C.  Do you recognize this as one the disks that you

5   made from the originals back in Colombia?

6   A    Yes.

7   Q    606-D.  Do you recognize this as one of the copies that

8   you made from the originals back in Colombia?

9   A    Yes.

10  Q    How about 606-E.  Do you recognize your handwriting here?

11  A    Yes.

12  Q    And you recognize 606-E as one of the copies you made

13  from the original in Colombia?

14  A    Yes.

15  Q    Now, this you've written here "Tomas."

16       Based on your investigation, you know who Tomas was?

17  A    Yes.

18  Q    Who?

19  A    Gavino Ontiveras Rios.

20  Q    That's his real name?

21  A    Yes, Gavino Ontiveras Rios was his real name.

22  Q    And, sir, are you aware that there were calls made on his

23  Colombian phone?

24  A    Yes.

25  Q    And those calls were intercepted?

Hincapie - Direct/Mr. Fels

1    A    Yes.

2    Q    Okay, 606-F.

3         Do you recognize this as one of the disks that you

4    made from the original back in Colombia?

5    A    Yes.

6    Q    Last one, 606-G.

7         Do you recognize this as one of the copies of disks

8    that you made from an original back in Colombia?

9    A    Yes.

10   Q    Now, sir, Government's Exhibits 606-A, B, C, D, E, F, and

11   G were these all identical copies to the originals that are

12   maintained in the evidence vault back in Colombia?

13   A    Yes.

14   Q    Have they about this altered in any way?

15   A    No.

16   Q    Okay.  I want to walk you through something you did the

17   other day.

18         Sir, were you asked to compare a disk that had

19   already been prepared for you with the disks, 606-A, B, C, D,

20   E, F, G?

21   A    Yes.

22   Q    I'm going to show you what's been marked for

23   identification purposes as 606-I.

24         Do you recognize your initials on this disk?

25   A    Yes.

Hincapie - Direct/Mr. Fels

1    Q    And a date?

2    A    Yes.

3    Q    And whose initials are they?

4    A    Those initials were written down by me.  They correspond

5    to my name.

6    Q    And the date.  Can you read what date it is?

7    A    December 18, 2018.

8    Q    Sir, what is the significance of putting your initials on

9    this disk?

10   A    That I went over its contents.

11   Q    And do the contents contained in 606-I match with at

12   least one call in 606-A, B, C, D, E, F, G?

13   A    Yes.

14   Q    Meaning, just to be clear, that you were able to find

15   each one of the calls in 606-I on one of those previous disks

16   that I mentioned?

17   A    Yes.

18   Q    And did you compare the calls to make sure that they were

19   identical and that they had not been altered?

20   A    Yes.

21             MR. FELS:  Your Honor, at this point we move to

22   admit Government's Exhibit 606-I.

23             MR. LICHTMAN:  No objection.

24             THE COURT:  That's quite a chain of custody.  Yes,

25   it is received.

Hincapie - Direct/Mr. Fels

1           (Government Exhibit 606-I, was received in

2     evidence.)

3           THE COURT:  What you're saying is 606-I is comprised

4     of some of the original wiretap calls?

5           MR. FELS:  That is correct.

6           THE COURT:  Okay.  Let's go on.

7     EXAMINATION BY

8     MR. FELS:

9     (Continuing.)

10    Q    I'm going to show you three more disks right now.

11          Government's Exhibit, one of which is already in

12    evidence, two of which are not.  Government's Exhibit 606-J,

13    which is currently in evidence, 606-K, and 606-L.

14          Sir, were you asked to review the contents of these

15    three disks as well?

16    A    Yes.

17    Q    And with the exception of one call, which we'll get into

18    in just a moment, were all of the calls on 606-I on one of

19    these three disks?

20    A    Yes.

21          MR. FELS:  One second, your Honor.

22          (A brief pause in the proceedings was held.)

23          MR. FELS:  Your Honor, we would at this point move

24    to admit Government's Exhibits 606-K and 606-L.

25          MR. LICHTMAN:  No objection.  No objection.

3856

Hincapie - Direct/Mr. Fels

1          THE COURT:  Received.

2          (Government Exhibits 606-K and 606-L, were received

3  in evidence.)

4  Q    We talked about one call; correct?

5  A    Yes.

6  Q    Now, actually, let me if I might just see if we can

7  resolve this with the defense attorney one second.

8          THE COURT:  Better late than never.

9          (A brief pause in the proceedings was held.)

10 Q    We're going to speed this along.

11         Sir, were you asked to listen to the one call that

12 did not appear in 606-A, B, C, D, E, F, or G?

13 A    Yes.

14 Q    And that was a call between -- if I can lead a little

15 bit -- in this area between Jota, Jere, and Lucia?

16 A    Yes.

17 Q    Sir, were you able to recognize that call as one of the

18 calls that you remember specifically from your investigation

19 back in 2009?

20 A    Yes.

21 Q    And showing you what's been marked for identification

22 purposes as Government's Exhibit 606-H.

23         Sir, were you asked to review this disk 606-H and

24 the one call on that disk?

25 A    Yes.

3857

Hincapie - Direct/Mr. Fels

1    Q    And what do we see here on the front of this disk.  Let

2    me see if I can get some of the glare out.  606-H.  Doesn't

3    help at all.

4    A    The disk has my name, initial, and the date December 19,

5    2018.

6    Q    And what is your significance of your initials and the

7    date on disk 606-H?

8    A    That I went over its contents and it contained one call

9    specifically.

10   Q    And is that the call we were just talking about between

11   Lucia and JR?

12   A    Yes.

13   Q    Did you review that call recently?

14   A    Yes.

15   Q    And the contents he Government's Exhibit 606-H do not

16   appear to have been altered in any way from the original as

17   you recalled it?

18   A    No.

19            MR. FELS:  We move to admit into evidence

20   Government's Exhibit 606-H.

21            MR. LICHTMAN:  No objection.

22            THE COURT:  Received.

23            (Government Exhibit 606-H, was received in

24   evidence.)

25   EXAMINATION BY

Hincapie - Direct/Mr. Fels

1   MR. FELS:

2   (Continuing.)

3   Q   Now, sir, were you a member of what's called the SIU?

4   A   Yes.

5   Q   And as a consequence of being a member of the SIU, do you

6   receive additional monies from the United States Government?

7   A   Yes.

8   Q   And, approximately, how much is that?

9   A   $200 a month.

10          MR. FELS:  No further questions, your Honor.

11          THE COURT:  Any cross?

12          MR. LICHTMAN:  Judge, very briefly.

13   CROSS-EXAMINATION

14   CROSS-EXAMINATION

15   BY MR. LICHTMAN:

16   Q   Sir, you're a member of the Colombian SIU?

17   A   Yes.

18   Q   And you were involved in the investigation of the Jorge

19   Cifuentes Drug Trafficking Organization?

20   A   Yes.

21   Q   And this occurred over a period of years; correct?

22   A   Yes.

23   Q   Did you learn at any point that Jorge Cifuentes had

24   bribed Colombian law enforcement officials to have his

25   fingerprints removed from law enforcement databases?

Hincapie - cross/Lichtman

1    A    No.

2    Q    Are you aware that Jorge Cifuentes had bribed Colombian

3    law enforcement officials to have his fingerprints removed

4    from law enforcement databases?

5    A    That I did not hear about during our investigation.

6    Q    And lastly, are you aware of the allegation from Jorge

7    Cifuentes that he met with a corrupt member of the Colombian

8    SIU in November of 2010 and received investigatory materials

9    from this case?

10   A    No.

11   Q    This is the first you're hearing of all of this?

12   A    Yes.

13             MR. LICHTMAN:  Nothing further.  Thank you.

14             MR. FELS:  Brief, your Honor.

15             THE COURT:  Yes.

16             MR. FELS:  I can do this from here.

17   REDIRECT EXAMINATION

18   REDIRECT EXAMINATION

19   BY MR. FELS:

20   Q    Sir, you just heard a bunch of questions about Jorge

21   Cifuentes destroying his fingerprint records and prison

22   records and potentially being bribe -- potentially bribing an

23   official?

24   A    Yes.

25   Q    And that didn't come up in your investigation.  I believe

3860

Hincapie - redirect/Lichtman

1   that was your testimony?

2   A    Yes.

3   Q    Would it surprise you, sir --

4             MR. LICHTMAN:  Objection.

5   Q    That the information came from Jorge Milton Cifuentes

6   himself volunteering it to the United States?

7             MR. LICHTMAN:  Objection.

8             THE COURT:  Sustained.

9             MR. FELS:  No further questions.

10            THE COURT:  You may step down.  Thank you, sir.

11            (Witness leaves the witness stand.)

12            THE COURT:  Ladies and gentlemen, we'll take our

13   lunch break.  We have some holiday cookies since this is our

14   last day before the holidays.  Please don't talk about the

15   case, talk about the cookies.  We'll see you back here at

16   1:30.  Thanks very much.

17            (Jury exits courtroom.)

18            THE COURT:  All right.  1:30.

19            (Luncheon recess taken.)

20            (Continued on the next page.)

21

22

23

24

25

3861
Lozano - Direct/Parlovecchio

1          A F T E R N O O N   S E S S I O N

2          (In open court.)

3          THE CLERK:  All rise.

4          THE COURT:  Let's have the jury first.

5          (Jury enters.)

6          THE COURT:  All right.  Everyone be seated.

7          For the sake of good order, we are going to reswear

8     this witness, now that we know who he is.

9          THE CLERK:  Please raise your right hand.

10          (Witness sworn.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lozano - Direct/Parlovecchio

1    RAUL LOZANO, called as a witness, having been first duly

2    sworn/affirmed, was examined and testified as follows:

3              RAUL LOZANO, called as a witness, having been first

4    duly sworn/affirmed, was examined and proceeded to testify as

5    follows:

6              THE WITNESS:  I do.

7              THE CLERK:  Please state and spell your name for the

8    record.

