5149

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   -------------------------------x
                                        09-CR-00466(BMC)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5            -against-                  January 15, 2019
                                        9:30 a.m.
6   JOAQUIN ARCHIVALDO GUZMAN LOERA,

7            Defendant.

8   -------------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                BEFORE THE HONORABLE BRIAN M. COGAN
10                 UNITED STATES DISTRICT JUDGE
                          BEFORE A JURY

11

12  APPEARANCES

13  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
14                             271 Cadman Plaza East
                               Brooklyn, New York 11201
15                             BY:  GINA M. PARLOVECCHIO, AUSA
                                    ANDREA GOLDBARG, AUSA
16                                  MICHAEL ROBOTTI, AUSA

17                             UNITED STATES ATTORNEY'S OFFICE
                               Southern District of Florida
18                             99 NE 4th Street
                               Miami, Florida 33132
19                             BY:  ADAM S. FELS, AUSA

20                             DEPARTMENT OF JUSTICE
                               Criminal Division
21                             Narcotic and Dangerous Drug Section
                               145 N. Street N.E. Suite 300
22                             Washington, D.C. 20530
                               BY:  ANTHONY NARDOZZI, ESQ.
23                                  AMANDA LISKAMM, ESQ.

24
    (CONTINUED FOLLOWING PAGE)
25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

```
 1    (APPEARANCES CONTINUED)

 2

 3

      For the Defendant:        BALAREZO LAW
 4                              400 Seventh Street, NW
                                Washington, D.C. 20004
 5                              BY:  A. EDUARDO BALAREZO, ESQ.

 6                              LAW OFFICES OF JEFFREY LICHTMAN
                                11 East 44th Street, Suite 501
 7                              New York, New York 10017
                                BY:  JEFFREY H. LICHTMAN, ESQ.
 8                                   PAUL R. TOWNSEND, ESQ.

 9                              LAW OFFICE OF PURPURA & PURPURA
                                8 E. Mulberry Street
10                              Baltimore, Maryland 21202
                                BY:  WILLIAM B. PURPURA, ESQ.

11
                                LAW OFFICES OF MICHAEL LAMBERT, ESQ.
12                              369 Lexington Avenue, PMB #229
                                New York, New York 10017
13                              BY:  MARIEL COLON MIRO, ESQ.

14

15

16

17

18

19    Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
                                Phone:  (718)804-2777
20                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com
21

22

23    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
24

25
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1          (In open court; jury not present.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Good morning.  Let's have the jury,

4     please.

5          (Jury enters courtroom.)

6          THE COURT:  Everyone be seated.

7          Good morning, ladies and gentlemen.  We'll finish up

8     with direct examination this morning.

9          Ms. Parlovecchio.

10         MS. PARLOVECCHIO:  Thank you, Your Honor.

11    HILDEBRANDO ALEXANDER CIFUENTES VILLA, resumed as a witness,

12    having been previously duly sworn/affirmed, was examined and

13    testified further as follows:

14    DIRECT EXAMINATION (Continued)

15    BY MS. PARLOVECCHIO:

16    Q    Good morning, Mr. Cifuentes.

17    A    Very good morning to you.

18    Q    I want to direct your attention to mid-2011.  Where were

19    you staying at that time?

20    A    Cabo San Lucas, Mexico.

21    Q    Were you in contact with the defendant while you were

22    living there?

23    A    Yes, ma'am.

24    Q    How were you communicating with him at that time?

25    A    Through Blackberry.

5152

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    Q    Did there come a time when the defendant sent someone to

2    see you in Cabo San Lucas?

3    A    That's right.

4    Q    Who did he send to see you?

5    A    He sent me his cousin Virgo.

6    Q    What happened when Virgo came to see you in Cabo San

7    Lucas?

8    A    Well, I invited him out to lunch.

9                THE INTERPRETER:  Interpreter correction.

10   A    I invited him to lunch at the apartment where I was

11   staying.  I said that I had left Culiacan because I had felt

12   neglected by Licensiado Damaso, that I had almost been

13   arrested at the house where I had been staying.  And that I

14   had decided to take care of myself on my own.  And so I had

15   moved to Los Cabos, which is a calmer city than Culiacan.

16   Q    What, if anything, did Virgo say to you about Cabo San

17   Lucas?

18   A    He said that it was a very calm, serene town, and that

19   they were even trying to take Joaquin to Los Cabos because it

20   was becoming very expensive to keep him in Culiacan.

21   Q    What did you understand Virgo to mean when he said it was

22   becoming expensive to keep Joaquin in Culiacan?

23   A    Because of the bribes to the police that were looking for

24   Joaquin in Culiacan, it was very hot over there at the time.

25   Q    Now, did the defendant ever come to Cabo San Lucas?

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    A    Yes, eventually he went to visit me in Los Cabos.

2    Q    Approximately when was that?

3    A    In 2011.

4    Q    Approximately when in 2011?

5    A    Like mid to late time of the year.

6    Q    Where, if at all, did he come to see you?

7              THE INTERPRETER:  I'm sorry, can you repeat?

8    Q    Where, if at all, did he come to see you?

9    A    In the neighborhood of Pedregal in Cabo San Lucas at an

10   apartment that I had rented after having rented a previous

11   apartment where I had seen Virgo.

12   Q    Now, when the defendant came to see you, was he by

13   himself or was he with someone else?

14   A    He was with someone.

15   Q    Who was he with?

16   A    With one of his secretaries.

17   Q    Which one?

18   A    Condor.

19   Q    Now, you testified yesterday that the defendant wore

20   camouflage in the mountains.  What did you see him wear when

21   he was in Cabo San Lucas?

22   A    Well, Joaquin, by that time, was wearing casual clothing;

23   sneakers, jeans, a long-sleeve shirt, striped, sunglasses and

24   a black baseball cap.

25   Q    Did you ever see the defendant personally carry anything

5154

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1  with him while he was in Cabo San Lucas?

2  A    Yes, he was always carrying around the little bag where

3  all the grenades for all the weapons were in.

4  Q    What color was the bag?

5  A    Black.

6  Q    Now, I want to direct your attention to February 2012.

7  What happened in Cabo San Lucas around that time?

8  A    In Cabo San Lucas on that day Joaquin was almost

9  arrested.

10  Q    Now, can you please describe what happened on the day

11  that the defendant was almost arrested in Cabo San Lucas?

12  A    Well, that was at the time where the G20 was in the city

13  of Los Cabos.  There was a lot of security, from Mexico, from

14  the U.S.  The city was being heavily guarded.

15        Joaquin insisted that he wanted to see me on that

16  day.  I told him that I wanted to wait for my wife to get

17  there so she could tell me what the road was looking like

18  before I could give him the green light, because the city was

19  heavily guarded.

20        He then wrote to me on the Blackberry and said that

21  he had gone through a checkpoint and what should he do.  He

22  asked whether he would come to the house where I was, or he

23  should go somewhere else.

24        And I told him to go elsewhere, that he shouldn't

25  come close to there.  He was going to bring all the heat on

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5155

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1  me.  Either way, I had the gate in the condo where I was

2  staying open, just in case he arrived like in an emergency

3  fashion.

4  Q    Now, during this period, did you see which vehicles the

5  defendant used to travel around while he was in Cabo San

6  Lucas?

7  A    Yes.

8  Q    What did you see him travel in?

9  A    Don Joaquin always traveled in a golden Suburban, with

10 tinted windows, normal tires.  It wasn't a car that called a

11 lot of attention to itself.

12 Q    Now, what happened after you left the back gate open at

13 your condominium?

14 A    That was like in the afternoon at dusk.  I lost

15 communication with him for a little while.  Then army

16 helicopters for the Mexican army started flying overhead.

17 Black, Black Hawks.

18       They were coming from the ocean side and they were

19 shining spotlights on the beach.  And from the other side,

20 there were others that were shining spotlights from the San

21 Jose del Cabo area towards Cabo San Lucas.

22 Q    Did you eventually hear from the defendant again?

23 A    Yes.

24 Q    Approximately what time of day was that?

25 A    Like an hour and a half later.

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    Q    What time of day was that?

2    A    It was nighttime by then.  He told me that he had arrived

3    at his house and that he had arrived safely.

4    Q    Now, when he said -- when the defendant told you that he

5    had arrived safely at his house, what did you understand him

6    to mean?

7    A    That he had arrived in Culiacan.

8    Q    Now, did you say anything to the defendant about the fact

9    that you saw Black Hawk helicopters?

10   A    Yes, I told him he had left a big ruckus in the city.

11   What was I to do now?  He told me to go into a sewage area.

12   Q    Now, what did you do once you started to see the

13   helicopters circling the city?

14   A    Well, I went into the house.  I closed the storm -- the

15   hurricane windows and the hurricane curtains, and I turned the

16   lights off so that it would look like there was no one there.

17   Q    Why did you do that?

18   A    To hide.  In case they suddenly were coming after me as

19   well.

20   Q    Now, aside from the defendant, did you contact anyone

21   when you thought that you might be captured by law

22   enforcement?

23   A    Yes.

24   Q    Who did you contact?

25   A    On my encrypted iPhone that I had, I called my mom.  I

5157

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    told her that there was a -- the possibility that I was going

2    to be arrested very soon because there was a big problem in

3    the city.  I told her what had happened.

4    Q    What --

5    A    I told her that if I didn't call her again, it would be

6    because I would have been arrested.

7    Q    Why did you use your phone if you thought you might be

8    captured by law enforcement?

9    A    I thought that iPhone was encrypted and, according to

10   Cristian, he had fixed it so that it wouldn't give away my

11   location.

12   Q    Mr. Cifuentes, I'm going to show you what's in evidence

13   as Government's Exhibit 603E.  Do you recognize this?

14   A    Yes.

15   Q    What do you recognize it to be?

16   A    My initials and the date that I wrote.

17   Q    And which date was that?

18   A    January 4th, 2019.

19   Q    And did you have an opportunity to review the calls on

20   this disk prior to coming to court today?

21   A    Yes, ma'am.

22   Q    I'm going to play an audio clip for you from this disk.

23            MS. PARLOVECCHIO:  And I want to direct the jury's

24   attention to the transcript in evidence as Government's

25   Exhibit 603D, as in David-5T.  That's also for the witness.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1              And the call we'll be playing is 603E-5.  And we'll

2    be starting at 10 seconds, which is paragraph 6 in the

3    transcript.

4    Q    Now, before we start, Mr. Cifuentes, can you just tell

5    the jury what the date is on the first page of the transcript

6    here, 603D-5T?

7    A    February 23rd, 2012.

8    Q    Now, we'll start the call.

9              MR. LICHTMAN:  Can you turn up the volume?

10             THE COURT:  It's not on yet.

11             MS. PARLOVECCHIO:  Waiting in anticipation.

12             MR. BALAREZO:  Objection.

13             THE COURT:  Did you object?

14             MR. BALAREZO:  To the silence.

15             THE COURT:  Sustained.

16             How are we doing?

17             THE COURTROOM DEPUTY:  We're good.

18             THE COURT:  Okay.  Good.

19             (Audiotape played.)

20             (Audiotape stopped.)

21   BY MS. PARLOVECCHIO:

22   Q    Mr. Cifuentes, who are the speakers on this call?

23   A    My mother and me.

24   Q    And generally, what are you and your mother discussing on

25   this clip of audio?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1   A    I was telling her that some helicopters were there, using

2   the word "sancudos."  And I said that my friend, referring to

3   my Padrino Joaquin, had been able to leave already.  And

4   that -- but that he had left a big ruckus there in the city

5   and then they were raiding places all over the city.

6   Q    Now, I just want to direct your attention to the

7   transcript for this call.  I first want to direct your

8   attention to paragraph 10 where you say, I'm calling you for

9   the following reason:  Ah, the mosquitoes or los sancudos.

10        And again in paragraph 21, where you say, The

11   mosquitoes have already arrived where I am and... What are you

12   saying there?

13   A    Helicopters.

14   Q    Now, directing your attention to paragraph 35 of the

15   transcript, where your mother asks, Well, do you have any

16   company or are you alone?

17        And you respond, alone, alone.  But while

18   unexpectedly, the other one rushed to see me.  I warned him

19   not to come over, the friend.

20        What are you saying there?

21   A    I'm telling her that, unexpectedly, Joaquin rushed over

22   to see me, which I had warned him not to do.  I told him many

23   times, I said the G20 was there.  There was a lot of security

24   in the city, it was not a good idea to see each other on those

25   days.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5160

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1  Q    Now, I want to direct your attention to paragraphs 39

2  through 41 of the transcript.  In 39 you say, And the friend.

3  And picking up in 41, paragraph 41 rather, Managed to get to

4  his house and, anyway, they left.  They left all of that on

5  board here and a lot of have arrived already.  So we'll no,

6  there isn't -- there is no way, and that's still going on

7  right now.

8           What are you saying there?

9  A    I'm saying that Joaquin was able to go home to his house,

10 meaning Culiacan, but that he had still left a big ruckus in

11 the city and that federal police had arrived as support in Los

12 Cabos.  There were planes coming from Mexico City, where they

13 were going to search the entire city, house by house, looking

14 for him.

15 Q    Now, did you later learn what happened at the defendant's

16 house in Los Cabos?

17 A    Yes.

18 Q    How did you learn about it?

19 A    Well, when I was already back in Culiacan later on, the

20 maid, Dona Mary, told me that they had a house in San Jose del

21 Cabo, and that -- and that they actually showed up there, but

22 what happened was that Joaquin just left as, you know, he was

23 in his own house.  He got in his car and he left and they

24 didn't find him.

25 Q    Now, when you say they came to the house, what are you

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5161

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    referring to?

2    A    The army.

3    Q    Now, I want to show you what's in evidence as

4    Government's Exhibit 70.  Can you just remind the jury who

5    this is?

6    A    That's Dona Mary.

7    Q    And is she the one who told you about what happened at

8    the Cabo house?

9    A    Yes.  In fact, she had been arrested and she was arrested

10   for two months because of that event.

11   Q    Now, you testified earlier that the last time you spoke

12   to Cristian was in 2012, meaning Cristian, the IT engineer.

13   A    That's right.

14   Q    After Cristian stopped working for the defendant in 2012,

15   were there any different communication structures that the

16   defendant used?

17   A    Yes.

18   Q    How do you know about this system?

19   A    Joaquin took away my Blackberry, the one that I would

20   regularly use, and he gave me another one.  And he explained

21   to me that the work was now through cloned Blackberrys and

22   through filters, meaning through people who were filters, so

23   that we didn't have to get in touch with people directly

24   because those people could then give information to the police

25   through all the pins.

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    Q    So how would the system, these filters, work, briefly?

2    A    Okay.  So I have a Blackberry, which is a cloned

3    Blackberry, which is the copy of a -- the original Blackberry,

4    which is in the hands of a secretary.  I would only then have

5    exclusive communication with the secretary.  And that

6    secretary had my contacts, either mine or whatever contacts

7    Joaquin may have had, and I would then type a message for my

8    contacts through -- to -- for each of my contacts, which he

9    would have then in the Blackberrys he had.  And the secretary

10   would then type the messages, or take a picture of my text

11   message, and send it to the other Blackberry.

12   Q    Now, just to be clear, did you ever use this system?

13   A    Yes.

14   Q    I want to show you what's in evidence as Government's

15   Exhibit 604H-6T.  Do you recognize this message?

16   A    Yes.

17   Q    And what system is this message on -- from?

18   A    On the last system that we were working with Joaquin.

19   Q    Now, who are the participants in this conversation?

20   A    In this conversation you have Andrea, my secretary,

21   Office 7, which belonged to Joaquin.

22   Q    Now, who -- you said one of the participants is Andrea.

23   Who is using Empera as a screen name?

24   A    Andrea Velez Fernandez.

25   Q    Then Office 7 is who?

5163

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    A    That is Mr. Joaquin Guzman Loera's office.

2    Q    Now, why is Andrea addressing this message to Padrino?

3    A    Because that message is for him to read it.

4    Q    Now, directing your attention further down the page to

5    paragraph 6, where Andrea says, Misterios sends his regards.

6    He is asking if you have a taxi so he can send it to you.

7             What do you understand that to mean?

8    A    Misterios was a friend of Andrea's who had already worked

9    with Joaquin Guzman Loera and with Mr. Damaso Lopez, and is

10   asking if they had a plane, and that's the word taxi.

11   Q    In paragraph 8, Office 7 responds, Tell Misterios that

12   there is a plane that can carry 450 kilos.  So he needs to get

13   a pilot and go pick that up.  We'll bring those first 1,000 up

14   in two or three trips.

15            What does that mean?

16   A    It is Mr. Misterios' answer saying that there was a

17   plane, a small plane, for 450 kilos.

18   Q    Is Misterios --

19   A    And that for Mr. Misterios to go find a pilot and to go

20   and pick up that merchandise, and that in two or three runs he

21   could then pick up those 1,000 kilos.

22   Q    Now, I want to direct your attention to paragraph 15 of

23   the same message, where Office 7 says, Girlfriend, ask the guy

24   with the weapons for details regarding what he has, and if he

25   can get me an RPGF7, with bullets and some that are called MGL

ALEXANDER CIFUENTES – DIRECT – PARLOVECCHIO

1  40 millimeters and some others called minimi.

2           What do you understand that to mean?

3  A    We're asking about the weapons and she was introducing a

4  person from Mexico City Leticia, and to ask her if she had

5  RPG7s with bullets, and other weapons that are called MGL 40

6  millimeters, and some machine guns which are called minimi.

7  Q    Now, you mentioned that the defendant had been working

8  with somebody named Misterios, who is referenced in this

9  message.  Did you ever try to do business with Misterios?

10  A    Yeah, that's right.

11  Q    And on whose behalf were you doing that?

12  A    On Mr. Joaquin Guzman's behalf.

13  Q    During what period of time were you trying to do business

14  with Misterios?

15  A    I would say it was beginning 2012.

16  Q    And did you have any conversations with Misterios prior

17  to the 2013 conversation I just showed you?

18  A    Yes.

19  Q    And how did you communicate with him?

20  A    Well, we had communication through Blackberry.  I made an

21  appointment with his brother, Chicki and with his partner, La

22  Mula in Cabo San Lucas.

23  Q    Approximately when was that?

24  A    That was in 2012.

25  Q    And did you speak with Misterios prior and his brother

5165

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1   prior to 2012?

2   A    I think so.

3   Q    I want to show you what's in evidence as Government's

4   Exhibit 605C-3T, 605C-4T, 605C-5T and 605C-6T.

5            Now, what are we looking at here?

6   A    We are looking at some messages that I had with Misterios

7   through the encrypted Blackberrys that Cristian had prepared

8   for us.

9   Q    So -- and the date of this message?

10  A    Yes, it says September 5th, 2011.

11  Q    And who are the participants in this conversation?

12  A    It's me, and Andrea Velez Fernandez has the other

13  Blackberry.

14  Q    Just to be clear, who is the participant using the number

15  111?

16  A    That's Andrea Velez Fernandez.

17  Q    And the participant using 333?

18  A    That's me.

19  Q    So Andrea says, hello, Super Avi.  I am with Mystery's

20  brother.

21            What is Andrea saying there?

22  A    She's greeting me and she's telling me that she's with

23  Misterios' brother.

24  Q    Next, on the same date at 10:17 p.m., you say, Hello.

25  Basically I need to know the following:  Is Belize a good

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    place to arrive?  How many meters do you need?  Runway?  I

2    have two airplanes, modified small ones that fly 10 and a half

3    hours each.  Each and hold from 450 to 500K.  We could send

4    them there to do the pickup.

5                What are you saying there?

6    A    Well, what it says.

7    Q    And are you trying to arrange a shipment with Misterios'

8    brother there?

9    A    That's right.

10   Q    What type of transaction?

11   A    It's a cocaine transaction.

12   Q    Now, finally, I'm showing you another message from the

13   same day, at 10:31 p.m., where you say, Tell your brother that

14   the deal is directly with me and with Chapo, and so we can do

15   it on a consistent basis.

16                What are you telling Misterios' brother there?

17   A    I'm telling Misterios' brother that it's directly with me

18   and with Mr. Joaquin Guzman, because they had had a previous

19   problem with Damaso and they did not want to work with Damaso

20   directly.  They just wanted to work with me.

21   Q    Now, why did you refer to the defendant so explicitly in

22   this message instead of using a code?

23   A    Well, supposedly, the Blackberry had been encrypted.

24   Misterios didn't know him by any other name.

25   Q    Now, you testified that you met with Misterios' brother

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1   and somebody named La Mula in Cabo San Lucas.  Where did you

2   have that meeting?

3   A    That was at the ME Hotel in Cabo San Lucas.

4   Q    Did you tell the defendant that you had met with

5   Misterios' brother in Cabo San Lucas?

6   A    With his partner, of course, because there were some

7   technical questions that Joaquin could be the only one to

8   answer.

9   Q    What did you tell the defendant about your meeting with

10  Misterios' brother and his associate?

11  A    Well, the guys wanted to know what was the percentage

12  that they would charge for the arrival.  And Don Joaquin sent

13  a message that he would charge 13 percent.

14  Q    Mr. Cifuentes, did you participate in any drug-related

15  kidnappings when you were working for the defendant?

16  A    Yes.

17  Q    Are you aware of a kidnapping involving someone named

18  Tatiana?

19  A    Yes.

20  Q    Who is Tatiana?

21  A    Tatiana was a woman who lived in Panama.  She was

22  partners with my sister-in-law, Patricia Rodriguez.  We were

23  going to carry out the purchase of some drugs in Panama, and

24  some money was sent for that purchase to be done.  The

25  negotiation wasn't done.  It wasn't clear and the money was

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1   not returned to Mr. Joaquin.

2           So at the first chance when the woman went to

3   Culiacan, she was retained so that she would make the payment.

4   Q    So how much money was sent to Tatiana that was not

5   returned?

6   A    It was approximately $300,000.

7   Q    And you said that she was retained.  What do you mean by

8   that?

9   A    We kidnapped her.

10  Q    And briefly can you tell the jury what happened when she

11  was -- Tatiana was kidnapped.

12  A    Yes, when the woman arrived in the city, Joaquin's chief

13  of security, Fantasma, retained her, her husband and a third

14  person who came with them.  They took them to a house and they

15  let one of them go so that person could go get the money.

16  Q    How did you know this was happening?

17  A    I was with Mr. Joaquin Guzman, by his side.

18  Q    Now, was Tatiana, her husband and the third person

19  eventually released?

20  A    Yes, when we spoke to my sister-in-law, she called and

21  she was very mad.  She asked why we had tied up this woman.

22  She said she would have to talk to her Godfather, Lobo

23  Valencia.  Don Joaquin said, good, I'm glad at least they have

24  a Godfather so they can pay what they owe.

25  Q    And was the defendant paid what he was owed?

5169

ALEXANDER CIFUENTES – DIRECT – PARLOVECCHIO

1   A    That's right.

2   Q    Were you involved in another drug-related kidnapping

3   after that?

4   A    That's right.

5   Q    Which one was that?

6   A    Captain Telmo Castro.

7   Q    Approximately when did that happen?

8   A    The beginning of 2013.

9   Q    Who gave the order for the kidnapping on this occasion?

10  A    Joaquin Guzman Loera asked me for it.

11  Q    Why did the defendant ask you to kidnap Telmo Castro?

12            MR. LICHTMAN:  Objection.

13            THE COURT:  Sustained.  Form.

14  BY MS. PARLOVECCHIO:

15  Q    For what purpose did the defendant ask you to kidnap

16  Telmo Castro?

17            MR. LICHTMAN:  Objection.

18            THE COURT:  Sustained.

19  BY MS. PARLOVECCHIO:

20  Q    What did the defendant tell you about the kidnapping of

21  Telmo Castro?

22  A    He told me that that friend had stolen some money

23  belonging to a friend of his and he also had some

24  inconsistencies with us as well and he was starting to hide.

25  So he asked me to help him locate him so he could collect what

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5170

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1   did not belong to him.

2   Q    So what did you do as a result?

3   A    I asked my friend Andrea for the favor to place him in a

4   place where the person who Joaquin had working in Ecuador

5   asked.

6   Q    And what happened next?

7   A    They agreed to meet up in that location and he was

8   kidnapped.

9   Q    Now, just to be clear, did you tell Andrea Velez that the

10  kidnapping was going to occur at that place?

11  A    No.

12  Q    I want to show you what's in evidence as Government's

13  Exhibits 604H-16T and 604H-19T.  What are we looking at here

14  generally?

15  A    It's a Blackberry message of mine with Andrea.

16  Q    And just to be clear, what is the date on this Blackberry

17  message?

18  A    March 12th, 2013.

19  Q    And you said it's a message between you and Andrea.  Who

20  is using the screen name Empera?

21  A    Andrea Velez Fernandez.

22  Q    And you're using the other screen name?

23  A    That's me.

24  Q    I want to direct your attention to paragraph 35 of this

25  Blackberry message where Andrea says, What do I tell Caba if

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1    he asks about Capi?

2              What is Capi a reference to?

3    A    Caba means caballero, gentleman.  She's asking me what to

4    tell Mr. Caballero if he asks about Capi, because Capi was

5    already kidnapped at that time.  Because the idea was also to

6    kidnap caballero at that time because he had stolen a thousand

7    kilos of cocaine from Mr. Guzman and to collect from him.

8    Q    I want to direct your attention later in that message to

9    paragraphs 56 through 61, where Andrea says, Tell the office

10   to add me, because I deleted them out of the damn fear.

11             What do you understand her to mean there?

12   A    Well, Andrea when the kidnapping occurred, she was right

13   next to the captain when the people came in to tie him up and

14   take him.  So what she did was she eliminated every contact

15   she had in her Blackberry and she eliminated every contact

16   that she had in her Blackberry and she eliminated Joaquin's

17   office.

18   Q    And then you say, I'll tell them should I give them this

19   PIN?

20             What are you saying there?

21   A    That I'm going to report that to Joaquin's office, and

22   I'm asking if I should give him this PIN here, or which one I

23   should give him.

24   Q    Now, let's look at Government's Exhibit 604H-19T.  Is

25   this the same date as the previous message?

5172

ALEXANDER CIFUENTES - DIRECT - PARLOVECCHIO

1   A    That's right.

2   Q    Who are the participants in this message?

3   A    It's Andrea and Office 4, which belongs to Joaquin Guzman

4   Loera.

5   Q    And directing your attention to paragraph 2 here where

6   Andrea says, I deleted them for safety reasons.

7            Is she referring to what she said in the previous

8   message about deleting the PIN?

9   A    That's right.

10  Q    And then Office 4 responds, My friend, please talk to

11  Serpa because Capi says that he did not receive certain money

12  from Mexico.

13           What do you understand that to mean?

14  A    Serpa is interrogating the captain at that time and the

15  captain is not acknowledging money that Andrea had delivered

16  to him in Mexico.

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

5173

Alexander Cifuentes Villa – Direct/Parlovecchio

1          (In open court.)

2    DIRECT EXAMINATION

3    BY MS. PARLOVECCHIO (continuing):

4    Q    Now, I direct your attention further down the page to

5    paragraph six.

6          Just generally, what is Andrea describing in this

7    part of the message?

8          MR. LICHTMAN:  Objection, to what Andrea is

9    describing.

10         THE COURT:  Well, I think it's implicit that she is

11   asking the witness what his understanding is of what she is

12   describing.  He can give his understanding.

13   Q    What is your understanding of what Andrea is describing

14   here?

15   A    She is giving all the details of what happened during

16   Telmo's kidnapping.

17   Q    I'm not going to read the entire message, but I'm just

18   going to read briefly part of what she says here.  The

19   representative summoned me and Capi to the restaurant.

20   Fifteen minutes later a narcotics operative arrived.

21         This narcotics operative she is referring to, what

22   did you understand that to mean?

23   A    The people who kidnapped Telmo, the people that Joaquin

24   had sent to be precise, it was Serpa's people.

25   Q    Does Serpa have another nickname?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Direct/Parlovecchio

1   A    No -- oh, El Delgado.

2   Q    Now, she next says, Capi and I were alone at one table

3   and his employees were at two others.  Capi was saying that

4   they were not police, and he resisted.  They dragged him out,

5   and it was a big show at the restaurant.  I was looking at his

6   workers to see if they would react but they didn't have time.

7        What do you understand that to mean?

8   A    When they were sitting at the able the antinarcotics

9   operative arrived and the captain recognized that they were

10  not police, and he resisted.

11  Q    Briefly, what happened after the defendant had Telmo

12  kidnapped by Serpa?

13  A    Joaquin had one day told me, Look, Capi kept saying the

14  whole time that he had no money and we had been able to take

15  away from him a hotel that he had in Central America.  I don't

16  remember if it was in Honduras or Guatemala.

17  Q    Was Telmo released after the defendant collected money

18  from him?

19  A    What I found out later was that Telmo was arrested when

20  he was getting on a small plane belonging to Joaquin with

21  300,000 -- 300 kilos of coke and also the tombstone for the

22  pilot who had crashed earlier on, taking some money to

23  Ecuador, Solis.

24  Q    You testified yesterday that there were problems in

25  Ecuador with Telmo in 2012.

5175

Alexander Cifuentes Villa — Direct/Parlovecchio

1          Did there come a time that the defendant sent you

2    down to Ecuador?

3    A    That's right.

4    Q    How did you plan to get to Ecuador?

5    A    Joaquin organized the trip.  I did it by sea.

6    Q    How were you going to get there by sea?

7    A    Well, we went on a boat that fit six people, and we were

8    going on our way to Ecuador.

9    Q    Where did you plan to depart for Ecuador?

10   A    From Mazatlan, Sinaloa.

11   Q    Approximately when was that?

12   A    That was in October 2012.

13   Q    What, if anything, did you have with you when you arrived

14   in Mazatlan?

15   A    I had a million $50,000 in an ice box that I had.

16   Q    Who gave you that $1,050,000?

17   A    On Joaquin's behalf the person who delivered it to me was

18   his right-hand man at the time, 50.

19   Q    Who met you when you arrived in Mazatlan?

20   A    That night I was met by Popeye.

21   Q    Who is Popeye?

22   A    One of the VIP people in charge of security in Mazatlan.

23   Q    Did you ever make it to Ecuador?

24   A    No.

25   Q    Why not?

5176

Alexander Cifuentes Villa - Direct/Parlovecchio

1    A    We broke down near Costa Rica.

2    Q    Who is "We"?

3    A    The crew and myself, and the U.S. Coast Guard rescued us.

4    Q    Now, who, if anyone, did you call when you saw the coast

5    guard approaching?

6    A    Yes.  Since we were -- brought with us a satellite

7    antenna for data, so we had direct contact with Joaquin and

