

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

FJN/RMP:AA/RMU          *271 Cadman Plaza East*
F. #2009R01065/NY-NYE-616          *Brooklyn, New York 11201*

July 13, 2026

<u>By ECF</u>

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Ismael Zambada Garcia
>       <u>Criminal Docket Nos. 09-CR-466 and 25-CR-262 (BMC)</u>

Dear Judge Cogan:

The government submits this letter in advance of the July 20, 2026, sentencing of the defendant Ismael Zambada Garcia, also known as "El Mayo" and "Mayo Zambada." For decades, the defendant was one of the most—if not the most—prolific and powerful narcotraffickers in the world. Together with his co-defendant, Joaquín Guzmán Loera ("Guzmán"), also known as "El Chapo," the defendant was a co-founder in the late 1980s of the brutally violent Sinaloa Cartel (the "Cartel"). The defendant oversaw the transshipment of millions of kilograms of lethal drugs including cocaine, fentanyl, and methamphetamine. He employed armed sicarios who, at the defendant's direction, assaulted, tortured, and murdered to further the Cartel's goals. And under the defendant's control and supervision, the Cartel paid millions in bribes at all levels of the Mexican government—police, military, and politicians—to ensure the Cartel could operate without interference. It would be difficult to overstate the magnitude of the defendant's crimes and scale of the corruption, violence, and other harm he spread throughout Mexico, the United States, and the world. Indeed, the defendant's crimes are so vast that the law requires a sentence of life imprisonment. Accordingly, the government respectfully requests that the Court sentence the defendant to life imprisonment and enter a forfeiture money judgment of $15 billion, as set forth in the plea agreement.

I.     <u>Background</u>

A.     <u>Overview</u>

The Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA"), and the Department of Homeland Security, Homeland Security Investigations ("HSI"), began their investigation into the Cartel and its leaders in the early 1990s.

See Presentence Investigation Report ("PSR") at ¶ 92.  The investigation revealed that starting approximately in the 1980s, the defendant commenced his drug trafficking operations within Mexico and established international networks to facilitate the distribution of cocaine, methamphetamine, marijuana, and more recently, fentanyl into the United States.  Id. at ¶ 93. Previously known as the Mexican Federation, the Cartel pioneered the use of novel distribution techniques, including the use of trains and cross-border tunnels between Mexico and the United States to expand the quantities and types of drugs it would distribute.  Id.

The Cartel established partnerships with leaders of Colombia's Medellin Cartel and other subsequent Colombian cartels to ship cocaine to the United States.  Id.  Once the Cartel's connections with Colombia had been established, the defendant and his partners facilitated the distribution of Colombian cocaine into the United States at an impressive speed.  PSR at ¶ 94.  The shipments grew exponentially such that the Cartel eventually arranged for nightly receipt of as many as 15 to 20 planes each loaded with 1,000 to 1,500 kilograms of cocaine.  Id.  This changed in the 2000s when the Colombians, seeing increased law enforcement activity, started to abandon their United States distribution businesses in favor of permitting Mexican traffickers to invest in cocaine shipments at wholesale prices, which those Mexican traffickers would then distribute in the United States.  As a result, the Cartel began to take a more integral role in moving cocaine from Colombia into and throughout the United States. Filling a vacuum left by the departing Colombian traffickers, the Cartel established distribution networks across the United States, including in New York.

In the late 1980s and early 1990s, competition amongst drug trafficking organizations led to territorial disputes.  PSR at ¶ 96.  During this time, the defendant and Guzmán created an alliance that would ultimately transform the Mexican Federation into what become known as the Sinaloa Cartel.  Id.  Guzmán and the defendant engaged in an armed conflict with the Arrellano Felix Organization and others regarding claims to drug trafficking routes and areas of distribution within the United States.  Id.  This conflict culminated in a 1993 shootout which led to Guzmán's arrest and his 20-year prison sentence.  Id. at ¶ 97.  During Guzmán's incarceration in Mexico in the early 1990s, Guzmán was charged in seven judicial districts in the United States related to his drug distribution scheme.  Id. at ¶ 98.  In 2001, the Mexican Supreme Court issued a decision in favor of extraditing drug traffickers to the United States.  Id.  Shortly thereafter, Guzmán escaped from prison and evaded capture by Mexican and United States authorities for 13 years.  Id.  Guzmán was able to escape and avoid capture, in part, with the assistance of the defendant.  Id. at ¶ 99.