9              THE WITNESS:  My name is Raul Lozano.  The spelling

10   is R-A-U-L, Lozano, L-O-Z-A-N-O.

11             THE CLERK:  Okay.

12             THE COURT:  All right.  You may proceed.

13             MS. PARLOVECCHIO:  Thank you, Your Honor.

14   DIRECT EXAMINATION

15   BY MS. PARLOVECCHIO:

16   Q    Good afternoon, Mr. Lozano.

17   A    Good afternoon.

18   Q    Welcome back.

19   A    Thank you.

20   Q    Where are you employed?

21   A    I am employed by the State of El Paso, Texas.

22   Q    What is your title there?

23   A    Currently I'm a sergeant assigned to the special

24   investigations unit.

25   Q    Is that with the El Paso police department?

Lozano - Direct/Parlovecchio

1    A    Yes, it is.

2    Q    What are your duties and responsibilities as a sergeant

3    with the El Paso Police Department?

4    A    Currently I'm in charge of emergency management incidents

5    and also public corruption, allegations made against public

6    officials.

7    Q    I want to draw your attention to January 13, 2010.

8              Where were you assigned at that time?

9    A    At that time I was assigned to El Paso Police Department

10   narcotics unit, in particular the stash house unit.

11   Q    What did the stash house unit do back in 2010 when you

12   were assigned there?

13   A    The stash house unit was responsible for identifying

14   locations where narcotics or large quantities of narcotics

15   were being stored and repackaged for distribution throughout

16   the United States.

17   Q    Is El Paso known as a way station for narcotics?

18   A    Yes, it is.

19   Q    How so?

20   A    It's due to the close proximity to the U.S. border.

21   Juarez, Mexico is directly across from us.  It's a known

22   location where drugs are brought over to the United States

23   through those means.

24   Q    Were you on duty on January 13, 2010?

25   A    Yes, I was.

3864

Lozano - Direct/Parlovecchio

1    Q    What were you doing that day?

2    A    I was following up on leads that we had received through

3    our office, just going around, checking up on different

4    locations.

5    Q    I want to focus your attention on 4:00 p.m. that day.

6         What happened?

7    A    I received a call from our narcotics office regarding a

8    vehicle that was coming in from Mexico into the United States.

9    That was going to be held with another vehicle.

10   Q    What did you do as a result of receiving that

11   information?

12   A    I received specific plates to a VW Jetta, black in color.

13   I ran those plates and received a registration that's an

14   address located on Tierra Bella.

15   Q    What did you do next?

16   A    I proceeded -- first, I notified my team with the

17   information that was received.  I proceeded to that address.

18   I set up surveillance, being that I was the first one that

19   arrived, and proceeded to conduct surveillance at the house.

20   Q    What did you see after you arrived at the residence?

21   A    Approximately 15 minutes into the surveillance I observed

22   a black Jetta arrive at the residence.  The vehicle stopped

23   and backed into the garage.  Of course, the garage door

24   opened, and the vehicle backed up into the garage.

25   Q    Did you observe any other vehicles while you were

*MICHELE NARDONE, CSR -- Official Court Reporter*

3865

Lozano - Direct/Parlovecchio

1   conducting surveillance at the residence that day?

2   A    At that time, no.  The vehicle drove into the garage,

3   and, again, the door closed.

4   Q    What happened next?

5   A    About 15 minutes after it arrived a dark-colored SUV with

6   Chihuahua, Mexico plates showed up, and an individual, a male

7   individual, exited the residence and entered the vehicle.

8   Again, I relayed this information to the team.

9   Q    You mentioned that the vehicle you saw had Chihuahua,

10  Mexico plates?

11  A    That's correct.

12  Q    Where is Chihuahua, Mexico?

13  A    Chihuahua is located in Mexico.

14  Q    Now, what happened after you observed that?

15  A    The male occupant, the passenger, entered through the

16  passenger side, and the vehicle drove off.  Again, I relayed

17  this information to the team, and they proceeded to follow the

18  vehicle.

19        MS. PARLOVECCHIO:  I'm going to show you what's

20  marked for identification as Government's Exhibits 217-10

21  through 217-12.

22        MR. PURPURA:  No objection, Your Honor.

23        THE COURT:  Okay.

24        MS. PARLOVECCHIO:  I would like to move into

25  evidence Government Exhibits 217-10 through 12.

Lozano - Direct/Parlovecchio

1    THE COURT:  Received.

2         (Government Exhibits 217-10 through 217-12, were

3    received in evidence.)

4    Q    Mr. Lozano, I'm going to show you photographs here.

5         Government's Exhibit 217-10, what do you see here?

6    A    That's the resident located on Tierra Bella.

7    Q    What is the address?

8    A    12412 Tierra Bella.

9    Q    What do you see inside the garage there?

10   A    Inside the garage is a VW Jetta backed into the garage.

11   Q    Is that the Jetta you observed on January 13, 2010?

12   A    Yes, it is.

13   Q    I'm showing you 217-11, is that just another view of the

14   house?

15   A    That's another view of the house, that's correct.

16   Q    And 217-12?

17   A    Again, another view of the residence.

18   Q    Now, what happened after you notified your team in regard

19   to that dark SUV?

20   A    The team followed the vehicle.  A short time later they

21   came back to the house with the individual that had left in

22   the SUV.

23   Q    What happened after that?

24   A    They entered the house.  They had received consent to

25   search the residence, at which point they entered the house.

Lozano - Direct/Parlovecchio

1    Q    What did you do next?

2    A    I followed them inside the residence.  Again, we were

3    conducting a search for narcotics.  Upon entering the

4    residence, I was notified that a large quantity of weapons was

5    located inside the garage.

6    Q    Did you see the weapons?

7    A    Yes, I did.

8    Q    Where did you see them?

9    A    If I remember correctly, they were in the garage.  We had

10   moved them from the garage to the living room area for

11   inventory purposes.

12            MS. PARLOVECCHIO:  Just for the witness, I would

13   like to show you Government Exhibits 217-7, 217-8, and 217-9.

14            MR. LICHTMAN:  No objection.

15            MS. PARLOVECCHIO:  I would like to move them into

16   evidence then, Your Honor.

17            THE COURT:  Received.

18            MS. PARLOVECCHIO:  Thank you.

19            (Government Exhibits 217-7, 217-8, and 217-9, were

20   received in evidence.)

21            MS. PARLOVECCHIO:  Publish them.  Thank you.

22   Q    I'm showing you Government Exhibit 217-7.

23            What are we looking at here?

24   A    We are looking at a picture of AK-47s, ballistic vests,

25   and some boxes that also contained AK-47s.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Lozano - Direct/Parlovecchio

1   Q    Are those boxes on the left-hand side of the photograph?

2   A    Yes, they are.

3   Q    I'm showing you Government's Exhibit 217-8.

4        What do we see here?

5   A    Again, another view of the ballistic vests, the AK-47s,

6   and the ammunition magazines that were located inside the

7   garage.

8        THE COURT:  When you say a ballistic vest, you mean

9   a bulletproof vest?

10       THE WITNESS:  A bulletproof vest, yes.

11  Q    Using your screen there, could you circle the magazines

12  that you observed that day.

13       Now I'm showing you Government Exhibit 217-9.

14       Is that another view of what you saw that day?

15  A    That's correct.  That's another view.

16  Q    Now, what did you do after you and your colleagues

17  discovered the weapons, the vests, and the magazines?

18  A    Again, our primary purpose was to locate narcotics.  We

19  didn't have a state chart.  So we went ahead and notified the

20  federal agencies.  I contacted the FBI, DEA, and ATF; and they

21  agreed they would reply or respond to the scene.

22  Q    What happened to the weapons, the vests, and the

23  ammunition after you contacted those agencies?

24  A    ATF arrived, and they agreed they would take over the

25  investigation.

3869

Lozano - Direct/Parlovecchio

1          MS. PARLOVECCHIO:  No further questions for this

2     witness, Your Honor.

3          THE COURT:  All right.  Any cross?

4          MR. PURPURA:  Thank you, Your Honor.  No questions.

5          THE COURT:  All right.  You may step down.

6          The government's next witness?

7          MS. PARLOVECCHIO:  The government calls Curtis

8     Williams.

9          THE CLERK:  Please raise your right hand.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3870

Williams - Direct/Parlovecchio

1        (Witness sworn.)

2        CURTIS WILLIAMS, called as a witness, having been

3   first duly sworn/affirmed, was examined and proceeded to

4   testify as follows:

5        THE CLERK:  Please state and spell your name for the

6   record.

7        THE WITNESS:  Curtis Williams, C-U-R-T-I-S

8   W-I-L-L-I-A-M-S.

9        THE COURT:  You may inquire.

10       MS. PARLOVECCHIO:  Thank you, Your Honor.

11  DIRECT EXAMINATION

12  BY MS. PARLOVECCHIO:

13  Q    Good afternoon, Mr. Williams.

14  A    Good afternoon.

15  Q    Where are you employed?

16  A    I'm employed with the Bureau of Alcohol, Tobacco,

17  Firearms, and Explosives.

18  Q    Is that also known as the ATF?

19  A    Yes,s.

20  Q    What is your position with the ATF?

21  A    I'm a special agent.

22  Q    How long have you been a special agent with the ATF?

23  A    Approximately ten and a half years.

24  Q    Where is your current assignment?

25  A    I'm assigned to the Houston field division, Houston,

*MICHELE NARDONE, CSR -- Official Court Reporter*

Williams - Direct/Parlovecchio

1    Texas.

2    Q    Prior to being assigned at Houston where were you

3    assigned?