8    with his secretary Condor.  So we reported to him what was

9    going on.  We even sent him photographs of the helicopters

10   that were approaching.  After that we dumped all of our

11   communications.

12        We started to speed up in the boat, going north; and

13   we started to dump everything we had on us, including the

14   money.

15   Q    Who was on the boat with you when the coast guard was

16   approaching?

17   A    There were two tuna boat captains; there was a mechanic;

18   there were two of Joaquin's bodyguards, Doce, 12, and Tango;

19   and myself.

20   Q    You said the U.S. Coast Guard saved you.

21        Did you end up under arrest?

22   A    No.  There were no charges against us.

23   Q    Did they detain you?

24   A    They kept us for 19 days, and they transferred us to

25   several ships.  Then they delivered us to the Mexican coast

Alexander Cifuentes Villa - Direct/Parlovecchio

1    guard.  The ships actually met up in the water, and we were

2    transferred and we were taken to Mexico.

3    Q    Mexico City or Mexico the country?

4    A    That was actually Puerto Madero, Chiapas.  We were kept

5    at the public ministry for 48 hours.  Thanks to Don Joaquin

6    and Mayo Zambada, who had made some arrangements, we were

7    released.

8    Q    What types of arrangements?

9    A    Bribes.

10   Q    To be clear, when you were detained by the U.S. Coast

11   Guard did you give your real name?

12   A    No.

13   Q    What name did you give?

14   A    Enrique Rodriguez Garcia.

15   Q    Now, when you were released from Mexican custody, where

16   did you go?

17   A    To Culiacan.

18   Q    Where in Culiacan did you go?

19   A    Joaquin assigned me a house, and one of his workers,

20   Ranas, brought me there.

21   Q    Can you describe the house that Ranas took you to in

22   Culiacan?

23   A    Yes.  It was like a mid-class house, three rooms, and the

24   main -- the master bedroom had a full bath; and Ranas actually

25   showed me it had a tunnel in case I needed to escape.

5178

Alexander Cifuentes Villa – Direct/Parlovecchio

1   Q    Can you describe this tunnel that was in the master

2   bathroom?

3   A    Yes, of course.  As you go into -- as you go into the

4   bathroom, on the left-hand side you have the sink.  Actually,

5   excuse me, it's on the right-hand side that you have the sink.

6   Then you have the toilet.  Right in front of it you have a

7   bath tub, and it's got like a stall and you have like a door

8   that's a sliding door.

9        And Ranas explained to me that in order to open,

10  what you have to lift up the bathtub and you had to plug in a

11  sensor to the outlet, the electricity.  Right behind the

12  mirror on the right-hand side you could press a button, and

13  the bathtub would pretty much open up quickly as if it were

14  the trunk of a car, and then with your fingertips you could

15  then lift up the bathtub; and it had some very thin black

16  shock absorbers, the long ones, so you could actually open it

17  widely.

18       And right immediately after that you could see some

19  wooden steps, a flashlight, and a long way that takes you to

20  the sewers of the city.  It's about a mile long, something

21  like that.  The house also had like a closed circuit camera

22  system that monitors it.

23  Q    I want to ask you more questions about the tub.

24  A    Yes.

25  Q    When you lifted up the tub, what color was the underside

MICHELE NARDONE, CSR -- Official Court Reporter

5179

Alexander Cifuentes Villa - Direct/Parlovecchio

1    of the tub?

2    A    I think it was like burgundy.

3    Q    Now, you testified that you saw security cameras in the

4    house.

5    A    Yes.

6    Q    What types of security cameras?

7    A    There were some cameras that were connected to a circuit,

8    and they were in the external areas of the house.  There was

9    another one that was focused on the kitchen.

10            And you had monitors that show you what you could

11    see from the cameras, and the monitors were in the garage, the

12    kitchen, and the master bedroom.

13    Q    After you came back to Culiacan, did you talk to the

14    defendant about your arrest by the coast guard?

15    A    Yes.  He came to visit me at the house.

16    Q    What did he say about it?

17    A    After I told them the entire story, he told me that I had

18    been born again.

19    Q    Now, did you only stay at one house in Culiacan, or did

20    you stay at more than one?

21    A    In more than one.

22    Q    I'm going to show you what's marked for identification as

23    Government's Exhibit 219-2.

24            What are we looking at here?

25    A    That's one of Joaquin's houses.

Alexander Cifuentes Villa - Direct/Parlovecchio

1    Q    How do you recognize it?

2    A    I went there about two or three times in 2013.

3              MS. PARLOVECCHIO:  The government moves to admit

4    Government Exhibit 219-2.

5              MR. LICHTMAN:  No objection.

6              THE COURT:  Received.

7              (Government Exhibit 219-2, was received in

8    evidence.)

9    Q    This is the house that you visited on two or three

10   occasions?

11   A    That's right.

12   Q    Do you know someone named Nariz?

13   A    Yes.

14   Q    Have you met him?

15   A    Of course.

16   Q    I want to show you what's marked for identification as

17   Government's Exhibit 62.

18              What is this?

19   A    That's Nariz.

20              MS. PARLOVECCHIO:  The government moves to admit

21   Government Exhibit 62.

22              MR. LICHTMAN:  No objection.

23              THE COURT:  Received.

24              (Government Exhibit 62, was received in evidence.)

25   Q    What did Nariz do for the defendant?

5181

Alexander Cifuentes Villa - Direct/Parlovecchio

1   A    Nariz was the last filter or the most important filter

2   for Joaquin.  He was Joaquin's personal passenger.  He was the

3   one who would bring in the people who would visit at the house

4   and the food and everything.  That was really at an internal

5   level.

6        Everything had to go through Nariz because there

7   were other filters, but those were external and those did not

8   know anything about Joaquin's internal circle.

9   Q    Now, you mentioned that people would come to visit or

10  Nariz would bring people to visit.

11       Did anyone come to visit you while you were staying

12  at the house in Culiacan?

13  A    Yes, of course.

14  Q    Who came to visit you there?

15  A    From Valentina and my son to Canadians who were there to

16  offer me business.

17  Q    Anyone else?

18  A    Dona Mary was there with me.

19  Q    Anyone else?  Did Andrea Velez ever come to visit you?

20       MR. LICHTMAN:  Objection.

21       THE COURT:  Overruled.

22  A    Andrea Velez also came to visit me, yes.

23  Q    Who was present when Andrea Velez came to visit you?

24  A    Joaquin Guzman.

25  Q    What, if anything, did the defendant discuss with Andrea

*MICHELE NARDONE, CSR -- Official Court Reporter*

5182

Alexander Cifuentes Villa - Direct/Parlovecchio

1   Velez on this occasion?

2           MR. LICHTMAN:  Objection.

3           THE COURT:  Overruled.

4   A    Well, since Andrea had a modeling agency in Mexico City,

5   she would introduce female friends to the general of the

6   nation on Wednesdays for private parties.  So Mr. Joaquin

7   asked her for the favor to offer --

8           MR. LICHTMAN:  Objection, judge, 403.

9           THE COURT:  Well, I need more context.  Let's have a

10  sidebar.

11           (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

5183
Sidebar

 1              (Sidebar conference.)

 2              THE COURT:  What are you trying to prove?

 3              MS. PARLOVECCHIO:  So this is a conspiracy to bribe

 4     a high-level general in Mexico City.  This is the methods and

 5     means of the enterprise.

 6              The defense has made the argument that the defendant

 7     didn't have high-level bribery and that Mayo Zambada was the

 8     only one who tried do it.  This is being offered to show

 9     methods and means.

10              MR. LICHTMAN:  For prostitutes?

11              MS. PARLOVECCHIO:  No.  He is going to say he asked

12     Andrea Velez to bribe the general with $10 million and that he

13     would give her a million dollars as compensation for doing

14     that.

15              THE COURT:  Overruled.  How long?

16              MS. PARLOVECCHIO:  I think like 20 minutes, maybe.

17     I'm hoping to get -- my plan was to get it done by the morning

18     break.  We are really in the last --

19              MR. LICHTMAN:  I think this is the morning break.

20              THE COURT:  We are very close.

21              MS. PARLOVECCHIO:  We are very close, and we are

22     there.  And no more calls so it's going to keep moving.

23              THE COURT:  Okay.

24              (End of sidebar conference.)

25              (Continued on the next page.)

Alexander Cifuentes Villa - Direct/Parlovecchio

1          (In open court.)

2   BY MS. PARLOVECCHIO:

3   Q    So, Mr. Cifuentes, I think you were about to tell us what

4   the defendant asked Andrea Velez to do in regards to this

5   general.

6   A    Yes.  He asked her for the favor to offer the general

7   $10 million for the general to leave him in peace, and if she

8   accomplished the objective then he would gift her with

9   $1 million.

10  Q    Now, I briefly want to turn your attention back to

11  604H-6T.

12         What is the date on this message?

13  A    January 22, 2013.

14  Q    I want to direct your attention to two portions of this

15  message.  In paragraph 11, Ofis 7 says, Okay, so how is the

16  appointment with the cachuchon going, girlfriend?

17         What do understand the defendant to be asking here?

18  A    That how is the woman going with the general.  The word

19  cachuchon indicates a military guy.

20  Q    Then again, in paragraph 20, the defendant asked, Is the

21  appointment with cachuchon set for this Wednesday, just so I

22  can confirm it with the man?

23         What do you understand this to mean?

24  A    I'm asking her if she already has some appointments set

25  up with the general for that Friday --

5185

Alexander Cifuentes Villa - Direct/Parlovecchio

1     THE INTERPRETER:  Interpreter correction, for that

2  Wednesday.

3  A     -- so that I can confirm that with Joaquin.

4  Q     Just to be clear, this is through Ofis 7, correct?

5  A     Yes, that's right.

6  Q     So did the defendant have access to all of these

7  messages, to your understanding?

8  A     That's right.  It was through his secretary.

9  Q     Did Andrea follow through in bribing the general for the

10  defendant?

11  A     No.  She was not successful, and the general hated

12  Joaquin very much.

13  Q     Now, what was the defendant's reaction --

14           MR. LICHTMAN:  Objection, move to strike.

15           THE COURT:  Hang on one second.  The jury will

16  disregard the last answer to the question.

17  Q     Now, just briefly yes or no, can you tell us whether

18  Andrea followed through in bribing the general?

19           MR. LICHTMAN:  Objection, asked and answered.

20           THE COURT:  Overruled.

21  A     No.

22  Q     What was the defendant's reaction when Andrea failed to

23  bribe the general for him?

24  A     He was angry and he said that she was a liar.

25  Q     What happened as a result?

Alexander Cifuentes Villa – Direct/Parlovecchio

1   A    He order her killed.

2   Q    What, if any, problems arose with your Canadian worker

3   Steven Tello around this time?

4   A    Well, Steven Tello, I mean there had been many complaints

5   that I had gotten from Joaquin and also from Andrea herself,

6   that he was stealing in Canada.  He was stealing the product

7   or the profit of the drug sale.

8   Q    Did you tell the defendant about Steven Tello stealing

9   from him?

10  A    In fact, he already knew through the workers he had in

11  Canada.

12  Q    Did there come a time when you became aware of a plot to

13  murder Steven Tello?

14  A    Yes.  In fact, I tried bringing him over to Mexico, but

15  he would refuse.  So what we did was to ask my wife Valentina

16  for the favor.

17  Q    Who is "we"?

18  A    Joaquin, Joaquin Guzman and I.

19  Q    What happened after you asked Valentina for the favor to

20  find someone to kill Steven Tello?

21        MR. LICHTMAN:  Objection, judge.

22        THE COURT:  Sustained.

23  Q    I'm sorry.  What did you ask Valentina to do with regard

24  to Steven Tello?

25  A    Yes.  I had her brought in to Culiacan, and in person

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Direct/Parlovecchio

1  Joaquin and I asked her for the favor to see if she could get

2  us a person in Canada who could kill Steven.  And Joaquin said

3  and they can just kill the secretary right away as well

4  because she is a liar.

5  Q    When the defendant said the secretary who did you

6  understand him to mean?

7  A    Andrea Velez Fernandez.

8  Q    What did you say when the defendant suggested killing

9  Andrea Velez?

10 A    I agreed.

11 Q    Now, after speaking with Valentina, did you take any

12 other steps to try to kill Steven Tello and Andrea Velez?

13 A    I had some appointments pending with the Hells Angels,

14 and it was likely that I would do that through them.

15 Q    Is Steven Tello still alive?

16 A    He is still alive.

17 Q    Is Andrea Velez still alive?

18 A    She is still alive.

19 Q    How, if at all, did your relationship with the defendant

20 change after you were arrested by the coast guard in 2012?

21 A    Well, sure, it did change.  Just coincidently my brother

22 had been arrested around the same date, and that created lack

23 of trust.

24 Q    Which brother was arrested around the same time?

25 A    My brother Jorge Milton, on November 7, 2012.

Alexander Cifuentes Villa - Direct/Parlovecchio

1    Q    When had you been arrested by the coast guard?

2    A    November 7, 2012.

3    Q    Now, besides the defendant's houses in Culiacan that you

4    described, did you stay anywhere else during this period of

5    time?

6    A    That's right.

7    Q    Where did you stay?

8    A    Joaquin assigned to me a small ranch in the outskirts of

9    the city, in the town of Villa Juarez.

10   Q    What was it called?

11   A    It was -- the name was Las Azucenas.

12   Q    Did anyone else live there with you?

13   A    Yes.

14   Q    Who lived with you?

15   A    There was like a service employee, her daughter, and the

16   security was by The Anthrax Group.

17   Q    What is The Anthrax Group?

18   A    They are Joaquin's hit -- gunmen group.

19   Q    How long did you live at Las Azucenas?

20   A    All of 2013, until the day of my arrest.

21   Q    What were you doing while you were living there on the

22   ranch?

23   A    I coordinated the drugs that were going to Canada.  I was

24   in charge of cocaine sales as well as heroin and ice.  I also

25   was working on the side on his book.

Alexander Cifuentes Villa - Direct/Parlovecchio

1    Q    While you were living at Las Azucenas did you ever tell

2    your wife you had been shot when you had not been shot?

3    A    Yes.

4    Q    Briefly, can you explain what happened?

5    A    Well, my wife disappeared for several days.  So I left a

6    phone number at the doorman where she lived.  Some days later

7    that number was called through a text message and they were

8    asking for me.  I dialed to see if she would answer with her

9    own voice, and she didn't.

10        So I wrote and I said, you know, the question that

11   you asked me, that had I had been shot, to see if she would

12   get scared and speak up but she didn't.  So that made me

13   suspect that it wasn't her who was behind that phone.

14   Q    Now, I want to direct your attention to November 12,

15   2013.

16        What happened to you on that day?

17   A    I was arrested on that day.

18   Q    Where were you arrested?

19   A    In Las Azucenas in Culiacan, Sinaloa.

20   Q    Did you give your real name when you were arrested?

21   A    No.

22   Q    Who had filed charges against you at the time of your

23   arrest?

24   A    You guys, the Americans.

25   Q    Did Mexican law enforcement interview you after your

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa – Direct/Parlovecchio

1    arrest?

2    A    Yes.

3    Q    Did you have a lawyer with you at the time you were

4    interviewed right after your arrest?

5    A    No.

6    Q    When you were interviewed by Mexican law enforcement did

7    you tell the authorities everything you knew about the

8    defendant?

9    A    No.

10   Q    Why not?

11   A    Because they are very corrupt.  How am I going to say

12   that to them?

13   Q    Now, before speaking to you about the defendant, did the

14   Mexican authorities say anything to you?

15   A    Yes.

16   Q    Briefly, what did they say?

17   A    That if I did not cooperate with them they were going to

18   give me 29 years in the Matamoros Prison with Los Zetas.

19   Q    Why would it be a problem to be in jail with Los Zetas?

20   A    They are the enemies of Joaquin Guzman Loera.

21            MR. LICHTMAN:  Objection, move to strike.

22            THE COURT:  Overruled.

23   Q    Where did you end up going to prison in Mexico?  Where

24   did you ultimately end up going to prison in Mexico?

25   A    I went to jail in Rancho LaPalma.  That's Altiplano.

Alexander Cifuentes Villa – Direct/Parlovecchio

1  Q    Approximately when was that?

2  A    On December 17, 2013.

3  Q    I want to now direct your attention to February 2014.

4        What happened to the defendant while you were

5  incarcerated at Altiplano?

6        MR. LICHTMAN:  Objection.

7        THE COURT:  Overruled.

8  A    He was arrested.

9  Q    How do you know he was arrested?

10 A    Well, several helicopters came around, flying around

11 Altiplano.  One of them came down to the treatment area, and

12 everyone was yelling that it was El Senor who was there.

13 Q    Did you see the defendant while you were in jail at

14 Altiplano?

15 A    Yes.

16 Q    How many times?

17 A    Several.

18 Q    What were the circumstances the first time?

19 A    Once I saw him in the medical area.  He greeted me.  He

20 recognized me.  In the hallways when you are going to see the

21 lawyers, it's normal for people to see each other.

22 Q    Did the defendant's attorneys ever come to visit you at

23 Altiplano?

24 A    Yes.

25 Q    Which of his attorneys came to see you?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa – Direct/Parlovecchio

1   A    The ones who represented me to get out of there.  It was

2   Andres Granados, and I don't remember the name of the other

3   one.

4   Q    When did you first see Andres Granados at Altiplano?

5   A    At the end of February or beginning of March of 2014.

6   Q    Approximately how many times did Andres Granados come to

7   see you in that period in 2014?

8   A    He came each week.  I don't remember if it was Wednesdays

9   or Thursdays.  He would come at 4:00 p.m. to see me.

10  Q    What, if any, agreement did you come to with Andres

11  Granados during these visits?

12  A    Well, he told me since we were going to present Joaquin

13  as evidence in front of the prosecutor, I would have to say

14  that we didn't know each other; that we had no relationship in

15  common.

16  Q    What was your understanding of what would happen if you

17  didn't go along with this plan?

18          MR. LICHTMAN:  Objection.

19          THE COURT:  Sustained.

20  Q    Were you interviewed by the Mexican prosecutors?

21  A    Yes.

22  Q    Was the defendant in the room when you were interviewed?

23  A    Yes, of course.  He was right next to me, on my right

24  side.  I was on the left.

25  Q    What, if any, formal statements did you make to the

*MICHELE NARDONE, CSR -- Official Court Reporter*

5193

Alexander Cifuentes Villa - Direct/Parlovecchio

1   prosecutors?

2   A    What they asked me, if I knew the person who was sitting

3   next to me, and I said that I didn't know him.  If I had ever

4   seen him, like on the news, because he was a very famous

5   person.

6   Q    What, if anything, did the defendant say about whether he

7   knew you?

8   A    He said that he had never seen me before.  They asked him

9   if he had ever traveled to Colombia before.  He said he didn't

10  know Colombia.

11  Q    Now, just prior to making these formal statements to the

12  prosecutors, were you and the defendant permitted to speak to

13  one another?

14  A    Yes.  We were right next to each other, like I'm with

15  her.

16  Q    Now, after you came to the prison in the United States,

17  did you see the defendant?

18  A    Yes.

19  Q    Briefly, what were the circumstances?

20  A    Well, you know, as a coincidence, on February 15 I was

21  taken to the SHU because I was getting a ticket for putting up

22  a curtain on the side of my bed.  They were taking about eight

23  to ten of us inmates.

24        When we were in the room waiting for the report to

25  come in, it was like around 11:00 a.m.  All the policemen

Alexander Cifuentes Villa - Direct/Parlovecchio

1   started yelling, Everyone against the wall, against the wall.

2   They were yelling, It's El Chapo, he will Chapo.

3   Q    What did you do when you heard the shouting?

4   A    I peeked out of like the screen.  There is like a screen

5   or bars on the entire door.  I saw him going up some stairs,

6   and I yelled out at him.

7   Q    About how far away was the defendant when you saw him?

8   A    Like the distance that there is between you and me.

9   Q    Were there guards near the defendant when this happened?

10  A    He had guards in front of him and behind him.

11  Q    Were you able to speak with the defendant when you saw

12  him?

13  A    I just yelled out at him.

14  Q    Why did you do that?

15  A    I don't know.  It just came out spontaneously.

16  Q    Now, prior to your arrest in November 2013, were you

17  aware of any videos posted online featuring the defendant?

18  A    There was a video that had gone viral on YouTube.

19  Q    What was featured in this video?

20  A    It was an interrogation.

21  Q    Did you recognize where this interrogation was taking

22  place, in this video?

23  A    Well, it seemed to be in the outskirts of Culiacan.

24  Q    Why do you say that?

25  A    Because as far as I could hear, it was Los Limones, and

Alexander Cifuentes Villa - Direct/Parlovecchio

1   that's an area outside of Culiacan.

2   Q    I'm going to direct your attention to what's in evidence

3   as Government's Exhibit 704.

4           THE COURT:  Ms. Parlovecchio, how far are you?

5           MS. PARLOVECCHIO:  This is the last thing, Your

6   Honor.

7           THE COURT:  Okay.

8   Q    Do you recognize this?

9   A    Yes.

10  Q    What do you recognize this to be?

11  A    It is a video of an interrogation of Joaquin.

12  Q    Did you have the opportunity to view the contents of this

13  video before you came to court today?

14  A    That's right.

15  Q    What do you recognize on this disk?

16  A    I recognize Mr. Joaquin interrogating a person.

17  Q    Did you initial this disk before you came to court today?

18  A    That's right.

19          MS. PARLOVECCHIO:  I'm going to play this video for

20  you.

21          (Recording played.)

22  Q    Mr. Cifuentes, did you recognize anyone in that video?

23  A    Mr. Joaquin.

24  Q    Did anything else in the video look familiar to you?

25  A    Well, the Palapa is very similar to the ones that were

USA v. Guzman Loera

1    used in the security houses.

2            MS. PARLOVECCHIO:  One moment, Your Honor.

3            (Pause.)

4            MS. PARLOVECCHIO:  No further questions.

5            THE COURT:  All right.  We will take our morning

6    break, ladies and gentlemen.  Please come back at 11:35.

7            Don't talk about the case.  See you in 15 minutes.

8            (Jury exits.)

9            THE COURT:  Recess, 11:35.

10            (Recess.)

11            (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes - cross - Lichtman

1   (Continuing.)

2              THE COURT:  Please bring in the jury.

3              (Jury enters.)

4              THE COURT:  Everyone be seated.

5              Cross-examination, Mr. Lichtman.

6              MR. LICHTMAN:  Thank you, Judge.

7   CROSS-EXAMINATION

8   CROSS-EXAMINATION

9   BY MR. LICHTMAN:

10  Q    Mr. Cifuentes, good afternoon.

11  A    Good afternoon, sir.

12  Q    You interpreted many tapes for the jury during your

13  direct examination?

14  A    Yes.

15  Q    And some of the tapes you were a participant in the

16  conversation?

17  A    Yes, sir.

18  Q    But most of them you were not; correct?

19  A    Correct.

20  Q    And in many of the tapes, you weren't even aware of who

21  one of the participants were; isn't that correct?

22  A    That's right.

23  Q    Nevertheless you interpreted for the jury your brief of

24  what was being discussed in the tapes, yes or no?

25  A    Yes, sir.

                    SN       OCR       RPR

Alexander Cifuentes – cross – Lichtman

1  Q    And the participants for the most part were not speaking

2  in direct, clear language.  They were speaking in code to some

3  extent; isn't that correct?

4  A    That's right.

5  Q    So you weren't aware of some of the participants, the

6  participants weren't speaking in direct, clear language, and

7  in the end you were providing what you would agree were

8  educated guesses of what these participants were speaking

9  about; correct?

10  A    Correct.

11        THE COURT:  Mr. Lichtman, you are plenty loud.  We

12  can hear you fine but we're concerned that the overflow can't

13  without a mic.  So I would like you to put on a mic.

14        MR. LICHTMAN:  Thank you, Judge.

15  BY MR. LICHTMAN:

16  Q    Now, if you recall, you first started debriefing with the

17  Government sometime in January of 2016; isn't that correct?

18  A    Yes, sir.

19  Q    And you told the Government during your first two days of

20  debriefings that you were living with Mr. Guzman for a period

21  of about eight or nine months?

22  A    Yes, sir.

23  Q    And you told them in the debriefing, your very first one

24  in fact, that it was between sometime in 2007 and 2008?

25  A    Yes, sir.

*SN      OCR      RPR*

                    Alexander Cifuentes – cross – Lichtman

1    Q    Last week you testified and I will give you the pages,

2    page seven of his direct from January 10th:

3            "Question:  When did you live with the defendant.

4            "Answer:"

5                    And that's you.

6            "Since approximately the fall of 2007 up until the

7    spring of 2009."

8                    Was that your answer to that question.

9    A    Yes, sir.

10   Q    Now, you met with the Government numerous times in

11   preparation for your testimony here?

12   A    Yes, sir.

13   Q    And I'm not talking just about you discussing what your

14   criminal history was but with regard to your entire direct

15   examination; correct?

16   A    Correct.

17   Q    And you went over topics that the Government told you

18   they wanted to ask you about on direct examination during your

19   debriefings; isn't that correct?

20   A    Yes, sir.

21   Q    And you went over the actual questions that you were

22   asked on direct examination during these debriefings, weren't

23   you?

24   A    Yes.

25   Q    So none of the questions that you heard on direct

Alexander Cifuentes – cross – Lichtman

1  examination were a surprise to you; correct?

2  A    That's right.

3  Q    You've heard them all before; correct?

4  A    Yes, sir.

5  Q    And when you were going over these questions and your

6  answers during your preparation, if there were any issues with

7  an answer, you discussed it with the Government; correct?

8  A    Yes, sir.

9  Q    And if an answer wasn't right or if you weren't

10  comfortable with some of the information, you and the

11  Government discussed it; correct?

12  A    Correct.

13  Q    And you went over possible cross-examination areas as

14  well during your preparation, didn't you?

15  A    Yes.

16  Q    You went over with the prosecutors what they thought I

17  would ask you during cross; correct?

18  A    Correct.

19  Q    And you were prepped with actual cross-examination

20  questions that the Government thought I would ask you?

21          MS. PARLOVECCHIO:  Objection, asked and answered.

22          THE COURT:  Sustained.

23  BY MR. LICHTMAN:

24  Q    You gave answers to those mock cross-examination

25  questions during your preparation?

Alexander Cifuentes – cross – Lichtman

1    A    Yes, sir.

2    Q    And you were advised by the Government during these

3    debriefings that you were always supposed to say that you're

4    here to tell the truth; correct?

5    A    Correct.

6    Q    That was actually told to you that you should tell the

7    jury that you are here to tell the truth; correct?

8    A    I must tell the truth, that's correct.

9    Q    But that was told to you during the debriefings in

10   preparation for your testimony today?

11            MS. PARLOVECCHIO:  Objection, asked and answered.

12   Q    That that's what you need to say?

13            THE COURT:  Go ahead and answer.

14            Overruled.

15   A    No, sir, I was told that I should just tell the truth.

16   Q    And you were also told during your preparation to make

17   sure that you say that you're facing life in prison; correct?

18   A    I know that since the beginning.

19   Q    Well, did you discuss the fact that you should say to the

20   jury that you don't know what your sentence will be when you

21   finally get to sentencing?

22   A    Yes, sir.

23   Q    And did you go over the topic in your preparation that

24   you don't even know if you're going to get a break from the

25   sentencing judge?  I can't hear you, sir?

Alexander Cifuentes - cross - Lichtman

1    A    Could you repeat the question, please?

2    Q    I said during your preparation you went over a subject to

3    talk to the jury about, that you're not even sure that when

4    you're sentenced that you're going to get a break at all from

5    the judge?

6    A    That's true.

7    Q    And your training sessions for this examination included

8    coaching on your demeanor as well, didn't it?

9    A    I don't know what you mean by demeanor.

10   Q    You were coached on how to handle yourself in front of

11   the jury to my questions.

12   A    Not really.  Just to be natural.

13   Q    Are you aware that your brother Jorge testified a few

14   weeks ago in this case?

15   A    No, sir.

16   Q    Are you aware that he's a cooperating witness?

17   A    No, sir.

18   Q    You're not aware that he's cooperating?

19        MS. PARLOVECCHIO:  Objection, asked and answered.

20   Q    Didn't you testify on direct that when you spoke to your

21   brother when he called you from the MDC to your prison cell in

22   Colombia that he said that if you didn't cooperate that he'd

23   be the first person to testify against you?

24   A    He told me that I should confess with the Americans as if

25   I were confessing to God.

SN        OCR        RPR

Alexander Cifuentes - cross - Lichtman

1   Q    I said simply didn't you testify on direct examination

2   when asked by Ms. Parlovecchio that when you spoke to your

3   brother in December -- I believe you said in 2014 on a

4   smuggled cell phone into your prison cell in Colombia that he

5   said that if you did not cooperate, he would testify against

6   you first.

7   A    Oh, yes, sir.

8   Q    So of course you know that he's cooperating in this case.

9   Yes?

10  A    Yes, sir.

11  Q    So you just lied 30 seconds ago; correct?

12  A    I made a mistake, sir.

13  Q    Mistake.  Are all the mistakes -- are all the lies

14  mistakes today?

15         MS. PARLOVECCHIO:  Objection.

16         THE COURT:  Sustained.

17  BY MR. LICHTMAN:

18  Q    Were you told not to argue with me in preparation for

19  your testimony today?

20         MS. PARLOVECCHIO:  Objection.

21         THE COURT:  Overruled.

22  A    Yes, sir.

23  Q    Who told you not to argue with me?

24         MS. PARLOVECCHIO:  Objection.

25         THE COURT:  Overruled.

*SN        OCR        RPR*

Alexander Cifuentes - cross - Lichtman

1    A    The Government.

2    Q    What else did they tell you about how you should talk to

3    me during this cross-examination?

4            MS. PARLOVECCHIO:  Objection.

5            THE COURT:  Overruled.

6    A    To answer with the truth.

7    Q    And not to argue with me?

8            MS. PARLOVECCHIO:  Objection asked and answered.

9            THE COURT:  Sustained.

10   BY MR. LICHTMAN:

11   Q    Are you aware that your brother argued with me plenty

12   during his cross-examination?

13           MS. PARLOVECCHIO:  Objection.

14           THE COURT:  Sustained.

15   BY MR. LICHTMAN:

16   Q    You testified on direct that you grew up in Colombia?

17   A    Yes, sir.

18   Q    You've been a criminal since you're a child; isn't that

19   correct?

20   A    Yes, sir.

21   Q    And you didn't go into criminal activity on your own; it

22   was your family's business; correct?

23   A    Yes, sir.

24   Q    You were encouraged to be a criminal by your parents;

25   isn't that correct?

Alexander Cifuentes - cross - Lichtman

1    A    My siblings.

2    Q    You didn't engage in criminal activity with your father?

3    A    But he never told me to become a criminal.

4    Q    He didn't have you working in black market goods like

5    fabrics, cigarettes, TVs, et cetera when you were a child?

6    A    He didn't make me.  I would just help voluntarily.

7    Q    Well, he didn't make you, but you helped the family

8    engage in the selling of black market goods as a child;

9    correct?

10   A    No, sir, I -- I only stored them.  I did not know about

11   the sales.

12   Q    What about -- your family had a farm when you grew up;

13   correct?

14   A    Yes, sir.

15   Q    And you helped your father grow cocaine on that family

16   farm, didn't you?

17   A    Not me, sir.

18   Q    Not you, sir?

19   A    No.

20   Q    Do you recall telling the Government in your very first

21   debriefing with them in January of 2016 that as a child you

22   helped your father grow cocaine on the family farm, you would

23   work the crops after school?

24   A    No, sir.  There's some mistake in that writing that you

25   have there.

SN        OCR        RPR

5206

Alexander Cifuentes - cross - Lichtman

1  Q    How do you know that I'm reading from this document?

2  A    Or maybe you have a mistake -- you made a mistake in your

3  mind.

4  Q    Were you prepared in this area during your preparation

5  for today about the fact that neither you nor Jorge were

6  involved in the cocaine family farm as kids?

7  A    No, sir.

8              THE COURT:  Can we have a sidebar, please?

9              (Sidebar held outside of the hearing of the jury.)

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    SN      OCR      RPR

Sidebar