After Guzmán's escape, the defendant and Guzmán created a stronger faction within the Cartel and agreed to share profits of their drug trafficking operations.  PSR at ¶ 99. Factions within the Cartel consisted of a hierarchy of workers, lieutenants, security personnel, plaza bosses, pilots, truck drivers, money launderers, and leaders.  Id.  In February 2014, Guzmán was recaptured and returned to prison, but with the help of Cartel personnel, escaped anew on July 12, 2015.  PSR ¶¶ 103-104.  Guzmán was captured once again in January 2016 and ultimately extradited to the United States on January 19, 2017.  Id. ¶ 105.  After Guzmán's capture, the defendant became the sole highest-ranking leader of the Cartel, a role he maintained until his arrest in July 2024.  Id. ¶ 106.  Under the defendant's direction, over that near decade, the Cartel

2

distributed at least 1.5 million kilograms of cocaine and expanded into distributing other drugs, including heroin and fentanyl.  This resulted in billions of dollars in annual proceeds for the Cartel.

As the sole principal leader of the Cartel, the defendant continued to pursue violence and corruption.  He continued to direct Cartel members to kill to protect and expand the Cartel's criminal interests. These confrontations led to many deaths, including those of innocent civilians.  The Cartel maintained an arsenal of military-grade weapons at the defendant's disposal to protect his person, his drugs, and his empire.  His heavily armed private security forces were used as his personal bodyguards and as protection for drug shipments throughout Mexico, Colombia, Ecuador, and beyond.  Moreover, he continued to maintain a stable of armed personnel, who carried out gruesome assassinations and kidnappings aimed at maintaining discipline within the Cartel, protecting against challenges from rivals, and silencing those who would cooperate with law enforcement.  Indeed, the defendant engaged in systematic assassinations of fellow members of the Cartel, rival Cartel members, and law enforcement and military personnel who either betrayed or worked against the goals of the Cartel.

The violence directed by the defendant continued throughout his reign.  Indeed, just a few months before his arrest, the defendant ordered the murder of his nephew Eliseo Imperial Castro, also known as "Cheyo Antrax," after learning that he was collecting debts purportedly on behalf of the defendant for his own benefit and without permission.  PSR ¶ 135.  Imperial Castro was found dead in a car by the side of the road in Culiacán, Sinaloa where he was ambushed in May 2024.  Id.  In similar fashion, in approximately November 2023, the defendant directed violence in retaliation for the theft of a large cache of fentanyl pills, methamphetamine, and cocaine that belonged to the Cartel in Tijuana.  Id. At least three people were murdered in retaliatory violence directed by the defendant in connection with that theft.  Id.

Aside from violence, the defendant increased his use of corruption to perpetuate the Cartel's criminal reach.  Numerous witnesses have testified, including at the trials of Guzmán and corrupt former Mexican Secretary of Public Security Genaro García Luna, that corruption at all levels was necessary to allow the Cartel to function so effectively at such a large scale: from local police officers who escorted the drugs through Mexico, to corrupt officials who informed the Cartel of military actions, thwarted capture operations, and consulted with the Cartel about proceedings and investigations against it.  Under the defendant's reign, he increased the bribes to police, military commanders, and to politicians to protect the Cartel from government interference.  The Cartel spent millions of dollars a year at the defendant's direction on corruption payments.