4    A    Well, prior to Houston where was I assigned?

5    Q    Yes.

6    A    I was assigned to the El Paso field office in El Paso,

7    Texas.

8    Q    What are your duties and responsibilities as a special

9    agent with the ATF?

10   A    I investigate violations of the federal firearms and

11   explosives laws.

12   Q    I want to direct your attention to January 2010.

13        Were you working on an investigation at that time?

14   A    I was.

15   Q    What investigation was that?

16   A    It was an investigation into Alberto Sandoval, where he

17   was found in possession of 40 AK-47-type rifles.

18   Q    I'm going to direct your attention in particular to

19   January 13, 2010.

20        What did you do that day?

21   A    I remember being at work.  I remember late afternoon,

22   maybe early evening, I received a phone call from the El Paso

23   Police Department, Sergeant Lozano, Raul Lozano; and he said

24   he found or his team had found several AK-47-type rifles at an

25   address in East El Paso, Texas.

Williams - Direct/Parlovecchio

1    Q    What did you do as a result of receiving that

2    information?

3    A    I went to the address he provided me.

4    Q    I'm going to show you what's in evidence as Government

5    Exhibit 217-10.

6              What are we looking at here?

7    A    This is the front of the home that I went to on

8    January 13, 2010.

9    Q    Did you enter the residence?

10   A    Yes, I did.

11   Q    What did you observe upon entering the residence?

12   A    When I went in, I remember seeing several boxes with

13   firearms in them and five or six firearms on the floor in the

14   living room of the house.

15   Q    I'm going to show you what's in evidence as Government

16   Exhibit 217-7, 217-8, and 217-9.

17             What do we see here on 217-7?

18   A    Those are the firearms that I saw when I walked into the

19   house.

20   Q    I'm showing you 217-8.

21   A    Just a different angle of the same room with the

22   firearms.  I can also see the ballistic vests that were found

23   and several ammunition magazines.

24   Q    I'm going to circle these boxes here in 217-8 on the

25   left-hand side of the photograph.

Williams - Direct/Parlovecchio

1          What were contained in those boxes?

2     A    I remember that each box had, I believe there were two

3     AK-47-type rifles.

4     Q    Now, what, if at all, was distinctive about these weapons

5     you found at the residence?

6     A    I remember thinking -- I thought they were brand-new.

7     They had -- I don't know if they were sales tags but tags

8     identifying the firearms in addition to the markings on the

9     firearm.  Either the boxes also had marks identifying some of

10    the firearms, so because of that it made me think they were

11    brand-new.

12    Q    I'm going to show you Government's Exhibit 217-9.  I'm

13    going to circle these vests here.

14          Now, you mentioned that -- what did you call, them

15    ballistic vests?

16    A    Yeah.  That's how I would describe them, yes.

17    Q    What ballistic vests?

18    A    Basically a bulletproof vest.  It's to protect the wearer

19    from damage from a firearm.

20    Q    Now, what did you do after you observed the weapons, the

21    vests, and the magazines in the residence?

22    A    Well, we transported them back to our office and stored

23    them there for evidence.

24    Q    I'm going to show you what's marked for identification as

25    Government's Exhibits 217-1 through 217-6, 217-16 through

                    *MICHELE NARDONE, CSR -- Official Court Reporter*

Williams - Direct/Parlovecchio

1    217-19.

2              MR. PURPURA:  No objection.

3              THE COURT:  Received.

4              (Government Exhibits 217-1 through 217-6, 217-19,

5    were received in evidence.)

6    Q    Just briefly, Special Agent Williams, I'm showing you

7    Government Exhibit 217-1.

8              What are we looking at here?

9    A    Those are the firearms in our evidence vault in El Paso,

10   the ones I took on January 1, 2010.

11   Q    And Government's Exhibit 217-2.

12   A    Those are the vests that we took from the home in

13   El Paso, January 13, 2010.

14   Q    And 217-3, is this another shot of the vests?

15   A    Yes, it is.

16   Q    217-4, also the vests?

17   A    Yes, it is.

18   Q    217-16?

19   A    This looks like just another shot on the wall with some

20   of the other firearms that we took into custody that night in

21   January.

22   Q    217-17, what do we see here?

23   A    More of the firearms that we took into custody from the

24   address in El Paso on January 13, 2010.

25   Q    Is that a view of all of the weapons that were put into

Williams - Direct/Parlovecchio

1  evidence at the same time?

2  A    I believe it is.

3  Q    Finally, 217-18.

4  A    Just another shot of several of the firearms taken into

5  custody.

6  Q    Now, how many rifles in total did you seize from the

7  residence on Bella Tierra, on January 13, 2010?

8  A    Forty.

9  Q    How many ballistic vests in total?

10  A    Seven.

11  Q    And how many magazines were seized that day?

12  A    Eighty.

13  Q    Can you describe for the jury what is a magazine?

14  A    A magazine holds ammunition that you insert into the

15  weapon so when you fire it, you can continually feed the

16  ammunition.

17  Q    In the course of your training as an ATF agent, have you

18  become familiar with different caliber weapons?

19  A    Yes, I have.

20  Q    Based on your training and experience what are the

21  characteristics of the types of rifles that you seized that

22  day?

23  A    These rifles were -- I know five of them were

24  manufactured by a company named Romarm.  Thirty-five of them

25  were manufactured by a company or imported by a company

3876
Williams - Direct/Parlovecchio

1   Century Arms International.  They were all 7.62 by

2   39-millimeter.  That's the caliber of the ammunition of the

3   firearms.

4   Q    What did you do after you took these weapons, vests, and

5   magazines into evidence?

6   A    We continued our investigation.

7   Q    Did you do anything to document your seizure of these

8   firearms and vests and magazines?

9   A    Yes.  We wrote a report, and then we entered each weapon,

10  vest, and the evidence into our case management system.

11            MS. PARLOVECCHIO:  I'm going to show just for the

12  witness only a document that's marked for identification as

13  Government's Exhibit 217-68.

14            MR. PURPURA:  No objection.

15            MS. PARLOVECCHIO:  I would like to offer it into

16  evidence, Your Honor.

17            THE COURT:  Received.

18            (Government Exhibit 217-68, was received in

19  evidence.)

20            MS. PARLOVECCHIO:  Thank you.  May I publish,

21  please.

22  Q    Special Agent Williams, what are we looking on the

23  screen?

24  A    These are property status of summary reports.

25  Q    Did you create these reports to document your seizure of

*MICHELE NARDONE, CSR -- Official Court Reporter*

Williams - Direct/Parlovecchio

1    the weapons, vests, and magazines?

2    A    Yes.  They were generated from the information inputted

3    into our case management system.

4    Q    I just want to direct your attention to the top left-hand

5    corner of the document, where it says value.  I'm going to

6    circle that.

7              What does value signify?

8    A    That's the value of what we believe the weapon was either

9    purchased for or what they are worth in the retail market.

10   Q    And approximately how much did you value each of these

11   weapons at?

12   A    At that time it was a thousand dollars for each one.

13   Q    Now, you had noted earlier in your testimony that there

14   were two different types of weapons.

15             What were those two different types?

16   A    One was a Romarm.  It's just the name of the company.

17   The other one was a CAI, or Century Arms International.

18   Q    I'm going to show you what is in evidence as Government's

19   Exhibit 217-18.  I know you said there were two different

20   types.

21             Could you just circle for the jury one type of each

22   weapon that you were just describing.

23   A    Yes.  I remember the firearms with the fixed wooden

24   stock, with the Romarm, were manufactured by the Romarm

25   company; and the ones with the folding stock were manufactured

3878

Williams - Direct/Parlovecchio

1  or imported by CAI.

2          MS. PARLOVECCHIO:  I'm just going to note for the

3  record that the witness has circled the weapon at the bottom

4  of Government's Exhibit 217-18 and the one towards the very

5  top on 217-18.

6  Q    Now, what's the advantage of having a collapsable stock?

7  A    It makes the overall length of the weapon shorter so it's

8  easier to store, possibly to conceal.

9  Q    Special Agent Williams, I'm going to ask you to come up

10  to the witness stand.

11          MS. PARLOVECCHIO:  I apologize, Ms. Clark.

12  Q    Special Agent Williams, I'm going to ask you to examine

13  the exhibits that are in the cart on the left-hand side there.

14  That's Government's Exhibits 217-20 through 217-60.

15          Are you familiar with -- did you have the

16  opportunity to examine these before you came to court today?

17  A    Yes, I did.

18  Q    What do you recognize these weapons to be?

19  A    These are like the weapons we took into custody on

20  January 13, 2010.

21          MS. PARLOVECCHIO:  The government moves to admit

22  Government Exhibits 217-20 to 217-60.

23          MR. PURPURA:  No objection.

24          THE COURT:  Received.

25          (Government Exhibits 217-20 to 217-60, were received

*MICHELE NARDONE, CSR -- Official Court Reporter*

Williams - Direct/Parlovecchio

1   in evidence.)

2   BY MS. PARLOVECCHIO:

3   Q    Special Agent Williams, while I have you up here, can you

4   demonstrate for the jury what one of the Romarm rifles looks

5   like?

6   A    This would be the Romarm.

7   Q    By the way, I notice there are some white zip ties on

8   these weapons.

9          What is the purpose of those?

10  A    It's just to keep the bolt partially open.  It's a safety

11  feature so a round can't be inserted and used.  So you can

12  properly store them.

13  Q    They can't be fired?

14  A    Correct.

15  Q    Can you also show us one of the Century or the CAI

16  weapons, please.

17         Which government exhibit number is that -- I'm

18  sorry -- on the top?

19  A    Number 39.

20  Q    Could you demonstrate for the jury what the collapsable

21  stock looks like?