```
 1              (The following sidebar took place outside the

 2    hearing of the jury.)

 3              THE COURT:  Mr. Lichtman, I just don't want you to

 4    back yourself into a corner because there is of course going

 5    to be instruction, as there always is in the final

 6    instructions, to say that the Government is entitled to meet

 7    with their witnesses and prepare and that no inference should

 8    be placed on --

 9              MR. LICHTMAN:  The reason why I mentioned the

10    reading is because he thought I suggested to the jury that I

11    was reading it.

12              THE COURT:  You kind of waived it around.  That's

13    why he suggested that.

14              MR. LICHTMAN:  Thank you.

15              THE COURT:  Do as you see fit.  If you want to bring

16    out more, you are certainly entitled to.

17              MR. LICHTMAN:  Thank you, Judge.

18              (Sidebar ends.)

19              (Continued on next page.)

20

21

22

23

24

25
```

Alexander Cifuentes – cross – Lichtman

1    (Continuing.)

2  BY MR. LICHTMAN:

3  Q    Sir, so we can be clear for the record, when you were a

4  child you did not help your father and your brother with

5  growing and packaging -- excuse me growing and drying cocaine

6  on the family farm?

7  A    Not growing.

8  Q    Well then why don't you tell us what you did with cocaine

9  when you were a child.

10  A    What they did was process the paste and convert it into

11  coke.

12  Q    What did you do is the question.

13  A    I was in charge of the drying and packaging kilos.

14  Q    How old were you when that occurred?

15  A    10, 11 years old.

16  Q    So you helped your father and brother with the -- did you

17  say drying and packaging the kilos?

18  A    Yes.

19  Q    And where was the cocaine paste derived from?  How did

20  your family get it and end up with you?

21  A    It came from the southern part of the country.

22  Q    And there was no -- again, there was no cocaine growing

23  on your family's farm?  Just again to be clear.

24            MS. PARLOVECCHIO:  Objection asked and answered.

25            THE COURT:  Sustained.

Alexander Cifuentes – cross – Lichtman

1     MR. LICHTMAN:  Fair.

2 BY MR. LICHTMAN:

3 Q By the time you were a teenager in Colombia, Pablo

4 Escobar was becoming a very famous and powerful international

5 drug trafficker in Medellin?

6     MS. PARLOVECCHIO:  Objection, relevance.

7     THE COURT:  Overruled.

8 A Yes, sir.

9 Q You looked up to him?

10     MS. PARLOVECCHIO:  Objection, relevance.

11     MR. LICHTMAN:  That's the last question before the

12 next one.

13     THE COURT:  Isn't that is always the case.  I will

14 overrule the objection, but get to your point.

15 A Yes, sir.

16 Q And his right-hand man lived in the same building as your

17 mother?

18     MS. PARLOVECCHIO:  Objection, relevance.

19     THE COURT:  Overruled.

20 A Yes, sir.

21 Q And this was exciting news for you and your mother?

22 A For me it was.

23 Q Because you wanted to be a drug dealer, correct?

24 A No, sir.  It's because he had an office that had a

25 bowling lane and I liked to go play -- go bowling with his

*SN   OCR   RPR*

                    Alexander Cifuentes – cross – Lichtman

1   bodyguards.

2   Q    But this right-hand man of Pablo Escobar suggested that

3   you should move to Cali and work for Escobar; correct?

4   A    That's false.

5   Q    So you didn't tell the Government during your very first

6   debriefing in January of 2016 that this individual who lived

7   in the same building as your mother told you to go to work

8   with your brother Fernando, also known as Pacho, in Cali on

9   behalf of Escobar?  That's false?

10  A    If what you're telling me is written down, it's written

11  wrong and if it's in your mind, it's wrong in your mind.

12  Q    What if the Government is going to come in here and say

13  that you told them that, is that also wrong?

14            MS. PARLOVECCHIO:  Objection.

15            THE COURT:  Sustained.

16  BY MR. LICHTMAN:

17  Q    Did you ever go to Cali and work with Pacho when you were

18  15 years old?

19  A    No, sir.

20  Q    You never worked with Fernando?

21  A    For my brother Fernando, yes.  The right-hand man for

22  Pablo Escobar never told me to go to Cali.  That's false.

23  Q    Did you go to Cali?

24  A    My mom sent me to Cali.  My mom sent me to Cali so I

25  would have nothing to do with the people in Medellin.

Alexander Cifuentes – cross – Lichtman

1    Q    What did you do in Cali?

2    A    I worked with my brother Fernando.

3    Q    Who was a drug dealer; correct?

4    A    He was a systems engineer.

5    Q    He was a systems engineer for a drug dealer; correct?

6    A    He worked for Mr. Efrain Hernandez.

7    Q    Who was a drug dealer for the third time?

8             MS. PARLOVECCHIO:  Objection.

9             THE COURT:  Overruled.

10   A    I never saw a kilo in Don Efrain's hands.

11   Q    You don't know that Don Efrain is a drug dealer?

12   A    In the news they would say that he was a drug dealer.

13   Q    But you didn't know, even though you were working for

14   your brother who was working for Don Efrain you didn't know

15   that Don Efrain was a drug dealer except for what you heard on

16   the news?

17            MS. PARLOVECCHIO:  Objection to form.

18            THE COURT:  Overruled.

19   A    That's right.

20   Q    What did you think Don Efrain was doing with your

21   brother?

22   A    They would buy companies that were broke and they turn

23   them into successful companies.

24   Q    And your brother as you said was a systems engineer for

25   this Don Efrain who you didn't know to be a drug dealer;

*SN        OCR        RPR*

Alexander Cifuentes – cross – Lichtman

1    correct?

2    A    Yes.

3    Q    And your brother Fernando killed Don Efrain; isn't that

4    true?

5    A    That's what they say, yes, sir.

6    Q    So do you know many systems engineers who kill their

7    bosses?

8              MS. PARLOVECCHIO:  Objection.

9              THE COURT:  Sustained.

10   Q    Looking back, does it make sense that perhaps Don Efrain

11   was a very famous drug dealer in Cali?

12             MS. PARLOVECCHIO:  Objection.

13             THE COURT:  Sustained.

14   BY MR. LICHTMAN:

15   Q    Do you know that Don Efrain was a drug dealer?

16   A    In the news they said that he was.

17   Q    Do you know that Fernando was a drug dealer?

18   A    System engineer.

19   Q    Do you know that Fernando was killed as well because he

20   killed Don Efrain?

21   A    There was that rumor, yes.  I was not over there.

22   Q    You've never been told by anyone in your family that Don

23   Efrain's people killed your brother in retaliation for killing

24   him killing Don Efrain, a non drug dealer?

25             MS. PARLOVECCHIO:  Objection.

SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1    THE COURT:  Sustained.

2    Q    If you know how, do you think Fernando was killed?

3    MS. PARLOVECCHIO:  Objection.

4    THE COURT:  Sustained.

5    Q    During this period when you were working for the systems

6    engineer Fernando in the cocaine capital of the world as a

7    teenager you were paid 1 million Colombian pesos per month?

8    MS. PARLOVECCHIO:  Objection.

9    THE COURT:  Sustained.

10   Q    During this period --

11   MR. LICHTMAN:  Now I've got to ask it twice.

12   Q    During this period in which you worked for Fernandez in

13   Cali as a teenager you were paid 1 million Colombian pesos per

14   month?

15   A    I don't remember how much I made each month at that time,

16   sir.

17   Q    If I can refresh your recollection with HACD 37 page two.

18   If you can read the underlined portion to yourself and let me

19   know if that refreshes your recollection that during this

20   period that you were working for your brother, a systems

21   analyst who was working for Don Efrain, that you were paid 1

22   million Colombian pesos per month.

23   A    Yes, that's possible.

24   Q    I ask if that refreshes your recollection that you told

25   the Government that you were being paid 1 million Colombian

Alexander Cifuentes – cross – Lichtman

1   pesos per month?

2   A    Yes, it does refresh my memory.

3   Q    And if we can just be clear, Fernando you said he was

4   remodeling properties for Don Efrain.

5          MS. PARLOVECCHIO:  Objection.

6          THE COURT:  Sustained.

7   Q    And you told the Government during debriefing that not

8   only were you receiving 1 million Colombian pesos per month

9   but that you regularly carried three handguns on your person

10  during that period.

11         Was that a yes?

12         THE COURT:  Let's have the answer and then we will

13  know.

14  A    (In English) Yes.

15         THE COURT:   Please translate the witness' answer.

16  A    I'm sorry.  He said that it was three guns and I wanted

17  to specify what they were.

18         THE COURT:  We didn't get an answer before

19  Mr. Lichtman put in another question.  Let's have the

20  translation of the answer that the witness gave.

21         I'm talking to the interpreter.

22         THE INTERPRETER:   I need the witness to repeat in

23  order to do that.

24         THE COURT:  Okay, go ahead.

25  A    Yes, I had three weapons; a gun, a revolver and a changon

SN        OCR        RPR

Alexander Cifuentes - cross - Lichtman

1    (phonetic) and they were permitted by the Colombian Army.

2    Q    Three guns?

3    A    They were permitted.

4    Q    Three guns?

5            MS. PARLOVECCHIO:  Objection, asked and answered.

6            THE COURT:  Sustained.

7            MR. LICHTMAN:  I didn't get an answer.

8            THE COURT:  You did.

9    BY MR. LICHTMAN:

10   Q    So while you were working for your brother -- systems

11   engineer, did you say, or analyst?

12   A    Systems engineer.

13   Q    While you were working -- how old were you at this time,

14   15?

15   A    15, 16, yes.

16   Q    So while you were working for your brother the systems

17   engineer in Cali, Colombia you carried three weapons on your

18   person?

19   A    Yes.  In Colombia that's normal.

20   Q    If he was a drug dealer, Don Efrain, would you have

21   carried four guns perhaps?

22           MS. PARLOVECCHIO:  Objection.

23           THE COURT:  Sustained.

24   Q    Were all the guns loaded?

25   A    What do you mean by that?

*SN        OCR        RPR*

Alexander Cifuentes – cross – Lichtman

1    Q    Did they have bullets in the magazine inside the gun?

2    A    Oh, yes, sir.

3    Q    Bullet in the chamber ready to go?

4              MS. PARLOVECCHIO:  Objection.

5              THE COURT:  Overruled.

6    A    No, sir.

7    Q    So you had the bullets and the magazine but you actually

8    would have had to ratchet the gun in order to get a bullet

9    ready to go to fire, right?

10             MS. PARLOVECCHIO:  Objection.

11             THE COURT:  Sustained.

12   Q    So you are claiming that you had bullets in a nag seen

13   but the gun was not ready to fire?

14             MS. PARLOVECCHIO:  Objection, relevance.

15             THE COURT:  Go on to something else.

16   Q    Where did you carry the three guns?

17   A    In the back of the car.

18   Q    When you say you carried them on your person, the car is

19   not your person; correct?

20   A    I also have the car on me.

21   Q    Did you have any of the weapons, like, in your belt or in

22   a holster when you were 15 or 16 working for the systems

23   analyst?

24   A    When I would go, like, inside a bank then I would carry

25   it in my waist.

                    SN        OCR        RPR

5217

Alexander Cifuentes - cross - Lichtman

1   Q   What if you were going to visit, perhaps, drug dealers?

2   A   I wouldn't have to visit any.

3   Q   Did you know how to use the weapons that you were

4   carrying on your person?

5          MS. PARLOVECCHIO:  Objection.

6          THE COURT:  I will allow it.

7   A   My sister Lucia had a boyfriend who was a major in the

8   Army and he showed me how.

9   Q   If you needed to use those guns when you were 15 and 16

10  and carrying three of them on your person you would have taken

11  them out and used them; correct?

12         MS. PARLOVECCHIO:  Objection.

13         THE COURT:  Sustained.

14  Q   The guns weren't for show, were they?

15  A   Not even for that.

16  Q   What then?

17  A   They are carried discretely in case they are needed.

18  Q   Needed to shoot; correct?

19  A   Defend oneself, yes.

20  Q   And you were capable of using the guns defensively;

21  correct?

22         MS. PARLOVECCHIO:  Objection.

23         THE COURT:  Sustained.

24  Q   Now later on you told the Government that you carried a

25  grenade and a pistol and an assault rifle and an AK-47 on your

Alexander Cifuentes – cross – Lichtman

1  person?

2  A    Yes.

3  Q    Now were you working in drugs then or were you working in

4  systems engineering?

5  A    I worked for Joaquin Guzman Loera.

6  Q    A systems engineer; correct?

7  A    Among others.

8  Q    And you told the Government that you carried two clips

9  with the AK-47?

10  A    At least.

11  Q    How many bullets were in each magazine?

12  A    35, 30 shots, I don't know.

13  Q    Now, you discussed your mother a bit on direct

14  examination; correct?

15  A    Yes.

16  Q    Your mother was not just a mother.  She was involved in

17  the criminal activity of the family; correct?

18  A    I wouldn't know what to tell you, sir.

19  Q    Well, you testified on direct examination when calls were

20  played between you and your mother where you were asking her

21  for advice about various drug dealing issues; correct?

22        MS. PARLOVECCHIO:  Objection, misstates the

23  testimony.

24        THE COURT:  Well, we'll see.  Overruled.

25  A    With the behavior of my siblings.

Alexander Cifuentes - cross - Lichtman

1   Q    Well, like your nephew.  When Jaime Roll stole cocaine,

2   you discussed that with your mother?

3   A    I think it was with her.

4   Q    With your mother you discussed it; correct?

5   A    I think it was with her, yes.

6   Q    So you were discussing cocaine dealings with your mother.

7   A    That's likely.

8   Q    She knew you were a drug dealer, is there any question in

9   your mind?

10  A    No.

11  Q    So when you were discussing with her that you were having

12  difficulties with Joaquin Guzman because he was going back to

13  Culiacan and the mosquitoes were descending in your area, she

14  had no idea that Mr. Guzman was a drug dealer according to

15  you?

16            MS. PARLOVECCHIO:  Objection to form.

17            THE COURT:  Sustained.

18  Q    If you know, she didn't know that Mr. Guzman was a drug

19  dealer?

20            MS. PARLOVECCHIO:  Objection.

21            THE COURT:  Sustained as to form.

22  Q    Do you remember the tape where you explained for the jury

23  that Mr. Guzman was coming to visit you, I believe it was, in

24  Cabo or is it Cancun?

25  A    Yes, sir, Los Cabos.

*SN       OCR       RPR*

Alexander Cifuentes - cross - Lichtman

1    Q    And you were telling her how -- and you were speaking in

2    coded language; correct?

3    A    Yes.

4    Q    You were speaking in coded language because you were

5    talking about your drug dealing business; correct?

6    A    Not in that case.

7    Q    So when you were talking about the fact that the

8    mosquitoes were descending and Ms. Parlovecchio asked you to

9    explain what the mosquitoes were, that wasn't code language

10   for the police?

11   A    Yes.

12   Q    You were talking about trying to escape the police that

13   were descending upon you because they were trying to arrest

14   Mr. Guzman; correct?

15   A    Yes.

16   Q    Now, I'll ask you again, are you aware, if you know that

17   she believed that Mr. Guzman was a wanted drug dealer and that

18   you were working for him?

19   A    Yes.

20   Q    That answer just changed, didn't it?

21           MS. PARLOVECCHIO:  Objection.

22           THE COURT:  Sustained.

23   Q    Now, you also if you recall you've gone over various

24   conversations that were secretly intercepted by the Government

25   in preparation for your testimony today; correct?

Alexander Cifuentes - cross - Lichtman

1   A    Yes.

2   Q    Do you recall in preparation going over a tape in which

3   you were discussing with your mother your obtaining of Mexican

4   citizenship?

5   A    No.

6   Q    Putting up HACD 49, page two, if you can read the

7   bracketed portion to yourself and let me know after you're

8   done if it refreshes your recollection that you were

9   discussing with your mother Carlina about obtaining your

10  Mexican citizenship.

11          THE COURT:  Do you want him reading it in English or

12  do you want to --

13          MR. LICHTMAN:  You can read it in English.

14  A    If it can be translated into Spanish, please.

15          THE COURT:   Go ahead.

16          What's your question again, please.

17  BY MR. LICHTMAN:

18  Q    Does that refresh your recollection that you had a

19  discussion with your mother about obtaining your Mexican

20  citizenship?

21  A    Yes.

22  Q    And does it -- let me ask the question before I ask if it

23  needs to be refreshed, your memory.  Did you, in fact, discuss

24  with your mother the fact that the application form for the

25  Mexican citizenship required that you disclose a profession?

Alexander Cifuentes – cross – Lichtman

1    A    Yes.

2             MS. PARLOVECCHIO:  Your Honor, may we have a

3    sidebar?

4             THE COURT:  Yes.

5             (Sidebar held outside of the hearing of the jury.)

6             (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          MS. PARLOVECCHIO:  Your Honor, this is improper

4    refreshment.

5          THE COURT:  You're right.  He knows it.  He won't do

6    it again.

7          MR. LICHTMAN:  I won't do it.

8          (Sidebar ends.)

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alexander Cifuentes – cross – Lichtman

1    (Continuing.)

2    BY MR. LICHTMAN:

3    Q    Sir, in that call to your mother when you discussed

4    getting your Mexican citizenship, do you recall that you told

5    her that it required you disclosing a profession that you had?

6    Is that nod --

7    A    I remember the topic but I don't recall having talked to

8    my mother about it.

9    Q    If you can then read the bracketed information again and

10   let me know when you're finished.

11   A    Yes, yes, sir.

12   Q    Does that refresh your recollection that you discussed

13   with your mother the fact that you were required to disclose a

14   profession on your Mexican citizenship form?

15   A    Yes.

16   Q    And you told your mother that you were planning on

17   writing that you were involved in a business -- that you had a

18   business that imported submersible plants?

19   A    Yes.

20   Q    And that was a lie.  You obviously did not own a business

21   that imported submersible plants.

22   A    I was going to get that business started.

23   Q    But you didn't at the time, did you?

24   A    No because first I needed the citizenship and then I had

25   to do all the paperwork.

SN        OCR        RPR

Alexander Cifuentes - cross - Lichtman

1    Q    Sir, in 2009 you were a hardcore drug dealer, weren't

2    you?

3    A    No, sir.

4    Q    You were not a hardcore drug dealer in 2009?

5    A    2009 --

6    Q    Is hardcore the word -- let me remove it.  I withdraw

7    that question.

8              THE COURT:  Put another question.

9              Were you a drug dealer in 2009?

10             THE WITNESS:  Yes.

11   BY MR. LICHTMAN:

12   Q    Didn't I ask you 15 seconds ago the same question and you

13   said no?

14             MS. PARLOVECCHIO:  Objection.

15             THE COURT:  Sustained.  No, you didn't.

16   Q    Were you a hardcore drug dealer in 2009?

17             MS. PARLOVECCHIO:  Objection.

18             THE COURT:  Sustained.

19             MR. LICHTMAN:  I didn't get an answer to that.  Fair

20   enough.

21   BY MR. LICHTMAN:

22   Q    In 2009 you had lived with Mr. Guzman, according to you,

23   since 2007; correct?

24   A    That's correct.

25   Q    You were involved in moving massive quantities of cocaine

SN          OCR          RPR

5226

Alexander Cifuentes – cross – Lichtman

1   during that period, weren't you?

2   A     That failed, sir.

3   Q     So you didn't actually successfully move quantities of

4   cocaine by 2009?

5   A     You can ask your own client.

6   Q     What if I ask you instead because you're the one on the

7   stand.  Is that okay?

8         MS. PARLOVECCHIO:  Objection, argumentative.

9         THE COURT:  Why don't you put another question.

10  Q     Where is your mother now?

11        MS. PARLOVECCHIO:  Objection, relevance.

12        THE COURT:  I assume it's going somewhere.  I will

13  overrule the objection.

14  Q     Is your mother alive?

15  A     She's alive.

16  Q     Is she in jail?

17  A     No, sir.

18  Q     Now you're aware that your brother Jorge, as you

19  testified to earlier, cooperated with the Government?

20        MS. PARLOVECCHIO:  Objection, asked and answered.

21        THE COURT:  He is setting the stage.  He can answer

22  again.

23        MR. LICHTMAN:  Thank you, Your Honor.

24  A     If you say so.

25  Q     Your sister Dolly, she was a drug dealer?

*SN        OCR        RPR*

Alexander Cifuentes - cross - Lichtman

1    A    Yes, sir.

2    Q    She cooperated with the Government, if you know?

3    A    I think so, sir.

4    Q    Where did you find out?

5    A    In the news.

6    Q    So you only found out in the news that your sister Dolly

7    is cooperating with the Government?

8    A    Yes, sir.

9    Q    Which news, television?

10            MS. PARLOVECCHIO:  Objection.

11            THE COURT:  Sustained.

12    Q    When did you learn that she was cooperating with the

13    Government?

14    A    I don't remember, sir.  As far as I knew, she was going

15    to go to trial.

16    Q    Do you know when she was arrested?

17    A    She was arrested in 2000 -- 2010.  I think it was 2010.

18    Q    And it's 2019 now?

19    A    Yes, sir.

20    Q    And you're not aware if she went to trial or not?

21    A    No, she did not go to trial.  She pled guilty.

22    Q    And she's cooperating.

23    A    I don't know if by pleading guilty she had then decided

24    to cooperate or not.

25    Q    So in the last nine years, some of them which while you

*SN        OCR        RPR*

Alexander Cifuentes – cross – Lichtman

1  were free because you were free in 2010, 2011, into 2012;

2  correct?

3  A    Yes, sir.

4  Q    You never learned that Dolly didn't go to trial and, in

5  fact, began cooperating with them; is that your testimony?

6  A    No, sir.

7  Q    What is your testimony then?

8          MS. PARLOVECCHIO:  Objection.

9          THE COURT:  Sustained.

10 Q    Now, you would agree that you've traveled all over the

11 world to traffic drugs?

12 A    No, sir.

13 Q    Did you travel anywhere and traffic drugs some countries?

14 A    Yes, sir.

15 Q    Which countries?

16 A    Canada.

17 Q    That's part of the world; correct?

18 A    Yes, sir.

19 Q    What other countries did you travel to to traffic drugs,

20 Colombia?

21 A    Colombia.

22 Q    Ecuador?

23 A    No, sir.

24 Q    What about Paris?

25 A    Paris?  Yes, sir.

*SN      OCR      RPR*

5229
Alexander Cifuentes – cross – Lichtman

1    Q    So Paris, Canada, United States?

2    A    United States, yes.

3    Q    So you traveled all over the world to traffic drugs;

4    isn't that correct?

5              MS. PARLOVECCHIO:  Objection.

6              THE COURT:  Sustained.

7    BY MR. LICHTMAN:

8    Q    You were part of the Cifuentes Villa drug dealing, drug

9    trafficking organization, would you agree?

10   A    Yes, sir.

11   Q    And that was a very large drug trafficking organization

12   out of Colombia; correct?

13   A    Yes, sir.

14   Q    And in order to be a -- do you consider yourself a

15   successful drug trafficker despite your present circumstances?

16   A    No, sir.

17   Q    You were unsuccessful?

18   A    No, sir.

19   Q    So you were mid-lane successful?

20   A    Like lower-level.

21   Q    So like un poquito?

22   A    That set, sir.

23   Q    You made a lot of money dealing drugs?

24   A    Some millions, sir.

25              (Continued on the following page.)

SN          OCR          RPR

5230

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   BY MR. LICHTMAN:

2   Q    That's successful, wouldn't you say?

3   A    Some success, sir.