Drug and money seizures traced to the Cartel in New York City and throughout the United States were routine throughout the defendant's criminal career.  See PSR ¶¶ 83, 85, 111, 113.  Ever since the Cartel's expansion into the United States, its distribution networks have also supported money laundering efforts that have delivered billions of dollars in illegal profits generated from drugs sales in the United States back to the Cartel.

3

B.     Procedural History

The defendant has been indicted no fewer than 16 times over the past two decades in districts across the United States—his first indictment in this district was in 2009, and a fifth superseding indictment against him was returned on February 15, 2024 (the "EDNY Indictment"). ECF. Nos. 1, 720.[1]

On July 25, 2024, the defendant was arrested at Santa Teresa Airport in Doña Ana County, New Mexico, and was subsequently presented and arraigned on a 2012 indictment pending in the neighboring Western District of Texas in El Paso (the "WDTX Indictment"). See United States v. Ismael Zambada García, No. 3:12-CR-849 (W.D. Tex.), ECF No. 1283-1287; PSR ¶ 106. On August 18, 2025, the defendant and the government consented to a transfer of the WDTX Indictment to this Court for sentencing. See United States v. Ismael Zambada García, No. 25-CR-262 (E.D.N.Y.), ECF No. 1.

On August 25, 2025, the defendant pleaded guilty, pursuant to a Plea Agreement, to Count One of the EDNY Indictment, which charged the defendant with committing a Continuing Criminal Enterprise ("CCE"), (including 85 alleged violations), ECF No. 720, and Count One of the WDTX Indictment, charging a racketeering conspiracy. PSR ¶ 89. In the Plea Agreement, the defendant stipulated that the amount of cocaine involved in the offense conduct and for which he is responsible is at least 1.5 million kilograms in addition to quantities of heroin and fentanyl. Plea Agreement ¶ 3. The defendant also agreed to the entry of a $15 billion forfeiture money judgment.

---

[1]     Other unsealed federal indictments and superseding indictments against the defendant have been pending in the District of Colombia since 2003 (Nos. 03-cr-34 and 03-cr-331 (D.D.C.)); the Northern District of Illinois since 2009 (No. 09-cr-383 (N.D. Ill.)); the Western District of Texas since 2012 (No. 12-cr-849 (W.D. Tex.)); the Southern District of California since 2014 (No. 14-cr-658 (S.D. Cal.)); and the Central District of California since 2015 (No. 15-cr-566 (C.D. Cal.)).

II.     Applicable Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007).

Although the Guidelines are no longer mandatory, they continue to play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." Booker, 543 U.S. at 252; see also United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. Molina-Martinez v. United States, 136 S. Ct. 1338, 1345-46 (2016) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in 18 U.S.C. § 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a).

In light of Booker, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. See Crosby, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112; see also United States v. Corsey, 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. See Crosby, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113.

5

III.   The Court Should Impose a Guidelines Sentence of Life Imprisonment and $15 Billion in Forfeiture

With respect to the applicable sentence, the government agrees with the Guidelines calculation set forth in the PSR, which yields a total offense level of 43, a Criminal History Category of I, and an applicable Guidelines sentence of life imprisonment. See PSR ¶¶ 172, 220. Moreover, because the defendant pleaded guilty to Count One in the EDNY indictment, charging a CCE, the statutory mandatory minimum sentence is life imprisonment because (1) the defendant was a "principal administrator, organizer, or leader" of the Cartel, and (2) the Cartel received more than $10 million in proceeds for its drug-trafficking operations in one year. PSR ¶ 219; see also 21 U.S.C. § 848(b).