22  A    This is a folding stock.  It has the tie so I can't pull

23  it forward.  This is it, and I would pull.

24  Q    Thank you.  Can you just be clear:  All these have been

25  made safe, correct?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Williams - Direct/Parlovecchio

1    A    Yes.

2    Q    Now, I want to direct your attention to the cart on the

3    right and the bottom items, Government Exhibit's 217-61 to

4    217-67.

5         Had you examined these before you came to court

6    today?

7    A    Yes, I looked at them.

8    Q    What do you recognize them to be?

9    A    They -- I recognize them to be the same vests we took

10   from the residence on January 13, 2010.

11        MS. PARLOVECCHIO:  The government moves to admit

12   Government Exhibits 217-61 to 217-67.

13        MR. PURPURA:  No objection.

14        THE COURT:  Received.

15        (Government Exhibits 217-61 to 217-67, were received

16   in evidence.)

17   Q    If you could pick one of those vests up, Special Agent

18   Williams, and display it to the jury, please.

19   A    There are two.  They are connected.

20   Q    About how much would you estimate those vests weigh?

21   A    Anywhere from around ten, fifteen pounds.  Some of them

22   maybe more.

23   Q    What gives the vest that weight?

24   A    I believe it's Kevlar, and some of them have a -- I

25   believe it's Kevlar inside.  I don't know for certain, but,

Williams - Direct/Parlovecchio

1    and some of the other vests have a heavier material, strike

2    plate.

3    Q    I'm going to ask you to open Government Exhibit 217-69,

4    which is that big cardboard box.

5              What do you see inside there?

6    A    Several ammunition magazines.

7    Q    Are these the same magazines that you seized on

8    January 13, 2010?

9    A    Yes.

10              MS. PARLOVECCHIO:  The government moves to admit

11    Government Exhibit 217-16.

12              MR. PURPURA:  No objection.

13              THE COURT:  Received.

14              (Government Exhibit 217-16, was received in

15    evidence.)

16              MS. PARLOVECCHIO:  You may return to the witness

17    stand.  Thank you.

18    Q    Special Agent Williams, who, if anyone, was arrested as a

19    result of this seizure of these weapons, vests, and

20    ammunition?

21    A    Alberto Sandoval.

22    Q    Did you continue your investigation after seizing these

23    weapons?

24    A    Yes, I did.

25    Q    What, if anything, did you do?

*MICHELE NARDONE, CSR -- Official Court Reporter*

3882

Williams - Direct/Parlovecchio

1  A    We -- I worked with other agencies, but we conducted

2  witness interviews, at least one or two occasions surveillance

3  operation, and we also submitted those weapons for entrance

4  into our national integrated ballistic information system just

5  for testing.

6  Q    You testified that you partnered with other agencies.

7        Who are the agencies that you partnered with?

8  A    Homeland Security Investigations and the DEA.

9  Q    What, if any, drug trafficking organization became the

10  focus of your investigation?

11  A    The Sinaloa Cartel.

12  Q    What individuals in particular became the targets of your

13  investigation?

14        MR. PURPURA:  Objection.

15        THE COURT:  Overruled.

16  A    It was Rudy Briseno, Edgar Galvan, and then Jose Antonio

17  Marrufo, also known as Jaguar.

18  Q    I'm going to show you what's marked for identification as

19  Government's Exhibit 109.

20        What is this?

21  A    This is Edgar Galvan.

22  Q    How do you recognize him?

23  A    From the photograph, and, also, as part of our

24  investigation we saw him.

25        MS. PARLOVECCHIO:  The government moves to admit

*MICHELE NARDONE, CSR -- Official Court Reporter*

Williams - Direct/Parlovecchio

1    Government Exhibit 109.

2              MR. PURPURA:  No objection.

3              THE COURT:  Received.

4              (Government Exhibit 109, was received in evidence.)

5              MR. PURPURA:  May I publish?

6              THE COURT:  Yes.

7    Q    This is who you identified as Edgar Galvan?

8    A    Yes.

9    Q    I want to show you what's marked for identification as

10   Government's Exhibit 71.

11             Who do you recognize this to be?

12   A    Looks like Jose Antonio Marrufo.

13   Q    How do you recognize him?

14   A    A picture I have seen before and through witness

15   identification.

16             MS. PARLOVECCHIO:  The government moves to admit

17   Government Exhibit 71.

18             MR. PURPURA:  No objection.

19             THE COURT:  Received.

20             (Government Exhibit 71, was received in evidence.)

21             (Continued on the next page.)

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

3884

WILLIAMS — DIRECT — PARLOVECCHIO

1    DIRECT EXAMINATION

2    BY MS. PARLOVECCHIO:

3    Q    And Special Agent Williams, this is the individual you've

4    also identified as having the alias Jaguar?

5    A    Yes.

6              MS. PARLOVECCHIO:  Thank you, Special Agent

7    Williams.

8              I have no further questions.

9              THE COURT:  Any cross?

10             MR. PURPURA:  No cross.  Thank you.

11             THE COURT:  You may step down.

12             The government's next witness?

13             MR. NARDOZZI:  The government calls Max Kingery.

14             THE COURTROOM DEPUTY:  Please raise your right hand.

15             (Witness sworn.)

16

17

18

19

20

21

22

23

24

25

                    WILLIAMS - DIRECT - PARLOVECCHIO

1   MAX MASON KINGERY, called as a witness, having been first duly

2   sworn/affirmed, was examined and testified as follows:

3              THE WITNESS:  I do.

4              THE COURTROOM DEPUTY:  Please state and spell your

5   name for the record.

6              THE WITNESS:  Max Mason Kingery.  Last name is

7   K-I-N-G-E-R-Y.

8              THE COURT:  All right.  Before you inquire, let me

9   see counsel at sidebar for a minute.

10             (Sidebar conference.)

11             (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3886

SIDEBAR CONFERENCE

1          THE COURT:  Defense counsel didn't object, but I'm

2     not really happy about all the rifles and the vests and all

3     that -- that may be coming into evidence, but all that sitting

4     there in front of the jury for the entire trial.

5          Now, I think if we do anything about it at this

6     stage, it just makes it more noticeable if we wheel it all

7     out, but during the break take it and don't give me any more

8     weapons caches like that.  You've got the pictures.  A picture

9     tells a thousand words.

10          If you want to bring an exemplar of one of the

11     rifles, or even the two kinds of rifles, that's okay.  You can

12     show that to the jury.  I might even let you show the jury how

13     they shoot, I don't know, but to have the weapons stationed

14     there, I think it's unnecessary -- I won't say unduly

15     prejudicial, I'll say unnecessarily prejudicial.

16          MR. LICHTMAN:  Maybe we can --

17          MS. PARLOVECCHIO:  May I be heard?  Thank you.

18          Your Honor, we don't intend to leave these here for

19     the rest of the trial.  This witness is going to testify

20     specifically with regard to these.  Just for purposes of

21     efficiency, we haven't moved them out.  We're entitled to put

22     them into evidence because they were seized as part of this

23     case --

24          THE COURT:  You're entitled to subject to my

25     discretion, frankly.  You're entitled, like I said, to put one

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1  of each kind into evidence, although I can see an argument for

2  saying the pictures are enough, you're not entitled to put

3  even one into evidence, but I couldn't say that.  I just don't

4  like the cart sitting in front of the jury.

5       So after -- you're going to use it for this witness?

6       MS. PARLOVECCHIO:  Just for this witness.  It's out

7  of here.  We're not intending to leave it for trial.  That was

8  not our intention certainly and we won't bring the whole thing

9  out during summation.  We can have one of each.

10      MR. PURPURA:  Your Honor, so the Court doesn't think

11  the defense is totally asleep --

12      THE COURT:  I could see a strategic reason for not,

13  okay.

14      MR. PURPURA:  And I did speak to Mr. Nardozzi as to

15  does he need these weapons for these witnesses on the stand

16  and he indicated yes, and that's why we didn't ask him to

17  remove them immediately.

18      THE COURT:  Okay.

19      MR. PURPURA:  But we thank the Court, obviously, for

20  their concern -- your concern.

21      THE COURT:  I'm trying to keep the playing field

22  level.

23      MR. PURPURA:  Thank you, Your Honor.

24      (End of sidebar conference.)

25      (Continued on the next page.)

KINGERY - DIRECT - NARDOZZI

1      (In open court.)

2      THE COURT:  You may inquire.

3      MR. NARDOZZI:  Thank you, Your Honor.

4  DIRECT EXAMINATION

5  BY MR. NARDOZZI:

6  Q    Good afternoon, Mr. Kingery.  How are you today?

7  A    Good afternoon.

8  Q    Mr. Kingery, can you tell the ladies and gentlemen of the

9  jury, where you're employed.

10 A    I'm the chief of the Firearms and Ammunition Technology,

11 Criminal Branch, with the Bureau of Alcohol, Tobacco, Firearms

12 and Explosives.

13 Q    And can you explain to the ladies and gentlemen of the

14 jury what that means?

15 A    I'm chief of a branch within ATF that classifies firearms

16 under the Gun Control Act or National Firearms Act and I test

17 those firearms.

18 Q    And what are your specific duties in your role as chief

19 of that branch?

20 A    I supervise the evaluations of firearms by other FEOs and

21 occasionally I also conduct examinations myself.

22 Q    And by supervise, when a firearm is tested by an ATF

23 agent, are you the person that signs off on their report

24 classifying a firearm?

25 A    Not by an agent, by an FEO; a firearms enforcement

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

KINGERY - DIRECT - NARDOZZI

1    officer.

2    Q    Okay.  Very well.  Prior to serving in your role as chief

3    of the firearms technology branch, what other roles did you

4    serve within ATF?