4   Q    And part of being a drug dealer, as we've seen today, is

5   being a good liar, correct?

6   A    Yes, sir.

7   Q    You lied all the time, didn't you?

8   A    Yes, sir.

9   Q    You lied to other drug dealers?

10  A    Yes, sir.

11  Q    You lied to your co-conspirators, correct?

12  A    Yes, sir.

13  Q    You lied to your friends?

14  A    Yes, sir.

15  Q    You lied to law enforcement.

16  A    Yes, sir.

17  Q    You lied to immigration officials.

18  A    Yes, sir.

19  Q    You lied to prosecutors.

20  A    Yes, sir.

21  Q    You lied to lawyers.

22  A    Yes, sir.

23  Q    You lied to your family.

24  A    Yes, sir.

25  Q    You lied to your siblings.

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   A   Yes, sir.

2   Q   You lied to your wife.

3   A   Yes, sir.

4   Q   Your girlfriends.

5   A   Yes, sir.

6   Q   And you didn't just lie about your drug dealing business,

7   you lied about personal affairs as well; isn't that true?

8   A   Yes, sir.

9   Q   You lied about Mr. Guzman, didn't you?

10  A   No, sir.

11  Q   He's the only person you didn't lie about?

12  A   That's right, sir.

13  Q   Would you agree that you're a very convincing liar?

14          MS. PARLOVECCHIO:  Objection.

15          THE COURT:  Overruled.

16  A   No, sir.

17  Q   You're a bad liar; is that what you're saying?

18  A   Yes, sir.

19  Q   But you lied so many times over the years, by giving

20  false identification, lying to co-conspirators, lying to

21  lawyers, you got away with it for years, didn't you?

22  A   Many times, yes, sir.

23  Q   During our examination, have you lied at all?

24  A   I have misinterpreted a few things.

25  Q   You lied for your own personal gain, didn't you?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    A    I have done that.

2    Q    If you didn't lie, you could go to jail sometimes?

3    A    Of course.

4    Q    If you didn't lie, you couldn't get what you wanted

5    sometimes, correct?

6    A    Yes, sir.

7    Q    And you've been lying for decades, haven't you?

8    A    Yes, sir.

9    Q    Would you agree that you're a very practiced liar?

10    A    Not a lot of practice, but I am a liar.

11    Q    So even though you've been lying for decades, you don't

12    consider that a lot of practice?

13    A    No, sir.

14    Q    Now, you also can lie very quickly on your feet.  You've

15    done that as well, haven't you, over the years?

16    A    I have been bad at it, but I have done it.

17    Q    Like when law enforcement asks you your name, you quickly

18    didn't tell your name.  You had another name ready to go, a

19    lie?

20    A    Yes, sir.

21    Q    Or sometimes you were asked by law enforcement what you

22    were doing at the time of arrest, you lied as well?

23    A    Yes.

24            MR. LICHTMAN:  Now, Judge, do you want to take this

25    time for a break because I'm going into a different area?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1          THE COURT:  Okay.  We'll break for lunch, ladies and

2    gentlemen.

3          Please don't talk about the case.  Come back here at

4    1:35.  Have a good lunch.

5          (Jury exits courtroom.)

6          (Luncheon recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1           A F T E R N O O N   S E S S I O N

2                    (1:35 p.m.)

3           THE COURTROOM DEPUTY:  All rise.

4           THE COURT:  Please bring in the jury.

5           (Jury enters courtroom.)

6           THE COURT:  Be seated, please.  Mr. Lichtman, you

7    may continue.

8           MR. LICHTMAN:  Thank you, Judge.

9    CROSS-EXAMINATION(Continuing)

10   BY MR. LICHTMAN:

11   Q    Your brother Jorge taught you a lot about drug

12   trafficking?

13   A    Yes, sir.

14   Q    Unlike Mr. Guzman, you've been kept apart from him since

15   you've been in the United States?

16   A    Could you repeat the question, please.

17   Q    Have you been kept apart from him since you've been in

18   the United States?

19   A    Yes, sir.

20   Q    And you're aware that he's in prison?

21   A    Yes, sir.

22   Q    Who told you that he was in prison?

23   A    Well, I know that he was captured.

24   Q    And you've had no contact, no -- either indirectly or

25   directly?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    A    He has sent his regards with my mom.

2    Q    He speaks to your mom.  You speak to your mom and

3    messages are passed that way?

4    A    We greet each other, yes, sir.

5    Q    Through your mother?

6    A    Through my mother.

7    Q    And that's through the phone you speak to your mother?

8    A    Yes, the jail phone.

9    Q    And another subject, decades before you even met

10   Mr. Guzman, you've used fake names?

11   A    Yes, sir.

12   Q    And your brother Jorge told you not to use your real name

13   when you were working together, correct?

14   A    That's correct.

15   Q    And why did he tell you to use fake names?

16   A    To evade the police.

17   Q    So that if you were caught you wouldn't be caught under

18   your real name.

19   A    Yes, sir.

20   Q    And you had to change your names frequently when you were

21   dealing drugs, correct?

22   A    Yes, sir.

23   Q    And why is that?

24   A    Because you would burned out a name.

25   Q    What do you mean, if you can explain to the jury, what do

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   you mean by burned out a name?

2   A    Well, if they arrest you under a fake name, then you

3   switch to another one.

4   Q    When you get out of prison?

5   A    Yes, sir.

6   Q    So it would give you, let's say, more lives, so to speak?

7   A    Yes, sir.

8   Q    And you burned through a lot of names, didn't you?

9   A    Yes, sir.

10  Q    From 1992 to 1997, you used the name Jose Alejandro Osuna

11  Villareal?

12  A    Yes, sir.

13  Q    And you had an American visa created in that fake name?

14  A    Yes, sir.

15  Q    You obviously had no problem, no moral problem, violating

16  American immigration laws?

17  A    Well, it was a good visa so, no, sir.  There was no

18  problem.

19  Q    It was a good visa but it was in a fake name?

20  A    I was the fake one.  The documents were good.

21        THE COURT:  Quiet, please.

22  Q    So you see no problem going to American immigration

23  officials and submitting a request for travel papers under a

24  fake name, because it's a good name, or is it because --

25  explain that to me.  I'm sorry.

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1          MS. PARLOVECCHIO:  Objection to form.

2          THE COURT:  Sustained.

3     Q    Tell me why it was a good visa if you were submitting

4     it -- submitting your application under a fake name?

5     A    Because the visa was issued by the American Embassy and

6     it was a good document.

7     Q    It was a real visa, but it had fraudulent information in

8     it, correct?  Is that what you're saying?

9     A    The person, that is me, yes, it was a fraudulent person.

10    That's it, sir.

11    Q    So it's a phony document, wouldn't you agree?

12    A    Well, sir, yes.

13    Q    It's an illegal document, wouldn't you agree?

14    A    Correct.

15    Q    It's a violation of our laws here in America, wouldn't

16    you agree?

17    A    Yes, sir.

18    Q    And none of that is good, wouldn't you agree?

19    A    Agreed.

20    Q    Other names you used were Eloi Franco?

21    A    Yes, sir.

22    Q    How did you think of that one?

23         MS. PARLOVECCHIO:  Objection.

24         THE COURT:  Overruled.

25    A    Eloi Franco was a name that a guy who worked for my

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1  brother Jorge in Monterrey gave to me.  And it was in

2  reference to Eloi Cabasos a bullfighter from Mexico and his

3  son actually resembled me.

4  Q    Did you use that name to get fake identification?

5  A    Like a license.  That's it, yes, sir.

6  Q    That's identification, correct?

7  A    Yes, sir, a license.

8  Q    And you used the license with a fake name in order to

9  commit frauds?

10  A    Yes, sir.

11  Q    And the reason you had a license in this fake name was to

12  help you deal drugs easier?

13  A    It was so that I could move easier or easily with a

14  Mexican document because having a Colombian document wasn't

15  good.

16  Q    Well, but you wanted to move easily to traffic narcotics?

17  A    At that time, sir, I did not traffic narcotics.

18  Q    So you --

19  A    I worked in accounting.

20  Q    Oh.  So you were an accountant and you carried a license

21  with a fake name on it, correct?

22  A    Yes.

23  Q    And your testimony is that the reason why you, the

24  accountant, needed to carry a license in a fake name was to

25  allow you to travel easier through the country?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    A    Yes.

2    Q    You were committing a crime every day you used that phony

3    license while you were an accountant, correct?

4    A    Okay.  Yes, sir.

5    Q    Jose Alejandro Tirado Ortiz, another one of your fake

6    names that you used?

7    A    Tirado Ortiz, yes, sir.

8    Q    And you got a passport in that fake name?

9    A    Yes, sir.

10   Q    You got a bank account in that fake name?

11   A    Yes, sir.

12   Q    Was this when you were an accountant or was this when you

13   were a drug trafficker?

14   A    I worked for Jorge in accounting and I was a drug

15   trafficker.

16   Q    Oh.  So when you said that you were an accountant before

17   using the name Eloi Franco, were you an accountant for Jorge?

18   A    Yes, sir.

19   Q    So when I asked you if you were a drug trafficker while

20   you were carrying the license with the name Eloi Franco on it,

21   and you said you were an accountant, you were an accountant

22   for a narco trafficker?

23   A    Yes.

24   Q    And you knew that Jorge was trafficking narcotics when

25   you were working for him as an accountant?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    A    Yes.

2    Q    Were you doing his books for his narco trafficking

3    business?

4    A    Part of them, yes, sir.

5    Q    You were part of the conspiracy with Jorge to traffic

6    narcotics at that time, weren't you?

7    A    Yes, sir, in the area of accounting.

8    Q    So when I asked you if you were trafficking drugs when

9    you were using that license and you said no, you were an

10   accountant, that was a lie, wasn't it?

11   A    No.  I understood it as which one was my role.

12   Q    Were you responsible for the drugs that Jorge was

13   trafficking when you were working in the accounting department

14   of the Cifuentes Villa Drug Trafficking Organization?

15           MS. PARLOVECCHIO:  Objection.

16           THE COURT:  Sustained.

17   Q    Jose Alejandro Garza Zada, is that another fake name you

18   used?

19   A    Yes, sir.

20   Q    Romel Alberto Zada de la Garza another fake name you

21   used?

22   A    Yes, sir.

23   Q    I have to ask, the Romel part, is that a reference to the

24   famous Nazi?

25   A    No, sir.

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    Q    What is it a reference to?  How did you get that name?

2    A    One of my girlfriends gave me that name just because her

3    little brother's name was like that and she liked the name

4    very much, so she gave it to me.

5    Q    You used it while you were trafficking drugs?

6    A    Yes, sir.

7    Q    One of your names that had to get burned at some point?

8    A    Yes, sir.

9    Q    Enrique Rodriguez Garcia, another fake name you used?

10   A    Yes, sir.

11   Q    Fernando Alberto Garza Zada, another fake name that you

12   used?

13   A    Yes, sir.

14   Q    You had several American Express cards in Mexico in these

15   fake names?

16   A    Yes, sir.

17   Q    MasterCard as well?

18   A    Yes, sir.

19   Q    All while you were trafficking drugs?

20   A    Yes, sir.

21   Q    And you did it so that you wouldn't be caught under your

22   real name, correct?

23   A    That's correct, sir.

24   Q    Every time you used one of these cards under a fake name,

25   it was a crime, wasn't it?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   A    Yes, sir.

2   Q    You had no problem committing those crimes, did you?

3   A    If the money was my own, no.  No, sir.

4   Q    So you're saying that it was okay for you to use these

5   cards, these credit cards under fake names, because you were

6   paying the money for the bills?

7            MS. PARLOVECCHIO:  Objection.

8   Q    For the materials that you were purchasing under these

9   cards with fake names.

10           MR. LICHTMAN:  What a horrible question.

11           MS. PARLOVECCHIO:  Objection.

12           THE COURT:  Sustained.

13           MR. LICHTMAN:  To form, Judge?

14           THE COURT:  Yes.

15           MR. LICHTMAN:  Just checking.

16  Q    You're saying that you don't consider it a wrong because

17  you were paying the bills that were generated from these fake

18  credit cards?

19           MS. PARLOVECCHIO:  Objection.  Misstates the

20  testimony.

21           THE COURT:  The witness can answer.

22  A    Yes, sir.

23  Q    But you agree that it was wrong to use these cards with

24  fake names?

25  A    Having a fake name, yes, sir.

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   Q    But because you didn't steal anything with the cards, you

2   feel that morally it was okay?

3   A    Up to a certain point, yes, sir.

4   Q    Which point?

5   A    Because of the point that I was not stealing from

6   anybody.

7   Q    You were just committing fraud on the banks that issued

8   the cards?

9   A    A fake name, fraud.  That was it.

10  Q    And people also called you Simon?

11  A    Yes, sir.

12  Q    Do you know why?

13  A    Yes, sir.

14  Q    Why don't you tell us.

15  A    In Culiacan, when you want to say yes and you want to do

16  it in a very positive and optimistic way, you say Simon, yes,

17  because when you don't refuse anything, you use that.

18       You can ask your client.

19  Q    How about I ask you instead.

20  A    Well, just because he's from Culiacan, he could explain

21  it better.

22  Q    During the break.

23       Who gave you the name Simon?

24  A    Don Joaquin.

25  Q    It wasn't from your brother Jorge perhaps?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5244

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   A    He would also be called Simon, Simon.

2   Q    And Mr. Guzman gave him the name Simon as well?  Jorge,

3   if you know?

4   A    I think so.  It was the two of them.

5   Q    Isn't it in fact true that the name Simon comes from a

6   movie character, a movie/television character named Simon

7   Templar?

8   A    There was also a movie that was called like that, but *The*

9   *Saint*.

10  Q    It had nothing to do with your name, Simon?

11  A    No.  No, sir.

12  Q    Completely false?

13  A    As far as I know it's false.

14  Q    Now, Jorge would provide you with fake documents every

15  time you changed names?

16  A    I myself would do that.

17  Q    You didn't get the documents from Jorge?

18  A    We have the same source.

19  Q    And you also used the name Jose Felipe Aguilar Islas?

20  A    Yes.

21  Q    Mauricio Garza Zada?

22  A    Yes.

23  Q    Do you even know how many fake names you've used over the

24  years?

25  A    All of the ones you just mentioned.  I myself gave them

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   to you.

2   Q    You didn't give them to me, did you, sir?

3   A    Those are the ones you just read.

4   Q    You didn't give them to me, though.  We never have met

5   before today, have we?

6   A    That's right.  I didn't have the pleasure, but you just

7   read them.

8   Q    So you've met with them, though, numerous times in

9   preparation for your testimony, as we determined before?

10          MS. PARLOVECCHIO:  Objection.  Asked and answered.

11          THE COURT:  Sustained.

12  Q    You haven't met with me before your testimony today, have

13  you?

14          MS. PARLOVECCHIO:  Objection.  Asked and answered.

15          THE COURT:  Sustained.

16  Q    If you were asked to speak to me before your testimony

17  today, would you have agreed to speak to me?

18          MS. PARLOVECCHIO:  Objection.  Relevance.

19          THE COURT:  Sustained.

20          Mr. Lichtman, I think we got the point on the names,

21  can we move on to something else.

22  BY MR. LICHTMAN:

23  Q    And once you got arrested in Paris with a fake passport,

24  do you recall that?

25  A    Yes, sir.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5246

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    Q    With Jorge?

2    A    Yes, sir.

3    Q    You were trying to get to Montreal while working on a

4    hash deal?

5    A    Yes, sir.

6    Q    When you got arrested, that didn't stop you from using

7    fake identification, didn't it?

8    A    No, sir.

9    Q    You bribed judges?

10   A    Yes, sir.

11   Q    You sent Erica Lopez to bribe judges to get Telmo Castro

12   out of jail, as you testified on direct?

13   A    Yes, sir.

14   Q    And Castro had worked with your brother Jorge?

15   A    Castro had worked for Serpa, the cocaine supplier who was

16   Politico.

17   Q    And the reason you bribed the judge is to get Castro out

18   of jail is because he was responsible for you losing

19   8,000 kilos of cocaine?

20   A    That's right.

21   Q    And he had promised to make good on half of the lost

22   cocaine if you could get him out of jail?

23   A    He made that commitment, yes, sir.

24   Q    So you bribed the judges to help you make money, correct?

25   A    To recover the cocaine of Joaquin's and ours.

5247

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   Q    My point is, you're willing to pervert the legal system

2   for your own personal gain, aren't you?

3   A    At that time I was.  Yes, sir.

4   Q    And now that you're testifying, you value your freedom

5   more than money, don't you?

6   A    Yes, sir.

7   Q    And you'll do whatever you need to to get what you want;

8   isn't that true?

9   A    If that implies telling all the truth, then, yes, sir.

10  Q    Your sister Dolly, as you said, was arrested in Colombia,

11  I think you said in 2011?

12  A    It was like 2010, 2011.  I don't remember the date

13  exactly, sir.

14  Q    And you told your brother Jorge that you wanted to break

15  her out of that prison in Colombia, didn't you?

16  A    Yes, sir.

17  Q    Like bust her out with violence, correct?

18  A    I believe so, yes, sir.

19  Q    Was that a part of the telling the truth that you just

20  mentioned before?

21          MS. PARLOVECCHIO:  Objection.

22          THE COURT:  Sustained.

23  Q    And you also bribed officials, not just in your drug

24  dealing business, but for personal issues as well?

25  A    Yes, sir.

5248

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   Q    And you've bribed people in order to get out of those

2   scrapes as well, agreed?

3   A    Yes, sir.

4   Q    And when you've been arrested on matters having nothing

5   to do with drug dealing, you've used fake names, haven't you?

6   A    Yes, sir.

7   Q    You used the name Jose Alejandro Osuna Villareal when you

8   were arrested having nothing to do with drug dealing?

9   A    Yes, sir.

10  Q    Now, you and your family, you would agree, made hundreds

11  of millions of dollars illegally from drug trafficking?

12  A    I would say yes, sir.

13  Q    And if you're aware, your brother Jorge had hundreds of

14  millions of dollars of property and assets seized in Colombia.

15  A    Yes, sir.

16  Q    And how did you learn of that?

17  A    I found out through the Internet.

18  Q    When?

19  A    I think that was in 2010, I believe it was.

20  Q    After he was arrested?

21  A    I think that from before.

22  Q    Now, you yourself have owned numerous homes and

23  properties that you've purchased with drug proceeds?

24  A    No, sir.

25  Q    You don't -- you haven't bought homes and properties with

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5249

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   drug proceeds?

2   A      No, sir.

3   Q      How many homes have you owned?

4   A      None, sir.

5   Q      You've never purchased a property in your life?

6   A      I bought an apartment in Cali many, many years ago, like

7   in the '90s, and I sold it in 2005.

8              And I gave a deposit for some land in California in

9   2012, but I lost that because I didn't make the payments.

10  Q      So those are the only two properties you've ever

11  purchased in your life, either through drug -- either with

12  drug proceeds or otherwise?

13  A      Yes, sir.

14  Q      Cars, did you ever buy cars with drug proceeds?

15  A      Yes, I would buy cars.  I would gift it to girlfriends.

16  I would gift them watches; a good life.

17  Q      Did you ever keep any of these cars or watches for

18  yourself, or were you just giving them away?

19  A      I gave them away.  And at the end, I sold the cars.

20  Q      And did you keep the money from the proceeds of the

21  sales?

22  A      No, sir.  I spent it.

23  Q      You spent it.  What did you spend it on?

24  A      When you are a thief then -- or a thug, then the expenses

25  become much higher.

5250

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   Q    And you're a thief?

2   A    Excuse me.  I'm using the word "fugitivo," fugitive.

3   Q    Oh, when you were a fugitive?

4            THE INTERPRETER:  Interpreter correction.

5            MR. LICHTMAN:  Understood.

6   A    Excuse me.  Yes, thank you --

7   Q    My apologies.

8   A    -- sir.

9   Q    So you're saying that you have almost no assets,

10  according to you, correct?

11  A    That's right, sir.

12  Q    Even though your brother managed to amass hundreds of

13  millions of dollars of assets from drug proceeds?

14  A    That would be my brother, not me.

15  Q    Now, as part of your cooperation agreement -- oh, by the

16  way, let me back up.

17           You've never had any assets even seized by the

18  American government, correct?

19  A    No, sir.

20  Q    What about the Colombian government, have they ever

21  seized any of your assets?

22  A    I don't have anything to seize.

23  Q    I didn't ask that.  I asked that did the Colombian

24  government ever seize any of your assets?

25  A    No, sir.

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1  Q    What about the Mexican government, did they ever seize

2  any of your assets?

3  A    No, sir.

4  Q    And as part of your cooperation agreement, you agreed to

5  pay just $1 million in forfeiture, correct?

6  A    Yes, sir.

7  Q    And do you think that reflects the total amount of money

8  that you've made as a drug dealer in the past 20 years or so?

9  A    I wouldn't be able to answer that.

10  Q    Why not?

11  A    I don't know what you're asking me.

12  Q    Did the government ever ask you about the allegation that

13  you bought an entire town?

14  A    A town?

15  Q    An entire town I think in Baja, California, or something

16  like that?

17  A    No, sir.  That was the land that I told you about that I

18  gave a deposit for, and that deposit was lost.

19  Q    And how much did you put down for that land?

20  A    One million a hundred thousand dollars.

21  Q    $1,100,000 you put down for that piece of land?  You put

22  down that much money?

23  A    Yes.

24  Q    Even though that's basically all you've ever made as a

25  drug dealer in your entire life.  Did you save it all?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1        MS. PARLOVECCHIO:  Objection to form.

2        THE COURT:  Sustained.

3   BY MR. LICHTMAN:

4   Q    Didn't you just say that you think you made about a

5   million dollars in your entire career as a drug dealer?

6   A    No, sir.

7   Q    You made significantly more than a million dollars,

8   didn't you?

9   A    Yes, sir.

10  Q    How many more millions, do you think?

11  A    I'd say 7.

12  Q    7 million now in drug proceeds?

13  A    Probably.

14  Q    Are you aware that before the break you gave a completely

15  different answer to that question?

16        MS. PARLOVECCHIO:  Objection.  Misstates the

17  testimony.

18        THE COURT:  Sustained.

19  BY MR. LICHTMAN:

20  Q    Didn't you say that you weren't a very successful drug

21  dealer, that you were sort of lower middle?

22        MS. PARLOVECCHIO:  Objection.  Asked and answered.

23        THE COURT:  Sustained.

24  BY MR. LICHTMAN:

25  Q    Now, certainly the $1 million you owe the government is