Even if the Court had discretion to impose a sentence of less than life imprisonment, this Court should still impose a life sentence under the sentencing factors outlined in Section 3553(a). The nature and circumstances of the defendant's offenses cannot be overstated. Beyond the dangerousness of his narcotics trafficking, the defendant directly oversaw and ordered numerous acts of violence and murders carried out by Cartel members, and through his direction of the Cartel, the defendant has demonstrated a disregard for human life. The defendant committed some of the most serious crimes under federal law, crimes that warrant a lifetime behind bars. See 18 U.S.C. § 3553(a)(1)-(2). A life sentence is justified to protect the public from further crimes of the defendant, who has spent decades distributing lethal narcotics at an unfathomable scale—while at the same time directing violence and corruption to preserve the profits and success of the Cartel. Id. Drug kingpins like the defendant deserve a life sentence. Such a sentence is just punishment and will provide general deterrence to persons who lead drug trafficking organizations and who wrongly believe they are beyond the reach of the law. 18 U.S.C. § 3553(a)(2)(A)-(B). The government would respectfully request that the Court impose a sentence of life imprisonment even if the statute did not mandate such a sentence. A life sentence is also appropriate given that this Court sentenced Guzmán to life imprisonment plus 30 years.

Separately, the government submits that a forfeiture money judgement of $15 billion is appropriate here. At Guzmán's sentencing, the Court ordered him to pay $12.6 billion in forfeiture. That amount reflected criminal proceeds of the Cartel under the defendant and Guzmán's joint leadership. As noted at the plea hearing and in the plea agreement, the larger $15 billion Order sought in this case reflects the number jointly attributable to the defendant and Guzmán, as well as an additional amount for the defendant's subsequent leadership of the Cartel's continued criminal activities after Guzmán's capture. In the plea agreement, the defendant agreed that this amount is appropriate.

IV.   The Defendant's Request for Designation and Associated Health Conditions

In his sentencing memorandum, the defendant requests that the Court recommend designation to a Bureau of Prisons ("BOP") facility suitably equipped to address the defendant's alleged need for medical treatment, such as FMC Butner, FMC Rochester, and MCFP Springfield. ECF No. 12, Defendant's Sentencing Memorandum at 2. The government has no objection to the Court considering the defendant's medical conditions in fashioning a designation recommendation

but respectfully requests that the Court also consider including in any recommendation an acknowledgment of the serious ongoing security risks posed by the defendant.

As the Court is aware, 18 U.S.C. § 3621 requires that the Bureau of Prisons:

> shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons . . ."

As such, the Bureau of Prisons will undertake its own evaluation of the defendant, including his health conditions, to determine the appropriate place for confinement.

The defendant's request scantly mentions the serious security concerns posed by the defendant. The defendant is the co-founder of one of the world's most violent criminal organizations, and for decades directed its operations, including its violence. Moreover, many members of the Cartel remain loyal to the defendant, including one of the defendant's sons, who remains a key leader of the defendant's faction of the Cartel in the defendant's absence. There is therefore substantial cause for concern that, if permitted to do so, the defendant could continue to direct the Cartel from prison. For this reason, among others, the defendant has been detained to date pursuant to Special Administrative Measures. Those security concerns will continue for the foreseeable future because individuals loyal to the defendant continue to control the Cartel, which is also now designated by the Secretary of State as a Foreign Terrorist Organization.

Accordingly, the detention facilities favored by the defendant may not be appropriate for the security concerns posed by the defendant. At a minimum, the list proposed by the defendant is not an exhaustive list of appropriate facilities.

7

V.    Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of life imprisonment and a forfeiture money judgment of $15 billion.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/ Adam Amir
Francisco J. Navarro
Robert M. Pollack
Adam Amir
Rebecca M. Urquiola
Assistant United States Attorneys
(718) 254-7000

MARGARET A. MOESER, CHIEF
Money Laundering, Narcotics and Forfeiture
Section
Criminal Division
United States Department of Justice

By:    /s/
Jayce Born
Kirk Handrich
Trial Attorneys

OF COUNSEL
JASON A. REDING QUIÑONES
United States Attorney
Southern District of Florida

By:    /s/
Andrea Goldbarg
Monique Botero
Assistant United States Attorney

cc:    All counsel of record (by ECF)
       Clerk of Court (BMC) (by ECF)