5    A    Prior to that I was an FEO myself.

6    Q    For how long?

7    A    I'm sorry?

8    Q    For how long?

9    A    I've been chief since 2013.  Prior to that I joined ATF

10   in 2005.

11   Q    Did you receive any training upon joining ATF in terms of

12   the classification of firearms?

13   A    Yes, I did.  I entered in an apprenticeship program to --

14   I learned to classify firearms.  As part of that program I had

15   to write a series of about 14 or 15 white papers.  I had to

16   disassemble and assemble a number of different types of

17   firearms, learn their histories, the different types of

18   operating systems and mechanisms, how firearms are

19   constructed, the different methods of manufacturing firearms

20   and firearm parts, and memorize all the different definitions.

21   Q    Can you just explain to the ladies and gentlemen of the

22   jury, what is a white paper?

23   A    Basically like a college paper that you write on a

24   subject, except these particular subjects were each of a

25   particular firearm.

KINGERY - DIRECT - NARDOZZI

1           MR. PURPURA:  Your Honor, will stipulate to the

2      witness's expertise in the field of firearms.

3           MR. NARDOZZI:  Yes.  I would just like to ask a

4      couple of more questions so the jury can understand his

5      expertise.

6           THE COURT:  Go ahead.

7           MR. NARDOZZI:  Thank you.

8      Q    Sir, can you explain to the ladies and gentlemen of the

9      jury, have you ever taught any classes or given any lectures

10     on firearm classifications?

11     A    Yes, I have.

12     Q    How many times have you done that?

13     A    I couldn't count how many.  A lot.  I've been a guest

14     speaker at the International Association of Firearms Toolmark

15     Examiners for the last four years.  I've taught in a couple of

16     foreign countries.  I've taught at the National Academy down

17     in Glynco, Georgia, at Quantico.  A number of different

18     places.

19     Q    How many different firearms or sets of firearms have you

20     tested during your entire time at ATF?

21     A    Thousands.

22          MR. NARDOZZI:  Your Honor, at this time, without

23     objection, I'd like to move Mr. Kingery in as an expert in the

24     field of firearms identification and manufacturing and design.

25          THE COURT:  He may testify as to his opinions.

KINGERY - DIRECT - NARDOZZI

1          MR. NARDOZZI:  Thank you, Your Honor.

2    BY MR. NARDOZZI:

3    Q    Mr. Kingery, first of all, are there different ways that

4    you test firearms when they come into ATF, when a firearm is

5    alleged to have been fired versus when a firearm is alleged to

6    have not been fired?

7    A    It really depends upon the type of examination that's

8    being requested by the agent, and what type of firearm it

9    might be under, whether it's an NFA firearm or a GCA firearm.

10   Q    What does that mean?

11   A    GCA is the Gun Control Act and the Gun Control Act

12   regulates basically all firearms under a single definition of

13   firearm.  And it basically just -- if it shoots, it's a

14   firearm, in its simplest terms.  But also, the National

15   Firearms Act regulates more dangerous firearms, like machine

16   guns, sawed-off shotguns and rifles, gadget guns, like pen

17   guns, or some type of a concealed firearm, like a James Bond

18   type of a firearm.  Destructive devices, such as large canons,

19   rockets, grenades, bombs, are actually regulated as firearms

20   under the National Firearms Act.

21   Q    When a firearm -- first of all, what is the statute under

22   which you classify a firearms under the Firearms Act?  Do you

23   know the statute number?

24   A    Under the National Firearms Act?

25   Q    Yes, sir.

KINGERY - DIRECT - NARDOZZI

1   A    It's 26 United States Code, Section 5845.

2   Q    Are there any other statutes that guide the analysis that

3   you perform at ATF?

4   A    The different subsections under that, and then under the

5   Gun Control Act, is 18 United States Code, Section 921.

6   Q    When a firearm is sent to ATF for analysis, and it is not

7   believed to have been fired previously, how do you test that

8   firearm for operability?

9   A    First we would perform what's called a field function

10  check.  The field function check is simply to manipulate the

11  firearm manually without any ammunition.  You cycle the action

12  to see how it functions.

13          While you're doing this, you'd be manipulating the

14  trigger and placing the selector lever in different positions

15  while you're repeating this cycling the action and

16  manipulating the trigger.  This may tell us whether the

17  firearm mechanically functions as a machine gun or not and

18  potentially, if it's broken or damaged, and we might not want

19  to shoot it, or something like that.

20  Q    Okay.  Prior to coming here today to testify, were you

21  asked to review any documentation related to a firearm

22  seizure?

23  A    Yes, I was.

24          MR. NARDOZZI:  Your Honor, can I approach the

25  witness?

KINGERY - DIRECT - NARDOZZI

1      THE COURT:  Yes.

2   Q    Mr. Kingery, I've handed you what's already in evidence

3   as Government Exhibit 217-68.

4           MR. NARDOZZI:  Placed it on the screen now as well,

5   ask to publish it to the jury.

6           (Exhibit published.)

7   Q    Is this the documentation that you were asked to review?

8   A    Yes, it was.

9   Q    And did you, in fact, review this documentation?

10  A    Yes.

11  Q    What were you asked to do with the documentation in front

12  of you?

13  A    I was asked to determine if these firearms would likely

14  be semi-automatic or machine guns, and if they were

15  semi-automatic, how they might be converted into machine guns.

16  Q    Okay.  And in conducting your review, did you prepare a

17  report based upon your findings?

18  A    Yes, I did.

19          MR. NARDOZZI:  Your Honor, just for the witness.

20  Q    Showing you what's marked as Government

21  Exhibit 3500-MMK-6, do you recognize this?

22  A    Yes.

23  Q    Just flipping through.  Is that your signature on the

24  third page?

25  A    Yes, sir, it is.

3894

KINGERY - DIRECT - NARDOZZI

1  Q    What is this?

2  A    This is a memorandum of a report that I produced looking

3  at these documents and evaluating whether or not these

4  firearms would likely be semi-automatic or machine guns.  It

5  also describes how easily they might be converted into machine

6  guns.

7  Q    Is this a document that you would prepare or a report

8  such as this in the regular course of your business in

9  performing an analysis such as the one you were asked to

10  perform here?

11  A    Yes, sir.  It's a routine type of report.

12          MR. NARDOZZI:  Your Honor, at this time I'd ask to

13  move 3500-MMK-6 into evidence.

14          MR. PURPURA:  No objection.

15          THE COURT:  Received.

16          (Government  Exhibit 3500-MMK-6, was received in

17  evidence.)

18  BY MR. NARDOZZI:

19  Q    Mr. Kingery, what conclusions did you reach as you

20  performed your analysis?

21  A    I concluded that these were all semi-automatic or

22  normally semi-automatic firearms, and that converting them

23  should be -- they were the type of firearm that are actually

24  relatively easy to convert into machine guns.  Both of them

25  functioned slightly differently, but the modification steps

KINGERY - DIRECT - NARDOZZI

1    are relatively similar; simply drill a hole and install a

2    single part.

3    Q    Okay.  And I want to talk more about that in a moment.

4         First, what types of firearms were contained in this

5    report?

6    A    In this report, it details AK-type of firearms.

7    Specifically a WASR 10 and M70 type AKs.

8    Q    What does it mean to be an AK type of firearm?

9    A    Well, an AK is the original name.  AK47 is the original

10   name for the firearm and then depending upon different

11   features that that firearm has, or who made it, that might

12   have a different model name.  But it's essentially the same

13   firearm.

14   Q    And how, just generally, do AK type of firearms work?

15   A    AK type firearms are fed with a magazine.  Usually a

16   magazine holds 30 rounds and they operate from the closed

17   bolt, which means the bolt is -- loads the round into -- loads

18   the cartridge into the chamber and is locked in a closed

19   position before the firing pin strikes the primer on the

20   cartridge.

21        When this happens, there's essentially a small

22   explosion that take place in the chamber behind this bullet,

23   where the pressure rises to something around 55,000 pounds per

24   square inch, pushes that projectile down the barrel.  At a

25   certain point along the length of that barrel, there is a hole

KINGERY - DIRECT - NARDOZZI

1   where a portion of this high-pressure gas is diverted back

2   into another part of the firearm and presses against a piston.

3   This piston drives the bolt and bolt carrier backwards,

4   unlocking the bolt from the chamber.  This allows the

5   cartridge to be extracted and then a spring drives this bolt

6   and bolt carrier forward again, loading the next round.

7            And depending upon whether it's a semi-automatic or

8   fully automatic determines what happens after that

9   mechanically.

10  Q   At some time after you prepared your report, did you have

11  the opportunity to perform a physical inspection of the items

12  that were listed in the report?

13  A   Yes, I did.

14  Q   And when was that actually?

15  A   Just this week, Tuesday.

16  Q   Okay.

17  A   Or -- yes, Tuesday.  I'm sorry Tuesday.

18  Q   Okay.  You sure it wasn't yesterday?

19  A   Yes, I'm sorry.  I'm getting -- I've been here a little

20  while.

21  Q   I know you have.

22  A   This is Thursday.  Yes, Wednesday.

23           THE COURT:  We're all kind of losing track of days

24  in this case.

25           THE WITNESS:  Yes, Your Honor.

KINGERY - DIRECT - NARDOZZI

1    BY MR. NARDOZZI:

2    Q    We've all been there, sir.

3         Do you see the items that you performed a physical

4    inspect on here in the courtroom?

5    A    Yes, it appears to be them in the cart there.

6    Q    Okay.

7         MR. NARDOZZI:  Let the record reflect Mr. Kingery

8    has indicated physical items 217-20 through 217-60 present in

9    front of counsel table here in the courtroom.

10   Q    Mr. Kingery, can you describe for the ladies and

11   gentlemen of the jury what the physical inspection you

12   performed was?