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   less than the 7 million that you're claiming that you made as

2   a drug dealer?

3   A     Yes, it's less.

4   Q     And you haven't paid a penny of that 1 million-dollar

5   forfeiture number, have you?

6   A     No, sir.

7   Q     You need to pay it in the future, isn't that what your

8   deal is?

9   A     Yes, sir.

10  Q     After you're sentenced, correct?

11  A     Yes, sir.

12  Q     After you've testified against Joaquin Guzman, correct?

13  A     I don't know if after that or when it would be.

14  Q     Well, you know that you're not going to pay for it before

15  you finish testifying against Mr. Guzman, correct?

16  A     I don't know for how long the U.S. government is going to

17  need me.

18  Q     Regardless, you're not paying any of that money until

19  after your sentencing, whenever that is?

20  A     That's right, sir.

21  Q     Why not before?

22  A     I wouldn't be able to tell you.

23  Q     Do you have any assets right now to your name?

24  A     No, sir.

25  Q     You don't have a single dollar to pay towards that

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    1 million, do you?

2    A    No, sir.

3    Q    Well, you told the government that you had no assets?

4    A    That's right.  I don't have assets, but I have the

5    intention of paying.

6    Q    Well, how are you going to pay it if you have no assets?

7    A    I wouldn't be able to tell you for the time being, sir.

8    Q    You have no prospects of making a million dollars in the

9    future, do you?

10   A    At this time I have no plans.

11   Q    No plans to make any money?

12   A    I'm locked up right now.  Right now my mindset is not

13   right for that.

14   Q    Right for what, drug dealing?

15   A    No, sir.  That was in the past.

16   Q    Well, you have a cooperation agreement with the

17   government, don't you?

18   A    That's right, sir.

19   Q    And you're aware that there is language in there about

20   this forfeiture payment that you owe?

21   A    Yes, sir.

22   Q    And in the cooperation agreement it specifically states,

23   and you specifically agreed, that the million dollars needs to

24   be paid in full no later than six months after the date of

25   your sentencing; isn't that correct?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    A    Yes, sir.

2    Q    And you just signed this cooperation agreement

3    January 3rd, 2018, just a year ago, correct?

4    A    Yes, sir.

5    Q    So six months after you're sentenced, you have to pay a

6    million dollars or else there is going to be some trouble for

7    you, agreed?

8    A    That's true, sir.

9    Q    And as you're sitting right now, there is no way you're

10   paying that million dollars any time soon, correct, because

11   you don't have a penny?

12              MS. PARLOVECCHIO:  Objection.  Asked and answered.

13              THE COURT:  Sustained.

14   BY MR. LICHTMAN:

15   Q    If you don't pay that million dollars six months after

16   your sentencing, your cooperation agreement is breached, isn't

17   it?

18              THE COURT:  All right.  Let's have a sidebar,

19   please.

20              (Sidebar conference.)

21              (Continued on the next page.)

22

23

24

25

5256

SIDEBAR CONFERENCE

1    THE COURT:  It is creating a false impression to the

2  jury to say it is a dishonest act for agreeing to pay a

3  forfeiture that the defendant is likely not to have money to

4  pay.  That's not dishonest.  You all know, every lawyer knows,

5  that everyone has to agree to that as part of their guilty

6  plea.  It's not dishonest if he gets the money and he has to

7  pay it.  If he doesn't get it, then the government is not

8  going to make him live in a cardboard box.

9    MR. LICHTMAN:  Well, there's one difference is that

10  in this agreement, frankly, I haven't seen this one before in

11  this case or in any case, it says if he fails to make the

12  million dollar payment in six months, it's a material breach

13  of the plea agreement.

14    THE COURT:  I've seen that.

15    MR. LICHTMAN:  I haven't.

16    THE COURT:  I've seen that in a lot of agreements.

17    MS. PARLOVECCHIO:  Yes.

18    MR. LICHTMAN:  But he has to admit that he is very

19  possibly going to have a material breach of his agreement

20  and --

21    THE COURT:  You're impeaching him on a -- what's it

22  called in the future -- a possible future noncompliance.

23    MS. PARLOVECCHIO:  Right.

24    MR. LICHTMAN:  He can say that if he's going to pay

25  or if he can pay it.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5257

SIDEBAR CONFERENCE

1      THE COURT:  I think you've got plenty of facts to

2  the jury it makes it sound very unlikely that he's going to

3  million dollars in six months.

4      MR. LICHTMAN:  Can I ask him if he's aware that this

5  is a material breach --

6      THE COURT:  Yes, you can ask him that, but then move

7  on.  It's a dead horse situation.

8      MR. LICHTMAN:  Well, can I ask him what does he

9  think happens if there's a material breach.

10      THE COURT:  No, no.

11      MS. PARLOVECCHIO:  He already testified that he

12  would be in trouble if he didn't pay it six months after this.

13      MR. LICHTMAN:  What's trouble?

14      THE COURT:  We don't know.  He doesn't know.  She

15  doesn't know.  No one knows.

16      MR. LICHTMAN:  Well --

17      THE COURT:  In the real world, there is no trouble.

18      MR. LICHTMAN:  Well, that's the problem.  If he's

19  signing an agreement where it says it's a material breach of

20  the agreement, which means that he could be punished with no

21  5K1, he could be --

22      THE COURT:  That's not up to him.

23      MR. LICHTMAN:  But I can't ask him that that it's up

24  to them to decide what to do if there is a material breach.

25      THE COURT:  I'll give you a little more.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5258

SIDEBAR CONFERENCE

1    MR. LICHTMAN:  You understand my point?

2    THE COURT:  I understand your point.  But you're

3  creating an alternative reality to plea agreements.  It's not

4  the way it works and the jury has no experience with it and so

5  they don't know what all of us know about this

6  1 million-dollar forfeiture.

7    MS. PARLOVECCHIO:  Correct.  And it's very

8  misleading in that it's after his sentencing, so presumably if

9  everything goes well with his cooperation after he gets his

10  5K.  So this is like --

11    MR. LICHTMAN:  No, it says here that if he doesn't

12  pay his million in six months, you can then determine he

13  violated --

14    THE COURT:  Mr. Lichtman, you know how it works.  If

15  the government thinks he's been in compliance at the time of

16  his sentencing, they'll give him a 5K1, and if he doesn't have

17  the money to pay the forfeiture, they probably won't chase

18  him, but that's not up to him, that's up to them.

19    MR. LICHTMAN:  Can I ask him what his understanding

20  is.  If there is a material breach of the agreement and he's

21  out -- let's say he gets sentenced with the 5K1 and gets time

22  served, he gets out six months later he doesn't make the

23  payment, they're allowed to say, listen, you breached, you're

24  going back to jail.

25    THE COURT:  They're allowed.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1           MR. LICHTMAN:  So why can't I ask him if he knows

2     that?

3           THE COURT:  Because this is the real world.

4           MR. LICHTMAN:  He signed this a year ago.  Can I ask

5     him what his understanding is of what the breach --

6           THE COURT:  You can have a couple of more questions,

7     but really, you're creating a misimpression and it's not fair.

8     You know exactly what I'm talking about.  I don't have to

9     explain it further.  You've done these before.

10          MR. LICHTMAN:  Okay.  Judge, thank you.

11          (End of sidebar conference.)

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1              (In open court.)

2    BY MR. LICHTMAN:

3    Q    Sir, you're aware if you don't make the 1 million-dollar

4    payment six months after your sentencing, it's determined to

5    be a material breach of your cooperation agreement, correct?

6    A    Yes, sir.

7    Q    And what is your understanding of what occurs if there is

8    a material breach of your cooperation agreement?

9    A    I would be jailed again.

10   Q    But as we sit here right now, you have no money to your

11   name.

12              MS. PARLOVECCHIO:  Objection.  Asked and answered.

13              THE COURT:  Sustained.

14   BY MR. LICHTMAN:

15   Q    Did you tell the government about where all of your

16   assets have gone?

17   A    Yes, sir.

18   Q    Did you give them bank account names and numbers?

19   A    I gave them everything that I had.

20   Q    What did you give them?

21   A    Names.  I told them I had credit cards, but I didn't have

22   them on me because I didn't use them again.  With the names it

23   would be easy to find out if I have something or not.

24   Q    Did you give those names up?

25   A    All of them.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1    Q    You have assets under fake names?

2    A    No, sir.

3    Q    Do you have assets in other countries under any name?

4    A    No, sir.

5    Q    And you told the government that, correct?

6    A    That's right, sir.

7    Q    Were you required to fill out a financial statement under

8    oath?

9    A    I think so, sir.

10   Q    You think you filled out a financial statement under

11   oath?

12   A    Right now I do not remember.

13   Q    What if I told you that you didn't fill out a financial

14   statement under oath.  Would you agree?

15              MS. PARLOVECCHIO:  Objection.

16              MR. LICHTMAN:  Can I get a stipulation?

17              MS. PARLOVECCHIO:  Objection.

18              THE COURT:  Well, no.  The question is -- you can

19   try to refresh his recollection with a question.

20              MR. LICHTMAN:  I can't refresh his recollection with

21   a negative, Judge.

22              THE COURT:  Yes, you can.  You just did.  The

23   question was proper.  I don't know if it will be successful,

24   but the question was proper.

25              MR. LICHTMAN:  Did he give me an answer, Judge?  I

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    don't remember.

2              THE COURT:  He didn't.

3              MR. LICHTMAN:  Do I have to ask it again?

4              THE COURT:  You do.

5              MR. LICHTMAN:  Can you tell me what the question

6    was?

7              THE COURT:  Would it refresh your recollection if

8    Mr. Lichtman told you that you, in fact, did not give a

9    financial statement under oath?

10             MR. LICHTMAN:  Thank you, Judge.

11   A    I think so, sir.

12   Q    Meaning that you never filled out a financial statement.

13   A    I don't remember.

14   Q    Which means these nice people are required to rely on

15   what you tell them about your finances?

16             MS. PARLOVECCHIO:  Objection to form.

17             THE COURT:  Sustained.

18   BY MR. LICHTMAN:

19   Q    These people are required to rely on your honesty

20   regarding your finances, correct?

21   A    That's correct.  And I have told the truth.

22   Q    You'd never lie about your finances, correct?

23   A    I would never lie to this Court.

24   Q    Now, on direct examination you testified that you believe

25   you're facing anywhere from 1 to $10 million in fines,

5263

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   correct?

2   A    That's correct, sir.

3   Q    But, in fact, in your cooperation agreement, it

4   encompasses two cases, correct?

5   A    Yes, sir.

6   Q    One case for Manhattan and one case from Florida, federal

7   cases?

8   A    Yes, sir.

9   Q    Which means you're facing 10 million -- up to $10 million

10  in fines in each case, correct?

11  A    Yes, sir.

12  Q    So you're actually facing up to $20 million in fines,

13  correct?

14  A    Yes, sir.

15  Q    Can you foresee any possibility of you ever paying any of

16  that?

17            MS. PARLOVECCHIO:  Objection.

18            THE COURT:  Sustained.

19  BY MR. LICHTMAN:

20  Q    You speak several languages?

21  A    Yes, sir.

22  Q    Which ones?

23  A    English, Spanish, a little Portuguese.

24  Q    You speak English pretty well, don't you?

25  A    I studied in England when I was little, when I was a

5264

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1  young man.

2  Q    When you were 18, in fact?

3  A    Approximately, sir.

4  Q    You went to Brighton and you immersed yourself in the

5  English language.

6  A    Yes, sir.

7  Q    And you weren't speaking Spanish in Brighton, you were

8  speaking English, correct?

9  A    Most of the time, yes, sir.

10 Q    And that was 35 years ago, correct?

11 A    Yes, sir.

12 Q    Is today your birthday?

13 A    It's on the 18th.

14 Q    Oh, the 18th, sir.

15        Happy early birthday.

16 A    Thank you, sir.

17 Q    Now, you appeared before a judge in this building when

18 you took your guilty plea, correct?

19 A    Yes, sir.

20 Q    And this was a hugely important day in your life, wasn't

21 it?

22 A    Yes, sir.

23 Q    You were pleading guilty to charges that could require

24 you to spend the rest of your life in prison, correct?

25 A    Yes, sir.

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    Q    And you actually had your guilty plea taken by a

2    magistrate, not a district court judge in this building,

3    correct?

4    A    Yes, sir.

5    Q    And the magistrate judge is slightly below the district

6    court judge, correct?

7              MR. LICHTMAN:  No offense, Judge.

8              THE COURT:  I'm not offended.

9    A    If you say so, sir.

10             THE COURT:  Ladies and gentlemen, there are two

11   kinds of judges in this building.  There are district court

12   judges, like me, who are nominated by the President and

13   confirmed by the Senate.  But there's also magistrate judges

14   who are appointed by the district court judges.

15             The magistrate judges help with pretrial

16   proceedings, generally.  Can't sit on trials or make final

17   dispositions, but one of the things they can do to free up

18   district court time is to take guilty pleas.  That's what

19   happened here.

20             Go ahead, Mr. Lichtman.

21   BY MR. LICHTMAN:

22   Q    And in order for you to have your plea taken by a

23   magistrate, you had to consent to that, correct?

24   A    Yes, sir.

25   Q    And you had to sign a form indicating your agreement to

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5266

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   have your plea taken before a magistrate?

2   A    Yes, sir.

3   Q    And on this very important day, that form was read to you

4   in English by your lawyer, wasn't it?

5   A    Yes, sir.

6   Q    Without the interpreter.

7   A    Yes, sir.

8   Q    And you confirmed to the magistrate judge in this

9   building that you understood what was read to you in English,

10  correct?

11  A    Yes, sir.

12  Q    And the magistrate judge asked you a series of questions?

13  A    Yes, sir.

14  Q    She needed to understand that you understood what rights

15  you were giving up by pleading guilty, correct?

16  A    Yes, sir.

17  Q    And she needed to know whether you were knowingly and

18  voluntarily pleading guilty, correct?

19  A    Yes, sir.

20  Q    And everything was done in English that day, wasn't it?

21  A    With a small discrepancy, counsel.

22  Q    The judge asked you if your English was good?

23  A    Yes, sir.

24  Q    And your lawyer responded that your English was almost

25  perfect, didn't she?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   A    Yes, sir.

2   Q    After your brother was arrested, you told prosecutors and

3   agents in debriefing that Mr. Guzman provided you a phone to

4   use?

5   A    Could you repeat the question, please.

6   Q    You recall that you were given a phone, is what you claim

7   you told the government, by Mr. Guzman, to conduct cartel

8   business with Canadians.

9   A    Yes, sir.

10  Q    And you arranged to have some of these Canadians come to

11  Culiacan?

12  A    Yes, sir.

13  Q    And the Canadians, and according to you, Mr. Guzman had

14  meetings in the house you were living in in Culiacan, correct?

15  A    Yeah, and with me, yes, sir.

16  Q    And you were the translator for the Canadians with

17  Mr. Guzman, isn't that correct, because he doesn't speak any

18  English.

19          MR. LICHTMAN:  That's a bad question.  Withdrawn.

20  Q    You were the translator for the Canadians and Mr. Guzman?

21  A    That's right.

22  Q    Because the Canadians didn't speak Spanish and Mr. Guzman

23  doesn't speak English, correct?

24  A    That's correct.

25  Q    You understand all of my questions, don't you, when I say

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1   them in English?

2   A    Most of them.

3   Q    Well, you understood the magistrate judge when she had

4   you plead guilty to crimes that could cause you to spend the

5   rest of your life in prison, right?

6   A    (Answering in Spanish, not interpreted.)

7   Q    Sir, that was a yes or no question.

8        I said simply can you understand what I'm saying to

9   you in English?

10  A    Yes, sir.

11  Q    You understand it well, can't you?

12       MS. PARLOVECCHIO:  Objection.  Asked and answered.

13       THE COURT:  Sustained.

14  BY MR. LICHTMAN:

15  Q    By using a translator to translate my question to you, it

16  buys you extra time to think of an answer, doesn't it?

17       MS. PARLOVECCHIO:  Objection.

18       THE COURT:  Sustained.

19  BY MR. LICHTMAN:

20  Q    Now, you're aware that the crimes that you pled to cause

21  you to have a sentencing guideline calculation of life in

22  prison, correct?

23  A    Yes, sir.

24  Q    And you know what the federal sentencing guidelines are,

25  correct?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    A     Yes, sir.

2    Q     And you know that you received an enhancement in your

3    sentencing guideline calculation for being a leader of a drug

4    trafficking organization, correct?

5    A     Yes, sir.

6    Q     You also received an enhancement for being a career

7    criminal offender, if you know?

8              MS. PARLOVECCHIO:  Objection.

9              THE COURT:  Sustained.

10   BY MR. LICHTMAN:

11   Q     Now, you pled guilty to charges in two separate

12   indictments, as you said?

13   A     Yes, sir.

14   Q     And you agreed to have the cases from Florida and

15   Manhattan moved to Brooklyn and consolidated, correct?

16   A     That's correct.

17   Q     There's no question in your mind that you're facing life

18   in prison, correct?

19   A     Yes, sir.

20   Q     There's no question in your mind that without cooperation

21   with the government here, you're getting life in prison,

22   correct?

23   A     That's correct.

24   Q     And in order to get less time, you need the government to

25   file what's known as a 5K1 letter with the Judge, correct?

5270

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1   A     Ah, yes, sir.

2   Q     Are you not sure?

3           MS. PARLOVECCHIO:  Objection.

4           THE COURT:  Overruled.

5           MR. LICHTMAN:

6   A     Not necessarily.

7   Q     Why don't you explain.

8   A     The 5K1 letter would give a better perception to the

9   judge as to everything bad and everything good that I have

10  done.

11          But the final decision is in his hands.  It doesn't

12  depend on the letter.

13  Q     So you believe that you could perhaps get time served

14  without a 5K1 letter?

15  A     I'm not going to assume such things, sir.

16  Q     Well, you said that you believed that without a 5K1, you

17  can avoid life in prison.

18  A     I hope for a good reduction, sir.

19

20

21

22

23

24

25

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1              (In open court.)

2    CROSS-EXAMINATION

3    BY MR. LICHTMAN (continuing):

4    Q    You want the 5K1 letter, don't you?

5    A    Yes, sir.

6    Q    You know that you are getting a lower sentence with a 5K1

7    letter, don't you?

8              MS. PARLOVECCHIO:  Objection.

9              THE COURT:  Sustained.

10   Q    Do you think if you don't get a 5K1 letter there is a

11   reason?

12             MS. PARLOVECCHIO:  Objection.

13             THE COURT:  Sustained.

14   Q    What is the purpose of the 5K1 letter with regard to

15   lowering your sentence?

16   A    The purpose is for the judge, who is the maximum

17   authority, can look in detail at all the good things and all

18   the bad things that I have done and could be -- very possibly

19   have some compassion.

20   Q    But the 5K1 letter is attached to a motion by the

21   government asking for a lower sentence for you?

22             MS. PARLOVECCHIO:  Objection.

23             THE COURT:  Sustained.

24   Q    I will ask one last question and I will move off of it.

25             You want the 5K1 letter because you know that gives

*MICHELE NARDONE, CSR -- Official Court Reporter*

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   you your best chance guesting out of jail quicker?

2   A    It's very possible that I will get a reduction in time,

3   yes, sir.

4   Q    Well, you are aware that you are facing mandatory minimum

5   times on two cases, aren't you?

6            MS. PARLOVECCHIO:  Objection.

7            THE COURT:  Sustained.

8   Q    You know that you have ten-year minimums?

9            MS. PARLOVECCHIO:  Objection.

10           THE COURT:  Okay.  We will have a sidebar.

11           (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar

1              (Sidebar conference.)

2              THE COURT:  It is being entirely lost on the jury

3    and may well be lost on this witness that all the 5K1 does is

4    get him out of the mandatory minimum.

5              It is not the case, I believe, that if he is facing

6    two counts with mandatory minimums he has two consecutive

7    mandatory minimums.

8              MR. LICHTMAN:  I didn't say that.

9              THE COURT:  You strongly implied it, and I don't

10   think this witness is going to know the answer to it because

11   I'm only 90 percent sure of the answer.

12             MR. LICHTMAN:  At the very minimum, without the 5K1

13   he doesn't get below 10.

14             THE COURT:  That's correct.

15             MR. LICHTMAN:  I asked him.

16             THE COURT:  That's not what you are asking him.

17             MR. LICHTMAN:  I asked him.

18             THE COURT:  The way you phrased it, you have two

19   mandatory minimums.

20             MR. LICHTMAN:  That was the problem.

21             THE COURT:  That was the problem.  Conceivably, but

22   probably not.

23             MR. LICHTMAN:  It's not important enough --

24             THE COURT:  Really, if he doesn't get a 5K1 is

25   someone going to sentence him to two consecutive mandatory

Sidebar

1    ten-year minimums instead of life?

2              MR. LICHTMAN:  He is also telling the jury that if

3    he gets a 5K1 is not that important.  He says he can still get

4    less than life without a 5K1.

5              THE COURT:  He can.

6              MR. LICHTMAN:  If he doesn't get a 5K1 then we can

7    establish --

8              THE COURT:  That's true, but how do we know what he

9    is going to get?

10             MR. LICHTMAN:  How could we know?

11             THE COURT:  You want to emphasize the point that the

12   mandatory minimum --

13             MR. LICHTMAN:  Yes.

14             THE COURT:  Just don't imply he's got a mandatory

15   minimum of 20 because he's got two counts.

16             MR. LICHTMAN:  Understood.

17             (End of sidebar conference.)

18             (Continued on the next page.)

19

20

21

22

23

24

25

Alexander Cifuentes Villa – Cross/Lichtman

1          (In open court.)

2          MR. LICHTMAN:  Ready?

3          THE COURT:  Ready.

4   BY MR. LICHTMAN:

5   Q    Sir, you are facing ten-year mandatory minimum in these

6   cases?

7   A    Yes, sir.

8   Q    In order to get below the ten-year mandatory minimum you

9   need the 5K1 letter, correct?

10  A    That's correct.

11  Q    The judge can't go below the ten-year mandatory minimum

12  that you pled to without the 5K1 letter, correct?

13  A    That's correct.

14  Q    So in order to get the 5K1 letter, the judge doesn't file

15  it, correct?

16  A    It's the judge.