13   A    I took out each and every single firearm, there's 40 of

14   them, and did a field function test, as I explained before.

15   That test indicated that the firearms functioned

16   semi-automatically, but also showed me that they had machine

17   gun parts installed in them, although they didn't function as

18   machine guns.  Then I installed a blank cartridge in each

19   firearm and fired it to verify that the weapon would actually

20   function physically to shoot a projectile.

21   Q    Did each of the physical items here in the courtroom

22   217-20 through 217-60 physically firearm when you performed

23   your test?

24   A    Yes.

25   Q    Okay.  Sir, you talked a moment ago about weapons being

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3898

KINGERY - DIRECT - NARDOZZI

```
1    made readily convertible.  Are these --
2              MR. PURPURA:  Your Honor, objection.  401 at this
3    point.
4              THE COURT:  Yes, overruled.
5    BY MR. NARDOZZI:
6    Q    Sir, first of all, do these weapons classify as firearms
7    under the statute?
8    A    They do, yes.
9    Q    Do they classify as machine guns under the statute?
10   A    No, they do not.
11   Q    Okay.  So that means that they are semi-automatic
12   weapons?
13   A    Yes, sir.
14   Q    When you talked about weapons being made readily
15   convertible, that's convertible to an automatic weapon?
16   A    Yes, sir.
17   Q    That would qualify as a machine gun, right, an automatic
18   weapon?
19   A    If it had been converted, yes.
20   Q    Correct.  How would -- we can go by individual model, if
21   there is a difference.  But how would these particular weapons
22   be converted to an automatic weapon from a semi-automatic
23   weapon?
24   A    There's two different methods that are used -- that could
25   be used to convert these into automatic weapons.  The first
```

KINGERY - DIRECT - NARDOZZI

1   one is actually not very reliable.  It involves changing the

2   physical geometry of the hammer on this firearm.  The hammer

3   has a ledge on it that is captured by what looks like a claw.

4   We call it a disconnector.  And the angle of the face of this

5   hammer to this claw is basically 90 degrees.

6         If you file on that to change that angle at exactly

7   the right point, and the exact angle, what will happen is that

8   disconnector, when it grabs the hammer, instead of stopping

9   it, it will grab it, but then not be able to fully hold it.

10  So the hammer slowly releases.  If you get that angle wrong,

11  it will just slide right off and won't cause any delay

12  whatsoever.  Or, if you don't get it enough, then the

13  disconnector doesn't disconnect.

14        The reason you need a delay in this is there's a

15  projection on the back of the bolt carrier that covers the

16  firing pin until the bolt and bolt carrier are completely

17  closed and locked.  So if the hammer were to move forward

18  before that occurs, it would strike the back of the bolt

19  carrier, instead of the back of the firing pin.  So if you do

20  this modification wrong, basically, it doesn't shoot.

21        If you do it right, it will shoot as a machine gun

22  and it will always be a machine gun.  That is, it will only be

23  safe or a machine gun.  It will not be a semi-automatic

24  firearm.

25  Q    How difficult is it to perform this modification?

KINGERY - DIRECT - NARDOZZI

1    A    Not very difficult at all.  A simple hand file will do

2    the modification.  You just have to know where to apply it.

3    Q    For an individual who had the knowledge of where to apply

4    that hand file, how long would it take to perform this

5    modification?

6    A    A few seconds.

7    Q    Is there any additional hardware that's necessary in

8    these firearms that would be required for this type of

9    modification?

10   A    Not that type of modification, no.

11   Q    Is there any other type of modifications that would

12   require additional hardware to be installed in these firearms?

13   A    Yes.  The second modification would actually be to make

14   it into a machine gun, modify the receiver, so it's actually a

15   machine gun receiver.  That would allow a person to install

16   what we call the machine gun auto sear into the firearm.

17        This machine gun auto sear is a part that causes the

18   delay that I mentioned before, but causes it in a very

19   reliable manner, and it also does it in such a way that the

20   weapon is turned into a select fire machine gun.  So that I

21   can select either semi-automatic mode of operation, or full

22   auto mode of operation.

23        This is done by drilling a hole at a certain

24   location in front of the hammer pin, and installing a part

25   that -- it's a -- the machine gun auto sear and its spring

KINGERY - DIRECT - NARDOZZI

1   together cost about 15, $16.  It's, by itself, is an

2   unregulated item.  It's not until you actually modify this

3   receiver that it becomes a regulated item.  Then you can just

4   install that.

5          It actually takes a little bit longer to install

6   that because you have to take all the other parts out first.

7   That takes about two minutes or so.  Then another two to three

8   minutes to put it all back in.  So five minutes total, you've

9   got a very reliable machine gun.

10  Q    Five minutes, $16?

11  A    Yes.

12  Q    Okay.  So for a person that understands how to do this,

13  they could do it relatively easily.

14         Can you explain to the jury what the difference is

15  between a regular gun, and a machine gun; a semi-automatic,

16  versus automatic?

17  A    Well, in the machine gun, with the auto sear in place,

18  your selector lever is moved to the automatic position.  It

19  disengages the disconnector.  So the disconnector will not

20  capture the hammer and instead, this machine gun auto sear

21  will capture the hammer.  It has a leg on it that sticks up

22  above the bolt guide rail and as the bolt is moving forward to

23  its closed position, it hits that lever, which causes the auto

24  sear to release the hammer at just the right moment, so that

25  the hammer strikes the firing pin when the bolt's closed.

KINGERY - DIRECT - NARDOZZI

1        And this will continue -- this cycle of operation

2   will continue until the weapon either breaks, or runs out of

3   ammunition, or you let go of the trigger.

4   Q    Okay.  So in simpler terms, if I take a semi-automatic

5   weapon and I pull the trigger once and I hold it down -- with

6   the semi-automatic weapon, if I pull the trigger once and I

7   hold it down, what happens?

8   A    It will fire one shot.  It will eject that cartridge and

9   load the next one.  Then the hammer will stay cocked until you

10  release the trigger and pull it again.

11  Q    With an automatic weapon or a machine gun, if I pull the

12  trigger once, and I hold it down, what happens?

13  A    It keeps on shooting, as I said, until the magazine's

14  empty.

15  Q    Okay.  I want talk about some of the items that you

16  tested briefly, and then also talk about some other weapons

17  that you've either heard about in testimony here in court, or

18  may hear about.

19        MR. NARDOZZI:  Can we have a couple of lapel mics?

20  Q    Mr. Kingery, can you come down from the stand and

21  approach.

22  A    Yes.

23  Q    All right.  So there were two separate types of firearms

24  recovered.  Can you identify for the jury the two different

25  types of firearms that were recovered out of that mess of

KINGERY - DIRECT - NARDOZZI

1  firearms there?

2  A    Yes.  We have the M70 --

3         MR. PURPURA:  Objection.  This is -- I apologize.

4  We just did this.

5         THE COURT:  Well, we did it in words.  Now we're

6  about to do in it pictures.

7         MR. PURPURA:  No, the last witness, actually,

8  Judge --

9         MR. NARDOZZI:  Your Honor, this is an expert

10 witness --

11        THE COURT:  Stop.  Stop.

12        He may do something different than the last witness

13 did, illustrating the testimony he gave, which the last

14 witness did not.

15        Go ahead.

16 BY MR. NARDOZZI:

17 Q    All right, sir.  Can you tell us -- and hold it up for

18 the jury so they can see -- what kind of firearm that is?

19 A    This is an AK type, it's an M70 AB2.

20 Q    Where is that manufactured?

21 A    This is manufactured in Yugoslavia, for an American

22 importer, Century Arms.

23 Q    Okay.  And just hold up the other one for us.

24 A    I'm sorry?

25 Q    The other type of firearm for us.

KINGERY - DIRECT - NARDOZZI

1    THE COURT:  So far we're not moving on anything that

2    wasn't done with the last witness.  We know there's two kinds

3    of firearms, we know who manufactures them.

4        What do you want him to show the jury?

5    MR. NARDOZZI:  Your Honor, you know what?  I'll move

6    on.  I can see the Court is eager to get going.

7    Q    Why don't we put that down and let's move over to the

8    demonstrative exhibits that we have here.  You can open that

9    box.

10       All right.  So first, I want you to pick up what's

11   marked as Government Exhibit 217-76.

12   MR. NARDOZZI:  And, Your Honor, for the Court's

13   edification, we have photographs of each of these

14   demonstrative weapons that I'd ask to move into evidence.

15   These are simply for here in court today.

16   THE COURT:  Okay.  That's fine.

17   MR. NARDOZZI:  Thank you.

18       This is Government Exhibit 217-76.

19   Q    Can you tell the ladies and gentlemen of the jury what

20   this is?

21   A    This is an M16, simply M16A1.

22   Q    Is it similar -- there's other guns in the M series, like

23   an M4, what makes an M16 different than, say, an M4?

24   A    Yes.  M4 and M16 are essentially the same weapon.  The

25   only real difference, the M4 has a shorter and heavier barrel

KINGERY - DIRECT - NARDOZZI

1 and will have a different buffer inside the buffer tube here.

2 Q    Is the M16 a semi-automatic weapon by nature or an

3 automatic weapon?

4 A    M16s are automatic firearms by nature.

5 Q    Okay.  And in this firearm that you're holding up here

6 for the ladies and gentlemen of the jury, half of the weapon

7 is actually basically cut off, correct?

8 A    Yes.

9 Q    Can you explain, using this example which shows the

10 insides of the weapon, how an M16 works?

11 A    Yes.  Can I approach?

12        The way this firearm works, this is our bolt carrier

13 and this is the bolt right in here.  And when you pull the

14 charging handle, the bolt comes back past the magazine, allows

15 it to pick up a cartridge.  When it's released this bolt and

16 bolt carrier move forward.  They will load the cartridge into

17 the chamber, which is right here, and then when you pull the

18 trigger, right here -- yes, this won't fire.