17  Q    You think the judge files the 5K1 letter?

18  A    No, the government.

19  Q    But they are the only ones -- not your lawyer, not the

20  judge -- just these prosecutors are the ones that make the

21  determination as to whether or not you get a 5K1 letter,

22  correct?

23  A    That's correct, sir.

24  Q    And they make the unilateral decision on whether or not

25  to file that letter, it's up to them completely, correct?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Cross/Lichtman

1    A    Correct.

2    Q    And you need to please them, don't you agree?

3         MS. PARLOVECCHIO:  Objection.

4         THE COURT:  Overruled.

5    A    All I have to do is to tell the truth, sir.

6    Q    You need to please them, don't you?

7         MS. PARLOVECCHIO:  Objection, asked and answered.

8         MR. LICHTMAN:  He didn't answer it.

9         THE COURT:  I'm going to let him answer the

10   question.

11   A    I don't have to please anybody, just answer the truth.

12   Q    Do you think a conviction here would help you?

13   A    No, sir.

14   Q    Do you think an acquittal would hurt you?  I can't hear

15   you.

16   A    No, sir.

17   Q    Do you want a conviction here?

18   A    It's not up to me to answer that question, sir.

19   Q    I'm asking you.  It is, actually.  I'm asking you.

20        Do you want a conviction here in this case?

21        MS. PARLOVECCHIO:  Objection, asked and answered.

22        MR. LICHTMAN:  He didn't answer the question.

23        THE COURT:  Don't argue with each other.

24        The objection is overruled.

25        You may answer.

*MICHELE NARDONE, CSR -- Official Court Reporter*

5277

Alexander Cifuentes Villa – Cross/Lichtman

1    A    I'm not looking for a conviction here, only for the

2    truth.

3    Q    That's the truth?  Sir?  That's the truth, what you just

4    said?

5    A    Just for the truth to be known.

6    Q    You don't think that you will get a 5K1 letter easier if

7    there is a conviction of Mr. Guzman?

8         MS. PARLOVECCHIO:  Objection, asked and answered.

9         THE COURT:  Sustained.

10   Q    Did you go over that question in your preparation for

11   your testimony here today?

12        MS. PARLOVECCHIO:  Objection.

13        THE COURT:  Overruled.

14   A    I don't remember, sir.

15   Q    You don't remember it, during your preparation they said

16   to you the defense lawyer may ask you if you want a conviction

17   in this case?

18   A    No, sir.

19   Q    But you are desperate to get out of jail, aren't you?

20   A    Anyone would like to get out of jail immediately.

21   Q    Sir, I'm not asking about anyone.  I'm asking about you,

22   Alex Cifuentes.

23   A    Yes, I would like to get out of jail, of course.

24   Q    You have all sorts of health problems in jail, don't you?

25   A    Some, yes, sir.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Cross/Lichtman

1    Q    You have problems with your eyes?

2    A    Yes, sir.

3    Q    You have complained about the medical treatment that you

4    have had in jail?

5    A    Yes, sir.

6    Q    On the day that you pled guilty, a year ago, in this

7    building, your lawyer addressed the judge about your medical

8    problems, didn't you?

9              MS. PARLOVECCHIO:  Objection, relevance.

10             THE COURT:  Sustained.

11             MR. LICHTMAN:  Judge, can I approach?

12             THE COURT:  You have him acknowledging that he had

13   problems.  The fact that his lawyer raised it before the

14   magistrate judge, what more probative value is that?

15   Q    Your lawyer told the magistrate that you were getting

16   poor treatment?

17   A    Yes, sir.

18   Q    And that it had been affecting your memory, correct?

19   A    It was affecting some of my abilities.

20   Q    It was affecting your memory, your lawyer said to the

21   judge, didn't she?

22             MS. PARLOVECCHIO:  Objection.

23             THE COURT:  Overruled.

24   A    That's what the lawyer said.

25   Q    Well, was that true, or did she lie?

*MICHELE NARDONE, CSR -- Official Court Reporter*

                    Alexander Cifuentes Villa – Cross/Lichtman

1           THE COURT:  Overruled.

2   A    Some memory, because I have to memorize everything.  I

3   can't write things down so I can't remember.

4   Q    You know that your memory affects your credibility before

5   this jury, don't you?

6   A    I imagine so.

7   Q    And you know that if your lawyer says that your memory is

8   being affected, is being harmed, that it makes you look like a

9   less credible witness in front of these people?

10  A    That's what you are saying.

11  Q    I'm asking what you believe.

12           Don't you think that this jury would think that you

13  are less credible if you are required to admit that your

14  memory has been affected by your eye problems?

15           MS. PARLOVECCHIO:  Objection.

16           THE COURT:  Sustained.

17  Q    Isn't that why you are fighting me about this issue?

18           MS. PARLOVECCHIO:  Objection.

19           THE COURT:  Sustained.

20  Q    Your lawyer also said that you were very angry about the

21  bad medical treatment you were receiving in prison.

22  A    Yes, sir.

23  Q    Were you angry?

24  A    With her, because the appointments were not making any

25  progress and any appointment that was made was simply

                    *MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa – Cross/Lichtman

1    postponed.

2    Q    I simply asked if you were angry about the bad medical

3    treatment you were receiving for your eyes in prison.

4              THE COURT:  Sustained.

5    Q    Did the government go through with you the allegation

6    that you were a hypochondriac?

7    A    I'm sorry?

8    Q    Giglio letter, page 4, at the bottom.

9              MS. PARLOVECCHIO:  Objection.

10              Your Honor, can we have a sidebar, please?

11              THE COURT:  Sure.

12              (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

1              (Sidebar conference.)

2              THE COURT:  First, Mr. Lichtman, go back and take

3    that down.

4              MR. LICHTMAN:  Sorry.

5              THE COURT:  It's okay.  Hang on one second.  Okay.

6              MS. PARLOVECCHIO:  So the question was did the

7    government go over the allegation that you are a

8    hypochondriac.

9              MR. LICHTMAN:  He said he wasn't sure.

10             MS. PARLOVECCHIO:  He said he wasn't sure, but you

11   didn't say are you a hypochondriac.

12             THE COURT:  Hold on.  Stay right here.

13             He didn't understand the question.  He said, "I'm

14   sorry?"  That was his answer.

15             MR. LICHTMAN:  Okay.

16             MS. PARLOVECCHIO:  Further to the request for the

17   sidebar, Mr. Lichtman didn't ask is there something that I can

18   refresh your recollection with.  He did the equivalent of

19   waving the report, which is to say Giglio letter, page 5, as

20   if this is the defendant's own statement that he is going to

21   rebut.

22             THE COURT:  All the record has is "I'm sorry?"

23             MR. LICHTMAN:  I will ask it again.

24             THE COURT:  I don't even know if this defendant

25   knows what hypochondria is.

Sidebar

1          But, while we are up here, does anyone believe that

2     hypochondria is indicative of truth telling or telling

3     falsehoods?

4          MS. PARLOVECCHIO:  No.  I think it's indicative of

5     someone's opinion of how they feel; and, having hypochondriacs

6     in my family, I don't think it is indicative of truthfulness.

7          THE COURT:  All right.  Well, let's, first of all,

8     find out if he knows what it is and if he indeed said it or

9     doesn't remember saying it or whatever it was.

10          MR. LICHTMAN:  Thank you, judge.

11          (End of sidebar conference.)

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Cross/Lichtman

1              (In open court.)

2    BY MR. LICHTMAN:

3    Q    Do you know what it is to be a hypochondriac?

4    A    Hypochondriac is like people who think they are sick

5    always, they have some illness.

6    Q    When they are not, correct?

7    A    Correct.

8    Q    And did you discuss with the government the allegation

9    that you were a hypochondriac?

10   A    I don't remember the expression hypochondriac in my

11   terms.

12   Q    Well, did they go over something that means hypochondriac

13   with you?

14             MS. PARLOVECCHIO:  Objection.

15             THE COURT:  Sustained.  Want me to help?

16             MR. LICHTMAN:  Sure.

17             THE COURT:  Did the government discuss with you that

18   you are prone to complain about medical conditions?

19             THE WITNESS:  I complain because the symptoms that I

20   have have been true.

21             I have a double corneal transplant, my -- I have

22   high blood pressure, and it goes up to my eyes and they hurt

23   and sting constantly.

24   BY MR. LICHTMAN:

25   Q    The question was:  Did the government go over with you

5284

Alexander Cifuentes Villa - Cross/Lichtman

1  the fact that you perhaps were complaining about medical

2  conditions that perhaps you may not have?

3          MS. PARLOVECCHIO:  Objection.

4          THE COURT:  Sustained.

5          MR. LICHTMAN:  Was that not a correct?

6          THE COURT:  Yes.  That's why I sustained the

7  objection.

8          MR. LICHTMAN:  Because it wasn't the correct

9  definition?

10         THE COURT:  The question was phrased wrong.  All

11 right.  Let's have a sidebar.

12         (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

1          (Sidebar conference.)

2          THE COURT:  The problem is you are trying very hard

3    to get in agent's opinions of hypochondria, but there is no

4    indication at all that that opinion was discussed with this

5    witness.

6          This witness, when asked the question what did you

7    tell the government about your physical condition, from when I

8    asked him, said, well, I have this, I have this, I have that.

9    Any conclusions drawn from that are the agent's.  So you can't

10   put it in his mouth.

11         MR. LICHTMAN:  Can I simply ask him why you asked

12   about it?

13         THE COURT:  Asked about what?

14         MR. LICHTMAN:  The fact that you lied about your

15   medical problems.

16         THE COURT:  Did anyone ask you whether you lied

17   about your medical problems?

18         MR. LICHTMAN:  Not lie.

19         THE COURT:  What's the question?

20         MR. LICHTMAN:  The question is I'm trying to ask him

21   if he has been over with the government the fact they believe

22   he is a hypochondriac, someone who complains about medical

23   conditions that are not accurate.

24         THE COURT:  I'm not going to let you phrase it that

25   way.

Sidebar

1              MR. LICHTMAN:  Tell me how it will be allowed,

2       because I don't want to come back.

3              THE COURT:  You can say, did the word hypochondria

4       ever come up in your discussions with the government.

5              MR. LICHTMAN:  Okay.

6              THE COURT:  Did the government ever accuse you of

7       not having genuine medical issues?

8              MR. LICHTMAN:  I was trying to break it down to

9       something easier to understand.

10             MS. PARLOVECCHIO:  I'm going to object to this

11      entire line of questioning.  I think somebody's opinion of

12      hypochondriasis is entirely subjective, and I think this is a

13      red herring.

14             THE COURT:  I agree.  I'm going to withdraw my

15      ruling.

16             We are going to go somewhere else.

17             (End of sidebar conference.)

18             (Continued on the next page.)

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Cross/Lichtman

1          (In open court.)

2          THE COURT:  Anything else, Mr. Lichtman?

3          MR. LICHTMAN:  In the cross?

4          THE COURT:  Yes.

5          MR. LICHTMAN:  Yes, judge.

6          THE COURT:  Go right ahead.

7     BY MR. LICHTMAN:

8     Q    You have had many proffer sessions with these

9     prosecutors?

10    A    That's right, sir.

11    Q    Would you say dozens?

12    A    Yes, sir.

13    Q    And in these proffer sessions you have given detailed

14    explanations of your criminal activity?

15    A    Yes, sir.

16    Q    And a major focus of these debriefings were Mr. Guzman,

17    correct?

18    A    Part of them, yes, sir.

19    Q    A large part of it, correct?

20    A    All of my family and also about him too.

21    Q    Have you testified against anybody but Mr. Guzman?

22    A    I have talked about so many people.

23    Q    Did you testify against anyone but Mr. Guzman?

24    A    At this time, no.

25    Q    And it was important for you to get all your facts right

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa – Cross/Lichtman

1    when you were discussing your criminal activity, correct?

2    A    That's right, sir.

3    Q    But before you met with the prosecutors to discuss your

4    criminal activity you met with your lawyer first, correct?

5    A    Yes, sir.

6    Q    And you told her all the details of your criminal

7    activity before you told them, correct?

8    A    No, sir.

9    Q    So you didn't go over your criminal background with your

10   lawyer before you met the government?

11   A    No, sir.

12   Q    So the first time you discussed your criminal activity

13   was with the government, not your lawyer, just to confirm?

14   A    That's right, sir.

15   Q    And your lawyer wasn't even present during many of your

16   debriefings with the government, correct?

17   A    Some of them, yes, sir.

18   Q    Now, beyond the low prison sentence you want the

19   prosecutors to help you stay in the United States, correct?

20   A    The government offered me an option.

21   Q    Part of the option is to help you and your family receive

22   visas to stay in America, correct?

23   A    It's optional, yes, sir.

24   Q    Optional, up to you?

25   A    Yes, sir.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa – Cross/Lichtman

1    Q    You want to stay in America, don't you?

2    A    Could I reserve the right to answer that?

3    Q    Sure.

4         Now, do you recall that you were debriefed in

5    mid-January 2016, the first time?  I think we went over this

6    before.

7    A    Yes, sir.

8    Q    During that first set of debriefings it was two days of

9    debriefings the first time, together?

10   A    Yes, sir.

11   Q    And during that first debriefing you told the government

12   that Mr. Guzman paid Mexican President Pena Nieto 250 American

13   dollars?

14   A    That is not correct.

15   Q    You don't recall telling them that there was payments

16   made by Mr. Guzman to the president of Mexico?

17   A    I remember the incident but not that amount; and then

18   from then on I corrected myself, and I told them that I didn't

19   want to share what the amount had been because I wasn't sure

20   about it.

21   Q    Well, let's unpack a little bit out of that, if we can.

22        You said that you made a mistake?

23        Sir, the question was simply that you said you made

24   a mistake.

25   A    Yes, sir.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Cross/Lichtman

1   Q    And the mistake that you later claim was the amount of

2   the money that was given to the president of Mexico, correct?

3   A    The amount of money that Mr. Joaquin Guzman had mentioned

4   to me.

5   Q    But you initially stated in your first debriefing that

6   $250 million was requested of Mr. Guzman by the president of

7   Mexico, in your first debriefing?

8            MS. PARLOVECCHIO:  Objection, asked and answered.

9            THE COURT:  Initially, the first time, I think he

10  said $250.

11           MR. LICHTMAN:  Oh, no.

12           THE COURT:  Which may have confused the witness, or

13  maybe I missed but I thought that's what he said.

14           MR. LICHTMAN:  Fair enough.

15  Q    You initially, whether by mistake or otherwise, in your

16  first set of debriefings by the government, you told them that

17  Mr. Guzman paid the president of Mexico $250 million, correct?

18  A    If Your Honor may allow me to answer counsel, that same

19  mistake you just made, that's the same mistake I made in the

20  beginning with the debriefing.

21  Q    The mistake that you claim you made is that in the first

22  debriefing you told the government that Mr. Guzman paid

23  President Nieto 250 million American dollars, that's the

24  mistake you are talking about?

25  A    I told them that he had been requested an amount of money

*MICHELE NARDONE, CSR -- Official Court Reporter*

5291

Alexander Cifuentes Villa - Cross/Lichtman

1   and that he had offered a different amount or that he had

2   given that amount, but it could have been a different amount.

3   So I didn't want to mention an amount because I wasn't certain

4   at the time.

5   Q    But you did mention an amount in that first debriefing,

6   didn't you?

7   A    Yes, sir.

8   Q    And the number was $250 million, wasn't it?

9   A    Yes, sir.

10   Q    And you said that a woman named Madre Maria delivered a

11   hundred million U.S. dollars to President Nieto in Mexico

12   City?

13            MS. PARLOVECCHIO:  Objection.

14            THE COURT:  Overruled.

15   A    It's a confusion.  It wasn't like that.

16   Q    Did you say to the government --

17            THE COURT:  One moment.  At a convenient time, I

18   would like to break.  It doesn't have to be now.  You can

19   finish your line.

20            MR. LICHTMAN:  Yes.

21   Q    You said during the initial debriefings that Mr. Guzman

22   was asked to pay $250 million, correct?

23   A    Yes, sir.

24   Q    And you know a woman named Madre Maria, correct?

25   A    Comadre Maria is Mr. Joaquin Guzman's lawyer, as comadre,

MICHELE NARDONE, CSR -- Official Court Reporter

Alexander Cifuentes Villa - Cross/Lichtman

1  and what happened was --

2  Q    Can I ask the questions?

3            THE COURT:  Let me see if I can help.

4            Please explain to the witness that if it's possible

5  for him to answer the questions with a yes or no he should do

6  that.  If there is more information to come out, then the

7  government has the right to ask him more questions later.

8            If he can't answer the question yes or no, then he

9  can simply say he can't answer the question yes or no.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  Go ahead.

12 A    I cannot answer the question with a yes or no, sir.

13 Q    The question I have for you is:  Did you tell the

14 government -- actually, let me back up.

15           The question I said is:  Do you know a woman named

16 Maria?

17 A    Comadre Maria.

18 Q    Do you know that person?

19 A    Yes.

20 Q    Did you tell the government in those first debriefings

21 that she delivered a hundred million U.S. dollars to President

22 Nieto in Mexico City?

23 A    I cannot answer that question with a yes-or-no.

24 Q    Sir, I simply asked:  Did you tell the government in your

25 first debriefing that Comadre Maria delivered $100 million to

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Cross/Lichtman

1    President Nieto in Mexico City?  Did you tell the government

2    that in your first debriefing, yes or no?

3    A     No.

4    Q     Did you also tell the government during this first

5    debriefing that the $250 million that was requested of

6    Mr. Guzman was also requested of Mr. Mayo Zambada, together?

7    A     No.

8    Q     Are you sure?

9    A     Yes.

10   Q     Did you go over this subject before you testified today?

11   A     No, but it's clear to me.

12   Q     Was it clear to you back then?

13   A     Joaquin told me.

14   Q     I asked you if it was clear to you back then, when you

15   told government about it.

16   A     No, it wasn't completely clear because of the amount of

17   money.

18   Q     On April 12, 2016, just a few months later, you attended

19   a debriefing with the prosecutors?

20   A     Yes, sir.

21   Q     Do you remember that date?

22   A     Could you remind me, please?

23   Q     On April 12, 2016, a few months later, you attended a

24   debriefing with the government?

25   A     Okay.

Alexander Cifuentes Villa - Cross/Lichtman

1    Q     In that debriefing you gave a story about the fact that

2    Mr. Guzman paid a bribe to President Pena Nieto of a hundred

3    million dollars, didn't you?

4    A     That's right.

5    Q     And you claim that the bribe occurred in October of 2012,

6    correct?

7    A     I cannot answer that with a yes or no, and I would like

8    to expand on that topic, to tell you how it was.

9    Q     Do you recall that you told the government during this

10   April 2016 debriefing that the payment of a hundred million

11   dollars to Pena Nieto was made in October of 2012?

12              MS. PARLOVECCHIO:  Objection, asked and answered.

13              THE COURT:  Sustained.  Good time for a break?

14              MR. LICHTMAN:  I guess, judge.

15              THE COURT:  All right.

16              Please don't talk about the case, ladies and

17   gentlemen.  Come back here at 20 to 4:00.  Thank you.

18              (Jury exits.)

19              THE COURT:  Anything we need to talk about while we

20   have this break?  Okay.  We will resume in 15 minutes.

21              (Recess.)

22              THE CLERK:  All rise.

23              THE COURT:  All right.  Let's have the jury, please.

24   Mr. Lichtman a nonbinding estimate?

25              MR. LICHTMAN:  I have a way to go.

*MICHELE NARDONE, CSR -- Official Court Reporter*

USA v. Guzman Loera

1           THE COURT:  Okay.

2           MR. LICHTMAN:  I'm sorry.

3           THE COURT:  It's okay.  Do your job.

4           MR. LICHTMAN:  I'm crossing some things out.

5           THE COURT:  I'm not limiting you.

6           MR. LICHTMAN:  I understand.

7           (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5296

Alexander Cifuentes Villa - Cross/Lichtman

1      (Jury enters.)

2      THE COURT:  All right.  Be seated.

3      Continue, Mr. Lichtman.

4      MR. LICHTMAN:  Thank you, judge.

5  BY MR. LICHTMAN:

6  Q    Sir, when we broke, I asked you about an April 12, 2016

7  debriefing with the government.

8  A    Yes, sir.

9  Q    And you testified that during that debriefing you told

10 the government that Mr. Guzman paid the president of Mexico a

11 hundred million dollars?

12 A    Yes, sir.

13 Q    And that bribe occurred in October of 2012, you told the

14 government?

15 A    Yes, sir.

16 Q    And the election in Mexico, as you know, was in November

17 of 2012?

18 A    I think, I think.

19 Q    And you mentioned in this proffer session that Andrea

20 Fernandez was employed by J.J. Rendon?

21 A    Yes, sir.

22 Q    And to assist in the Nieto campaign?

23 A    Yes, sir.

24 Q    And just so we can clarify for the jury, J.J. Rendon is a

25 political consultant?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa - Cross/Lichtman

1    A    Yes, sir.

2    Q    And as you told the government, Andrea showed you

3    pictures of suitcases filled with cash on J.J. Rendon's

4    personal plane?

5    A    She did show me pictures with suitcases filled with cash,

6    but it wasn't on J.J. Rendon's plane.

7    Q    Are you certain about that?

8    A    I recall, yes, sir.

9    Q    Are you certain?  Can I refresh your recollection?

10           MS. PARLOVECCHIO:  Objection.

11           THE COURT:  Sustained.

12   Q    The suitcases filled with cash that Andrea Fernandez sent

13   you pictures of, where was she when she took those pictures?

14   A    I don't recall, sir, whether it was in Mexico City.

15   Q    Well, do you recall telling the government that

16   diplomatic planes don't have to stop at customs, which is how

17   money gets transported without being noticed?

18   A    Yes, sir, but I don't remember having said that it was

19   money.

20   Q    Money that was in the suitcases?

21   A    That's right.

22   Q    Well, what was in the suitcases filled with cash that you

23   just testified about?

24   A    According to Andrea, she sent me some pictures of

25   suitcases and -- but I think it was in Mexico City, with

*MICHELE NARDONE, CSR -- Official Court Reporter*

5298

Alexander Cifuentes Villa – Cross/Lichtman

1  money.

2  Q    Well, but you told the government in February of 2016

3  that Andrea sent photos of suitcases filled with money during

4  the campaign?

5  A    Yes.

6  Q    The point is that those suitcases filled with cash, what