19        I place the selector in the semi-automatic position.

20 When I pull the trigger, the hammer is released.  You all

21 heard that.  This piece here, the hammer, flies forward,

22 strikes the firing pin.  The firing pin looks kind of like a

23 golf tee basically.  It's about this long and it's going to

24 strike the primer of the cartridge that sets off this chain

25 reaction.  The primer has explosives in it that causes the

KINGERY - DIRECT - NARDOZZI

1    powder in that cartridge to burn.  That powder burns at an

2    extremely fast rate, which is essentially another explosion,

3    forces the bullet down the barrel here.

4         As that is happening, the gas, as I mentioned

5    earlier, is pushing that bullet, it's under high pressure, and

6    it will pass an opening and is diverted back up this way and

7    then back down the cylinder towards the bolt carrier.

8         Now, this weapon works slightly differently than the

9    AK type, in that this uses what's known as direct gas

10   impingement, which is the gas would strike directly on to the

11   bolt carrier and the bolt.  And they essential become the

12   piston and are driven backwards, as you'll see with the AK, as

13   a piston in front of it in between the gas and this bolt

14   carrier.

15        Essentially the machine gun version or the machine

16   gun setting is going to work the same, the automatic setting.

17   You cock the bolt, rotate the selector lever, and the selector

18   lever is on the opposite side here, it's going to rotate it to

19   the auto position.  In this weapon, this hole right here is

20   where I have to drill to -- or I would have had to drill if it

21   was semi-automatic, but the hole is already here.  It has the

22   pivot pin for our machine gun auto sear.

23        This time when I pull the trigger, you wouldn't have

24   seen it, but this is our disconnector.  The disconnector has

25   moved backwards about a thousandths of an inch.  It is a very

KINGERY - DIRECT - NARDOZZI

1  small amount, but it is just enough so that it's not going to

2  capture the hammer.

3       So the hammer falls, this explosive reaction takes

4  place, the bolt and bolt carrier want to come backwards.  The

5  bolt is cocked, but now it's simply being held by the

6  disconnector itself by the auto sear, so when the bolt goes

7  all the way forward, it goes all the way forward, the hammer

8  is automatically tripped and released.

9       This will strike that primer and this operation will

10  continue until I release the trigger.

11  Q    Now, with that type of a weapon, you mentioned that the

12  projectile feed comes from a magazine, correct?

13  A    Yes.

14  Q    Is there a standard size of magazine, or are there

15  multiple different sizes of magazines?

16  A    There's multiple difference sizes.

17  Q    So what's the significance of the fact that there's

18  multiple sizes of magazines?  What does a bigger magazine

19  mean?

20  A    Just that it can shoot more ammunition.

21  Q    Because it can hold more projectiles?

22  A    Yes.

23  Q    Very well.  Is there a maximum size of a magazine that

24  you're aware of?

25  A    The largest one I know of is called a Century.  It's a

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3908

KINGERY - DIRECT - NARDOZZI

1    hundred round magazine.

2    Q    Okay.

3    A    Not for this weapon.

4    Q    And this weapon, we've called it an M16.  Is this made by

5    a particular manufacturer or is this a model that's

6    manufactured by multiple companies?

7    A    There are today hundreds of manufacturers that make the

8    M16 type of weapon.  There is really only three gun

9    contractors that make it in a machine gun version right now.

10   Colt, FN and --

11              THE COURT:  That's all right if you don't remember

12   the third.  I think --

13              THE WITNESS:  Yeah, I don't remember the third one.

14              THE COURT:  I think we've got all the details we

15   need.

16              MR. NARDOZZI:  Thank you, Your Honor.

17              MR. PURPURA:  May counsel approach the bench

18   briefly?

19              THE COURT:  Yes.

20              (Sidebar conference.)

21              (Continued on the next page.)

22

23

24

25

3909

SIDEBAR CONFERENCE

1          THE COURT:  Are we done with the demonstration?

2          MR. PURPURA:  That's what I'm going to object to.

3          At this point, what's next is a rocket launcher for

4     demonstration purposes.  It's really big.  I'm looking at it

5     right now --

6          THE COURT:  That's what you're going to do?

7          MR. NARDOZZI:  Your Honor, this is evidence that is

8     going to come into the record in this case.  We just recovered

9     three RPGs --

10         THE COURT:  That's to be determined.

11         MR. NARDOZZI:  Well, your Honor, we just recovered

12    three RPGs.

13         THE COURT:  Right.  So what do you need to do with

14    those?

15         MR. NARDOZZI:  I want to show the jury how a rocket

16    launcher works because there will be -- this is subject to

17    connection, there is testimony coming in this trial about use

18    of rocket launchers during incursions with rival cartels.  It

19    may not be convenient for Mr. Guzman, but it's evidence that's

20    going to come in the case.

21         THE COURT:  Please don't be sarcastic with me.  I

22    can't have a demonstration of an RPG in the level of detail

23    that you just gave with respect to the M16.  You can have him

24    walk through and show how it works.  But how it works is very

25    simple:  You put in the RPG into the launcher and pull the

3910

SIDEBAR CONFERENCE

1    trigger.  Now, I understand he's an expert he's got to say a

2    little more than that, but he doesn't have to say much more

3    than that.  You do not go in to the level of detail that you

4    did with the M16.  This is not a weapons show, this trial,

5    okay.

6           Now, I think most Americans understand the term

7    "RPG."  They know what it means.  They don't know how it

8    works, but they know what it looks like.  They've seen enough

9    movies where it takes off.  So it requires a minimal

10   demonstration.

11          MR. NARDOZZI:  Understood, Your Honor.  But we are

12   asking this jury to consider the facts that are presented in

13   this case.  That's why we feel it's important to show how

14   those weapons work.

15          THE COURT:  Yes, well, I'm telling you what facts

16   are going to be presented in this case.  So do it my way,

17   please.

18          MR. NARDOZZI:  Thank you, Your Honor.

19          THE COURT:  Go ahead.

20          (End of sidebar conference.)

21          (Continued on the next page.)

22

23

24

25

3911

KINGERY - DIRECT - NARDOZZI

1              MR. NARDOZZI:  Thank you, Your Honor.

2              (In open court.)

3    BY MR. NARDOZZI:

4    Q    Mr. Kingery, you're picking up what's marked as

5    Government Exhibit 78.

6    A    Yes.

7    Q    Let me pick up the part for you.

8              You're holding what's marked as Government

9    Exhibit 78.

10   A    Yes.

11   Q    Can you tell the ladies and gentlemen of the jury what

12   that is?

13   A    This is the RPG-7.  RPG stands for rocket-propelled

14   grenade and the 7 is the seventh model.

15   Q    Which part is the rocket -- the projectile portion?

16   A    This one in my left hand.

17   Q    Okay.  And of course this is not a live grenade, correct?

18   A    No, it's not.

19   Q    And the part in your other hand -- you can put that down,

20   sir.

21             The item that you're holding in your hand now, what

22   is this?

23   A    This is the launcher for that grenade.

24   Q    And I see, sir, we have a cross section of this open on

25   the side that's facing the jury.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

KINGERY - DIRECT - NARDOZZI

1    A    Yes.

2    Q    Can you just very briefly explain to the jury how this

3    firearm works.

4              THE WITNESS:  Yes.  I can approach again, Your

5    Honor.

6              THE COURT:  Yes.

7    A    Basically the rocket sits inside this tube and you'll

8    notice in the front -- I won't point it at you -- but there is

9    a little notch right here.  That's the indexing notch so that

10   the rocket is pointed the right way.  On the bottom of the

11   rocket is a firing pin and a primer, just like a rifle

12   cartridge, or pistol cartridge.  And this trigger, you pull

13   this trigger and the hammer will swing up strike the -- strike

14   this firing pin, the firing pin inside here will strike the

15   primer on the bottom of the rocket, that ignites the, what's

16   known as the launching stage of the rocket, or the initial

17   stage.  This throws the rocket out away from you.  Then the

18   main or flight motor, the main stage of the rocket ignites.

19             So its initial flight is still relatively powerful,

20   but the rocket is only moving about a hundred or so meters a

21   second.  After that, when the main motor kicks in, it's moving

22   around 3, 350 meters a second; a lot faster.

23   Q    How far can the projectile that's associated with this

24   weapon travel?

25   A    It's capable of traveling about 1100 meters, but most of

KINGERY - DIRECT - NARDOZZI

1  them have a mechanism in them that causes them to

2  self-destruct at about 900 meters.

3  Q    What is the effect of that projectile?  What does it do

4  upon impact?

5  A    Well, there are several different type of projectiles.

6  One that we had demonstrated here was the shaped charge.

7  That's the most common one that you would see with this

8  launcher.  The shaped charge is capable of penetrating armor

9  anywhere from 30 millimeters to 100, depending on the

10  particular warhead, to about 150 millimeters of armor, which

11  is, if I do my conversion, around six inches of armor.

12          So a six-inch solid steel wall, this would blow a

13  hole through it.

14  Q    And based upon what you just said, would it also be

15  something that could help to stop or disable a vehicle?

16  A    Yes, it certainly would.

17  Q    All right.  You can put that down, sir.  Thank you.  You

18  can go back to the stand as well.

19          MR. NARDOZZI:  Your Honor, I ask to move into

20  evidence Government's Exhibit 217-76 and 217-78, the

21  photographs associated with the demonstratives.

22          MR. PURPURA:  No objection to the photos.

23          THE COURT:  Received.

24          (Government  Exhibits 217-76 and 217-78, were

25  received in evidence.)

KINGERY - DIRECT - NARDOZZI

1        THE COURT:  We'll take your mic back, sir.

2   BY MR. NARDOZZI:

3   Q    Okay.  Sir, I have one more set of questions for you for

4   a weapon that we don't have a demonstrative for.