7  you told the government, was destined for President Nieto?

8  A    I wouldn't be able to tell you.

9  Q    Can I refresh your recollection, if you are uncertain?

10        MS. PARLOVECCHIO:  Objection to relevance, Your

11  Honor.

12        THE COURT:  Agreed.

13  Q    In November of '17 you attended another debriefing with

14  the government?

15  A    Yes, sir.

16  Q    And there was also a discussion about the bribes made to

17  President Nieto?

18  A    I believe so, sir.

19  Q    This proffer in November of '17 was a year and a half

20  after you began debriefing with the government, correct --

21  actually almost two years, correct?

22  A    Yes.

23  Q    And in this debriefing you claim that the president of

24  Mexico had contacted Mr. Guzman?

25  A    Yes.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa – Cross/Lichtman

1    Q    And the message was that Mr. Guzman didn't have to stay

2    in hiding.

3         That's what you told the government?

4    A    Yes, that very thing is what Joaquin said to me.

5    Q    And that the presidency wanted was money?

6    A    To work with him, yes.

7    Q    To work with him, you mean Mr. Guzman pays money and the

8    president allows Mr. Guzman to continue working?

9    A    I imagine so.

10   Q    And you told the government in November of 2017 that

11   President Nieto had asked Guzman for $250 million but that

12   Mr. Guzman offered them a hundred million dollars instead?

13   A    That's right, but I may have some confusion surrounding

14   the numbers.

15   Q    I will get to that.

16        I'm just talking about before the issue of the

17   confusion was in the end of November '17 you mentioned the

18   request for 250 million and the payment -- or the offer of a

19   hundred million back?

20        MS. PARLOVECCHIO:  Objection.  Asked and answered.

21        THE COURT:  Sustained.  I'm afraid I need a sidebar.

22        (Continued on the next page.)

23

24

25

1          (Sidebar conference.)

2          MR. LICHTMAN:  You wanted to know the relevance?

3          THE COURT:  No.  I need to know more.  You all know

4   a lot more about the background here than I do; but the way

5   it's coming out, it sounds to me like this witness alleges

6   that Mr. Guzman told him about this 250 or a hundred million

7   dollar bribe to Nieto to leave him alone and that this witness

8   doesn't know anything about it except through Mr. Guzman.

9          MS. PARLOVECCHIO:  Correct.

10         MR. LICHTMAN:  That's not what he said at the

11  beginning.  He didn't mention it was from Mr. Guzman.

12         THE COURT:  You didn't ask him.  It kind of slipped

13  out now, when he said that's what Mr. Guzman told me.

14         MR. LICHTMAN:  Let me tell you what the point of all

15  this is.  It's not that hundreds of millions of dollars was

16  paid out to the president of Mexico.

17         When he initially was debriefed, he gives the story

18  250 was requested; a hundred was taken.  He later is debriefed

19  a few months later, in April of '16, 250 requested, a hundred

20  million dollars received.  Then he is asked in November of

21  2017, which is now like a year and a half later, 250

22  requested, a hundred million paid.

23         Then here is the big finish, is that in September of

24  '18, just a few months ago, he has a debriefing on one topic,

25  just one, and he is asked about these payment figures; and,

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sidebar

1    all of a sudden, I don't remember anything, which is why he is

2    fighting so hard because he doesn't remember.  My point is

3    that he changed the story for a reason.

4           THE COURT:  Okay.  That's perfectly legitimate.  I

5    don't mind you go in there, but you understand, of course,

6    that on redirect it's going to come out that he doesn't know

7    anything from Mr. Guzman.

8           MR. LICHTMAN:  Fine.  I understand.  My point is the

9    numbers, that they change all of a sudden out of the blue.

10          THE COURT:  You are going far beyond that.

11          MS. PARLOVECCHIO:  I agree.  I think we have

12   established that.  He said multiple times I was confused on

13   the numbers.

14          MR. LICHTMAN:  He didn't say until a few months ago.

15   He was very certain of the numbers until a few months ago.

16          THE COURT:  You can take him through that.  You have

17   taken him through most of that already.  Close the loop, and

18   let's move on.

19          MR. LICHTMAN:  I'm at the last one.

20          THE COURT:  Okay.

21          MR. LICHTMAN:  Thank you.

22          (End of sidebar conference.)

23          (Continued on the next page.)

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes Villa – Cross/Lichtman

1              (In open court.)

2     BY MR. LICHTMAN:

3     Q     Sir, in September of 2018, just a few months ago, you

4     were debriefed again by the prosecutors?

5     A     Yes, sir.

6     Q     And this was an unusual debriefing in that it was just on

7     one topic, wasn't it?

8     A     Yes, sir.

9     Q     And this was unusual because normally when you were

10    debriefed you would sit for hours and discuss any number of

11    topics?

12    A     That's right, sir.

13    Q     Now, in this proffer, which occurred just a few months

14    ago, you noted that although you had previously provided exact

15    dollar amounts that Mr. Guzman had supposedly paid the

16    president of Mexico, in various other debriefings, you had

17    done a lot of thinking and now determined that you were

18    confusing the amounts of money, correct?

19    A     That's correct.

20              (Continued on the next page.)

21

22

23

24

25

5303

Alexander Cifuentes - cross - Lichtman

1   BY MR. LICHTMAN:  (Continuing.)

2   Q    Now, you know that this issue of bribe payments to the

3   president of Mexico is a very politically charged issue?

4              MS. PARLOVECCHIO:  Objection.

5              THE COURT:  Sustained.

6   Q    Are you aware that this issue has been in the news?

7              MS. PARLOVECCHIO:  Objection.

8              THE COURT:  Sustained.

9   Q    So apparently what you're testifying to today is that

10  although your number figures were the same in January of '16,

11  April of '16, November of '17, by September of 2018, suddenly

12  the numbers become fuzzy?

13             MS. PARLOVECCHIO:  Objection.

14             THE COURT:  I will allow him to answer.

15  A    Yes, sir.

16  Q    Now, you had a debriefing in June of 2018 in which you

17  went over a phone call in which you had discussed a narcotics

18  trafficker named El Mago?

19  A    El Mado (phonetic)?

20  Q    El Mago, M-A-G-O, Mago.

21  A    El Mago is a wizard.  He's not any drug trafficker.

22  Q    Well, perhaps he's a wizard that bribes the president of

23  Mexico.

24  A    No, no, I don't think so, sir.

25             THE COURT:  Everyone quiet, please.

Alexander Cifuentes - cross - Lichtman

1    BY MR. LICHTMAN:

2    Q    Now, we've discussed obviously Mexican law enforcement

3    from the police to the military to the judiciary to local

4    politicians to the president's office is corrupt?

5                MS. PARLOVECCHIO:  Objection.

6                THE COURT:   It is overbroad.  Sustained.

7                Rephrase it, please.

8    BY MR. LICHTMAN:

9    Q    You've testified that Mexican law enforcement is corrupt?

10   A    That's right.

11   Q    Local police in Mexico, corrupt?

12   A    Yes, sir.

13   Q    Mexican military, corrupt?

14   A    No, sir.

15   Q    The military is not corrupt?

16   A    I don't -- I don't know that for sure.

17   Q    Well, have you heard that they're corrupt?

18               MS. PARLOVECCHIO:  Objection.

19               THE COURT:  Sustained.

20   Q    Mexican judiciary, are they corrupt?  Judges?

21               MS. PARLOVECCHIO:  Objection, overbroad.

22               THE COURT:  Sustained.

23   Q    Do you have any knowledge that judges in Mexico are

24   corrupt?

25   A    Some.

5305

Alexander Cifuentes - cross - Lichtman

1    Q    And you have knowledge that many local politicians in

2    Mexico are corrupt?

3              MS. PARLOVECCHIO:  Objection.

4              THE COURT:  I will allow it.

5    A    Yes, sir.

6    Q    And, as you just testified to, the president of Mexico

7    has been corrupt?

8              MS. PARLOVECCHIO:  Objection.

9              THE COURT:  Sustained.

10   Q    And you claimed that Mr. Guzman had enemies such as the

11   Beltran-Leyva drug trafficking group?

12   A    Yes, sir.

13   Q    And you claim that a war occurred between Mr. Guzman's

14   organization and the Beltran-Leyvas?

15   A    Yes, sir.

16   Q    And you attended debriefings in February of 2016;

17   correct?

18   A    Yes, sir.

19   Q    And in that debriefing, you told the Government that the

20   Beltran-Leyvas paid former Mexican president Calderon for

21   protection against Mr. Guzman?

22   A    I would like to see that document.

23   Q    HACV-28, page three, paragraph eight.  You can read the

24   underlined portion there.  And let me know if that refreshes

25   your recollection that you told the Government that the

*SN      OCR      RPR*

Alexander Cifuentes - cross - Lichtman

1    Beltran-Leyva organization was paying President Calderon for

2    protection against Mr. Guzman?

3    A    I don't recall this incident very well.

4    Q    I asked --

5         THE COURT:    "I do" or "I don't."

6         THE INTERPRETER:    I don't.

7    BY MR. LICHTMAN:

8    Q    Do you recall the question was, does this refresh your

9    recollection that you told the Government that the

10   Beltran-Leyvas were paying President Calderon for protection

11   in this war against Mr. Guzman?

12   A    Right now, I do not remember that.

13   Q    Well, forget what you told them.  Was it true?

14   A    Well, the Beltran-Leyvas did send their army against

15   Joaquin, yes.

16   Q    I'm asking is it true that the Beltran-Leyvas paid

17   President Calderon for help during their war with Mr. Guzman?

18   A    I don't remember if that was to President Calderon.

19   Q    Well, who were the payments made to, if you know?

20   A    I think it was the Army.

21   Q    Well, didn't you say in the same debriefing that

22   Mr. Guzman was paying members of the military for their

23   assistance in the war against the Beltran-Leyvas?

24   A    With the captain, yes, sir.

25   Q    The military?

Alexander Cifuentes - cross - Lichtman

1    A    Special forces.

2    Q    Military?

3    A    Yes.

4    Q    And you just testified a couple of minutes ago that you

5    didn't think the Mexican military was crooked, but in fact

6    they were?

7    A    I got confused.  Yes, sir, you are completely right.

8    Q    And you claimed to the Government during the war with the

9    Beltran-Leyvas, enemies of the Beltran-Leyvas would contact

10   Mr. Guzman and provide phone numbers of Beltran-Leyva members;

11   correct?

12   A    Yes.

13   Q    And you claim what you told the Government was that

14   Mr. Guzman would then trace and identify the locations of

15   those numbers, those phone numbers being used; correct?

16   A    That's correct.

17   Q    And then you told the Government that Mr. Guzman would

18   provide those coordinates, those locations, to his contacts

19   within the Mexican military?

20   A    He would give them a number, yes, sir.  Affirmative.

21   Q    And you told the Government that Mr. Guzman would then

22   pay between 10 and $12 million to initiate a military

23   operation and either kill or capture Beltran-Leyva associates;

24   correct?

25   A    Those were the amounts that I would hear, yes, sir.

Alexander Cifuentes - cross - Lichtman

1  Q    And you claimed that this had happened, these initiation

2  of the military operation to kill Beltran-Leyvas two to three

3  times?

4  A    Yes, sir.

5  Q    So during the war between Beltran-Leyvas and Mr. Guzman,

6  according to you, he was paying the military to fight for him?

7        MS. PARLOVECCHIO:  Objection to form.

8        THE COURT:  Overruled.

9  A    The organization, yes, sir.

10  Q    The Beltran-Leyva organization?

11  A    The Sinaloa Cartel with Joaquin Guzman Loera.

12  Q    And the war between Mayo and Chapo against the

13  Beltran-Leyvas?

14  A    Mayo, Chapo, the others against the Beltran-Leyvas, yes,

15  sir.

16  Q    But the one -- the one part of this equation that you

17  don't recall is the fact that the Beltran-Leyvas were paying

18  Mexican President Calderon to fight for him as well?

19        MS. PARLOVECCHIO:  Objection, misstates the --

20        THE COURT:  Sustained.

21  Q    Do you find it unusual that that's the one part you don't

22  remember?

23        MS. PARLOVECCHIO:  Objection.

24        THE COURT:  Sustained.

25  Q    Now, you also told the Government that the Mexican

*SN        OCR        RPR*

Alexander Cifuentes - cross - Lichtman

1   federal police actually trafficked drugs with the

2   Beltran-Leyvas?

3   A    I think so, sir.

4   Q    Well, you told the Government that, didn't you?

5   A    Could you refresh with a document, please?

6   Q    I certainly can.

7   A    Thank you.

8   Q    HACV-28, page five, paragraphs 13 and 14.  If you can

9   read those two paragraphs to yourself when they're translated

10  to you and let me know when you're finished.

11  A    (Reviewing.)

12        I'm ready, Counsel.

13  Q    Does that refresh your recollection that you told the

14  Government that the Mexican federal police trafficked drugs

15  with the Beltran-Leyvas?

16        MS. PARLOVECCHIO:  Objection.

17        THE COURT:  Overruled.

18  A    That it was possible.  In fact in, that document that you

19  had I was explaining that my wife, Angie San Clemente, and I

20  were working with the Mexican federal police.  We had been

21  authorized by Joaquin Guzman Loera to import cocaine from

22  Argentina to Mexico.

23  Q    Sir, the question simply was, having read that, does that

24  refresh your recollection that you told the Government that

25  Mexican federal police trafficked drugs with the

SN          OCR          RPR

Alexander Cifuentes – cross – Lichtman

1  Beltran-Leyvas?

2  A    Yes, sir.

3  Q    And you told the Government that cocaine filled suitcases

4  were sent on a plane from Argentina to Mexico?

5  A    Yes, sir.

6  Q    And you told the Government that once in Mexico, the

7  federal police would retrieve the suitcases?

8  A    Yes, sir.

9  Q    The police would be sent a photo of the suitcases and the

10 flight number?

11 A    Yes, sir.

12 Q    And then, according to you, you said that the police

13 would then claim the suitcases at baggage because they had the

14 information of the flight and a picture of the suitcases?

15 A    Yes, sir.

16 Q    And you claim that the police would then sell the drugs?

17 A    Yes, sir.

18 Q    And you told the Government that the police were actually

19 the customers of the drug dealers?

20        MS. PARLOVECCHIO:  Objection, 401, 403.

21        THE COURT:  Overruled.

22 A    Yes, sir.

23 Q    And you told the Government that these Mexican federal

24 police also did this for a drug trafficker named Barbie?

25 A    Yes, sir.

Alexander Cifuentes - cross - Lichtman

1  Q    Now, you obviously -- another subject.  You obviously

2  were deeply involved in the corrupting of public officials in

3  Columbia?

4  A    Yes, sir.

5  Q    The military you were involved in bribing?

6  A    Military?

7  Q    Colombian military.

8  A    Colombian, yes.

9  Q    Police?  Colombian police?

10  A    Yes, of course.

11  Q    Politicians?

12  A    Yes, sir.

13  Q    Prosecutors?

14  A    Yes, sir.

15  Q    In Columbia, you knew of a General Betancourt-Llanos?

16  A    Betancourt-Llanos.  He was my sister's boyfriend.

17  Q    Your sister --

18  A    Lucia.

19  Q    Lucia?

20  A    Augusto Betancourt.

21  Q    And you and your family corrupted him?

22  A    I don't know in what sense.  He was a very good friend of

23  the family and, in fact, he showed me or taught me, rather,

24  how to shoot.  He wanted me to become part of the military.

25  Q    Didn't, in fact, Augusto Betancourt provide the Cifuentes

Alexander Cifuentes - cross - Lichtman

1  family with protection from rivals?

2  A    Yes, sir.

3  Q    That means he was corrupted.  He was helping a drug

4  trafficking organization against their rivals, wasn't he?

5  A    He was with the guerillas, sir.

6  Q    He was in the military, wasn't he?

7         THE INTERPRETER:  I'm sorry, the interpreter needs

8  to clarify the last response.

9         Interpreter correction.

10 A    So he was protecting us from the guerillas because the

11 guerilla almost kidnapped my mother and father.  They had shot

12 at my mother on the farm and they almost killed her and the

13 Army protected them.

14 Q    He was working for the Cifuentes drug trafficking

15 organization, wasn't he?

16 A    I don't know that for a fact, sir.

17 Q    Well, he was protecting your drug trafficking

18 organization, wasn't he?

19        MS. PARLOVECCHIO:  Objection.

20        THE COURT:  Sustained.

21 Q    Do you know a Colombian general named Naranjo?

22 A    Yes, sir.

23 Q    He was paid a monthly allowance to provide protection for

24 your family?

25        MS. PARLOVECCHIO:  Objection.

SN          OCR          RPR

Alexander Cifuentes – cross – Lichtman

1    Could we have a sidebar, please?

2    THE COURT:  Yes.

3    (Sidebar held outside of the hearing of the jury.)

4    (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar

1              (The following sidebar took place outside the

2    hearing of the jury.)

3              MS. PARLOVECCHIO:  This is actually the subject of a

4    motion in limine and Mr. Fels can speak to that.

5              MR. FELS:   This is really in line with the motions

6    that we had with Ray Zambada talking about specific people who

7    may have been corrupted.

8              MR. LICHTMAN:  Do you want me to leave out his name?

9              MR. FELS:  I don't think there's any reason to get

10   into people's names.

11             THE COURT:  So we're in agreement?

12             MR. FELS:  Yeah.

13             MR. LICHTMAN:  If I need to -- if he doesn't

14   understand what I'm talking about, I will need to give him the

15   name.

16             THE COURT:  You have a pretrial ruling.  Ask

17   counsel --

18             MR. LICHTMAN:  Do we have a pretrial ruling?

19             MR. FELS:  We talked about not going into that --

20             MR. LICHTMAN:  I don't mind leaving his name out,

21   but he doesn't --

22             THE COURT:  I am inclined to break and send the jury

23   home.  Let's do it now instead of making them wait.

24             MR. LICHTMAN:  Of course.

25             (Sidebar ends.)

*SN        OCR        RPR*

Sidebar

1              (Continued on next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                      *SN      OCR      RPR*

5316
PROCEEDINGS

1          THE COURT:  Ladies and gentlemen, we're going to

2     break for the day, but there's something I wanted to mention

3     to you, which is that Monday is Martin Luther King Day and the

4     court is going to be closed.  If you have any plans you want

5     to make for that day, whatever they may be, observe the

6     holiday or otherwise, I wanted to give you that opportunity.

7          You know the usual; stay away from media coverage,

8     do not communicate with anybody about this case, do not do any

9     research about the case.  Don't Google or Bing or Yahoo about

10    anything and we will see you tomorrow morning at 9:30.

11         Thank you again for your attention.

12         (Jury exits.)

13         (In open court.)

14         THE COURT:  Everybody be seated.  The marshals can

15    take the witness out.

16         (Witness steps down.)

17         THE COURT:  One thing I did want to mention besides

18    whatever else we want to mention is that the defendant is

19    supposed to get me his counter-instructions or objections to

20    jury instructions today.  Is that going to happen?

21         MR. LICHTMAN:  Could we have until tomorrow, Judge?

22         THE COURT:  Yes.  Anything else we need to cover?

23         MS. PARLOVECCHIO:  Yes, Your Honor.  I would like to

24    make a record that we have yet to receive a witness list from

25    the defense and I understand they're going to have a case to

PROCEEDINGS

1   put on.  We did receive the name of the one individual that

2   was the subject of the Court's order, but as to the others

3   they intend to call, we have yet to receive anything.

4          MR. LICHTMAN:  Mr. Guzman can be on the list of

5   potential witnesses.

6          THE COURT:  Are there others?

7          MR. LICHTMAN:  There may be.  If we have any others

8   many.  Could I have until Thursday on the jury instructions

9   only because we're going to be working on this tonight.

10         THE COURT:  Let's talk about the timetable of the

11   case.

12         When does the Government anticipate resting, taking

13   into account the cross-examination.

14         MS. PARLOVECCHIO:  Your Honor, we had hoped the end

15   of next week with some possible wiggle room into the following

16   Monday depending on how long the crosses go.

17         THE COURT:  If that's the case then yes,

18   Mr. Lichtman, you can have until Thursday for jury

19   instructions.

20         MR. LICHTMAN:  Thank you.

21         THE COURT:  When is the defense going to disclose

22   the witnesses?  I thought I picked a date.

23         MR. LICHTMAN:  The Government has the witness list.

24   So I don't think there's any additions.  There's no 3500

25   material and there is no discovery.

SN      OCR      RPR

PROCEEDINGS

1        MS. PARLOVECCHIO:   The defense has indicated they

2   may call some law enforcement officers, so --

3        MR. LICHTMAN:   What we're hoping to do by the end of

4   the weekend is we will send them requests for stipulations

5   instead of dragging these agents in.   If we can get an

6   agreement, we'll read the stipulations.   If not, we may have

7   to drag some people in.   I suspect that they're such

8   reasonable people we can work this out.

9        THE COURT:   Is the Government equally convinced

10  it's going to be reasonable?

11       MS. PARLOVECCHIO:   I agree that we're very

12  reasonable.   We'll certainly endeavor to do that, Your Honor,

13  but I can't guarantee it and as a result we would like to have

14  some notice because, as you know, this case involves agents

15  from all over the country.   We need to get them here and

16  prepare.

17       THE COURT:   We can't wait to see you succeed in

18  stipulations because people are going to have to be pulled in.

19  So really you've got to let the Government know by Thursday

20  night who they should bring in.

21       MR. LICHTMAN:   Judge, we can give them the

22  inconsistencies that we're going to need to finish off by

23  Thursday.   The problem is that the trial is not over and we

24  still have witnesses, cooperators, that may require us

25  bringing in agents to testify about what they heard during

*SN        OCR        RPR*

PROCEEDINGS

1   debriefing that are inconsistent with what the witness' are

2   saying.

3            THE COURT:  I do not know.  I think at this point

4   with the 3500 material you ought to be able to tell who you

5   need.

6            MR. LICHTMAN:  I don't want to gild the lily before

7   we ask the witnesses the questions because we don't know what

8   they're going to say.  It's in the 3500s.  We fully expect on

9   cross that they're going to answer consistently with what's in

10  the 3500s.  It's only when they answer inconsistently on cross

11  do we know that this becomes an issue.

12           THE COURT:  How do we solve this problem?

13           MS. PARLOVECCHIO:  Your Honor, we've been in trial

14  now for over two months.  I would imagine that counsel would

15  have a sense of who up until now they would like to call and

16  the other -- many of the agents who are involved with the

17  later witnesses are actually in New York City now.  So that

18  wouldn't be an issue.  If we can have up to today who they

19  intend to call, which law enforcement officers, that would

20  give us a big heads up.

21           THE COURT:  Tell the Government tomorrow who you

22  intend to call based upon the testimony that you have elicited

23  to date.

24           MR. LICHTMAN:  Which 3500 materials contain the

25  inconsistencies and who were the agents who wrote them up is

*SN      OCR      RPR*

PROCEEDINGS