5        Are you familiar with the 40-millimeter grenade

6   launcher?

7   A    Yes.

8   Q    Can you just tell us briefly what that is and how it

9   works?

10  A    Well, a 40-millimeter grenade launcher -- there is

11  actually several different models but they all work

12  identically.  They propel a grenade that's encased, looks like

13  a giant pistol cartridge, basically.  And they propel this or

14  launch this grenade at varying distances, depending upon the

15  power of the cartridge, and there are several different types

16  of warheads with this grenade, just like with the rocket on

17  the RPG-7.

18       When a grenade is launched, it rotates and that

19  sets, that rotating action sets the fuse inside the grenade.

20  Q    When you say a giant pistol cartridge, for the folks that

21  are not familiar, what shape is a pistol cartridge?

22  A    Let's see.  I don't really have a -- if I could draw it.

23  Basically it's a round-nosed projectile that's got straight,

24  flat sides.

25  Q    Would you agree -- that's very good.

KINGERY - DIRECT - NARDOZZI

1        Sir, I don't have any further questions for you.

2        THE COURT:  Any cross?

3        MR. PURPURA:  No questions.

4        THE COURT:  I have one question.

5        The grenade launcher, is that like one of those hawk

6    weapons with the huge cylinder?  Is that part of the --

7        THE WITNESS:  That's one model of the 40 millimeter,

8    yes, Your Honor.

9        THE COURT:  Thank you very much.

10       You may step down.

11       (Witness excused.)

12       THE COURT:  Does the government have next witness,

13   short or long?

14       MR. NARDOZZI:  Your Honor, in the spirit of the

15   season the government is out of witnesses.

16       THE COURT:  Oh.  Looks like you're going home a

17   little early, ladies and gentlemen.  Again, I'm sure you're

18   disappointed.

19       You know, the advice I've given you every night, I

20   know you know by heart, but I can't stress to you how

21   important it is, and I get concerned because it's kind of like

22   when people go on an airplane and the flight attendants show

23   them how to fasten their seat belts, and use their oxygen

24   masks, and anyone who has flown more than a few times, pretty

25   much stops listening because they think they know it and it's

PROCEEDINGS

1    when you think you know something that the danger is really

2    there.

3             So I thought before I send you home for the holiday,

4    I would give you a little context on why it's so important,

5    and the reason that we give you these directions.

6             The jury system evolved over time, kind of like the

7    way animals evolved.  But when it started back in about 900 in

8    England, every place was a small village.  And when people

9    were called to serve on the jury, they had -- in order to be

10   qualified for the jury, you had to know the defendant

11   personally.  Because the thinking was, well, who better to

12   judge the defendant than the people who know him personally.

13            Now, as cities got bigger, and that became

14   impossible, it changed completely to the system we have today

15   where we want the jurors to know nothing about the case, other

16   than what happens in the courtroom.  And that's why I make a

17   point of telling you and why it's in your very important oath

18   every day that you stay away from the media and you not

19   communicate about the case, and especially at this stage of

20   the case.  I'm certainly not going to threaten anyone with

21   consequences, because you've all been great.  You've been

22   paying close attention.  I know you're listening to me.

23   You're listening to the witnesses.  So I don't need to do

24   that, but I do want to emphasize there have been other cases

25   with less diligent juries where there have been consequences

PROCEEDINGS

1  to jurors for not following those very specific directions.

2          So again, media, stay away.  Conversations with

3  family, friends about the case, stay away.  Research about the

4  case, stay away.  This is not 900AD England where we want you

5  to go out and bring in your knowledge here.  We want you to

6  have only what we give you in here.  That's what our jury

7  system does today.

8          Other than that, for those of you who are

9  celebrating holidays, and I expect most or all of you are,

10 please enjoy them very much.

11         Our first day, remember back here, so there is no

12 confusion, is going to be a week from next Thursday.  That is

13 January 3rd, all right?

14         So everyone, please enjoy your holidays.  The

15 parties and I want to thank you so much for the riveting

16 attention that you've given all the testimony, and we know

17 you're going to do that when we come back to conclude the case

18 after the new year.  Thank you again.

19             (Jury exits courtroom.)

20             (In open court, jury not present.)

21         THE COURT:  Okay.  Have a seat for a minute.  Just a

22 couple of things I want to mention.

23         First, I think on the Monday we get back, it's not

24 too soon to suggest that the government may want to give me

25 some draft jury instructions.  I'm not going to insist on it

PROCEEDINGS

1     the day after New Years, but maybe by Friday of that week, if

2     not the following Monday.  My goal is to get the government's

3     proposed charge enough in advance of the end of the evidence

4     so that the defendant has a week to put in any response to it.

5     You know how your case is going, you can work out that timing

6     yourself.

7            I don't feel a need for anybody to give me the

8     boilerplate instructions, you know, the first part and third

9     part of the typical charge we give in this courthouse.  I am

10    interested in seeing CCE type instructions and what's proposed

11    for that.

12           The defendants typically don't give me a complete

13    counterproposal, they just give me particular things they want

14    or particular objections to the government's charge.  But you

15    can give me whatever you want.  That's entirely up to the

16    defense counsel.

17           The other thing is there was mention in one of the

18    government's letters about because the indictment has changed

19    form over time, given a redacted or renumbered version of the

20    indictment.  If I read the letter correctly, it suggested that

21    maybe my chambers would do that.  We're not doing that.  You

22    are going to do that.

23           MS. PARLOVECCHIO:  Yes.  We can do that, Your Honor.

24    It's not a problem.

25           THE COURT:  It's just the way you wrote it, it

PROCEEDINGS

1   sounded like, oh, Judge, you can do this.  Now I am thinking

2   you can do this.

3            MS. PARLOVECCHIO:  We'll be happy to do that.

4            THE COURT:  Okay.  Other than that, everyone have a

5   good holiday and I will see you January 3rd.

6            Something else, Ms. Parlovecchio?

7            MS. PARLOVECCHIO:  A housekeeping matter, Your

8   Honor.

9            THE COURT:  Okay.

10           MS. PARLOVECCHIO:  Just a few corrections to the

11   exhibit numbers that were put in the record.

12           THE COURT:  Go ahead.

13           MS. PARLOVECCHIO:  The first one is, I believe there

14   was 703-A6 that was put into evidence.  That is not correct.

15   The disk that was put into evidence is 703-A, as in apple.

16           Yesterday, there was on cross-examination of

17   Mr. Flores, the defense used a disk which we had incorrectly

18   given them the wrong exhibit number.  It's actually

19   Government's Exhibit 705-C, that was the Rolling Stone clip,

20   and the clip began at 9:28.

21           Then we also have a supplemental stipulation to read

22   into evidence.

23           THE COURT:  Not now.

24           MS. PARLOVECCHIO:  Or which we can --

25           THE COURT:  With the jury, right?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1          MS. PARLOVECCHIO:  We can put it in front of the

2     jury.  That's fine.

3          THE COURT:  Right?  Doesn't it have to be in front

4     of the jury.

5          MS. PARLOVECCHIO:  Yeah, we should do it in front of

6     the jury.  So we'll do it when we come back --

7          THE COURT:  That's fine.

8          MS. PARLOVECCHIO:  -- two weeks from today.

9          THE COURT:  Anything from the defense?

10         MR. PURPURA:  No, thank you, Your Honor.

11         THE COURT:  Okay.  Good holiday, everyone.

12         MS. PARLOVECCHIO:  Happy holidays.

13         MR. PURPURA:  Thank you.

14         (Whereupon, the trial adjourned at 3:00 p.m. to

15    resume Thursday, January 3, 2019 at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                              PAGE

3    YEISON TAPASCO SUAREZ

4    DIRECT EXAMINATION      BY MS. GOLDBARG    3784

5    CROSS-EXAMINATION       BY MR. LICHTMAN    3802

6
     SAMUEL SAUL SUAREZ SARMIENTO
7
     DIRECT EXAMINATION      BY MS. GOLDBARG    3810
8

9    HUMBERTO VELASQUEZ ARDILA

10   DIRECT EXAMINATION      BY MR. FELS        3823

11   CROSS-EXAMINATION       BY MR. LICHTMAN    3831

12
     MAURICO VEGA GOMEZ
13
     DIRECT EXAMINATION      BY MR. FELS        3835
14

15   JOHN HINCAPIE

16   DIRECT EXAMINATION      BY MR. FELS        3846

17   CROSS-EXAMINATION       BY MR. LICHTMAN    3858

18   REDIRECT EXAMINATION    BY MR. FELS        3859

19
     RAUL LOZANO
20
     DIRECT EXAMINATION                         3862
21                          BY MS. PARLOVECCHIO

22   CURTIS WILLIAMS

23   DIRECT EXAMINATION                         3870
                             BY MS. PARLOVECCHIO
24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

1   MAX MASON KINGERY

2   DIRECT EXAMINATION   BY MR. NARDOZZI   3885

3            E X H I B I T S

4   GOVERNMENT         PAGE

| GOVERNMENT | PAGE |
|---|---|
| 210-4 through 26 | 3787 |
| 606-K and 606-L | 3856 |
| 606-H | 3857 |
| 217-10 through 217-12 | 3866 |
| 217-1 to 217-6, 217-19 | 3874 |
| 217-68 | 3876 |
| 217-20 to 217-60 | 3878 |
| 217-61 to 217-67 | 3880 |
| 217-16 | 3881 |
| 109 | 3883 |
| 71 | 3883 |
| 210-2 | 3819 |
| 801 | 3828 |
| 606-I | 3855 |
| 3500-MMK-6 | 3894 |
| 217-76 and 217-78 | 3913 |