```
 1    what you mean.

 2              THE COURT:  Who you intend to call.  If that is who

 3    you intend to call, that is fine.

 4              MR. LICHTMAN:  That's fine.

 5              THE COURT:  I am not sure I am going to -- we will

 6    take it a case at a time.  If you are going to call additional

 7    people based on testimony that has not yet been elicited, then

 8    you're going to have to let the Government know promptly, when

 9    that testimony is elicited, and I am going to make a

10    determination as to whether that is something that should have

11    been disclosed earlier, in which case I won't let you call

12    that 3500 witness.

13              MR. LICHTMAN:   Judge, the problem is that if you're

14    signaling that and one of the witnesses who gave inconsistent

15    statements which I'd like to call the agents, Jorge Cifuentes

16    who testified a few weeks ago, he'll have no incentive to

17    provide stipulations if they believe that you're not going to

18    allow me to call the agents in.

19              THE COURT:  I think there is a mutual incentive in

20    stipulations and indeed generally speaking, I think the

21    Government would rather stipulate rather than have its agents

22    actually brought in and say what the Government knows they are

23    going to say.  If they won't stipulate with you, it is because

24    I think either they are not agreeing with what you are

25    proposing in the stipulation or there's more to the story.
```

SN        OCR        RPR

PROCEEDINGS

1          MR. LICHTMAN:  Fair enough.

2          THE COURT:  I don't see altering the playing field

3   at all to give them the disclosure.

4          MR. LICHTMAN:  I'm going to give them the

5   disclosure.  Your signal perhaps that the lateness of our

6   requests may cause you to turn it down regardless of the

7   existence of inconsistencies, I don't want to give them any

8   incentive not to agree to stipulations.

9          THE COURT:  I probably should not have said that.

10   Some of the stuff that you have done impeachment on strikes me

11   as collateral that a witness could not testify to and it only

12   goes to bias -- Like I said, I will have to take them one at a

13   time and see what they are.

14          MR. LICHTMAN:   We're obviously going to take the

15   greatest hits.  I'm not looking to clean up every possible

16   area of cross.

17          THE COURT:  Then we won't have a problem.

18          MR. LICHTMAN:  Thank you, Judge.

19          THE COURT:  Anything else?

20          MS. PARLOVECCHIO:  Nothing from the Government, Your

21   Honor.

22          MR. LICHTMAN:  Nothing further.

23          THE COURT:  Thank you.

24          (Whereupon, the trial adjourned at 4:30 p.m. to

25   resume Wednesday, January 16, 2019 at 9:30 a.m.)

*SN      OCR      RPR*

5322

1                          I N D E X

2      WITNESS                                    PAGE

3      HILDEBRANDO ALEXANDER CIFUENTES VILLA

4      DIRECT EXAMINATION                          5151
                          BY MS. PARLOVECCHIO
5

6      CROSS-EXAMINATION    BY MR. LICHTMAN        5197

7

8                        E X H I B I T S

9      GOVERNMENT                 PAGE
       219-2                      5180
10     62                        5180

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*